UNITED STATES DISTRICT COURT NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| Howard J. Miller, individually, and on behalf of Maria Rhonita LeBaron, H.M. Jr., K.B.M., T.A.M. and T.G.M., and as the legal guardian of T.M., A.M., and Z.M.;<br>Tyler Edward Johnson, individually and on behalf of of Christina Marie Langford, and as the legal guardian of F.M.J., C.C.J., J.T.J., T.E.J., H.J.J. and E.D.J.;<br>Amelia Christine Sedgwick, individually and as the legal guardian of E.L.;<br>Elizabeth Ann Langford;<br>Serina Sharon Langford;<br>Issac Anson Langford;<br>Adrian LeBaron-Soto;<br>Bathsheba Shalom Tucker, individually and as the legal guardian of M.L.;<br>Laura Corina LeBaron;<br>Miguel LeBaron;<br>William LeBaron;<br>Javier LeBaron;<br>Dayer LeBaron;<br>Ruthila LeBaron;<br>Melissa Conklin;<br>Laura LeBaron;<br>Adriana Jones;<br>Rholena Lian Johnson;<br>Karen Woolley;<br>Jaremy Ryan Ray;<br>Kerah Ray;<br>Justin Michael Ray;<br>James Oliver Ray;<br>Jonathan Sean Ray;<br>Amber Ray;<br><br>Plaintiffs,<br><br>v. | Civil Action No.<br><br><br>**COMPLAINT** |

1

|  | ) |
|---|---|
| Juárez Cartel, a/k/a Vicente Carrillo | ) |
| Fuentes Organization ( a/k/a "CFO"), | ) |
| a/k/a La Línea | ) |
|  | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

Plaintiffs plead the following facts and legal claims:

## INTRODUCTION

On November 4, 2019, members of the Juárez Mexican drug cartel and its violent armed wing, La Línea ("The Line"), ambushed and murdered three women and six of their children in the Sierra Alta in Sonora, Mexico. In a series of coordinated assaults, the families came under attack approximately 70 miles south of the United States-Mexico border as they drove in a three-car convoy between the states of Sonora and Chihuahua. All victims killed or injured in the attacks are United States citizens.

Cartel assassins killed Maria Rhonita LeBaron ("Rhonita") and her four children – twelve-year-old H.M. Jr., ten-year-old K.B.M., and eight-month-old twins T.A.M. and T.G.M. Cartel assassins also killed Christina Langford ("Christina") and Dawna Ray ("Dawna") and her two children – eleven-year-old T.L. and two-year-old R.L.[1]

## PARTIES

**Plaintiffs**

1.      Howard J. Miller is the husband of Maria Rhonita LeBaron and the father of H.M. Jr., K.B.M., T.A.M., T.G.M., T.M., A.M. and Z.M. He is a dual United States and Mexican citizen residing and working in North Dakota.

---

[1] The Estates of Dawna Ray, T.L. and R.L. are not Plaintiffs in this action, nor are the claims of David Langford or his five children who were injured in the attacks.

2.      Howard and Rhonita were married on August 2, 2006. They lived together in North Dakota for the last eight years. In early 2019 after the death of his brother, Howard and Rhonita began to spend time in La Mora, Mexico to help Howard's family with their business. Howard continued to work and live in North Dakota, splitting his time between Mexico and North Dakota.

3.      Howard J. Miller brings this action individually and on behalf of Maria Rhonita LeBaron and their minor children.

4.      T.M. is a nine-year-old minor child. He is the child of Maria Rhonita LeBaron and Howard Miller and brother of H.M. Jr., K.B.M, T.A.M, and T.G.M. He is a dual United States and Mexican citizen residing in North Dakota.

5.      A.M. is a six-year-old minor child. She is the child of Maria Rhonita LeBaron and Howard Miller and sister of H.M. Jr., K.B.M, T.A.M, and T.G.M. She is a dual United States and Mexican citizen residing in North Dakota.

6.      Z.M. is a two-year-old minor child. He is the child of Maria Rhonita LeBaron and Howard Miller and brother of H.M. Jr., K.B.M, T.A.M, and T.G.M. He is a dual United States and Mexican citizen residing in North Dakota.

7.      Adrian LeBaron-Soto is the father of Maria Rhonita LeBaron. He is a Mexican citizen residing in Colonia LeBaron, Chihuahua, Mexico.

8.      Bathsheba Shalom Tucker (hereinafter "Shalom") is the mother of Maria Rhonita LeBaron. She is a dual United States and Mexican citizen residing in Chihuahua, Mexico.

9.      Adriana Jones is the sister of Maria Rhonita LeBaron and is a dual United States and Mexican citizen residing in Utah.

10.      Ruthila LeBaron is the sister of Maria Rhonita LeBaron. She is a dual United States and Mexican citizen residing in North Dakota.

11.    Melissa Conklin is the sister of Maria Rhonita LeBaron.  She is a dual United States and Mexican citizen residing in Colonia LeBaron, Chihuahua, Mexico.

12.    Laura Corina LeBaron is the sister of Maria Rhonita LeBaron.  She is a dual United States and Mexican citizen residing in Chihuahua, Mexico.

13.    Javier LeBaron is the brother of Maria Rhonita LeBaron.  He is a dual United States and Mexican citizen residing in Colorado.

14.    Miguel LeBaron is the brother of Maria Rhonita LeBaron.  He is a dual United States and Mexican citizen residing in Colorado.

15.    Dayer A. LeBaron is the brother of Maria Rhonita LeBaron.  He is a dual United States and Mexican citizen residing in Colorado.

16.    William A. LeBaron is the brother of Maria Rhonita LeBaron.  He is a dual United States and Mexican citizen residing in Colorado.

17.    M.L. is a sixteen-year-old minor child and the brother of Maria Rhonita LeBaron. He is a dual United States and Mexican citizen residing in Arizona.

18.    Rholena Lian Johnson is the sister of Maria Rhonita LeBaron.  She is a dual United States and Mexican citizen residing in Arizona.

19.    Tyler Edward Johnson is Christina Langford's common-law husband and father to their children: F.M.J., C.C.J., J.T.J., T.E.J., H.J.J. and E.D.J. He is a dual United States and Mexican citizen residing and working in North Dakota.

20.    Tyler Edward Johnson and Christina Marie Langford lived for all intents and purposes as husband and wife for thirteen years before Christina's murder.  They held a wedding ceremony at his mother's house in Mexico on February 14, 2007 and resided together as a couple in Texas and in other states throughout the United States.  They lived openly as a married couple,

introducing one another as husband and wife and filing joint tax returns as a married couple. They had six children together during their marriage. Christina was a stay-at-home mother raising their children while Tyler worked to provide for the family financially. The couple lived for many years in Williston, North Dakota, where Tyler worked. On November 4, 2019, Christina was driving from La Mora to Colonia LeBaron, Mexico to pick up Tyler to relocate once again to North Dakota. They had sold their home in Mexico and made arrangements for their family in North Dakota. Throughout the last several years, Tyler split his time between North Dakota, where he co-owned a business and worked, and La Mora, Mexico.

21.     Tyler Edward Johnson brings this action individually and on behalf of Christina Marie Langford and their minor children.

22.     F.M.J. is a one-year-old minor child. She is the child of Christina Langford and Tyler Johnson. She is a dual United States and Mexican citizen residing in North Dakota. She was in the vehicle during the attack. Several bullets penetrated her car seat, but she survived the attack.

23.     C.C.J. is a twelve-year-old minor child. She is the child of Christina Langford and Tyler Johnson. She is a dual United States and Mexican citizen residing in North Dakota.

24.     J.T.J. is a ten-year-old minor child. He is the child of Christina Langford and Tyler Johnson. He is a dual United States and Mexican citizen residing in North Dakota.

25.     T.E.J. is a seven-year-old minor child. He is the child of Christina Langford and Tyler Johnson. He is a dual United States and Mexican citizen residing in North Dakota.

26.     H.J.J. is a five-year-old minor child. He is the child of Christina Langford and Tyler Johnson. He is a dual United States and Mexican citizen residing in North Dakota.

27.     E.D.J. is a three-year-old minor child.  He is the child of Christina Langford and Tyler Johnson.  He is a dual United States and Mexican citizen residing in North Dakota.

28.     Amelia Christine Sedgwick is the mother of Christina Langford.  She is a dual United States and Mexican citizen residing in Mexico.

29.     Elizabeth Ann Langford is the sister of Christina Langford.  She is a dual United States and Mexican citizen residing in North Dakota.

30.     Serena Sharon Langford is the sister of Christina Langford.  She is a dual United States and Mexican citizen residing in North Dakota.

31.     E.L. is a twelve-year-old minor child and the sister of Christina Langford.  She is a dual United States and Mexican citizen residing in North Dakota.

32.     Isaac Anson Langford is the brother of Christina Langford.  He is a dual United States and Mexican citizen residing in North Dakota.

33.     Karen Wooley is the mother of Dawna Ray.  She is a dual United States and Mexican citizen residing in Utah.

34.     Jaremy Ryan Ray is the brother of Dawna Ray.  He is a dual United States and Mexican citizen residing in Mexico.

35.     Kerah Ray is the sister of Dawna Ray.  She is a dual United States and Mexican citizen residing in Mexico.

36.     Justin Michael Ray is the brother of Dawna Ray.  He is a dual United States and Mexican citizen residing in Texas.

37.     James Oliver Ray is the brother of Dawna Ray.  He is a dual United States and Mexican citizen residing in Utah.

38.     Jonathan Sean Ray is the brother of Dawna Ray.  He is a dual United States and Mexican citizen residing in Utah.

39.     Amber Ray is the sister of Dawna Ray.  She is a dual United States and Mexican citizen residing in Mexico.

**Defendant**

40.     The Juárez Cartel (hereinafter referred to as the "Cartel"), also known as the Vicente Carrillo Fuentes Organization ("CFO"), is one of Mexico's oldest and most infamous criminal organizations.  The Cartel's origins date back to the 1980s.

41.     The Juárez Cartel has engaged in a decades-long battle to influence the actions of the Mexican government and to terrorize and intimidate the civilian population.  Currently, the Cartel operates across north-central Mexico with its activities concentrated in the state of Chihuahua and surrounding areas, especially in Ciudad Juárez and the Valle de Juárez, an extremely lucrative corridor for illegal drugs entering the United States.  Between 2008 and 2019, more than 26,000 people were murdered in the state of Chihuahua, according to Mexican police records.  Many of these murders are attributed to the Juárez Cartel or rival cartels with whom they are in conflict.

42.     The violent armed wing inside the Juárez Cartel is known as La Línea.  La Línea has violently attacked civilians, public officials and rival cartels.  The group's attacks on civilians are designed to intimidate and coerce members of the public from speaking out and acting against the Cartel.  Members of the LeBaron family of Chihuahua, including Julian LeBaron, have been vocal, public critics of the Juárez Cartel and they have staged anti-cartel marches and demonstrations.  They have protested civilian mistreatment by the cartels at the highest levels of the Mexican government.  Moreover, the LeBaron family has criticized government corruption

and negligence in stopping cartel criminality and violence. As a result of this activism and public exposure, two members of the extended LeBaron family have been kidnapped and murdered by Juárez Cartel members. The LeBarons formed an anti-crime protest movement known as "SOS Chihuahua." Thus, the LeBarons have become symbols of Mormon resistance to the Cartel. Consequently, the Cartel views Mormons in Chihuahua and its environs as their opponents.

43.    On June 1, 2000, the President of the United States designated Vicente Carrillo Fuentes as a significant foreign narcotics trafficker under the Foreign Narcotics Kingpin Designation Act (the "Kingpin Act").[2] On June 1, 2004, the Vicente Carrillo Fuentes Organization (a/k/a CFO; a/k/a Juárez Cartel) was added to the Foreign Narcotics Kingpin Designation Act.[3] The Office of Foreign Assets Control, "OFAC," added the Juárez Cartel to its Specially Designated Nationals List as significant foreign traffickers.[4] The Cartel has remained a designated foreign narcotics trafficker under the Kingpin Act each year since 2000. Under the Act, kingpin property owned or controlled within U.S. jurisdictions are blocked, including assets of any foreign person or entity designated by the U.S. Treasury Department for materially assisting or supporting the kingpin.

---

[2] U.S. Dep't of State, Presidential Designation of Foreign Narcotics Kingpins, June 1, 2004, available at: https://2001-2009.state.gov/p/inl/rls/prsrl/ps/33038.htm
[3] U.S. Dep't of the Treasury, Recent OFAC Actions, June 1, 2004, available at: https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20040601.aspx
[4] *Id.*

## JURISDICTION AND VENUE

44.     Jurisdiction exists under 28 U.S.C. §1331 for this civil action arising under the laws of the United States.

45.     Jurisdiction also arises and under 28 U.S.C. §1332(a)(2) for this civil action between citizens of a State and citizens or subjects of a foreign state where the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

46.     Venue is both proper and convenient in this District under 28 U.S.C. §1391(b).

## FACTUAL ALLEGATIONS

47.     Various governments have drawn links between the actions of narcotics traffickers and those of terrorist organizations since at least the early 1980s. The phrase "narco terrorism" is attributed to Peruvian President Fernando Belaunde Terry in 1982.  When gunmen attacked a police station in rural Peru, he blamed guerrillas who he said worked with drug traffickers. It was an act of "narco terrorism," he said, "the union of the vice of narcotics with the violence of terrorism."[5]

48.     The concept of "narco terrorism" or drug traffickers engaged in terrorist actions, gained traction in neighboring Colombia in the 1980s and 1990s. In Colombia, there were three distinct forces: insurgent guerrilla organizations including the Revolutionary Armed Forces of Colombia or FARC that became heavily involved with drug trafficking; drug traffickers such as those in the Medellin Cartel employing terroristic tactics; and paramilitary groups, who banded together and were heavily involved in drug trafficking.

---

[5] https://www.upi.com/Archives/1982/03/09/Police-station-attacked-near-site-of-Peru-prison-break/2901384498000/.

9

49.     All three of these forces in Colombia, the guerrillas, drug traffickers and paramilitaries, engaged in significant business with Mexican cartels, working with them to traffic cocaine. There is also evidence that these Colombian groups shared their terrorist techniques, including car-bombing technology, with the Mexican cartels.

50.     Domestic and international pressure on Colombian guerrillas and drug traffickers greatly diminished their effectiveness and international operations. Mexican drug cartels, armed with new terrorist techniques became stronger, filling the void left by the Colombians and gaining a larger share of the cocaine profits as well as the smuggling other drugs to the United States.

## I.     History of the Juárez Cartel and La Línea

51.     During the 1980s, those Mexican drug traffickers including Miguel Angel Felix-Gallardo, also known as "El Padrino" ("the Godfather"), rose to dominate Mexico's illegal drug trade and establish the Guadalajara Cartel. They engaged in extraordinary acts of violence directed at civilians, Mexican authorities and U.S. law enforcement agencies. In 1985, members of the Guadalajara Cartel ordered the kidnapping, rape, torture and murder of Drug Enforcement Agency agent Enrique "Kiki" Camarena. In a symbolic act which has become all too common among narco-terrorists, agent Camarena was found badly beaten in a staged position in boxer shorts, his hands and legs bound with a stick forced into his rectum.[6] Felix-Gallardo was found guilty of the DEA agent's murder and sentenced to 37 years in a Mexican prison.[7] Unable to effectively direct the cartel from prison, Felix-Gallardo relinquished control over the cartel's lucrative drug corridors to the U.S. known as "*plazas*" to his extended family and associates. Joaquín Guzmán Loera, also known as "El Chapo," and his partner, Ismael "El Mayo" Zambada, eventually assumed control

---

[6] Ioan Grillo, El Narco: Inside Mexico's Criminal Insurgency, pg. 67 (2011); citing generally, Elaine Shannon, Desperados (1988).
[7] "Mexican court nixes 70-year-old capo's plea for house arrest," Associated Press, February 20, 2019 available at https://apnews.com/53b4662db8464621b69f16ee93f1603a

of the Baja California and Sonora corridor operating as the Sinaloa Cartel. The state of Chihuahua was taken over by Rafael Aguilar Guajardo, whose operations would become the Juárez Cartel. In 1993. Guajardo was murdered and Amado Carrillo Fuentes took control of the cartel.

52.    Amado Carrillo Fuentes, who would become known as "El Señor de Los Cielos" ("The Lord of the Skies") and his younger brothers Vicente and Rodolfo, significantly expanded the Juárez Cartel's drug trafficking operations in the 1990s. Under the direction of Carrillo Fuentes, the Cartel's illicit enterprise grew exponentially to include international drug trafficking, kidnapping, human trafficking, and money laundering.[8] Known for using a fleet of aircraft, the Juárez Cartel transported drugs directly from drug producers in Central and South American to Mexico. From Mexico, the Cartel moved the drugs to the U.S. Importantly, the Juárez Cartel, under the leadership of Carrillo Fuentes, continued to engage in political assassinations and intimidation of civilians and local public officials.

53.    In 1997, Amado suddenly died during plastic surgery. Vicente, who is known as "El Viceroy," his brother Rodolfo, who was known as "El Niño do Oro" ("Golden Child"), and their nephew Vicente Carrillo Leyva assumed control of the cartel.

54.    Sometime in the 1990s or early 2000s, the Juárez and Sinaloa cartels established working alliances, which included financial partnerships in drug shipments, sharing transportation resources, and the leverage of corrupt officials. In June 2000, the U.S. designated Vicente Carrillo Fuentes a "kingpin" under the Foreign Drug Kingpin Designation Act, along with eleven other

---

[8] https://www.insightcrime.org/mexico-organized-crime-news/Juarez-cartel-profile/

11

cartel leaders.[9]  On June 1, 2004, the Vicente Carrillo Fuentes Organization (a/k/a CFO; a/k/a Juárez Cartel) was added to the Foreign Narcotics Kingpin Designation Act.[10]

55.     The partnership between the Sinaloa and Juárez cartels fractured in 2004 after Rodolfo killed several of Guzmán's Sinaloa associates.  Guzmán demanded retaliation, and Rodolfo was murdered with his wife as they walked out of a movie theater in September 2004. Guzmán's brother, Arturo, was killed a few months later while in prison.  The killings would mark the beginning of an increasingly violent, decades-long war between the cartels.

56.     While the catalyst for the Sinaloa and Juárez cartels' war was personal, the violent struggle between the organizations grew and centered on the control of the lucrative *plazas* and drug trafficking infrastructure in Sonora and Chihuahua, and particularly the Juárez Valley and Ciudad Juárez, and the border between Sonora and Chihuahua.  Both cartels recruited additional forces employing corrupt police officers, former members of the military and local gangs.  Some of the Sinaloa Cartel's mercenaries became known as the Gente Nueva ("New People").  The Juárez Cartel recruited Mexican police officers, military personnel and federal armed forces to join its violent armed wings.  The Juárez Cartel also aligned with a U.S.-based gang, Barrio Azteca in El Paso, Texas, among other U.S. cities.  The partnership with Barrio Azteca provided the Juárez Cartel with additional forces to conduct violent attacks.  The Mexican cartels' violence left hundreds of thousands dead, many of whom were innocent civilians.

57.     Between 2007 and 2019, there were more than 277,000 murders in Mexico according to police reports.  In various years, the Mexican government has estimated that more

---

[9] Dep't of Treasury, *Specially Designated Nationals and Blocked Persons List,* The Office of Assets Control at p. 305, 614 (last updated March 12, 2020); *see also* Dep't of Treasury, *Sanctions Pursuant to the Foreign Narcotics Kingpin Designation Act,* The Office of Foreign Assets Control at p. 1 (last updated June 11, 2019).
[10] U.S. Dep't of State, Presidential Designation of Foreign Narcotics Kingpins, June 1, 2004, available at: https://2001-2009.state.gov/p/inl/rls/prsrl/ps/33038.htm

than two-thirds of these homicides were committed by cartels. In response to such attacks Mexican prosecutors have used terrorist criminal charges against cartel operatives on various occasions over the last decade.[11]

58.     In 1997 and again in 2000, a Texas grand jury indicted Vicente Carrillo Fuentes for several crimes, including murder, drug trafficking, and money laundering. Mexican authorities eventually arrested Vicente Carrillo Fuentes on October 9, 2014, in Torreon, Coahuila. Since Vicente Carrillo Fuentes' arrest, a succession of senior members of La Línea and affiliates have led the Juárez Cartel. Recently, the Cartel has begun using the name the New Juárez Cartel.

59.     The Juárez Cartel has developed into an increasingly sophisticated armed group with guerilla and paramilitary capabilities. The group includes former members of the Mexican military and police. The Juárez Cartel equips its members with body armor and helmets and their weapons includes fully automatic machine guns, 50 caliber rifles, as well as car bombs and other improvised explosive devices.

60.     In addition to eliminating rivals, the Juárez Cartel and its affiliates use violence to intimidate and coerce the civilian population and to influence the policy of the Mexican government. These violent acts include mass killings. Many of these killings include grotesque acts of violence and intimidation such as rape, torture, decapitation and mutilation.[12] The Juárez Cartel has bombed police and military targets, kidnapped and assassinated political figures, journalists, criminal justice activists, religious figures, doctors and innocent civilians to protect and strengthen its power, its territory, and its illegal activities. In many instances, the Juárez Cartel

---

[11] Among those charged were operatives who seized trucks and left them burning to block roads while cartel operatives shot down a military helicopter with a rocket-propelled grenade in 2015.

[12] H Campbell and T Hansen, "Is Narco-Violence in Mexico Terrorism?" 33, No. 2 Bulletin of Latin Am Research, 158, 159 (2014).

places corpses in public places, hanging them from bridges and buildings and displaying the bodies in theatrical poses.[13]   They also burn vehicles after assassinations.   Mexican authorities have labeled the Cartel's use of violent tactics as "social terrorism."   Many other experts have described the acts as "Narco-Terrorism."[14]

61.     These brutal attacks far exceed the simple murder of an individual or even a group. The attacks are carried out for dramatic, symbolic, and horrific effects intending to intimidate and provoke fear.  These acts have:

> Political ends rather than simply an individual expression of psychopathology: it is planned and organized, not simply spontaneous and random; it is revenge and retribution-oriented act of violence that responds to perceived social inequality, trauma, abuse, marginalisation, frustration and humiliation; it is dramatic and spectacular and designed to seek publicity, renown, celebrity, recognition, and reaction; and it is violence committed primarily by young males, many of whom are poor and socially deprived (although those ordering narco-terrorism do not necessarily share those characteristics); it is violence that transforms society and instills fear, chaos, alarmism and governmental response.[15]

62.     Examples of attacks conducted by the Juárez Cartel and its affiliates demonstrate their terrorist tactics and methods:

63.     In July 2010, the armed wing of the Juárez Cartel, La Línea, conducted a sinister car bombing plot targeting the Ciudad Juárez first responders and civilians.  Dressing a wounded, innocent man in a police uniform, La Línea members lured first responders to the scene before detonating the device.  The car bomb killed four people, including the wounded man, a doctor, an innocent bystander, and a policeman.  Twenty others were injured.  Authorities believed twenty pounds of plastic explosives packed with 3-inch drywall nails as shrapnel were used.  U.S.

---

[13] *Id.*
[14] *Id.*
[15] *Id* at 162.

14

authorities described La Línea's car bombing as similar to "… terror tactics generally seen in Iraq and Afghanistan – mass video-recorded decapitations, targeting of civilians, and most recently the July 15 VBIED [vehicle-borne improvised explosive device or car bomb] – to instill fear among rivals, law enforcement and the general public."[16] La Línea graffiti found near the scene threatened future bombings: "we still have car bombs."

64.     In the same month, La Línea assassinated the deputy attorney general for the Mexican state of Chihuahua, prosecutor Sandra Ivonne Salas Garcia.

65.     On January 31, 2010, gunmen from the Juárez Cartel's elite assassination squad, Los Linces ("The Lynxes") and Juárez Cartel's other armed wing Barrio Azteca indiscriminately massacred victims celebrating at a Juárez neighborhood birthday party. The attack killed sixteen and wounded twenty. Most of the victims were teenagers, and none of the victims were known to be associated with cartels or drug gangs. The attackers, who arrived in a convoy of seven trucks, closed off surrounding streets before entering the party.

66.     Before the birthday party massacre, Los Linces previously attacked and assassinated Mexican political officials.

67.     The elite hit squad is behind the February 22, 2009, attack against then-Chihuahua Governor Jose Reyes Baeza Terrazas, which killed one of his bodyguards and injured others. According to Mexican authorities, one of the assailants captured after the assault was a former military officer suspected of being a member of Los Linces. A similar attack occurred in February 2020 which wounded two bodyguards of the current Governor Javier Corral.

---

[16] "Mexican Drug Cartels' New Weapon in Border War – The Car Bomb; US authorities warn of potential 'American casualties' after blast near El Paso," ABC News, August 12, 2010, available at https://abcnews.go.com/Blotter/mexican-drug-cartels-weapon-border-war-car-bomb/story?id=11383665

68.     Officials say Los Linces also killed Pedro Aragonez on August 11, 2009. Aragonez was the forensic science director of the Chihuahua state Attorney General's office. At the time of his death, Aragonez was investigating links between state police agents and scores of gangland killings.

69.     Los Linces assassinated former Aquiles Serdán, Chihuahua mayor Leonel Roberto Carrillo Márquez on November 28, 2008. Assassins shot Carrillo Márquez in the face and dumped his body, along with two others, near a racetrack.

70.     The Juárez Cartel has targeted Americans as well as Mexican citizens. On March 13, 2010, assassins from the Juárez Cartel's Barrio Azteca armed wing murdered U.S. consulate employee Lesley Enriquez Redelfs and her husband Arthur Redelfs, who was an El Paso County Sheriff's Detention Officer. Moments later that same day, Barrio Azteca hitmen assassinated Jorge Alberto Salcido Ceniceros, who was the husband of U.S. Consulate employee Hilda Edith Antillon Jimenez. The Cartel carried out these attacks in broad daylight, targeting these officials while they attended a children's birthday party in Juárez sponsored by the U.S. Consulate. Barrio Azteca members surrounded the Redelfs in their vehicle near the Paso Del Norte Bridge in Juárez, Mexico, and repeatedly fired into the car. Lesley Enriquez Redelfs was pregnant at the time of her killing and her seven-month-old daughter was in the back seat. Salcido was killed in a separate shooting minutes later.

71.     On June 30, 2010, Sandra Ivonne Salas Garcia, a state internal affairs prosecutor in Chihuahua State, was slain in a roadside attack that also killed one of her bodyguards. Cristian "El Cris" Rosado Mendoza, who identified himself as a member of La Línea, admitted to the killing. Rosado explained that La Línea leaders ordered Salas' execution because of her investigations into cartel members.

72.    In 2012, Jose Antonio Acosta-Hernandez, also known as "El Diego," was extradited to the U.S. to face charges related to crimes committed by the Juárez Cartel and Barrio Azteca. Acosta-Hernandez pled guilty to directing or participating in over 1,500 murders since 2008, including the birthday massacre of teenagers in January 2010 and the assassinations of the Redelfs and Salcido in March 2010. Acosta-Hernandez admitted leading the armed enforcement wing of the Juárez Cartel, La Línea, and directing the alliance with Barrio Azteca. At his sentencing, U.S. prosecutors stated, "[a]s the leader of La Línea's enforcement wing, Mr. Acosta-Hernandez directed a reign of terror." DEA officials described Acosta-Hernandez as "a cold-blooded murderer with no respect for human life or the rule of law."[17]  Acosta-Hernandez is serving seven concurrent life terms, three additional consecutive life terms, and 20 years in U.S. federal prison.

73.    To further their illegal drug trafficking and extortion, the Juárez Cartel seizes functions of the local and state government through corruption, intimidation, and violence. As a non-state actor, the Cartel dictates policy favorable to its illegal activities and exercise its control. The Cartel influences personnel decisions, movement of non-federal police, deciding and granting individual businesses the right to operate and imposing taxes on those businesses and select citizens.[18] "Cartel terrorism...is not 'just business' but is the use of violence to intimidate, destroy and terrorize opponents – be they representatives of the government, rival cartels or the general public."[19]

---

[17] "Juárez Drug Cartel Leader Pleads Guilty to Charges Related to U.S. Consulate Murders and Is Sentenced to Life in Prison; Defendant Admits to Directing or Participating in More than 1,500 Murders since 2008," U.S. Department of Justice, April 5, 2012, available at https://www.justice.gov/opa/pr/juarez-drug-cartel-leader-pleads-guilty-charges-related-us-consulate-murders-and-sentenced

[18] *Id.*

[19] *Id.*

74.     The Juárez Cartel has also engaged in an aggressive propaganda campaign.  For the Juárez Cartel, "this is not only a violent struggle for control of drug markets, but it is a struggle to control the hearts and minds of people."[20]  The Juárez Cartel used a campaign of YouTube videos, narco-blogs, pro-cartel musical ballads and the placement of intimidating signs and banners to threaten local government leaders, claiming they are the legitimate leaders of the community.

75.     The Mexican Department of Public Security labels areas controlled by cartels as zones of impunity.  In 2008, 2,204 zones of impunity existed in Mexico.[21]  Experts say their number has increased in the years since.  Within these zones, cartels act as an effective shadow government – imposing taxes, extorting businesses, trafficking drugs, and terrorizing the civilian population without restriction.  "Cartel bosses, often linked to political insiders, become de facto political and economic bosses of these impunity zones."[22]  The Juárez Cartel had long been actively engaged in this activity including in the weeks and days before the November 4, 2019 killings.  On November 3, 2019, The Juárez Cartel attacked a faction of the rival Sonora Cartel in Agua Prieta, Sonora, Mexico, a drug *plaza* on the Arizona/Mexico border – unconcerned about governmental interference.

76.     The Juárez Cartel's acts of terror are consistent with the attacks against the Miller, Johnson, Langford and LeBaron families.  According to General Homero Mendoza, Chief of Staff for Mexico's Secretary of Defense, La Línea reacted to the threat posed by the Sinaloa Cartel's Los Salazar faction in Chihuahua by assassinating Christina, Rhonita and Dawna and their children and instilling fear in the community.  The killings demonstrate both La Línea's control of the highway crossing from Sonora into Chihuahua and their intolerance for any perceived connection

---

[20] Testimony of Howard Campbell, Hearing on U.S.-Mexico Border Violence Commission on Foreign Relations, U.S. Senate, 111 Congress, First Session (March 30, 2009).
[21] *Id.* at 163.
[22] *Id.*

to the Salazar faction.  The fear caused by La Línea's attack on Plaintiffs establishes control over this vital drug smuggling route and forces the public to surrender to the powerful cartel's illegal activities.

77.     The Juárez Cartel has engaged in a decades-long effort to maintain a state of terror and unrest throughout Chihuahua and parts of Sonora.  The goal of their campaign of terror has been to paralyze, intimidate, and threaten the Mexican government, local police, prosecutors, and the civilian population.  Evidence of the Cartel's effectiveness to influence Mexican government policy is visible in the Cartel's unrestricted drug trade, its extortion of the civilian population, its establishment of illegal check points on certain roads, its control of *plazas*, and its ability to act indiscriminately and without concern for local laws or interference of any sort.  The Cartel's influence is evident in its brazen attempts to intimidate these victims' families from speaking out against these violent attacks.

78.     The sheer number of the killings committed by all of Mexico's criminal cartels demonstrates their ability to act with impunity.  The Juárez and Sinaloa cartels have collectively murdered approximately 10,000 individuals in and near Ciudad Juárez alone from 2008 through 2012.[23]

**II.     The La Mora Attacks**

79.     In the last week of October 2019, approximately one hundred (100) men were directed to a ranch owned by a member of the La Línea section of the Juárez cartel.[24]  Present at the meeting were two former members of the Sonora cartel who had defected to La Línea in mid-

---

[23] *Id.*
[24] FBI 302 of Confidential Witness A dated December 20, 2019, p. 3.  Confidential Witness A ("CW-A") is a member of the Juárez Cartel and La Línea who attended planning meetings and participated in the attacks in Agua Prieta, in Sonora, Mexico on November 3, 2019.

2019.[25]   At the ranch, the men were told that they were planning an attack on Sonora cartel members in Agua Prieta. "[T]he purpose of the attack [...] in Agua Prieta was [...] to gain some level of control over the Agua Prieta plaza" for La Línea and the Juárez cartel.[26]  "The 100 men were divided into two groups – one group of approximately 60... and a second group of approximately 40..."[27]

80.     On Sunday, November 3, 2019, the forty (40) men left the ranch at approximately 5:00 pm in four vehicles.[28]  They were carrying AK-47's, AR-15's, and extra magazines of .223 caliber ammunition.[29]  The men were dressed in civilian clothes and some wore helmets.[30]  They were divided into two groups to travel to the staging area in the mountains intersecting San Miguel to La Mora in Chihuahua, Mexico and to ambush any vehicles, civilian or otherwise on these roads.[31]

81.     The other sixty (60) militants left the ranch around 8:00 p.m. on Sunday, November 3, 2019—three hours after the first group departed.[32]  These men were ordered into Agua Prieta, Sonora, to burn cars, open fire in the streets, fight local cartel members, and attempt to take control of the *plaza*.[33]  On the evening of November 3rd, a large convoy of cartel soldiers was seen heading

---

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*at 4.
[29] *Id.*
[30] *Id.*
[31] Witness Statement of Confidential Witness B to the Office of the Asst. Prosecutor for the Investigation of Organized Crime in Mexico, pg. 7 (November 22, 2019).  Confidential Witness B ("CW-B") is a member of the Juárez Cartel and was present at the killing of Maria Rhonita LeBaron and her children.  He has cooperated with the Mexican authorities and given a witness statement and physical evidence to the authorities in the presence of his counsel.
[32] FBI 302 of CW-A at p. 4.
[33] Witness Statement of CW-B, pg. 9.

through the village of Pancho Villa toward Agua Prieta.  Very early in the morning on November 4, 2019 the group reached Agua Prieta, fired upon three houses and set two of them on fire.[34]

82.     On the morning of Monday, November 4, 2019, mothers Maria Rhonita LeBaron, Christina Langford, Dawna Ray and their children formed a three-car caravan in La Mora, Sonora, Mexico for their travel to the United States and Colonia LeBaron, Chihuahua, Mexico.

83.     Maria Rhonita LeBaron and her four children were traveling to Phoenix, Arizona to pick up her husband, Howard Miller, at the airport.  Howard had finished a month of work in the oil fields of North Dakota and was traveling to Arizona to reunite with his wife and children. They planned to return to La Mora after spending a few days together shopping and enjoying Phoenix.

84.     Christina Langford planned to accompany Rhonita to the main highway and then head to Colonia LeBaron in Chihuahua, Mexico to meet her husband Tyler and their five children. Christina and Tyler planned to leave Colonia LeBaron the next day and begin their family's permanent move back to North Dakota.

85.     Dawna Ray also planned to accompany Rhonita to the main highway and then split off to attend the wedding of family member Kendra Miller in Colonia LeBaron in Chihuahua.

86.     The planned route was used frequently by the families.

87.     In the first vehicle, a white 2014 Chevrolet Suburban LT was Christina Langford and her seven-month-old infant F.M.J.

88.     In the second vehicle, also a white Chevrolet Suburban, was Dawna Ray and nine of her children – D.L., T.L., L.L., K.L., M.L., C.L., X.L., B.L., and J.L.

---

[34] FBI 302 of Confidential Witness A, at p. 5.

89.     And in the third car, a black Chevrolet Suburban, was Maria Rhonita LeBaron and four of her children – H.M. Jr., K.B.M, T.A.M, and T.G.M.

90.     On the morning of November 4, 2019, La Línea members took control of the road between San Miguel and Ejido Pancho Villa, as instructed, by establishing two outposts in the hills above. Fourteen kilometers separated the outposts from one another.

91.     Soon after departing La Mora, the bearing on Rhonita's front passenger wheel failed. After examining the vehicle and determining it could not be driven, Christina and Dawna helped Rhonita and her children exit the broken-down vehicle and Dawna drove Rhonita back to La Mora. The cell phone tower was not operating that morning. Christina continued with her trip to Colonia LeBaron.



92.     The distance from the broken-down vehicle to the location of the first hit team perched in the hills was approximately 1.25 kilometers.  The hit team saw, through binoculars, the three SUVs from their hiding spot in the hills.[35]

93.     After dropping Rhonita and her children off at her mother-in-law's home in La Mora, Dawna left again for Chihuahua.

94.     Upon returning to La Mora, Rhonita asked to borrow her mother-in-law's white Chevrolet Suburban and asked her brother-in-law, Andre Miller, to meet her at the broken-down vehicle to help transfer her belongings to the new vehicle.  After her mother-in-law agreed to loan her the car and Andre agreed to help with the transfer, Rhonita then returned to the broken-down vehicle to collect her belongings.  Andre went to pick up a trailer and find someone who could help him tow the broken-down vehicle back to town.  Andre never saw Rhonita and her children again.

95.     Approximately twenty (20) minutes later, Dawna returned to the scene of the broken-down black Suburban and drove on.  The first La Línea hit team allowed Christina's and Dawna's vehicles to pass, knowing a second hit team was lying in wait further down the road.[36]

96.     Approximately twenty-five (25) minutes after restarting her trip, Rhonita reached her broken-down vehicle and stopped to transfer belongings between cars.  She decided not to wait for Andre to assist her and she moved the two car seats, their luggage and her other belongings from one vehicle to the other.  Once repacked, Rhonita rushed to catch up with Christina and Dawna.

---

[35] Witness Statement of CW-B, at pg. 5.  *See also,* Application for Arrest Warrant for Sergio Valenzuela Palacios, at pg. 33, January 27, 2020.
[36] Witness Statement of CW-B, at pg. 8

97.    H.M. Jr. was in the front seat with his mom, twins T.A.M. and T.G.M. were in the middle row, and K.B.M. was in the third row.

98.    A few minutes up the road, Rhonita's vehicle came under heavy gunfire from the first hit team.  For at least ten (10) minutes, assailants repeatedly fired automatic and belt-fed machine gun rounds into this Suburban.

99.    The ambush did not immediately take the lives of Rhonita and her children. Evidence shows that H.M. Jr. tried to escape the vehicle.  His car door was found open and his legs hung outside of the passenger side door.  During the shooting, assailants approached the vehicle and bullet casings were found around the vehicle.

100.    A member of the Juárez Cartel videotaped part of the assault.  On the video, cartel members can be seen approaching the vehicle.  One of the *sicarios* stated, "they're going to finish it off dude...."  "They're still there...."  Another voice states "shoot him, don't trust...", "**burn it....**"  Near the end of the recoding, in the background, a *sicario* says, "it's in ruins now."[37]



[37] Technical Report of National Planning Center of Analysis and Information for the Fight against Crime, Attorney General of the Republic of Mexico, File VID_20191104_103539, p 119.

101.     Roughly 14 kilometers away and at approximately the same time as the attack on Rhonita and her children, the vehicles carrying Christina and Dawna also came under heavy gunfire.

102.     Attackers shot at Christina's vehicle from a hill above.  Bullets entered her vehicle from a downward diagonal angle.



103.     After taking gunfire and being shot in the hip, Christina exited her vehicle with her hands in the air to show the attackers that she was an unarmed and harmless woman.  The gunmen continued to fire, shooting her in the chest and murdering her.  Seven-month-old baby F.M.J. was in her car seat in the back seat.  Bullets penetrated her car seat.  Fortunately, none of the shots hit her.

104.     Shortly after the attack on Christina began, Dawna arrived on the scene and saw Christina outside of her vehicle.  Dawna tried to exit her vehicle but was shot at.  She got back into the Suburban but could not restart the car after it suffered heavy gunfire.  Knowing she was trapped and under unceasing attack, Dawna told her children to "get down right now.  She was trying to

pray to the Lord."[38] K.L., aged fourteen, and R.L., aged two-years old, were in the front row with Dawna. D.L. (thirteen years old) and T.L. (eleven years old) were in the second row with B.L. (eight-months old). X.L. (four years old), M.L. (nine years old), and C.L. (eight years old) are believed to have been in the third row. T.L. jumped into the second row to move B.L.'s car seat onto the floor when the attack began.

105.    Approximately fifteen gunmen fired directly into Dawna's vehicle. The attackers shot into the vehicle from the front and the ridge above, killing Dawna and her eleven-year old son T.L., and two-year old son R.L. T.L. was found in the middle of the second row curled in a fetal position. He was shot through the head and shoulders. Dawna was slouched over the steering wheel, shot thirteen times, twice in the head and eleven times throughout her body. R.L. was found dead on the passenger floorboard with two-to-three bullet holes. According to the surviving Langford children, the attackers wore masks, used long guns and fired many bullets. "They just started hitting the car at first with a bunch of bullets. Just started shooting rapidly at us," said D.L.[39] Authorities found over two hundred shell casings at the scene of Christina and Dawna's murders.

106.    Before leaving the attack, the gunmen "got us out of the car and they just got us on the floor and they just drove off."[40]

107.    After the attackers left, "we walked a little while until we couldn't carry [the younger children] anymore."[41] The children decided that thirteen-year-old D.L. should walk for help because he had not been shot. D.L. hid his six other surviving brothers and sisters in a bush

---

[38] Interview of D.L., ABC News, November 11, 2019. https://abcnews.go.com/International/teen-survivor-recalls-horrifying-details-ambush-mexico-killed/story?id=66893436
[39] Id.
[40] Id.
[41] Id.

about fifty (50) meters from the Suburban, where his mother's, two brothers' and his aunt's dead bodies lay.

108.    D.L. left his siblings and began to follow a slope towards his house.  After walking twelve kilometers, D.L. climbed to the top of a ridge, afraid he was being followed or shot at.  He hid for an additional hour before continuing his trek home.  D.L. walked approximately 22 kilometers back to La Mora where he informed his family of the attack and the need for help for his injured siblings.

109.    At approximately 10:30 a.m., Andre returned to Rhonita's broken-down Suburban to load it onto the trailer.  Rhonita had already moved the car seats and luggage and left before Andre arrived.  After five minutes, Andre noticed smoke to the east of the road, but kept working on the vehicle.  Two minutes later, he turned to where he saw the smoke and noticed a little flame, so he kept his eye on the area for about five minutes before hearing an explosion.  A massive fire erupted.  Andre recorded the fire on his phone.  In the video Andre remarks, "Someone's truck is burning… it barely started.  Someone just blew up their truck."  Worried that the truck that "just blew up" might be Rhonita's, Andre went to investigate the fire.  At the scene, the fire engulfed the Suburban but Andre recognized the license plate as his mother's.  Andre further saw bullet shells on the ground, and that the vehicle was full of bullet holes.  Because the fire was so intense and because the front passenger-side door was open, Andre could not tell if Rhonita and the kids were inside or had been kidnapped.

110.    Andre walked over a small hill near the burning vehicle and saw three people dressed in all black and wearing military helmets walking east on the road that leads to Chihuahua.

111.    Terrified, Andre unhooked the trailer from his vehicle and immediately drove back toward La Mora.  He was unable to make any calls because cell phone service was out.

112.    After arriving back in La Mora, Andre Miller went to his parents' home to tell them what he saw.  He spoke to his mother and then went to find his father, Kenny Miller, at an uncle's house.

113.    After hearing the news from Andre, the senior Miller family members used their connections to call the police from neighboring towns to help them go up to the location of the burning Suburban.  Calls were made by the police chief of Bavispe to state and federal police forces.

114.    With the cell phone towers not working, the families used Wi-Fi connections and a satellite phone to communicate.  Family members sent numerous messages about the attacks via the families' WhatsApp messenger chat group.

115.    Andre, Kenny, and other Miller family members in La Mora went to the area where the Suburban Rhonita was driving was on fire.  After they saw that there was nothing they could do to help anyone in the vehicle, and fearing for their own lives, they went back to Kenny Miller's house to wait for more assistance from local authorities.  Around this time, they saw several vehicles with militant-dressed men with weapons head into La Sierra.

116.    At around the same time, Rhonita's parents Shalom and Adrian were together in Galeana, running an errand.[42]  Shalom received a phone call from her sister, Nahoma Jensen, asking Shalom if she had any information from Rhonita.  Nahoma then sent Shalom an audio message she had received from relative Margarita Langford, stating that Rhonita's vehicle had been shot up, that she and the children had not been found, and that Dawna and Christina were not answering their phones. Margarita was desperate, stating "I hope everyone is alright, I'm about to lose my mind…"

---

[42] Galena is near Colonia LeBaron, Mexico on the opposite side of La Sierra, southeast of La Mora.

117.    Family members, including Tyler, tried reaching Christina and Dawna on their cell phones without success.

118.    Shalom and Adrian received calls from family members offering assistance to search for the women and children.  The phone calls provided additional details of information about what each knew of the events.

119.    While Shalom and Adrian were speaking to other family members and trying to assemble a search team, Shalom received a call informing her that Rhonita and the children were dead.

120.    Adrian, Shalom and other LeBaron family members decided to search for Rhonita and the kids.

121.    After gathering a search team, Adrian, Julian, and other extended LeBaron family members met in Galeana and set off north toward La Mora to begin the search for the missing women and children.

122.    At approximately 3:00 p.m., the search team arrived at Janos and were stopped by the authorities from proceeding further.  Authorities feared gunfire from the cartels and prevented the families from driving through.  Eventually they were permitted to proceed.  At approximately 4:00 p.m., the family arrived at Pancho Villa, where they were stopped again by the authorities.

123.    The search teams waited in Pancho Villa until approximately 5:00 p.m.  It was during this time period that non-party David Langford arrived to meet with Adrian and the others.

124.    During this time, Howard Miller was in his apartment in North Dakota, getting ready for a late afternoon flight to Phoenix, where he was to reunite with Rhonita and the kids. When he received word that Rhonita's vehicle was found shot up and burning and that his wife and children were missing, he frantically tried to get on an earlier flight, but was unable to do so.

A short while later, he received a telephone call from one of his sisters informing him that Rhonita and the kids were most likely dead.

125.    The Miller family resumed their search for Rhonita and her children. While Andre and other family members were driving to the scene, they came upon Dawna's son, D.L. walking down the highway. They immediately put him in their truck and brought him back to the family home in La Mora.

126.    D.L. told Andre that his mother, several of his siblings, and Christina had been killed, and that his other siblings were wounded and hiding near the scene of the attacks.

127.    At approximately 5:20 p.m., David Langford received a call informing him that D.L. had made it home, that Dawna and Christina were dead, and several of the Langford children were seriously injured.

128.    The LeBarons told authorities at Pancho Villa, where they were being prevented from driving forward, that the Langford children were alive.

129.    Upon learning that the Langford children were alive and alone in La Sierra, the LeBaron family argued with the state authorities in Pancho Villa about permitting them to search for the children. State authorities had stopped the LeBaron contingent from continuing toward La Mora because of continued gunfire between La Línea and the Sinaloa gunmen fighting in the mountains. Over objections from the police, Shalom, Adrian, Justin Ray and non-parties David Langford, Julian LeBaron, and others set off in search of Christina, Dawna, and the children. The authorities reluctantly followed them.

130.    At approximately 7:30 p.m., the family arrived at the gruesome scene of Christina, Dawna, and the children's murders. Each of their vehicles sustained over two hundred shots from high-powered automatic weapons from all angles and Christina's body was found approximately

twenty feet from her vehicle. Her arms were positioned over her head, indicating that her arms had been raised when she was shot.

131.    Julian LeBaron approached Christina's vehicle expecting to see seven-month old F.M.J. murdered but when he slid the bullet-riddled car seat cover back, he found F.M.J. alive.

132.    F.M.J. was extremely dehydrated. She had just spent the past ten hours alone, strapped into her car seat. She was soaked in urine and was in shock. Plaintiff Shalom Tucker, Rhonita's mother, comforted her, gave her fluids and attempted to improve her condition. F.M.J. cried through the entire evening as her aunt and Christina's sister, Deborah Langford, stayed up trying to comfort her.

133.    Justin Ray found his sister, Dawna slumped over the steering wheel of her Suburban, with at least thirteen bullet wounds, including two to the head. T.L. was in the second row, crouched in the fetal position and shot in the head. R.L. was down in the passenger floorboard with three bullet wounds.

134.    The search team learned that another of Dawna's children, nine-year-old M.L., also went in search of help after D.L. did not return. The group feared M.L. was lost in the dark.

135.    Adrian, David Langford, and the others began frantically searching for M.L.

136.    After learning from D.L. that his siblings were alive and hiding, the Millers also left La Mora to begin searching for the kids.

137.    Kenny Miller found M.L. at 10:30 p.m. that night. Family members were able to track her via her footprints as she was missing one shoe, which she removed during the walk to fend off a snake. When Kenny Miller saw her in the brush, he jumped out of the vehicle he was riding in and grabbed M.L. She resisted him, thinking he was an attacker, but when she heard "it's Uncle Kenny," she grabbed on to him. Immediately, M.L. said "we have to get the other kids."

138.   The surviving Langford children were transported, with their father, David Langford, to hospitals in the United States for treatment while Adrian and the others continued the search for Rhonita's vehicle.

139.   Adrian found his daughter Rhonita's vehicle at approximately 11:30 p.m. It was still smoking from the fire that had engulfed it earlier in the day. They remained near the vehicle, mourning the loss of their daughter and grandchildren and then returned home.

140.   Adrian and Shalom returned to the scene of their daughter's and grandchildren's horrific murder at 6:00 a.m. the next day, November 5, 2019. It was then that they were able to see the devastating scene in daylight for the first time. Nothing but ashes and bones of the five Miller family members remained. K.B.M., ten years old, was found in the back seat, hunched down and gripping what remained of her little pink purse strap. The Suburban was a shell of burnt metal.

141.   Howard landed in Phoenix late in the evening on November 4th. After spending an hour at his sister's home, he left around 1:30 a.m. on November 5, 2019, driving to his father's house in La Mora, Mexico. He arrived at the scene mid-morning on November 5, 2019, where he too witnessed the horrific scene of his wife's and children's murders.

142.   Tyler was able to go to the scene of Christina's murder on November 6, 2019 and was able to see Christina's vehicle at the scene.

143.   Adrian, Shalom, and the other family members climbed to the top of the hill where the gunmen had begun their attack. From this elevated vantage point it appears the attackers could and should have seen that the occupants of the car were not rival cartel members but innocent women and children. Moreover, they found numerous shell casings on the hill and along the slope

on the way down and around the burned-out vehicle itself. They also found personal items from the vehicle, such as Rhonita's checkbook, strewn about on the ground.

144.   An examination of the attack site where Dawna, her children, and Christina were killed also confirms the attackers knew they were firing upon innocent women and children. The position of Christina's body indicates assailants shot her after she had moved away from the vehicle and was waving her arms in the air. Dawna arrived at the scene after Christina had been shot and she too attempted to leave her vehicle. Thus, the attackers knew they were shooting at women and children.

145.   Adrian and Shalom had the unthinkable task of collecting their daughter's and grandchildren's bones and ashes and transporting the remains back to La Mora for burial within the three days that is customary in their Mormon faith. The family buried Rhonita's remains in the same coffin as those of T.A.M. and T.G.M., and alongside the coffins of H.M. Jr. and K.B.M in Colonia LeBaron.

146.   Justin Ray and his brothers took the bodies of Dawna, T.L., R.L. and Christina. They took Christina to her mother, Amelia's, home in La Mora and Dawna and her children to Dawna and David's home in La Mora. The families prepared the bodies themselves for the funerals as the medical examiners had not arrived.

147.   Dawna and her two children, T.L. and R.L. were buried in La Mora.

148.   Christina was buried in Colonia LeBaron.

149.   The causes of death as listed on the death certificates issued by the Mexican government show that Dawna, T.L., R.L. and Christina were all killed as the result of gunshot wounds. Rhonita and her four children, H.M. Jr., K.B.M., T.A.M. and T.G.M. died as the result of third-degree burns.

150.   In the days following the attacks, some members of the Juárez Cartel involved in the attacks fled to the United States, demonstrating the international nature of the Juárez Cartel. Two of Juárez Cartel members were arrested in the United States and deported to Mexico.

151.   Even after these murders, the Juárez Cartel continues to engage in repeated acts of terrorism.  On January 16, 2020, as many as 150 men invaded Las Pomas in Madera, Chihuahua. They burned twenty-seven (27) houses and seven (7) vehicles and abducted members of the town.

152.   The Mexican government has indicted and arrested at least nine of the Juárez Cartel/La Línea members that participated in the activities surrounding the November 4, 2019 murders.  The charges include: (a) organized crime for the purpose of committing crimes against the public health; (b) possession of methamphetamines and marijuana; and (c) possession of firearms cartridges for exclusive use of the army, navy, and air force.  At least one of the arrest warrants specifically decries prior judicial decisions which found that Juárez Cartel and La Línea are a criminal organization that has committed crimes in violation of the law against organized crime.  Juárez Cartel and La Línea are "engaged in various conducts with the aim of committing, among others, crimes against public health, activities that it has carried out since 2007, and that it was then commanded by Vicente Carrillo Fuentes, which had within its ranks an operational group made up of men specialized in the use of firearms, survival techniques in areas such as the mountains and whose purpose was to attack anyone who tried to invade the territory they controlled...."[43]

---

[43] Application for Arrest Warrant for Sergio Valenzuela Palacios, at pg. 40, January 27, 2020.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
## CIVIL LIABILITY UNDER 18 U.S.C. § 2333(a)
## AGAINST DEFENDANT FOR VIOLATIONS OF
## 18 U.S.C. § 2333 CONSTITUTING ACTS OF INTERNATIONAL TERRORISM

153.    Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

154.    Plaintiffs[44] are U.S. nationals injured by reason of an act of international terrorism and seek damages under 18 U.S.C. § 2333. Plaintiffs' family members Christina Langford, Dawna Ray, Maria Rhonita LeBaron, and children H.M. Jr., K.B.M., T.A.M., and T.G.M. were murdered by Defendant.

155.    Plaintiffs were victimized by acts of "international terrorism" as defined by 18 U.S.C. § 2331(1) which states:

> "(1) the term "international terrorism" means activities that--
> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
> (B) appear to be intended--
> (i) to intimidate or coerce a civilian population;
> (ii) to influence the policy of a government by intimidation or coercion; or
> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

---

[44] Adrian LeBaron-Soto is not a United States citizen, but can bring this claim because decedents were all United States citizens.

156.    On November 4, 2019, members of La Línea, a violent wing of the Juárez Cartel, opened fire on three civilian vehicles. The vehicles were filled with women and children, all United States citizens.

157.    Many occupants of the vehicles were killed.  Eight of the children were able to escape the gunfire and hide in the woods while awaiting assistance.

158.    Defendant La Línea is a subgroup of the Juárez Cartel. The Juárez Cartel has been designated as a foreign narcotics kingpin pursuant to the Foreign Narcotics Kingpin Designation Act since June 1, 2004.  While not designated as a foreign terrorist organization pursuant to Title 8, United States Code, Section 1189, the Juárez Cartel nevertheless engaged in an act of international terrorism through the commission of these acts directly against the Plaintiffs by killing Christina Langford, Dawna Ray, Maria Rhonita LeBaron, H.M. Jr., K.B.M., T.A.M. and T.G.M.

159.    Defendant committed these acts directly against Plaintiffs injuring them by killing Christina Langford, Dawna Ray, Maria Rhonita LeBaron, H.M. Jr., K.B.M., T.A.M., and T.G.M. or conspiring to commit acts to provide logistics, financing, safe houses and safe havens, transportation, communications, funds, transfer of funds, other in-kind material benefit, false documentation or identification including alias names, weapons, explosives, non-medical training, and ammunition to further criminal activity of the Juárez Cartel and La Línea.

160.    Defendant utilized weapons of mass destruction in violation of the criminal laws pertaining to acts of international terrorism, 18 U.S.C. § 2332(a), against nationals of the United States while such nationals were outside the United States. These United States nationals included, but were not limited to, Christina Langford, Dawna Ray, Maria Rhonita LeBaron, H.M. Jr.,

K.B.M., T.A.M., and T.G.M., and such use of weapons of mass destruction were intended to further the criminal terroristic activity of the Juárez Cartel and La Línea.

161.   Defendant murdered Christina Langford, Dawna Ray, Maria Rhonita LeBaron, H.M. Jr., K.B.M., T.A.M., and T.G.M. and/or knowingly aided and abetted or conspired to provide material support to the perpetrators of such acts. Defendant also aided, abetted, conspired, or otherwise engaged in or provided material support for the acts of international terrorism, including but not limited to providing material support and/or aiding and abetting assistance to the Juárez Cartel and La Línea. This material support and/or aiding and abetting of acts of international terrorism allowed Defendant to carry out the injuries and wrongful death of plaintiffs and specifically Christina Langford, Dawna Ray, Maria Rhonita LeBaron, H.M. Jr., K.B.M., T.A.M., and T.G.M.

162.   Defendant specifically targeted U.S. nationals as targets of the criminal activity, shot at cars full of United States citizens, then murdered the vehicles' drivers, Maria Rhonita LeBaron, Dawna Ray and Christina Langford, and murdered innocent children, H.M. Jr., K.B.M., T.A.M., and T.G.M. Defendant also injured F.M.J who was present, witnessed the attack, was within the zone of danger of the attack, and has suffered emotional injury as a result of the attack.

163.   Defendant's activities involved violent and dangerous acts to human life that were, and are, a violation of the criminal laws of the United States and the State of North Dakota.

164.   Defendant's acts were intended to intimidate or coerce the Mexican and United States civilian population, to influence policy of the U.S. and Mexican Governments by intimidation or coercion, and to affect the conduct of a government by kidnapping, hostage taking, and assassination.

165.   The November 4, 2019, attacks were the latest and perhaps most ruthless in the Juárez Cartel's decades-long struggle to intimidate the civilian population and influence the Mexican government and local governments not to act.

166.   Defendant's activities occurred outside the territorial jurisdiction of the United States and transcend international boundaries.

167.   Defendant's acts are therefore acts of international terrorism as defined under 18 U.S.C. §2331(1).

168.   Defendant intentionally and purposefully hid and concealed its true identity, physical whereabouts, and its involvement in the Juárez Cartel and La Línea criminal activities, including killing several Plaintiffs.

169.   As a designated organization, or as members of a designated organization and criminal conspiracy, Defendant is a criminal party who proximately caused the deaths and injuries described herein and is liable for the criminal acts, including acts of international terrorism, the aiding and abetting of international terrorism, conspiring to commit further acts of international terror, engaging in a joint single enterprise to conduct international terrorism through illegal schemes, and/or the material support and sponsorship of international terrorism.

170.   WHEREFORE, Plaintiffs demand judgment against Defendant for their past and future mental pain and suffering, anguish, emotional distress, loss of solatium, loss of companionship, society, affection, consortium and guidance, including treble damages under 18 U.S.C. 2333, plus interest, costs, attorneys' fees, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate Plaintiffs.

## SECOND CLAIM FOR RELIEF
## ASSAULT AND BATTERY

171.    Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

172.    Pursuant to N.D.C.C. 28-01-26.1, the claims for assault and battery survive the deaths of Estate Plaintiffs.

173.    Estate Plaintiffs bring this claim for assault and battery against the Defendant, because the Juárez Cartel and La Línea unlawfully, violently, willfully, maliciously, and without just provocation on the part of Estate Plaintiffs, assaulted and battered Estate Plaintiffs by shooting at cars full of civilian women and children.   The shots struck several of the Estate Plaintiffs, causing serious bodily harm and death.

174.    As a direct and proximate result of the assault and battery, the Estate Plaintiffs suffered serious and permanent bodily injury that resulted in the deaths of Maria Rhonita LeBaron and her four children – twelve-year-old H.M. Jr., ten-year-old K.B.M., and eight-month-old twins T.A.M. and T.G.M.; and Christina Langford.

175.    A claim for assault only is brought by Tyler Johnson, as legal guardian of F.M.J.

176.    Tyler Johnson, as legal guardian of F.M.J., brings this claim for assault against the Defendant, because the Juárez Cartel and La Línea unlawfully, violently, maliciously, and without just provocation on the part of F.M.J., assaulted F.M.J. by shooting at cars full of civilian women and children.

177.    As a direct and proximate result of the assault, F.M.J. suffered mental anguish and reasonable fear of imminent bodily harm during the attack carried out by Defendant.

178.    As a further direct and proximate cause of the assault and battery described above, Estate Plaintiffs suffered great physical pain and mental anguish and were injured and disabled.

179. The above-described injuries to Estate Plaintiffs and F.M.J. were caused solely by the Defendant's actions.

180. As a further direct and proximate result of the Defendant's actions, Estate Plaintiffs incurred funeral, travel, and other expenses for their injuries.

181. As a further direct and proximate result of the Defendant's actions, Estate Plaintiffs have lost wages and employment opportunities.

182. Defendant acted intentionally, with an evil mind, guided by an evil hand, which warrants punitive damages.

183. WHEREFORE, Estate Plaintiffs and Tyler Johnson as legal guardian of F.M.J. demand judgment in their favor against Juárez Cartel and La Línea and demand damages in an amount to be determined by a jury for damages arising out of assault and battery, including punitive damages, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate the Estate Plaintiffs and Tyler Johnson as legal guardian of F.M.J.

## THIRD CLAIM FOR RELIEF
## WRONGFUL DEATH

184. Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

185. Plaintiffs bring this claim for wrongful death against the Defendant, because the Juárez Cartel and La Línea caused the Decedents' deaths through such wrongful acts and/or omissions as knowingly, purposefully, directly and indirectly, assisting, aiding, abetting, facilitating, materially supporting, incentivizing and/or recklessly disregarding the intentional commission of killing of civilians, and other murderous attacks and shockingly egregious acts of

international terrorism against Plaintiffs and their Decedents, and such other wrongful actions and omissions as set forth herein.

186.    As a direct and proximate result of the wrongful actions and/or omissions of the Juárez Cartel and La Línea, as set forth herein, Decedents suffered serious emotional and bodily injuries resulting in their deaths on the dates as referenced herein.

187.    As a direct and proximate result of the wrongful actions and/or omissions of the Juárez Cartel and La Línea, and the Decedents' resulting wrongful deaths, the Decedents' relatives, representatives, and other survivors, have suffered pecuniary and other losses including but not limited to loss of earnings and services of pecuniary value, as well as funeral expenses.

188.    Plaintiffs, as Decedents' surviving relatives and/or representatives, are entitled to recover damages as a result of the wrongful acts and/or omissions of Juárez Cartel and La Línea, and the Decedents' resulting wrongful deaths, as plead herein pursuant to pertinent Wrongful Death statutes, including N.D.C.C. ch. 32-21.

189.    As a direct and proximate result of the wrongful actions and/or omissions of Juárez Cartel and La Línea, and the Decedents' resulting wrongful deaths, the Decedents' surviving relatives have suffered and will continue to suffer both economic and non-economic damages including but not limited to permanent physical and emotional distress, severe trauma, and lasting physical, emotional, and psychological injuries, for which they have and will continue to incur actual damages including but not limited to ongoing medical and other expenses.

190.    WHEREFORE, Plaintiffs demand judgment in their favor against Juárez Cartel and La Línea, and demand damages in an amount to be determined by a jury, not less than the statutory amount, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium,

and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate the Plaintiffs.

## FOURTH CLAIM FOR RELIEF
## NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

191.    Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

192.    Pursuant to N.D.C.C. 28-01-26.1, this claim survives the deaths of Estate Plaintiffs.

193.    All Plaintiffs bring this claim for negligent and/or intentional infliction of emotional distress against Juárez Cartel and La Línea, because Juárez Cartel and La Línea facilitated, assisted, aided, abetted, materially supported, and incentivized acts of murder and wrongful death, specifically, the shooting at and murdering of women and children and other shockingly egregious acts of international terrorism discussed herein.

194.    Family Member Plaintiffs are entitled to a claim for negligent and/or intentional infliction of emotional distress despite not being present at the scene.  Cases arising out of other terrorist attacks have removed the presence requirement because it is "sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present." *Murphy v. Islamic Rep. of Iran,* 740 F. Supp. 2d 51 (D. D.C. 2010) (citing *Heiser II v. Islamic Rep. of Iran,* 659 F. Supp. 2d 20 (D. D.C. 2009)).  The attack on innocent women and children amounts to such an extreme and outrageous conduct that the Defendant knew such an act would inflict severe emotional harm on the family members of the victims.

195.    Juárez Cartel and La Línea knowingly, and purposefully, directly and indirectly aided and abetted, intentionally facilitated, and/or recklessly caused the murderous attacks that resulted in the Estate Plaintiffs' deaths and substantial emotional injuries their family members and F.M.J.

196.    Juárez Cartel and La Línea intended or knew or should have known, that their conduct would lead to the killing of or injury to innocent persons and resulting severe emotional distress. Juárez Cartel and La Línea intended, knew, or should have known that the murderous attacks committed by them would kill, maim, and/or permanently injure Decedents and their Plaintiffs and other innocent people, leaving devastated family members to grieve for their losses with ongoing physical, psychological and emotional injuries and ongoing post-traumatic stress disorder.

197.    The actions of Juárez Cartel and La Línea were unconscionable and done with an intentional, malicious, willful, and/or reckless disregard for the rights and lives of those murdered, and the surviving family members.

198.    As a direct and proximate cause of Juárez Cartel and La Línea's intentional misconduct and/or reckless disregard for human life, Plaintiffs have suffered and will continue to suffer severe, debilitating, permanent emotional, and psychiatric disorders, ongoing emotional distress and anxiety, physical and mental distress, and significant mental injury and impairment causing ongoing and long-term expenses for medical treatment, services, and counseling and long-term care, particularly for all minor Plaintiffs.

199.    Juárez Cartel and La Línea, by engaging in this intentional, unlawful conduct, intentionally, grossly negligently, or negligently inflicted emotional distress upon the Plaintiffs.

200.    WHEREFORE, Plaintiffs demand judgment in their favor against Juárez Cartel and La Línea and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Court deems appropriate to compensate the Plaintiffs..

## FIFTH CLAIM FOR RELIEF
## SURVIVAL ACTION

201.   Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

202.   Plaintiffs bring this survival action against Juárez Cartel and La Línea, because Juárez Cartel and La Línea caused the Decedents' pain, suffering, and eventual deaths through such wrongful acts and/or omissions as knowingly, purposefully, directly and indirectly, assisting, aiding, abetting, facilitating, materially supporting, incentivizing and/or recklessly disregarding the intentional commission of civilian deaths and injuries, and other murderous attacks and shockingly egregious acts of international terrorism against Plaintiffs and their Decedents, and such other wrongful actions and omissions as set forth herein.

203.   As a direct and proximate result of the wrongful, intentional, malicious, reckless, criminal, grossly negligent and negligent acts of Juárez Cartel and La Línea, as described herein, those killed in the murderous attacks described herein were placed in a severe, often prolonged, extreme, traumatic, apprehension of harmful, offensive unwarranted bodily contact, injury, and assault. Those murdered suffered intensely severe and offensive harmful bodily contact, personal injury, and battery; including but not limited to extreme fear, terror, anxiety, emotional and psychological distress, knowledge of pending death, physical and emotional trauma, and intentionally inflicted physical pain.

204.   As a direct and proximate result of the wrongful, intentional, malicious, reckless, criminal acts of Juárez Cartel and La Línea, as described herein, Estate Plaintiffs suffered damages including conscious pain and suffering, severe trauma, fear, anxiety, permanent physical and emotional distress, ultimate loss of life and life's pleasures, companionship and consortium, loss of family, career, earnings and earning capacity, loss of accretion to their estates, medical expenses

and other immeasurable items of damages to be shown at trial. Plaintiffs herein seek and are entitled to survival damages for those tortured and killed in these murderous attacks.

205.    Estate Plaintiffs all experienced conscious pain and suffering and fear of injury during the attacks by Defendant.

206.    Maria Rhonita LeBaron and her children were ambushed with automatic machine guns and fired upon for at least ten minutes. Before they were killed, they each had time to comprehend the situation and understand death was likely to occur. There is evidence that H.M. Jr. tried to escape the vehicle while he and his family were under attack, demonstrating he knew he was in grave danger. K.M.B. was found curled in the fetal position in the back of the car, depicting her efforts to protect herself from the gunfire. Each of them were fully aware of the danger, felt pain when shot and burned in the car, and experienced fear for not only themselves but their other family members. The cause of death on their death certificates is third-degree burns.

207.    After Christina Langford's car came upon gunfire, she was shot in the hip. She suffered conscious pain from the injury as she exited her vehicle with her arms up to show the attackers the car was full of innocent civilians. She also suffered the mental anguish of knowing that her infant daughter, strapped into the car seat behind her, was also under attack. Defendant continued to fire and murdered Christina.

208.    F.M.J. also suffered conscious pain and suffering. She was strapped into her car seat for the duration of the attack and for almost 10 hours alone in the desert before she was found. She had urinated herself repeatedly, was extremely dehydrated and was in shock.

209.    Plaintiffs are entitled to all compensatory, punitive, and other damages permitted under the pertinent survival statutes against the Defendant.

210.    WHEREFORE, Plaintiffs demand judgment in their favor against Juárez Cartel and La Línea and demand damages in an amount to be determined by a jury, not less than the statutory amount, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate the Plaintiffs.

## SIXTH CLAIM FOR RELIEF
## LOSS OF CONSORTIUM

211.    Plaintiffs adopt and incorporate the allegations and facts contained in prior paragraphs and in allegations common to all counts.

212.    Plaintiff Howard Miller and Maria Rhonita LeBaron were married at the time of the attack.

213.    Plaintiff Howard Miller and four Estate Plaintiffs – H.M. Jr., K.M.B., T.A.M., and T.G.M. – were in a father-child relationship at the time of the attack.

214.    Plaintiff T.M. and Maria Rhonita LeBaron were in a mother-child relationship at the time of the attack.  Plaintiff T.M. was also in a sibling relationship with H.M. Jr., K.M.B., T.A.M., and T.G.M. at the time of the attacks.

215.    Plaintiff A.M. and Maria Rhonita LeBaron were in a mother-child relationship at the time of the attack.  Plaintiff A.M. was also in a sibling relationship with H.M. Jr., K.M.B., T.A.M., and T.G.M. at the time of the attacks.

216.    Plaintiff Z.M. and Maria Rhonita LeBaron were in a mother-child relationship at the time of the attack.  Plaintiff Z.M. was also in a sibling relationship with H.M. Jr., K.M.B., T.A.M., and T.G.M. at the time of the attacks.

217.    Plaintiff Adrian LeBaron-Soto and Maria Rhonita LeBaron were in a father-child relationship at the time of the attack.

218.   Plaintiff Bathsheba Shalom Tucker and Maria Rhonita LeBaron were in a mother-child relationship at the time of the attack.

219.   Plaintiff Adriana Jones and Maria Rhonita LeBaron were in a sibling relationship at the time of the attack.

220.   Plaintiff Ruthila LeBaron and Maria Rhonita LeBaron were in a sibling relationship at the time of the attack.

221.   Plaintiff Melissa Conklin and Maria Rhonita LeBaron were in a sibling relationship at the time of the attack.

222.   Plaintiff Laura Corina LeBaron and Maria Rhonita LeBaron were in a sibling relationship at the time of the attack.

223.   Plaintiff Javier LeBaron and Maria Rhonita LeBaron were in a sibling relationship at the time of the attack.

224.   Plaintiff Miguel LeBaron and Maria Rhonita LeBaron were in a sibling relationship at the time of the attack.

225.   Plaintiff Dayer A. LeBaron and Maria Rhonita LeBaron were in a sibling relationship at the time of the attack.

226.   Plaintiff William A. LeBaron and Maria Rhonita LeBaron were in a sibling relationship at the time of the attack.

227.   Plaintiff M.L. and Maria Rhonita LeBaron were in a sibling relationship at the time of the attack.

228.   Plaintiff Rholena Lian Johnson and Maria Rhonita LeBaron were in a sibling relationship at the time of the attack.

229.    Plaintiff Tyler Johnson and Christina Langford were in a committed romantic relationship, mirroring that of a marriage at the time of the attack and recognized under Mexican law as a common law marriage.

230.    Plaintiff F.M.J. and Christina Johnson were in a mother-daughter relationship at the time of the attack.

231.    Plaintiff C.C.J. and Christina Langford were in a mother-child relationship at the time of the attack.

232.    Plaintiff J.T.J. and Christina Langford were in a mother-child relationship at the time of the attack.

233.    Plaintiff T.E.J. and Christina Langford were in a mother-child relationship at the time of the attack.

234.    Plaintiff H.J.J. and Christina Langford were in a mother-child relationship at the time of the attack.

235.    Plaintiff E.D.J. and Christina Langford were in a mother-child relationship at the time of the attack.

236.    Plaintiff Amelia Christine Sedgwick and Christina Langford were in a mother-child relationship at the time of the attack.

237.    Plaintiff Elizabeth Ann Langford and Christina Langford were in a sibling relationship at the time of the attack.

238.    Plaintiff Serena Sharon Langford and Christina Langford were in a sibling relationship at the time of the attack.

239.    Plaintiff E.L. and Christina Langford were in a sibling relationship at the time of the attack.

240.    Plaintiff Isaac Anson Langford and Christina Langford were in a sibling relationship at the time of the attack.

241.    Plaintiff Karen Woolley and Dawna Ray were in a mother-child relationship at the time of the attack.

242.    Plaintiff Jaremy Ryan Ray and Dawna Ray were in a sibling relationship at the time of the attack.

243.    Plaintiff Kerah Ray and Dawna Ray were in a sibling relationship at the time of the attack.

244.    Plaintiff Justin Michael Ray and Dawna Ray were in a sibling relationship at the time of the attack.

245.    Plaintiff James Oliver Ray and Dawna Ray were in a sibling relationship at the time of the attack.

246.    Plaintiff Jonathan Sean Ray and Dawna Ray were in a sibling relationship at the time of the attack.

247.    Plaintiff Amber Ray and Dawna Ray were in a sibling relationship at the time of the attack.

248.    As a result of the wrongful acts of the Defendant, the above-Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, affection and assistance, all to the detriment of the marital, parental, and sibling relationship.

249.    All the injuries and damages were caused solely and proximately by the Defendant.

250.    WHEREFORE, Plaintiffs demand judgment in their favor against Juárez Cartel and La Línea and demand damages in an amount to be determined by a jury for damages arising out of the wrongful death, survival, loss of solatium, and/or loss of services, plus interest, costs and

such other monetary and equitable relief as this Honorable Court deems appropriate to compensate the Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

251. Enter judgment against each Defendant and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial;

252. Enter judgment against each Defendant and in favor of Plaintiffs for punitive damages in amounts to be determined at trial;

253. Enter judgment against each Defendant and in favor of Plaintiffs for pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

254. Enter judgment against each Defendant and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333;

255. Enter judgment against each Defendant and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333; and

256. Grant such other and further relief as justice requires.

Plaintiffs demand trial by jury on all issues so triable.

Dated: July 23, 2020                    By:

MOTLEY RICE LLC

Michael Elsner, Esq.
John M. Eubanks, Esq.
Courtney Wolf, Esq.
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone: (843) 216-9000

**MITCHELL & MITCHELL LLC**
Samuel F. Mitchell, Esq.
Steven C. Mitchell, Esq.
7161 E. Rancho Vista Dr.
Scottsdale, AZ 85251

**O'KEEFE O'BRIEN LYSON FOSS
ATTORNEYS**
Tatum O'Brien, Esq.
720 Main Avenue
Fargo, ND 58103
Telephone: 701-235-8000