# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA
## WESTERN DIVISION

| | |
|---|---|
| David Langford, Estate of Dawna Ray Langford, Estate of T.L., Estate of R.L., K.L., X.L. C.L., B.L., D.L., M.L., J.L. (minor children of David and Dawna Ray Langford), Brandy Karen Spenst, Bryce David Langford, Cole Langford, Crystal Alexis Langford, | Court File No._____ |
| | **COMPLAINT**<br>**AND DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
| vs. | |
| Juárez Cartel, La Línea, John Does I through LX, | |
| Defendants. | |

## INTRODUCTION

1.      Plaintiffs, David Langford, Estate of Dawna Ray Langford, Estate of T.L., Estate of R.L., minor children K.L., X.L., C.L., B.L., D.L., M.L., J.L., and Brandy Karen Spenst, Bryce David Langford, Cole Langford, and Crystal Alexis Langford (collectively, "Plaintiffs" or the "Langford Family"), all of whom are United States citizens, bring this action pursuant to the Antiterrorism Act ("ATA"), 18 U.S.C. §§ 2333 *et seq.*, and various state law causes of action to pursue civil remedies for the unthinkable violence perpetrated against their family in an attack carried out by hitmen (known as "sicarios" in Mexico) of the Juárez Cartel on a route used to transport illegal drugs through Mexico.

2.      On November 4, 2019, sicarios brutally murdered three American women and their minor children, all of whom were living abroad in La Mora—a peaceful and secluded community in Sonora, Mexico.

3.     The sicarios hid out on hilltops near Colonia La Mora and fired hundreds of rounds from automatic weapons into three vehicles traveling on the road near La Mora that is often used for the Cartel's illegal drug smuggling.

4.     The passengers signaled to the gunmen that the vehicles were full of innocent women and children, but even then they continued the attack and murdered all three drivers and six of their children, and injured five others.

5.     The attackers killed Dawna Ray Langford, wife of David Langford and mother to thirteen children.

6.     The attackers killed David and Dawna's eleven-year-old son, T.L.

7.     The attackers killed David and Dawna's two-year-old son, R.L.

8.     In the aftermath of the attack, after witnessing the death of his mother and siblings, thirteen-year-old D.L. walked fourteen miles across rugged desert terrain to seek help for his wounded and freezing siblings left stranded at the site of the attack where their mother and brothers had just been murdered.

9.     When D.L. did not return for hours, nine-year-old M.L., who had been shot in the arm, also set out into the wilderness to seek help for her siblings whose injuries were growing graver by the minute. M.L. became lost in the desert at night and was not located until the following morning.

10.    K.L., B.L., X.L., C.L., and M.L. suffered gunshot wounds in the attack. All seven surviving minor children continue to suffer severe emotional distress.

11.    As a result of the attack, the majority of the residents of La Mora, including David Langford and his family, fled the village where their families had lived for decades. They left behind their homes and land, along with the valuable fields, cattle, and orchards that represent their primary means of financial support.

12.    Mexican authorities investigating the November 4, 2019 attack have arrested several individuals connected with the massacre, including leaders of La Línea and the Juárez Cartel.

## JURISDICTION AND VENUE

13.    This matter is brought under 18 U.S.C. §§ 2333, *et seq.*, and thus arises under the laws of the United States. This Court therefore has subject matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 1331.

14.    Jurisdiction also arises under 28 U.S.C. § 1332(a)(2) as a civil action between citizens of a State and citizens of a foreign state where the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.    This Court has personal jurisdiction over Defendants because as alleged elsewhere herein, all Defendants have established continuous and systematic contacts with the United States through their illegal drug trafficking operations.

16.    Venue properly lies within this District pursuant to 18 U.S.C. § 2334(a). Plaintiffs Brandy Karen Spenst and Bryce David Langford reside in North Dakota.

17.    Venue is also proper under 28 U.S.C. § 1391(b)(3), as Defendants do not reside in the United States but are subject to this Court's jurisdiction.

## PARTIES
### Plaintiffs

18.    Plaintiff David Langford is and was at all times relevant hereto an American citizen and the husband of Dawna Ray Langford, a 43-year-old American citizen murdered in an act of international terrorism carried out by defendants in Sonora, Mexico, on November 4, 2019. Plaintiff was also the father of eleven-year-old T.L. and two-year-old R.L., both of whom were American citizens murdered in the attack. David Langford is also the father of K.L., X.L., C.L., B.L., J.L., D.L., and M.L., the seven surviving minor children plaintiffs who suffered emotional and physical injury due to the attack.

19.    Plaintiff Estate of Dawna Ray Langford is the personal estate of decedent Dawna Ray Langford, who was a citizen of the United States. Sicarios murdered Dawna Ray Langford on November 4, 2019.

3

20.     Plaintiff Estate of T.L. is the personal estate of decedent T.L., who was a citizen of the United States and was eleven years old at the time of the attack.  Sicarios murdered T.L. on November 4, 2019.

21.     Plaintiff Estate of R.L. is the personal estate of decedent R.L., who was a citizen of the United States and was two years old at the time of the attack.  Sicarios murdered R.L. on November 4, 2019.

22.     Plaintiff David Langford expects to be named the personal representative of the Estates of Dawna Ray Langford, T.L., and R.L.

23.     Plaintiff K.L. is and was at all times relevant hereto a citizen of the United States and was fourteen years old at the time of the attack.  Sicarios shot K.L. on November 4, 2019.  In addition to serious physical injuries, K.L. has suffered and continues to suffer emotional injuries due to the loss of her mother and brothers, as well as the traumatic experience of witnessing the November 4 massacre.

24.     Plaintiff D.L. is and was at all times relevant hereto a citizen of the United States and was thirteen years old at the time of the attack.  D.L. suffered emotional injuries when he was forced to trek over 14 miles through rugged desert terrain to seek help for his brothers and sisters who were left stranded at the site of the attack.  D.L. has suffered and continues to suffer emotional injuries due to the loss of his mother and brothers, as well as the traumatic experience of witnessing the November 4 massacre.

25.     Plaintiff M.L. is and was at all times relevant hereto a citizen of the United States and was nine years old at the time of the attack.  Sicarios shot M.L. in the forearm on November 4, 2019.  M.L. then suffered emotional injuries when she was forced to trek through rugged desert terrain to seek help for her brothers and sisters who were left stranded at the site of the attack.  M.L. became lost in the desert, encountered wild animals, and feared for her life until rescued by family members the following day.  M.L. has suffered and continues to suffer emotional injuries due to the loss of her mother and brothers, as well as the traumatic experience of witnessing the November 4 massacre.

4

26.     Plaintiff X.L. is and was at all times relevant hereto a citizen of the United States and was four years old at the time of the attack.  Sicarios shot X.L. on November 4, 2019.  In addition to a gunshot wound to his shoulder and buckshot to his chest, X.L. has suffered and continues to suffer emotional injuries due to the loss of his mother and brothers, as well as the traumatic experience of witnessing the November 4 massacre.

27.     Plaintiff C.L. is and was at all times relevant hereto a citizen of the United States and was eight years old at the time of the attack.  Sicarios shot C.L. on November 4, 2019.  C.L. suffered severe gunshot wounds to his jaw and both legs that, even after multiple surgeries, hamper his ability to walk and talk, and will require years of intensive physical therapy.  In addition, C.L. has suffered and continues to suffer emotional injuries due to the loss of his mother and brothers, as well as the traumatic experience of witnessing the November 4 massacre.

28.     Plaintiff B.L. is and was at all times relevant hereto a citizen of the United States and was eight months old at the time of the attack.  Sicarios shot B.L. on November 4, 2019.  In addition to a grazed bullet wound to the chest, B.L., has suffered and continues to suffer emotional injuries due to the loss of his mother and brothers, as well as the traumatic experience of witnessing the November 4 massacre.

29.     Plaintiff J.L. is and was at all times relevant hereto a citizen of the United States and a minor child.  J.L. has suffered and continues to suffer emotional injuries due to the loss of his mother and brothers, as well as the traumatic experience of witnessing the November 4 massacre.

30.     Plaintiff Brandy Karen Spenst is the adult daughter of David and Dawna Ray Langford.  Brandy Spenst has suffered and continues to suffer emotional injuries due to the loss of her mother and two brothers and the terror perpetrated against her minor siblings by the defendants.

31.     Plaintiff Bryce David Langford is the adult son of David and Dawna Ray Langford.  Bryce Langford has suffered and continues to suffer emotional injuries due to

the loss of his mother and two brothers and the terror perpetrated against his minor siblings by the defendants.

32.     Plaintiff Cole Langford is the adult son of David and Dawna Ray Langford. Cole Langford has suffered and continues to suffer emotional injuries due to the loss of his mother and two brothers and the terror perpetrated against his minor siblings by the defendants.

33.     Plaintiff Crystal Alexis Langford is the adult daughter of David and Dawna Ray Langford.  Crystal Langford has suffered and continues to suffer emotional injuries due to the loss of her mother and two brothers.

### Defendants

34.     Defendant Juárez Cartel (the "Cartel") is an international crime syndicate and drug trafficking organization based primarily in Chihuahua, Mexico, with drug trafficking operations that pervade all of Mexico and the United States.   Upon information and belief, the Juárez Cartel was responsible for the attack on the Langford Family on November 4, 2019.

35.     La Línea is the enforcement arm of the Juárez Cartel and is involved in the Cartel's illegal drug trafficking business.  La Línea's primary role in the Juárez Cartel is to perpetrate violence at the direction of the Juárez Cartel, in order to protect its territory and drug trafficking operations.  Upon information and belief, La Línea was in part responsible for the attack on November 4, 2019.

36.     John Does I through LX are individual members of La Línea and the Juárez Cartel.   Upon information and belief, they are the individuals who carried out the November 4, 2019 attack and murdered nine innocent American citizens.

### STATEMENT OF FACTS
#### La Mora, Sonora

37.     La Mora is a community near the town of Bavispe, in Sonora, Mexico, near the border of the state of Chihuahua.  The area around La Mora and Bavispe is contested

cartel territory. Approximately 70 miles south of the Arizona border, it is located in the home state of the Sinaloa Cartel, but not far from the home state of the Juárez Cartel. For generations, La Mora has been home to a small community of families comprised of American citizens who chose to raise their children there. Mormon citizens of the United States first settled La Mora decades ago, and it has existed in peace with its Mexican neighbors since its inception.

38.     David Langford has lived in La Mora for most of his life, and he chose to raise his family there, alongside his brothers and extended family. David supported his family primarily through the profits of a successful pecan orchard and livestock operation.

39.     La Mora is situated near what has traditionally been a drug trafficking route used by cartels to smuggle illegal narcotics from Mexico to the United States. The route, west of La Mora, winds further west from the community and up into the mountainous terrain a few miles from La Mora and the Mexican town of Bavispe.

### Juárez Cartel Violence

40.     At all relevant times, the Juárez Cartel has been one of Mexico's most powerful drug cartels. Historically, it has controlled the Juárez-El Paso Corridor, one of the most important smuggling routes along Mexico's border with the United States. Formerly allied with the Sinaloa Cartel, before the Juárez Cartel split off in or around 2008, it aligned itself with Barrio Aztecas, an international gang renowned for violent acts. Members of Barrio Aztecas were tasked with carrying out gruesome murders in and around Juárez during the ensuing conflict with the Sinaloa Cartel, often creating public displays of corpses and ensuring that the murders would intimidate law enforcement, rival gangs, and civilians.

41.     Around the same time it joined forces with Barrios Aztecas, the Juárez Cartel also aligned itself with La Línea, a group founded by corrupt police officers trained in urban warfare. La Línea acts as the Juárez Cartel's enforcement arm and has

been linked to some of the Juárez Cartel's most well-known acts of violence, including the murder of American citizens employed in a local consulate of the American Embassy, the murder of sixteen teenagers at a high school party, a car bomb attack that killed first responders and civilians in Ciudad Juárez, and the murder of nineteen patients at a drug rehabilitation facility.

42.     Law enforcement has traced most cartel attacks to an ongoing war for territory and control.  These violent attacks are perpetrated with the intent to intimidate civilians and rival gangs, and to affect the decisions and conduct of the Mexican and United States governments.

43.     Most famously, the Juárez and Sinaloa Cartels were locked in a violent battle for control of Ciudad Juárez between 2008 and 2012.  That conflict resulted in an estimated 10,000 deaths and massive civilian displacement.

44.     The Juárez Cartel is known to use military-style weapons in its attacks. Members often wear body armor and carry a mix of weapons, including handguns and automatic weapons such as AR-15 rifles and machine guns.  These weapons are used to inflict maximum damage to the Cartel's targets, both civilian and military.

45.     The Juárez Cartel has members known as "sicarios," which is most often translated to "hitmen" or "hired assassins."  The sicarios are those responsible for the majority of the targeted attacks on civilian and military populations, as well as attacks on rival gangs.  Sicarios are known to operate as lookouts before an attack, setting up a position from which to track the movements of their targets.  Sicarios then frequently use an improvised or established communication network to share the location of targets and to coordinate attacks.

## Cartel Acts of Terror against Civilians

46.     Cartel violence is not limited to members of rival cartels.  The Juárez Cartel previously has carried out acts of violence against civilians in areas where it sought to establish or maintain control.  These violent acts are evidence of the Cartel's efforts to intimidate civilians or drive them out of Cartel territory.

47.     Researchers estimate that cartels killed 994 children in Mexico between 2006 and 2010 alone.

48.     Many cartel attacks against civilians are mass murders.  In 2004, officials discovered a mass grave outside a house near Ciudad Juárez.  The Juárez Cartel used the house to interrogate and murder civilians and gang members suspected of acting as informants for law enforcement.  The site became known in the community as "the House of Death."

49.     In 2010, the Juárez Cartel murdered several members of two other American families in an attack similar to the November 4, 2019 massacre.  Lesley Redelf and Jorge Salcido Cisneros, both consular employees and American citizens, attended a party hosted by the United States Consulate in Ciudad Juárez with their families.  When the two families left the event, each was chased down by Juárez Cartel members who communicated over an improvised communication network to coordinate their attacks. Each vehicle was surrounded by Juárez Cartel vehicles and approached by sicarios carrying assault weapons.  The gunmen shot Lesley Redelf, who was pregnant at the time, in the head.  Her husband, Arthur Redelf, tried to drive away to save the life of the couple's infant daughter who was in the backseat.  Gunmen shot and killed him. Authorities later discovered the infant alive in the vehicle.  Juárez Cartel members also murdered Jorge Salcido Cisneros and wounded his two daughters, ages seven and four.

50.     Law enforcement specialists in Mexico suspect that the cartel attacks have become more gruesome in order to intimidate civilians and government officials.  Experts cite a 2006 incident in western Mexico as the beginning of this pattern of violence

designed to attract attention and intimidate the public. In that attack, cartel members entered a crowded nightclub and rolled five decapitated human heads onto the dance floor. Since that incident, cartels have used decapitation with increasing frequency to intimidate civilians and law enforcement.

## Cartel Acts of Terror against Public Officials

51.     Major Mexican cartels, including the Juárez Cartel, have also murdered journalists, police officers, and public officials in their quest for control of drug smuggling territory. The murders are most often violent and public, in order to send a message to others who might challenge their authority in an area.

52.     In 2009, the Juárez Cartel attempted to assassinate the Governor of Chihuahua. Again in 2020, sicarios attacked the current Governor and targeted police in a shootout that left six dead after more than 1,000 rounds had been fired. The Governor later said in a news conference that the attack was an attempt to intimidate law enforcement and get revenge for law enforcement operations targeting cartel activity in Chihuahua.

53.     In February 2011, sicarios of another cartel murdered Special Agent Jaime Zapata of the United States Immigration and Customs Enforcement ("ICE"). Sicarios positioned along a Mexican highway ambushed the two ICE agents in their car and forced their vehicle off the road. Using AK-47s, eight sicarios opened fire on the agents, killing Special Agent Zapata and wounding Special Agent Victor Avila.

54.     The United States government has recognized that the pattern of violence carried out by cartels is intended to intimidate or coerce government or law enforcement officials. In the indictment of certain leaders of the Sinaloa Cartel, the Department of Justice noted that they "used various means to evade law enforcement and protect their narcotics distribution activities, including . . . intimidating with threats of violence members of law enforcement." Dept. of Justice, *Ten Alleged Mexican Drug Cartel*

*Leaders Among 43 Defendants Indicted in Brooklyn and Chicago as Part of Coordinated Strike Against Mexican Drug Trafficking Organizations* (Aug. 20, 2009).

55.    Cartels frequently intimidate or coerce law enforcement officials into ignoring their criminal activity or even into joining the cartels' efforts. La Línea is comprised largely of former Mexican police officers, and recently a United States Border Patrol agent was indicted in a cartel murder, after having joined the cartel while maintaining his post as a United States law enforcement officer. Jay Root, *The Texas Tribune*, "Border Patrol Agent Indicted in Cartel Murder," https://www.texastribune.org/2016/01/13/border-patrol-agent-indicted-cartel-murder/ (Jan. 13, 2016).

56.    A local police officer, Fidel Alejandro Villegas of the town of Janos in Chihuahua, was arrested in connection with the November 4 attack. Reuters, *Municipal Police Chief Arrested over Mexican Mormon Massacre*, https://www.reuters.com/article/us-mexico-violence-usa-arrest/municipal-police-chief-arrested-over-mexican-mormon-massacre-idUSKBN1YV1LA (Dec. 27, 2019).

57.    The United States government recently recognized that cartels seek to commit acts of violence against both the United States and Mexican governments, in order to continue their campaign of intimidation and coercion and to drive government officials out of cartel territory. *United States v. Guzman-Loera, et al.*, Case No. 09-CR-383 (N.D. Ill.), Superseding Indictment (various cartel defendants "discussed the use of violence against American and/or Mexican government buildings"); U.S. Dept. of Justice, *Joaquin "El Chapo" Guzman, Sinaloa Cartel Leader, Convicted of Running a Continuing Criminal Enterprise and Other Drug-Related Charges*, https://www.justice.gov/usao-sdfl/pr/joaquin-el-chapo-guzman-sinaloa-cartel-leader-convicted-running-continuing-criminal (Feb. 12, 2019) ("The success of the Sinaloa Cartel relied upon the use of violence to maintain their power throughout the region and beyond.").

### Cartel Smuggling Activities

58.     Cartels engage in pervasive drug smuggling through the United States. Mexican cartels are responsible for an estimated 70 percent of the illegal narcotics in the United States.

59.     Cartels also engage in weapons smuggling through the United States. Weapons used by the cartels are overwhelmingly made and sold in America. The most common weapons smuggled from the United States to Mexico are believed to be assault rifles, including the AR-15 and the AR-47. Between 2009 and 2014, 70 percent of the firearms seized by Mexican authorities are believed to have originated in the United States. Half of those seized were "long guns," including the AR-15, which Mexican authorities recognize as a preferred weapon of sicarios.

60.     The United States government has recognized that cartels "have unfettered access to weapons," including automatic rifles. U.S. Dept. of Justice, *Joaquin "El Chapo" Guzman, Sinaloa Cartel Leader, Convicted of Running a Continuing Criminal Enterprise and Other Drug-Related Charges*, https://www.justice.gov/usao-sdfl/pr/joaquin-el-chapo-guzman-sinaloa-cartel-leader-convicted-running-continuing-criminal (Feb. 12, 2019).

### The November 4 Massacre

61.     On November 4, 2019, three vehicles set out from La Mora. Vehicle One was driven by Rhonita Miller, who was traveling with four of her seven children. They were driving to pick up her husband, who had been working in Arizona. Vehicle Two was driven by Christina Marie Langford Johnson, who was traveling with her seven-month-old daughter. Vehicle Three was driven by Dawna Ray Langford, who was traveling with nine of her children to a wedding in Chihuahua, Mexico.

62.     Shortly after departing La Mora, Vehicle One experienced mechanical difficulties. Rhonita Miller and her children exited the vehicle, Dawna drove Rhonita Miller back to La Mora for assistance, and Dawna continued on from La Mora in Vehicle

Three.  Once Rhonita Miller obtained a new vehicle and drove back to her disabled vehicle, she and her children moved their luggage from the disabled vehicle to the new one.  They did this in full view of sicarios stationed on a hill above the road.  While a family member promised to arrive to tow the disabled vehicle back to town, Rhonita and her children continued on their original route through the mountains.

63.     At or around 9:40 a.m., after Rhonita Miller and her four children departed in the replacement Vehicle One, gunmen—members of the Juárez Cartel and La Línea— opened fire on that vehicle from a vantage point somewhere above the road.  The gunmen are believed to have been situated at the top of a hill that overlooks the portion of the road where replacement Vehicle One was driving and where Rhonita had left the disabled vehicle.

64.     Sicarios fired over 200 rounds of ammunition into Rhonita Miller's car, murdering her and her minor children.  Then, they set the vehicle on fire.  Rhonita and all four of the children traveling with her—twelve-year-old H.M., ten-year-old K.M., and eight-month-old twins T.M. and T.M—were killed.

65.     Approximately one hour after the murders of Rhonita Miller and her four children, the gunmen similarly attacked Vehicles Two and Three, which were twelve miles up the road from Vehicle One.  Sicarios began firing on the vehicles from a hill looking down on the road.

66.     Christina Marie Langford Johnson was driving Vehicle Two in the lead. When the shooting began, she placed her seven-month-old daughter's car seat on the floor of the front seat, and covered the baby with a blanket to protect her from bullets and falling glass. Christina then exited her vehicle with her hands up, shouting and attempting to show the attackers that the vehicles were full of women and children.  The sicarios shot her—she was struck by multiple rounds and killed in the road.

67.     Christina's seven-month-old daughter survived the attack, but it took hours for rescuers to reach her.

68.     Sicarios fired upon Vehicle Three, killing Dawna Ray Langford, eleven-year old T.L., and two-year-old R.L.  Before she died, Dawna tried to save all of her children by telling them to get down, and tried to save R.L. by instructing K.L., who was riding in the front seat, to put R.L. on the floor of the passenger's seat, where he might be shielded.  Bullets pierced the floor and sides of the vehicle, killing the two-year-old.

69.     Of the seven children who survived the attack on Vehicle Three, five were shot and injured.

70.     Even after Christina Marie Langford Johnson identified the passengers as women and children, the gunmen fired between 300 and 500 rounds of ammunition upon Vehicles Two and Three.

71.     The seven surviving children from Vehicle Three managed to escape the vehicle and seek shelter in vegetation on the side of the road.

72.     It was clear to the older children of David and Dawna Ray Langford that their brothers and sisters needed medical attention.  Being on a remote mountain road, miles from home, with no adults remaining alive, the children decided that thirteen-year-old D.L. would try to run back to La Mora for help.

73.     D.L. trekked fourteen miles through the desert, largely at night, avoiding the main road for fear that the gunmen were still lying in wait on the hilltop.  It took him around eight hours to reach La Mora and notify adults of the attack.  By the time family members from La Mora reached the spot of the attack, the children had been hiding on the side of the road in near-freezing temperatures for approximately ten hours.

74.     In the meantime, unsure if D.L. would return safely, one of the siblings on the side of the road tried to retrieve coats from the wreckage of Vehicle Three, to keep the children warm in the near-freezing temperatures.  While on the road, the child spotted more sicarios on the hill, and ran back to the makeshift shelter of branches where the other children were hiding.

14

75.     After D.L. had been gone several hours, the children became concerned that no help was coming.  Nine-year-old M.L., who had been shot in the forearm, set out on her own across the desert.  As night fell, she became lost and walked far off course.  The search party did not locate her until the following morning.

76.     Once D.L. reached La Mora and notified his uncles of what had happened, David Langford's brothers attempted to seek help from the local Mexican police, stationed down the road from La Mora.  Fearing for their own safety in cartel territory, the police refused to accompany the family.

77.     David's three brothers set out on their own to locate the children.

78.     David, who was in Arizona at the time of the attack, received a WhatsApp message telling him of the attack.  He drove straight from Phoenix to the site of the attack without knowing what had happened to his family.  When he arrived, David found that his wife and two children were dead, and five of his other children were injured.

### Aftermath of the Attack

79.     Five of David's minor children— K.L., X.L., C.L., B.L., and M.L.— suffered gunshot wounds in the attack.  Each child required medical attention.  After their eventual rescue, the minor Plaintiffs were airlifted to a United States hospital, where several underwent surgery.  C.L., shot multiple times, has required multiple surgeries to salvage use of his leg and jaw.

80.     All the minor children Plaintiffs continue to suffer mental and emotional distress due to witnessing the attack, its grueling aftermath, and the loss of their mother and two brothers.

81.     David continues to suffer mental and emotional distress due to the loss of his wife and two children, and the traumatic injuries suffered by his surviving minor children.

82.     Plaintiffs Brandy Karen Spenst, Bryce David Langford, Cole Langford, and Crystal Alexis Langford continue to suffer mental and emotional distress due to the loss

of their mother and two brothers, and the traumatic injuries suffered by their surviving younger siblings.

83.     Since the massacre, approximate 210 of La Mora's 270 residents, fearing for their safety, have fled the community. They left behind the homes and the land their families have owned for generations.

84.     David Langford decided to move his family to Arizona while his children underwent surgeries and medical treatment, and later to Utah where the family has decided to stay. They left behind their home in La Mora, as well as acres of land, and a pecan orchard that provided the family's main source of income.

85.     After the attack, the Mexican government and military announced that they would build a new military outpost near Bavispe, along the road where the attack occurred. The government aims to curb future cartel violence in the area.

86.     In their investigation, Mexican police determined that the bullet casings around the vehicles were from AR-15 rifles, the type often used by cartel members in mass attacks.

87.     Mexican police arrested suspects, including leaders of La Línea, in connection with the November 4 attack. The investigations by Mexican law enforcement authorities and the United States Federal Bureau of Investigation are ongoing.

88.     Upon information and belief, the Juárez Cartel and La Línea are primarily responsible for the attack and for aiding and abetting the murders of nine innocent American citizens, including decedent Plaintiffs Dawna Ray Langford, T.L., and R.L. They are responsible for the injuries caused to Plaintiffs, as described herein.

89.     Upon information and belief, Defendant John Does I through LX are members of the Juárez Cartel and La Línea, and are the sicarios who carried out the attack. They are responsible for the injuries caused to Plaintiffs, as described herein.

**CLAIMS FOR RELIEF**

## COUNT ONE

### Anti-Terrorism Act
### 18 U.S.C. § 2333

90.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

91.    Plaintiffs are all U.S. Nationals injured by reason of an act of international terrorism and all seek damages under 18 U.S.C. § 2333.

92.    The November 4, 2019 attack perpetrated by Defendants constitutes an act of international terrorism pursuant to 18 U.S.C. § 2331(1).

93.    Defendants' actions involved violent acts dangerous to human life.

94.    Defendants' actions – among them, murder, attempted murder, and assault with a deadly weapon – would constitute violations of the criminal laws of the United States if committed within the jurisdiction of the United States.

95.    Defendants' actions were intended to intimidate or coerce a civilian population.  As the governments of the United States and Mexico have concluded, the Defendants have engaged in acts of violence that are intended to intimidate civilians and deter them from encroaching on cartel territory or impeding illegal smuggling operations. Acts of extreme violence like the attack of November 4 serve to frighten and intimidate local populations like the American citizens living in La Mora, who have since fled the Cartel's territory because of the attack and the ensuing fear of further violence.

96.    The acts of Defendants appear to have been intended to influence the policy of a government by intimidation or coercion.  The November 4 attack was the latest undertaking in the Juárez Cartel's decades-long mission to throw Mexico into chaos and to subvert any efforts to promulgate and enforce laws and policies that would negatively affect the Cartel's business.

97.    The acts of Defendants appear to have been intended to affect the conduct of a government by mass destruction, assassination or kidnapping.  The attack was part of the Juárez Cartel's ongoing mission to intimidate law enforcement so that the cartel

business can carry on, unimpeded by police interference. On November 4, police officers from the town of Bavispe did not immediately respond to the massacre because they feared further cartel violence.

98.     The acts of defendants occurred in Sonora, Mexico, which is outside the territorial jurisdiction of the United States.

99.     Plaintiff David Langford was injured by an act of "international terrorism" for purposes of 18 U.S.C. § 2331(1) when his wife and two sons were murdered in the November 4 attack. He has incurred and continues to incur damages for mental pain and suffering, and emotional distress due to the loss of his wife and children, as well as the injuries and trauma sustained by his surviving children. Further, David Langford has incurred and continues to incur economic damages due to the costs of medical treatment for his surviving children, loss of the use of his property, and lost profits and loss of future profits due to the loss of his agricultural operations.

100.     Dawna Ray Langford was a U.S. National injured by an act of "international terrorism" for purposes of 18 U.S.C. § 2331(1). Her Estate, represented by David Langford, seeks damages under 18 U.S.C. § 2333.

101.     T.L. and R.L. were U.S. Nationals injured by an act of "international terrorism" for purposes of 18 U.S.C. § 2331(1). Their Estates, represented by David Langford, seek damages under 18 U.S.C. § 2333.

102.     David Langford's surviving minor children (K.L., X.L., C.L., B.L., J.L., D.L., and M.L.), whose interests are represented by David Langford, are U.S. Nationals injured by acts of "international terrorism" as defined by 18 U.S.C. § 2331(1) when forced to witness the violent deaths of their mother and two brothers and then to await rescue for over ten hours in the desert or trek through the desert in search of help for their wounded siblings. All seven continue to suffer damages related to trauma and psychological injuries.

103.   Among David Langford's minor children, K.L., X.L., C.L., B.L., and M.L. were further injured by the act of international terrorism when they were shot by members of the Cartel. These minor continue to suffer damages related to their physical injuries.

104.   David Langford's adult children, Brandy Karen Spenst, Bryce David Langford, Cole Langford, and Crystal Alexis Langford were injured by an act of international terrorism for purposes of 18 U.S.C. § 2331(1) and the resulting loss of their mother and two brothers. They seek damages under 18 U.S.C. § 2333.

105.   Damages awarded to Plaintiffs under 18 U.S.C. § 2333 may be satisfied through attachment of "blocked assets" under the Terrorism Risk Insurance Act of 2002 ("TRIA"). Assets of Defendants satisfy the definition of "blocked assets" under 18 U.S.C. § 2333(e) because they have been "seized or frozen by the United States under section 805(b) of the Foreign Narcotics Kingpin Designation Act."

106.   "Blocked assets" may be attached to any "judgment against a terrorist party on a claim based upon an act of terrorism." 28 U.S.C. § 1610 note (TRIA § 201(a)). The acts described herein constitute "act[s] of terrorism" committed by a terrorist party under the applicable definitions in TRIA, including 8 U.S.C. § 1182(a)(3)(B)(iii) and (iv).

107.   All Plaintiffs demand judgment under 18 U.S.C. § 2333 and damages for pain and suffering, emotional distress, loss of companionship, wrongful death, and other damages, including treble damages under 18 U.S.C. § 2333, plus interest, costs, attorneys' fees, and any other such relief as the Court deems appropriate.

## COUNT TWO

### Assault and Battery

108.   The preceding paragraphs are incorporated by reference as though fully set forth herein.

109.   Plaintiff David Langford brings this claim for assault and battery on behalf of his surviving minor children because Defendants unlawfully, violently, and willfully

19

assaulted and battered minor children K.L., X.L., C.L., B.L., J.L., D.L., and M.L. by shooting hundreds of rounds at their vehicle, wounding all but two of the children.

110.   As a direct and proximate result of the attack, plaintiffs  K.L., X.L., C.L., B.L., and M.L. suffered serious and—in some cases—permanent physical injury.

111.   As further direct and proximate result of Defendants' actions, plaintiffs K.L., X.L., C.L., B.L., and M.L. incurred medical and other expenses from their injuries.

112.   Pursuant to N.D.C.C. § 28-01-26.1, a claim for assault and/or battery survives the deaths of Dawna Ray, T.L., and R.L and may be brought by their Estates.

113.   The estates of Dawna Ray Langford, T.L., and R.L.—all represented by David Langford—bring this claim for assault and battery against Defendants.  Dawna Ray Langford, T.L., and D.L. were, as a direct and proximate result of the assault and battery, injured and killed.

114.   As further direct and proximate result of Defendants' actions, the Estates of Dawna Ray Langford, T.L., and R.L. incurred funeral and other expenses from their injuries.

115.   As further direct and proximate result of Defendants' actions, the Estates of Dawna Ray Langford, T.L., and R.L. have suffered from lost wages, future earnings, and future opportunities.

116.   Plaintiff David Langford, on behalf of his minor children, and Plaintiff Estates of Dawna Ray, T.L., and R.L., demands judgment in their favor and damages arising out of assault and battery, including punitive damages, interest, costs, attorneys' fees, and any other such relief as the Court deems appropriate.

## COUNT THREE
### Wrongful Death

117.   The preceding paragraphs are incorporated by reference as though fully set forth herein.

118.   Plaintiff David Langford, as the father of decedents T.L. and R.L., brings claims for the wrongful death of T.L. and R.L. pursuant to N.D.C.C. § 32-21-01 and § 32-21-03.

119.   Plaintiffs Brandy Karen Spenst, Bryce David Langford, Cole Langford, and Cyrstal Alexis Langford, as the children of decedent Dawna Ray Langford, bring a claim for the wrongful death of Dawna Ray Langford pursuant to N.D.C.C. § 32-21-01 and § 32-21-03.

120.   Defendants directly and proximately caused the death of Dawna Ray Langford, T.L., and R.L. ("Decedents") by a wrongful and intentional act.

121.   As a direct and proximate result of Defendants' wrongful and intentional act, Plaintiffs have suffered and will continue to suffer both economic and non-economic damages, including loss of earnings, funeral expenses, severe emotional distress, and permanent psychological injury.

122.   Plaintiff David Langford, on behalf of the Estates of T.L. and R.L., demands judgment in their favor and demands damages arising out of wrongful death, plus interest, costs, fees, and any other such relief as the Court deems appropriate.

123.   Plaintiffs Brandy Karen Spenst, Bryce David Langford, Cole Langford, and Crystal Alexis Langford, on behalf of the Estate of Dawna Ray Langford, demand judgment in their favor and demands damages arising out of wrongful death, plus interest, costs, fees, and any other such relief as the Court deems appropriate.

124.   David Langford's minor children also bring wrongful death claims arising out of the deaths of their mother and brothers, and pursuant to N.D.C.C. § 32-21-01 and § 32-21-03(2). They demand judgment in their favor and damages arising from wrongful death, plus interest, costs, fees, and any other such relief as the Court deems appropriate.

## COUNT FOUR

### Negligent and/or Intentional Infliction of Emotional Distress

125.   The preceding paragraphs are incorporated by reference as though fully set forth herein.

126.   Plaintiffs bring this claim for negligent and/or intentional infliction of emotional distress against Defendants who facilitated, assisted, aided, abetted, materially supported, and incentivized acts of murder and wrongful death, specifically, the shooting at and murder of Dawna Ray Langford and her children and other acts of international terrorism discussed herein.

127.   Pursuant to N.D.C.C. § 28-01-26.1, a claim for negligent and/or intentional infliction of emotional distress survives the deaths of Dawna Ray, T.L., and R.L.

128.   Plaintiffs who were not present at the scene of the attack are entitled to a claim for negligent and/or intentional infliction of emotional distress because the conduct was "sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present." *Murphy v. Islamic Rep. of Iran*, 740 F. Supp. 2d 51, 75–76 (D.D.C. 2010).

129.   Due to the negligent and/or intentional infliction of emotional distress caused by Defendants, all Plaintiffs have suffered severe emotional distress and its attendant physical effects.

130.   The conduct of Defendants was extreme and outrageous, and Defendants knew or should have known that such an act would inflict severe emotional harm on its victims and their family members.

131.   As a direct and proximate result of Defendants' intentional misconduct and/or reckless disregard for human life, all Plaintiffs have suffered and will continue to suffer severe and permanent psychological harm, including ongoing emotional distress and anxiety, requiring ongoing and long-term medical treatment, services, and counseling.

132.    All Plaintiffs demand judgment in their favor and demand damages arising out of assault and battery, including punitive damages, interest, costs, attorneys' fees, and any other such relief as the Court deems appropriate

## COUNT FIVE

### Survival Action

133.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

134.    Plaintiff David Langford, as personal representative[1] of the Estates of Dawna Ray, T.L., and R.L. brings this survival action against Defendants because Defendants knowingly and willfully caused Decedents pain through their wrongful acts before willfully causing Decedents' wrongful deaths.

135.    As a direct and proximate result of the wrongful, intentional, malicious, reckless, grossly negligent, and negligent acts of Defendants as described herein, the Decedents suffered severe and extreme prolonged trauma and apprehension of harmful, offensive bodily contact, bodily injury, and battery.   They suffered extreme fear, terror, anxiety, emotional and psychological distress, knowledge of pending death, physical and emotional trauma, and intentionally inflicted physical pain.

136.    When Defendants fired upon Dawna Ray Langford's vehicle, she had time to comprehend the situation and understand that she would likely die, and that her children may die as well.   She had time to instruct her daughter to attempt to shield R.L. in the passenger well, and time to tell her other children to get down in an effort to save them from the hail of bullets.   She suffered severe mental anguish and psychological pain.   She was shot multiple times and likely suffered physical pain as a result.

---

[1] As noted herein, proceedings to appoint David Langford as personal representative are planned.   Plaintiffs will amend this Complaint upon the appointment of David Langford as personal representative.

137.    T.L. and R.L. also experienced conscious pain and suffering as they were struck with multiple bullets and suffered the mental anguish of knowing that their mother and siblings were all in danger.

138.    Estate Plaintiffs are entitled to all compensatory, punitive, and other damages permitted under the pertinent survival statutes against Defendants. Accordingly, they, through Plaintiff David Langford, demand judgment in their favor and demand damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other relief as the Court deems appropriate.

## **COUNT SIX**

### **Loss of Consortium**

139.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

140.    Plaintiff David Langford and Dawna Ray Langford shared a husband-wife relationship at the time of the attack.

141.    Plaintiff David Langford and T.L.shared a father-child relationship at the time of the attack.

142.    Plaintiff David Langford and R.L. shared a father-child relationship at the time of the attack.

143.    Plaintiff K.L. and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

144.    Plaintiff K.L. and T.L. shared a sibling relationship at the time of the attack.

145.    Plaintiff K.L. and R.L. shared a sibling relationship at the time of the attack.

146.    Plaintiff X.L. and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

147.    Plaintiff X.L. and T.L. shared a sibling relationship at the time of the attack.

148.   Plaintiff X.L. and R.L. shared a sibling relationship at the time of the attack.

149.   Plaintiff C.L. and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

150.   Plaintiff C.L. and T.L. shared a sibling relationship at the time of the attack.

151.   Plaintiff C.L. and R.L. shared a sibling relationship at the time of the attack.

152.   Plaintiff B.L. and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

153.   Plaintiff B.L. and T.L. shared a sibling relationship at the time of the attack.

154.   Plaintiff B.L. and R.L. shared a sibling relationship at the time of the attack.

155.   Plaintiff J.L. and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

156.   Plaintiff J.L. and T.L. shared a sibling relationship at the time of the attack.

157.   Plaintiff J.L. and R.L. shared a sibling relationship at the time of the attack.

158.   Plaintiff D.L. and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

159.   Plaintiff D.L. and T.L. shared a sibling relationship at the time of the attack.

160.   Plaintiff D.L. and R.L. shared a sibling relationship at the time of the attack.

161.   Plaintiff M.L. and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

162.   Plaintiff M.L. and T.L. shared a sibling relationship at the time of the attack.

163.   Plaintiff M.L. and R.L. shared a sibling relationship at the time of the attack.

164.   Plaintiff Brandy Karen Spenst and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

165.   Plaintiff Brandy Karen Spenst and T.L. shared a sibling relationship at the time of the attack.

166.   Plaintiff Brandy Karen Spenst and R.L. shared a sibling relationship at the time of the attack.

167.   Plaintiff Bryce David Langford and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

168.   Plaintiff Bryce David Langford and T.L. shared a sibling relationship at the time of the attack.

169.   Plaintiff Bryce David Langford and R.L. shared a sibling relationship at the time of the attack.

170.   Plaintiff Cole Langford and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

171.   Plaintiff Cole Langford and T.L. shared a sibling relationship at the time of the attack.

172.   Plaintiff Cole Langford and R.L. shared a sibling relationship at the time of the attack.

173.   Plaintiff Crystal Alexis Langford and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

174.   Plaintiff Crystal Alexis Langford and T.L. shared a sibling relationship at the time of the attack.

175.   Plaintiff Crystal Alexis Langford and R.L. shared a sibling relationship at the time of the attack.

176.   As a direct and proximate result of the wrongful acts of Defendants, surviving Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, affection and assistance, all to the detriment of the marital, parental, and sibling relationship.

177.   Surviving Plaintiffs demand judgment in their favor and demand damages arising out of loss of consortium, plus interest, costs, fees, and any other such relief as the Court deems appropriate.

### DEMAND FOR A JURY TRIAL

178.   Plaintiffs demand a jury trial for all claims alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against all Defendants, jointly and severally, for damages under the Anti-Terrorism Act, 18 U.S.C. § 2333 *et seq.*, assault and battery, wrongful death, negligent and/or intentional infliction of emotional distress, survival action, and loss of consortium.  Plaintiffs request damages for all past and future pain and suffering, past and future mental pain and suffering, loss of consortium, wrongful death, loss of future earnings potential, and any other potential remedies including treble damages for the maximum amount allowed under the Anti-Terrorism Act, 18 U.S.C. § 2333, *et seq.*, including reasonable attorneys' fees and costs, and for any other relief the Court deems just and proper.

Respectfully submitted this 25th day of August, 2020.


ROBINS KAPLAN LLP

By: */s/ Timothy Q. Purdon*

Timothy Q. Purdon, ND #05392
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
701-255-3000
TPurdon@RobinsKaplan.com

BALLARD SPAHR LLP

Henry E. Hockeimer, Jr.
(*pro hac vice* application pending)
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103

27

215-665-8500
HockeimerH@BallardSpahr.com

Jacey Skinner
(*pro hac vice* application pending)
BALLARD SPAHR LLP
201 South Main Street #800
Salt Lake City, Utah 84111
801-531-3000
SkinnerJ@BallardSpahr.com

Mark S. Kokanovich
Jillian L. Andrews
(*pro hac vice* applications pending)
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004
602.798.5400
KokanovichM@BallardSpahr.com
AndrewsJ@BallardSpahr.com

*Attorneys for Plaintiffs*

90879591.1