**JR LANGUAGE**
TRANSLATION SERVICES, INC.

P: 585.935.7144  •  F: 585.486.1033  •  2112 EMPIRE BLVD. SUITE 1C  •  WEBSTER, NEW YORK 14580  •  WWW.JRLANGUAGE.COM

# CERTIFICATE OF ACCURACY
# CERTIFICADO DE FIDELIDAD

This is to **CERTIFY** that the translation from <u>English</u> into <u>Spanish</u> is a true, accurate and faithful representation of the original that was submitted, to the best of our translator's training and ability, who is fluent in the language and qualified to translate.

Por la presente **CERTIFICO** que esta es una traducción del <u>inglés</u> al <u>español</u> completa y fiel del original del documento recibido, efectuada de acuerdo al conocimiento y preparación de nuestro traductor quien tiene dominio del idioma y está capacitado para traducir.

To which we set our hand and seal
En constancia de lo cual firmo y sello este Certificado.

_____

Yuisa Gonzalez-Rivera
Date:      09-25-2020
Fecha:    25-09-2020



**JR Language Translations, Inc.** ata
Member of the American Translators Association No. **259340**

TRIBUNAL FEDERAL DE PRIMERA
INSTANCIA POR EL DISTRITO DE
DAKOTA DEL NORTE FUERO DEL OESTE

---

David Langford, Sucesión de Dawna Ray
Langford, Sucesión de T.L., Sucesión de
R.L., K.L.,
X.L. C.L., B.L., D.L., M.L., J.L. (hijos
menores de David y Dawna Ray
Langford), Brandy Karen Spenst, Bryce
David Langford, Cole Langford, Crystal
Alexis Langford,

        Demandantes,

vs.

Cartel de Juárez, La Línea, John
Does I al LX,

        Demandados.

Expediente judicial Nro._____

**DEMANDA
Y PEDIDO DE JUICIO POR JURADO**

---

## INTRODUCCIÓN

1.    Los Demandantes, David Langford, Sucesión de Dawna Ray Langford, Sucesión de T.L., Sucesión de R.L., niños menores K.L., X.L., C.L., B.L., D.L., M.L., J.L., y Brandy Karen Spenst, Bryce David Langford, Cole Langford, y Crystal Alexis Langford (colectivamente, los "Demandantes" o la " Familia Langford"), todos ellos son ciudadanos estadounidenses, inician esta acción de conformidad con la Ley Antiterrorismo ("ATA"), art. 2333 y sgts. del Título 18 del Código de los EE.UU. (18 U.S.C. §§ 2333 *et seq*.), y diversas pretensiones amparadas por la legislación estadual para impulsar acciones civiles por la inconcebible violencia cometida en contra de su familia en un ataque perpetrado por matones (conocidos como "sicarios" en México) del Cartel de Juárez en una ruta que se usa para transportar drogas ilegales por México.

2.    El 4 de noviembre de 2019, unos sicarios asesinaron brutalmente a tres mujeres estadounidenses y a sus hijos menores, quienes en su totalidad vivían en el extranjero en La Mora, que es una comunidad tranquila y apartada en Sonora, México.

3.      Los sicarios se ocultaron en las cumbres de las colinas cercanas a Colonia La Mora y dispararon cientos de tiros desde armas de fuego automáticas a tres vehículos que se desplazaban por el camino cercano a La Mora que suele ser utilizado para el contrabando de drogas ilegales del Cartel.

4.      Los pasajeros señalaron a los tiradores que los vehículos estaban llenos de mujeres y niños inocente, pero aun así prosiguieron con el ataque y asesinaron a las tres conductoras y a seis de sus hijos, e hirieron a otros cinco.

5.      Los atacantes mataron a Dawna Ray Langford, esposa de David Langford y madre de trece hijos.

6.      Los atacantes mataron a T.L., el hijo de once años de edad de David y Dawna.

7.      Los atacantes mataron a R.L., el hijo de dos años de David y Dawna.

8.      Luego del ataque, después de haber presenciado el fallecimiento de su madre y sus hermanos, el menor de trece años de edad, D.L. caminó catorce millas por un terreno accidentado y desértico con el fin de pedir auxilio para sus hermanos mal heridos y abandonados a su suerte en condiciones gélidas en el lugar del ataque donde su madre y sus hermanos acababan de ser asesinados.

9.      Cuando ya habían pasado varias horas sin que regresara D.L., M.L. de nueve años de edad, a quien le habían disparado en el brazo, también partió hacia campo traviesa para buscar ayuda para sus hermanos cuyas lesiones se agravaban minuto a minuto. M.L. se perdió en el desierto durante la noche y no se la pudo localizar hasta la mañana siguiente.

10.     K.L., B.L., X.L., C.L., y M.L. sufrieron heridas de armas de fuego en el ataque. Todos los siete niños menores sobrevivientes siguieron sufriendo de grave angustia emocional.

11.     Como consecuencia del ataque, la mayoría de los residentes de La Mora, incluso David Langford y su familia, huyó del poblado donde sus familias habían vivido durante décadas. Abandonaron sus hogares y tierras, además de sus valiosos campos, ganados y huertos que representan sus principales medios de sustento económico.

12.     Las autoridades mexicanas que investigan el ataque del 4 de noviembre de 2019 han arrestado a varios individuos vinculados con la masacre, incluidos los líderes de La Línea y el Cartel de Juárez.

## JURISDICCIÓN Y SEDE JUDICIAL

13.     Esta causa se inicia con fundamento en el 18 U.S.C. §§ 2333, *et seq*., y así surge de conformidad con las leyes de los Estados Unidos. Por lo tanto, este Tribunal tiene competencia jurisdiccional en razón de la materia en virtud del 18 U.S.C. § 2338 y del 28 U.S.C. § 1331.

14.     La jurisdicción también surge de conformidad con el 28 U.S.C. § 1332(a)(2) como acción civil entre ciudadanos de un Estado de los EE.UU. y ciudadanos de un estado extranjero donde el monto litigioso supera los US$ 75.000, sin incluir intereses ni costas.

15.     Este Tribunal cuenta con jurisdicción personal sobre los Demandados porque tal como se alega en otro tramo de la presente, todos los Demandados han establecidos contactos continuos y sistemáticos con los Estados Unidos a través de sus operaciones ilegales de narcotráfico.

16.     La sede judicial corresponde a este Distrito de conformidad con el 18 U.S.C. § 2334(a). Los Demandantes Brandy Karen Spenst y Bryce David Langford residen en Dakota del Norte.

17.     La sede judicial también corresponde por el 28 U.S.C. § 1391(b)(3), ya que los Demandados no residen en los Estados Unidos, pero están sujetos a la competencia jurisdiccional de este Tribunal.

## PARTES
### Demandantes

18.     El Demandante David Langford es y fue, en todo momento relevante para esta causa, un ciudadano estadounidense y el marido de Dawna Ray Langford, una ciudadana estadounidense de 43 años de edad asesinada en un hecho de terrorismo internacional perpetrado por los demandados en Sonora, México, el 4 de noviembre de 2019. El Demandante también era el padre de T.L. de once años de edad y de R.L. de dos años de edad, ambos eran ciudadanos estadounidenses asesinados en el ataque. David Langford también es el padre de K.L., X.L., C.L., B.L., J.L., D.L., y M.L., los siete niños menores sobrevivientes y demandantes que sufrieron daños, perjuicios y lesiones físicas y emocionales a causa del ataque.

19.     La Demandante Sucesión de Dawna Ray Langford es la sucesión personal de la causante Dawna Ray Langford, quien era ciudadana de los Estados Unidos. Los sicarios asesinaron a Dawna Ray Langford el 4 de noviembre de 2019.

20.     La Demandante Sucesión de T.L. es la sucesión personal del causante T.L., quien era ciudadano de los Estados Unidos y tenía once años de edad al momento del ataque. Los sicarios asesinaron a T.L. el 4 de noviembre de 2019.

21.     La Demandante Sucesión de R.L. es la sucesión personal del causante R.L., quien era ciudadano de los Estados Unidos y tenía dos años de edad al momento del ataque. Los sicarios asesinaron a R.L. el 4 de noviembre de 2019.

22.     El Demandante David Langford espera ser nombrado como representante personal de las Sucesiones de Dawna Ray Langford, T.L., y R.L.

23.     La Demandante K.L. es y fue en todo relevante para esta causa una ciudadana de los Estados Unidos y tenía catorce años de edad al momento del ataque. Los sicarios le dispararon a K.L. el 4 de noviembre de 2019. Además de las graves lesiones físicas sufridas, K.L. ha padecido y sigue padeciendo daños emocionales a causa de la pérdida de su madre y sus hermanos, así como también por la traumática experiencia de presenciar la masacre del 4 de noviembre.

24.     El Demandante D.L. es y fue en todo momento relevante para esta causa un ciudadano de los Estados Unidos y tenía trece años de edad al momento del ataque. D.L. sufrió daños emocionales cuando se vio obligado a caminar a campo traviesa unas 14 millas atravesando terreno accidentado y desértico para buscar auxilio para sus hermanos y hermanas quienes fueron abandonados a su suerte en el lugar del ataque. D.L. sufrió y sigue sufriendo daños emocionales a causa de la pérdida de su madre y sus hermanos, así como también por la traumática experiencia de presenciar la masacre del 4 de noviembre.

25.     La Demandante M.L. es y fue en todo momento relevante para esta causa una ciudadana de los Estados Unidos y tenía nueve años de edad al momento del ataque. Los sicarios le dispararon a M.L. en el antebrazo el 4 de noviembre de 2019. M.L. luego sufrió daños emocionales cuando se vio obligada a caminar a campo traviesa por terreno accidentado y desértico para buscar auxilio para sus hermanos y hermanas quienes quedaron abandonados a su suerte en el lugar del ataque. M.L. se perdió en el desierto, se cruzó con animales salvajes y temió por su vida hasta que fuera rescatada por sus familiares al día siguiente. M.L. sufrió y sigue sufriendo daños emocionales por la pérdida de su madre y sus hermanos, así como también por la traumática experiencia de presenciar la masacre del 4 de noviembre.

26.    El Demandante X.L. es y fue en todo momento relevante para esta causa un ciudadano de los Estados Unidos y tenía cuatro años de edad al momento del ataque. Los sicarios le dispararon a X.L. el 4 de noviembre de 2019. Además de una herida de arma de fuego en su hombro y un perdigón en su pecho, X.L. sufrió y sigue sufriendo daños emocionales a causa de la pérdida de su madre y sus hermanos, así como también por la traumática experiencia de presenciar la masacre del 4 de noviembre.

27.    El Demandante C.L. es y fue en todo momento relevante para esta causa un ciudadano de los Estados Unidos y tenía ocho años de edad al momento del ataque. Los sicarios le dispararon a C.L. el 4 de noviembre de 2019. C.L. sufrió graves heridas de armas de fuego en su maxilar y en ambas piernas, incluso después de haberse sometido a múltiples cirugías, que dificultan su capacidad para caminar y hablar, y que le requerirán años de terapia física intensiva. Asimismo, C.L. sufrió y sigue sufriendo daños emocionales a causa de la pérdida de su madre y sus hermanos, así como también por la traumática experiencia de presenciar la masacre del 4 de noviembre.

28.    El Demandante B.L. es y fue en todo momento relevante para esta causa un ciudadano de los Estados Unidos y tenía ocho meses de edad al momento del ataque. Los sicarios le dispararon B.L. el 4 de noviembre de 2019. Además de una abrasiva herida de bala en el pecho, B.L., sufrió y sigue sufriendo daños emocionales a causa de la pérdida de su madre y sus hermanos, así como también por la traumática experiencia de presenciar la masacre del 4 de noviembre.

29.    El Demandante J.L. es y fue en todo momento relevante para esta causa un ciudadano de los Estados Unidos y un niño menor de edad. J.L. sufrió y sigue sufriendo daños emocionales a causa de la pérdida de su madre y sus hermanos, así como también por la traumática experiencia de presenciar la masacre del 4 de noviembre.

30.    La Demandante Brandy Karen Spenst es hija adulta de David y Dawna Ray Langford. Brandy Spenst sufrió y sigue sufriendo daños emocionales a causa de la pérdida de su madre y dos hermanos y por el terror perpetrado en contra de sus hermanos menores por parte de los demandados.

31.    El Demandante Bryce David Langford es hijo adulto de David y Dawna Ray Langford. Bryce Langford sufrió y sigue sufriendo daños emocionales a causa de la pérdida de

su madre y dos hermanos y por el terror perpetrado en contra de sus hermanos menores por parte de los demandados.

32.     El Demandante Cole Langford es hijo adulto de David y Dawna Ray Langford. Cole Langford sufrió y sigue sufriendo daños emocionales a causa de la pérdida de su madre y dos hermanos y por el terror perpetrado en contra de sus hermanos menores por parte de los demandados.

33.     La Demandante Crystal Alexis Langford es hija adulta de David y Dawna Ray Langford. Crystal Langford sufrió y sigue sufriendo daños emocionales a causa de la pérdida de su madre y dos hermanos.

### **Demandados**

34.     El Demandado Cartel de Juárez (el "Cartel") es un sindicato criminal y organización narcotraficante internacional radicada principalmente en Chihuahua, México, con operaciones de narcotráfico que se propagan a lo largo y a lo ancho de todo México y Estados Unidos. Se consta por información y creencia, el Cartel de Juárez fue el responsable del ataque contra la Familia Langford el 4 de noviembre de 2019.

35.     La Línea es el brazo de ejecución del Cartel de Juárez y está involucrado en el negocio ilegal de narcotráfico del Cartel. La función principal de La Línea en el Cartel de Juárez consiste en perpetrar actos de violencia bajo la dirección del Cartel de Juárez, con el propósito de proteger su territorio y sus operaciones de narcotráfico. Según consta por información y creencia, La Línea fue en parte responsable del ataque el 4 de noviembre de 2019.

36.     John Does I al LX son cada uno de los miembros individuales integrantes de La Línea y del Cartel de Juárez. Según consta por información y creencia, son los individuos que llevaron a cabo el ataque del 4 de noviembre de 2019 y asesinaron a nueve inocentes ciudadanos estadounidenses.

### **DECLARACIÓN DE LOS HECHOS**
#### **La Mora, Sonora**

37.     La Mora es una comunidad cercana al pueblo de Bavispe, en Sonora, México, próximo al límite del estado de Chihuahua. El área que rodea a La Mora y Bavispe es un

territorio que se disputan diversos carteles. Aproximadamente unas 70 millas al sur de la frontera con Arizona, se encuentra ubicada en el estado natal del Cartel de Sinaloa, pero no tan lejos del estado de origen del Cartel de Juárez. Por generaciones, La Mora ha sido el hogar de una pequeña comunidad de familias compuestas por ciudadanos estadounidenses que eligieron criar a sus hijos allí. Ciudadanos estadounidenses mormones fueron los primeros que se asentaron en La Mora hace ya décadas, y ha subsistido en paz con sus vecinos mexicanos desde sus inicios.

38.     David Langford ha vivido en La Mora la mayor parte de su vida, y eligió criar a su familia allí, junto con sus hermanos y su familia extendida. David sustentó a su familia primordialmente con los ingresos generados por un exitoso huerto de nogales y por sus actividades ganaderas.

39.     La Mora está situada cerca de lo que tradicionalmente ha sido una ruta del narcotráfico utilizada por los carteles de la zona para contrabandear narcóticos ilegales desde México hacia los Estados Unidos. La ruta, al oeste de La Mora, serpentea hacia el oeste de la comunidad hasta llegar al terreno montañoso que queda a pocas millas de La Mora y del pueblo mexicano de Bavispe.

### La violencia del Cartel de Juárez

40.     En todos los momentos relevantes, el Cartel de Juárez ha sido uno de los carteles narcotraficantes más poderosos de México. Históricamente ha controlado el Corredor Juárez-El Paso, una de las rutas de contrabando más importantes a lo largo de la frontera de México con los Estados Unidos. Antiguamente estaba aliado al Cartel de Sinaloa, antes de que el Cartel de Juárez se dividiera aproximadamente en 2008, se alineó con Barrio Aztecas, una pandilla internacional famosa por actos violentos. A los miembros de Barrio Aztecas se les encomendó la tarea de ejecutar aberrantes asesinatos en la zona de Juárez durante el conflicto sobreviniente con el Cartel de Sinaloa, lo que solía generar exhibiciones públicas de cadáveres y así se aseguraban de que los asesinatos intimidarían tanto a las autoridades y fuerzas de seguridad, como a las pandillas rivales y ciudadanos civiles por igual.

41.     Para la misma época unió sus fuerzas con Barrios Aztecas, el Cartel de Juárez también se alió con La Línea, un grupo fundado por oficiales de policía corruptos entrenados en conflictos armados urbanos.  La Línea actúa como el brazo ejecutivo del Cartel de Juárez y ha

estado vinculado con algunos de los hechos de violencia más conocidos del Cartel de Juárez, incluido el homicidio de ciudadanos estadounidenses empleados en un consulado local de la Embajada de los EE.UU., el asesinato de dieciséis adolescentes en una fiesta de escuela secundaria, un atentado con autobomba que mató tanto a socorristas como a civiles en Ciudad Juárez, y el homicidio de diecinueve pacientes en un instituto de rehabilitación por consumo de drogas.

42.     Las fuerzas de seguridad han rastreado a la mayoría de los ataques cometidos por carteles hasta vincularlo con una guerra por territorio y control. Estos ataques violentos se perpetran con la intención de intimidar a civiles y pandillas rivales, y para afectar las decisiones y conductas de los gobiernos de México y Estados Unidos.

43.     Lo que más trascendió al conocimiento público fue que los Carteles de Juárez y Sinaloa se trabaron en una violenta batalla por el control de Ciudad Juárez entre 2008 y 2012. Dicho conflicto provocó unas 10.000 muertes y un masivo desplazamiento de civiles.

44.     Se sabe que el Cartel de Juárez utiliza armas de características militares en sus ataques. Los miembros suelen usar chalecos antibalas y llevan una mezcla de armas, incluso armas cortas y automáticas como rifles AR-15 y ametralladoras. Estas armas se utilizan para infligir la máxima cantidad de daños a los objetivos del Cartel, tanto civiles como militares.

45.     El Cartel de Juárez cuenta con miembros conocidos como "sicarios", término que suele entenderse más popularmente como "matones" o "asesinos a sueldo". Los sicarios son los responsables de la mayoría de los ataques dirigidos a poblaciones civiles y militares, así como también de los ataques a pandillas rivales. Se sabe que los sicarios operan como centinelas antes de un ataque, estableciendo una posición desde la cual pueden rastrear los movimientos de sus objetivos. Luego, los sicarios suelen usar una red de comunicación improvisada o ya establecida para compartir la ubicación de sus objetivos y así poder coordinar sus ataques.

## Actos de Terror de Carteles en contra de Civiles

46.     La violencia de los carteles no se limita a los miembros de carteles rivales. El Cartel de Juárez ya ha cometido actos de violencia en contra de civiles en áreas donde pretendió establecer o mantener su control. Estos actos violentos evidencian los esfuerzos que realiza el Cartel para intimidar a civiles o sacarlos del territorio del Cartel.

47.     Los investigadores estiman que los carteles mataron a 994 niños en México tan solo entre los años 2006 y 2010.

48.     Muchos ataques de carteles en contra de civiles consisten en asesinatos masivos. En 2004, los funcionarios descubrieron una tumba masiva afuera de una casa cerca de Ciudad Juárez. El Cartel de Juárez usó la casa para interrogar y asesinar a civiles y pandilleros sospechados de actuar como informantes para las fuerzas de seguridad. El lugar pasó a conocerse en la comunidad como "la Casa de la Muerte."

49.     En 2010, el Cartel de Juárez asesinaron a varios miembros de otras dos familias estadounidenses en un ataque similar a la masacre del 4 de noviembre de 2019. Lesley Redelf y Jorge Salcido Cisneros, ambos empleados consulares y ciudadanos estadounidenses, asistieron junto con sus familias a una fiesta organizada por el Consulado de los Estados Unidos en Ciudad Juárez. Cuando las dos familias se fueron del evento, cada una de ellas fue perseguida por miembros del Cartel de Juárez que se comunicaron mediante una red de comunicación improvisada para coordinar sus ataques. Cada vehículo fue rodeado por vehículos del Cartel de Juárez y fueron abordados por sicarios que portaban armas de asalto. Los hombres armados le dispararon en la cabeza a Lesley Redelf, quien estaba embarazad en ese momento. Su marido, Arthur Redelf, intentó huir conduciendo su vehículo para salvar la vida de la hijita de la pareja que iba en el asiento trasero. Los hombres armados le dispararon y lo mataron. Más tarde, las autoridades descubrieron viva a la pequeña adentro del vehículo. Los miembros del Cartel de Juárez también asesinaron a Jorge Salcido Cisneros e hirieron a sus dos hijas, de siete y cuatro años de edad.

50.     Algunos especialistas de las fuerzas de seguridad en México sospechan que los ataques del Cartel se han tornado cada vez más aberrantes con el fin de intimidar tanto a civiles como a funcionarios gubernamentales. Los expertos citan un incidente de 2006 sucedido en el oeste de  México como el principio de este patrón de  violencia diseñado para llamar la atención

e intimidar a la sociedad en su conjunto. En ese ataque, los miembros del cartel entraron a un club nocturno lleno de gente e hicieron rodar por la pista de baile cinco cabezas humanas decapitadas. Desde aquel incidente, los carteles han utilizado la decapitación con mayor frecuencia para intimidar a civiles y a las fuerzas de seguridad.

### Actos de Terror de los Carteles en contra de Funcionarios Públicos

51.     Los principales carteles mexicanos, incluso el Cartel de Juárez, también han asesinado a periodistas, oficiales de policía y funcionarios públicos en su búsqueda por ejercer el control de su territorio para el contrabando de estupefacientes. En la mayoría de los casos, los homicidios suelen ser violentos y públicos, con el propósito de enviar un mensaje a otros que podrían desafiar su autoridad en un área determinada.

52.     En 2009, el Cartel de Juárez intentó asesinar al Gobernador de Chihuahua. Una vez más en 2020, los sicarios atacaron al actual Gobernador y a los policías que tuvieron como un objetivo en un tiroteo que produjo seis muertos después de haberse disparado más de 1.000 tiros. Posteriormente, el Gobernador dijo en una conferencia de prensa que el ataque había sido un intento de intimidar a las fuerzas de seguridad y vengarse por los operativos que las fuerzas de seguridad habían dirigido contra la actividad de los carteles en Chihuahua.

53.     En febrero de 2011, los sicarios de otro cartel asesinaron al Agente Especial Jaime Zapata del Servicio de Control Inmigratorio y Aduanero de los Estados Unidos (el "ICE"). Los sicarios se posicionaron a lo largo de una carretera mexicana y emboscaron a los dos agentes del ICE en su coche y forzaron la salida de su vehículo del camino. Usando armas AK-47, ocho sicarios abrieron fuego sobre los agentes y mataron al Agente Especial Zapata e hirieron al Agente Especial Víctor Ávila.

*54.*     El gobierno de los Estados Unidos ha reconocido que el patrón de violencia ejecutado por los carteles tiene por objeto ejercer intimidación o coerción tanto sobre los funcionarios gubernamentales como sobre los oficiales de las fuerzas de seguridad. En el procesamiento judicial de ciertos líderes del Cartel de Sinaloa, el Departamento de Justicia advirtió que "utilizaban diversos medios para evadir a las fuerzas de seguridad y proteger sus actividades de distribución de estupefacientes, incluso . . . intimidando con amenazas de violencia a miembros de las fuerzas de seguridad". Depto. de Justicia, *Diez presuntos líderes de un cartel narcotraficante mexicano*

10

*entre los 43 imputados procesados en Brooklyn y Chicago como parte de un golpe coordinado contra las organizaciones narcotraficantes mexicanas* (20 de agosto de 2009).

55.     Los carteles suelen intimidar o coaccionara oficiales de las fuerzas de seguridad para que ignoren su actividad criminal o incluso se sumen a los esfuerzos de los Carteles.

La Línea se compone en gran medida de ex policías mexicanos, y recientemente un agente de la Patrulla Fronteriza de los Estados Unidos fue procesado por estar implicado en un homicidio cometido por un cartel, después de haberse incorporado al Cartel mientras mantenía su puesto como oficial de las fuerzas de seguridad de los Estados Unidos. Jay Root, *The Texas Tribune*, "Agente de la Patrulla Fronteriza procesado en un homicidio cometido por un cartel", https://www.texastribune.org/2016/01/13/border-patrol-agent-indicted-cartel-murder/ (13 de enero de 2016).

56.     Un oficial de policía local, Fidel Alejandro Villegas, del pueblo de Janos en Chihuahua, fue arrestado en relación con el ataque del 4 de noviembre. Reuters, *Jefe de la policía municipal arrestado por la masacre de un mormón mexicano*, https://www.reuters.com/article/us-mexico-violencia-usa-arrest/municipal-policía-chief-arrested-over-mexican-mormon-massacre-idUSKBN1YV1LA (27 de diciembre de 2019).

57.     El gobierno de los Estados Unidos acaba de reconocer que los carteles buscaron cometer actos de violencia en contra de los gobiernos de Estados Unidos y México, con el fin de continuar su campaña de intimidación y coerción y sacar a funcionarios públicos del territorio del cartel. *Estados Unidos v. Guzmán-Loera, et al.*, Caso Nro. 09-CR- 383 (N.D. Ill.), Procesamiento Sustituto (varios imputados de carteles "declararon acerca del uso de la violencia en contra de edificios de los gobiernos estadounidense y/o mexicano gobierno "); Depto. de Justicia de los EE.UU., *Joaquín "El Chapo" Guzmán, líder del Cartel de Sinaloa, condenado por dirigir una organización delictiva permanente, entre otros cargos relacionados con el narcotráfico*, https://www.justicia.gov/usao-sdfl/pr/joaquin-el-chapo-guzman-sinaloa-cartel-leader-convicted-running-continuing-criminal (12 de febrero de 2019) ("El éxito del Cartel de Sinaloa se basa en el uso de la violencia para mantener su poder en toda la región y zonas aledañas".).

## Actividades de Contrabando de los Carteles

58.     Los carteles se dedican al ubicuo contrabando de drogas en todos los Estados Unidos. Los carteles mexicanos son los responsables de un 70 por ciento de los narcóticos ilegales que circulan por los Estados Unidos.

59.     Los carteles también participan en el contrabando de armas en todos los Estados Unidos. En su enorme mayoría las armas que usan los Carteles se producen y venden en los EE.UU. Se cree que las armas que más se contrabandean desde los Estados Unidos hacia México son rifles de asalto, incluidos el AR-15 y el AR-47. Entre 2009 y 2014, se cree que el 70 por ciento de las armas de fuego incautadas por las autoridades mexicanas han tenido su origen en los Estados Unidos. La mitad de esas armas incautadas se trataba de "armas largas", incluso el AR-15, que las autoridades mexicanas reconocen como una de las armas preferidas por los sicarios.

60.     El gobierno de los Estados Unidos ha reconocido que los carteles "han liberado el acceso a las armas", incluso a los rifles automáticos. Depto. de Justicia de los EE.UU., *Joaquín "El Chapo" Guzmán, líder del Cartel de Sinaloa, condenado por dirigir una organización delictiva permanente, entre otros cargos relacionados con el narcotráfico*, https://www.justice.gov/usao-sdfl/pr/joaquin-el-chapo-guzman-sinaloa-cartel-leader-convicted-running-continuing- criminal (12 de febrero de 2019).

## La masacre del 4 de noviembre

61.     El 4 de noviembre de 2019, tres vehículos partieron desde La Mora. Al Vehículo número Uno lo conducía Rhonita Miller, quien viajaba con cuatro de sus siete hijos. Se trasladaban en su coche para recoger a su marido, quien había estado trabajando en Arizona. Al Vehículo número Dos lo conducía Christina Marie Langford Johnson, quien viajaba con su hija de siete meses de edad. Al Vehículo número Tres lo conducía Dawna Ray Langford, quien viajaba con nueve de sus hijos a una boda en Chihuahua, México.

62.     Un rato después de salir de La Mora, el Vehículo número Uno tuvo algunos desperfectos mecánicos. Rhonita Miller y sus hijos salieron del vehículo, Dawna la llevó a Rhonita Miller de regreso a La Mora para recibir ayuda, y Dawna continuó conduciendo desde

La Mora en el Vehículo Tres. Una vez que Rhonita Miller obtuvo un nuevo vehículo y volvió hasta donde se encontraba su vehículo descompuesto, ella y sus hijos pasaron su equipaje del vehículo descompuesto al nuevo. Lo hicieron a plena vista de los sicarios estacionados sobre una colina que se encuentra por arriba del camino. Mientras que un familiar prometió llegar para remolcar el vehículo descompuesto de regreso al pueblo, Rhonita y sus hijos siguieron conduciendo por su ruta original a través de las montañas.

63.     Aproximadamente a las 9:40 a.m., después de que Rhonita Miller y sus cuatro hijos salieron en el Vehículo número Uno de reemplazo, unos hombres armados que eran miembros del Cartel de Juárez y La Línea- abrieron fuego sobre ese vehículo desde un punto ventajoso que se encontraba por encima del camina. Se cree que los hombres armados se habían situado en la cima de la colina que da a la porción del camino por donde iba el Vehículo número Uno de reemplazo y por donde Rhonita había dejado el vehículo descompuesto.

64.     Los sicarios le dispararon más de 200 tiros al automóvil de Rhonita Miller, lo que provocó su muerte y las de sus hijos menores. Luego, incendiaron el vehículo. Así murieron Rhonita y todos sus cuatro hijos que viajaban con ella H.M. de doce años de edad, K.M. de diez, y los mellizos T.M. y T.M de apenas ocho meses de edad.

65.     Aproximadamente una hora después de los asesinatos de Rhonita Miller y sus cuatro hijos, los hombres armados atacaron de manera similar a los Vehículos Dos y Tres, los cuales se encontraban a doce millas más adelante por el camino del Vehículo Uno. Los sicarios comenzaron a dispararle a los vehículos desde una colina que daba sobre el camino.

66.     Christina Marie Langford Johnson iba conduciendo el Vehículo Dos delante de todos. Cuando comenzó la balacera, colocó la sillita de su hija de siete meses de edad sobre el piso del asiento delantero, y cubrió a la bebé con una sábana para protegerla de las balas y del vidrio acribillado. Luego Christina salió de su vehículo con sus manos en alto, gritando y tratando de demostrarles a los atacantes que los vehículos estaban llenos de mujeres y niños. Los sicarios le dispararon y ella resultó impactada múltiples tiros que la dejaron muerta en el camino.

67.     La hija de meses de edad de Christina sobrevivió al ataque, pero les llevó horas a los rescatistas para ubicarla donde se encontraba.

68.     Los sicarios le dispararon al Vehículo Tres, y con ello mataron a Dawna Ray Langford, a T.L. de doce años de edad, y a R.L. de dos años. Antes de que falleciera, Dawna trató de salvar a todos sus hijos gritándoles que se mantuvieran agazapados, e intentó salvar a R.L. dándole a K.L., que estaba viajando en el asiento delantero, la instrucción de poner a R.L. en el piso del asiento del pasajero, donde podría quedar protegido. Las balas perforaron el piso y los costados del vehículo, lo que provocó la muerte del niño de dos años de edad.

69.     De los siete niños que sobrevivieron al ataque en el Vehículo Tres, cinco recibieron disparos y resultaron heridos.

70.     Incluso después de que Christina Marie Langford Johnson identificara a los pasajeros como mujeres y niños, los hombres armados dispararon entre 300 y 500 tiros contra los Vehículos Dos y Tres.

71.     Los siete niños sobrevivientes del Vehículo Tres lograron escapar del vehículo y buscaron refugio en la vegetación del costado del camino.

72.     Resultó evidente para los niños mayores de David y Dawna Ray Langford que sus hermanos y hermanas necesitaban atención médica. Al encontrarse en un remoto camino de montaña, a millas de distancia de su casa, y sin ningún adulto que estuviera vivo a su alrededor, los niños decidieron que D.L. de trece años de edad intentaría volver corriendo a La Mora para buscar ayuda.

73.     D.L. caminó a campo traviesa catorce millas por el desierto, en su mayor parte de noche, evitando el camino principal por temor a que los hombres armados siguieran esperando de guardia en la cima de la colina. Le llevó casi ocho horas llegar a La Mora y avisarles a algunos adultos acerca del ataque. Para el momento en que sus familiares de La Mora llegaron al lugar del ataque, los niños se habían escondido al costado del camino bajo temperaturas cercanas a los 0° durante aproximadamente diez horas.

74.     Mientras tanto, sin la Certeza de que D.L. regresaría a salvo, uno de los hermanos que se encontraba al costado del camino intentó recuperar los abrigos que estaban entre los restos del Vehículo Tres, para poder abrigar a los niños y protegerlos de tan bajas temperaturas. Mientras se encontraba en el camino, el niño divisó a más sicarios que estaban en la colina, y regresó corriendo al refugio improvisado de ramas donde se ocultaban los demás niños.

75.      Varias horas después de que se había ido D.L., los niños se preocuparon de que no viniera la ayuda que necesitaban. M.L. de nueve años de edad, quien había recibido un disparo en el antebrazo, salió por su propia cuenta a cruzar el desierto. A medida que caía la noche, se perdió y se alejó de su trayecto. El grupo de búsqueda no la pudo localizar hasta la mañana siguiente.

76.      Una vez que D.L. llegó a La Mora y les contó a sus tíos lo que había sucedido, los hermanos David Langford trataron de buscar ayuda de la policía mexicana local que estaba estacionada por el camino que sale de La Mora. Al temer por su propia seguridad por encontrarse en territorio de carteles, la policía se rehusó a acompañar a la familia.

77.      Los tres hermanos de David partieron por su cuenta para localizar a los niños.

78.      David, quien estaba en Arizona al momento del ataque, recibió un mensaje de WhatsApp donde se le contaba del ataque. Condujo directamente desde Phoenix hasta el lugar del ataque sin saber lo que le había sucedido a su familia. Cuando llegó, David descubrió que su esposa y dos de sus hijos estaban muertos, y cinco de sus otros hijos estaban heridos.

**Las secuelas del ataque**

79.      Cinco de los hijos menores de David - K.L., X.L., C.L., B.L., y M.L. – sufrieron heridas de armas de fuego en el ataque. Cada niño requirió de atención médica. Después de su rescate eventual, los Demandantes menores fueron trasladados por avión a un hospital de los Estados Unidos, donde varios de ellos tuvieron que someterse a cirugía. C.L., que recibió múltiples disparos, ha necesitado múltiples cirugías para salvar el uso de su pierna y de su maxilar.

80.      Todos los niños menores Demandantes siguen padeciendo de angustia mental y emocional por haber presenciado el ataque, sus extenuantes secuelas, y la pérdida de su madre y sus dos hermanos.

81.       David sigue sufriendo angustia mental y emocional a causa de la pérdida de su esposa y dos niños, y por las traumáticas lesiones sufridas por sus hijos menores sobrevivientes.

82.      Los Demandantes Brandy Karen Spenst, Bryce David Langford, Cole Langford, y Crystal Alexis Langford siguen sufriendo angustia mental y emocional a causa de la pérdida

de su madre y de sus dos hermanos, y por las traumáticas lesiones sufridas por sus hermanos menores sobrevivientes.

83.     Desde la masacre, unos 210 de los 270 residentes de La Mora, al temer por su seguridad, se han ido de la comunidad. Abandonaron sus hogares y los terrenos que les han pertenecido a sus familias por generaciones.

84.     David Langford decidió mudar a su familia a Arizona mientras que sus hijos se sometían a cirugías y tratamiento médico, y después a Utah donde la familia ha decidido quedarse. Dejaron atrás su hogar en La Mora, así como también los acres de terreno, y un huerto de nogales que le proporcionaba a su familia su principal fuente de ingresos.

85.     Después del ataque, el gobierno y el ejército mexicanos anunciaron que construirían un nuevo puesto fronterizo militar cerca de Bavispe, a lo largo del camino donde ocurrió el ataque. El gobierno apunta a limitar la futura violencia de los carteles en el área.

86.     En su investigación, la policía mexicana determinó que los casquillos de las balas que se encontraron alrededor de los vehículos eran de rifles AR-15, el tipo que suelen utilizar los miembros de los carteles en ataques masivos.

87.     La policía mexicana arrestó a los sospechosos, incluso a líderes de La Línea, en relación con el ataque del 4 de noviembre. Las investigaciones realizadas tanto por las autoridades de las fuerzas de seguridad mexicanas como por la Oficina de Investigación (FBI) de los Estados Unidos Federal todavía continúan.

88.     Según consta por información y creencia, el Cartel de Juárez y La Línea son los principales responsables del ataque y por colaborar y participar en los homicidios de nueve ciudadanos estadounidenses inocentes, incluido los causantes Demandantes Dawna Ray Langford, T.L., y R.L. dichas organizaciones criminales son las responsables de las lesiones ocasionadas a los Demandantes, tal como se describe en la presente.

89.     Según consta por información y creencia, los Demandados John Does I al LX son miembros del Cartel de Juárez y de La Línea, y son los sicarios llevaron a cabo el ataque. Ellos son los responsables de las lesiones ocasionadas a los Demandantes, tal como se describe aquí.

## RECLAMOS DE RESARCIMIENTO

# IMPUTACIÓN NÚMERO UNO

## Ley Antiterrorismo - Art. 2333 del
## Título 18 del Código de los EE.UU.

### (18 U.S.C. § 2333)

90. Los párrafos precedentes quedan incorporados a la presente por su mera referencia como si hubieren sido establecidos en su total integridad en el presente.

91. Los Demandantes son todos ciudadanos nacionales de los EE.UU. damnificados en razón de un acto de terrorismo internacional y todos ellos están intentando una acción por daños y perjuicios fundamentada en el 18 U.S.C. §2333.

92. El ataque del 4 de noviembre de 2019 perpetrado por los Demandados constituye un acto de terrorismo internacional en los términos definidos por el 18 U.S.C. §2331(1).

93. Las acciones de los Demandados implicaron actos violentos peligrosos para la vida humana.

94. Las acciones de los Demandados –entre ellos, el homicidio, la tentativa de homicidio, y la agresión con un arma mortal- configurarían violaciones de las leyes penales de los Estados Unidos en caso de cometerse dentro de la jurisdicción de los Estados Unidos.

95. Las acciones Demandados tenían por objeto intimidar o coaccionar a una población civil. Tal como han concluido los gobiernos de los Estados Unidos y de México, los Demandados se han dedicado a realizar actos de violencia por los que pretendían intimidar civiles y disuadirlos de invadir el territorio de los carteles o impedir las operaciones ilegales contrabando. Actos de extrema violencia como el ataque del 4 de noviembre sirven para amedrentar e intimidar a las poblaciones locales como los ciudadanos estadounidenses que viven en La Mora, quienes desde entonces han abandonado el territorio del Cartel a causa del ataque y el posterior temor de sufrir mayores actos de violencia.

96. Al parecer, los actos de los Demandados han pretendido influir sobre la política de un gobierno mediante intimidación o coerción. El ataque del 4 de noviembre fue el último cometido en la misión, ya de décadas, del Cartel de Juárez por sembrar el caos en México y subvertir todos los esfuerzos por promulgar y aplicar las leyes y políticas que afectarían de manera negativa a los negocios del Cartel.

97. Al parecer, los actos de los Demandados han pretendido afectar la conducta de un gobierno mediante actos masivos de destrucción, asesinato o secuestro. El ataque fue parte de la constante misión que tiene el Cartel de Juárez de intimidar a las fuerzas de seguridad para que el

17

los negocios de los carteles puedan seguir adelante, sin trabas ni injerencia de parte de la policía. El 4 de noviembre, los oficiales de policía del pueblo de Bavispe no respondieron de inmediato ante la masacre porque temían mayores actos de violencia de parte del cartel.

98.    Los actos de los demandados ocurrieron en Sonora, México, lo cual está fuera de la jurisdicción territorial de los Estados Unidos.

99.    El Demandante David Langford resultó herido por un acto de "terrorismo internacional" conforme a lo establecido por el 18 U.S.C. § 2331(1) cuando su esposa y sus dos hijos fueron asesinados en el ataque del 4 de noviembre. Él ha sufrido y sigue sufriendo daños y perjuicios por su dolor y padecimiento mental, además de angustia emocional a causa de la pérdida de su esposa y sus hijos, así como también las lesiones y el trauma vivido por sus hijos sobrevivientes. Asimismo, David Langford has sufrido y continúa sufriendo daños y perjuicios de índole económica a raíz de los costos del tratamiento médico por sus hijos sobrevivientes, la pérdida del uso de su propiedad, y el lucro cesante y la pérdida de ingresos futuros a causa de la pérdida de sus actividades agrícolas.

100.    Dawna Ray Langford era una ciudadana estadounidense damnificada por un acto de "terrorismo internacional" conforme lo establecido por el 18 U.S.C. § 2331(1). Su Sucesión, representada por David Langford, pretende una indemnización por daños y perjuicios de conformidad con el 18 U.S.C. § 2333.

101.    T.L. y R.L. eran ciudadanos estadounidenses damnificados por un acto de "terrorismo internacional" a los efectos del 18 U.S.C. § 2331(1). Sus Sucesiones, aquí representadas por David Langford, pretenden una indemnización por daños y perjuicios conforme al 18 U.S.C. § 2333.

102.    Los hijos menores sobrevivientes de David Langford (K.L., X.L., C.L., B.L., J.L., D.L., y M.L.), cuyos intereses están aquí representados por David Langford, son ciudadanos estadounidenses damnificados por actos de "terrorismo internacional" tal como se define en el 18 U.S.C. § 2331(1) cuando se vieron obligados a presenciar las muertes violentas de su madre y de sus dos hermanos y luego aguardar su rescate durante más de diez horas en el desierto o bien caminar a campo traviesa por el desierto en busca de auxilio para sus hermanos heridos. Todos ellos, siete en total, siguen sufriendo daños y perjuicios relacionados con el trauma vivido y las lesiones psicológicas sufridas.

103. Entre los hijos menores de David Langford, K.L., X.L., C.L., B.L., y M.L. también resultaron damnificados por el acto de terrorismo internacional toda vez que recibieron disparos por parte de miembros del Cartel. Estos menores siguen sufriendo daños y perjuicios relacionados con sus lesiones físicas.

104. Los hijos adultos de David Langford, Brandy Karen Spenst, Bryce David Langford, Cole Langford, y Crystal Alexis Langford resultaron damnificados por un acto de terrorismo internacional conforme al 18 U.S.C. § 2331(1) y la consecuente pérdida de su madre y sus dos hermanos. Pretenden una indemnización por daños y perjuicios conforme al 18 U.S.C. § 2333.

105. Tal indemnización por daños y perjuicios concedidas a los Demandantes en virtud del 18 U.S.C. § 2333 podrían satisfacerse con el embargo de "activos bloqueados" de conformidad con la Ley de Seguros contra Riesgos de Terrorismo de 2002 ("TRIA"). Los activos de los Demandados satisfacen la definición de "activos bloqueados" según el 18 U.S.C. § 2333(e) dado que han sido "embargados o incautados por los Estados Unidos de conformidad con el artículo 805(b) de la Ley de Designación de Cabecillas Narcotraficantes Extranjeros".

106. Los "activos bloqueados" podrían embargarse para ser afectados al pago de toda "sentencia dictada en contra de una parte terrorista en una demanda fundada en un acto de terrorismo". 28 U.S.C. nota al § 1610 (TRIA § 201(a)). Los actos que aquí se describen constituyen "acto[s] de terrorismo" cometidos por una parte terrorista según las definiciones aplicables en la ley TRIA, incluidos los incisos del 8 U.S.C. § 1182(a)(3)(B)(iii) y (iv).

107. Todos los Demandantes solicitan una sentencia conforme al 18 U.S.C. § 2333 y una indemnización por los daños y perjuicios físicos y mentales sufridos, la angustia emocional, la pérdida de compañía, el homicidio, entre otros daños y perjuicios, incluidos los daños triplicados establecidos en el 18 U.S.C. § 2333, más los intereses, las costas, los honorarios de abogados, y todo otro resarcimiento que el Tribunal estime procedente.

## <u>IMPUTACIÓN NÚMERO DOS</u>

### Agresiones y Lesiones

108. Los párrafos precedentes quedan incorporados por sum era referencia como si hubieren sido establecidos en su total integridad en la presente.

109. El Demandante David Langford entabla esta demanda por agresiones y lesiones en nombre de sus hijos menores sobrevivientes en razón de que los Demandados agredieron y

lesionaron de manera ilícita, violenta y dolosa a sus hijos menores K.L., X.L., C.L., B.L., J.L.,
D.L., y M.L. por haberles disparado cientos de tiros a su vehículo, herir a todos los niños menos a
dos de ellos.

110.   Como resultado directo e inmediato del ataque, los demandantes K.L., X.L.,
C.L., B.L., y M.L. sufrieron lesiones físicas graves y -en algunos casos- permanentes.

111.   También como resultado directo e inmediato de las acciones de los Demandados,
los demandantes K.L., X.L., C.L., B.L., y M.L. debieron incurrir en gastos médicos, entre otros,
debido a sus lesiones.

112.   En virtud de los artículos 28-01-26.1 del Código del Siglo de Dakota del Norte
(N.D.C.C. § 28-01-26.1), una demanda por agresiones y/o lesiones subsiste más allá de las
muertes de Dawna Ray, T.L., y R.L y pueden iniciarse por sus Sucesiones.

113.   Las sucesiones de Dawna Ray Langford, T.L., y R.L.—todos ellos aquí
representados por David Langford- inician esta demanda por agresiones y lesiones en contra
de los Demandados. Dawna Ray Langford, T.L., y D.L. resultaron heridos y asesinados,
como a resultado directo e inmediato de las agresiones y lesiones infligidas.

114.   Además, como resultado directo e inmediato de las acciones de los Demandados,
las Sucesiones de Dawna Ray Langford, T.L., y R.L. debieron incurrir en gastos funerarios, entre
otros, a raíz de sus lesiones.

115.   También como resultado directo e inmediato de las acciones de los Demandados,
las Sucesiones de Dawna Ray Langford, T.L., y R.L. han sufrido salarios caídos, pérdida de
futuros ingresos, y futuras oportunidades.

116.   El Demandante David Langford, en nombre de sus hijos menores, y las
Demandantes Sucesiones de Dawna Ray, T.L., y R.L., solicitan que se dicte sentencia a su favor
y se les conceda una indemnización por los daños y perjuicios ocasionados por las agresiones y
lesiones cometidas, incluso una indemnización agravada con carácter punitivo, intereses, costas,
honorarios de abogados, y todo otro resarcimiento que el Tribunal estimare procedente.

## <u>IMPUTACIÓN NÚMERO TRES</u>

### Homicidio

117.   Los párrafos precedentes quedan incorporados por referencia como si hubieren
sido establecidos en su total integridad en la presente.

118. El Demandante David Langford, como padre de los causantes T.L. y R.L., también inicia demandas por los homicidios de T.L. y R.L. de conformidad con los artículos 32-21-01 y 32-21-03 del Código del Siglo de Dakota del Norte (N.D.C.C. § 32-21-01 and § 32-21-03).

119. Los Demandantes Brandy Karen Spenst, Bryce David Langford, Cole Langford, y Cyrstal Alexis Langford, como hijos de la causante Dawna Ray Langford, inician una demanda por el homicidio de Dawna Ray Langford de conformidad con las disposiciones previstas en N.D.C.C. § 32-21-01 and § 32-21-03.

120. Los Demandados provocaron de manera directa e inmediata las muertes de Dawna Ray Langford, T.L., y R.L. (los "Causantes") por un negligente y doloso.

121. Como resultado directo e inmediato del acto negligente y doloso de los Demandados, los Demandantes han sufrido y continúan sufriendo daños y perjuicios tanto económicos como no económicos, incluso la pérdida de ingresos, gastos funerarios, angustia emocional grave y daño psicológico permanente.

122. El Demandante David Langford, en nombre de las Sucesiones de T.L. y R.L., solicita que se dicte sentencia a su favor y que se le conceda una indemnización por los daños y perjuicios ocasionados por el homicidio, más los correspondientes intereses, costas, honorarios, y todo otro resarcimiento que el Tribunal estime procedente.

123. Los Demandantes Brandy Karen Spenst, Bryce David Langford, Cole Langford, y Crystal Alexis Langford, en nombre de la Sucesión de Dawna Ray Langford, solicitan que se dicte sentencia a su favor y que se le conceda una indemnización por los daños y perjuicios ocasionados por de homicidio, más los correspondientes intereses, costas, honorarios, y todo otro resarcimiento que el Tribunal estime procedente.

124. Los hijos menores de David Langford también inician demandas por homicidio como consecuencia de las muertes de su madre y sus hermanos, de conformidad con las disposiciones previstas en N.D.C.C. § 32-21-01 y § 32-21-03(2). Ellos solicitan que se dicte sentencia a su favor y que se les conceda una indemnización por los homicidios, más los correspondientes intereses, costas, honorarios, y todo otro resarcimiento que el Tribunal estime procedente.

## IMPUTACIÓN NÚMERO CUATRO

### Imposición Negligente y/o Dolosa de Angustia Emocional

125.     Los párrafos precedentes quedan incorporados por referencia como si hubieren sido establecidos en su total integridad en la presente.

126.     Los Demandantes inician esta demanda por imposición negligente y/o dolosa de angustia emocional en contra de los Demandados quienes facilitaron, asistieron, colaboraron, cooperaron, apoyaron sustancialmente, e incentivaron los actos de muerte y homicidio, específicamente, por accionar disparos y provocar la muerte de Dawna Ray Langford y sus hijos y demás actos de terrorismo internacional que aquí se mencionan.

127.     En virtud de las disposiciones previstas en N.D.C.C. § 28-01-26.1, una demanda por imposición negligente y/o dolosa de angustia emocional subsiste a las muertes de Dawna Ray, T.L., y R.L.

128.     Los Demandantes que no estuvieron presentes en el lugar del ataque están legitimados para iniciar una demanda por imposición negligente y/o dolosa de angustia emocional en razón de que la conducta fue "lo suficientemente aberrante y pretendió imponer un daño emocional grave en una persona que no está presente". *Murphy v. Rep. Islámica de Irán*, 740 F. Sup. 2d 51, 75-76 (D.D.C. 2010).

129.     Debido a la imposición negligente y/o dolosa de angustia emocional ocasionada por los Demandados, todos los Demandantes han sufrido una angustia emocional grave y sus efectos físicos concomitantes.

130.     La conducta de los Demandados fue extrema y aberrante, por lo que los Demandados sabían o deberían haber sabido que dicho acto provocaría un daño emocional grave sobre las víctimas y sus familiares.

131.     Como resultado directo e inmediato de la mala conducta que los Demandados cometieron con dolo eventual y directo, así como con desprecio temerario por la vida humana, todos los Demandantes han sufrido y seguirán sufriendo un daño psicológico grave y permanente, incluso una angustia emocional y ansiedad permanente, lo cual requiere de tratamiento médico, servicios clínicos, y apoyo psicológico permanentes a largo plazo.

132.    Todos los Demandantes solicitan que se dicte sentencia en su favor y que se les conceda una indemnización por los daños y perjuicios ocasionados por las agresiones y lesiones, incluso una indemnización agravada con carácter punitivo, más los correspondientes intereses, costas, honorarios de abogados, y todo otro resarcimiento que el Tribunal estime procedente

## IMPUTACIÓN NÚMERO CINCO

### Acción Subsistente (post mortem)

133.    Los párrafos precedentes quedan incorporados por referencia como si hubieren sido establecidos en su total integridad en la presente.

134.    El Demandante David Langford, como representante personal[1] de las Sucesiones de Dawna Ray, T.L., y R.L. inicia esta acción subsistente (post mortem) en contra de los Demandados por haberles ocasionado de manera dolosa y deliberada dolor y sufrimiento a los Causantes a través de sus actos ilícitos antes de cometer los homicidios dolosos de los Causantes.

135.    Como resultado directo e inmediato de los actos dolosos, intencionales, maliciosos, temerarios, gravemente negligentes y culposos que aquí se les imputa a los Demandados, los Causantes sufrieron traumas y temores prolongados, graves y extremos de contacto físico ofensivo, lesiones corporales y agresiones. Además, sufrieron temor extremo, terror, ansiedad, angustia emocional y psicológica, consciencia de muerte y traumas físicos y emocionales inminentes, y provocación intencional de dolor físico.

136.    Cuando los Demandados dispararon contra el vehículo de Dawna Ray Langford, ella tuvo tiempo de comprender la situación y entender que probablemente moriría, y que sus hijos también podrían morir. Tuvo tiempo para decirle a su hija que intentara proteger bien a R.L. en el lugar de pasajeros, y tiempo para decirles a sus otros hijos que se mantuvieran agazapados en un esfuerzo para salvarlos de las ráfagas de la balacera. Ella sufrió una angustia mental y un dolor psicológico graves. Recibió múltiples disparos y probablemente sufrió dolor físico como consecuencia del trágico episodio.

---

[1] Como aquí se advierte, el procedimiento para designar a David Langford como representante personal ya está planeado. Los Demandantes modificarán esta Demanda al momento de concretarse la designación de David Langford como representante personal.

137.    T.L. y R.L. también experimentaron consciencia de dolor y sufrimiento por haber sido impactados con múltiples balas y sufrieron la angustia mental de saber que su madre y sus hermanos se encontraban todos en peligro.

138.    Las Sucesiones Demandantes están legitimadas para reclamar todas las indemnizaciones por daños y perjuicios de carácter compensatorio, punitivo y demás resarcimientos permitidos según las respectivas leyes que contemplan acciones (post mortem) subsistentes al fallecimiento de sus titulares en contra de Demandados. En consecuencia, todos ellos, por medio del Demandante David Langford, solicitan que se dicte sentencia en su favor y que se les conceda una indemnización por daños y perjuicios por el homicidio, la subsistencia, la pérdida de consorcio conyugal, los daños morales, y/o pérdida de servicios, más intereses, costas, y todo otro resarcimiento que el Tribunal estime procedente.

## IMPUTACIÓN NÚMERO SEIS

### Pérdida de Consorcio Conyugal

139.    Los párrafos precedentes quedan incorporados por referencia como si hubieren sido establecidos en su total integridad en la presente.

140.    El Demandante David Langford y Dawna Ray Langford compartían un vínculo de marido y mujer al momento del ataque.

141.    El Demandante David Langford y T.L. compartían un vínculo de padre e hijo al momento del ataque.

142.    El Demandante David Langford y R.L. compartían un vínculo de padre e hijo al momento del ataque.

143.    La Demandante K.L. y Dawna Ray Langford compartían un vínculo de madre e hija al momento del ataque.

144.    La Demandantes K.L. y T.L. compartían un vínculo de hermanos al momento del ataque.

145.    La Demandantes K.L. y R.L. compartían un vínculo de hermanos al momento del ataque.

146.    El Demandante X.L. y Dawna Ray Langford compartían un vínculo de madre e hijo al momento del ataque.

147.    El Demandante X.L. y T.L. compartían un vínculo de hermanos al momento del ataque.

148. El Demandante X.L. y R.L. compartían un vínculo de hermanos al momento del ataque.

149. El Demandante C.L. y Dawna Ray Langford compartían un vínculo de madre e hijo al momento del ataque.

150. El Demandante C.L. y T.L. compartían un vínculo de hermanos al momento del ataque.

151. El Demandante C.L. y R.L. compartían un vínculo de hermanos al momento del ataque.

152. El Demandante B.L. y Dawna Ray Langford compartían un vínculo de madre e hijo al momento del ataque.

153. El Demandante B.L. y T.L. compartían un vínculo de hermanos al momento del ataque.

154. El Demandante B.L. y R.L. compartían un vínculo de hermanos al momento del ataque.

155. El Demandante J.L. y Dawna Ray Langford compartían un vínculo de madre e hijo al momento del ataque.

156. El Demandante J.L. y T.L. compartían un vínculo de hermanos al momento del ataque.

157. El Demandante J.L. y R.L. compartían un vínculo de hermanos al momento del ataque.

158. El Demandante D.L. y Dawna Ray Langford compartían un vínculo de madre e hijo al momento del ataque.

159. El Demandante D.L. y T.L. compartían un vínculo de hermanos al momento del ataque.

160. El Demandante D.L. y R.L. compartían un vínculo de hermanos al momento del ataque.

161. La Demandante M.L. y Dawna Ray Langford compartían un vínculo de madre e hija al momento del ataque.

162. La Demandante M.L. y T.L. compartían un vínculo de hermanos al momento del ataque.

163. La Demandante M.L. y R.L. compartían un vínculo de hermanos al momento del ataque.

164. La Demandante Brandy Karen Spenst y Dawna Ray Langford compartían un vínculo de madre e hija al momento del ataque.

165.    La Demandante Brandy Karen Spenst y T.L. compartían un vínculo de hermanos al momento del ataque.

166.    La Demandante Brandy Karen Spenst y R.L. compartían un vínculo de hermanos al momento del ataque.

167.    El Demandante Bryce David Langford y Dawna Ray Langford compartían un vínculo de madre e hijo al momento del ataque.

168.    El Demandante Bryce David Langford y T.L. compartían un vínculo de hermanos al momento del ataque.

169.    El Demandante Bryce David Langford y R.L. compartían un vínculo de hermanos al momento del ataque.

170.    El Demandante Cole Langford y Dawna Ray Langford compartían a de madre e hijo vínculo al momento del ataque.

171.    El Demandante Cole Langford y T.L. compartían un vínculo de hermanos al momento del ataque.

172.    El Demandante Cole Langford y R.L. compartían un vínculo de hermanos al momento del ataque.

173.    El Demandante Crystal Alexis Langford y Dawna Ray Langford compartían un vínculo de madre e hijo al momento del ataque.

174.    El Demandante Crystal Alexis Langford y T.L. compartían un vínculo de hermanos al momento del ataque.

175.    El Demandante Crystal Alexis Langford y R.L. compartían un vínculo de hermanos al momento del ataque.

176.    Como resultado directo e inmediato de los actos ilícitos de los Demandados, a los Demandantes sobrevivientes se les provocó que sufrieran, y que continúen sufriendo en el futuro, la pérdida de consorcio conyugal, la pérdida de sociedad, acompañamiento, afecto y asistencia conyugal, todo ello en detrimento del vínculo marital, parental y fraternal.

177.    Los Demandantes sobrevivientes solicitan que se dicte sentencia en su favor y que se les conceda una indemnización por daños y perjuicios ocasionados por la pérdida de consorcio familiar, más intereses, costas, honorarios, y todo otro resarcimiento que el Tribunal estime procedente.

## PEDIDO DE JUICIO POR JURADO

1.      Los Demandantes solicitan que todas sus demandas aquí presentadas se tramiten
mediante un juicio por jurado.

## PETITORIO DE RESARCIMIENTO

EN VIRTUD DE TODO LO CUAL, los Demandantes solicitan respetuosamente que se
dicte sentencia en contra de todos Demandados, individual y solidariamente responsables de los
daños y perjuicios ocasionados de conformidad con la Ley Antiterrorismo, consagrada las
disposiciones del 18 U.S.C. § 2333 *y sgts.*, por agresiones y lesiones, homicidio, imposición
negligente y/o dolosa de angustia emocional, acción subsistente, y pérdida de consorcio familiar.
Los Demandantes solicitan una indemnización por daños y perjuicios por todo el dolor y
sufrimiento pasado y futuro, dolor y sufrimiento mental pasado y futuro, pérdida de consorcio
familiar, homicidio, pérdida de futuros ingresos potenciales, y todos los demás resarcimientos
potenciales incluso las indemnizaciones triplicadas por daños y perjuicios por el monto máximo
que permita la Ley de Antiterrorismo, 18 U.S.C. § 2333, *y sgts.*, incluidos los razonables
honorarios de abogados y costas judiciales, y todo otro resarcimiento que le Tribunal estime
justo y procedente.

Respetuosamente presentado a los 25 días del mes de agosto del año 2020.

ROBINS KAPLAN LLP

Por: */f/ Timothy Q. Purdon*

Timothy Q. Purdon, ND #05392
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
701-255-3000
TPurdon@RobinsKaplan.com

BALLARD SPAHR LLP

Henry E. Hockeimer, Jr.
(solicitud *pro hac vice* en trámite)
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 1910

215-665-8500
HockeimerH@BallardSpahr.com

Jacey Skinner
(solicitud *pro hac vice* en trámite)
BALLARD SPAHR LLP
201 South Main Street #800
Salt Lake City, Utah 84111
801-531-3000
SkinnerJ@BallardSpahr.com

Mark S. Kokanovich
Jillian L. Andrews
(solicitudes *pro hac vice* en trámite)
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004
602.798.5400
KokanovichM@BallardSpahr.com
AndrewsJ@BallardSpahr.com

*Abogados de los Demandantes*

908795
91.1

UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

---

David Langford, Estate of Dawna Ray
Langford, Estate of T.L., Estate of R.L., K.L.,
X.L. C.L., B.L., D.L., M.L., J.L. (minor
children of David and Dawna Ray
Langford), Brandy Karen Spenst, Bryce
David Langford, Cole Langford, Crystal
Alexis Langford,

       Plaintiffs,

vs.

Juárez Cartel, La Línea, John Does I
through LX,

       Defendants.

Court File No._____

**COMPLAINT
AND DEMAND FOR JURY TRIAL**

---

## INTRODUCTION

1.    Plaintiffs, David Langford, Estate of Dawna Ray Langford, Estate of T.L.,
Estate of R.L., minor children K.L., X.L., C.L., B.L., D.L., M.L., J.L., and Brandy Karen
Spenst, Bryce David Langford, Cole Langford, and Crystal Alexis Langford (collectively,
"Plaintiffs" or the "Langford Family"), all of whom are United States citizens, bring this
action pursuant to the Antiterrorism Act ("ATA"), 18 U.S.C. §§ 2333 *et seq*., and various
state law causes of action to pursue civil remedies for the unthinkable violence
perpetrated against their family in an attack carried out by hitmen (known as "sicarios" in
Mexico) of the Juárez Cartel on a route used to transport illegal drugs through Mexico.

2.    On November 4, 2019, sicarios brutally murdered three American women
and their minor children, all of whom were living abroad in La Mora—a peaceful and
secluded community in Sonora, Mexico.

3.     The sicarios hid out on hilltops near Colonia La Mora and fired hundreds of rounds from automatic weapons into three vehicles traveling on the road near La Mora that is often used for the Cartel's illegal drug smuggling.

4.     The passengers signaled to the gunmen that the vehicles were full of innocent women and children, but even then they continued the attack and murdered all three drivers and six of their children, and injured five others.

5.     The attackers killed Dawna Ray Langford, wife of David Langford and mother to thirteen children.

6.     The attackers killed David and Dawna's eleven-year-old son, T.L.

7.     The attackers killed David and Dawna's two-year-old son, R.L.

8.     In the aftermath of the attack, after witnessing the death of his mother and siblings, thirteen-year-old D.L. walked fourteen miles across rugged desert terrain to seek help for his wounded and freezing siblings left stranded at the site of the attack where their mother and brothers had just been murdered.

9.     When D.L. did not return for hours, nine-year-old M.L., who had been shot in the arm, also set out into the wilderness to seek help for her siblings whose injuries were growing graver by the minute.  M.L. became lost in the desert at night and was not located until the following morning.

10.     K.L., B.L., X.L., C.L., and M.L. suffered gunshot wounds in the attack.  All seven surviving minor children continue to suffer severe emotional distress.

11.     As a result of the attack, the majority of the residents of La Mora, including David Langford and his family, fled the village where their families had lived for decades. They left behind their homes and land, along with the valuable fields, cattle, and orchards that represent their primary means of financial support.

12.     Mexican authorities investigating the November 4, 2019 attack have arrested several individuals connected with the massacre, including leaders of La Línea and the Juárez Cartel.

2

## JURISDICTION AND VENUE

13.     This matter is brought under 18 U.S.C. §§ 2333, *et seq*., and thus arises under the laws of the United States.  This Court therefore has subject matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 1331.

14.     Jurisdiction also arises under 28 U.S.C. § 1332(a)(2) as a civil action between citizens of a State and citizens of a foreign state where the amount in controversy exceeds $75,000, exclusive of interest and costs.

15.     This Court has personal jurisdiction over Defendants because as alleged elsewhere herein, all Defendants have established continuous and systematic contacts with the United States through their illegal drug trafficking operations.

16.     Venue properly lies within this District pursuant to 18 U.S.C. § 2334(a).  Plaintiffs Brandy Karen Spenst and Bryce David Langford reside in North Dakota.

17.     Venue is also proper under 28 U.S.C. § 1391(b)(3), as Defendants do not reside in the United States but are subject to this Court's jurisdiction.

## PARTIES
### Plaintiffs

18.     Plaintiff David Langford is and was at all times relevant hereto an American citizen and the husband of Dawna Ray Langford, a 43-year-old American citizen murdered in an act of international terrorism carried out by defendants in Sonora, Mexico, on November 4, 2019.  Plaintiff was also the father of eleven-year-old T.L. and two-year-old R.L., both of whom were American citizens murdered in the attack.  David Langford is also the father of K.L., X.L., C.L., B.L., J.L., D.L., and M.L., the seven surviving minor children plaintiffs who suffered emotional and physical injury due to the attack.

19.     Plaintiff Estate of Dawna Ray Langford is the personal estate of decedent Dawna Ray Langford, who was a citizen of the United States.  Sicarios murdered Dawna Ray Langford on November 4, 2019.

20.     Plaintiff Estate of T.L. is the personal estate of decedent T.L., who was a citizen of the United States and was eleven years old at the time of the attack.  Sicarios murdered T.L. on November 4, 2019.

21.     Plaintiff Estate of R.L. is the personal estate of decedent R.L., who was a citizen of the United States and was two years old at the time of the attack.  Sicarios murdered R.L. on November 4, 2019.

22.     Plaintiff David Langford expects to be named the personal representative of the Estates of Dawna Ray Langford, T.L., and R.L.

23.     Plaintiff K.L. is and was at all times relevant hereto a citizen of the United States and was fourteen years old at the time of the attack.  Sicarios shot K.L. on November 4, 2019.  In addition to serious physical injuries, K.L. has suffered and continues to suffer emotional injuries due to the loss of her mother and brothers, as well as the traumatic experience of witnessing the November 4 massacre.

24.     Plaintiff D.L. is and was at all times relevant hereto a citizen of the United States and was thirteen years old at the time of the attack.  D.L. suffered emotional injuries when he was forced to trek over 14 miles through rugged desert terrain to seek help for his brothers and sisters who were left stranded at the site of the attack.  D.L. has suffered and continues to suffer emotional injuries due to the loss of his mother and brothers, as well as the traumatic experience of witnessing the November 4 massacre.

25.     Plaintiff M.L. is and was at all times relevant hereto a citizen of the United States and was nine years old at the time of the attack.  Sicarios shot M.L. in the forearm on November 4, 2019.  M.L. then suffered emotional injuries when she was forced to trek through rugged desert terrain to seek help for her brothers and sisters who were left stranded at the site of the attack.  M.L. became lost in the desert, encountered wild animals, and feared for her life until rescued by family members the following day.  M.L. has suffered and continues to suffer emotional injuries due to the loss of her mother and brothers, as well as the traumatic experience of witnessing the November 4 massacre.

26.     Plaintiff X.L. is and was at all times relevant hereto a citizen of the United States and was four years old at the time of the attack.  Sicarios shot X.L. on November 4, 2019.  In addition to a gunshot wound to his shoulder and buckshot to his chest, X.L. has suffered and continues to suffer emotional injuries due to the loss of his mother and brothers, as well as the traumatic experience of witnessing the November 4 massacre.

27.     Plaintiff C.L. is and was at all times relevant hereto a citizen of the United States and was eight years old at the time of the attack.  Sicarios shot C.L. on November 4, 2019.  C.L. suffered severe gunshot wounds to his jaw and both legs that, even after multiple surgeries, hamper his ability to walk and talk, and will require years of intensive physical therapy.  In addition, C.L. has suffered and continues to suffer emotional injuries due to the loss of his mother and brothers, as well as the traumatic experience of witnessing the November 4 massacre.

28.     Plaintiff B.L. is and was at all times relevant hereto a citizen of the United States and was eight months old at the time of the attack.  Sicarios shot B.L. on November 4, 2019.  In addition to a grazed bullet wound to the chest, B.L., has suffered and continues to suffer emotional injuries due to the loss of his mother and brothers, as well as the traumatic experience of witnessing the November 4 massacre.

29.     Plaintiff J.L. is and was at all times relevant hereto a citizen of the United States and a minor child.  J.L. has suffered and continues to suffer emotional injuries due to the loss of his mother and brothers, as well as the traumatic experience of witnessing the November 4 massacre.

30.     Plaintiff Brandy Karen Spenst is the adult daughter of David and Dawna Ray Langford.  Brandy Spenst has suffered and continues to suffer emotional injuries due to the loss of her mother and two brothers and the terror perpetrated against her minor siblings by the defendants.

31.     Plaintiff Bryce David Langford is the adult son of David and Dawna Ray Langford.  Bryce Langford has suffered and continues to suffer emotional injuries due to

the loss of his mother and two brothers and the terror perpetrated against his minor siblings by the defendants.

32.     Plaintiff Cole Langford is the adult son of David and Dawna Ray Langford. Cole Langford has suffered and continues to suffer emotional injuries due to the loss of his mother and two brothers and the terror perpetrated against his minor siblings by the defendants.

33.     Plaintiff Crystal Alexis Langford is the adult daughter of David and Dawna Ray Langford. Crystal Langford has suffered and continues to suffer emotional injuries due to the loss of her mother and two brothers.

### Defendants

34.     Defendant Juárez Cartel (the "Cartel") is an international crime syndicate and drug trafficking organization based primarily in Chihuahua, Mexico, with drug trafficking operations that pervade all of Mexico and the United States. Upon information and belief, the Juárez Cartel was responsible for the attack on the Langford Family on November 4, 2019.

35.     La Línea is the enforcement arm of the Juárez Cartel and is involved in the Cartel's illegal drug trafficking business. La Línea's primary role in the Juárez Cartel is to perpetrate violence at the direction of the Juárez Cartel, in order to protect its territory and drug trafficking operations. Upon information and belief, La Línea was in part responsible for the attack on November 4, 2019.

36.     John Does I through LX are individual members of La Línea and the Juárez Cartel. Upon information and belief, they are the individuals who carried out the November 4, 2019 attack and murdered nine innocent American citizens.

### STATEMENT OF FACTS
### La Mora, Sonora

37.     La Mora is a community near the town of Bavispe, in Sonora, Mexico, near the border of the state of Chihuahua. The area around La Mora and Bavispe is contested

cartel territory. Approximately 70 miles south of the Arizona border, it is located in the home state of the Sinaloa Cartel, but not far from the home state of the Juárez Cartel. For generations, La Mora has been home to a small community of families comprised of American citizens who chose to raise their children there. Mormon citizens of the United States first settled La Mora decades ago, and it has existed in peace with its Mexican neighbors since its inception.

38.     David Langford has lived in La Mora for most of his life, and he chose to raise his family there, alongside his brothers and extended family. David supported his family primarily through the profits of a successful pecan orchard and livestock operation.

39.     La Mora is situated near what has traditionally been a drug trafficking route used by cartels to smuggle illegal narcotics from Mexico to the United States. The route, west of La Mora, winds further west from the community and up into the mountainous terrain a few miles from La Mora and the Mexican town of Bavispe.

## Juárez Cartel Violence

40.     At all relevant times, the Juárez Cartel has been one of Mexico's most powerful drug cartels. Historically, it has controlled the Juárez-El Paso Corridor, one of the most important smuggling routes along Mexico's border with the United States. Formerly allied with the Sinaloa Cartel, before the Juárez Cartel split off in or around 2008, it aligned itself with Barrio Aztecas, an international gang renowned for violent acts. Members of Barrio Aztecas were tasked with carrying out gruesome murders in and around Juárez during the ensuing conflict with the Sinaloa Cartel, often creating public displays of corpses and ensuring that the murders would intimidate law enforcement, rival gangs, and civilians.

41.     Around the same time it joined forces with Barrios Aztecas, the Juárez Cartel also aligned itself with La Línea, a group founded by corrupt police officers trained in urban warfare. La Línea acts as the Juárez Cartel's enforcement arm and has

been linked to some of the Juárez Cartel's most well-known acts of violence, including the murder of American citizens employed in a local consulate of the American Embassy, the murder of sixteen teenagers at a high school party, a car bomb attack that killed first responders and civilians in Ciudad Juárez, and the murder of nineteen patients at a drug rehabilitation facility.

42.     Law enforcement has traced most cartel attacks to an ongoing war for territory and control. These violent attacks are perpetrated with the intent to intimidate civilians and rival gangs, and to affect the decisions and conduct of the Mexican and United States governments.

43.     Most famously, the Juárez and Sinaloa Cartels were locked in a violent battle for control of Ciudad Juárez between 2008 and 2012. That conflict resulted in an estimated 10,000 deaths and massive civilian displacement.

44.     The Juárez Cartel is known to use military-style weapons in its attacks. Members often wear body armor and carry a mix of weapons, including handguns and automatic weapons such as AR-15 rifles and machine guns. These weapons are used to inflict maximum damage to the Cartel's targets, both civilian and military.

45.     The Juárez Cartel has members known as "sicarios," which is most often translated to "hitmen" or "hired assassins." The sicarios are those responsible for the majority of the targeted attacks on civilian and military populations, as well as attacks on rival gangs. Sicarios are known to operate as lookouts before an attack, setting up a position from which to track the movements of their targets. Sicarios then frequently use an improvised or established communication network to share the location of targets and to coordinate attacks.

## Cartel Acts of Terror against Civilians

46.     Cartel violence is not limited to members of rival cartels.  The Juárez Cartel previously has carried out acts of violence against civilians in areas where it sought to establish or maintain control.  These violent acts are evidence of the Cartel's efforts to intimidate civilians or drive them out of Cartel territory.

47.     Researchers estimate that cartels killed 994 children in Mexico between 2006 and 2010 alone.

48.     Many cartel attacks against civilians are mass murders.  In 2004, officials discovered a mass grave outside a house near Ciudad Juárez.  The Juárez Cartel used the house to interrogate and murder civilians and gang members suspected of acting as informants for law enforcement.  The site became known in the community as "the House of Death."

49.     In 2010, the Juárez Cartel murdered several members of two other American families in an attack similar to the November 4, 2019 massacre.  Lesley Redelf and Jorge Salcido Cisneros, both consular employees and American citizens, attended a party hosted by the United States Consulate in Ciudad Juárez with their families.  When the two families left the event, each was chased down by Juárez Cartel members who communicated over an improvised communication network to coordinate their attacks.  Each vehicle was surrounded by Juárez Cartel vehicles and approached by sicarios carrying assault weapons.  The gunmen shot Lesley Redelf, who was pregnant at the time, in the head.  Her husband, Arthur Redelf, tried to drive away to save the life of the couple's infant daughter who was in the backseat.  Gunmen shot and killed him.  Authorities later discovered the infant alive in the vehicle.  Juárez Cartel members also murdered Jorge Salcido Cisneros and wounded his two daughters, ages seven and four.

50.     Law enforcement specialists in Mexico suspect that the cartel attacks have become more gruesome in order to intimidate civilians and government officials.  Experts cite a 2006 incident in western Mexico as the beginning of this pattern of violence

designed to attract attention and intimidate the public.  In that attack, cartel members entered a crowded nightclub and rolled five decapitated human heads onto the dance floor.  Since that incident, cartels have used decapitation with increasing frequency to intimidate civilians and law enforcement.

### Cartel Acts of Terror against Public Officials

51.     Major Mexican cartels, including the Juárez Cartel, have also murdered journalists, police officers, and public officials in their quest for control of drug smuggling territory.  The murders are most often violent and public, in order to send a message to others who might challenge their authority in an area.

52.     In 2009, the Juárez Cartel attempted to assassinate the Governor of Chihuahua.  Again in 2020, sicarios attacked the current Governor and targeted police in a shootout that left six dead after more than 1,000 rounds had been fired.  The Governor later said in a news conference that the attack was an attempt to intimidate law enforcement and get revenge for law enforcement operations targeting cartel activity in Chihuahua.

53.     In February 2011, sicarios of another cartel murdered Special Agent Jaime Zapata of the United States Immigration and Customs Enforcement ("ICE").  Sicarios positioned along a Mexican highway ambushed the two ICE agents in their car and forced their vehicle off the road.  Using AK-47s, eight sicarios opened fire on the agents, killing Special Agent Zapata and wounding Special Agent Victor Avila.

54.     The United States government has recognized that the pattern of violence carried out by cartels is intended to intimidate or coerce government or law enforcement officials.  In the indictment of certain leaders of the Sinaloa Cartel, the Department of Justice noted that they "used various means to evade law enforcement and protect their narcotics distribution activities, including . . . intimidating with threats of violence members of law enforcement."  Dept. of Justice, *Ten Alleged Mexican Drug Cartel*

*Leaders Among 43 Defendants Indicted in Brooklyn and Chicago as Part of Coordinated Strike Against Mexican Drug Trafficking Organizations* (Aug. 20, 2009).

55.     Cartels frequently intimidate or coerce law enforcement officials into ignoring their criminal activity or even into joining the cartels' efforts.  La Línea is comprised largely of former Mexican police officers, and recently a United States Border Patrol agent was indicted in a cartel murder, after having joined the cartel while maintaining his post as a United States law enforcement officer.  Jay Root, *The Texas Tribune*, "Border Patrol Agent Indicted in Cartel Murder," https://www.texastribune.org/2016/01/13/border-patrol-agent-indicted-cartel-murder/ (Jan. 13, 2016).

56.     A local police officer, Fidel Alejandro Villegas of the town of Janos in Chihuahua, was arrested in connection with the November 4 attack.  Reuters, *Municipal Police Chief Arrested over Mexican Mormon Massacre*, https://www.reuters.com/article/us-mexico-violence-usa-arrest/municipal-police-chief-arrested-over-mexican-mormon-massacre-idUSKBN1YV1LA (Dec. 27, 2019).

57.     The United States government recently recognized that cartels seek to commit acts of violence against both the United States and Mexican governments, in order to continue their campaign of intimidation and coercion and to drive government officials out of cartel territory.  *United States v. Guzman-Loera, et al.*, Case No. 09-CR-383 (N.D. Ill.), Superseding Indictment (various cartel defendants "discussed the use of violence against American and/or Mexican government buildings"); U.S. Dept. of Justice, *Joaquin "El Chapo" Guzman, Sinaloa Cartel Leader, Convicted of Running a Continuing Criminal Enterprise and Other Drug-Related Charges*, https://www.justice.gov/usao-sdfl/pr/joaquin-el-chapo-guzman-sinaloa-cartel-leader-convicted-running-continuing-criminal (Feb. 12, 2019) ("The success of the Sinaloa Cartel relied upon the use of violence to maintain their power throughout the region and beyond.").

## Cartel Smuggling Activities

58.     Cartels engage in pervasive drug smuggling through the United States.
Mexican cartels are responsible for an estimated 70 percent of the illegal narcotics in the
United States.

59.     Cartels also engage in weapons smuggling through the United States.
Weapons used by the cartels are overwhelmingly made and sold in America.  The most
common weapons smuggled from the United States to Mexico are believed to be assault
rifles, including the AR-15 and the AR-47.  Between 2009 and 2014, 70 percent of the
firearms seized by Mexican authorities are believed to have originated in the United
States. Half of those seized were "long guns," including the AR-15, which Mexican
authorities recognize as a preferred weapon of sicarios.

60.     The United States government has recognized that cartels "have unfettered
access to weapons," including automatic rifles.  U.S. Dept. of Justice, *Joaquin "El
Chapo" Guzman, Sinaloa Cartel Leader, Convicted of Running a Continuing Criminal
Enterprise and Other Drug-Related Charges*, https://www.justice.gov/usao-
sdfl/pr/joaquin-el-chapo-guzman-sinaloa-cartel-leader-convicted-running-continuing-
criminal (Feb. 12, 2019).

## The November 4 Massacre

61.     On November 4, 2019, three vehicles set out from La Mora.  Vehicle One
was driven by Rhonita Miller, who was traveling with four of her seven children.  They
were driving to pick up her husband, who had been working in Arizona.  Vehicle Two
was driven by Christina Marie Langford Johnson, who was traveling with her seven-
month-old daughter.  Vehicle Three was driven by Dawna Ray Langford, who was
traveling with nine of her children to a wedding in Chihuahua, Mexico.

62.     Shortly after departing La Mora, Vehicle One experienced mechanical
difficulties.  Rhonita Miller and her children exited the vehicle, Dawna drove Rhonita
Miller back to La Mora for assistance, and Dawna continued on from La Mora in Vehicle

Three.  Once Rhonita Miller obtained a new vehicle and drove back to her disabled vehicle, she and her children moved their luggage from the disabled vehicle to the new one.  They did this in full view of sicarios stationed on a hill above the road.  While a family member promised to arrive to tow the disabled vehicle back to town, Rhonita and her children continued on their original route through the mountains.

63.     At or around 9:40 a.m., after Rhonita Miller and her four children departed in the replacement Vehicle One, gunmen—members of the Juárez Cartel and La Línea—opened fire on that vehicle from a vantage point somewhere above the road.  The gunmen are believed to have been situated at the top of a hill that overlooks the portion of the road where replacement Vehicle One was driving and where Rhonita had left the disabled vehicle.

64.     Sicarios fired over 200 rounds of ammunition into Rhonita Miller's car, murdering her and her minor children.  Then, they set the vehicle on fire.  Rhonita and all four of the children traveling with her—twelve-year-old H.M., ten-year-old K.M., and eight-month-old twins T.M. and T.M—were killed.

65.     Approximately one hour after the murders of Rhonita Miller and her four children, the gunmen similarly attacked Vehicles Two and Three, which were twelve miles up the road from Vehicle One.  Sicarios began firing on the vehicles from a hill looking down on the road.

66.     Christina Marie Langford Johnson was driving Vehicle Two in the lead.  When the shooting began, she placed her seven-month-old daughter's car seat on the floor of the front seat, and covered the baby with a blanket to protect her from bullets and falling glass. Christina then exited her vehicle with her hands up, shouting and attempting to show the attackers that the vehicles were full of women and children.  The sicarios shot her—she was struck by multiple rounds and killed in the road.

67.     Christina's seven-month-old daughter survived the attack, but it took hours for rescuers to reach her.

68.     Sicarios fired upon Vehicle Three, killing Dawna Ray Langford, eleven-year old T.L., and two-year-old R.L.  Before she died, Dawna tried to save all of her children by telling them to get down, and tried to save R.L. by instructing K.L., who was riding in the front seat, to put R.L. on the floor of the passenger's seat, where he might be shielded.  Bullets pierced the floor and sides of the vehicle, killing the two-year-old.

69.     Of the seven children who survived the attack on Vehicle Three, five were shot and injured.

70.     Even after Christina Marie Langford Johnson identified the passengers as women and children, the gunmen fired between 300 and 500 rounds of ammunition upon Vehicles Two and Three.

71.     The seven surviving children from Vehicle Three managed to escape the vehicle and seek shelter in vegetation on the side of the road.

72.     It was clear to the older children of David and Dawna Ray Langford that their brothers and sisters needed medical attention.  Being on a remote mountain road, miles from home, with no adults remaining alive, the children decided that thirteen-year-old D.L. would try to run back to La Mora for help.

73.     D.L. trekked fourteen miles through the desert, largely at night, avoiding the main road for fear that the gunmen were still lying in wait on the hilltop.  It took him around eight hours to reach La Mora and notify adults of the attack.  By the time family members from La Mora reached the spot of the attack, the children had been hiding on the side of the road in near-freezing temperatures for approximately ten hours.

74.     In the meantime, unsure if D.L. would return safely, one of the siblings on the side of the road tried to retrieve coats from the wreckage of Vehicle Three, to keep the children warm in the near-freezing temperatures.  While on the road, the child spotted more sicarios on the hill, and ran back to the makeshift shelter of branches where the other children were hiding.

75.     After D.L. had been gone several hours, the children became concerned that no help was coming.  Nine-year-old M.L., who had been shot in the forearm, set out on her own across the desert.  As night fell, she became lost and walked far off course.  The search party did not locate her until the following morning.

76.     Once D.L. reached La Mora and notified his uncles of what had happened, David Langford's brothers attempted to seek help from the local Mexican police, stationed down the road from La Mora.  Fearing for their own safety in cartel territory, the police refused to accompany the family.

77.     David's three brothers set out on their own to locate the children.

78.     David, who was in Arizona at the time of the attack, received a WhatsApp message telling him of the attack.  He drove straight from Phoenix to the site of the attack without knowing what had happened to his family.  When he arrived, David found that his wife and two children were dead, and five of his other children were injured.

### Aftermath of the Attack

79.     Five of David's minor children— K.L., X.L., C.L., B.L., and M.L.— suffered gunshot wounds in the attack.  Each child required medical attention.  After their eventual rescue, the minor Plaintiffs were airlifted to a United States hospital, where several underwent surgery.  C.L., shot multiple times, has required multiple surgeries to salvage use of his leg and jaw.

80.     All the minor children Plaintiffs continue to suffer mental and emotional distress due to witnessing the attack, its grueling aftermath, and the loss of their mother and two brothers.

81.      David continues to suffer mental and emotional distress due to the loss of his wife and two children, and the traumatic injuries suffered by his surviving minor children.

82.     Plaintiffs Brandy Karen Spenst, Bryce David Langford, Cole Langford, and Crystal Alexis Langford continue to suffer mental and emotional distress due to the loss

of their mother and two brothers, and the traumatic injuries suffered by their surviving younger siblings.

83.     Since the massacre, approximate 210 of La Mora's 270 residents, fearing for their safety, have fled the community. They left behind the homes and the land their families have owned for generations.

84.     David Langford decided to move his family to Arizona while his children underwent surgeries and medical treatment, and later to Utah where the family has decided to stay. They left behind their home in La Mora, as well as acres of land, and a pecan orchard that provided the family's main source of income.

85.     After the attack, the Mexican government and military announced that they would build a new military outpost near Bavispe, along the road where the attack occurred. The government aims to curb future cartel violence in the area.

86.     In their investigation, Mexican police determined that the bullet casings around the vehicles were from AR-15 rifles, the type often used by cartel members in mass attacks.

87.     Mexican police arrested suspects, including leaders of La Línea, in connection with the November 4 attack. The investigations by Mexican law enforcement authorities and the United States Federal Bureau of Investigation are ongoing.

88.     Upon information and belief, the Juárez Cartel and La Línea are primarily responsible for the attack and for aiding and abetting the murders of nine innocent American citizens, including decedent Plaintiffs Dawna Ray Langford, T.L., and R.L. They are responsible for the injuries caused to Plaintiffs, as described herein.

89.     Upon information and belief, Defendant John Does I through LX are members of the Juárez Cartel and La Línea, and are the sicarios who carried out the attack. They are responsible for the injuries caused to Plaintiffs, as described herein.

## CLAIMS FOR RELIEF

## COUNT ONE

### Anti-Terrorism Act
### 18 U.S.C. § 2333

90. The preceding paragraphs are incorporated by reference as though fully set forth herein.

91. Plaintiffs are all U.S. Nationals injured by reason of an act of international terrorism and all seek damages under 18 U.S.C. § 2333.

92. The November 4, 2019 attack perpetrated by Defendants constitutes an act of international terrorism pursuant to 18 U.S.C. § 2331(1).

93. Defendants' actions involved violent acts dangerous to human life.

94. Defendants' actions – among them, murder, attempted murder, and assault with a deadly weapon – would constitute violations of the criminal laws of the United States if committed within the jurisdiction of the United States.

95. Defendants' actions were intended to intimidate or coerce a civilian population. As the governments of the United States and Mexico have concluded, the Defendants have engaged in acts of violence that are intended to intimidate civilians and deter them from encroaching on cartel territory or impeding illegal smuggling operations. Acts of extreme violence like the attack of November 4 serve to frighten and intimidate local populations like the American citizens living in La Mora, who have since fled the Cartel's territory because of the attack and the ensuing fear of further violence.

96. The acts of Defendants appear to have been intended to influence the policy of a government by intimidation or coercion. The November 4 attack was the latest undertaking in the Juárez Cartel's decades-long mission to throw Mexico into chaos and to subvert any efforts to promulgate and enforce laws and policies that would negatively affect the Cartel's business.

97. The acts of Defendants appear to have been intended to affect the conduct of a government by mass destruction, assassination or kidnapping. The attack was part of the Juárez Cartel's ongoing mission to intimidate law enforcement so that the cartel

business can carry on, unimpeded by police interference.  On November 4, police officers from the town of Bavispe did not immediately respond to the massacre because they feared further cartel violence.

98.  The acts of defendants occurred in Sonora, Mexico, which is outside the territorial jurisdiction of the United States.

99.  Plaintiff David Langford was injured by an act of "international terrorism" for purposes of 18 U.S.C. § 2331(1) when his wife and two sons were murdered in the November 4 attack. He has incurred and continues to incur damages for mental pain and suffering, and emotional distress due to the loss of his wife and children, as well as the injuries and trauma sustained by his surviving children.  Further, David Langford has incurred and continues to incur economic damages due to the costs of medical treatment for his surviving children, loss of the use of his property, and lost profits and loss of future profits due to the loss of his agricultural operations.

100.  Dawna Ray Langford was a U.S. National injured by an act of "international terrorism" for purposes of 18 U.S.C. § 2331(1).  Her Estate, represented by David Langford, seeks damages under 18 U.S.C. § 2333.

101.  T.L. and R.L. were U.S. Nationals injured by an act of "international terrorism" for purposes of 18 U.S.C. § 2331(1).  Their Estates, represented by David Langford, seek damages under 18 U.S.C. § 2333.

102.  David Langford's surviving minor children (K.L., X.L., C.L., B.L., J.L., D.L., and M.L.), whose interests are represented by David Langford, are U.S. Nationals injured by acts of "international terrorism" as defined by 18 U.S.C. § 2331(1) when forced to witness the violent deaths of their mother and two brothers and then to await rescue for over ten hours in the desert or trek through the desert in search of help for their wounded siblings.  All seven continue to suffer damages related to trauma and psychological injuries.

103.    Among David Langford's minor children, K.L., X.L., C.L., B.L., and M.L. were further injured by the act of international terrorism when they were shot by members of the Cartel.  These minor continue to suffer damages related to their physical injuries.

104.    David Langford's adult children, Brandy Karen Spenst, Bryce David Langford, Cole Langford, and Crystal Alexis Langford were injured by an act of international terrorism for purposes of 18 U.S.C. § 2331(1) and the resulting loss of their mother and two brothers.  They seek damages under 18 U.S.C. § 2333.

105.    Damages awarded to Plaintiffs under 18 U.S.C. § 2333 may be satisfied through attachment of "blocked assets" under the Terrorism Risk Insurance Act of 2002 ("TRIA").  Assets of Defendants satisfy the definition of "blocked assets" under 18 U.S.C. § 2333(e) because they have been "seized or frozen by the United States under section 805(b) of the Foreign Narcotics Kingpin Designation Act."

106.    "Blocked assets" may be attached to any "judgment against a terrorist party on a claim based upon an act of terrorism."  28 U.S.C. § 1610 note (TRIA § 201(a)).  The acts described herein constitute "act[s] of terrorism" committed by a terrorist party under the applicable definitions in TRIA, including 8 U.S.C. § 1182(a)(3)(B)(iii) and (iv).

107.    All Plaintiffs demand judgment under 18 U.S.C. § 2333 and damages for pain and suffering, emotional distress, loss of companionship, wrongful death, and other damages, including treble damages under 18 U.S.C. § 2333, plus interest, costs, attorneys' fees, and any other such relief as the Court deems appropriate.

## COUNT TWO

### Assault and Battery

108.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

109.    Plaintiff David Langford brings this claim for assault and battery on behalf of his surviving minor children because Defendants unlawfully, violently, and willfully

19

assaulted and battered minor children K.L., X.L., C.L., B.L., J.L., D.L., and M.L. by shooting hundreds of rounds at their vehicle, wounding all but two of the children.

110. As a direct and proximate result of the attack, plaintiffs K.L., X.L., C.L., B.L., and M.L. suffered serious and—in some cases—permanent physical injury.

111. As further direct and proximate result of Defendants' actions, plaintiffs K.L., X.L., C.L., B.L., and M.L. incurred medical and other expenses from their injuries.

112. Pursuant to N.D.C.C. § 28-01-26.1, a claim for assault and/or battery survives the deaths of Dawna Ray, T.L., and R.L and may be brought by their Estates.

113. The estates of Dawna Ray Langford, T.L., and R.L.—all represented by David Langford—bring this claim for assault and battery against Defendants. Dawna Ray Langford, T.L., and D.L. were, as a direct and proximate result of the assault and battery, injured and killed.

114. As further direct and proximate result of Defendants' actions, the Estates of Dawna Ray Langford, T.L., and R.L. incurred funeral and other expenses from their injuries.

115. As further direct and proximate result of Defendants' actions, the Estates of Dawna Ray Langford, T.L., and R.L. have suffered from lost wages, future earnings, and future opportunities.

116. Plaintiff David Langford, on behalf of his minor children, and Plaintiff Estates of Dawna Ray, T.L., and R.L., demands judgment in their favor and damages arising out of assault and battery, including punitive damages, interest, costs, attorneys' fees, and any other such relief as the Court deems appropriate.

## COUNT THREE

### Wrongful Death

117. The preceding paragraphs are incorporated by reference as though fully set forth herein.

118.   Plaintiff David Langford, as the father of decedents T.L. and R.L., brings claims for the wrongful death of T.L. and R.L. pursuant to N.D.C.C. § 32-21-01 and § 32-21-03.

119.   Plaintiffs Brandy Karen Spenst, Bryce David Langford, Cole Langford, and Cyrstal Alexis Langford, as the children of decedent Dawna Ray Langford, bring a claim for the wrongful death of Dawna Ray Langford pursuant to N.D.C.C. § 32-21-01 and § 32-21-03.

120.   Defendants directly and proximately caused the death of Dawna Ray Langford, T.L., and R.L. ("Decedents") by a wrongful and intentional act.

121.   As a direct and proximate result of Defendants' wrongful and intentional act, Plaintiffs have suffered and will continue to suffer both economic and non-economic damages, including loss of earnings, funeral expenses, severe emotional distress, and permanent psychological injury.

122.   Plaintiff David Langford, on behalf of the Estates of T.L. and R.L., demands judgment in their favor and demands damages arising out of wrongful death, plus interest, costs, fees, and any other such relief as the Court deems appropriate.

123.   Plaintiffs Brandy Karen Spenst, Bryce David Langford, Cole Langford, and Crystal Alexis Langford, on behalf of the Estate of Dawna Ray Langford, demand judgment in their favor and demands damages arising out of wrongful death, plus interest, costs, fees, and any other such relief as the Court deems appropriate.

124.   David Langford's minor children also bring wrongful death claims arising out of the deaths of their mother and brothers, and pursuant to N.D.C.C. § 32-21-01 and § 32-21-03(2).  They demand judgment in their favor and damages arising from wrongful death, plus interest, costs, fees, and any other such relief as the Court deems appropriate.

## COUNT FOUR

### Negligent and/or Intentional Infliction of Emotional Distress

125.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

126.     Plaintiffs bring this claim for negligent and/or intentional infliction of emotional distress against Defendants who facilitated, assisted, aided, abetted, materially supported, and incentivized acts of murder and wrongful death, specifically, the shooting at and murder of Dawna Ray Langford and her children and other acts of international terrorism discussed herein.

127.     Pursuant to N.D.C.C. § 28-01-26.1, a claim for negligent and/or intentional infliction of emotional distress survives the deaths of Dawna Ray, T.L., and R.L.

128.     Plaintiffs who were not present at the scene of the attack are entitled to a claim for negligent and/or intentional infliction of emotional distress because the conduct was "sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present." *Murphy v. Islamic Rep. of Iran*, 740 F. Supp. 2d 51, 75–76 (D.D.C. 2010).

129.     Due to the negligent and/or intentional infliction of emotional distress caused by Defendants, all Plaintiffs have suffered severe emotional distress and its attendant physical effects.

130.     The conduct of Defendants was extreme and outrageous, and Defendants knew or should have known that such an act would inflict severe emotional harm on its victims and their family members.

131.     As a direct and proximate result of Defendants' intentional misconduct and/or reckless disregard for human life, all Plaintiffs have suffered and will continue to suffer severe and permanent psychological harm, including ongoing emotional distress and anxiety, requiring ongoing and long-term medical treatment, services, and counseling.

132.   All Plaintiffs demand judgment in their favor and demand damages arising out of assault and battery, including punitive damages, interest, costs, attorneys' fees, and any other such relief as the Court deems appropriate

## COUNT FIVE

### Survival Action

133.   The preceding paragraphs are incorporated by reference as though fully set forth herein.

134.   Plaintiff David Langford, as personal representative[1] of the Estates of Dawna Ray, T.L., and R.L. brings this survival action against Defendants because Defendants knowingly and willfully caused Decedents pain through their wrongful acts before willfully causing Decedents' wrongful deaths.

135.   As a direct and proximate result of the wrongful, intentional, malicious, reckless, grossly negligent, and negligent acts of Defendants as described herein, the Decedents suffered severe and extreme prolonged trauma and apprehension of harmful, offensive bodily contact, bodily injury, and battery.  They suffered extreme fear, terror, anxiety, emotional and psychological distress, knowledge of pending death, physical and emotional trauma, and intentionally inflicted physical pain.

136.   When Defendants fired upon Dawna Ray Langford's vehicle, she had time to comprehend the situation and understand that she would likely die, and that her children may die as well.  She had time to instruct her daughter to attempt to shield R.L. in the passenger well, and time to tell her other children to get down in an effort to save them from the hail of bullets.  She suffered severe mental anguish and psychological pain.  She was shot multiple times and likely suffered physical pain as a result.

---

[1] As noted herein, proceedings to appoint David Langford as personal representative are planned.  Plaintiffs will amend this Complaint upon the appointment of David Langford as personal representative.

137.    T.L. and R.L. also experienced conscious pain and suffering as they were struck with multiple bullets and suffered the mental anguish of knowing that their mother and siblings were all in danger.

138.    Estate Plaintiffs are entitled to all compensatory, punitive, and other damages permitted under the pertinent survival statutes against Defendants.  Accordingly, they, through Plaintiff David Langford, demand judgment in their favor and demand damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other relief as the Court deems appropriate.

## COUNT SIX

### Loss of Consortium

139.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

140.    Plaintiff David Langford and Dawna Ray Langford shared a husband-wife relationship at the time of the attack.

141.    Plaintiff David Langford and T.L.shared a father-child relationship at the time of the attack.

142.    Plaintiff David Langford and R.L. shared a father-child relationship at the time of the attack.

143.    Plaintiff K.L. and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

144.    Plaintiff K.L. and T.L. shared a sibling relationship at the time of the attack.

145.    Plaintiff K.L. and R.L. shared a sibling relationship at the time of the attack.

146.    Plaintiff X.L. and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

147.    Plaintiff X.L. and T.L. shared a sibling relationship at the time of the attack.

148.    Plaintiff X.L. and R.L. shared a sibling relationship at the time of the attack.

149.    Plaintiff C.L. and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

150.    Plaintiff C.L. and T.L. shared a sibling relationship at the time of the attack.

151.    Plaintiff C.L. and R.L. shared a sibling relationship at the time of the attack.

152.    Plaintiff B.L. and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

153.    Plaintiff B.L. and T.L. shared a sibling relationship at the time of the attack.

154.    Plaintiff B.L. and R.L. shared a sibling relationship at the time of the attack.

155.    Plaintiff J.L. and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

156.    Plaintiff J.L. and T.L. shared a sibling relationship at the time of the attack.

157.    Plaintiff J.L. and R.L. shared a sibling relationship at the time of the attack.

158.    Plaintiff D.L. and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

159.    Plaintiff D.L. and T.L. shared a sibling relationship at the time of the attack.

160.    Plaintiff D.L. and R.L. shared a sibling relationship at the time of the attack.

161.    Plaintiff M.L. and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

162.    Plaintiff M.L. and T.L. shared a sibling relationship at the time of the attack.

163.    Plaintiff M.L. and R.L. shared a sibling relationship at the time of the attack.

164.    Plaintiff Brandy Karen Spenst and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

165.    Plaintiff Brandy Karen Spenst and T.L. shared a sibling relationship at the time of the attack.

166.    Plaintiff Brandy Karen Spenst and R.L. shared a sibling relationship at the time of the attack.

167.    Plaintiff Bryce David Langford and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

168.    Plaintiff Bryce David Langford and T.L. shared a sibling relationship at the time of the attack.

169.    Plaintiff Bryce David Langford and R.L. shared a sibling relationship at the time of the attack.

170.    Plaintiff Cole Langford and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

171.    Plaintiff Cole Langford and T.L. shared a sibling relationship at the time of the attack.

172.    Plaintiff Cole Langford and R.L. shared a sibling relationship at the time of the attack.

173.    Plaintiff Crystal Alexis Langford and Dawna Ray Langford shared a mother-child relationship at the time of the attack.

174.    Plaintiff Crystal Alexis Langford and T.L. shared a sibling relationship at the time of the attack.

175.    Plaintiff Crystal Alexis Langford and R.L. shared a sibling relationship at the time of the attack.

176.    As a direct and proximate result of the wrongful acts of Defendants, surviving Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, affection and assistance, all to the detriment of the marital, parental, and sibling relationship.

177.    Surviving Plaintiffs demand judgment in their favor and demand damages arising out of loss of consortium, plus interest, costs, fees, and any other such relief as the Court deems appropriate.

## DEMAND FOR A JURY TRIAL

178.    Plaintiffs demand a jury trial for all claims alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against all Defendants, jointly and severally, for damages under the Anti-Terrorism Act, 18 U.S.C. § 2333 *et seq.*, assault and battery, wrongful death, negligent and/or intentional infliction of emotional distress, survival action, and loss of consortium.  Plaintiffs request damages for all past and future pain and suffering, past and future mental pain and suffering, loss of consortium, wrongful death, loss of future earnings potential, and any other potential remedies including treble damages for the maximum amount allowed under the Anti-Terrorism Act, 18 U.S.C. § 2333, *et seq.*, including reasonable attorneys' fees and costs, and for any other relief the Court deems just and proper.

Respectfully submitted this 25th day of August, 2020.

ROBINS KAPLAN LLP

By: */s/ Timothy Q. Purdon*

Timothy Q. Purdon, ND #05392
1207 West Divide Avenue, Suite 200
Bismarck, ND 58501
701-255-3000
TPurdon@RobinsKaplan.com

BALLARD SPAHR LLP

Henry E. Hockeimer, Jr.
(*pro hac vice* application pending)
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103

215-665-8500
HockeimerH@BallardSpahr.com

Jacey Skinner
(*pro hac vice* application pending)
BALLARD SPAHR LLP
201 South Main Street #800
Salt Lake City, Utah 84111
801-531-3000
SkinnerJ@BallardSpahr.com

Mark S. Kokanovich
Jillian L. Andrews
(*pro hac vice* applications pending)
1 East Washington Street, Suite 2300
Phoenix, Arizona 85004
602.798.5400
KokanovichM@BallardSpahr.com
AndrewsJ@BallardSpahr.com

*Attorneys for Plaintiffs*

90879591.1