## UNITED STATES DISTRICT COURT NORTH DAKOTA
## WESTERN DIVISION

_____

| | |
|---|---|
| Howard J. Miller, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Case No. 1:20-cv-00132-DMT-CRH |
| | ) |
| Juárez Cartel a/k/a Vicente Carrillo | ) |
| Fuentes Organization (a/k/a/ "CFO") a/k/a | ) |
| La Línea, | ) |
| | ) |
| Defendant. | ) |

_____   )

## PLAINTIFFS' TRIAL BRIEF REGARDING TRIAL FOR
## ENTRY OF DEFAULT JUDGMENT

Plaintiffs in this action seek the entry of a default judgment against Defendant Juárez Cartel a/k/a Vicente Carrillo Fuentes Organization (a/k/a "CFO") a/k/a La Línea (hereinafter "Defendant" or "the Cartel").  Plaintiffs submit that this Court has both subject matter and personal jurisdiction. In addition, Plaintiffs' unchallenged Complaints set forth facts, now deemed admitted and true by Defendant's default, establishing legitimate causes of action upon which this Court may enter a final default judgment.

This brief is also intended to provide the Court with information and evidence that will assist the Court in assessing damages for the upcoming damages trial currently scheduled to commence on February 7, 2022 before the Honorable Clare R. Hochhalter. Finally, this brief will discuss the law regarding damages for claims arising under the civil-damages provision of the Antiterrorism Act, 18 U.S.C. § 2333(a) ("ATA"), and the analogous "terrorism exception" under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A.

On November 4, 2019, a three-vehicle caravan was traveling between the Mexican states of Sonora and Chihuahua when the caravan of vehicles—carrying women and children—were

ambushed in a hail of gunfire by members of the Cartel acting under direct orders from the Cartel's leaders.  During the course of the ambush and subsequent close-range attack on the caravan, nine occupants of the vehicles were murdered—Maria Rhonita LeBaron, four of her minor children (H.M., Jr. who was 12 years old, K.B.M who was ten years old, and T.A.M. and T.G.M. who were eight-month-old twins), Christina Langford, Dawna Ray Langford, and two of her minor children (T.L. who was 11 years old and R.L. who was two years old).  Christina Langford's seven-month-old daughter F.M.J. was travelling with Christina in a car seat and survived the ambush and subsequent attack despite multiple bullets penetrating her car seat.  Seven of Dawna Ray Langford's children also survived the attack despite traveling with their mother in the same vehicle at the time of the ambush.  In addition to those who were present during the ambush, forty-seven (47) additional family members assert claims for solatium damages and/or intentional infliction of emotional distress for the loss of their loved ones who are the spouses, children, parents, and siblings of those who were killed in the attack.

Plaintiffs submit that an approximately 40-minute long mini-documentary titled "Lara Logan Investigates: Mexican Mormon Massacre" that initially aired on January 31, 2021 on Fox News Channel might provide the Court with certain context regarding the location of the attack and an understanding of the American citizens residing in La Mora who were impacted by this attack.  A copy of the video can be found as Exhibit 1 included with this submission.[1]

---

[1] While Exhibit 1 will be provided to the Court directly, because of the size of the file, it exceeds the size limitations for filing electronically.

## I.      Procedural History

On July 23, 2020, the first case arising out of the massacre was filed by Howard Miller (on his own behalf and on behalf of his wife Rhonita's estate and the estates of his four children who were murdered), additional members of the Miller/LeBaron family including Howard and Rhonita's three surviving children, Tyler Johnson (on his own behalf and on behalf of his wife Christina's estate), additional members of the Johnson/Langford family, and members of Dawna Ray Langford's family.  *See* ECF No. 1 (Complaint in the *Miller* action).  On August 25, 2020, the second case arising out of the November 4, 2019 attack was filed asserting claims by David Langford (on his own behalf on behalf of his wife Dawna's estate and the estates of his two children who were murdered and on behalf of his seven surviving minor children who were also involved in the attack), and four adult children of David and Dawna Ray Langford who are asserting solatium claims arising from the attack in which their mother and nine of their siblings were involved.  *See* Complaint in the *Langford* action, Case No. 20-cv-00159.  On October 16, 2020, the Court entered an Order consolidating the *Miller* and *Langford* cases.  *See* ECF No. 17. After serving the Cartel by publication and failure by the Cartel to serve a responsive pleading, an Entry of Default was entered in the *Miller* case on December 7, 2020 (ECF No. 22) and in the *Langford* case on December 31, 2020 (ECF No. 25).  Based on the Entry of Default issued in each of the two consolidated cases before this Court, Plaintiffs hereby seek a trial to obtain default judgments against the Cartel.

## II.     Jurisdiction

The entry of a default judgment is "committed to a district court's discretion."  *Nuevos Destinos, LLC v. Peck*, Case No. 3:19-cv-00045, 2020 U.S. Dist. LEXIS 207509, at *2 (D.N.D. Mar. 10, 2020), *citing United States ex. rel. Time Equip. Rental & Sales, Inc. v. Harre*, 983 F.2d

128, 130 (8th Cir. 1993).   While the Eighth Circuit has determined that "there is a 'judicial preference for adjudication on the merits,'" here the grounds for default are *not* in doubt. *See Belcourt Pub. Sch. Dist. v. Herman*, 786 F.3d 653, 661 (8th Cir. 2015), *quoting Johnson v. Dayton Electric Mfg. Co.*, 140 F.3d 781, 784 (8th Cir. 1998); *see also Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc.*, 513 F. Supp. 2d 1, 3 (S.D.N.Y. 2007) (quoted in *Belcourt* for the principle that one of the factors to be considered in entering a default judgment includes "whether the grounds for default are clearly established or are in doubt"). As part of the analysis, "a district court has an affirmative duty to assure itself of jurisdiction over the case and the defendants" prior to entering a default judgment.  *Nuevos Destinos*, 2020 U.S. Dist. LEXIS 207509, at *2. Nevertheless, "upon default, the factual allegations of a complaint (except those relating to the amount of damages) are taken as true." *Murray v. Lene*, 595 F.3d 868, 871 (8th Cir. 2010). Plaintiffs submit that, based on the well-pleaded allegations in their Complaint, this Court possesses both subject matter jurisdiction and personal jurisdiction in these claims arising under both federal and state law to permit the entry of default judgment against the Cartel for the acts that took place on November 4, 2019.  The attack meets the definition of an act of international terrorism as set forth in 18 U.S.C. § 2331(1), and the victims were all United States nationals at the time of the attack.  Because certain of the Plaintiffs worked and resided in North Dakota, venue is also proper here, and by virtue of its actions against United States citizens, the Cartel should reasonably anticipate being haled into court in the United States to answer for its tortious acts.

### A.  Subject Matter Jurisdiction over ATA Claims

Plaintiffs' claims arise under both federal law and state law, so subject matter jurisdiction is asserted under 28 U.S.C. §§ 1331 (federal-question jurisdiction) and 1367 (supplemental jurisdiction). Pursuant to 18 U.S.C. § 2338, the district courts of the United States have exclusive

jurisdiction over actions arising under 18 U.S.C. § 2333(a), the civil-damages provision of the Antiterrorism Act.  "The ATA grants United States nationals a private right of action for injury caused by an act of international terrorism."  *See Kaplan v. Lebanese Canadian Bank, SAL*, 999. F.3d 842, 846 (2d Cir. 2021); 18 U.S.C. § 2333(a); *see also Morris v. Khadr*, 415 F. Supp. 2d 1323, 1327 (D.C. Utah 2006) ("In 18 U.S.C. § 2333, Congress created a cause of action for United States nationals who were injured by 'terrorism that occurred in a foreign country'").  Section 2333(a) states:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sure therefor any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333(a).

### 1. Standing

To assert standing under 18 U.S.C. § 2333(a), Plaintiffs must demonstrate that they were United States nationals at the time of the injury or that they are the "estate, survivor[], or heir[]" of a United States national who was injured by reason of an act of international terrorism. To meet the first prong, Plaintiffs address the definition of a national of the United States.

A "national of the United States" is defined in accordance with the meaning of that term in Section 101(a)(22) of the Immigration and Nationality Act. *See* 18 U.S.C. § 2331(2). The Immigration and Nationality Act defines "national of the United States" as "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22) (I.N.A. § 101(a)(22)).  The second prong of this definition is immaterial to this case, and "is now apparently limited to residents of American Samoa and Swains Island." *See Hashmi v. Mukasey*, 533 F.3d 700, 703 n.1 (8th Cir. 2008).

Here, all of the Plaintiffs were United States citizens as of November 4, 2019, with the sole exception of Plaintiff Adrian LeBaron-Soto. *See* Exhibits 11-35, 38-46. Because his daughter, Maria Rhonita LeBaron was a U.S. citizen at the time of her death, Adrian LeBaron-Soto—as a "survivor" of her estate under Section 2333(a)—possesses standing to pursue his claims in this Court notwithstanding his nationality at the time of his daughter's murder. *See Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, l52-53 (E.D.N.Y. 2020) (finding that if the victim of the attack is a U.S. citizen, then the surviving heirs or family members need not be U.S. citizens; to hold otherwise "would undermine the ATA's broad remedial purpose 'to grant a remedy to U.S. nationals and their families who suffered from injury to an individual or property as a result of international terrorism'"); *Weinstock v. Marzook*, 2019 U.S. Dist. LEXIS 56937, at *10 (S.D. Fla. Apr. 2, 2019); *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 620 (E.D.N.Y. 2006).

### 2. Act of International Terrorism

Plaintiffs also must demonstrate that they were injured "by reason of an act of international terrorism."  The term "international terrorism" is defined as:

…activities that--

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended--

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum;

18 U.S.C. § 2331(1).

The Second Circuit has held that a "plaintiff must prove that the defendant's act not only violated United States law or a State law…, but that the act '*also* involve[d] violence of endanger[ed] human life,' and "[f]urther … *appear[ed] to be intended* to intimidate or coerce a civilian population or to influence or affect a government." *See Weiss v. Nat'l Westminster Bank*, 993 F.3d 144, 160-61 (2d Cir. 2021), *quoting Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018).  As set forth in the *Miller* Complaint, Defendant's members opened fire on vehicles filled with women and children—all of whom were United States citizens.  *See* ECF No. 1 at ¶156. Defendant's members "utilized weapons of mass destruction in violation of the criminal laws pertaining to acts of international terrorism."  *See id.* at ¶160 (citing violation of 18 U.S.C. § 2332a).  Further, the act of murder—if committed within the jurisdiction of the United States or of any State—would constitute a violation of the criminal law.

The attacks at issue here also, *prima facie*, involved acts that involved violence and endangered human life.  Three adult women and six children were brutally murdered in these attacks while another six children sustained violent injuries as they were subjected to a barrage of gunfire followed by the igniting of Rhonita's vehicle while it was occupied by multiple children.

"Whether a defendant 'appear[ed]' to have intended its activities to intimidate or coerce is not a question of the defendant's subjective intent but rather a question of what its intent objectively appeared to be." *Weiss*, 993 F.3d at 161.  The history of Defendants set forth in the *Miller* Complaint demonstrates the objective intentions of the Defendant.  *See* ECF No. 1 at ¶¶51-78. The November 4, 2019, attacks were the latest and perhaps most ruthless in the Juárez Cartel's

decades-long struggle to intimidate the civilian population and influence the Mexican government and local governments not to act. As set forth in the Complaint, the Defendant is engaged in various targeted asssassinations of innocent civilians, political figures, public servants, and U.S. government officials. *See* ECF No. 1 at ¶¶57-78.  The Juaréz Cartel has engaged in this conduct for decades.  In a Superseding Indictment filed against the head of the Juaréz Cartel, Vicente Carrillo-Fuentes, in the U.S. District Court for the Western District of Texas on August 16, 2000, the Grand Jury charged that Carrillo-Fuentes "intentionally killed and counseled, commanded, induced, procured and caused the international killing" of nine separate individuals "with the intent to prevent the communication" by these individuals "to a law enforcement officer of the United States of information relating to the commission or possible commission of a federal offense." *See* Case No. 3:97-cr-00665-PRM (W.D. Tex.), Document 11 (Superseding Indictment), Aug. 16, 2010, at Counts 37-45. These alleged actions demonstrated the Cartel's intent to intimidate civilians who were killed for attempting to provide information on the Cartel's activities to the U.S. government. In a separate Superseding Indictment issued against Mr. Carrillo-Fuentes in the U.S. District Court for the Eastern District of New York on October 2, 2019, the Grand Jury charged that the Juaréz Cartel "maintained its power in part through the payment of bribes to law enforcement and public officials, and through numerous acts of violence. [Mr. Carrillo-Fuentes], as a member and leader of the [Juaréz Cartel], employed 'sicarios,' or hitmen, who carried out hundreds of acts of violence, including murders, assaults, kidnappings, assassinations and acts of torture" at Carrillo-Fuentes' direction.  One of the reasons provided by the Grand Jury for these directions was to protect "members of the [Juaréz Cartel] from arrest and prosecution by silencing potential witnesses and retaliating against anyone who provided information or assistance to law enforcement authorities."  *See* Case No. 1:09-cr-00522-SJ (E.D.N.Y.), Document 6 (Superseding

Indictment), Oct. 2, 2019, at ¶4. The allegations in the Complaint and in these two federal indictments against the head of the Cartel describe the outward intentions and activities of the Defendant leading up to the massacre involving the Plaintiffs here.

In this case, the Mexican government concluded that Juaréz Cartel members hid in the mountains "to attack anyone who tried to invade the territory they controlled." *See* ECF No. 1 at ¶152. Further, a Confidential Witness who was present at the murder of Maria Rhonita LeBaron and her children stated that Cartel members set up in the mountains along the road where the attack took place to "ambush any vehicles, civilian or otherwise on these roads." *Id.* at ¶80. These facts make clear that the Defendant's conduct was intended to intimidate and/or coerce the civilian population while also influencing the policies and activities of the Mexican government.

Finally, Plaintiffs submit that the final prong of the analysis to determine if a particular action constitutes an act of international terrorism is the international flavor of the attack.  First, the attack took place outside the territorial confines of the United States against United States citizens; however, its overall activities are international in nature involving the trafficking of narcotics, persons, and arms between Mexico and the United States. Further, as set forth in the *Miller* Complaint, certain of Defendant's members who were involved in the attacks sought to hide in the United States to avoid arrest demonstrating how this attack transcended international borders.  *See* ECF No. 1 at ¶150.  Based on these facts as pled in the Complaints, Plaintiffs have established by uncontroverted facts that these attacks constituted acts of international terrorism as defined in 18 U.S.C. §2331(1).

### B.  Subject Matter Jurisdiction over State Law Claims

"A district court may exercise supplemental jurisdiction over state law claims that arise from the same nucleus of operative fact as the plaintiff's federal claims and when the plaintiff

would ordinarily be expected to try all the claims in one judicial proceeding." *Humann v. KEM Elec. Co-op., Inc.*, 450 F. Supp. 2d 1006, 1012 (D.N.D. 2006) (citing *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 973 (8th Cir.1999)).   The exercise of supplemental jurisdiction over Plaintiffs' state law claims is proper.  All causes of action in this case—both federal and state— arise out of the same event occurring on November 4, 2019.  The same parties are involved, and all facts are the same.  It would be proper and most efficient to try all of the Plaintiffs' claims in one proceeding in this Court. Plaintiffs submit that the claims for assault and battery, wrongful death, negligent and/or intentional infliction of emotional distress, survival, and loss of consortium arise under the same nucleus of facts.  Furthermore, while Plaintiffs submit that these claims were filed within the requisite statute of limitations (N.D.C.C. §§ 28-01-18(4) and (5)) of two years. Regardless, statute of limitations is an affirmative defense that must be pled.  Defendant, by virtue of its default and failure to answer, has waived all affirmative defenses including statute of limitations.  N.D.C.C. § 28-01-39.

### C.  Personal Jurisdiction and Venue

The procedural requirement of service of a summons must be satisfied before a federal court may exercise personal jurisdiction over a defendant. *Omni Capital Int'l Ltd. V. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987).   The ATA provides that service of process may be effected "in any district where the defendant resides, is found, or has an agent." 18 U.S.C. § 2334(a). Defendant here does not reside in any district within the United States.  As a result, the *Miller* Plaintiffs sought leave to serve Defendant by publication under Fed. R. Civ. P. 4(f)(3). *See* ECF No. 11.  The *Langford* Plaintiffs subsequently moved for leave to serve by publication.  *See* ECF No. 18.

In another case arising under the ATA in which service was accomplished by publication against a foreign defendant, the court stated, "the personal jurisdiction issue in this case is not novel; several courts have faced similar facts.  These courts have held that the Due Process Clause's 'minimum contacts' requirement for personal jurisdiction is met when terrorists 'engage[] in unabashedly malignant actions directed at [and] felt in' the forum." *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1334 (D. Utah 2006); *see also Mwani v. Bin Laden*, 417 F.3d 1, 12-13 (D.C. Cir. 2005).  The court in *Morris* held that Fed. R. Civ. P. 4(k)(2) "establishes the court's jurisdiction." 415 F. Supp. 2d at 1334.  Rule 4(k)(2) states:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Fed. R. Civ. P. 4(k)(2).

The D.C. Circuit in *Mwani* interpreted the Rule to "permit[] a federal court to exercise personal jurisdiction over a defendant (1) for a claim arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States." 417 F.3d at 10.  As in this case, the court in *Morris* determined that in a case arising under the ATA where service by publication was authorized and completed under Fed. R. Civ. P. 4(f), then the first two prongs in the *Mwani* analysis of Rule 4(k)(2) have been satisfied.  *See* 415 F. Supp. 2d at 1335.  Like the defendant in *Morris*, the Defendant here is not subject to the jurisdiction of any single state court.  *See* ECF No. 11 at 2 ("The Juárez Cartel has no known address and operates as a clandestine criminal organization in and around Chihuahua, Mexico"). The rule allows a court to exercise personal jurisdiction over a defendant with sufficient contacts with the United States generally but lacks contacts with any one state. F.R.C.P. 4(k)(2)

(advisory committee's note).  For the rule to apply, there must be a federal claim, personal jurisdiction must not exist over the defendant in any state, and the defendant must have sufficient contacts with the United States as a whole so that the exercise of jurisdiction does not violate Fifth Amendment due process. *Nuevo Destinos, LLC v. Peck*, Case No. 3:19-cv-00045, 2019 U.S. Dist. LEXIS 207313 at *25 (D. N.D. Dec. 2, 2019).

The question of personal jurisdiction then turns upon whether the exercise of personal jurisdiction in these circumstances meets the requirement that the Defendant has "sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment." 415 F. Supp. 2d at 1335.  Here, this Court has "a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King v. Rudzewicz*, 471 U.S. 462, 473 (1985).  In cases arising out of terrorist acts, "courts have employed the 'effects doctrine' to establish the requisite minimum contacts for personal jurisdiction" that "jurisdiction may attach if the defendant's conduct is aimed at or has an effect in the forum."  *Morris*, 415 F. Supp. 2d at 1335-36, *citing Mwani*, 417 F.3d at 4.  "Because injury in the United States undeniably is a foreseeable effect of a terrorist attack purposefully directed at this country's citizens, terrorism inherently is the sort of 'conduct and connection with' the United States that should cause a foreign terrorist to 'reasonably anticipate being haled into court' here." *Morris*, 415 F. Supp. 2d at 1336, *quoting World-Wide Volkswagen Corp v. Woodson*, 444 U.S. 286, 297 (1980).  To further solidify the personal-jurisdiction analysis in this case, numerous Plaintiffs herein reside in North Dakota, or were residing in North Dakota at the time of the massacre, causing the impact of the terrorist attack not only to be on the United States as a whole, but on North Dakota specifically.  *See* ECF No. 1 at ¶¶ 1, 2, 4-6, 10, 19, 22-27, 29-32.

The instant action involves claims arising under federal law.  The Juárez Cartel is not subject to general jurisdiction of any one state.  As such, Rule 4(k)(2) allows the aggregation of nationwide contacts to allow for service of process because the plaintiffs' claims arise under federal law and the assertion of personal jurisdiction by this Court over the Defendant comports with the Due Process Clause of the Fifth Amendment. Based on Plaintiffs' representations, this Court granted Plaintiffs' motion for leave to serve by publication finding "there is good cause to authorize service by publication given the particular circumstances in this case." *See* ECF No. 14 at 2-3 (*Miller* case); ECF No. 19 (*Langford* case). Proof of service by publication was provided to the Court in both cases.  *See* ECF No. 20 (*Miller* case); ECF No. 24 (*Langford* case).  On motion, the Clerk of the Court entered defaults in each case.  *See* ECF No. 22 (*Miller* case); ECF No. 25 (*Langford* case).

As set forth above, numerous Plaintiffs reside and work in North Dakota.  The venue provision of the ATA provides:

> Any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent.

18 U.S.C. § 2334(a).  Therefore, the United States District Court for the District of North Dakota serves as a proper venue for this action.  Plaintiffs served the Defendant by publication in Mexico, serving the Defendant in the country where it operates.

## III.    The Unchallenged Facts Constitute a Legitimate Cause of Action

The Eighth Circuit has stated unequivocally that it is "appropriate for a district court to enter a default judgment when a party fails to appropriately respond in a timely manner.  Even so, it is incumbent upon the district court to ensure that 'the unchallenged facts constitute a legitimate cause of action' prior to entering final judgment." *Marshall v. Baggett*, 616 F.3d 849, 852-53 (8th

Cir. 2010) (citations omitted), *quoting Murray v. Lene* 595 F.3d 868, 871 (8th Cir. 2010). The plain statement of unchallenged facts in the "Introduction" of the *Miller* Complaint provides a succinct view of the case:

> On November 4, 2019, members of the Juárez Mexican drug cartel and its violent armed wing, La Línea ('The Line'), ambushed and murdered three women and six of their children in the Sierra Alta in Sonora, Mexico.  In a series of coordinated assaults, the families came under attack approximately 70 miles south of the United States-Mexico border as they drove in a three-car convoy between the states of Sonora and Chihuahua.  All victims killed or injured in the attacks are United States citizens.

ECF No. 1 at Introduction.

The Complaint sets forth the history and activities of the Defendant from its origins in the 1980s (*id.* at ¶40) to the attack on November 4, 2019 and the subsequent arrests and searches conducted by the Mexican government and law enforcement to detain those responsible for Defendant's terrorist acts committed on November 4, 2019.  U.S. government actions against the Cartel through designations of different entity names as narco-terrorists is laid out in the unchallenged allegations of the Complaint.  *Id.* at ¶43.  Furthermore, on December 15, 2021, the U.S. Department of the Treasury expanded the scope of designations against the Cartel to expressly incorporate the alias "La Línea".  *See* U.S. Dept. of the Treasury, Issuance of Executive Order Imposing Sanctions on Foreign Persons Involved in the Global Illicit Drug Trade; Counter Narcotics Designations and Designations Updates, Dec. 15, 2021, available at: https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20211215           (last accessed January 24, 2022) ("CARRILLO FUENTES ORGANIZATION (a.k.a. JUAREZ CARTEL; a.k.a. "CFO"), Mexico [SDNTK]. -to- JUAREZ CARTEL (a.k.a. CARTEL DE JUAREZ; a.k.a. "CARRILLO FUENTES DRUG TRAFFICKING ORGANIZATION"; a.k.a. "LA LINEA"; a.k.a. "VCFO"), Mexico [SDNTK] [ILLICIT-DRUGS-EO].").

The history and activities of the Defendant in the 1980s and 1990s are set out in specific detail including the establishment of an alliance between the Defendant and the renowned Sinaloa Cartel "sometime in the 1990s or early 2000s."  *Id.* at ¶¶51-54.  While this alliance subsequently fell apart leading to violence between the two cartels, the Complaint continues to describe the increasing sophistication of the Defendant's criminal enterprise and its affinity for "us[ing] violence to intimidate and coerce the civilian population and to influence the policy of the Mexican government" through acts including mass killings, bombing police and military targets, kidnapping and assassinating political figures, journalists, activists, religious figures, doctors, and innocent civilians to tighten its grasp on power through intimidation while carrying out attacks that seek "political ends rather than simply an individual expression of psychopathology."  *Id.* at ¶¶55-61. The Complaint sets forth numerous examples of attacks carried out by the Defendant in the years leading up the attack on the Plaintiffs to demonstrate its terrorist tactics against Mexican and American targets alike.  *Id.* at ¶¶62-72.

The attack giving rise to this litigation was described by General Homero Mendoza, Chief of Staff for Mexico's Secretary of Defense, as follows:

> La Línea reacted to the threat posed by the Sinaloa Cartel's Los Salazar faction in Chihuahua by assassinating Christina, Rhonita and Dawna and their children and instilling fear in the community.  The killings demonstrate both La Línea's control of the highway crossing from Sonora into Chihuahua and their intolerance for any perceived connection to the Salazar faction.  The fear caused by La Línea's attack on Plaintiffs establishes control over this vital drug smuggling route and forces the public to surrender to the powerful cartel's illegal activities.

*Id.* at ¶76.

The Complaint also describes in detail the events of November 4, 2019 and the days and preparations of the Cartel leading up to the attacks in which three women and six children were murdered and six additional children were shot.  *Id.* at ¶¶79-152.  Causation for the attack is

demonstrated in the well-pleaded allegations to citations to the statements of Confidential Witnesses of the Mexican government including members of La Línea who were present during the ambush and recounted the events leading up to, and during, the attacks.  Further, video was taken by members of the Cartel during the ambush as Cartel members commented on the video to burn Rhonita's vehicle and "finish it."  *Id.* at ¶100.  Based on the unchallenged allegations and the evidence incorporated into the Complaint, there can be no dispute that the Cartel carried out the attack and that the injuries sustained by the Plaintiffs were proximately caused by the Defendant's conduct.

### A.  Count One – 18 U.S.C. § 2333(a)

As stated above, 18 U.S.C. § 2333(a) provide a private cause of action for United States nationals injured by reason of an act of international terrorism.  The nine individuals who were killed, and the six children who sustained gunshot wounds were clearly injured by reason of an act of international terrorism.  Further, Plaintiff D.L. (who was 13 years old at the time and is a Plaintiff in the *Langford* case), while not having sustained a gunshot wound in the ambush was nevertheless traumatized watching the murder of his mother and siblings and walking approximately 22 kilometers seeking assistance for his injured siblings. Plaintiff F.M.J. (who was seven months old at the time and is a Plaintiff through her father in the *Miller* case) was left alone in a car seat under a cover for ten hours after her mother had been murdered and the car seat in which she was seated was riddled with bullets.  She was assumed dead and likely thought she would die in the vehicle.

In addition to those who were present during the ambush, courts addressing claims under the ATA have almost uniformly allowed "solatium damages in suits brought under the ATA regardless of the availability of such damages under the general tort law of the state in which the

district court sits" as such damages evince the deterrent intent of the ATA as a mechanism in the fight against terrorism.  *See Rosenberg v. Lashkar-e-Taiba*, 2016 U.S. Dist. LEXIS 87724, at *75-*76 (E.D.N.Y. July 5, 2016); *see also Lelchook v. Commerzbank AG*, 2011 U.S. Dist. LEXIS 106305, at *6-*7 (S.D.N.Y. Aug. 1, 2011) ("permitting Plaintiffs to pursue claims for solatium damages is consistent with both the purpose of the ATA, and Congress' intention to incorporate traditional tort-law principles into the statute"); *Estate of Henkin,* 495 F. Supp. 3d at 152-53. "Family members do not need to be present for the terrorist attacks to recover under the ATA, because 'a terrorist attack is precisely the sort of situation in which presence at the time is not required in light of the severity of the act and the obvious range of potential grief and distress that directly results from such a heinous act.'" *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 41 (E.D.N.Y. 2019).  In this situation, the pleadings are replete with facts regarding the exposure of other family members to the scene of the attacks and the devastation to the members of their families such that their grief has been compounded.  The proximate cause of this grief is irrefutably the conduct of the Cartel in carrying out the attack on November 4, 2019.

### B.  Count Two – Assault and Battery

North Dakota law provides that "an assault is 'any willful and unlawful attempt or offer with force or violence, to do a corporal hurt to another,' and a battery is 'any willful and unlawful use of force or violence upon the person of another.'" *Clark v. Carlson*, 2020 U.S. Dist. LEXIS 257869, at *14-*15 (D.N.D. Oct. 14, 2020), *quoting Wall v. Zeeb*, 153 N.W.2d 779, 786 (N.D. 1967).  Here, the unchallenged facts support Plaintiffs' claims against Defendant for assault as to each of the individuals riding in the three vehicles who were subjected to the attack and battery as to each of the individuals killed or impacted by gunfire from the Cartel's members.

### C.  Count Three – Wrongful Death

North Dakota's statutory law states the following for when an action for wrongful death is "maintainable":

> Whenever the death of a person shall be caused by a wrongful act, neglect, or default, and the act, neglect, or default is such as would have entitled the party injured, if death had not ensued, to maintain an action and recover damages in respect thereof, then and in every such case the person who, or the corporation, limited liability company, or company which, would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured or of the tort-feasor, and although the death shall have been caused under such circumstances as amount in law to felony.

N.D.C.C. § 32-21-01. The Complaint sets forth that "Plaintiffs, as Decedents' surviving relatives and/or representatives, are entitled to recover damages as a result of the wrongful acts and/or omissions of Juárez Cartel and La Línea." ECF No. 1 at ¶188. The unchallenged allegations uphold the legal sufficiency of Plaintiffs' claims for wrongful death.

### D. Count Four – Negligent and/or Intentional Infliction of Emotional Distress

As Plaintiffs set forth in their Complaint, "cases arising out of other terrorist attacks have removed the presence requirement [for claims of infliction of emotional distress] because it is 'sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present.'" ECF No. 1 at ¶194, *quoting Murphy v. Islamic Rep. of Iran*, 740 F. Supp. 2d 51, 75-76 (D.D.C. 2010). North Dakota courts have looked to the *Restatement (2d) Torts*, § 46 regarding the standard for intentional infliction of emotional distress which requires a finding of "(1) extreme and outrageous conduct that is (2) intentional or reckless and that causes (3) severe emotional distress." *Neppel v. Dev. Homes, Inc.*, 953 N.W.2d 642, 646 (N.D. 2021); *Muchow v. Lindblad*, 435 N.W.2d 918, 923-24 (N.D. 1989). Section 46 of the Restatement is the same section interpreted in *Murphy* which held that family members "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." 740 F. Supp. 2d at 76. Applying the law in this circumstance supports—with testimony at the

damages phase—that family members of the decedents who were not present at the time of the attack may nevertheless assert claims for intentional infliction of emotional distress if they can demonstrate the requisite "severe emotional distress" at the loss of their loved ones.

### E.  Count Five – Survival Action

Under North Dakota law, a "survival action merely continues in existence an injured person's claim after death as an asset of his estate" and the elements of damages of such a claim "are generally as follows: conscious pain and suffering; medical expenses; funeral and burial expenses; and loss of earnings, *usually from the time of injury to the time of death*." *Sheets v. Graco, Inc.*, 292 N.W.2d 63, 67 (N.D. 1980). Estates have been opened for each deceased spouse and Howard Miller, Tyler Johnson, Crystal Langford, and David Langford have been duly appointed as executors of their spouse's, mother's, and deceased children's estates.  *See* Exhibits 2-10. Plaintiffs submit that during the damages trial Plaintiffs will offer evidence that those who were killed suffered emotional and physical pain and suffering prior to their death for the Court to award damages under a survival action.

### F.  Count Six – Loss of Consortium

Loss of consortium claims are distinct claims for tortious conduct separate from wrongful death and survival actions. *Weigel v. Lee*, 752 N.W.2d 618, 621 (N.D. 2008).  Courts in North Dakota refuse to recognize a child's claim for loss of parental consortium.  *See Butz v. World Wide, Inc.*, 492 N.W.2d 88, 92 (N.D. 1992). But claims for loss of spousal consortium are appropriate and relate to the loss of "love, companionship, affection, society, comfort, solace, support, sexual relations, and services." *Hastings v. James River Aerie No. 2337-Fraternal Order of Eagles*, 246 N.W.2d 747, 752 (N.D. 1976); *Weigel*, 752 N.W.2d at 621. Further, recognizing a "parents' claims for loss of a child's society and companionship [is] indicative of a trend broadening the spectrum

for loss of consortium claims." *Families Advocate, LLC v. Sanford Clinic North*, Case No. 3:16-cv-114, 2019 U.S. Dist. LEXIS 41219, at *44, n.9 (D.N.D. Jan. 31, 2019); *citing Butz*, 492 N.W.2d at 93.  But the court in *Families Advocate* also determined that "there is no reason to believe the North Dakota Supreme Court would recognize a claim for loss of society and companionship by siblings…." *Id.* at *44, n.9. Plaintiffs' well-pleaded allegations that remain unchallenged—in addition to testimony to be provided in a damages phase before the Court—demonstrate the legal sufficiency of Plaintiffs' claims.

**IV.   Plaintiffs' seek to present their case for damages through submission of evidence before the Court**

Having established, *supra.*, that the Court possesses jurisdiction over this case and the Defendant and that the unchallenged facts as set forth in the Complaint establish legitimate causes of action on all counts before the Court, Plaintiffs shall convene a trial for damages on consent before the Honorable Clare R. Hochhalter, United States Magistrate Judge for the United States District Court for the District of North Dakota commencing on February 7, 2022 and concluding by February 11, 2022. This damages trial will provide evidence of the attacks and the economic, emotional and physical damages suffered by the Plaintiffs from the Defendant's conduct.

A favorable decision for Plaintiffs will likely result in their damages being redressed through various post-judgment enforcement proceedings, including: (i) executing on assets owned or held by Defendant, directly or indirectly, in the U.S. or abroad, which may be subject to future seizure, forfeiture or blocking by the U.S.; or (ii) assertion of claims as crime victim judgment creditors in civil, criminal, and/or administrative seizures or forfeitures against the Defendant and its various alter egos.  Plaintiffs have more than a speculative prospect of redressing their injuries if the Court rules in their favor.  The Defendant has assets from which a judgment, if entered, may be satisfied.  "This establishes a 'likelihood that the injury will be redressed by a favorable

decision.'" *Morris*, 415 F. Supp. 2d at 1330 (holding that the plaintiffs had standing).   The government has many law enforcement agencies working to identify, locate, and freeze assets of narco-terrorist organizations worldwide, including the Juárez Cartel.  The Treasury Department's Office of Foreign Assets Control ("OFAC"), the Drug Enforcement Administration ("DEA"), and other federal agencies are working to dismantle the Juárez Cartel's financial network.  Through one or more of these investigations, actions, and resulting assets, the Plaintiffs will be able to satisfy a judgment in whole or in part.

In a default case, Plaintiffs may submit some or all of their evidence through affidavits or sworn reports.  *See Stansell, et al. v. Revolutionary Armed Forces of Colombia (FARC), et al.*, Case No. 8:09-cv-2308-T-26 MAP, 2010 U.S. Dist. LEXIS 149212, at *11 (M.D. Fla. June 14, 2010); *see also* Fed. R. Civ. P. 55.  At trial, not all of the Plaintiffs will be able to testify given the number of Plaintiffs and the length of the trial; therefore, Plaintiffs will be offering into evidence affidavits of Plaintiffs and a non-party fact witness.  Plaintiffs also anticipate using Fed. R. Evid. 1006 summaries to set forth damage calculations.  To assist the Court, Plaintiffs are providing the following affidavits and declarations (including their own exhibits) of Plaintiffs and two non-party fact witnesses, Douglas Johnson and Andre Miller, as Exhibits 11-46 to this memorandum:

**Miller Plaintiffs and Fact Witnesses**

a.      Howard J. Miller (Exhibit 11);
b.      Tyler Johnson (Exhibit 12);
c.      Amelia Sedgwick (Exhibit 13);
d.      Elizabeth Langford (Exhibit 14);
e.      Serina Langford (Exhibit 15);
f.      Isaac Langford (Exhibit 16);
g.      Adrian LeBaron-Soto (Exhibit 17);
h.      Bathsheba Shalom Tucker (Exhibit 18);
i.      Matthew LeBaron (Exhibit 19);
j.      Laura Corina LeBaron (Exhibit 20);
k.      Miguel LeBaron (Exhibit 21);
l.      William LeBaron (Exhibit 22);

m.    Javier LeBaron (Exhibit 23);
n.    Dayer LeBaron (Exhibit 24);
o.    Ruthila LeBaron (Exhibit 25);
p.    Melissa Conklin (Exhibit 26);
q.    Adriana Jones (Exhibit 27);
r.    Rholena Lian Johnson (Exhibit 28) [2];
s.    Karen Woolley (Exhibit 29);
t.    Jaremy Ray (Exhibit 30)[3];
u.    Kerah Ray (Exhibit 31);
v.    Justin Ray (Exhibit 32);
w.    James Ray (Exhibit 33);
x.    Jonathan Ray (Exhibit 34)[4];
y.    Amber Ray (Exhibit 35);
z.    Andre Miller (non-party fact witness) (Exhibit 36); and
aa.   Douglas Johnson (non-party witness) (Exhibit 37).

**Langford Plaintiffs**

a.    Joseph Langford (Exhibit 38);
b.    Bryce Langford (Exhibit 39);
c.    Crystal Langford (Exhibit 40);
d.    Brandy Spenst (Exhibit 41);
e.    K.L. (Exhibit 42);
f.    M.L. (Exhibit 43);
g.    C.L. (Exhibit 44);
h.    D.L. (Exhibit 45); and
i.    J.L. (Exhibit 46)
j.    David Langford (Exhibit 47).

**A.  Computing Damages in This Case**

The Eighth Circuit has set forth the method for computing damages in default-judgment

proceedings:

"It is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly." *Pope v. United States*, 323 U.S. 1, 12, 65 S. Ct. 16, 89 L. Ed. 3, 102 Ct. Cl. 846 (1944). "The court may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to . . . determine the amount of damages." Fed. R. Civ. P. 55(b)(2)(B). *See also Am. Red Cross v. Cmty. Blood Ctr.*, 257 F.3d 859, 864 (8th Cir. 2001) ("When a default judgment is entered on a claim

---

[2] Plaintiffs will supplement with Ms. Johnson's executed declaration upon receipt.
[3] Plaintiffs will supplement with Jaremy Ray's executed declaration upon receipt.
[4] Plaintiffs will supplement with Jonathan Ray's executed declaration upon receipt.

for an indefinite or uncertain amount of damages, facts alleged in the complaint are taken as true, except facts relating to the amount of damages, which must be proved in a supplemental hearing or proceeding." (*quoting Everyday Learning Corp. v. Larson*, 242 F.3d 815, 818 (8th Cir. 2001) (internal quotation marks omitted))). Once the amount of damages has been established, the court may enter judgment pursuant to the rule.

*Stephenson v. El-Batrawi*, 524 F.3d 907, 915-16 (8th Cir. 2008). Plaintiffs hereby seek to present their damages to the Court through an evidentiary hearing to permit the Court to establish the amount of damages and to enter judgment under Rule 55(b)(2).

Plaintiffs seek to present the Court with a framework herein for addressing damages values utilizing an analysis of past cases arising under both 18 U.S.C. § 2333(a) and also 28 U.S.C. § 1605A (also known as the "terrorism exception" to sovereign immunity). Whereas Plaintiffs' claims are proceeding under both federal law and state statutory and common law, it is important to note that "the ATA incorporates 'general principles of tort law.' … The basic presumption is that Congress creates federal torts against the background of general tort law…." *See Linde v. Arab Bank, PLC*, 97 F. Supp.3d 287, 336 (E.D.N.Y. 2015). The ATA provides "private parties the right to pursue common tort claims against terrorist organizations and those that provide material support or financing to terrorist organizations." *Weiss v. Nat'l Westminster Bank, PLC*, 242 F.R.D. 33, 50 (E.D.N.Y. 2007). In fact, when the ATA was initially enacted in 1991, Senator Grassley stated that the ATA "removes the jurisdictional hurdles in the courts confronting *victims* and it empowers *victims* with all the weapons available in civil litigation …. The [ATA] accords *victims* of terrorism the remedies of American tort law." *Litle v. Arab Bank, PLC*, 611 F. Supp.2d 233, 245 (E.D.N.Y. 2009), *quoting* 137 Cong. Rec. S4511 (Apr. 16, 1991). This language "suggests that Congress intended that the full range of damages should be available to persons entitled to bring actions pursuant to §2333(a)." *Estates of Ungar v. Palestinian Authority*, 304 F. Supp.2d 232, 265 (D.R.I. 2004). In short, should the Court determine that Plaintiffs have satisfied

their burden under the ATA, then the state-law claims may become superfluous as Plaintiffs are not seeking to "double dip" regarding damages in this case, and the ATA likely incorporates (and likely exceeds) the damages mechanisms available under state common-law remedies.

### 1. Damages under 18 U.S.C. § 2333(a)

The legislative history underpinning 18 U.S.C. § 2333(a) "in combination with the language of the statute itself, evidences an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law." *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1010 (7th Cir. 2002) (citing various provisions of the legislative history leading to the enactment of the civil damages provision of the Antiterrorism Act).  This legislative history also "evinces a clear congressional intent to deter and punish acts of international terrorism" and to "hold[] terrorists accountable 'where it hurts them most: at their lifeline, their funds.'" *Estates of Ungar*, 304 F. Supp.2d at 238 (citing additional provisions of the legislative history of 18 U.S.C. § 2333).  In *Ungar*, the Magistrate Judge held that "[t]he deterrent effect of [18 U.S.C. § 2333] will be maximized if it is interpreted to subject terrorists to the broadest possible range of damages" including "pecuniary damages … and also for non-economic damages, including loss of companionship, society, and mental anguish experienced by the victim's surviving family members, including his siblings." 304 F. Supp.2d at 267 (fully adopted by the District Judge in *Ungar*); *see also Morris v. Khadr*, 415 F. Supp. 2d at 1337; *Knox v. Palestine Liberation Organization*, 442 F. Supp. 2d 62 (S.D.N.Y. 2006).  Based on this precedent, damages in the ATA context apply not only to those who were injured and/or killed, but also to their immediate family members who sustained loss of their loved ones as a result of the attack.

In ATA death cases that have reached a judgment, courts have measured pecuniary loss (including loss of income, loss of parental services, etc.) and also non-economic loss including conscious pain and suffering and mental pain and anguish (solatium) for the family members of the decedent falling within the categories of parents, spouses, children, and siblings. In many cases, courts have taken guidance from cases arising under an analogous statute, the "terrorism exception" to foreign sovereign immunity codified at 28 U.S.C. § 1605A.

### a.   Estate Pain and Suffering Damages Under the Antiterrorism Act

Estate Plaintiffs' conscious pain and suffering damages are determined based on the amount of suffering endured before death and the amount of time between injury and death. *See Mastrantuono v. United States*, 163 F. Supp. 2d 244 (S.D.N.Y.2001); *see generally Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 51 (D.D.C. 2007). The Court may also consider any mental anguish caused by observing injured relatives present at the scene. *Ungar*, 304 F. Supp. 2d at 270. In *Ungar*, a case decided over 17 years ago, the court determined that the length of the attack was between ten seconds and 30 seconds with the court accepting 30 seconds for purposes of establishing damages for conscious pain and suffering where the decedent had lost consciousness at least by the end of the attack. There, the court looked to values for conscious pain and suffering generally in cases arising under the "terrorism exception" to determine an appropriate quantum of damages for the decedent's conscious pain and suffering:

> The physical injuries suffered by [the decedent] prior to his losing consciousness were severe and caused great pain. In addition, he experienced the mental pain resulting from observing that his wife had been horribly wounded and probably killed while seated next to him and knowing that his young son, lying in the back seat, was in danger of being killed. While this physical and mental agony was of mercifully brief duration, a substantial award for pain and suffering is justified. Accordingly, I recommend an award of $500,000 for pain and suffering to the estate. *Cf. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, No. 01 CIV. 10132(HB), 2003 WL 21027170, at *15 (S.D.N.Y. May 16, 2003) (awarding $2.5 million for pain and suffering to estate of plaintiff who realized he was trapped

and doomed in the North Tower of World Trade Center and likely experienced a very painful death); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 18, 23 (D.D.C. 2002) (awarding $10 million for pain and suffering to estate of bombing victim who survived with severe burns for forty-nine days and who suffered a higher level of pain throughout his stay at the hospital than a patient with his injuries otherwise would have endured because usual doses of pain medication could have lowered his blood pressure and killed him); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 113 (D.D.C. 2000) (finding $1 million appropriate compensation for pain and suffering of decedent who apparently struggled with his assassin for thirty seconds before being shot eight times); *Higgins v. Islamic Republic of Iran*, 2000 U.S. Dist. LEXIS 22173, No. 1:99CV00377, 2000 WL 33674311, at *8 (D.D.C. Sept. 21, 2000) (awarding $30 million for pain and suffering where decedent was held captive for 529 days in primitive conditions and whose body indicated grievous injuries and barbaric mutilations); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5, 8 (D.D.C. 2000) (concluding that $1 million was appropriate to compensate for "several minutes" of pain and suffering of bombing victim who expired on the scene); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998) (finding $1 million appropriate to compensate for three to five hours of pain and suffering of bombing victim).

304 F. Supp.2d at 270.

More recent precedent validates this approach to damages for conscious pain and suffering. *See Hirshfeld v. Islamic Rep. of Iran*, 330 F. Supp. 3d 107, 145 (D.D.C. 2018) (awarding $1 million in "survival damages" where the decedent was shot, "was conscious, fearful and suffering for at least a few minutes after he was shot because he was able to run away from the shooter and into a building and then make it to the stairwell, where he was later found deceased"); *Braun v. Islamic Rep. of Iran*, 228 F. Supp. 3d 64, 83 (D.D.C. 2017) (awarding $1 million where evidence showed decedent "suffered being thrown into the air and an impact that caused her head to become smashed and her to begin vomiting and that she survived for two hours after the Attack, during which time she was attended to by medical personnel"). Plaintiffs will present evidence that each of the individuals who were killed in the attack endured conscious pain and suffering based on the circumstances, eyewitness accounts, and expert testimony. Plaintiffs' Complaint outlines how the women observed their children being in imminent danger of death, the children understood the magnitude of the attack, and that Rhonita and her children were alive when the vehicle was set on

fire.  Each of these facts add to the severity of their pain and suffering, and thus should be reflected in their damages award.

In addition to the testimony of survivors and first-responding family members on scene, the *Miller* Plaintiffs will also present eyewitness and technical and scientific expert testimony from one of the Plaintiffs, Dayer LeBaron, who was one of the family members who came to scene of Rhonita's vehicle on November 5, 2019.  Dayer LeBaron is a trained automotive mechanic with experience working on all aspects of the operation of motor vehicles including passenger vehicles, sport-utility vehicles, and 18-wheeler trucks.  Mr. LeBaron will provide testimony on his examination, from this technical perspective and background, regarding the cause of the fire that had engulfed his sister's vehicle with all of its occupants inside.  His conclusions resulting from this examination are set forth in a separate declaration, and he will provide testimony before the Court on the process he undertook to reach his findings that the fire that engulfed the vehicle was intentionally set through the "malicious dumping (and ignition) of fuel around and inside of the vehicle."  *See* Exhibit 47.

The *Miller* Plaintiffs will also present expert-witness testimony from Dr. Sebastian D. Schubl on conscious pain and suffering (both physical and emotional) sustained by the various individuals killed in the attacks.  Dr. Schubl's expert report accompanies this memorandum as Exhibit 48 which sets forth the expert opinions about which he will provide testimony before the Court.  Dr. Schubl is a graduate of the University of Virginia School of Medicine and was a resident at New York Presbyterian Hospital/Weill Cornell Medical Center in New York City.  He served as a member of the faculty of the Department of Surgery at Weill Cornell Medical Center from 2011 to 2016 while also serving as the Trauma Medical Director at Weill Cornell's trauma affiliate in Queens, Jamaica Hospital, an ACS verified and New York State Designated Level 1 Trauma

27

Center.  In 2016-2017, Dr. Schubl served as a Clinical Fellow in Surgical Critical Care and Trauma at the University of California at Irvine Medical Center.  He has remained at UC-Irvine since his fellowship holding various positions relating to his specialties in surgery and trauma care, and as of January 2022, he holds the position of Medical Director for Surgical Services for the University of California at Irvine Medical Center.

Dr. Schubl's testimony will be based on his review of the Mexican government investigative files related to the attacks including detailed ballistic reports regarding the type and caliber of weapons used along with photographs of the crime scene and the bodies at the crime scene to provide his opinions regarding the conscious pain and suffering undergone by those killed in the attacks.  His opinions will include his determination that the decedents 1) knew of, and appreciated the danger of their situation prior to death; 2) were not immediately killed by the gun shots; and 3) in the case of Rhonita and her children, were still, more likely than not, alive when their vehicle was set ablaze.

The *Miller* Plaintiffs will also present expert-witness testimony of Dr. Donna Schuurman, Senior Director of Advocacy & Training at The Dougy Center: The National Grief Center for Children & Families in Portland, Oregon.  Dr. Schuurman has worked for The Dougy Center since 1991, 25 of those years as Executive Director.  Dr. Schuurman has served as an expert in over 50 legal cases in 21 states since 2001 primarily providing expert opinions on the impact of the death on family members, including children, teens, and parents in wrongful death matters.  She has worked with the FBI's Victim Assistance Program to train FBI staff on best practices in responding to the needs of children and families when a family member died as the result of an FBI-investigated fatality.  She was also appointed in 2018 to the FBI Mass Violence and Children Working Group along with being hired to assist communities following mass-casualty events

ranging from the terrorist attacks on September 11, 2001 to the Sandy Hook School shooting in

Newtown, Connecticut.  With regard to the pain and suffering of decedents, Dr. Schuurman is

expected to provide her opinions on the emotional and psychological damages inflicted on those

killed in the moments leading up to their deaths while also opining on the psychological trauma

experienced by the spouses, children, parents and siblings of the deceased.    Dr. Schuurman's

expert report accompanies this memorandum as Exhibit 49 which sets forth the expert opinions

about which she will provide testimony before the Court.

### b.  Injury Pain and Suffering Damages under the Antiterrorism Act

Pain and suffering damages for individuals who were injured in an attack but who did not

succumb to their injuries are also available.  Again, looking to precedent arising from FSIA cases

demonstrates a range of values for pain and suffering damages in these circumstances.  Many

courts addressing damages in a "directly injured" situation followed what has been referred to as

the *Heiser* framework.  *See Heiser v. Islamic Rep. of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).  A

more recent decision set forth the criteria for applying the *Heiser* framework:

> a court begins with baseline amounts and may adjust upward or downward to
> account for individual circumstances. For a directly-injured claimant, "[c]ourts
> generally 'begin[] with the baseline assumption that persons suffering substantial
> injuries in terrorist attacks are entitled to $5 million in compensatory
> damages.'" *Barry I*, 410 F. Supp. 3d at 180 (quoting *Wultz*, 864 F. Supp. 2d at 37-
> 38). An upward adjustment to the $7 to $12 million range may be appropriate "in
> more severe instances of physical and psychological pain, such as where victims
> suffered relatively more numerous and severe injuries, were rendered quadriplegic,
> partially lost vision and hearing, or were mistaken for dead." *Valore*, 700 F. Supp.
> 2d at 84. Conversely, a downward departure to the $1.5 million to $3 million range
> may be appropriate "where victims suffered relatively more minor injuries, such as
> 'minor shrapnel injuries,' or 'severe emotional injury accompanied by relatively
> minor physical injuries.'" *Barry I*, 410 F. Supp. 3d at 180 (first quoting *Valore*, 700
> F. Supp. 2d at 84, then quoting *Estate of Doe v. Islamic Republic of Iran* (*Estate of
> Doe II*), 943 F. Supp. 2d 180, 186 (D.D.C. 2013)). Such awards for physical injuries
> "assume severe psychological injuries." *Schertzman Cohen*, 2019 U.S. Dist. LEXIS
> 115278, 2019 WL 3037868, at *6 (citing *Wamai*, 60 F. Supp. 3d at 92-93).

*Barry v. Islamic Rep. of Iran*, 437 F. Supp. 3d 15, 53 (D.D.C. 2020).  In litigation arising out of the terrorist attacks on September 11, 2001, injury judgments asserted against Iran have yielded an upward departure from the *Heiser* framework.  In a more recent application of pain and suffering damages that arose as part of the September 11 Litigation, the Court "establishe[d] a baseline award of $7 million, an upward deviation of $10 million, and a downward deviation of $5 million.  The Court, however, reserves its discretion to award further upward departures in exceptional cases." *Burnett v. Islamic Rep. of Iran*, 2020 U.S. Dist. LEXIS 22849, at *606 (S.D.N.Y. Feb. 7, 2020) (Magistrate Judge's Report and Recommendation adopted by the District Judge).  In *Miller*, this analysis would apply to the claims related to minor F.M.J. as the only Plaintiff who was present during the attack who was not killed as a result of the attack.

In *Langford*, this analysis would be applicable to the claims of the seven surviving children of Dawna Ray Langford who were shot or who were in the vehicle with their mother at the time of the attack and were able to escape.  To establish non-economic damages, the *Langford* Plaintiffs will proffer declarations from David and Dawna Langford's children—Joseph Langford, Bryce Langford, Crystal Langford, Brandy Spenst, K.L., M.L., C.L., D.L., and J.L.—describing the bond they shared with their now-deceased mother and siblings.  Additionally, the *Langford* Plaintiffs will offer live testimony from David Langford and two minor children who survived the massacre, D.L. and K.L., to describe the harrowing attack and aftermath.  Although "no amount of money can properly compensate a victim and his family for their suffering during and after a terrorist attack," the *Langford* Plaintiffs nevertheless seek comparable compensation to the other similarly situated *Miller* Plaintiffs. *Goldstein v. Islamic Republic of Iran*, 383 F. Supp. 3d 15, 19 (D.D.C. 2019).

Plaintiffs' affidavits, declarations, testimony, and/or summary testimony will assist the Court in addressing how each was injured and the continued pain and suffering that they undergo to this day—over two years since the attack took place.

### c. Pain and Suffering Damages for Survivors of Victims/Solatium Damages

In the terrorism context under the Antiterrorism Act, "non-economic damages are … available, including loss of companionship and society, and mental anguish experienced by the victim's surviving family members." *Lelchook v. Islamic Rep. of Iran*, 2020 U.S. Dist. LEXIS 221606, at *20 (E.D.N.Y. Nov. 23, 2020).  Put more plainly, "[c]ourts permit '[p]laintiffs to pursue claims for solatium [emotional] damages' under the ATA." *Estate of Henkin*, 495 F. Supp. 3d at 152; *see also Weinstock v. Islamic Rep. of Iran*, 2019 U.S. Dist. LEXIS 75532, at *11-*12 (S.D. Fla. May 6, 2019) (addressing availability of solatium damages in default judgment against the foreign terrorist organization Hamas). "Courts addressing the availability and amount of solatium damages in terrorism cases … have considered damages awards in other terrorism cases, including those decided under the related terrorism exception to the Foreign Sovereign Immunities Act ('FSIA'), 28 U.S.C. § 1605A…."  *Weinstock*, 2019 U.S. Dist. LEXIS 56937, at *12; *see also Goldstein*, 383 F. Supp. 3d at 19 ("courts strive to maintain consistency for awards as between the specific plaintiffs and among plaintiffs in comparable situations."). Furthermore, presence at the terrorist attack "is not required in light of the severity of the act and the obvious range of potential grief and distress that directly results from such a heinous act." *Miller*, 372 F. Supp. 3d at 41, *quoting Heiser*, 466 F. Supp. 2d at 328.

The *Heiser* decision created a framework also for solatium damages for the family members of individuals who were killed in terrorist attacks:

> In determining the amount of compensatory damages awards to family members of a surviving victim, this Court has held that these awards are determined by the

"nature of the relationship" between the family member and victim, and "the severity of the pain suffered by the family member." *Haim*, 425 F. Supp. 2d at 75. Spouses typically receive greater damage awards than parents, who, in turn, receive greater awards than siblings. *Compare, e.g., Anderson v. Islamic Republic of Iran*, 90 F. Supp. 107, 113 (D.D.C. 2000) (Jackson, J.) (awarding $10 million to the wife of a hostage and torture victim); *Sebago*, 18 F. Supp. 2d at 70 (same), *with Eisenfeld*, 172 F. Supp. 2d at 8 (awarding $5 million each to the parents and $2.5 million each to the siblings of victims of a suicide bombing on a passenger bus); *see also Flatow*, 999 F. Supp. at 31 (awarding parents each $5 million and siblings each $2.5 million of victim who was killed in the same passenger bus bombing in which Seth was injured). Moreover, "families of victims who have died are typically awarded greater damages than families of victims who remain alive." *Id*. While the loss suffered by the plaintiffs in these cases is undeniably difficult to quantify, courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse, approximately $5 million to a parent whose child was killed, and approximately $2.5 million to a plaintiff whose sibling was killed.

466 F. Supp. 2d at 269.   Again, the September 11 Litigation altered the manner in which it addressed solatium damages in the context of judgments against the Islamic Republic of Iran. "Considering the extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families," the court adopted solatium values of $12.5 million for spouses, $8.5 million for parents, $8.5 million for children, and $4.25 million for siblings. *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 110673, at *105-*106 (S.D.N.Y. July 30, 2012). Further, these determinations are solely guidelines as enhancements are available for solatium judgment values that "generally fall into one of three categories: evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi v. Islamic Rep. of Iran*, 768 F. Supp. 2d 16, 26-27 (D.D.C. 2011); *see also Flanagan v. Islamic Rep. of Iran*, 87 F. Supp. 3d 93, 118 (D.D.C. 2015) (applying a 25% upward departure based on the devastating impact of the death, the violent nature of the death, and "the medical evidence show[ing] that each plaintiff

experienced extraordinarily severe pain and suffering following [decedent's] death"). It is important to note that the *Heiser* guidelines were established in 2006, and the guidelines established in the context of the terrorist attacks on September 11, 2001 were adopted in 2012. Plaintiffs assert that the Court should consider the passage of time in conjunction with the time-value of money in assessing upward departures in this case given the heinous nature of the acts committed against the individuals and that the baseline numbers were adopted nearly a decade ago and beyond.

Under the FSIA, solatium damages are awarded to compensate "the mental anguish, bereavement, and grief that those with a close relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D. D.C. 2010). For the pain and suffering of relatives who were not present at the site of the attack, damages "must be determined by the nature of the relationship and the severity and duration of the pain suffered by the family member." *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 55 (citing *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56). The factors that may be considered in assessing solatium damages are: "(1) whether the decedent's death was sudden and unexpected; (2) whether the death is attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression or related disorders resulting from the decedent's death; (4) the nature (i.e., closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimant's mental anguish in excess of that which would have been experienced following the decedent's natural death." *Rosenberg*, 2016 U.S. Dist. LEXIS 87724, at *104-*105, *quoting Knox*, 442 F. Supp. 2d at 78.

Affidavits, declarations, testimony, and/or summary testimony by adult family members will assist the Court in addressing the level of grief and relationship between each family member and the decedents.   Furthermore, expert testimony by Dr. Schuurman will assist the Court in assessing the emotional damage sustained by the *Miller* Plaintiffs who lost loved ones in the attack including feelings of survivor's guilt, post-traumatic stress disorder, anxiety disorders, and the accompanying symptomology accompanying each of these conditions.

### d.  Pecuniary Loss

#### i.  *Miller* Plaintiffs

Each Plaintiff suffered damages as a result of the November 4, 2019 attacks.    In addition to their emotional suffering, certain Plaintiffs also sustained economic or pecuniary damages. The *Miller* Plaintiffs submit that testimony will be proffered regarding lost wages, funeral expenses, lost benefits, loss of household services, and loss of enjoyment of life through Plaintiffs' economic expert, Dr. Stan V. Smith.  Plaintiffs do not intend to call Dr. Smith at trial before the Court; however, Plaintiffs intend to submit to the Court for acceptance into evidence the affidavit supplied by Dr. Smith that includes his expert-witness opinions regarding economic loss for each deceased victim—Maria Rhonita LeBaron, Christina Langford, H.M., Jr., K.B.M., T.G.M. and T.A.M..  Dr. Smith is the President of Smith Economics Group, Ltd. based in Chicago, Illinois.

Dr. Smith holds his Bachelor's Degree from Cornell University and his Master's Degree and Ph.D. in Economics from the University of Chicago.  He has worked as an economic and financial consultant since 1974 after completing a Research Internship at the Federal Reserve Board of Governors in Washington, DC.  He wrote the first textbook on Forensic Economic Damages and has provided economic analysis in thousands of cases since the early 1980s.  The

methodology he employs is set forth in his reports for each of the decedents.  His affidavit and accompanying expert reports can be found attached hereto as Exhibit 50 setting forth the opinions that he has expressed on these cases.

In calculating pecuniary damages resulting from the adult deaths, Dr. Smith considered several factors: loss of household/family services; loss of value of life; and loss of society or relationship. Dr. Smith considered estimated life expectancy if they had not been killed by the Defendant on November 4, 2019, among other factors, to calculate the damages that resulted from their murders.

For the loss of household/family services, Dr. Smith analyzed contributions to the household through housekeeping and household management services; advice and guidance the adult decedents would have given their surviving families; accompaniment services they would have participated in with their surviving families; and, for Rhonita, the physical therapy services she would have continued performing with her daughter, A.M.M., for her cerebral palsy.  In his calculations, he averaged hours spent and wages earned by looking at related occupations for each subcategory.  For example, a few occupations considered for loss of household/family services and household management were childcare workers, maids and housekeeping cleaners, and private household cooks.  Dr. Smith repeated this same process for each subcategory in his report to calculate the damages felt by each family-member plaintiff for the loss of Rhonita and Christina.

In his assessment for loss of enjoyment of life, Dr. Smith used peer-reviewed economic literature.  He estimated the central tendency of the range of the economic studies to be approximately $5.1 million for both Rhonita and Christina.  As for loss of society or relationship, it is based on a measure of the value of preserving the ability to live a normal life. Each Plaintiff

has had their ability to live a normal life taken away by the Cartel's violent murder of their family members. Dr. Smith then assigned percentages to each plaintiff to calculate the loss felt.

For Rhonita, Dr. Smith also analyzed the physical therapy services Rhonita provided to A.M.M. for her cerebral palsy. He used the same method for calculating the loss as he did for loss of household services.

For the children, the pecuniary damages include loss of household/family services, loss of value of life, and loss of society or relationship discussed above. In addition, loss of wages and employee benefits are part of the calculation for the deceased children. Dr. Smith's methodology for calculating each child's lost wages and benefits included looking at the parents' education level and career. He set up two scenarios based on Rhonita's and Howard Miller's education levels and estimated the average earnings based on information from the U.S. Department of Labor. Dr. Smith then accounted for personal consumption to offset the income total. He applied the personal consumption offset to both wage scenarios and created a chart to reference depending on the age the child stopped working.

Finally, Dr. Smith also calculated the value of the property loss from the attacks using well-accepted economic methodology including amortization costs and interest over time.

In the analysis of pecuniary damages for each Plaintiff, Dr. Smith used well-accepted methodologies in economics to calculate the losses using multiple categories and scenarios to account for differences in age, educations, and lifestyle. The damages assigned to each Plaintiff should be awarded.

### ii. *Langford* Plaintiffs

The November 4, 2019 massacre caused the *Langford* Plaintiffs to suffer economic and non-economic losses. Separate from the emotional impact of the loss of loved ones, the distress

from witnessing the deaths of family members, the pain endured from physical injury, and the terror experienced, the *Langford* Plaintiffs will establish certain economic damages through a vocational economist's declaration.  The economist, J. Matthew Sims, has been providing expert vocational evaluations and testimony since 2000 and obtained his Master's degree in economics in 2005. As such, courts have found Mr. Sims qualified to offer his opinion regarding vocational loss in more than 20 trials.  Here, Mr. Sims calculated only vocational loss and household service loss using widely accepted methodologies for Plaintiffs K.L., D.L., M.L., C.L., X.L., B.L., T.L., R.L., and Dawna Langford.  His accompanying expert reports demonstrating his approach and ultimate calculations are attached as Exhibit 51.

For the loss of Dawna Langford's household services, Mr. Sims considered the time Dawna Langford devoted to her family and her contributions to caring for the household, such as cooking, cleaning, gardening, making household purchases, and caring for other household members.  Mr. Sims used Dawna Langford's life expectancy if she had not been murdered on November 4, 2019, to reach a final value for those contributions.  For the minor surviving Plaintiffs, Mr. Sims calculated only the cost of vocational rehabilitation to compensate for the lingering psychological symptoms that effect schooling and lifelong earning capacity.  Lastly, for the deceased minor Plaintiffs, T.L. and R.L., Mr. Sims calculated only the loss of earning capacity minus personal consumption.

### e.  Treble Damages

Finally, 18 U.S.C. § 2333(a) specifically provides that Plaintiffs "shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."  The trebling applies not only to economic, but also to non-economic damages.  *See Caballero v. FARC*, 2020 U.S. Dist. LEXIS 89839, at *14 (S.D. Fla. May 20, 2020) (assembling cases supporting this point).

Therefore, Plaintiffs submit that any damages value that the Court applies to these cases for both economic and non-economic damages *shall* be trebled under the strict language of the law and the weight of the authority supporting this reading.

### f.   Collectability of Judgment

As stated above, a final default judgment entered by this Court will likely result in damages being redressed through various post-judgment enforcement proceedings, including: (i) executing on assets owned or held by Defendant, directly or indirectly, in the U.S. or abroad, which may be subject to future seizure, forfeiture or blocking by the U.S.; or (ii) assertion of claims as crime victim judgment creditors in civil, criminal, and/or administrative seizures or forfeitures against the Defendant and its various alter egos.  The Terrorism Risk Insurance Act of 2002, Pub. L. 107-297 (Nov. 26, 2002), provides that "in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, … the blocked assets of that terrorist party … shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable." 28 U.S.C. § 1610, Note, 116 Stat. 2337.  A "terrorist party" is defined in this statute, as pertinent here, as "a terrorist" or "a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. § 1182(a)(3)(B)(vi))", and section 212(a)(3)(B)(vi) incorporates entities such as the Defendant.  Further, 18 U.S.C. § 2333(e) provides that the term blocked asset in the Terrorism Risk Insurance Act of 2002 "shall include any asset of that terrorist party (including the blocked assets of any agency or instrumentality of that party) seized or frozen by the United States under section 805(b) of the Foreign Narcotics Kingpin Designation Act (21 U.S.C. § 1904(b))."  As such, a judgment under the ATA against

Defendant, qualifying as a "terrorist party", permits Plaintiffs to seek attachment of Defendant's assets blocked or frozen under the Foreign Narcotics Kingpin Act.

## V.    Conclusion

Plaintiffs respectfully submit that this memorandum establishes the Court's jurisdiction—both subject matter and personal jurisdiction in accordance with Due Process principles—and the legal sufficiency of Plaintiffs' claims.  Given Defendant's continued failure to appear in this litigation, Plaintiffs submit that the only issue remaining to be addressed is damages.  Plaintiffs further submit that the evidence in this case, some of which is included in the exhibits to this brief and much of which will be presented at trial, will be sufficient for the Court to determine the types and amounts of damages to be awarded to each Plaintiff individually as part of the default judgment.   Plaintiffs eagerly await trial on February 7, 2022 to set this proof before the Court for judgment.

Dated:  January 28, 2022                             Respectfully submitted,

**MOTLEY RICE LLC**                                  **BALLARD SPAHR LLP**

/S/ Michael E. Elsner                                /S/ Mark Kokanovich
Michael E. Elsner, Esq.                              Mark Kokanovich, Esq.
John M. Eubanks, Esq.                                Michelle L. Hogan, Esq.
Courtney Wolf, Esq.                                  1 East Washington Street
28 Bridgeside Boulevard                              Suite 2300
Mount Pleasant, South Carolina 29464                 Phoenix, Arizona 85004-2555
Tel: (843) 216-9000                                  Tel: (602) 798-5400
Fax: (843) 216-9450                                  Fax: (602) 798-5595

Attorneys for *Miller* Plaintiffs                    Attorneys for *Langford* Plaintiffs

**MITCHELL & MITCHELL LLC**                          **ROBINS KAPLAN LLP**
Samuel F. Mitchell, Esq.                             Timothy Q. Purdon, Esq.
Steven C. Mitchell, Esq.                             1207 West Divide Avenue
7161 E. Rancho Vista Dr.                             Suite 200
Scottsdale, Arizona 85251                            Bismarck, North Dakota 58501
                                                     Tel: (701) 255-3000
Attorneys for *Miller* Plaintiffs                    Fax: (612) 339-4181

Attorney for *Langford* Plaintiffs

**O'KEEFE O'BRIEN LYSON
ATTORNEYS**
Tatum O'Brien, Esq.
720 Main Ave
Fargo, North Dakota 58103
Tel: (701) 235-8000
Fax: (701) 235-8023

Attorney for *Miller* Plaintiffs