UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

Howard Miller, et al.,                )
                                      )
        Plaintiffs,                   )
                                      )
        vs.                           )     File No. 1:20-cv-00132
                                      )
Juárez Cartel a/k/a Vicente           )
Carrillo Fuentes                      )
Organization (a/k/a "CFO")            )
a/k/a La Línea,                       )
                                      )
        Defendant.                    )

TRANSCRIPT OF COURT TRIAL
Volume I

Taken at
United States Courthouse
Bismarck, North Dakota
February 7, 2022

BEFORE THE HONORABLE CLARE HOCHHALTER
-- UNITED STATES MAGISTRATE JUDGE --

Ronda L. Colby, RPR, CRR, RMR
U.S. District Court Reporter
220 East Rosser Avenue
Bismarck, ND  58501
701-530-2309
Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

APPEARANCES

Mr. Michael Elsner
Mr. John Eubanks
Mr. Courtney Wolf
Motley Rice
28 Bridgeside Boulevard
Mount Plesant, South Carolina  29464

Mr. Samuel Mitchell
Mitchell & Mitchell
7161 East Rancho Vista Drive
Scottsdale, Arizona  85251

                              FOR THE MILLER PLAINTIFFS


          - - - - - - - - - -


Mr. Mark Kokanovich
Ms. Michelle Hogan
Ms. Jacey Skinner
Ballard Spahr
1 East Washington Street, Suite 2300
Phoenix, Arizona  85004-2555

Mr. Timothy Purdon
Robins Kaplan
1207 West Divide Avenue, Suite 200
Bismarck, North Dakota  58501

                           FOR THE LANGFORD PLAINTIFFS


          - - - - - - - - - -

INDEX OF EXAMINATIONS

WITNESSES FOR PLAINTIFFS                                      Page
 KENNY MILLER SR.
    Direct Examination By Mr. Elsner                           35
    Direct Examination (cont.) By Mr. Eubanks                 116

 DAYER LEBARON
    Direct Examination By Mr. Eubanks                          71

 ENRIQUE BAEZA
    Direct Examination By Mr. Elsner                           96

(The above-entitled matter came before the Court, the Honorable Clare Hochhalter, United States Magistrate Judge, presiding, commencing at 9:00 a.m., Monday, February 7, 2022, in the United States Courthouse, Bismarck, North Dakota.  The following proceedings were had and made of record in open court:)

--------------

THE COURT:  Good morning.  My name is Clare Hochhalter, U.S. Magistrate Judge, Bismarck, and we're on the record in Miller, Langford, and others, versus Juárez Cartel, La Línea, John Does, Civil Case 1:20-cv-132.

And, Counsel, if you would please note your appearances.

MR. ELSNER:  Good morning, Your Honor.  My name is Michael Elsner from the law firm of Motley Rice on behalf of the Miller plaintiffs.  And with me today is Samuel Mitchell from the law firm of Mitchell & Mitchell, also for the Miller plaintiffs.  Courtney Wolf from my office for Motley Rice and John Eubanks from my office of Motley Rice on behalf of the Miller plaintiffs.

THE COURT:  All right.  And then there's another branch, the Langford branch.

MR. PURDON:  Yes.

THE COURT:  Mr. Purdon.

MR. PURDON:  Good morning, Your Honor.  Tim Purdon

from Robins Kaplan for the Langford plaintiffs.  David Langford's here with me at counsel table.  Other counsel at the table with me Mark Kokanovich and Michelle Hogan from the Ballard Spahr firm, Jacey Skinner from Ballard Spahr is here as well.  Those are the plaintiffs for the Langford plaintiffs -- the lawyers for the Langford plaintiffs.

THE COURT:  I got Mr. Kokanovich and who were the others, Mr. Purdon?

MR. PURDON:  Michelle Hogan and Jacey Skinner, Jacey is J-a-y-c-e-e.

THE COURT:  I'm sorry.

MR. PURDON:  J-a-c-e-y.

THE COURT:  All right.  We're convening -- we've got the entire week scheduled, of course, but as we talked about before, we may get interrupted from time to time.  I think we'll keep that to a minimum.  We'll plan on 9:00 a.m. to 4:00 p.m. with an hour and a half lunch break and then we'll plan on a morning and afternoon break as well.  But if circumstances arise such that counsel need a few minutes here or there, don't be shy about asking for short breaks from time to time.

Opening statements.

MR. ELSNER:  Yes, Your Honor.  Good morning, Your Honor.  My name is Michael Elsner from the law firm of Motley Rice.

Before we start, I just want to underscore the gravity of how we feel about presenting the facts of this case to you.  It's both sobering and awesome responsibility that we bear, and I know it's shared by everyone on this side of the bar.

I want to -- on behalf of my clients I want to introduce them to you.  This is Howard Miller; his wife Rhonita was killed.  This is Tyler Johnson; his wife Christina was killed.  Howard's four children -- four of his children were also killed on November 4.  On behalf of them and on behalf of Rhonita LeBaron's family, on behalf of Christina Langford's family, and on behalf of Dawna's mother and some of the siblings of Dawna, we want to thank you.  Thank you for your attention.  Thank you for giving us this week to present this evidence to you.

Also want to take a moment to introduce my team to you.  Some of them are going to be presenting evidence to you and be interacting with the Court.  My law partner John Eubanks from my office.  Our associate Courtney Wolf.  I've got two superstar paralegals.

THE COURT:  Mr. Eubanks, why don't you stand up so everybody can recognize you.

MR. ELSNER:  And, Ms. Wolf, if you would as well.  Thank you, Your Honor.  My superstar paralegals, Amanda Unterreiner and Megan New Bird who has worked so diligently on

this case for years.  And my cocounsel, Samuel Mitchell from the law firm of Mitchell and Mitchell.  He's been with me for the first meeting and I'm sure he'll be there for the last.

On the morning of November 4, 2019, roughly 90 miles south of the United States border, 3 women and 14 children piled into three Suburbans.  They left from this small farming village called La Mora in Mexico.  And while they were traveling together, they each had three different destinations.

Christina Langford:  She was 31 years old, and that's her baby Faith who was traveling with her that morning.  She was headed to Colonia LeBaron to pick up Tyler and the two of them were leaving either that day or the next to drive to North Dakota.  Tyler had rented a house here.  He had a business here, working in the oil industry near Williston, and they were going to start their new life together again in North Dakota; they had lived here previously.

Rhonita LeBaron:  She was 30 years old.  She was traveling with four of her children:  Howie Junior, who was 12; Krystal, who was 10; and 8 month twins, Titus and Tiana.  They were headed to Phoenix.  The plan was that they were going to pick up her husband, Howard, who too was working in the oil fields in Williston, north of Williston.  He was going to fly from North Dakota, meet them in Arizona, and they were going to take the kids to the zoo and do some shopping.

The third car in the caravan, when they left, was

Dawna Langford.  She was 43 years old.  She was traveling with nine of her children, two of which are displayed here Rogan and Trevor.  She was traveling to Colonia LeBaron for a wedding.

The quickest route in the path they were headed is down this dirt road, through the mountain pass between La Mora and Colonia LeBaron.  And this is a map.  You see the La Mora ranch there, the blue star, and that blue line is the path that they took from Sonora into Chihuahua down to Colonia LeBaron or north --

THE COURT:  I'm not sure I see it, Mr. Elsner.

MR. ELSNER:  So the La Mora ranch right above the word "Attack 2" has a blue star, and there's a blue line that runs between Mexico 14 and Mexico 2 and that is the path that they were headed on that dirt road.

Two of the cars were headed south on Mexico 10 to Colonia LeBaron, and Rhonita's vehicle was going to head north on Mexico 2 to reach the border of Arizona.  That was the plan that morning when they left.

They knew this road was risky.  You could get flat tires.  There were cartel members on that road.  So they decided, even though they were headed in different directions, that they would drive together, as a caravan, but they also had this sort of expectation.  It's kind of an expectation we all would have shared.  Who would attack innocent women and children and little babies.

But unbeknownst to them the Juárez Cartel sent two hit teams into the mountains and these just weren't any cartel members.  This was an elite trained hit squad -- 40 men, two teams.  The evidence will show that they were dressed in black with some camouflage, they wore helmets.  They had automatic weapons.  And they stationed themselves in two different places.  They stationed themselves in the mesa -- if you see where the white says "Rhonita's vehicle."  If you have that screen.  There's a mesa hill just to the left of her car.  That was one of the hit teams.  The other was stationed up near the border between Sonora and Chihuahua on the right hand side of where we've marked Christina's vehicle and Dawna's vehicle.  It's about 14 kilometers between where Rhonita's vehicle is and where Christina's vehicle was.

The women and children left La Mora about 9:00 a.m. and they barely travelled 10, 15 minutes up the road, if that, when the casing on Rhonita's tire cracked and she broke down.  Christina, who was the first car in the caravan continued on.  Dawna, who was behind Rhonita, stopped her vehicle.  All the kids jumped out of Rhonita's vehicle into Dawna's vehicle.  They already had 9 kids in the car, now they were up to about 13, and then they drove back to La Mora.  So we put here on this map this black vehicle because that SUV was black, Rhonita's broken-down vehicle.  That is just on the start of the dirt road.

Dawna drove Rhonita back with all the kids to La Mora, and when they got there, after a few minutes, Dawna then left on the road. We estimate she was about 20 to 30 minutes behind Christina who had gone on ahead. Rhonita then borrowed her mother-in-law's Suburban. She drove back to the scene of where her car had broken down and then she gathered all that stuff that you need when you got a newborn -- playpens, car seats, and the toys and the luggage. And she moved all of that from one vehicle into the other vehicle, and then continued on her way.

Christina's vehicle, which was traveling ahead of the others as she reached the border with Chihuahua, came under heavy, heavy gunfire. The evidence will show that Christina, no doubt fearful for the safety of her 7-month-old baby, exited the vehicle. She ran into the fire with her arms in the air, no doubt trying to warn them that she was a woman. They shot and killed Christina right in the middle of that road.

About 20 or 30 minutes later, Dawna traveling on that same path comes up and sees Christina in the middle of the road while her car too comes under heavy gunfire from the same hit squad. They kill Dawna, and they killed those two little boys I showed you a picture of in the beginning, the evidence will show, Trevor and Rogan.

Rhonita had barely made it five minutes up the road from where her broken-down vehicle is there. You can see that

in the black.  Travels about five minutes up the road and then she, too, from a separate hit squad, is attacked with a hailstorm of fire power.  Hundreds of bullets enter into her vehicle.

The evidence will show that Rhonita lowered or reclined her seat in the front, no doubt to hide from the bullets, and to reach her children in the back seat who were in their car seats, the twins, and tried to push them onto the floor.  The evidence will show that their daughter Krystal climbed under the second seat clutching her pink purse, and that brave, brave Howie Junior opened his car door either to escape or to try to protect his family.

The evidence will show that after about ten minutes' worth of shooting the cartel members came down from the hill and approached Rhonita's vehicle.  They took a videotape.  We're going to present evidence, Your Honor, of the still images of that videotape so that you can see that.

The evidence will show that the man who shot that video who cooperated with the Mexican authorities and confessed that he was in fact a member of the Juárez Cartel in La Línea.  We will present that to you.

Those cartel members then, after surrounding Rhonita's vehicle, the evidence will show, intentionally set her and her children and the car on fire and burned them beyond all recognition.

All of us here today are here seeking justice.  And the first step in the pursuit of justice is the creation of a formal record.  That record began, we will show you, on November 4, 2019.  One of the first pieces of evidence collected was from Kenny Miller Sr. who will testify after openings today.  He videotaped Rhonita's vehicle.  He videotaped the remains of his grandchildren and his daughter-in-law.

It won't be the only evidence we show you.  There will be other videos that we will try to introduce.  There will be photographs; there will be audio messages; there will be WhatsApp messages -- we'll talk about those.  Those were all preserved to document the murders of their family members.  And you may ask yourself -- I did -- how is it that you come to a horrific scene like this and you see your family members killed and your first instinct is to get out a camera and videotape it or take a picture?  Why would you do that?  You do that in Mexico because nearly every day Mexican cartels and the Juárez Cartel kidnap and murder innocent civilians.  Kill journalists, judges, politicians.  They kill anyone that they think they need to kill for whatever purpose.  Our first lawyer working on this case in Mexico was murdered by the cartel about 13 or 14 months ago.

These murders usually go completely unpunished.  No one is held responsible.  Often little evidence is ever

collected.  No record is created.  And in the absence of a record and the absence of accountability, the cartel's activities continue on and on.  We are here today to create that formal record.  Only with the creation of the record is there a hope for justice and accountability.

We have alleged, Your Honor, that the Juárez Cartel and La Línea carried out these attacks in violation of the U.S. Antiterrorism Act.  And these acts are -- facts are deemed admitted by the defendant's failure to appear here but, nevertheless, we will submit evidence to you to prove those facts and meet that statutory obligation.

In recognition of the Juárez Cartel's actions, the U.S. Department of Treasury has long designated the Juárez Cartel as a foreign narcotics kingpin organization since at least 2000.  That designation has remained in place to this day and recently, in December of last year, La Línea was added as an additional also known as with respect to the Juárez Cartel.

I want to turn now to the statute, the Antiterrorism Act.  It didn't work and then when I tried it, it did work.

The Antiterrorism Act provides that U.S. nationals injured by an act of international terrorism may seek damages in U.S. federal courts.  That's the first element.  All of the plaintiffs in this action are U.S. citizens except for Adrian LeBaron.  Adrian LeBaron's daughter Rhonita was a U.S. citizen which the case law provides him standing under the act and we

cite those cases to, Your Honor.

Next, what is international terrorism?  The statute itself provides a definition.  The Court need not substitute a political judgment or a societal judgment as to what is terrorism, what is not terrorism.  We simply need to look at the statute and ask do the facts meet the statutory definition. The definition provides three elements:  First, A, did the acts involve -- were they violent, were they dangerous to human life?  Did they violate the criminal laws of the United States? Here we have murders in violation of U.S. laws.

Part B, were those acts intended -- like, appear to be intended.  Appear to be intended.  1, to intimidate or coerce a civilian population.  Two, to influence the policy of a government by intimidation or coercion.  The evidence will show, Your Honor, that the cartel specifically ordered that anyone traveling down that road that day was to be killed. That's what those hit squads were ordered to do in those hills on that road to Chihuahua.  It didn't matter who it was that came down that road.  It didn't matter if it was a woman.  It didn't matter if it was a child.  It didn't matter if it was a rival cartel.  The order was to kill anyone that came down that road.

And not just to kill them, not just to kill them.  A few bullets would have done that.  We are going to submit evidence which shows that they shot over 1,300 rounds into

those three Suburbans.  And those are just the shots that hit. That doesn't count the hundreds of shots that missed.  It wasn't just a simple killing.

The evidence will show that those murders were conducted in the way that they were so that it would frighten, scare, and intimidate anyone else from coming down that road into their territory.

We'll also demonstrate that the cartel knew it was killing innocent women and children.  We will present evidence that Christina actually exited her vehicle, put her arms in the air to indicate to the shooters that she was an innocent woman. We will present evidence that from the distance where the shooters were to where Christina was you could see the gender of the person.  We will present evidence that the cartel members came down to Rhonita's vehicle -- we've got photographic proof of this -- surrounded it, and intentionally set it on fire.  From that distance they could tell, if not before, that these were innocent children and their mother.

But then they did the extra step.  They intentionally set Rhonita and the kids and their car on fire to burn it beyond recognition.  It is a signature -- we will submit evidence of -- of the Juárez Cartel's activities.  They do this to frighten anyone from getting in their way.  It's part of the message they send.

And you know it worked that morning.  We're going to

submit evidence that the police and the military were afraid to go down that road.  The only reason they made it down that road is because Adrian LeBaron -- who you'll hear testify -- and his family insisted we had to go down that road to rescue David Langford's surviving children.  We will submit evidence, Your Honor, which meets this next criteria under the definition of international terrorism.

Lastly, C, did the acts occur primarily outside the territorial jurisdiction of the United States.  The attacks occurred in Mexico.  That is met.

I want to show you some of the witnesses we're going to have testify.  This is Enrique Baeza.  He will testify this afternoon.  He is the Mexican Attorney General who's responsible for the criminal investigation of this case in Mexico.  He has collected reports for us from the Mexican government, and we will present those into evidence.  He is part of a special prosecution team in Mexico related to organized crime, and he works in a special division responsible for terrorism, stockpiling, and arms trafficking.  He has special permission to be able to appear in this case on these clients' behalf.

We're also going to submit the testimony of Dayer LeBaron.  He's a trained automotive technician and he has extensive experience in determining the causes of fires in automobiles and in trucks and other malfunctions.  He's going

to testify.  He was at the scene.  He examined the vehicle. And he's going to offer testimony as to what caused the fire in Rhonita's vehicle.

We're also going to present a number of fact witnesses who will testify in the case.  I won't go through everyone now, but these are some of the fact witnesses that are going to testify on behalf of our clients.

Having met the ATA elements, if the Court finds them, then the Court must determine what damages to award, if any. And, you know, most of us have experienced death in our life. You know, and every such loss is important.  It's important to our family.  It's important to the decedent's friends, to the communities in which they live.  And we, as human beings, we kind of prepare for this throughout our life in some ways.  We have certain hopes and expectations about what death will be like for the people we love.  Some of those hopes are we want to be able to say goodbye to them.  We want to be able to tell them before they die all those things we should have been telling them long ago but never had the chance to do or never took the time to do.  We want to hold their hands.  We want to kiss them on the forehead.  We want to tell them it's going to be okay.  We want them to be at peace, not in pain.  We want them to be surrounded by their family and their friends so they can pass from this world to the next world in as much comfort as they can.

But we also have sort of other expectations, you know, for ourself and for them. We want them to have lived a long, fruitful life, to experience all the joys of life that they could have enjoyed. But here, on November 4, 2019, we'll submit evidence that all of those hopes and expectations that we all have were completely destroyed by the cartel. They wiped them all out.

Congress recognized this kind of aggravated grief when it passed the Antiterrorism Act. So it empowered victims of terrorist attacks with all the weapons available in civil litigation, and it accorded victims of terrorist attacks in recognition of the special grief that these types of victims would face.

And so in this case we'll be called upon to assess and determine the amount of damages to be awarded to each family member and to the estates of those that were murdered. You know, the valuation of human life is never an easy task under any circumstances. Let alone in these. But we intend to offer some evidence to help the Court in trying to reach that decision and we're going to do so in the following categories of damages that I just want to briefly discuss with Your Honor.

We represent the estates of six individuals whom were murdered on November 4: Christina Langford, who was 31; Rhonita LeBaron, who was 30, and her four children, Howard Junior who was 12, Krystal who was 10, Titus who was 8 months

old, Tiana 8 months old; we also represent baby Faith who was 7 months old and survived the attack in her mother Christina's vehicle.  Their damages will include the terror of withstanding the gunfire.  For Christina and Faith some 40 shots were fired into their vehicle, and at least three of those shots hit baby Faith's car seat; we will present evidence of that.

These damages will include the fear that Christina had.  In exiting the vehicle, running toward the gunfire with her arms above her head to try to stop the attacks and save her child.

For Rhonita and her children, their car sustained over 320 shots we will present evidence of.  Their damages will include the terror of trying to hide from that gunfire as Rhonita reclined her seat, as Krystal hid under the second seat of the car, and as Howie Junior tried to exit the vehicle.

The damages will include the pain of being shot multiple times, the suffering from those bullet wounds, and the thoughts that run through their mind as they're shot contemplating imminent death for them, their children, their mother, their siblings.

For Rhonita and her children, they suffered gunshot wounds but the evidence will also show that it's more probable than not that they were alive when their car was set on fire.  And so their damages will include the fear of being burned and the pain from being burnt alive.

To assist the Court in evaluating that evidence, we're going to call Dr. Schubl.  He's going to provide some expert testimony in the case tomorrow morning.  Dr. Schubl is a trauma surgeon.  He's got significant experience in this area.  He is presently the chief, division of the emergency general surgery division of trauma, critical care, and burns at the University of California Irvine and he's the medical director for surgical services at UC Irvine Health Administration.  He's treated hundreds and hundreds of patients with gunshot wounds.  He's going to provide some opinions as to the cause of death and some opinions as to the pain and suffering that someone endures from gunshot wounds as well as how long someone may survive a gunshot wound.

The survivors of the attack, so moving from those who were actually killed in the attack to the family members, the survivors, spouses, parents, siblings.  Those survivors are entitled under the act to solatium damages, which includes the loss of the decedent's love, companionship, support, advice.  You know, the things like "mom's not here to fix it."  Things like bedtime stories at night.  The things like piano lessons, writing a song together, baking bread together.  An all night Fortnite game with your brother.  Making homemade dresses for your dolls, for your friends, and for yourself.  That person that you just want to have a cup of coffee with to talk about something great that's happened for you or something that

you're going through.  Those are all wrapped up in the damages of solatium.

There's another element of solatium damages, and that's the mental anguish.  You know, the guilt, the nightmares, the horror of seeing your family members killed and burned.  The way that pops into your head when you least expect it.  When you never thought you'd be thinking about it in this moment and suddenly it's there.  All of that is wrapped up in solatium damages.

We're going to offer the expert testimony of Dr. Schuurman.  Dr. Schuurman is a specialist in assessing and treating children and other family members who have lost people as a result of traumatic deaths.  For 25 years she's served as the executive director of the Doughy Center, the National Grief Center for Children and Families in Portland, Oregon; she's the director emeritus today.  Among her other experiences is she's been hired to assist communities suffering from tragic losses and devastating attacks such as victims of the 9/11 attacks -- the September 11 attacks in D.C. -- the Oklahoma City bombing, and the school shooting at Sandy Hook Elementary.  She's going to try to assist the Court in evaluating the psychological pain and suffering that the children and the other family members have endured.

A third category of damage, the Court may award economic damages and for those that have suffered an economic

loss.  Some of that testimony will be live for you here from family members; some of it will be by declarations, many of which we submitted to you in our pretrial brief.  Unfortunately not everyone will be able to testify here this week.  We also have -- will be providing to the Court and we included it in our pretrial submission brief, the report of Dr. Stan Smith. He has a master's degree and a Ph.D. from the prestigious University of Chicago in the field of economics.  He wrote one of the first textbooks on forensic economic damages which has been used at various universities around the country.  He has over 40 years of experience in the field of economics and he's been admitted in courts across the country hundreds of times. He will not be here to testify.  We're going to be relying on his report and the affidavit that supports that report and affirms his opinions.  He's going to assess and set forth the economic losses sustained by Christina and Rhonita and the four children.  He'll also calculate the loss of household services for the deaths of Rhonita and Christina as a component of economic damages.

To the extent it's helpful to the Court, we've prepared a -- three charts.  And with permission, Your Honor, I may approach?  I also have copies of these slides to the extent it's useful to you.  These three charts are divided by the family members and the attacks for the people that we represent, and they set forth the relationship between the

plaintiff and the deceased.  And, also, there are columns for the types of damages that they may be eligible to receive under the act.  So the Court may use that to the extent it's helpful to assess the damages as a way to kind of understand who goes with who and what goes with what.

In 2018, Congress amended the Antiterrorism Act to include kingpin-seized assets as collectible for terrorism victims.  We intend to use that provision, in the event we obtain a judgment here, to satisfy that judgment through that authorization by Congress in addition to other means.

And when the act was amended, this is the language that was included with that amendment.  It recognized that we want to provide a framework in our legal system for Americans to seek justice against all those who defy notions of morality and justice.  And we submit, Your Honor, that the evidence will present to you, satisfies that goal of Congress and meets the definition of the ATA.

You know, we all define and organize our lives based on a certain expectation of how people are supposed to act, how you're supposed to conduct yourself, how you respect the rights of other people.  We all share those kind of views.  They help define who we are.  They help explain this world to us.  They give us some comfort that things are going to have a certain path of normalcy to them.

You know, Christina and Rhonita thought along those

same lines that morning when they got in that caravan together and they drove off.  They had that expectation that women and children are sort of off limits.  They're not part of your wars.  They're not part of your attacks.  But the cartel, they capitalize on those rules and those codes of conduct and they smashed them, and in doing so that is what creates the terror.  That is what intimidates others.  Because they take those expectations and they ruin them in your mind and then you think how could anyone do that.  You know, we're going to submit evidence that when the Shooters approached Rhonita's car there's some audio on that which was transcribed by the Mexican government.  You'll read some of that this afternoon, hear testimony about that.  Toward the end of that video clip, they use a word, it's a slang word, "garros."  It means to shred it; to destroy it.

Our task this week is to pick up all those shreds of destruction and try to put it back so we can see what things looked like before those girls left the ranch.  What were things like on November 3, 2019, and only then can we compare what was then to what is now so that we can try as best as we're able to put a value on that, to put a value on everything that was lost and destroyed.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Elsner.  I appreciate the information, the filings and the like, very much all of that

information.  And I'll look forward, perhaps near the end or the end of the trial, to additional submissions.  Just a heads-up to counsel including possibly a proposed findings and conclusions.

MR. ELSNER:  We envisioned, Your Honor, if it would be helpful, that within a couple weeks of trial we present to you proposed findings of fact and conclusions of law with a posttrial brief.  Hopefully it will appear much like our pretrial brief if we can get everything into evidence.

THE COURT:  I appreciate that immensely.  I just want to make sure everybody's on the same page going forward as much of this information is going to be voluminous and it makes sense to have that in mind as we go so.  Thank you, sir.

MR. ELSNER:  Yes.  I know Mr. Purdon would like to address the Court.

MR. PURDON:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. PURDON:  As Mr. Elsner did, I'd like to more formally introduce some of the members of the team that are with me here today.  As I mentioned, I have David Langford here who's the father and client here, part of the team.  As I said, Mark Kokanovich, my cocounsel from Ballard Spahr.

Stand up, Mark.

Mark's a former AUSA, I mentioned that.  Michelle Hogan from Ballard Spahr as well.  Jacey Skinner from Ballard

Spahr.  And we also have a superstar paralegal -- everybody does, but I think the ones here truly are -- Tasha Hart is here as well.

THE COURT:  Everybody is fortunate.  It's okay to stand all the way up.  Your legs will need a stretch.

MR. PURDON:  So, you know, before I get started, I just want to say I spend a lot of time in this courtroom, sat in almost every seat here at various times, and I don't know that I've seen a presentation as impressive and as effective as the one that Mr. Elsner just provided, Your Honor.  I just want to tell him I thought he did a fantastic job.

My job is to take our piece of this and put it into the context of the incredible presentation you just saw.  And our piece of this -- when I say "our," I mean, David and his family's piece -- is the vehicle that carried Dawna Langford and her nine children.  You'll recall from the flow Dawna started out in Vehicle Number 3 but came upon Vehicle Number 2 which was broken down, brought Rhonita and her kids back to La Mora, comes back, drops off Rhonita and her kids and they -- as they said, carried the car seats from the broken down vehicle to the new one, but she then goes on.  She doesn't wait for that.  She moves on.  And the first vehicle, which had not stopped and had moved on ahead, became Christina Johnson's vehicle.  And that was Christina and her baby that were the first car that was attacked well down the road.

So we -- if I can have the PowerPoint slide of our clients.

In thinking about Dawn's vehicle -- Dawna's vehicle -- excuse me -- in thinking about Dawna's vehicle, we have the group of our plaintiffs and how they were impacted on the events of that vehicle.  Our clients fall into several categories.  We represent the estates of Dawna, Trevor, and Rogan who were murdered that morning.  We represent David and the adult children who were not present at the -- not present that morning but will be seeking solatium damages as Mr. Elsner discussed.  That's Crystal, Brandy, Bryce, Cole -- the adult children of David and Dawna, and David himself was not present. But we also represent the survivors and that's what makes our piece in this -- our vehicle, Dawna's vehicle, and the case of David and his family slightly different, slightly -- think of it as slightly different in that we have and you will hear from some of the survivors who were there that day.

Five children were grievously injured in the attack: Kylie, Cody, McKenzie, Xander, and Brixon sustained damages that I'll talk about in a second.  And we had two children that were present but were not -- luckily not injured, Devin and Jacob.  So we have estates for people who passed away, were murdered.  We have adult children and folks that were not present and then we have seven survivors who were there and will -- were part of the carnage that day.

Because we represent some survivors, we'll present some different testimony.  Kylie Langford and Devin Langford are here in the courtroom right now, Your Honor.  Kylie was 14 -- excuse me -- Kylie was 14 when the attacks occurred and Devin was 13.  Kylie was injured by a gunshot.  Devin escaped injury but after his brothers and sisters had been moved out of the vehicle, down the road, away from the shooting, he left them and attempted to walk ten miles back to the -- ten miles back to La Mora to gather help.

They're the only survivors that you'll hear from that are eye witnesses to what happened that day.  We plan on calling them Wednesday morning to testify.  We've been working with them.  We're hopeful they'll be able to testify.  As you can imagine, it will be very difficult for everyone involved.

THE COURT:  Anything that I can do to accommodate that.

MR. PURDON:  I have personally spoken with David and cocounsel about that, about your desire to make sure that goes as smoothly as it can for those young people.

David Langford will also testify, will be the third fact witness that testifies for us.  And it's all Wednesday morning.  It's three witnesses.  That's the live presentation from our piece of this.  And in thinking about David Langford's testimony, Your Honor, I just want to take a moment to just read a little bit from the declaration.  I know that seems odd

but I have a point, the declaration that he filed.  And just hear these words on the page and then I want to talk about them.

This is David talking about the date, November 4, 2019.  "I was in contact with Dawna via WhatsApp message until she left La Mora around 9:30.  Being familiar with the route she was driving, I knew that she would lose cellular service for about an hour and a half after leaving La Mora.  So I asked her to send me a message when she and the kids made it through the area with no service.  As time passed without message from Dawna I started to become concerned.  Two hours after she left La Mora I still had not heard from her.  Then I received a WhatsApp message from friends and family members and was horrified to learn that there had been an attack on the women's vehicles and there were possible casualties.  David was in Phoenix at the time.  I rushed towards La Mora and was met on the road by Mexican military and federal police.  They had waited there for some other relatives who were driving from Casa Grande, Arizona.  I drove as part of a caravan of military and police vehicles out to the site of the attack.  The group of military and police I was with were the first law enforcement presence to arrive at the scene.  The scene was undisturbed.  And it was there that I learned that Dawna, Trevor, and Rogan had been shot and killed."

It's three paragraphs in an affidavit.  Millions of

affidavits filed in this courtroom, in this courthouse over the last 125 years.  Very few I think capture -- very few point out how difficult it is to capture in the written word what must have happened to that father that morning.  As a father myself, can you imagine; can you imagine.  You'll hear from Mr. Langford on Wednesday and he'll tell his story.

I want to pivot, as Mr. Elsner did, to the elements of damage.  Because, again, we're here on a default judgment.  This Court is tasked with delivering justice to these plaintiffs, to these victims, and we have to talk about damages under the ATA.  Mr. Elsner did a good job of talking, I think, about three of the four elements.  The fourth one impacts our piece of this puzzle a little bit more; so I'm going to spend a little bit more time on that.  But generally like Mr. Elsner's clients that he represents, our three estate clients -- Dawna, Rogan, and Trevor who passed away -- you have the estate pain and suffering claims of those folks who passed away.  Their fear, their pain, Dawna's fear as a mother under a hail of bullets with nine of her kids in the car, that estate pain and suffering element as was the case with the estates that Mr. Elsner represents, we have that piece in our case.

We also have the solatium claims, if you will, for the brothers and sisters -- the adult brothers and sisters and -- that were not there and then the younger brothers and sisters who were there.  They all lost a mother.  They lost two

siblings. David lost two children. He lost a woman that he had fathered -- had a very large -- fathered numerous children with. Those solatium damages, as Mr. Elsner described them, that loss, the loss of all night Fortnite game, the loss of raising your children, those things, very similar analysis for our clients there as well. So that's -- that tracks.

We'll also present by expert testimony from J. Matthew Sims who we've submitted a declaration -- he won't testify live -- we've submitted a declaration on the economic losses as well. So these three categories of damages, if you will, are very similar. But the fourth category which Mr. Elsner did not need to talk about as much because of the way that the facts are here but that I want to focus on is the injury, pain, and suffering damages under the ATA for the survivors; the people who were injured and survived.

And in this case, again, we have -- we have -- we have seven children who fall into that category; injury pain and suffering damages for survivors under the ATA. The way the Courts usually deal with this, you've seen the case law, they establish a baseline amount to compensate these people and then you can be -- that can be plussed up for severe instances of psychologic -- physical and psychological pain, and they can be plussed down -- or subtracted for minor injuries. You're going to have to undertake that analysis for these seven children.

Five of the children were shot that morning. Kylie

Langford, who will testify, you'll hear from, she had a gunshot wound to her foot. McKenzie Langford, a gunshot wound to her forearm. Cody Langford, age 8 at the time of the attack, gunshot wound to his thigh, his knee, buckshot wounds to his back. Xander Langford, age 4 at the time of the attacks, gunshot to the left shoulder, buckshot through his chest. And Brixon Langford, 8 month old, bullet wound graze to his chest. Devin Langford, Jake Langford, fortunately not struck by bullets that morning.

But I've -- I've tried to control my emotions this morning. I've tried to make this presentation a little bit drier than I normally would if we had a jury, those sorts of things, but if you'll permit me, I want to just talk about one piece of that injury, pain and suffering piece and I want to talk about the mental anguish pieces. Imagine being a 14-year-old girl or a 13-year-old boy and you've got your seven living, surviving brothers and sisters that you've just moved away from a vehicle where your mother and two of your brothers have been killed, and you're hiding from Mexican hit men in the desert ten miles from La Mora. You're all alone. The oldest person there is 14 years old.

The decision was made that Devin would go for help. As I said, he was 13 at the time of the attack, and he walked back ten miles to La Mora for help. I can't imagine what was going through his mind as he dodged the hit men and was

thinking, I'm sure, about his six surviving brothers and sisters back on the roadside.  But it's a long way to walk in the desert, ten miles, and you're only 13 years old and it takes you a long time.  And you've got six other kids sitting there including five of whom who have suffered bullet wounds, trying to stop the bleeding, your brothers and sisters.  And time goes by, and now you're worried about Devin.  He's not there.  Where's Devin.  And the decision is made, well, we should send somebody else.  We don't know.  Again, it's not you and I making these decisions in a courtroom.  It's a 13-year-old, 14-year-old kid on the side of the road making these decisions.  We should send someone else; we should send McKenzie.  McKenzie should go for help as well.  McKenzie is 9 years old, and she suffered a gunshot wound.  And she struck out to try and get help for her brothers and sisters, and she wandered through the desert most of the night before she was recovered.

I will submit -- I would submit that when you -- Your Honor, when you take the time to -- when it comes time for you to look at these four categories of damages, and you have to look at the injury, pain and suffering element for these seven children, that it's difficult to imagine -- it's impossible to imagine.  It's not difficult.  It's impossible to imagine what they must have been through that morning.  And I think that's going to be very, very difficult part of your analysis as you

help us -- as Mr. Elsner said, pick up the shreds here and try and form it into something, something that looks like justice.

THE COURT:  Is your thinking, Mr. Purdon, would some of the cases seem to suggest that the statute itself should be liberally and broadly construed -- the ATA itself -- as far as categories and ranges of damages and likely encompass everything that the states have already codified?

MR. PURDON:  I was going to say what you said at the end which is that it is clear from the case law that the ATA is intended to scoop up all elements of state law damages available.  We have the four categories, I think that you can use those as a guideposts, but it is not intended -- the ATA is intended to be as broad as any state law claim would allow. We're not leaving any claim of damage on the table under state law.  The ATA is intended to broadly bring that in.  I agree with you.

THE COURT:  That's my reading as well.

MR. PURDON:  Yes.  If you have nothing further -- no further questions, Your Honor, thank you.

THE COURT:  Thank you.

MR. ELSNER:  Your Honor, we're prepared to call our first witness or if you would prefer a short break, we can do that.

THE COURT:  Why don't we take a short break.  It's 10:00 a.m. now.  We'll break until 10:15, Mr. Elsner.

MR. ELSNER:  That would be perfect.  Thank you, Your Honor.

THE COURT:  All right.  Thank you.

(Recess taken from 10:00 a.m. to 10:18 a.m.)

THE COURT:  Mr. Elsner, we're back on the record.

MR. ELSNER:  Thank you, Your Honor.  Plaintiff's call Kenny Miller Sr. as our first witness.

KENNY MILLER SR.,

having been first duly sworn, was examined and testified as follows:

THE COURT:  These microphones are directional, Mr. Miller.  So if you're speaking in the direction of the bulbous end, it will likely pick up pretty well.  You don't need to be real close to the thing but if you're just speaking in that direction.  You can move it closer.  Thank you.

Go ahead, Mr. Elsner.

DIRECT EXAMINATION

BY MR. ELSNER:

Q.   Good morning.  Could you please state your name again for the record.

A.   Kenneth Gregory Miller.

Q.   Mr. Miller, where were you born?

A.   Santa Rosa, California.

Q.   And where do you live today, Mr. Miller?

A.   Rancho La Mora Bavispe, Sonora, Mexico.

Q.   I want to show you a picture, if we can get the PowerPoint up.  Do you recognize this?

A.   Yes, I do.

Q.   And what is it?

A.   That's Rancho La Mora.

Q.   And that's where you live?

A.   Yes.

Q.   What it's like to live in La Mora?

A.   Sorry.

Q.   Take your time.

A.   It's a peaceful paradise.  I've lived there for 50 years ago.  As you can see, there's a river that we swam in all our life.  The children, you know, bug us every day "can we go swimming, can we go swimming" during the summertime but it's very -- just been a peaceful place up until the 4th of November.

Q.   And how many people live in La Mora?

A.   Before or after?

Q.   Both.  Let's start with before.

A.   I'm guesstimating but I think around four or five hundred with children before and I think around a hundred or less today.

Q.   So it's a hundred today after the attacks on November 4, 2019; is that right?

A.   Yes.

Q.    And how far is La Mora from the U.S./Mexican border roughly?

A.    Approximately 90 miles.

Q.    Okay.  When did your family first settle in La Mora?

A.    My parents moved down there approximately when I was 8 years old so that would be '68, '69, '70-ish, around there.

Q.    All right.  And what does La Mora mean?

A.    Mulberry, there was a mulberry tree in the middle of that upper field that you see down there and they named it after that tree.

Q.    All right.  And, sir, what is it that you do for a living?

A.    Various things.  I've worked in construction most of my life, roofing, later years in building single family residence in Minnesota and also North Dakota back and forth, and we have pecan orchards.  There you can see some of those pecan trees there and pomegranates.  So agriculture, construction, ranching, we have some ranches down there with cattle also.

Q.    How many head of cattle do you have?

A.    I don't know exactly but I would say four or five hundred, around there somewhere.

Q.    Have you ever done in any work in North Dakota?

A.    Oh, yes.

Q.    What did you do here?

A.    Single family residence all over the state for various farmers and ranchers.

Q.    Okay.  How are you related to Rhonita LeBaron?

A.    I'm her father-in-law.

Q.    And you're the grandfather to her children as well; correct?

A.    Yes.

Q.    And Howard is your son; is that right?

A.    Yep.

Q.    What was Howard like as a young man?

A.    If I were to use one word, I would say "intelligent," but he was a very attentive son, very kind and loving.  He enjoyed skiing.  We lived in Minnesota, in Minneapolis for a few years and they have a hill called Buck Hill.  He liked to ski on that.  We lived in various different places because of being in Mexico we would always try to find where the work was and where it paid the best naturally; so we didn't really stay so long in one place.  We lived in San Diego, California, take him to the beach.  He loved those little boogie boards and ride the waves on there.  We'd go to the park on weekends and watermelon and bring, you know, cousins and other relatives that lived there.  And we -- we lived to what I considered a happy life.  And naturally there's negatives and positives, but to my wife and I, it was all about our family.

          Sorry so emotional, but just reliving this.

          Howard, as he got older I'd bring him and his brothers to work with me whenever I could get away with it.

Q.   Did you teach him construction?

A.   Yes.

Q.   Was he an accomplished -- in carpentry under your teaching?

A.   I think that he can build his own house, yes.

Q.   Okay.  When did you start taking him to the job sites in Minnesota?  How old was he?

A.   I think 8, 9, 10 I'd bring him weekends, you know, clean up a little bit and they'd get a hammer and nails build their little things with the cut-off two-by-fours, so around the 8, 9, 10.

Q.   And as he grew older with more responsibilities, how long did he work with you?

A.   Well, I'd say off and on, you know, between school and marriage, which he got married young, that was pretty much he worked with me exclusively, you know, younger.

Q.   Do you remember how old he was when he married Rhonita?

A.   Well, it's funny.  As time goes by, I was thinking he was older but they tell me he was 17 so it's hard to remember.

Q.   That's for sure.  And how old was he when he went out on his own and started working on his own?

A.   Pretty much around that time, but we still continued to do, you know, construction together off and on.

Q.   And what was Rhonita like, his wife?

A.   She was -- she was happy, like happy, bubbly angel and she

definitely is one now.  She was happy-go-lucky, carefree, I felt like.  And it seems like the minute these two laid their eyes on each other they -- she -- you know, from what she said to me and the family that was the man for her, and Howard also come home after he first met her and really, really liked her.

Q.    Did you go with Howard to ask for her hand in marriage?

A.    Yes.  That was their requirement, which I actually think it's a good requirement, I think that all parents --

Q.    It was a requirement by who?

A.    By her parents.

Q.    What was their marriage like together, Howard and Rhonita's, as you saw it?

A.    Well, I think all marriages have their ups and downs but I think that they actually had a very good marriage, a very excellent marriage.  I really -- Rhonita, my stepdaughter, was like my daughter.  I mean, she'd called me "suegro" which in Spanish is father-in-law, and we got along real good.  And her desires were -- from watching her was -- she loved my son like -- like, that I'd consider a Godly love.  Her goals were God, husband, family.  Her desires were to raise up her children in, you know, a Christian element, Christian ideals, Christian beliefs, and she practiced it.

And the grandchildren come around all the time and Papa -- we had them call -- I had them call me Papa.  I didn't like the grandpa stuff.  Papa and just -- I loved it when, you

know, they'd come around.  And they lived times off and on because they have a house in that -- can't quite see it in the picture, but -- so they had a house and would come by daily.

But Rhonita was just -- she was like an angel and her life was her family, her husband, and her friends.

Q.   And how many children did they have together?

A.   Seven.

Q.   And what was Rhonita like as a mother to those seven kids?

A.   She doted on them.  I'd tell her she needs to give them a little more discipline.  But, no, she doted on those children; they were her life.

Q.   I want to turn now to the events of November 4, 2019, and I want to ask you a few questions about that, and I want to ask you also describe this path that they drove on in a little bit more detail that I mentioned in opening.

Where were Rhonita and Christina and Dawna headed the morning of November 4, 2019?

A.   Ultimately, pretty much three different destinations. They -- Rhonita was meeting with Howard, my son Howard, in Phoenix.  They had talked, actually, just the night before and decided -- he was flying down to Phoenix and going to meet him with the two twins and the two oldest to help watch the twins and then the three in the middle there were left with my family to watch.  And then Dawna was heading over to a wedding, as he had mentioned earlier, in Chihuahua.  And Christina also was

heading over there and also returning back to North Dakota with Tyler.

Q.    I want to show you this map, and it also appears on the screen there.  And I'm going to give you a copy of the map.

MR. ELSNER:  If I may approach, Your Honor?

Q.    If you want to mark on the map, you can also mark on the screen and just help the Court --

THE COURT:  Mr. Elsner, do you want to put this in evidence at all?  Or this exhibit?

MR. ELSNER:  It's really just a demonstrative.

THE COURT:  Okay.

MR. ELSNER:  But I think, when he marks on it, we might move it into evidence at that point in time.

THE CLERK:  Your Honor, we're not able to capture any markings on it.

THE WITNESS:  Oh, on the screen.

Q.    (MR. ELSNER CONTINUING)  That's why I gave him a hard copy; so whatever you mark on the screen, we'll have you also write on the paper and then we can move it in.

A.    Do we have a pen?

THE COURT:  Somewhere we have a video presenter, I think, Mr. Elsner.  They call it an ELMO.  So in the future, maybe not right now, but we may have that available.  I see it over there.  Just to keep in mind because -- and a witness could come down and then be able to mark that we would be able

to see, I think.  This is the courtroom with more advanced technology just so you know.

MR. ELSNER:  We'll try to take advantage of all the technology we can.  And I appreciate that, Your Honor.  Maybe we'll use the ELMO if this becomes too clumsy.

Q.   (MR. ELSNER CONTINUING)  So can you mark on the screen and also on the document where the La Mora ranch is.

A.   Right there where that blue star is.

Q.   Okay.  I think if you --

A.   Okay (indicating).

Q.   And where is Colonia LeBaron?

A.   Over here where this -- (indicating) -- lower right corner, other blue star.

Q.   And what's the quickest path -- if you're headed from La Mora ranch to Colonia LeBaron, what's the quickest way to go do that?

A.   Shall I draw it?

Q.   You can draw it or -- yeah.  Drawing is fine.

A.   Well, it's that blue path you guys have drawn up there. Pancho Villa -- there's a little town called Pancho Villa here, another one Colonia Los Bojenas, and then get on this federal national highway and then head on down here.

Q.   And if the weather's good, and -- I was going to say if there's no traffic, but I'm guessing there's not a whole lot of traffic on that road.  How long does it normally take you to

get from La Mora ranch to Colonia LeBaron?

A.    I think a safe average would be three and a half hours.

Q.    About three and a half hours.  And if you were going from the La Mora ranch and crossing the border into Mexico which I understand is the path that Rhonita was going to take to meet Howard, how far is that drive?

A.    Well, she would take off -- there's two ways you can go. They decided to go together and so you can actually go this route here (indicating), grab this highway, head up parallel with the border, and then cross into Douglas, Arizona. Douglas, Arizona is right here.

Q.    And roughly how long does that take, Mr. Miller, if you went the route she intended?

A.    About the same, three, three and a half hours.  You can also take this route here (indicating), and you can do that in about two and a half, three hours.

Q.    What is that road like between the La Mora ranch and Colonia LeBaron, that dirt road, the blue line that was there? What is that road like?

A.    In this first area here where it's curved, right here, it's mountains approximately 17 miles because I've, you know, clocked it.  It's approximately 17 miles and once you get through the great -- it's the great divide, also the state line, and you get out onto the prairie on the Chihuahua side then it's flat the rest of the way.  But the mountain is

17 miles of pretty, you know, steep cut into the mountainside, curves everywhere.

Q.    And we've got a few pictures of those?

MR. ELSNER:  And, Jon, if you could see the first one here.

Q.    (MR. ELSNER CONTINUING)  I think there's a clear button on the screen.  Maybe the right.

A.    Oh, this thing here?  Okay.

Q.    Do you recognize this photo?

A.    Yes.  This is the entrance from off the highway that goes by our -- by La Mora.

Q.    All right.  And for the record, this is Demo 59.  And is this the entrance to that dirt road that you described between La Mora and Colonia LeBaron?

A.    Yes.

Q.    All right.  Could we show the next photo, please.  And what is this photo, if you recognize it?

A.    This photo here is -- may I draw on it?

Q.    Sure.

A.    This mesa -- I can get into details if you want -- this is the hill or the mesa that they shot Nita just below this picture and these guys were up along this ridge here (indicating), and we believe there were also guys in this ravine right here (indicating).  But the highway, where you showed that cattle guard earlier, is right down here.  And that

cattle guard is right there (indicating).

Q.    So how far is it from that cattle guard to this location on the road roughly?

A.    To the X here at the bottom?

Q.    Yes.

A.    I'd say a couple kilometers.

Q.    All right.

A.    Guessing.

Q.    Show the next photo, if we could.  That was Demo 60.

        MR. ELSNER:  Could we show the next Demo, Jon.

Q.    (MR. ELSNER CONTINUING)  Could you hit clear again, Mr. Miller.  All right.  This is Demo 61.  Do you recognize this photograph?

A.    Yes.

Q.    What is it?

A.    This is the site where Dawna and Christina and the children were shot and killed.  Their vehicles have been moved in this -- let me see -- yeah.  Their vehicles have been moved. They were approximately one here and one -- Christina's would be here and Dawna's approximately here, and these guys were set up on a ridge up here with a .50 caliber, from what I understand, and other weapons.  And then also we believe there were also armed men in front (indicating).

Q.    We can hit clear on that now.  I want to turn back to that morning.

A.    By the way, that's the site that's 14 kilometers away from Rhonita's site.

Q.    Okay.  Thank you.  This area looks pretty remote.  Are there parts of this road where there's no cell service?

A.    Yes.

Q.    What parts of the road?  If we go back to the map, what parts of the road is there little or no cell service?

A.    Well, it's kind of small but basically I'd say a good half to two thirds of that 17 mile, probably roughly half of that -- actually more because you got to get around in the prairie -- you got to go around some other hills and get over by where it clears up to Pancho Villa.  So a good, I'd say, hour to -- depending on driving, hour, hour and a half to losing cell phone service and then picking another tower up in Chihuahua.

Q.    Okay.  Did you see Rhonita that morning before she left La Mora?

A.    Yes.

Q.    Did she speak to you?

A.    Yes, she did.

Q.    Do you remember what she asked you?

A.    I don't recall.  It was a day of infamy but she was asking me -- it was a small detail.  I cannot remember what she asked me but she stopped and it was a quick question.

Q.    All right.  Did you see the children in the car with her?

A.    Yes, I did.

Q.    Who was in the car and where were they sitting?

A.    What I remember is Howard was in the passenger's seat next to the driver, and then Krystal was in the rear seat.  Now the twins -- the windows were rolled up -- the back windows of the Suburban were rolled up, so I didn't see the twins but, like, I knew they were in there.

Q.    Okay.  After seeing Rhonita leave the ranch that morning, the farm that morning, what did you do then?

A.    I was getting ready to go to our ranch and taking another daughter-in-law and other grandchildren up to the ranch.

Q.    Okay.  When did you first learn that morning that something had gone wrong?

A.    The first thing I saw was smoke, but my assumption was, well, boy, that's strange, in a place you just don't ever see it.  But I kind of just brushed it off as maybe somebody burning rubbish or I had no idea but I just brushed it off.

Q.    All right.  And then did you come to learn some more information about that fire?

A.    So I'm driving back and forth in my house up to the shop here and there on my side-by-side.  And I pulled up into my house pretty much ready to go to the ranch and Andre immediately pulls up behind me, my son Andre, very breathless, "Dad, Dad, your Suburban's on fire."

           "What do you mean it's on fire?"

           He says, "Yeah."

"That smoke I saw?"

He said, "Yeah, your Suburban is on fire."

And I immediately asked him, "Well, where's Rhonita and the kids?"

He said, "I don't know, Dad."

"Well, what do you mean you don't know?"

"Dad, I went up there" -- he went to bring her broken-down vehicle back and the fire -- he could see the smoke but he couldn't visually see it because there's the rise in the hill there between it.  And he said that when he stopped to -- he saw the smoke too and, like, in a place you just don't usually see it.  He thought, well, you know, who knows what's going on.

So he stopped and got out, looked at the tire which the front right tire was broke and so the tire was on an angle.  And then he said he heard an explosion, and he jumped in the vehicle.  And he had a worker with him also and they both drove over there and he said my Suburban was just ablaze.  And he said he parked behind it and he walked up alongside but had to stay away because of the raging inferno and he said he could not see inside of it.  And, of course, that's information I wanted to know.  He could not see inside.  So he walked a little past and got on a rise where you could see up the road farther and he sees two or three armed guys walking away.  So I assume five, ten minutes before he got there, those killers

left.

And so his worker says, hey, we got to get out of here. So they had a trailer they had brought to haul Rhonita's vehicle back. He just unhooked it right there and drove back and straight to tell me.

Q. Let me stop you there, Mr. Miller. I want to show you what's been marked as Exhibit 24. If we could display that on the screen. I've got a copy for you. Having some trouble pulling that up. Take a look at this, Mr. Miller.

MR. ELSNER: What do you want me do with these potential exhibits, Your Honor? Should I put them in this box?

Q. (MR. ELSNER CONTINUING) Do you recognize this document, sir?

A. Yes, I do.

Q. What is it?

A. Title to my wife and I Suburban.

Q. Is that the Suburban that you saw on fire that morning?

A. Yes.

MR. ELSNER: Your Honor, I'd like to move Exhibit 24 into evidence.

THE COURT: 24 is received.

Q. (MR. ELSNER CONTINUING) All right. Thank you, sir. Did Andre show you a video that he took that morning of the fire?

A. He didn't show it to me that morning. He showed it to me the next few days. We're all in a panic. We're all "What do

we do?  What do we do?"  So I didn't see it until things were more calm down.  After a few days later, he showed it to me.

Q.    I'd like to -- I'd like to play the video if we could.

(Exhibit 7, a video, played in open court.)

Q.    Do you recognize that video?

A.    Yes.

Q.    Is this the video that Andre showed you?

A.    Yes.

Q.    Is that the video that he took on November 4, 2019?

A.    Yes, and he was right by Howard's and Rhonita's black Suburban, in front of it, where it broke down.

MR. ELSNER:  Your Honor, we've marked this as Exhibit 7.  We'd like to admit it into evidence and we have it on a flash drive for the court reporter.

THE COURT:  Exhibit 7 is received.

MR. ELSNER:  Thank you, Your Honor.

Q.    (MR. ELSNER CONTINUING)  After speaking with Andre, what did you do next that morning?

A.    Well, of course, no more going to the ranch.  I gathered up -- well, he did anyways, gathered up some of the cousins and brothers and we decided to drive up to that cattle guard that you showed earlier.  Which is the -- it doesn't show but the highway is there and that picture is off of the highway.  We stopped before that cattle guard and were there wondering, okay, what do we do.  Beings he saw these cartel members

walking away, we thought, well, we could go rushing in but what damage is done is done.  We're not going to be able to prevent that.  But of course my hope was that Rhonita and the kids had gotten out of the vehicle, because of course in my mind they're not going to shoot -- no way are they going to shoot innocent women and children.  So my thoughts were that possibly that she had gotten out and may be hiding in the bushes somewhere.

So we're sitting there about a half -- you know, standing there talking, wondering what to do, and then somebody mentioned a drone and Matthew, my cousin, said he had one.  So he drove back to the farm.  15, 20 minutes later he comes back again with a drone and flies it over the Suburban.  By this time the smoke was -- had stopped.

Q.    What were you looking for from the images shot from the drone?

A.    Personally what I was looking for, number one, was if Rhonita and the kids were maybe, you know, in the mesquite somewhere, hidden somewhere and, you know, with a bird's-eye view you can of course tell.  And also if any cartel members could be still seen in the vicinity.

It was a perfect day as far as for visual.  It was just really clear.  You can see there's a few clouds but they're real high up.  It's just a perfect vision.  And when he flew the drone over, of course, I'm watching the screen live and some of the family.  And he hovers over the Suburban but

he's real high.  It's really small down there so he starts to drop it and he gets approximately halfway between where he was and down to the Suburban, the battery went -- alarm went off and it automatically returned.  But we did not see any -- you know, no Rhonita, no cartel members.

Q.    That morning did you drive up to the scene of Rhonita's attack?

A.    Yes, and after that we got in the vehicle and drove in there.

Q.    Tell me and the Court what were you thinking and what did you see as you were driving up to your vehicle where Rhonita and the kids were?

A.    I was still hoping that we'd find her outside the vehicle somewhere.  And so we drove up to the vehicle and passed it a little because it's kind of on a little bit of a rise and the right passes more area to park.  So we drove past it and parked.  And I got out and walked over to the Suburban and of course it's still hot and embers, vapor, you know, coming up but none of the black smoke anymore.

And I looked inside the driver's door.  I could just make out a -- just a little bit of a charred remains of her bones in the driver's seat.  So at that point the realization hit, of course, that they didn't get out of the vehicle.  So I went over to the side of the road for a little -- just a few minutes to -- when that realization hit and we started hearing

firing, gunfire up the road.  So we decided -- well, what I thought, and of course the cousins and brothers were there too, was that in Mexico you cannot, you know, touch -- I suppose it's the same here -- you cannot touch a crime scene until, I mean.  Period.  It's a felony to move anything, to do anything to a crime scene.  So I thought, well, we can't do anything here.  We better, probably better go, you know.  And started to walk to the vehicle.  And I thought, you know what, I want to preserve exactly how it was when we arrived on it.  So then I took a video of it, walked around, took a video of it because I knew we couldn't touch it until the Ministerio Público, it's a public ministry comes up and does a crime scene analysis or whatever they call it.

MR. ELSNER:  Your Honor, I'd like to display Exhibit 8 which is the video recording.

(Exhibit 8, a video, played in open court.)

Q.   (MR. ELSNER CONTINUING)  Mr. Miller, is that the video you took on November 4, 2019?

A.   Yes.

Q.   Is it accurate and complete?

A.   Pardon?

Q.   Is it accurate and complete?

A.   Yes.

MR. ELSNER:  Your Honor, we'd move Exhibit 8 into evidence.

THE COURT:  8 is received.

MR. ELSNER:  It's contained on the same shared file.

Q.  (MR. ELSNER CONTINUING)  Later that day, after you left the site of Rhonita's vehicle, did you send this video to anyone?

A.  I'd like to make a point -- which maybe it will be made later on -- we never had phone service.  There is a phone, cell phone tower and there was no phone service that day.  Come to find out later they cut the phone service, the cell phone service.  But I had satellite internet from Exede Satellite so we're still able to communicate and we have a WhatsApp group, you know, family.  And I put that video on that WhatsApp group through the satellite service.

Q.  Just in case there's anyone in the Court that doesn't know, when you say it's a "WhatsApp chat," can you describe what that is?

A.  It's an application that somebody invented to be able to make phone calls and chats and you can add people; you can take off people; you can send pictures; you can send videos; so...

Q.  And do you have a chat group with members of your family on WhatsApp?

A.  Yes, and then of course other groups with, say, brothers, sisters, various different groups, you know.

Q.  And did you send that video later that day to your family members through the WhatsApp chat?

A.    Yes, I did.

Q.    Okay.  And roughly how many people will be included in that?

A.    Oh, 20 -- 20, 30 somewhere.  I've never counted.

Q.    Later in the day did there come a time where one of your relatives that received that video and asked you whether you could share it beyond just your family?

A.    Yes.  Laif Langford, who was working in Louisiana, called me and he said, hey -- I can't remember the news station asked if they could -- they wanted to post that video.  And of course I'm thinking, what do I want this to go anywhere for so I told him absolutely not, and so we ended the conversation.

And then he called back a little later -- in the meantime I got to thinking, in other words, we have never, you know, we've just lived a quiet life.  We weren't looking for exposure or anything like that.  But I got to thinking and I thought, you know what, the world probably ought to see this.  So when he called again, I says, yeah, you have my permission.  Needed my explicit permission to post that video, so they posted it on the news.

Q.    Did you make an effort that day to try to reach Rhonita's parents to inform them of what happened?

A.    I don't think I had their number at the time, but I called Julian.

Q.    And who's Julian?

A.    And asked him -- Julian would be Adrian's nephew.

Q.    All right.  And how did you communicate with Julian?

A.    Through the same WhatsApp, you know, you can make phone calls on that WhatsApp application.

Q.    And did you send him a message that morning?

A.    Yeah, I called him.  Talked to him verbally, and I think I sent a message also to -- to inform Adrian and Shalom, Rhonita's parents.

          MR. ELSNER:  Your Honor, we'd like to play that audio message which is -- we've marked as Exhibit 74.

          (Exhibit 74, a recording, played in open court.)

Q.    (MR. ELSNER CONTINUING)  Mr. Miller, is that the audio message that you sent to Julian?

A.    Yes.

Q.    Is it accurate and complete?

A.    Yes, it is.

          MR. ELSNER:  Your Honor, we'd like to move Exhibit 74 into evidence.

          THE COURT:  74 is received.

Q.    (MR. ELSNER CONTINUING)  How would you describe the various messages and flow of information on the morning of November 4, 2019?

A.    There was a few other satellite systems set up on a few houses there.  I don't know.  Four or five, I think.  So as this is going on, of course this has never happened, we're --

looking back, hindsight now, I wish we would have kept a lot more than we kept for a record.  But of course our consuming concern, of course, Rhonita and the children, they were the first ones that we, you might can say, we got closure on I think by approximately 11:00 a.m.

David -- David's wife Dawna and her kids, and Tyler's wife and her baby, we had not heard of.  So everybody is just panicking, trying to track them down.  Nobody's heard from them, and we did not even get any information on them until approximately, I'm guessing, approximately 5:00, 5:30 that evening when Devin -- when my son Andre found him walking on the highway.

Q.    Okay.  So if you could just repeat for us the first information you received related to Christina and Dawna came at around 5:00 p.m. that evening; is that right?

A.    Approximately.

Q.    Okay.

A.    Yes.

Q.    And how did you get that information?  What did you learn and from who?

A.    Me personally or our family?

Q.    You and the family.

A.    I was at the house and they -- and my son called, We found Devin, we found Devin, and the kids are up there, they're shot, they need to be rescued.  Everybody, you know, gather up, we

need to go rescue them.  So that was the process that started happening.  That's when we first found out about Dawna and Christina.

Q.    Okay.  And Devin is Dawna and David's son; is that right?

A.    Yes, he's the one that walked down.

Q.    Okay.  And he walked from where Dawna's vehicle was shot all the way to La Mora; is that right?

A.    Not quite but very close.  I'm thinking around 14 kilometers, 15 kilometers.

Q.    Did there come a time later in the day that you heard that McKenzie was missing?

A.    I did not -- okay.  They mounted a rescue.  I did not go on that rescue.  I was, yes, a coward, whatever you want to call it, but I was emotionally distraught.  I did not go on the initial rescue mission to rescue the kids.  Later on, after dark, we got a phone call from -- I cannot remember who called me, maybe Andre -- or, no, it was Jeffrey, that's who it was -- Hey, we found -- we have accounted for all of the children except for McKenzie.  And we -- of course they can't make the phone call where they're at.  They had to drive down the hill a little bit with the kids.  Once they got into a phone service, then that call was made.

Q.    Okay.

A.    Said we can't find her.  We drove up slow -- or we drove up, didn't see anything.  Driving back we tracked; we can't

find anything.  So please, you know, come help find her.  So I jumped on my side-by-side and I figured, well, it's, you know, a couple -- it was a good two, two and a half hours after dark. Of course, it's November.  It's quite cold outside so I grabbed a big old heavy blanket.  And Peter, one of my cousin's sons, jumped in with me and off we went.

Well, my thoughts were there was an old road that cut off.  I thought well maybe she's walking down this wash; so I headed up this wash.  We got lost; so I turned around.  Got on the highway and I decided I'll go up to the top of the wash where it crosses again and come back down.  But when I got to the top of the wash, there was the convoy of two army trucks full of soldiers, ambulance from Bavispe, David was there with his kids, and part, of course, of the other group that had come from, come from Chihuahua.  Actually, no, David wasn't there with his kids.  I'm sorry.  The kids were taken to Bavispe, the ones that got wounded.

Q.    Just to orient us, Mr. Miller, can you put up the map again one more time.  So -- and I know it's not easy to do because we don't have all the roads on this map, but can you tell me -- maybe just show us where you left from La Mora on your way to try to find McKenzie and show us on this map what you were describing?

A.    Okay.  This map -- I suppose the yellow star is La Mora right here?

Q.    Yes, that's right.

A.    Okay.  I got on my side-by-side, left La Mora, and let's see where this -- okay.  There's an old road we used to have that goes right up this wash right here.  That comes out right here.  I actually, with my dad, made that road years and years ago.  Well, we quit using it because they built a better one, you know, on around here.  So my idea was to go up this road here and hopefully she's walking, you know, walking down this wash.  Well, I got up here and took a wrong turn and got lost and of course it's dark, and I think I went about here somewhere.  So I went back out, drove through here and of course it's by Rhonita's vehicle and I drove all the way up to the top of this wash and right here is where I met the convoy with the soldiers and actually some federal police and soldiers that were coming also from the Chihuahua side.

Q.    So those soldiers and David Langford was with them; is that right?

A.    Yeah.

Q.    And so they had already passed Christina's and Dawna's vehicle and they had come down and you met them just before Rhonita's vehicle; is that right?

A.    Yeah.  They were stopped at that wash and a couple of the cousins were -- brothers were out.

         THE COURT:  Mr. Miller, maybe move it a little bit further and then just sit back.

THE WITNESS:  Further away or further up?  Okay.

A.   They had stopped there, and they had gotten out and were looking for tracks maybe going down the wash also.  And I remember Jeffrey telling me, hey, I don't see any tracks here and go on this certain road, this old road that maybe she, you know, turned somewhere else.  Well, after you get out of this wash approximately here, there's a road that goes in to -- that goes -- it's an old road to the town of Bavispe which is the head, like the Municipio or Municipio headquarters.

So I turned around and Lenzo Woodmar jumped in with me and he came with Adrian in their group.  So the three of us drove down that road, and I stopped at the first place which is really close to where I turned off because there was some soft dirt there and jumped out to see if I can see any tracks.  That's when I saw a shoe print and a barefoot print.  So I can't remember if I called to tell them or not but jumped in and took off.  And then every spot as we're driving down or I could see soft dirt, I'd stop to see if I could see the tracks.  And there they continued, the shoe and the bare foot.

We drove for approximately 3 kilometers down that road.  Because I clocked it a few weeks later.  And then I see this little silhouette coming up and I knew it was her.  I stepped on it and then didn't even stop the vehicle, jumped out and grabbed her.

And when I grabbed her, she was like real stiff, you

know, because like who are you, right.  In fact, she asked me, "Who are you?  Who are you," she says.

"I'm your uncle Kenny."

"You're my Uncle Kenny?"

I says, "Yeah."

She grabbed me and first thing she said is we got to go back get the other kids.

So I called David and told him we found her.  So then I drove back up this road and back around down and David was at Rhonita's vehicle with some of the vehicles --

Q.   (MR. ELSNER CONTINUING)  Mr. Miller, can I stop you for one quick second.  Did you send a message that you had recovered McKenzie?

A.   I think so.  There's just so many things going on I can't remember.  But I'm sure -- beings everybody's looking for her, I'm pretty sure I sent a message or two.

Q.   I'd like to play what we've marked as Exhibit 75 and see if you recognize this message?

(Exhibit 75, a recording, played in open court.)

Q.   (MR. ELSNER CONTINUING)  Mr. Miller, is that your voice?

A.   Yes.

Q.   Is that the message that you sent that evening?

A.   Yes, it is.

MR. ELSNER:  Your Honor, we'd like to move into the record Exhibit 75.

THE COURT:  75 is received.

Q.   (MR. ELSNER CONTINUING)  So, Mr. Miller, after you picked up McKenzie, where did you take her?

A.   Well, I picked her up and we had that blanket and she was shivering.  She had the one shoe on and bare foot.  She had a, like, a tourniquet on her arm where she -- I can't remember if it was her right or left arm, but she had like a tourniquet on her arm.  And as we drove off to take her, I kept looking at her, you know, because the reflection or light I could see her and she just had a smile on her face like her -- her ordeal was over with.  I took her down and I met David at Rhonita's vehicle -- they had stopped there, the convoy had stopped there to -- I'm not sure, and gave her to him.

Q.   Okay.  Did you see Adrian and Shalom, Rhonita's parents, at Rhonita's vehicle?

A.   Yes.

Q.   Did you talk to them at the vehicle?

A.   Yes, we did.

Q.   What did you say and what did they say?

A.   I do not have a recollection of that.  I know, you know, it's an emotional realization and I do not recall our conversation.  But I do know that we met and hugged and talked and looked at the vehicle.  And one thing I do remember is, after we had visited for however long we did -- I don't think it was too long -- I told them I'm going home.  I had had

enough and they said they were going to spend the night with the vehicle.

Q.    Did you go back the next day and look at the vehicle?

A.    Yes, we went and looked at it a few times, actually.

Q.    And what did you notice the next day around the vehicle or about the vehicle?

A.    Well, during the night, of course when her family and their children show up, they had found some shells and we found shells.  I mean, I personally saw a couple more shells.  I was there when some other people found shells just here and there around the vehicle and of course up on the hill.

Q.    Did you notice whether any of the car doors were ajar?

A.    Any of the what?  Pardon?

Q.    Any of the car doors were open, were ajar?

A.    Strangely enough I was just watching that video again.  I did not catch the passenger door open.  Although I notice it's in that video.

Q.    Did you note that --

A.    But the next day I definitely noticed it and -- yes.

Q.    So, Howard, your son, was traveling from Phoenix.  Did he drive to La Mora from Phoenix, Arizona, that night?

A.    I don't know if they changed tickets, if he actually did fly into Phoenix or Tucson, but wherever he flew into, he drove down from there.  I'm thinking Phoenix, though.

Q.    Were you worried about him driving from there to La Mora?

A.    Well, we're naturally all worried but by this time the military had showed up.  I'm talking state and feds, National Guard, Army, Marines.  I mean, it literally looked like a war zone there with the amount of military they had there.

Q.    Did you see Howard when he arrived the next day?

A.    Yes.

Q.    Did you see Howard with his kids the next day?

A.    Did I see what?

Q.    Did you see Howard with his children?

A.    Oh, yes.  Yes.

Q.    How was Howard doing when you saw him?

A.    Wasn't doing good at all.  In shock like all the rest of us.

Q.    Did you try to talk to Howard when you saw him?

A.    Just I'm sorry and we're just all in a -- just a state of unbelief that this actually could happen.  It's like a nightmare.  It's like, you know, you hear things in the news, happen to other people and far away, and there's just nothing compared to experiencing this yourself.  I still think about it and I feel like it's a nightmare and it didn't happen.

Q.    Mr. Miller, in the days after the attack, how many people do you estimate came into La Mora -- family members and relatives?

A.    I think a thousand or more, friends, family, relatives, and of course there's the military that there was a bunch of

them also.

Q.   Mr. Miller, where was Rhonita and the children's funeral service held?

A.   In my yard.

Q.   Did you speak at the funeral?

A.   Yes.

Q.   How many people, roughly, were at the funeral?

A.   It was very crowded but I -- I don't know.  I just remember it being very full.  I never thought about numbers but I'd say three or four hundred, five hundred.  That's just a guess.

Q.   After the funerals and as time went on, did you and your wife Loretta help Howard with the children?

A.   Yes.

Q.   Did Rhonita's parents, Adrian and Shalom, also help with the children?

A.   Yes.

Q.   How did that work?  Did you share time together?  How did you arrange that?

A.   Yeah.  You know, back and forth.  And of course Howard's working in North Dakota.  Initially he had to, you know, get back to work and so Loretta went to North Dakota.  And Howard -- I can't remember if he had already moved in.  I think he moved in to Heather's house.  My daughter Heather -- she's over in the audience.  He moved in with her house and Loretta

moved in there also and between them they helped take care of the kids in the initial few months there.

Q.   Have you seen any changes in the way Howard was before the attacks and since the attacks?

A.   Oh, yes.  Howard -- when you lose your wife and four of your children, people react differently, you know, I noticed through life.  He, I feel like, closed in, into himself.  And I was never -- I, you know, of course I'd been involved with the case in Mexico and I stayed in Mexico when my wife went up there to continue, you know, helping with the investigation in Mexico and the federal government.  And -- but whenever I'd call Howard on information, he definitely didn't want to talk about it and I don't blame him at all.  So, yes, it's a -- I guess different emotional states and reactions that you have, but he -- I feel like personally that he stayed more within himself.

Q.   And to this day have you ever been able to have a conversation with Howard about what happened to Rhonita and Howie Junior and Krystal and the twins?

A.   No.  You might say just on the surface but in detail, no, absolutely not.

        MR. ELSNER:  Thank you, Mr. Miller.  I appreciate your testimony.

        No further questions, Your Honor.

        THE COURT:  Mr. Miller, you testified earlier about

using a drone and when you used the drone, you didn't see any cartel members.  Were you suspicious that there had been an attack by cartel members at that point?

THE WITNESS:  Well, when my son went up there he -- I can't find it.  He brought up -- also besides the video of the car burning, he brought a picture back of the back of my vehicle.  And the fire was just above the license plate and I could see the bullet holes, you know, the clear Montana plate on the vehicle, you know, and I could see bullet holes there.  So absolutely that's what -- you know.

THE COURT:  Is this a route that your group had travelled before?

THE WITNESS:  Oh, yeah.  I've been driving on that road for 50 years.

THE COURT:  And it's a shortcut, it looks like, going to the east?

THE WITNESS:  Yes.  You can go up to Agua Prieta but it's a lot longer -- and you're still going to -- that road, Agua Prieta or Douglas is also a dirt road so might as well take this a lot shorter dirt road.  So, yeah, we travelled that dirt road all our life.

Q.    (MR. ELSNER CONTINUING)   Just one last question, Mr. Miller, you're not a plaintiff in this action; is that right?

A.    NO.

MR. ELSNER:  I don't have any other questions, Your Honor.

THE WITNESS:  Do you have any other questions?

MR. ELSNER:  Your Honor, the next witness we intended to call is going to be appearing via video and we sort of have him scheduled to begin after the lunch break.  So we could do one of two things:  We could either take a lunch break now and then come back and start him when he arrives, or we can call the witness we intended to call after the Attorney General -- the district attorney.  Do you have a preference?

THE COURT:  I have a preference that, if we have a witness available, we do that, assuming it's a witness that can be concluded within about 45 minutes before the noon hour.  I have a couple of other matters scheduled over the scheduled noon hour so it would be helpful to me if we can --

MR. ELSNER:  We'll do our best to conclude the testimony in 45 minutes.  I think it might be a little bit closer to an hour.

THE COURT:  All right.

MR. ELSNER:  If you don't mind, what we might do is just do that 45 minutes, start with the district attorney and we'll just wrap him up after that if that's okay.

THE COURT:  That would be fine.

MR. ELSNER:  Thank you, Your Honor.  Your Honor, we're going to call Dayer LeBaron to the stand.

<u>DAYER LEBARON,</u>

having been first duly sworn, was examined and testified as follows:

<u>DIRECT EXAMINATION</u>

<u>BY MR. EUBANKS:</u>

Q.    Good morning, Mr. LeBaron.  I just want to state my personal appearance on the record.  My name is John Eubanks. I'm from Motley Rice law firm in Mount Pleasant, South Carolina.  Can you please state your full name for the record.

A.    Dayer Adrian LeBaron.

Q.    And where do you live, Mr. LeBaron?

A.    I live in Midland, Texas.

Q.    Where were you born?

A.    I was born in Colonia LeBaron, Chihuahua, Mexico.

Q.    And what's your date of birth?

A.    My date of birth is February 19, 1995.

Q.    And you were related to Rhonita LeBaron; is that correct?

A.    Yes.

Q.    What is your relationship?

A.    Sibling.

Q.    How far apart in age were the two of you?

A.    About five and a half years.

Q.    In this case did you prepare and sign a declaration regarding your relationship with your sister Rhonita?

A.    Yes.

Q.    And I'm going to hand you what's been marked, premarked as Exhibit 43.  Now, Mr. LeBaron, have you seen this document before?

A.    Yes.

Q.    Did you sign this document?

A.    Yes.

Q.    Are the statements in the declaration true and accurate based on your best recollection?

A.    Yes.

Q.    Are you a U.S. citizen?

A.    Yes.

Q.    And have you seen this document before?

A.    Yes.

Q.    And what is that document?

A.    This is my U.S. passport.

Q.    And this is appended to the declaration that you have in front of you.  Did you also prepare and sign a declaration offering expert testimony in this matter?

A.    Yes.

Q.    What is your area of expertise as it pertains to this litigation?

A.    Diesel and automotive technician.

Q.    And what were you asked to testify about in this case regarding your experience as a certified automotive technician?

A.    Cause of fire, whether it be a mechanical issue or not.

Case 1:20-cv-00132-CRH    Document 52    Filed 02/24/22    Page 73 of 127

73

Q.   Okay.  And that's the cause of the fire on your sister Rhonita's vehicle?

A.   Correct.

Q.   Can you briefly describe for the Court the education you've received that would qualify you to give this expert testimony?

A.   Yes.  I studied in Avondale, Arizona, at the Universal Technical Institute.  Afterwards I got my student ASE certificates, and moved to Midland, Texas, shortly afterwards. Started my own business, service trucks, changing out truck parts on Love's gas stations.  Several years after that, me and my wife purchased a home with two and a half acres where I built a shop, a three-way shop to work on 18-wheelers.  All of it from money I had earned from my business.  Up until them killing my sister, it was about four and a half years.  And I had built my shop January of '19.

Q.   What kind of training did you receive -- and I'm going to refer to it as UTI, the school that you attended in Avondale -- what kind of training did you receive there?

A.   So I trained on fuel systems, routing of fuel, pressures, locations, fuel tanks, fuel pumps.  I trained in HVAC systems with the cooling, heating of the ductwork.  I trained in electrical systems of 18-wheelers and automotives alike. Finding shorts, knowing possible locations of shorts. Electrical issues are a big fire hazard on automotive.  Cooling

systems of the engine, engine break down and composure.  The UTI is about 75 percent hands on, 25 percent theoretical school so it really gets you in there.

THE COURT:  What is the UTI?

THE WITNESS:  Universal Technical Institute.

THE COURT:  Okay.

Q.    (MR. EUBANKS CONTINUING)  How long was your course of study at the Universal Technical Institute?

A.    It was ten months of what I would say a high, intensive course for diesel and automotive training.

Q.    And you said it was about 75 percent of hands-on training?

A.    Correct.

Q.    And how long have you been in your own business?

A.    I opened my business January 2015 up to date, same business.

Q.    Do you have any other experience that assisted you in rendering the opinions you provide in this case?

A.    Yes.  I am an avid or a seasoned welder.  I've been -- I started welding in high school in Deming, New Mexico.  Freshman year, got a lot of knowledge there and I've been an avid welder since then.  I do a lot of aluminum welding, which is one of the harder metals to weld, and I do TIG, arc, and MIG welding, I have all the equipment in my shop to perform safe welds on the equipment whether it be brackets for fenders, stitching up fenders.  I don't do any of the certified stuff because I

haven't got my welding certificates, but anything that doesn't pertain to need a certificate to weld, I weld.

Q.    I'm going to provide you a copy of the second declaration that you provided in this case and it's premarked as Exhibit 29.

THE COURT:  Just so I'm keeping up, Mr. Eubanks, you haven't offered 43 or 29 yet.

MR. EUBANKS:  That is correct.  Not yet.  We will get there, Your Honor.

Q.    (MR. EUBANKS CONTINUING)  Now if you can take a moment and look at this document.  Do you recognize it?

A.    Yes.

Q.    And is this a copy of the declaration you provided in this case relying on your expert education and experience as a certified technician?

A.    Yes.

Q.    And generally what opinions do you reach in your declaration at Exhibit 29 regarding the cause of the fire in your sister Rhonita's vehicle?

A.    My conclusion is that there was no mechanical failure to cause the fire.  My conclusion is that the fuel was siphoned out of the fuel tank of Rhonita's -- the Suburban she was in, and that same fuel was what they used to light the vehicle on fire.

Q.    So your testimony is that the vehicle was intentionally

set on fire; correct?

A.    Correct.

Q.    Okay.  And we'll get to why you reached that opinion that the fire was set intentionally in a moment.  But have your opinions regarding the cause of the fire on your sister's vehicle changed from when you first saw the vehicle to today?

A.    No.

Q.    And do you stand by the opinion that's in your report at Exhibit 29?

A.    Yes.

        MR. EUBANKS:  Your Honor, I do move that Exhibit 29 be entered into evidence.

        THE COURT:  29 is received.

Q.    (MR. EUBANKS CONTINUING)  Now, Mr. LeBaron, we're going to discuss your relationships with your sister Rhonita in a little bit.  But I want to skip ahead.  How did you learn that something had happened to your sister on November 4, 2019?

A.    My best friend is more, I guess, involved with the La Mora family, and he gave me a call.  I remember it to the day.  He asked a rhetorical question, he said, kind of in a panicking voice, Nita's your sister, right.  And this is my best friend for 15 years.  Yeah, he knew who my sister was.  And he just choked up and he said, I'm going to send you some messages and he hung up.  And I opened my WhatsApp once again -- that's where he sent them through -- and he had forwarded a message

from someone from La Mora saying that Rhonita's vehicle was on fire, and they didn't know where Rhonita and the kids were. I immediately went to my house after hearing that message.

Q.    Do you recall approximately what time in the morning that was that you got that phone call from your best friend?

A.    I want to say it was around eleven.

Q.    Okay. And do you recall approximately what time it was or how much later it was when you found out that Rhonita had actually been killed?

A.    I want to say it was about 30-minute lapse. I was already in my wife -- in the house with my wife. We were talking, kind of in shock of what was going on, hadn't even shed a tear yet just kind of with the hope that they weren't in the vehicle. And that's when my wife played the message of one of the people from La Mora had sent:  "That's it.  They're gone."

Q.    And what was your first reaction when you learned that that's it, they're gone, when you heard that message?

A.    It just -- all the hope, all the hope that one carries is -- leaves your body. You feel -- oh, you just feel like it's unreal. You feel unimaginable pain and just sadness from deep inside your soul.

Q.    After you were able to compose yourself to the best extent that you could, what was your next course of action?

A.    My next course of action was pack suitcases for my wife and my kids so we could go down to, I guess, just find out

exactly what was going on.

Q.   So how long after you got that initial message that she was killed was it before you actually left the house to start traveling to Mexico?

A.   One hour.

Q.   Did your wife and your children travel with you?

A.   Yes.

Q.   And where were you initially headed to in Mexico when you left your home?

A.   I was initially headed to Colonia LeBaron.  Once we were in the vehicle, me and my wife had decided to spend the night in El Paso to not cross through Mexico at night in the later hour.  That was our decision.  In Pecos, Texas, I had called Douglas Johnson to ask if he wanted me to pick up his son Alex Johnson, which is my sister Lian Johnson's son, from the military school that he was attending in Roswell, New Mexico. I felt like I was going to stop in El Paso anyways.  It was a detour to pick up my nephew and do something to help out.  Doug was, I'm sure, at this time already trying to start in to Mexico or waiting for Howard at the least.  I think he was waiting for Howard to land in Phoenix.

Q.   Now, you stopped in El Paso that night.  What time the next morning did you cross into Mexico?

A.   I would say at 8:00 in the morning.

Q.   And do you recall approximately what time you arrived in

Colonia LeBaron?

A.    12:00, 12:30.

Q.    Okay.  What was your next step from that point?

A.    Me and my wife had decided to go to La Mora with our kids just to -- my wife and my sister Rhonita were really good friends.  She didn't want to have me go alone.  So we left in the -- to catch the convoy in, I don't know, Benito Juárez.  I don't know where the convoy was waiting for us somewhere.  And we had left with my -- me; my wife, Ariana; my daughter, and Leroy, my son, in the vehicle following Javier and Miguel in a different vehicle.

Q.    And Javier and Miguel are two of your brothers; is that correct?

A.    Yes, two of my brothers.

Q.    Okay.  And you said you were going to meet a convoy.  Who was convening this convoy?

A.    So it was a convoy of a military that was scheduled for two o'clock to leave that we were going to meet up with to give a safe passage from the Benito Juárez to La Mora, the next day, November 5.

Q.    So this convoy was traveling on the same road that the incidents had occurred the previous day; is that correct?

A.    Correct.

Q.    Okay.  On your drive to La Mora, did you pass the location where Christina and Dawna's vehicles had been attacked?

A.   We stopped at the location that Dawna and Christina's vehicles were attacked.  We got out of the vehicle in front of the Virgin Mary Capilla.  It's like the house they make for the -- for praying, which is pretty much right on the Sonora/ Chihuahua line, and that is where the shells and the gunshots were towards the -- Christina and Dawna's vehicle up on the higher left.

Q.   How long did you stay at that site?

A.   We stayed there for about ten minutes.  All of us got out of the vehicle.  That was where I had saw that Tyler was in the Ford that was in the convoy with us.  I would say about ten minutes observing the location.  I recall my wife asking a question to Tyler, like, are you looking for something.  And he stated that -- he had told her that, no, I'm just trying to get the best picture of what's going on because I'm probably never coming back here again.

Q.   And from that point did you proceed to where your sister's vehicle was?

A.   No.  From that point we proceeded to where Dawna's and Christina's vehicles were.  So we got in the vehicles and drove to where to the other side of the canyon where Christina's and Dawna's vehicles were and got out.  I stayed in the vehicle but people in the other vehicles got out and were inspecting.  I don't think we were there for more than ten minutes either. The military had told us it's getting late, we need to get

going.

Q.   And once you headed out on the road after leaving that location, how long did it take you to get to where Rhonita's vehicle was located?

A.   I'd say about 20, 30 minutes.  I can't --

Q.   And this was taking place on November 5, 2019; correct?

A.   Yes.  Correct.

Q.   Okay.  At this point had you seen any photos taken by others of your sister's vehicle before you had arrived on the scene?

A.   No.  I -- upon leaving Midland, Texas, I told my wife to not show me any of the images.  Keep me posted on some of the positive stuff.  I didn't want to have my mind under that stress of images and stuff because I was undertaking that trip. I don't want to be impaired driving.

Q.   When you arrived to the location of where Rhonita's vehicle was, what was your initial reaction upon seeing the vehicle?

A.   My initial reaction was realization that it was real.  I guess I didn't want it to be real.  I didn't want it to be real.  When I saw her vehicle, I knew; I knew it was real.  I knew that it was -- that it had occurred.  Oh, it just broke me to pieces.  That was when I really accepted the fact that she was gone.

Q.   And if you'd look at the screen in front of you, have you

seen the photo before?

A.   Yes.

Q.   Was this around that same time that you were just talking about?

A.   That is the exact moment.

Q.   So this was the exact moment when you first saw your sister's vehicle?

A.   Correct.

Q.   And who else is in this photograph with you?

A.   That is my wife, the young boy is Leroy, me, and Tyler Johnson; Tyler Johnson is giving me a hug.

Q.   And this photograph was attached to your personal declaration; is that correct?

A.   Correct.

Q.   And I'd like to show you some photographs of the Suburban of your -- that your sister was driving that were taken from the scene that was found and that were attached to your expert declaration in this case.  And as an initial question, did you personally take any photos while you were at the scene of the attack of your sister's vehicle?

A.   No.

Q.   Now, Mr. LeBaron, these photographs were appended to your expert declaration on pages 7 through 9.  Are these photographs true and accurate depictions of what you saw when you were on the scene November 5, 2019?

A.    Yes.

Q.    And I apologize but I want to go through all of the photographs that were attached to that declaration just to set the scene.  Move to the next one.  Again, these are additional photographs taken of your sister's vehicle.  Do these appear in the same form that -- of what you saw that day?

A.    Yes.

Q.    And these are additional photographs from different vantage points.  Again, do these seem to be true and accurate depictions of your sister's vehicle?

A.    Yes.

Q.    And, finally -- these are the last few -- looking at these photographs also appended to your declaration, do these appear to be true and accurate depictions of what you saw that day?

A.    Yes.

Q.    Now, returning back to when you arrived on scene at your sister's vehicle, after you were able to somewhat compose yourself again and -- again, I'm not exactly sure how you could.  But what did you do?

A.    I -- my wife had mentioned to me that there was some controversy on how the vehicle caught fire.  So that was something that was kind of going through my head previously to showing up to location.  Me being a technician, someone that is even asked to prove what the cause of failure or fire or anything on an automotive would originate from, that was my

first inkling to do at the vehicle.  There wasn't any officials inspecting the vehicle; there wasn't anyone there at the time; so I initially just looked into the engine compartment of the vehicle.

Q.   I'm going to show you two photographs that were also -- or two pictures that were also appended to your expert declaration.  Can you tell me what these are?

A.   That is the engine compartment of a 2011 Suburban.

Q.   Now when you looked under the hood and into the engine compartment of your sister's vehicle, what did you see?

A.   I saw a lot of components that, judging on the state of the vehicle, in my opinion were in very well condition, almost protected from the fire.  I saw the air filter, the mesh wire on the air filter.  There was still unburnt cardboard on the air filter.  The serpentine belt wasn't on the -- wasn't routed through the engine anymore but it was on the floor kind of just burnt but not completely burnt.  The AC compressor, the alternator, various components of the -- that are aluminum similar to the rims of the vehicle were still intact.

Q.   Now, when you looked under the hood and looking at these diagrams, were the components under the hood generally in the same place that they should be?

A.   Yes, they did not shift from their position of the engine.

Q.   So based on your knowledge and experience as an automotive technician, what conclusions did you reach based on what you

saw under the hood?

A.    My conclusion there was that the fire did not originate from the engine compartment.

Q.    And is this your conclusion based on a reasonable degree of technical certainty?

A.    Yes.

Q.    And after you examined the engine compartment, what did you do next?

A.    I walked around to where the door was open on Howard Miller Junior's side of the vehicle, the passenger door.  I noticed some unlikely amount of black soot on the rocks and on the dirt around the door.  There was a mesquite tree there that was scorched from flames about 4 feet from the door, probably a little bit closer, 3 or 4 feet.  That's almost like that was the area where the soil and the rocks got the most flames burnt/charred.

        Something that -- I was very actively -- as a kid, I would play with fire and matches too much.  I burned down my mom's house when I was four years old.  That didn't cut it.  So I played with --

        THE COURT:  Accidentally, right?

        THE WITNESS:  Accidental little fire.  It wasn't intentional.

        MR. EUBANKS:  Thank you for that clarification, Your Honor.

THE WITNESS:  Yeah, accidentally.  So I kind of knew how soil looked when gasoline was poured on it and just lit a fire, it kind of chars the top of it.  And that's what I had seen in front of Howie's -- around Howard's door right there.

Q.   (MR. EUBANKS CONTINUING)  And just put a photo up.  This is also appended to your declaration.  Is this what you saw that day?

A.   Yes.

Q.   So the burnt -- the burning on the ground outside the passenger door?

A.   Yes.

Q.   Okay.  Now, after you looked at the outside of the passenger door that had been opened, what was the next thing that you looked at on the vehicle?

A.   I made my way to behind the vehicle and I looked under the rear of the vehicle to inspect the fuel tank to see if there was any signs of an explosion on the fuel tank.

Q.   And what did you see when you looked at where the fuel tank was or should have been?

A.   I saw that the straps holding the fuel tank were still intact.  The fuel tank itself had melted away.  But the straps were still intact as if it was holding it and the tank just melted away.  I also noticed that the body above the fuel tank didn't receive any damage.  There was no warpage on the body; it was just burnt.

Q.   Why was it important to you that the straps were intact and the underpart of the body was not warped?

A.   If it would have been an explosion, I believe there would have been warpage to the straps and to the underbody.  That's not very thick metal there.  It's more of a high-grade steel that can bend easily.

Q.   So it was your conclusion that the gas tank did not explode?

A.   It was my conclusion that the gas tank did not explode.

Q.   Okay.  Was there any other evidence on the scene that led you to believe that the fire was started by some other means than as the result of gunfire at the vehicle?

A.   One of the main evidence is the degree or how the vehicle burnt.  The paint evenly burnt around the entire vehicle.  It seems to me that it was a high, intensive heat, very high temperature for not a very long period of time.  Usually when a vehicle catches fire, it originates in one spot.  And it will start cooking the paint and baking it, and then it will get to the point where it will actually fall off and not be there any more because that's the origination to where on the opposite side of that there would be very much less damage.

Also there's -- the vehicle was ascending at the time.  It was going uphill.  You could tell by the molten metal that is running pretty much like a river here in the picture. Behind the vehicle, you see what's on the ground right there.

That is molten metal behind the vehicle from the burns.  If the fuel tank would have caught fire and it would have been full of fuel, the fuel would have ran back behind the vehicle.  It wouldn't have just simmered underneath the vehicle.  It would have fell and ran away from the vehicle and whatever remains had stayed there probably would have burnt a little bit of the vehicle but nothing to this degree.

Also judging on the damage inside of the vehicle, my conclusion is fuel was also poured inside of the vehicle.

Q.   If the gas tank had exploded, would you have expected the charring that you saw on the photograph up on the screen?

A.   No.

Q.   Why?

A.   If the tank had exploded, it would have caused just a big rapid heat, would have splashed fuel underneath and under that side of the compartment.  The -- Howard's side of the vehicle -- the Howard Junior side, the passenger, driver side -- sorry.  The passenger side front seat, would have -- that door wouldn't have even touched flame; there would be no damage on that door.

Q.   So to recap, is it your opinion that this fire was intentionally set and not caused by any mechanical failure or bullets hitting the vehicle?

A.   Yes, this was intentional.

Q.   Okay.  And is that opinion based on a reasonable degree of

technical certainty?

A.    Yes.

Q.    How long did your examination of the vehicle take on November 5, 2019?

A.    20 minutes, 30 minutes or so.

Q.    And to your knowledge, no other automotive technician had come to look at the vehicle to perform the same analysis; is that correct?

A.    That is correct.

Q.    Okay.  Do you continue to stand by your conclusions regarding what caused the fire?

A.    Yes.

Q.    Thank you, Mr. LeBaron.  At this point I want to turn to what may be a more difficult area of inquiry for you as it relates to the relationship between you and your sister Rhonita.  And we've established Rhonita was your older sister; correct?

A.    Yes.

Q.    And she was approximately five and a half years older than you?

A.    Yes.

Q.    When you were growing up, what was your relationship like with your sister Rhonita?

A.    I -- so our older siblings had left the house at a very young age.  So William, which is about two years or two and a

half years older than Rhonita, had left the house at 14 to study in Phoenix, Arizona.  Nita was probably about 12 at the time.  I was probably 6 when -- pretty much it was me -- it was Rhonita, Ruthila, me, Javier, Miguel, and Matthew which were the siblings that were left at home at the time.  At this time my mom got a job to help ends meet and Rhonita was my second mom at age 12.  She made sure I did the chores every day; made sure if I didn't do the chores, I wasn't going out to play.  She had the authority to ground me.  If I brought it up with my mom afterwards, she would just tell me that Nita's in charge and you need to listen to her and that's what happens.

Nita was very -- she was strict with disciplining me, never physical but always verbally telling me right from wrong and teaching me how to be a better kid.  Taking my younger brother Javie.  When I would go to play, take your younger brother.  That sort of thing.  I always say she was so nice to her kids because I always would bully her that she was too mean to me when we were kids.

She helped raise me.  I owe a lot to who I am today because of her.  She was 100 percent my second mom and disciplined me and taught me right from wrong and instilled a lot of good habits into me at a very young age.

Q.    I'm going to show you some photos that were attached to your -- to Exhibit 43.  Have you seen these photos before?

A.    Yes.

Q.   And what are these photos?

A.   These are Christmas and Halloween images.

Q.   And I believe you have a little pen over there, if you can just circle yourself and Rhonita in each of these pictures.

A.   (Witness complied.)

Q.   It looks like you had fun as kids together?

A.   Yes.

Q.   And were all the siblings close?

A.   Yes.  All of the siblings are close.

Q.   Do you recall how old you were or approximately how old you were when Rhonita and Howard got married?

A.   I was approximately 11, probably 11 going on 12.

Q.   And up until that time would it be fair to say that your relationship with Rhonita was more like a mother/son than it was as a sister and brother?

A.   Yes.

Q.   Was there a time when you lived in the same house as your sister Rhonita after she got married?

A.   Yes.  There was a period that we lived together afterwards.

Q.   When was that?

A.   I'd say I was about 14.  Rhonita had moved down to Mexico for a bit.  They had purchased a house that wasn't quite finished yet, and I remember helping her finishing up the house.  Me and her doing all of the work, finishing --

installing the electrical switches, the -- tiling the bathroom. The house didn't even have a septic system on it.  I went to the ranch and brought the backhoe and dug a backhoe for the septic -- big hole.  And this was just like me and her trying to figure out how to finish the house on the means that she had at the time.

Q.    During this time period did your relationship change from what used to be, like, a mother/son relationship to a sister/ brother relationship?

A.    Absolutely.  At this time in my life, I talked with her about, oh, a 14-year-old wanting to know about life, a little bit about religion, a little bit of philosophy and just bouncing questions off and on about each other.

I recall living in a house that my mom had purchased in LeBaron to -- previously we had lived in Galeana, in LeBaron, which was my grandma's old house and she was living there with us.  It was probably a two-bedroom, one-bath house. This is my fondest memory of Howard Miller Junior.  He was probably about -- I want to say about four years old at the time, probably three.  He had those rain boots, yellow rain boots with the blue sole, and he had a vendetta out for the baby cats in the backyard that he would play with.  I remember him being just covered in scratches, but him and the cat were always out to get each other.  Building the house, talking about -- just hanging out, just like siblings do, and helping

her out with everything I could.

Q.    Was there a time later on where your relationship with Rhonita got even closer?

A.    Yes.

Q.    And when was that?

A.    My relationship with Rhonita grew more after I got married in October of '15.  That was when every time I was around Nita we hung out.  Of course my wife was good friends with her and I wasn't the same young boy trying to go after the parties.  I was more just wanting to enjoy -- probably played some cards, or something of that nature, and board games.

Q.    You can hit the clear button at the top.  Do you recognize this photo?

A.    Yes.

Q.    What is this photo?

A.    That photo -- that photo is an image taken in Rhonita's home on her birthday in Williston, North Dakota.  I had -- one of my brothers-in-law had an 18 wheeler in North Dakota that he wanted me to go check out and get ready for him to drive down to Utah.  And I had drove up to North Dakota and I had told -- I had told Howard I was going but I didn't tell Nita.  She didn't know I was going.  A very fond memory I have of her is that she opened the door and seen me getting out of the vehicle in front of her house in North Dakota, a thousand miles away from -- I would say her reaction was ecstatic and shocked.

Almost like she was looking at a ghost.  But super excited, jumpy.  I believe she was pregnant with Zack in this picture.

Q.    After you got married, how often would you speak with Rhonita between then and when she passed away?

A.    I would say between three and ten times a week judging on...

Q.    And how long would those conversations last?

A.    The conversations would go from ten minutes to an hour and a half.  It depends how much me and my time, time I had.  If I was -- which is a lot because I'm not really a phone call kind of guy.

Q.    And how often would you see each other during that time period?

A.    I would say about three to seven times a year judging on what was going on whether she went on a family trip or vacation together or not.

Q.    Do you recall when the last time you saw or spoke with her was before she was killed?

A.    The last time I spoke with her I don't recall.  I do recall the messages she had sent me, voice recording after. That was the day before I also had a voice recording from her that Howard Junior had made and he had -- this is about a day or two before.  He had sent me a message saying send me a picture of our Rhonita, my Mexico princess.  My kids are the most Mexican out of the whole family so they're deemed...

THE COURT:  Mr. Eubanks, we're about ready to take our lunch break if you're close to a breaking point here.

MR. EUBANKS:  We're switching gears right now so this is the perfect time to take a break.

THE COURT:  All right.  Let's do it now.  We'll stand in recess until 1:30 p.m.

MR. EUBANKS:  Thank you, Your Honor.

(Recess taken from 12:00 p.m. to 1:30 p.m.

THE COURT:  Before we get started, I just want to remind those in attendance that the rules prohibit electronically recording proceedings in a courtroom like this. To the extent you've been tempted or may have even attempt -- done some recording, you're going to need to destroy that and don't be tempted to electronically record proceedings.  The only person who's officially licensed to do any recording in this courtroom is this woman right here.  Okay.  And if you see someone or hear of it, you can get in touch with the court security officers.  But, please, don't be tempted that way. Pay attention to the witness's testimony.  There's an official record that's made for this and most proceedings in these courtrooms.

So, Mr. Ensrud.

MR. ELSNER:  Thank you, Your Honor.  Plaintiffs call as their next witness, Enrique Baeza.

(Interpreter sworn.)

                          ENRIQUE BAEZA,

having been first duly sworn, was examined and testified as

follows:

                       DIRECT EXAMINATION

BY MR. ELSNER:

Q.    Could you please state and spell your name.

A.    My name is Enrique Octavio Baeza Pulido.

       THE INTERPRETER:  Madam Court Reporter, do you need
that to be spelled?

       THE CLERK:  Yes, please.

       THE INTERPRETER:  Yes, certainly.  First name
Enrique, E, as in "echo," -n, as in "Nancy," -r-i-q-u-e; middle
name Octavio, O-c-t, as in "Tom," a-v, as in "Victor," -a-i-o;
last name Baeza, B, as in "boy," -a-e-z-a; mother's maiden name
Pulido, P, as in "Paul," -u-l-i-d, as in "David," -o.

       MR. ELSNER:  Well, Your Honor, I've decided with the
most difficult witness we're going to introduce the most
difficult exhibits so please bear with us.

Q.    (MR. ELSNER CONTINUING)  Good morning, sir.  Could you
please state your name for the record.

A.    Good morning to everybody.  My name is Enrique Octavio
Baeza Pulido.

Q.    And where do you live, sir?

A.    I live in Mexico City.

Q.    Can you please take a moment and introduce yourself to the

Court and explain what your current role is with respect to the investigation and prosecution of the November 4, 2019, attacks in Mexico.

A.    I am a special prosecutor assigned to the special unit on terrorism and arms traffic investigation, part of the special prosecution -- for prosecution specialized in organized crime, and I am the prosecutor in charge of the file that was created following the unfortunate events that took place on November 4, 2019.

Q.    And, Mr. Baeza, have you been given special permission from the Mexican Government to testify here this afternoon?

A.    Yes, sir.  I have received authorization from my superior to provide testimony this afternoon.

Q.    And, sir, I know you wanted to be here in person but do you have a health condition which prevented you from traveling here today?

A.    Yes.  I would have liked to be there in person.  However, towards the end of November of last year, I suffered a health problem that led me to undergo heart surgery and that is what prevented me from traveling for the time being.

Q.    Thank you, sir.  And are you being offered any compensation or payment from my office for your testimony today?

A.    None at all, sir.

Q.    Now, Mr. Baeza, did you provide my office with a CV or

résumé which outlines your education and professional experiences?

A.   Yes.  I did provide you with my CV which contains my academic background and professional experience.

MR. ELSNER:  And, Mr. Knowles, can you display that on the screen for the witness in Spanish.

And, Your Honor, I have an English version of the CV if you'd like to look at it at the same time.

Q.   (MR. ELSNER CONTINUING)  We've marked it as Demo Exhibit 56.  Sir, do you recognize this document?

A.   Yes, I do recognize it.

Q.   And what is it?

A.   This is the CV that I provided to your office, sir.

Q.   Thank you.  And is it accurate and complete?

A.   Yes, it is correct but if I may take a look at the other pages, please.

Q.   Yes, of course.

MR. ELSNER:  Could you display some of the other pages.

Your Honor, I have a translated version with the certified translation copy of it in English for you.

THE WITNESS:  Yes, it is complete.  Thank you.

Q.   (MR. ELSNER CONTINUING)  Can you briefly describe for the Court your educational experience, please.

A.   Of course.  I obtained my law degree in a private

institution, a private university, from 2003 until 2008.  It took five years.  After that I have obtained two master's degrees, one in justice administration in the Education Institute of the Attorney General's Office, and another one in criminal procedure law.  And once I finished those two master's degrees I obtained my doctorate in criminal law and at the current time I am waiting -- in the process of obtaining my degree, my diploma.

Q.    Thank you.  And as part of your educational experience, have you attended any professional courses and seminars in the United States?

A.    Yes.  I took some courses in the University of San Diego, jointly with the institution called Accesso Preparacíon.

THE INTERPRETER:  Madam court reporter, I'll spell that for you later on if you'd like.

A.    Specializing in advanced cross-examination skills in litigation and these were provided by U.S. based professors. And I also took some courses provided by the United States Department of Justice, particularly workshops on specialized litigation strategies in matters involving organized crime, interviewing and preparing for testimony in high-risk victims in an oral proceeding, legal argumentation, and also investigation plan and unit of information, and lastly courses called "Train the Trainer" where they teach you to either become a speaker or teach.  And that would be all.

Q.    Okay.  And have you also taught legal courses and engaged in professional legal speaking engagements as part of your career?

A.    Yes.  After I took that Train the Trainer course, I began offering training courses both in universities as well as in prosecutors' offices in Mexico as well as in Columbia and Ecuador and also via the Zoom platform in Peru and other countries.  I continue teaching as much as I can at the present time.  Also I had the opportunity to be invited to speak as a expert prosecutor on traffic of immigrants, and I spoke about immigration and immigration investigations before the United Nation's organization in Vienna, Austria, and that was in 2018 if I recall correctly.

Q.    Thank you.  And after graduating and working briefly in the private sector, can you outline for the court your work in the prosecutor's office in Mexico?

A.    Of course in 2009 I started working at the office of the prosecutor as an assistant prosecutor and I was later on assigned to the position of prosecutor.  I worked in the different areas as part of the Immigrant Investigation Unit; and then in December of 2019, following the events of November of 2019, I was assigned to work in the Arms Traffic Unit where I continue to work at the present time.

Q.    Okay.  Thank you, sir.  How many cases have you prosecuted over your career?

A.    Approximately over 50 cases.

Q.    Can you please describe for the Court how you are assigned to work on this particular investigation and prosecution related to the November 4, 2019, attacks?

A.    Of course, I was working at the immigrant unit related to organized crime, and I was working a lot with victims and then following these events, the head of the prosecution's office specializing in organized crime decided to create this special unit given the magnitude of the case and because it involved organized crime.  So they created this unit with several specialized prosecutors -- I'm sorry -- specialized -- several prosecutors specialized in different matters and that's the reason why I was changed over to work in the terrorism unit where the investigation was starting.  And from there on out I became more and more familiar with the investigation, and at the present time, I am the prosecutor responsible in this case.

Q.    How many different prosecutors are working on this criminal case in Mexico?

A.    Currently I am the prosecutor in charge and responsible along with another prosecutor in charge of the investigation. However, if the investigation warrants it, we will add additional prosecutors to provide support given the magnitude of the case.

Q.    And how many police investigators have been working on the case in Mexico?

A.   We have approximately some 20 -- 20 police officers assigned to the case.  However, same as I said before, if the work demands it or if there is additional work to be done, we can add more police officer up to 50 or even a hundred.

Q.   And, sir, what are your responsibilities as the lead prosecutor in this matter?

A.   My responsibilities include supervising, coordinating, all matters of the investigation done as part of this case which is also under a federal prosecutor by the name of Fabiola Padilla Cruz.  This is F, as in "Frank," -a-b, as in "boy," -i-o-l-a; last name Padilla, P, as in "Paul," -a-d-i-l-l-a; mother's maiden name Cruz, C-r-u-z.

So I am in charge of gathering all the pieces of evidence that are added to the investigation filed in order to press charges against the responsible individuals when the time comes.  Therefore, I review all the information in the investigation including police reports, testimony provided, expert information, scientific reports, among others.

Q.   And, sir, what are the various types of expert reports that have been prepared for the November 4, 2019, investigation and criminal case in Mexico?

A.   They include many expert reports.  Among them including experts -- expert reports on forensic ballistics, audio and video, fire and explosives, field criminalistics, forensic photography, genetics, land transit or identification of

vehicles, among others.

Q.   And, sir, have you worked with my office to prepare for the Court a collection of these investigative documents to be submitted as evidence in this civil case?

A.   Yes.  We received a request to provide various documents that we had gathered as part of our investigation and these were duly authenticated or certified and then provided to your office, sir.

Q.   Okay.  And did you personally review those documents and are those documents and reports true and accurate copies of the originals?

A.   Yes.  I reviewed your request for information and upon providing your office with that investigation, I reviewed each and every one of those documents.  They are a true and exact copy of the original documents contained in our investigation.

Q.   And are you aware, sir, of whether the Mexican Government has authenticated an Apostille of the documents that you provided?

A.   Yes.  As the Office of the Prosecutor we provided authenticated information.  What that means is that it is a copy of the original document, and once it was authenticated, it was duly Apostilled by the appropriate Mexican dependency in order to make it valid outside of Mexico by way of that Apostille.

Q.   Thank you.  Sir, I know you have with you either in hard

copy or electronically Exhibit 3.  Is this a collection of the documents that you provided to our office and that was Apostilled?

MR. ELSNER:  If you could display that, Jon.

THE WITNESS:  Yes.  Those are the documents that were provided and that were included in the investigation ending in number 1337/2019.

Q.  (MR. ELSNER CONTINUING)  And I'd ask you to turn to page 604 in the Spanish version or 248 in the English.  Sir, do you recognize what's displayed on page 604?

A.  Yes.  That is the Apostille provided by the office in Mexico, and it certifies the name of Fabiola Padilla Cruz, who was the other prosecutor under my charge.  And the document makes it valid outside of Mexico including all the copies that were provided.

MR. ELSNER:  Your Honor, plaintiffs would like to move Exhibit 3 into evidence.

THE COURT:  3 is received.

MR. ELSNER:  It's quite voluminous, Your Honor.  We have the original Spanish documents, a certified translation of those documents into English, and we will provide them also electronically to your office.

You can take that down, Jon.

Q.  (MR. ELSNER CONTINUING)  Mr. Baeza, did you work with my office to create and review an index of the various reports

that are contained in Exhibit 3?

A.    Yes.  We worked together with your staff in order to prepare that index because there were very many documents.

        MR. ELSNER:  Okay.  Your Honor, for the Court's convenience I'd like to pass up Demo 57 which is this index to Exhibit 3 and some other exhibits.

Q.    And to your knowledge, sir, is the index accurate and complete?

A.    Yes, it is correct and complete.

Q.    Thank you.  I'd also like to display Exhibits 4, 5, and 70.  These are additional -- oh, sorry.  Are these additional reports that you prepared and that were Apostilled for this civil case?

A.    Yes.  Correct.  These are documents that we provided that belonged to the investigation.

Q.    And were each of these collections of documents in Exhibits 4, 5, and 70, also authenticated and Apostilled?

A.    Yes.  We provided an authenticated copy and they -- of the originals and they were duly Apostilled by the same office in Mexico in order to make them valid overseas.

Q.    And are these documents that are contained in Exhibits 4, 5, and 70 also included on the index that was prepared?

A.    Of course, Exhibits 4, 5, and 70 are also part of the index.

        MR. ELSNER:  Thank you, Your Honor.  We'd like to

move Exhibits 4, 5, and 70 into evidence.

THE COURT:  4, 5, and 70 are received.

MR. ELSNER:  If the Court doesn't mind, I'm just going to leave them there and I'll carry them over on the break.

Q.   (MR. ELSNER CONTINUING)  Mr. Baeza, have you personally visited the crime scenes from the November 4, 2019, attack?

A.   Yes, sir.  Once I was assigned to the case, I personally went to the scene of the crime two or three times, accompanied by the victims of those involved in the case as well as by police agents.

Q.   Sir, could you please give the Court a brief overview of the attacks based on the evidence your office has obtained and the reports that have been submitted in Exhibits 3, 4, 5, and 70?

THE INTERPRETER:  The interpreter would like to clarify one particular term the witness used prior to rendering the translation, if that's all right with the Court?

MR. ELSNER:  Please.

THE WITNESS:  Of course, the evidence that was obtained showed that 100 heavily armed individuals had a meeting on November 3, 2019, at the ranch belonging to the leader of the criminal organization known as La Línea or the Juárez Cartel.  This leader nicknamed the "29."

In that meeting those 100 individuals were divided

into two groups.  The first group consisted of 60 individuals led by one of the leaders nicknamed Gil, G-i-l, or G-3.  These individuals -- this leader went with almost 60 assassins to the town of Agua Prieta, A-g-u-a P, as in "Paul," -r-i-e-t, as in "Tom," -a, in the state of Sonora, that's S, as in "Sam," -o-n, as in "Nancy," -o-r-a.  They headed there in separate vehicles and they were all armed.

The second group consisted of 40 individuals led by an individual named El Tolteca.  That's spelled E-l, and second word T, as in "Tom" -o-l-t, as in "Tom," -e-c-a.  This second group headed over to the town of Bavispe.  That's B, as in "boy," -a-v, as in "Victor," -i-s, as in "Sam," P as in "Paul," -e in the state of Sonora.  And this group of about 40 individuals placed themselves in two strategic points:  The first strategic point was where the attack against Rhonita and her four minor children occurred, that was the vehicle that was later set on fire and burnt; and the other strategic point was when the attack to the other two vehicles occurred.  The first vehicle was driven by victim by name of Dawna and her nine minor children, and the other vehicle driven by Christina and her minor child.

The main objective of this criminal organization was to take back the territory of Agua Prieta which at that time belonged to the Sinaloa Cartel, also named "Gente Nueva," G-e-n, as in "Nancy," -t, as in "Tom," -e N, as in "Nancy"

-u-e-v, as in "Victor," -a. The order was to shoot as anybody who travelled through that road and try to hinder the objective or the attack and also to shoot at anyone, be it a civilian, police officer, just anyone.  That was the information provided by the evidence.

Additionally, a month prior to the attack, the evidence showed that this was planned by the leaders of this criminal organization known as La Línea.

Q.   Sir, were there any video --

A.   That's the summary.

Q.   I'm sorry.  Sir, were there any videotapes seized of any portion of the attacks on November 4, 2019?

A.   Yes.  One individual by the name of Fidencio Alejandro Gonzalez Esparza was arrested.  The name is spelled F, as in "Frank," -i-d, as in "David," -e-n-c-i-o; second name Alejandro, that's A-l-e-j-a-n, as in "Nancy," D, as in "David," -r-o; last name Gonzalez, G-o-n-z-a-l-e-z; and second last name Esparza, that's E-s-p, as in "Paul," -a-r-z-a.  He was arrested and he was carrying a cell phone with him.

And as a prosecutor's office required an authorization from a judge to access the contents of that phone, we found relevant information including contacts and several videos.  Particularly one video, a 30-second long video, that was taken on November 4, 2019, at approximately 10:35.  In this video you're able to see the events at the

location where Rhonita's vehicle was attacked.  The vehicle was later set on fire.

Q.   And, sir, has your office created still images from that video recording?

A.   Yes, of course.  I personally made a request to obtain an audio report and a video report which would create a color photo sequence of the video in which some of the faces in the video were also zoomed in.

Q.   I'd like to display Exhibit 4, pages 535 and 594.  And I'd ask you to take a look, sir, and ask if you could please identify these images.

A.   Yes.  That was the report that I requested for the photo sequence of the video that I mentioned earlier.

Q.   I know there are a number of different images from this video that are contained in Exhibit 4, but could you please describe for the Court what is occurring as displayed in these images and their attack on the vehicle.

A.   Certainly.  That image shows a group of 6 to 8 assassins belonging to La Línea criminal organization coming down from the hill.  You see they are heavily armed, and they're wearing military clothing including gloves and helmets.  And they come down and attack that Suburban vehicle where Rhonita and her four minor children were traveling.  That is what is depicted on the image.

Q.   And, sir, does the video image depict the vehicle at this

point in time being on fire?

A.    You cannot see the vehicle on fire.  However, in the video you're able to hear some voices saying "burn it" and from the evidence obtained, it was concluded that the vehicle was later burnt by the assassins.  I'd like to add that that's not the first time that they burn a vehicle because that is a signature move from that criminal organization.

Q.    The criminal organization being the Juárez Cartel in La Línea?

A.    Yes.  I am referring to La Línea, also known as the Juárez Cartel.  It's a particular signature of this organization.

Q.    I'd like to show you Exhibit 5, page 35.  And in the middle of the page there, do you recognize this writing here?

A.    Yes, certainly I recognize it.

Q.    And what is it, sir?

A.    Yes.  It is a transcript that was prepared by the audio and visual expert that took a look at the video, and you can hear several phrases at the time the video was taken.

Q.    And, sir, was one of those phrases to burn the vehicle?

A.    Yes.  There are several phrases leading to that or pointing to that.  One when the vehicle was already destroyed referring to the vehicle not to be -- not to be -- correction. To be very careful, to make sure and then burn it which is unfortunately what they did.

Q.    At the end of this transcription, there is the word there

"garros."  Was that one of the words contained in the transcript?

A.    Yes.  It is part of the transcript referring to the fact that it was already done, referring to the attack or rather the order that was given.

Q.    Sir, has your office arrested --

MR. ELSNER:  You can take that down, Jon.

Q.    -- and indicted any individuals with criminal charges related to the attacks on November 4, 2019?

A.    Yes.  There are currently six people who have been arrested for the massacre or the events that occurred on November 4, 2019.  In fact, the last individual who was arrested was arrested last Tuesday.  And some other individuals I have already prepared the indictment in order to bring them to trial.  Furthermore, there have -- we have over 20 individuals who have been arrested for organized crime.

Q.    Sir, the man who took the video that we showed as a portion of Exhibit 5, has that person provided a confession to the Mexican Government?

A.    Yes.  This individual by the name of Fidencio confessed and provided a statement before the prosecution accompanied by his attorney, and he mentioned that he belongs to La Línea, the criminal organization.  He described a part of the events that happened.  He also provided information regarding his job as part of the organization which was selling drugs, and also

provided nicknames for some of the assassins who participated in this massacre.

Q.   Sir, based on the evidence collected in your investigation, what were the members of the Juárez Cartel instructed to do to anyone driving down the road to Chihuahua?

A.   The order that was issued by the criminal leader nicknamed 32 at that ranch where the hundred people were gathered together, was to shoot at anyone, be it a civilian or a public servant, who travelled down that road because the purpose was that same objective to take back the territory of Agua Prieta.

Q.   And, sir, based on your investigation and the various reports that you reviewed and provided, do you believe that the attackers knew at any point during the attacks that they were attacking women and children?

A.   Yes.  The evidence that was collected led us to conclude that at first they were to shoot at anyone and those would be the victims.  However, later on -- and particularly when it comes to Christina's vehicle, she stepped out of her vehicle with her hands up in the air saying that there were women and children and asking for them not to shoot, but still the assassins shot and killed her.  And she went down and fell on the ground dead next to her vehicle, which wouldn't have been the case had she stayed inside.  And the same happened with the other vehicle which was burnt which the attackers set on fire after the attack.

Q.    I'd like to show you, sir, what we've introduced into evidence and marked as Exhibit 70.

MR. ELSNER:  Display that, please.

Q.    Sir, do you recognize this document from the investigation?

A.    Yes, I do.

Q.    And what is it?

A.    Yes.  This is the report -- the examination report for the bodies that were examined by the expert in forensic medicine provided by the prosecution's office.  This forensic examiner first examined the bodies and he provided a description of the bodies and stated what the cause of death was.

Q.    And, sir, did your office determine whether Christina Langford; Rhonita Miller and her four children, Howard Miller Junior, Krystal Miller, Tiana and Titus Miller; Dawna Rae Langford and her two children, Trevor and Rogan Langford, were killed by the attacks carried out by the Juárez Cartel on November 4, 2019?

A.    Yes.  The evidence collected shows that it was members of La Línea criminal organization who caused -- who carried out these attacks killing these individuals we have mentioned before, because from testimony provided by these witnesses they stated that they did belong to that criminal organization, and they describe how these attacks were planned.

Q.    And, sir, do you have professional experience related to

historical activities of the Juárez Cartel?

A.    Yes.  I have been working with organized crime for several years, and I have worked several cases involving La Línea.

Q.    And, sir, based on your professional experience and your knowledge of the Juárez Cartel, have they historically engaged in attacks against civilians, public servants, political officials?

A.    Yes.  Throughout history we have had several events where La Línea has attacked civilians like this case.  Public servants, former police, prosecutors, former politicians.  And as I stated earlier, it is their signature or their habits to burn vehicles or houses down, and that has been documented as part of this investigation.

Q.    And these attacks against innocent civilians and public officials and prosecutors and former police officers, based on your experience and your expertise are they intended to coerce or intimidate the civilians or the government from acting?

A.    Yes.  La Línea's intention is to intimidate civilians so that they don't testify against them.  And also they intimidate public servants so that they don't investigate them in order for them to be able to carry out their objective, depending on the case of course.

Q.    And based on the evidence your office has collected and compiled here for the Court, do you believe that the attacks on November 4, 2019, had a similar purpose to intimidate and to

coerce civilians and government officials?

A.    Yes.  The objective was to shoot at anyone who came across that road, be it civilians, assassins from an opposing group or police.  For example, at Bavispe they shot at the victims and then in Agua Prieta they killed civilians and several police from that city.  That shows what their objective was.

Q.    And the decision to burn Rhonita LeBaron's vehicle with her and her children in it, is that another signature act of the Juárez Cartel?

A.    Yes.  Burning vehicles and burning houses down is a signature of La Línea's.  The objective is to cause terror in people.

MR. ELSNER:  Thank you, Mr. Baeza.  I don't have any further questions.

Do you have any questions, Your Honor?

THE COURT:  No.  Thank you.

Thank you, Mr. Baeza.

MR. ELSNER:  Thank you very much.

THE WITNESS:  Thank you.

THE COURT:  Mr. Elsner, I think we'll probably take our afternoon break.  And why don't we plan to break until -- it's a few minutes past three now, till 3:20 p.m.

I'll just inform the spectators and family, if you don't already know, there are restrooms at either end of the building as well as on the floors below us.  Thank you.

(Recess taken from 3:03 p.m. to 3:23 p.m.)

THE COURT:  Mr. Eubanks.

MR. EUBANKS:  Thank you.  We have Mr. LeBaron up on the stand.

<u>DIRECT EXAMINATION (Cont.)</u>

<u>BY MR. EUBANKS</u>:

Q.    THE COURT:  Mr. Eubanks.

MR. EUBANKS:  Thank you.

Q.    Mr. LeBaron, you recognize you're still under oath from earlier; correct?

A.    Correct.

Q.    I want to ask you some questions about after you left the scene of your sister's vehicle on the road to La Mora.  What did you do upon arrival in La Mora?

A.    Upon arrival I drove straight to Loretta and Kenny Miller's house and got out of the vehicle.  And I saw my mother there and I gave her a big embrace and a hug.  From there I walked to the -- they had like a guesthouse in their backyard. As I was walking to the guesthouse, because my mom had told me that Doug Johnson was in there and the bodies were there as well.  As I was walking to the guesthouse, I noticed the two forensic teams walking away from it, like I crossed paths with them as I was walking in there.

Upon entering, Douglas Johnson was in the room.  He told me that they had barely finished up the forensics on

Rhonita, Howard Junior, Krystal, Titus, and Tiana.

Q.   And did you view your sister's remains and those of your nieces and nephews?

A.   Yes.  Douglas Johnson had asked me if I wanted to see the remains.

Q.   What was your reaction to seeing those remains?

A.   After seeing the condition of the vehicle, I felt a certain -- I don't know exactly how to describe it, but I felt there was going to be something for us to bury of them actually their charred bodies, what was left of them but I did feel it was going to be less.  That there were still bodies there.  You could clearly make out that it was Rhonita's body, Titus's body, Tiana's body, Krystal's body, and Howard Junior's body.

Q.   And how did that make you feel to know that there were enough remains to be able to separate them?

A.   That made me feel, I guess, uplift, I would say.  A plus to the -- everything I was going through up until that moment.  That there was a Nita to bury, a Howie to bury.  Because of the condition of the vehicle, I didn't even know if there was -- just incinerated.

Q.   So your concern was there wouldn't be enough remains to even be able to bury anything; is that correct?

A.   Correct.

Q.   Did you personally play any role in the preparations for your sister's funeral?

A.    Yes.

Q.    What role did you play?

A.    I helped build the coffins for Rhonita, Titus and Tiana, Howard and Krystal.

Q.    And we've put in front of you another photograph from your declaration.  What is this photograph?

A.    What is this photograph?

Q.    What is this photograph, yes.

A.    This is a photograph of my brother Javier nailing in a board on the coffin's top lid while I was holding it in place.

Q.    And have you seen this photograph before?

A.    Yes.

Q.    And this indicates when you were helping construct the caskets; is that correct?

A.    Correct.

Q.    Okay.  Were you involved in obtaining the death certificates for your sister and your nieces and nephews?

A.    Yes.

Q.    What was your involvement with that?

A.    I was -- I guess I put it on myself to get them.  And I had driven -- me and my wife and my older brother Fernando had driven to Bavispe, and they only had two documents that they could make the certificates with the folios required by the government.

Q.    And you needed to get at least five death certificates; is

that correct?

A.    Correct.

Q.    And if they only had two, what did you do at that point?

A.    We drove to the next town with the next clinic to get our hands on however many they had there, which I think it was another two.

Q.    And so you've been to two towns now and have only gotten four or approximately four death certificates.  Did have you to continue to another town?

A.    Yes, we had to continue to another town.

Q.    At this point were the death certificates completed or signed by the appropriate people?

A.    No.

Q.    When was that done?

A.    Once we obtained as much as we could, we returned to Bavispe to get them filled out and signed and I recall the -- I don't know if she was the doctor or the nurse, not wanting to sign them due to --

Q.    Do you know why they didn't want to sign them?

A.    Due to the -- I felt the husband was telling her not to get involved with the cartel's business.  That's the -- the feeling I got.  Because when we first showed up for the death certificates in Bavispe:  Oh, yeah, I'll get all of them and I'll fill them out.  And when we returned, that wasn't her attitude anymore; something had changed her attitude in

completing the death certificates.

Q.    So it was your understanding they wouldn't sign the death certificates because your sister and your nieces and nephews had been killed by the cartel?

A.    Correct.

Q.    Were they eventually signed?

A.    I'm not a hundred percent sure on that.  I'm sure my older brother Fernando had stayed behind because I was running late to the funeral.

Q.    Did you make it in time for the funeral?

A.    Yes.

Q.    And were you a participant in the funeral?

A.    Yes.

Q.    And the photograph in front of you -- again, this is attached to your declaration, Exhibit 43 -- do you recognize this photograph?

A.    Yes.

Q.    And what is it?

A.    That is me, siblings, and one of my nephews carrying the casket to -- of Krystal.

Q.    This was Krystal's casket?

A.    To the best of my recollection, yes.

Q.    Where was your sister buried?

A.    My sister was buried in Colonia LeBaron, Chihuahua, Mexico.

Q.    Do you visit her grave site?

A.    Yes.

Q.    How often?

A.    I try to go every time I'm in Mexico.

Q.    Has there been any time where you did not travel to Mexico?

A.    Yes.  Shortly after the incident I was worried of driving through Mexico.

Q.    Has your sister's death had any impact on your professional work?

A.    Yes.

Q.    What impact has it had?

A.    State of lethargy, not wanting to -- all the ambition I had had prior to that kind of just went out the window.  I would get phone calls for jobs and tell them I couldn't get to it or it would be a few days or -- just a lot of -- there's a lot of stuff that was holding me back from being able to feel positive of going back to work.  When you own your own business, it's real easy to just say no, no, no, and pretty much close the doors.  And that's my state in my mind and how I was -- felt for probably the first year afterwards.  Reflected a lot on my business and my financial and home and pretty much everything involving that.

It's just hard to work when your -- when your mind's somewhere else.  It's hard to perform your job correctly when

you're thinking about what happened and remorsing and grieving and everything in the process. I couldn't get a good night's sleep. I would have to watch TV until I fell asleep. If I turned the TV off, I'd probably just start thinking about it and sometimes be up until four in the morning just contemplating what had occurred. Very difficult time for me.

Q. Did you have any large business contracts that you lost during the course of this grieving time?

A. Yes. I had a large business contract with Trade Star. They were purchasing used trailers, and I was getting them back up to condition, ready for the oil field condition and also the DOT requirements by law. Doing substantial work for them up until this had occurred. After this occurred and I stopped attending them, they started using other repair shops than me.

Q. And was there a time where they stopped using you completely?

A. Yes.

Q. How long after your sister's death did that occur?

A. I'd say about three months afterwards.

Q. And attached to your declaration -- we won't show it right now -- was an invoice of work that you had performed for Trade Star during 2019 and it was a little over $308,000 in parts and labor that had you provided them during 2019. What percentage of that 308,000 would have been just related to the labor costs?

A.   Usually about 50 percent labor cost.  I would say my profits were higher than that because of marking up merchandise.  When you buy X amount of brake pads from companies, they sell it to you cheaper and I would then pass the -- increase the cost back to normal and sell them, install the higher price if that makes sense.

Q.   And so the loss of work from Trade Star specifically has resulted in significant economic loss for you; is that correct?

A.   Correct.

Q.   Now, has your sister's death had any impact on your relationship with your wife or your children?

A.   Yes.

Q.   How so?

A.   I cherish every moment I have with my wife and kids as much as possible.  I rarely go anywhere without my wife or children after this occurred.  I don't like leaving my home without my family at all.

Q.   Now, you live in Midland, Texas, but certain of your family still lives in Mexico; is that correct?

A.   Correct.

Q.   Do you have any concern for your family members who still live in Mexico following what happened to your sister?

A.   Yes.

Q.   What is that concern?

A.   I fear for my dad and my mom, my siblings that live in

Mexico due to the -- I would say the fight or the seeking of justice that my dad has undergone or started.  I get worried that he might -- he might just piss them off one day and have an equal fate as my sister.  Or my mother for that matter or someone else in my family just to aggravate or to get back at my dad, so to say.

Q.   Now you were here for Mr. Baeza's testimony earlier; is that correct?

A.   Correct.

Q.   Mr. Baeza gave testimony regarding a video that was shot of individuals speaking while other individuals from the cartel were approaching your sister's vehicle.  Do you recall that?

A.   Yes.

Q.   One of the things that was said in that video, according to the transcript, was someone had yelled "burn it" regarding your sister's vehicle.  How did that make you feel to hear that?

A.   It makes me feel like they're -- they're conducting their acts as if they're relevant to business.  They're almost just doing it as a job.  There's no humanity in them.  They're walking around like, I would say, animals.  Just they could have had some compassion, oh, there's women and children in there and walked away but that's not what they're doing.  They're going to the vehicle and burning it or even yelling in that video "burn it."  That makes me feel like there's no ounce

of, I guess, regret on their part for what they're doing.  They could have walked away.

Q.    So do you believe the cartel leadership itself has any remorse for what happened to your sister?

A.    No.

Q.    How does that make you feel that you believe they have no remorse?

A.    That makes me feel like the cartel in Mexico is just out for their bottom line, and they do not care about human rights, about women and children, about anything as long as they get their territories and get to do what they want to do.

Q.    And do you believe that the struggles or the impact of your sister's death that you testified about is similar across all of your siblings?

A.    I do believe it's very similar across my siblings.

MR. EUBANKS:  Your Honor, I'd like to ask to move Exhibit 43, which is the personal declaration, into evidence.

THE COURT:  43 is received.

MR. EUBANKS:  Thank you, Mr. LeBaron.  I have no further questions.

THE WITNESS:  Thank you.

THE COURT:  Mr. Elsner.

MR. ELSNER:  Your Honor, I think just to close the day we'd like to offer two documents into evidence and then break for the afternoon and start up in the morning if

that's --

THE COURT:  And are we on pace, Mr. Elsner --

MR. ELSNER:  We are.  We're exactly where we thought we'd be.  We're about 18 minutes early.  If you'd like me to call a witness, we could start but I'm happy to start in the morning.

THE COURT:  All right.  We can start in the morning.

MR. ELSNER:  Can we quickly display, Jon, Exhibit 2 first.  That's Exhibit 1, if you could do 2 first.  There we go.

Your Honor, we'd like to offer Exhibit 2.  This is the U.S. Treasury's Department designation under the Foreign Narcotics Kingpin Designation Act.  The Vicente Fuentes Organization also known as the Juárez Cartel.  The date of this is June 1, 2004.  We'd like to offer that and have the Court take judicial notice of that.

THE COURT:  And I will take judicial notice -- was there an exhibit on it?  Exhibit 2 is received.

MR. ELSNER:  Thank you, Your Honor.

I'd next like to turn to Exhibit 1.  This is the executive order on imposing sanctions on foreign persons involved in the global illicit drug trade.  This was a provision enacted by President Biden.  And he designates, through this act -- if we could turn to 3-5 -- just beneath that, Jon.  And it reads:  The Juárez Cartel and its faction

unit, La Línea, continue to pose a significant threat to the United States through its drug trafficking activities along the U.S. southwest border.  According to the DEA, this organization is one of nine significant Mexican criminal organizations that pose the greatest drug threat to the United States.

Your Honor, we'd ask that the Court take judicial notice of Exhibit 1 and we offer that into evidence.

THE COURT:  I will and it is received, Exhibit 1.

MR. ELSNER:  Thank you, Your Honor.  That's all we have for this afternoon.

THE COURT:  Mr. Elsner, "La Línea" means the line?

MR. ELSNER:  That's correct, Your Honor.

THE COURT:  Okay.  So if I heard 29 from the interpreter earlier, what that was was the line not 29?

MR. ELSNER:  Well, I think perhaps she did say La Línea several times but there was also a pseudonym or a code name for one of the leaders of La Línea who was EL-29; so it's both.

THE COURT:  All right.  Thank you.

MR. ELSNER:  Thank you, Your Honor.

THE COURT:  And we'll be in recess then until 9:00 a.m. tomorrow.  Thank you all.

(Proceedings concluded at 3:45 p.m., the same day.)