UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

Howard Miller, et al.,      )
                          )
     Plaintiffs,     )
                          )
     vs.              )   File No. 1:20-cv-00132
                          )
Juárez Cartel a/k/a Vicente  )
Carrillo Fuentes         )
Organization (a/k/a "CFO")  )
a/k/a La Línea,        )
                          )
     Defendant.      )

TRANSCRIPT OF COURT TRIAL
Volume IV

Taken at
United States Courthouse
Bismarck, North Dakota
February 10, 2022

BEFORE THE HONORABLE CLARE HOCHHALTER
-- UNITED STATES MAGISTRATE JUDGE --

Ronda L. Colby, RPR, CRR, RMR
U.S. District Court Reporter
220 East Rosser Avenue
Bismarck, ND  58501
701-530-2309
Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

APPEARANCES

Mr. Michael Elsner
Mr. John Eubanks
Mr. Courtney Wolf
Motley Rice
28 Bridgeside Boulevard
Mount Plesant, South Carolina  29464

Mr. Samuel Mitchell
Mitchell & Mitchell
7161 East Rancho Vista Drive
Scottsdale, Arizona  85251

                              FOR THE MILLER PLAINTIFFS

                - - - - - - - - - -

Mr. Mark Kokanovich
Ms. Michelle Hogan
Ms. Jacey Skinner
Ballard Spahr
1 East Washington Street, Suite 2300
Phoenix, Arizona  85004-2555

Mr. Timothy Purdon
Robins Kaplan
1207 West Divide Avenue, Suite 200
Bismarck, North Dakota  58501

                              FOR THE LANGFORD PLAINTIFFS

                - - - - - - - - - -

Certificate of Court Reporter - Page 556

443

INDEX OF EXAMINATIONS

<u>WITNESSES FOR PLAINTIFFS</u>                                    <u>Page</u>

 DR. DONNA SCHUURMAN
    Direct Examination (cont.) By Mr. Eubanks        445

 ADRIANA JONES
    Direct Examination By Mr. Mitchell               496

(The above-entitled matter came before the Court, the Honorable Clare Hochhalter, United States Magistrate Judge, presiding, commencing at 9:00 a.m., Thursday, February 10, 2022, in the United States Courthouse, Bismarck, North Dakota.  The following proceedings were had and made of record in open court:)

---------------

THE COURT:  Good morning, Mr. Eubanks, and everyone.

Before we get started, I just want to remind you all again things we've talked about all week, including not electronically recording and the like.  As I mentioned, there are rules.  Be sure to wear your masks in the common areas, washrooms, elevators, stairwells, hallways, all of that.  As I mentioned, there's a committee in this and I think every federal building of other agencies.  There are many other agencies who use this building.  They have representatives who get together and set the sort of protocols, and so we want to be respectful of that because many of them have to be in this building for one reason or another and we don't know about people's vulnerabilities and all of that; so that makes sense as well.

Then in addition to that, I know sometimes we forget, but put your phasers on stun for the day or your cell phones and the like.  There are also rules against chewing gum, believe it or not, that are part of the local rules.  And there

again it may be that you're an excellent gum chewer, but the person next to you finds it annoying.  So let's just be respectful of each other as well as the attorneys and of course the witnesses and the court in general.  Okay.

Mr. Eubanks, go ahead.

MR. EUBANKS:  Thank you, Your Honor.

DIRECT EXAMINATION (Cont.)

BY MR. EUBANKS:

Q.    And, Dr. Schuurman, you do recall that you're still under oath from yesterday?

A.    Yes.

Q.    And yesterday we moved into evidence your expert report at Exhibit 26.  Do you recall that?

A.    Yes.

Q.    In preparing your expert report, what case-specific materials did you review?

A.    I reviewed about 27 different case materials including the complaint, media articles, family photos, drafts of affidavits, some handwritten journalling, and then declarations.  Do you want me to list each declaration or?

Q.    Are each of those declarations listed in your report?

A.    Yes.

Q.    We don't need to list those today.  It is a lengthy list.

A.    Okay.  Yes.  Declarations and then the expert report of Dr. Schubl, who testified earlier, some mental health records,

and, again, additional declarations.

Q.   And in addition to reviewing these case specific materials, did you interview any of the plaintiffs or any of the family members in this case?

A.   I did.  I had the opportunity to speak with Rhonita's mother, Shalom; with Rhonita's husband, Howard, we spoke twice; I spoke with Tyler, Christina's husband; spoke with Loretta, Howard's mother; Amelia, Christina's mother; and Karen Woolley, Dawna's mother; as well as I received permission from Karen to speak with Dr. Kirt Cundick who was a therapist that she had been seeing.

Q.   Okay.  How were these interviews conducted?

A.   Most of them were by Zoom.  I think one of them was by phone at the request of the party, but the pandemic restrictions at the time really kind of prevented travel and -- too close -- so they were conducted by Zoom.

Q.   Was there a particular format that you followed when conducting these interviews?

A.   Well, I first collect kind of demographic information: age, date.  I already have the details that are specific to the case because I've reviewed the materials related to the case. So I explain my goal is to try and help understand and be able to represent your situation, your needs, your children's needs, and I have an outline of specific questions that I ask to that end, but then it can go, you know, more freeform depending on

how people respond and based on answers, additional questions.

Q.   Do you recall, generally, how long these interviews took?

A.   Roughly an hour, a little bit more than an hour.

Q.   In the course of these interviews, you did not conduct any one-on-one interviews with any of the minor children; is that correct?

A.   I did not.  Correct.

Q.   Was there a reason for that?

A.   Yes.  Actually, two related reasons.  And one of the reasons has to do with their ages at the time, both at the time of the attacks as well as their current ages.  I have interviewed three-years-olds and four-years-olds but never by Zoom, and I've tried to do a few Zoom interviews with younger children, not very successfully.  And, additionally, with children and teens, young adults, I mean, they don't know who I am.  I'm a stranger coming to them.  And so in person, you have the opportunity to build some rapport, to explain who you are and what you're doing, and also hopefully be in person in a place that they are comfortable with people that they trust and that doesn't happen very easily on Zoom.

Another factor really related to it was the retraumatization, the potential retraumatization of them having to repeatedly revisit and, again, with a stranger.

Q.   In the interviews you did conduct, did you feel like the interviews were candid and reliable sources of information?

A.    Yes.

Q.    And upon your review of the case materials and interviews that you conducted, what general observations did you make?

A.    Well, there's a lot of people so I'll just say a few kind of general things because I think we're going to talk more specifically.

I think I want to say first that there is no right or wrong way to grieve.  It's not like it's a formula and you have to follow it.  I think many people are familiar with Elisabeth Kübler-Ross's stages of grief and misinterpret that as:  First I do this, then I do this, and maybe I'm doing it wrong.  And I just want to preface my remarks by this isn't about doing it right or wrong.  There's not a formula.  Every death that we experience we will experience differently because we had different relationships with every person in our lives who dies.

And so the responses that both the children and the adults, the siblings of those who died, the child siblings as well as adult siblings, are having responses that would be considered normal in a really horrific situation.  So I want to be clear I'm not judging.  I'm simply observing, and having said that, there are responses that are helpful and responses that are not as helpful.  So it's not about right and wrong, good and bad, but it is about what's helpful in the long run and what's unhelpful.

And pretty much in every person whose material I read -- their quotes, the discussions I had -- tied into the research and the work that I've been able to listen to, thousands of people who have had violent deaths in their lives over the last 30 years.  A lot of symptoms of posttraumatic stress, a lot of including -- and understandably, again -- distressing images of the traumatic deaths, irritable behavior, some angry outbursts, certainly all of these in differing degrees depending on the personalities of the specific person. Problems with concentration, sleep disturbances, diminished interest in activities that used to be enjoyed, depression, anger, loss of joy.  So, you know, again, responses that I think make sense in terms of -- and yet they are troubling responses and -- recurring nightmares, responses to noises that startle -- kind of startle responses, fear of being alone, anxiety.  All of those topics came up frequently.

Q.   Now, in the course of reviewing the materials in the interviews that you conducted, and I believe you testified about this yesterday, your focus was on the family members for Rhonita LeBaron, the family members for Christina Langford and also the parents and siblings -- or parent and siblings of Dawna Ray; is that correct?

A.   Correct.  I was not asked to speak with or evaluate in any way the children from the other family.

Q.   Okay.  Looking at the grief that children who have lost a

parent undergo, are there particular risk factors that apply in that situation?

A.   There are and there have been multiple studies, so I'll try to condense it because this is compiling about 30 years of research and -- with my clinical practice.  So risk factors for children when a parent dies -- and this is dies of any means, falling off a roof, heart attack, just the fact of having a parent die for a child.  So children are at higher risk for mental health problems, lower academic success, lower self-esteem, and a greater, what we call "external locus of control," which is kind of a fancy way of saying kind of going through life as a victim.

A second risk factor -- and, again, these are higher risk than children who have not had a parent die -- higher risk for anxiety, depression, behavioral issues, and substance abuse.  And I do want to make it clear, it doesn't mean you're fated to experience these, it just means the research shows you're at higher risk.

A third factor is higher risk for depression among girls and aggression and acting out among boys, which makes sense kind of in how we're socialized in our mainstream society.

The fourth risk factor is higher risk for depressive symptoms and future relationship challenges, and some of those challenges may be not being able to, like, bond because you're

afraid if you love someone, they'll die or they'll go away, on one end of the spectrum; and, like, on the full other end of the spectrum would be kind of clinging to people even when the relationship might not be healthy because you don't want to be alone.  And of course there's a wide range in between there as well.

Q.    And based on your professional experience over the past 30-plus years, what is the likelihood that these risk factors will manifest themselves later in life for children who lost a parent?

A.    Well, I think the likelihood is high based on a lot of different factors, which I can go into.  I think we'll talk about the specifics that make this particular situation even more challenging.

Q.    That raises a separate question is does the traumatic nature or surprise nature of a death have any impact on these risk factors that you already named?

A.    Yes.

Q.    And what additional impacts would that have that are based on the trauma or the level of violence of the death?

A.    I'll make an introductory statement and then I'll just go to those risk factors or the additional risk factors.  And we -- I and my colleagues at Dougy Center -- have been working with children as young as three up through teens and young adults who have had a family member murdered since 1988.  And

so we've had the opportunity, the unfortunate opportunity, to work with hundreds and hundreds of children from three through young adults who have experienced the violent death of a family member.

And so some of the additional risk factors for violent death versus cancer death -- as challenging as that is as well to lose a parent from cancer, car crash, something like that -- there are ten factors that have been identified by some of my colleagues/researchers in the Boston and New England area.  They've written numerous books about what they call "traumatic grief," and they've identified these ten factors that certainly have applied in the situations that I've worked with after the Oklahoma City bombing and 9/11 and some of the school shootings, kids who were impacted.

And the first one is the -- and this kind of, I think, makes logical sense -- the closer the relationship with the person or persons who died actually makes it a higher risk of negative outcomes; and, you know, I think that logically makes sense when you lose someone close to you.  I have worked with children who have experienced the death of someone that they didn't know very well and while there are factors there, the closeness of the relationship; and certainly in all of the deaths that we're talking about today, very close relationships with siblings, with parents, with spouses.

The second factor is whether the death was sudden and

occurred without warning, so unexpected which -- and I think numerous people who have talked in the last few days have talked about things like feeling numb.  Like you really can't quite register that this has happened, it's so unexpected; so out of left field.

The third one is whether the loss was untimely, and this one is really about was the person 90 -- in my situation my 91-year-old mother died a year ago and it wasn't unexpected, she's 91.  I grieved her loss.  I mourned her.  But it's very different when it's a child, someone in their prime, a mother, young mothers, mothers with -- and obviously infants that all of us would agree that -- qualitatively different than having someone die after a long life.

The fourth factor is whether the manner of death was violent and it's -- the additional aspect of that is the trauma that the person's experienced but also trauma to our systems that -- the violence and the horror, it just undermines our sense of security, control, our assumptions about how our lives will go.

And I'd just mention the word "trauma" comes from a Greek word meaning "wound," and we know with -- physical wounds can heal and often still leave scars, and the same is true for emotional wounds when they're of a really traumatic nature. The emotional wounds, we can hide them, we can cover them up, they leave scars.

The fifth factor which increases the potential for negative outcomes is whether the manner of death caused trauma to the loved one's body, and I don't think I have to overemphasize in this situation how horrific -- the images are often -- they can't be unremembered, I think, is what one of the dads that I worked with whose wife was killed in a really horrible way.  It's try to unremember, but they're still there even when we're not super conscious of them and that certainly is an issue with these deaths.

The sixth factor is whether the surviving family members believed that their loved one suffered.  It is -- it's odd to say it's easier because none of it's easy, but I'm often asked by family members if I can get police records, if I can get medical records that will help them understand better.  Did my loved one suffer and there's small comfort but some comfort when you know that, you know, it was instantaneous.  And unfortunately, as we know from Dr. Schubl's testimony, it is more likely than not and very probable, according to his testimony as a trauma surgeon, that there was certainly a time period between when the women and their children knew that they were under attack, trying to plead and get down and save themselves, and that is a complicating factor.

The seventh one is whether the death was caused by someone else's negligence, and even the word "negligence" is -- you know, someone was driving under the influence of alcohol or

driving on the wrong side of the road or something.  Really this -- this is not about negligence.  This is about abject, intentional slaughter of people.  And so it's so far beyond the category of negligence that it -- you know, and the difficulty around why someone -- how human beings could do this to human beings as was brought up by several of the witnesses.

The eighth one is whether the death is regarded as unjust.  I think there's this idea among some of us that, like, we get what we deserve in life or that we'll be protected because of our beliefs or because of we're good people or how we were raised, and unfortunately that's not how the world seems to work.  And certainly in this case kind, loving, caring mothers, children just starting their lives, just the unfairness being cheated, them being cheated of their lives and what they would have brought to their children and to their husbands and their families.  And, you know, several of the parties' mothers and others talked about some struggle with we have our beliefs about God and yet struggling with, you know, how could God let something so horrific happen; so there is no way to look at this other than it's unjust, it's unfair.

The ninth one is whether the person or persons whose actions brought about the death or held accountable for what happened, and we know in this case it is unlikely that all the parties who were involved will be brought to justice.

Actually, you know, families that I have worked with

where perpetrators were caught and found guilty, again, it's small comfort because none of that brings back the person who died.  There's no such thing as justice in bringing the person back, but in this situation I think it's additionally complicated because while some parties have been caught, for lack of a better word, it's unlikely that all parties will be held accountable.  And that's a complicating factor.

And the tenth one, which kind of ties into the other one, is whether the responsible party or parties show remorse for what happened, and I think it's highly unlikely in this case that that's a possibility.

And what all that does is it leaves so many unanswered questions, so many gaps.  And we have this tendency as human beings to try to fill in gaps.  There's been a lot of research on -- for example, when people are talking on cell phones -- and I don't know, I've certainly had this experience.  I'm in airports a lot and you hear someone on a cell phone and they're saying, you know, I told him something and you are drawn into the conversation; and I actually find myself sometimes saying, Well, why don't you tell them -- wait, that's not my conversation.  But it's something the studies have shown that our systems, the way our brains work, the way our neurobiology works, we need to try to find completion.  And some people call it closure.  I don't call it closure because I don't think there's this magical ending where you're done

grieving and, you know, it's a lifelong process, as it should be when you -- someone you love dies.  We don't want them to be forgotten.  So all of these ten factors add additional challenges for children and for adults when someone has died violently.

Q.   Now, based on your review of the case materials and your presence in court during some of this trial and also your observations at breaks and with family members, can you tell me how the closeness of the relationship factors in to this case specifically?

A.   Well, I think everyone who has testified and everything that I have read I often experience -- I think we all experience when someone dies.  I remember after 9/11, for example, everyone -- when they wrote up the summaries of the people who died, "He was the perfect father," he was -- you know, everyone was an angel.  And I was working with a lot of those families and it turned out everyone wasn't an angel, and it was really challenging for a lot of those families that were going through divorces that were actually having their loved one painted as this person who was an angel and struggling with some of the issues.

       And I have to say in this situation these three mothers, wives, sisters, daughters, everyone loved.  Were beautiful, caring women.  And their children with so much hope in front of them whose lives were just tragically ended that --

and I think numerous people have said, you know, no one had a bad word about Rhonita.  No one had a bad word about Christina, you know.  And so the closeness of family, immediate family as well as extended family -- and I do -- I will add that I think a protective factor in this is the number of loving, caring family members and community members who have surrounded the families because not everyone has that; so that is a helpful and protective factor.  And it doesn't bring them back.

Q.   Now, a few of the factors that you are listing specifically, I believe it's Factors 4 through 6, deal with a violent nature or the suffering of the individual or the trauma caused to their body.  How does that factor into this case given the circumstances of the various attacks?

A.   For those -- I mean, it's bad enough to have a loved one die and a child die and your wife die, your sister, your daughter, but the callousness and the ruthlessness and the horror of how they were killed, it just adds another dimension that isn't there when someone dies of a heart attack.  When someone dies of, you know, other means that perhaps don't feel or that feel maybe more preventable, and there was nothing really preventable here.

Q.   Now in the case of Rhonita LeBaron and her four children who were killed, part of the story that you've heard this week is that their entire remains were not able to be buried.  What impact would that particular fact have on a family knowing that

they were really incinerated beyond recognition?

A.   Well, again, it just adds more horror to the reality of what happened.  And I will also add that I have deep respect for Doug and how family members surrounded the remains of their loved ones.  And in all cases as -- I think it was Doug who mentioned, you know, it's within our beliefs and our culture not to leave people alone at death, in life or in death.  So I think while their bodies and their remains were lovingly cared for and -- it still doesn't take away the horrific-ness of -- and the graphic images which can't be unremembered.

Q.   And thinking of the attack in which Christina Langford was killed, what impact do you feel it would have on the family knowing that she exited her vehicle apparently trying to show the assailants that this was a woman, she should have been safe?  What impact would that have on them to know that she was still killed not withstanding that?

A.   Well, certainly there was the period of time from when the attack first started through her getting out of the vehicle. You know, we can conjecture that it was most likely to, you know, demonstrate you have the wrong people:  I'm just a mother; I'm just a woman with my child; don't hurt us kind of thing; wanting to protect Faith.  And the -- just, I think, not being able to protect her and imagining what she went through. Again, it complicates how people -- and, again, not closure but the ability to, I don't know, find peace is really challenging.

Q.    In terms of that ability to find peace, looking at the last three factors, how does the inability to find justice or accountability or the failure of remorse that can be seen in the perpetrators, how can that impact the family in this type of situation?

A.    I think every parent, every father, every mother has it innately in them that one of their roles is to protect their children.  Every husband wants to protect his wife and children, and the inability to do that in this horrific situation adds to the complicating factors.  It is unjust.  It is unfair.  There is no -- again, it is unlikely that every perpetrator will be found and will be brought to justice let alone express remorse for their behavior, and that is a reality that doesn't end.  You don't some magical day say, "I think I'm okay with that."  You know, it's always there.  And it's kind of like it's unresolvable.  It fosters what we call "rumination," which is a negative outcome actually.  And rumination comes from the word -- from animals that are ruminates that -- like cows that chew their cud, chew their food but they never digest it.

And so one of the challenges here is there's not going to be some nice way to neatly wrap this all in a package and tie a bow on it and say, "Okay.  I think I'm done now.  It's all over."  This has shaped and it will continue to shape every family member who loved each of these children and each

of these mothers.  There's no way to tie a pretty ribbon around it and say, "I think I'm done with all of this."

And being that justice, true justice is unlikely, it adds to the complications around being able to transform this and kind of -- I'm not a fan of words like "move on" or -- I think the words to describe grief are deeper than we're able to capture in words.  So it's not about moving on.  It's not about getting over this, which a lot of people use for people who have had someone die.  Our goal is not to get over it.  Our goal is to find ways to adapt.  And certainly all of the family members are invested in helping the children have wonderful, fruitful, happy, productive lives; and I think that does give meaning and purpose, but there's always this still underlying pain.

Q.    Now, I believe you testified earlier that emotional wounds leave scars in the same way that physical wounds leave scars; is that correct?

A.    Yes.

Q.    Where -- many of the family members in this case have really checked all of these boxes, all of these ten boxes. What type of diagnostic outcomes would you anticipate for these plaintiffs going forward?

A.    Well, again, these are really about risk factors and they're also protective factors.  But the risk factors that are greatly increased because of the nature are:  depression, major

depressive disorder, certainly Posttraumatic Stress Disorder. I'm not a big fan of calling them disorders because I think that they are actually normal responses to what has happened. They're just not helpful responses because it's hard to deal with depression. It's hard to deal with hearing loud noises and being afraid.

Another risk factor is just kind of that sense of helplessness, like feeling that your actions could not prevent what happened. Also certainly, and again it makes sense, is higher levels of anxiety, just what other bad things are going to happen. And as Doug and others were describing their lives growing up, wanting their children to have the kind of joy in growing up that they had in small farming community and being unable to actually have that joy for their children is also an added factor that makes it more challenging. I think the anxiety is something that just -- it doesn't go away. It kind of goes undercover but it doesn't just magically disappear.

And then just a higher potential propensity for panic attacks, which is also tied to Posttraumatic Stress Disorder. But unexpected feeling like you are -- can't breathe and can't -- not necessarily traceable to something that happened. It might be traceable to a loud noise. It might be traceable to feeling lost, but sometimes these can just happen that feel, like, really out of the blue.

A sixth issue that is, I think, a high risk factor

here is separation anxiety, and certainly has been evidenced by some of the children of, you know, "I don't want to be alone; I'm afraid to be alone; I don't want to sleep alone; I want to be around people," and we know that we can't always have someone with us; so...

Q.   Now, in reviewing this case, you reached certain opinions and conclusions regarding the --

A.   I did miss one.  I'm sorry.  It just popped up on the screen.

Q.   Sure.  Go ahead.

A.   Just survivor's guilt.  Why did I live and my sibling die? Why -- you know, why me?  Why our family?  Why didn't I do X, Y or Z?  I think a lot of us do that revisiting like, you know, "what if's."  What if I had done this or that?  What if they had left ten minutes later?  You know, what if I had done things differently?  And I think that that is a common thing but it also can sort of eat away at us in ways that ultimately can do us some harm.

Q.   Now, in this case you reviewed the facts relating to specifically the spouses/fathers and the children of -- the surviving children of the women who were killed that day.  I want to first look at the Miller family.  And Howard Miller lost his wife Rhonita and four of his seven children on November 4, 2019.  And as you can see on the screen, before the attack the family consisted of Howard, Rhonita, Howie Junior,

Krystal, Tristan, Amaryllis, or Ama, Zack, Tiana and Titus, but after the attack the only survivors were Howard, Tristan, Ama, and Zack.  What specific interviews did you conduct to reach the conclusions that you did regarding the Miller family plaintiffs?

A.    Well, I spoke with Howard, I spoke with Loretta, and I spoke with Shalom.  And, you know, each person has some differing viewpoints but mostly commonalities.  And, again, I want to preface that I think that the responses of -- in the field of trauma and trauma-informed practice what we say is not "what's wrong with you" but "what happened to you."  And so each of the parties that I interviewed you have to factor in their personality.  They're going to respond differently based on their personality, based on their relationships with the person/persons who died, and just kind of factor that in.  And also in situations like this we have to draw on our coping mechanisms, so how do you cope with something this horrific.  And I think in Howard's case he would also agree with some of the things that were stated that Doug stated, both Shalom and Loretta talked about, and, again, normal responses to be numb, to be in shock, to want to find ways to cope that don't keep, you know, one focussing on what happened.

And so they described -- and I think it's consistent with what others have said and to some degree I think Howard -- at least with me and I think with some others -- was not ready,

not willing -- not ready to discuss how he's doing or -- and, again, not all people are verbal about their feelings.  And I think men in our society, in our mainstream society and also in the community in which Howard was raised, you know, it's:  Be strong; be a man; be tough; keep your feelings inside."  I also think that it's very challenging to know what to do with all of those feelings.  There's, again, a lot of socialization.  He has to be strong for his kids, and so what I see is trying to be strong.  My guess is that he does have others that he can confide in, perhaps Doug -- I hope Doug, with whom he seemed to have a close relationship.

But I was also very aware -- in speaking with Howard, one of the things that he said, he said, "I know the people who did this and what they're capable of and I don't want to risk things," and so there's that aspect.  I would say that people around him perceive and I also perceive that he is holding things in.  That it's consistent with how to -- some people respond to trauma and avoidance of reminders -- excuse me -- and I would say internalizing his feelings is how he seems to be coping.

Q.    Does his avoidance or internalization of his feelings possibly put him at higher risk of longstanding emotional and physical difficulties?

A.    Unfortunately it does because our bodies and -- everything is tied together.  So there are also physical symptoms, we

know, from stress and from chronic stress, that things need to get expressed in some ways.  I'm not suggesting that everyone has to talk about their feelings.  There's lots of other ways to express, but expression will find its course.  It will happen, and -- in some ways or another, whether we like it or not because it needs to get out of our bodies, and it doesn't always happen through classic talk therapy.  It can happen through building things, through breaking things, through -- but also another piece of that is we do need to have social connection, and so I hope for Howard that he has that.  I think it's challenging too when everybody wants you to be okay and you want to be okay, and you don't necessarily know how to express "you're not okay-ness."

Q.    You were present for Howard's testimony on Tuesday; is that correct?

A.    Yes.

Q.    Was there anything in his testimony that might have altered your opinion at all?

A.    No.

Q.    Now, Rhonita and Howard's three surviving children are all still fairly young minors.  And before I talk about each child separately, are there generalized conclusions that can be reached related to the losses of siblings in such a violent and traumatic manner?

A.    Yes.  I think siblings are often referred to as "the

forgotten grievers," and so obviously there's a lot of emphasis on how the children are coping with the death of their mother, but they also lost their two oldest siblings and their two younger -- youngest siblings.  And they suddenly -- the trajectory of the family shifts; so Tristan is now the oldest boy, when, you know -- just everything has shifted in the family, in the family dynamics.  And they also lost, you know, again, the oldest and the youngest of their family.

And siblings, as all of those of us who have siblings know, play a unique role in our lives in childhood and also in adulthood.  We can fight with them.  We can argue with them but when push comes to shove, you know, most of us will do anything to protect our siblings.  And so the loss of their siblings in their lives is an additional factor to have the family memory, but also the things they used to do together and what hopes they had to do with their siblings, with their siblings' children as they grow up, all those potential opportunities have been dashed.

Q.    Now, as you said, Tristan has now been somewhat elevated to the eldest child.

A.    Uh-huh.

Q.    What facts did you learn or opinions did you reach with regard to Tristan and how he's doing now?

A.    Uh-huh.  Well, I think Shalom and Loretta, and actually Howard, seem to agree that Tristan seems to be having the most

difficulty of the three children.  That initially he was crying himself to sleep for hours.  He didn't want to sleep alone.  Even if he fell sleep alone, he would wake up and go in; and, again, having -- expressing having nightmares, similar to his father, kind of keeping it inside.  I would imagine that there is kind of a subtle pressure, not that anyone is imposing it on him but, like, "I'm the oldest now and I have to be strong," and, you know, again, personality types.  Following both the example of his father, but also the type of boy that he is to keep it inside and to not really want to talk about it.

I remember, actually, when I spoke with Howard he said that Tristan was afraid all the time.  He's shy.  Loretta added that he's scared to death at every noise.  He's terrified everywhere we go.  He does better during the day but when it gets dark, he has trouble coping.  Again, all of that makes sense.  It's just not -- ultimately, that type of anxiety is not going to serve him well.

Q.   Now turning to the now next oldest child Ama.  Now -- she's seven years old now and she's previously diagnosed with cerebral palsy.  What did you learn about Rhonita's role in assisting her with this kind of emerging deficit that she may have going forward?

A.   Well, everyone describes Ama as a girlie girl.  Like, she loves to dress up.  She loves to dance and, you know, wear jewelry and was very close to her mother in those ways.  A

girlie girl.  A mommy's girl.  She has -- likes to dance, likes music, and her mother played an important role in her life in terms of her fostering, I think, those interests, but also for her physical challenges to make sure that she was doing everything possible to help Ama be able to use her arm, her side of her body that has some paralysis.  And, yes, other people can certainly take on that role, but it's not the same as having your mother there to do those things with you.

Q.   What impact does it have on a young girl to lose their mother?

A.   Well, I think it was about 20 years ago, the first book that came out around this, really, was by a woman named Hope Edelman called "Motherless Daughters," and it became, within weeks of its publication, New York Times Best Seller.  And it was really about the long-term impact of the death of a mother on girls, and she later wrote "motherless mothers."  So -- and all of the -- and this is true for all of the children but just speaking of girls and mothers -- all of the ways that you grow up that a mother is there for you as you grow developmentally, everything from, you know, all your successes, your recitals, your graduating from high school, your first dates, you're getting attracted to a boy without your mom there.  And all of these things, it -- like, it doesn't really end.  It's she won't be there at, you know, her wedding.  She won't get to be a grandmother to her grandchildren.  She won't get to -- and

Ama will feel all those things as she grows up.  It's just -- even though she is surrounded by loving women and caring, you know, grandparents and aunts, there's a bond.  There's a mother/daughter bond that no one else can completely fill.

And I think, also, Ama likely will struggle with her physical disabilities and being different in some ways than others.  And I know despite how loving any community is, sometimes kids can bully, can be cruel to one another.  It just -- there's a phase that a lot of kids go through no matter how well they're raised that some kids just tease or -- if you're different, if you're smaller, if -- and I think that Ama will, as she goes through these different developmental ages and the challenges that come with them, just continue to really, really miss her mother.

Q.   Now, finally in the Miller family we turn to Zack, who is now five, and there's been some testimony that may be he was too young to really comprehend what happened to his mother.  What does your expertise tell you about the impact to a child who is young when their parent dies?

A.   I think a lot of people don't recognize how much two- and three-years-old -- they're sponges really.  Like, they aren't necessarily able to verbalize everything, but if we as adults learned as many new words a day as your average three-year-old, we'd all be geniuses.  So while they can't necessarily verbalize as well, certainly at two or three -- because their

favorite words at two are "no" and "why" -- I think they're observing and they're taking in what's going around them.

So regardless of what he understood at two or three, as he grows older, he will learn more and more and understand better what happened to his mother and his siblings. And I think it's not unusual for children who were very young, particularly when a parent dies, to feel that they were -- they don't even have -- they're cheated multiply as opposed to older siblings because they don't necessarily have memories of their mother. People can show photos and they can talk about their mother and their siblings, but they don't have the same memories. And that's challenging for children who have a parent die when they're, you know, very young infants, two-year-olds, three-year-olds.

Q. I'm going to switch over to Christina Langford's family. And Christina left behind her husband Tyler and their six children who are all minors. Now I believe you were here for the testimony that Tyler gave but also that his mother-in-law Amelia provided and his brother Doug yesterday. What have you -- what facts did you learn or conclusions did you reach with regard to how Tyler is coping?

A. Well, I think -- again, I really want to make it clear, this isn't about good or bad or right or wrong. I think Tyler has a different personality type than Howard, and so it seems to be easier for him to -- not that it's easy by any stretch --

but easier to be open about his fears and his concerns and his emotions. He was very open in our discussion around himself as well as his fears and concerns for his children, which were also what he shared in his testimony. Certainly concerns for himself around feeling guilty that he didn't go pick up the passports. You know, again, normal "if only I had done that" regrets.

And then also the thing that Tyler talked about yesterday, and also spoke with me about, is just this lack of joy and interest in things that used to feel like they mattered. And I would call that actually a kind of low level depression that is sort of always there. It just -- it doesn't -- it's not going away. I don't know if it will go away. And just finding joy and purpose as a challenge. Now certainly purpose in raising the children, but personal purpose and joy has been something he hasn't been able to connect with.

THE COURT: Doctor -- excuse me, Mr. Eubanks -- are there therapies or interventions available to address those type of problems and what effect, if any, would that have on that parent's children then going forward? Could it mitigate some of the damage, for example?

THE WITNESS: My answer is a little complicated: yes, no, and sometimes. So there are therapeutic processes that can be helpful. The challenges there are really finding the right people who know what they're doing. I mentioned

yesterday that the vast majority of psychologists, psychiatrists, counselors are not trained in grief and loss, and it would be -- actually, in my opinion, cause more harm than good to see the wrong person or the wrong people.

I do think that with quality therapy, with the right person, that the issues can be addressed.  But there's no magical solution because you can't bring them back, and all of those other complicating factors are woven into the fabric of who he is now.  And I don't mean -- I'm not saying doom and gloom around it.  I'm saying I do think it would be helpful for all of the parties, actually, to find quality -- and, you know, therapy sometimes has a bad name, and sometimes it's well deserved.  But there is something about being able to talk with someone who is not a family member, who has no expectations of you, you don't have to perform, you don't have to stuff things, you don't have to hide, but it's really critically important that it be the right fit and the right person for anyone including Tyler.

THE COURT:  Thank you.  Sorry, again, Mr. Eubanks.

MR. EUBANKS:  That's quite all right.

Q.   (MR. EUBANKS CONTINUING)  Now I want to turn to Christina's and Tyler's oldest child Chanel.  Chanel just turned 14 earlier this week.  What did you learn about her and her struggles since her mother was killed?

A.   Before I answer that, I want to just say -- tie into

something that Tyler said yesterday.  I don't know if he remembers saying it or not.  I think he encapsulated something really well in his testimony which -- about his children, and what he said was "they're trying to hide their feelings and they're trying to act like they're okay."  And that certainly is -- what Amelia shared about, earlier with me, about Chanel and that she goes into the closet in her bedroom and cries. She doesn't want people to see her crying.  She doesn't want to show how she's feeling.  Tyler originally, the first time I spoke with him, said, she's become super quiet, kind of numb, doesn't show how she's feeling.  And I will say it's not unusual for children of any age, maybe unusual for three-year-olds -- but as children get older, for teens -- certainly teens are more oriented to share, typically, with their friends.  That's part of normal growing up.  But there is a commonality in children that they want their parents to feel better.  They don't want to add to their pain.

I've heard kids say, like, "I feel like I have to be the super kid now to make up for, you know, my siblings who died."  I don't want to distress my father any more than he's already distressed.  So it's not unusual for them to want to hide their feelings, to want to look like they're okay because in their minds often it's, like, that's a way I can be helpful. I can be helpful by not adding any burdens to what's already, you know, happening for, in this case, my father.

And so the other thing -- and I don't know what the status of this is now, but we did see the beauty of Chanel playing the piano with her mother.  And I don't know if she's still doing that, that she had wanted to do that, but apparently she just -- at least when I last spoke with Tyler just couldn't -- again, lost the joy in that because of the association of her mother not being -- not being present.  So that diminished interest that Tyler has also expressed -- avoidance, feeling of detachment, I mean, literally going into her closet to shut herself off from the world to feel safe, to express her feelings -- it's a normal reaction but it's ultimately not going to serve her well to keep those inside.

Q.    I know this may get a little tedious going through one by one but the next child is Joel.  What were you able to learn about Joel?

A.    Well, again, and I think this ties into personality types. You know, every kid has kind of their different personality. And I think Amelia had shared, and I think Tyler referred to this a little bit yesterday, that Joel -- and some of it may have to do with age and just -- and his personality type -- like losing his temper, not being able to regulate his emotions as well as others might, like, sometimes kind of throwing fits. There's some evidence that he has experienced bullying from other kids, and then just this -- I don't know if -- it's not necessarily purposeful teasing but, like, "you don't have a

mom" that he has experienced.  "Go ask your grandma, she's your mom," and, you know, he would shout back, "She's not my mom," and just all of those challenges.

And so his challenges in regulating emotion are normal for -- particularly for boys of his age, but even more challenging with some of the -- and at that age, like, what do you do with your feelings.  Well, you know, it's easier to get angry or to hit things or to fight people, that's a way of getting them out.  And I think one of the challenges will be, for the children, is how do you find constructive channels for them to express what they're going through.  They may not be, and often aren't, sitting in a therapist's office, you know, being asked "how do you feel."  There may be other strategies with them, but certainly one of my recommendations will be finding ways to help the children channel their emotional energy.

Q.   Now, Tyler Junior, is he also experiencing some of this difficulty in channeling his energy?

A.   What was reported to me:  He cries a lot; he's small for his age, gets teased by others sometimes; he has got a little bit of the, I don't know, menace -- Dennis the Menace in him; like, I just want to -- I want to just kind of do things I know I shouldn't do and doesn't necessarily seem to care about the consequences is sort of how he was described.  Again, some of that behavior is just normal for boys of his age and -- but

the, again, crying a lot, that's healthy and still finding ways to -- that he can find positive forms of expression for his pain. And it's not a one-time thing. He's nine now. He will process this all very differently when he's 12, when he's 15, when he meets, you know, hopefully, the woman of his dreams and his mother's not there; so it is something that just is a recurring loss. I've heard people describe it, you know, as literally a piece of me is missing that can't be filled.

Q. Now, Hunter just turned seven at the end of last week, and I believe his grandmother testified that he has what seems to be a lot of separation anxiety. Was that something that you found with your discussions with family members?

A. Yes. Also I think Tyler mentioned that he -- Hunter, like, wouldn't leave his side. You know, he just wants to be by him all the time. Not horribly unusual for a child of his age, particularly who has gone through -- I mean, it's very common for children to worry about their other parent when a parent dies. And when a parent dies in situations like this, you know, I don't want you out of my sight; I'm afraid you won't come back; I don't want to lose you as well. And so those kind of safety issues -- lack of safety issues, I should say, and increased anxiety to start developing those, you know, as a very young child, that can become chronic in life. And of course we can't say 100 percent to any of the children, you know, you're safe a hundred percent of the time or nothing will

ever happen to me.  So finding that balance of helping to re-establish a sense of safety and control but he certainly -- according to Amelia and Tyler and other things that people have said about Hunter is just he has this panic, I think.  Was described to me they entered a store at one time and he saw police and like, you know, "Are they going to shoot us; are they going to kill us."  So I think that those kinds of things will likely be recurring in --

THE COURT:  Mr. Eubanks, maybe we want to take a short break this morning.  Is this a good time?

MR. EUBANKS:  If we can get through about two more inquiries and then it will be a good break.

THE COURT:  Sure.  All right.

Q.    (MR. EUBANKS CONTINUING)  Assuming that you're all right, Dr. Schuurman?

A.    Yeah.  I'm fine.  Thank you.

Q.    Much like Zack Miller, Ephraim was very young when his mother was killed.  Would you say that the impact of Ephraim is similar to what you had testified about with regard to Zack?

A.    Yes.  Just that -- I actually misspoke earlier.  I was describing Ephraim.  Hunter, some similar behaviors though, like, "I'm going to get the bad guys; I'm going to get a gun and shoot these bad guys."  Again, I'm not judging that behavior, I think it would be normal behavior for I want to fight back.  I want to make it better.  And children have

these, like, magical beliefs, really, that, like, I can do this, I might only be three or four or six but I can get those bad guys and kind of make it better; and part of that is trying to overcome kind of that lack of control and that helplessness. So both Hunter and Ephraim seem to have both that fear that someone's going to get them and shoot them and also, like, I'm going to get those bad guys.

Q.   I want to turn to Faith Johnson very quickly.  Faith was in the car during this attack but she was seven months old. How do you think her part as a player in the actual events will impact her as she becomes older?

A.   Well, similar to the other younger children, she will not have the memories of her mother so that will be something throughout her lifetime.  But there's also a really interesting thing that I have observed -- and this is, again, over 30 years of working with children -- and I have noted it quite a bit with children who were born to their mothers right after 9/11 who never got to know their mothers, I mean, their fathers. And they -- the one piece of never getting to know them is a big piece.  The other piece I think for Faith is how -- you know, how did I survive.  Like, I don't know if it will be survivor's guilt as much as just coming to terms with the meaning of that.  You know, her -- as she grows older. Because, you know, several people have described her living as a miracle.  Like how did she not get shot, and the first

reports that she had died, and then -- so that is a part of who she is to everyone else.

And sometimes, not always, we can put a little pressure on kids who are sort of these miracle children to perform in ways that aren't always consistent with their personality.  Time will tell, but when she learns more about the story, I think it will -- I don't know if it will be struggle.  That's what I've seen from most of the kids that I've worked with who are now in their twenties and so on, that they struggle with how is it that my mother was killed but I lived.

MR. EUBANKS:  Your Honor, this is probably a good place to take a break.

THE COURT:  All right.  Let's take our break until 10:40.

(Recess taken from 10:19 a.m. to 10:41 a.m.)

THE COURT:  Mr. Eubanks.

Q.    (MR. EUBANKS CONTINUING)  Dr. Schuurman, we've talked about the surviving husbands and fathers and also the surviving children.  I'd like to turn to the victims of the attack, those who were killed that day.  You were here for Dr. Schubl's testimony earlier in the week; is that correct?

A.    Yes.

Q.    Is there anything you can add to the pre-death emotional impact that -- in addition to what Dr. Schubl testified to

earlier?

A.    Well, I think Dr. Schubl's expertise in terms of working with trauma victims and the time period between impact and death illustrated that it was more likely than not that really all of the parties were alive longer -- like, were not instantly killed.  And I don't think any of us can fully imagine that horror of what they went through, the panic and the fear.  Just the emotional impact of both physical pain and knowing your life is likely to end; and for the mothers, of course, not being able to protect their children.  It's -- I don't overuse the word "unimaginable" but it is kind of unimaginable and even in the testimony yesterday from the teens who were present of -- like, it was probably only seconds but it felt like forever.  So that time distortion of, you know, it could have been seconds, it could have been minutes, and we know that for some of the victims it could have been up to 15 minutes from the time that their vehicles were impacted until their deaths; so one can only imagine the unimaginable really.

Q.    And so in addition to what would clearly be the conscious, physical pain, would your testimony be that they also had conscious emotional pain as they went through this time period?

A.    Yes.  Panic, fear, shock, horror, all of those.

Q.    Now, in the course of preparing your report, you reviewed declarations from almost all of the parents and siblings of the

decedents who were plaintiffs in this case.  From these declarations what were you able to ascertain?

A.   Well, I'll just say -- having spoken -- I just want to say a few words about Shalom, Amelia, and Karen as the mothers of daughters who were killed in this way.  That when I was talking earlier about mother/daughter bonds, I mean, those bonds continue into adulthood.  And I don't think there's really anything worse for a mother or a father than having their child die in such a horrific way.  And all three -- Amelia, Karen and Shalom -- have, you know, suffered from nightmares and trouble sleeping and trouble regulating emotion and anger, and all of those things that, again, would be normal but are also -- can be really challenging.

And I think -- not to get overly scholarly here, but we talk about -- in my field we talk about different ways that people handle grief.  And on one level we call it "instrumental and intuitive"; at two different poles.  Most people are in here (indicating), but instrumental means I'm going to do things with my grief.  And certainly we see in Adrian, "I am compelled to act on behalf of my daughter and all who were killed."  Like almost "I have to," like, "it's not a choice." It's "I have to do something with this."

And other people -- and it tends to be -- men tend to be more instrumental:  "I've got to do something more with this."  Women tend, although there are variations, to be more

closer to intuitive; so more in touch with feelings, expressing feelings, and certainly more socialized to be able to do that. But they've all experienced anxiety, nightmares, continuing anxiety, and sleep things, and that hasn't really shifted.

I think, again, in response to your earlier question, Your Honor, there are things that can be done, I know, to help alleviate some of these symptoms but I -- it's very hard for them to, like, completely go away given the nature of this tragedy.

Q.   And does the psychological literature have any other things to say about the long-term impact of the loss of a child?

A.   It does.  I mean, some of the long-term studies -- and I've been involved with an international organization called the Compassionate Friends.  It's been around for 40 years. Works exclusively with parents who have had a child die at any age, and so, you know, no matter hold your child is you're still their mother, their father, their parent.  And even 18 years -- one of the studies, large study -- longitudinal study that followed parents 18 years after the death of their child, whether it was a young child or an adult child, found that bereaved parents compared to non-bereaved counterparts had more depressive symptoms, poorer wellbeing, more health problems, and more marital conflict.  And both mothers and fathers showed high levels of what they called "enduring

distress," and these were not all parents who had violent deaths.

So I think somehow in our mainstream society we have this crazy idea that, you know, a year later you should be better or two years later you'll feel better, and actually for a lot of people the longer it goes, the better able they might be to manage symptoms but their high levels of enduring stress actually can increase.

Q.   And you said that these studies aren't necessarily for people who lost people -- someone in a violent matter.  Would the violent nature of these attacks have additional ramifications for these parents?

A.   Yes.

Q.   How so?

A.   Well, just the anxiety -- the aspects of it that invoke anxiety, fear, I think it was described to me by several people as this has changed our family but it's also changed our entire community.  Like we can't go back to the way things were.  So there's larger scale.  There's cousins.  There's friends of -- who are also impacted who aren't plaintiffs in this case, but the ripple effect is really huge.

Q.   So much like you said earlier, I believe, that these emotional wounds leave scars.  Is that the same for parents?

A.   Absolutely.  Absolutely.  I mean, again, I think as parents we try to be strong, you know, for our children,

whether they're adult children or whether they're younger children; and the fact is we can't always be strong. But it does take a toll to lose a child. It's not what we would consider the normal course of events or assumptions about how life should be. That, you know, we take care of our parents in their old age and they die, you know, good deaths and everything about this has changed assumptions around safety and the world and meaning and God and -- you know, just kind of changes everything.

Q. Now, you testified earlier that individuals who lost a sibling, that they're sort of the forgotten group. Can you explain that again?

A. Yes. I think -- and this is a lot -- in terms of the research around the impact of sibling death has been really under -- let's see -- under-appreciated how much the death of a sibling can impact us in childhood but also in adulthood. And when -- in reading the declarations of many of the adult siblings of Rhonita, Christina, and Dawna and also having some conversations with them, think we under-estimate sometimes how deeply those relationships -- the death of a sibling strikes us and impacts us even as adults.

Q. And, again, is this impact even further amplified by the violent nature of the death?

A. It is. I mean, the studies that have been done, the longitudinal "following people over time" studies have shown

that sibling death -- and, again, not even considering violent death -- is actually linked to both physical and emotional challenges, higher levels of depression, higher levels of anxiety in particular; so those would be even more ramped up when -- again, the violent nature of this.

Q.    What would be some of those physical difficulties that you were discussing?

A.    Yeah.  There are all kinds of -- blood pressure, headaches, sometimes stomach issues, often eating issues -- whether it's overeating, under eating, not enjoying food.  It really can impact our entire physical and emotional beings.  I mean, a lot of people think about grief as emotions, you know: sad, mad, all those.  But grief and grieving the death of someone in our lives is a total experience -- physical, spiritual, relational.  It impacts all aspects of our lives.

          And for siblings for whom, you know, we talked weekly or she was the glue that kept our family together; she was the one who made sure everybody's birthdays were special; you know, we had coffee on WhatsApp every two weeks.  All of those kinds of traditions and supporting one another, supporting each other's children, just the scope of it -- and I think sometimes -- I'm not saying that it's happening here but I think sometimes we don't emphasize as much, particularly for adult siblings, how much the death of a sibling impacts and, again, even heightened because of the violent nature of these

deaths.

Q.    And would the close-knit nature of these families and how they seem to -- their lives are seemingly intertwined with one another also have a negative impact on how they mourn the loss?

A.    Yes, unfortunately.  You know, it also makes sense.  The closer you are to someone, the deeper, you know, you'll mourn.  It's a relational -- there's a relationship between how close you were, how deep your relationship was, and how deeply you mourn.

Q.    How do you believe, in your expert opinion, that this -- that November 4, 2019, will continue to affect a survivor into the future?

A.    Well, there's actually a book that's coming out that I'm looking forward to reading about how -- it's by a woman named Mary-Frances O'Connor and she has -- she and her colleagues at the University of UCLA have been studying how grief changes our physical bodies, and she has very compelling evidence about how it actually changes our brains; you know, makes us, again, more receptive to anxiety, to depression.

        And so it's like when I wrote the book that I wrote called "Never the Same:  Coming to Terms With a Parent," [sic] the reason I wound up calling it "never the same" was that -- and this is in interviewing hundreds of people who are now over -- at the time of the interviews over the age of 18.  The oldest was in her nineties, all of whom had a parent die before

they were 18.  And every single one of them in discussion used that term in one way or another.  They said, "After that, things were never the same," and they could list all kinds of things that changed.  It wasn't just the death.  It was:  We moved; my dad became depressed; I lost friends; I lost the innocence of childhood and the hope of the idyllic future that I thought my children could have.

So it is one of those before-and-after moments; things cannot go back to how they were.  It doesn't mean you can't still build a healthy and joyful, productive life but it will be a challenge.  And for the children they will be revisiting this throughout their lives as they, you know, go through this sort of normal developmental tasks common to, you know, their age and their family traditions.  So it's a lifelong process and anyone who thinks that grief has, you know, this magical ending probably has not experienced it themselves.

Q.   Dr. Schuurman, are there any other conclusions that you've reached in this case that we have not covered today?

A.   I think I've covered things pretty well.

MR. EUBANKS:  Your Honor, I don't know if you have any additional questions for Dr. Schuurman.

THE COURT:  Dr. Schuurman, just with regard to forward from this point, are there -- what can be done to mitigate the effects of this on the survivors, if anything?

THE WITNESS: Yes. Yes. Excellent question. Thank you for asking that because I did, in my report, list just some recommendations that I have.

I really do believe the children as well as all of the adult family members could benefit from being -- working with grief-informed/trauma-informed counselor or therapist who is, you know, just the right person -- persons' persons, because it would have to be more than one person with the number of people, but who really have that kind of training. And I do have resources to connect to some of those people.

And then there's also fit, just fit. Like some people prefer to speak to a woman, some people prefer to speak to a man. I do believe that really skilled mental health professionals could help particularly the fathers in helping them cope and also understand some of what their children is going through because all of that won't necessarily be shared directly by the children to their parents whom they're trying to protect. And sometimes it is easier to talk to somebody who isn't part of the community as protective as having loving family members. And, again, not everyone has that. So I think these children have an advantage to have so many people who love them and care about them, but none of those people can replace their mothers and their siblings. And having just sort of more objective people who are trained, not to fix them, but to give them some coping skills.

THE COURT:  Can that fit with a very strong community belief system or careers that are in these trucking and construction industries too?

THE WITNESS:  Yeah.  I think so.  I mean, I think a lot of people have skepticism around counselors and therapists and sometimes it's for good reason because they haven't always been portrayed positively in the media and movies and so on, but also there unfortunately are a number of people who aren't well trained in the magnitude of what has happened here.  And I have a lot of stories of people that didn't find the right counselors.  But it's not about -- I mean, I do believe that this full community wants to do the best for -- to support the children and to support the parents and the dads; so I don't see that as a barrier at all.

THE COURT:  How do you respond to someone who thinks addressing those mitigating therapies is somehow an acknowledgment or a sign of weakness, whether it's a child or a parent?

THE WITNESS:  Well, I think those are coping mechanisms that we learn, particularly as men.  Although some women also exhibit that.  Like, you know, "All the talking in the world won't bring them back."  But it's -- like, "it might bring you back."  And I think a lot of people have healthy skepticism and I also hear, like, "I'm afraid that if I start to really put this out there, I won't be able to cope with it,"

and with skilled clinicians that's not what happens.

So I think skepticism is okay.  But I have worked with, personally, and have colleagues who have worked with people from all walks of life, all religions.  I've worked extensively in Utah, for example, with Mormon families who lost fathers in a very public plane crash.  There actually is a program in Utah that mothers of children started.  The name escapes me right now, but I helped to train them and set up that program.  It's still operating there, that works with children; and although it's run by Mormon families, they were very clear that they wanted to open it to the wider community as well.  So I'm hoping that's not a barrier.

THE COURT:  If you were called to apportion the impact among groups and maybe even individuals affected by this, is there a way to do that?  Is there a baseline that affects particular groups at a certain level across the board and then with individual differences?

THE WITNESS:  Well, I would say children who are often -- you know, there's a saying, like, "Children are resilient, they'll be fine," but resilience doesn't happen in a vacuum.  There are factors that contribute to resilience.  So I think because children -- just simply the fact that they have longer life spans, presumably, than us as adults, there's going to be a longer period of time where they're struggling with these issues.  And I would imagine -- and this is what I see

with children who, you know, from 9/11, from other large scale death impacts, that periodic check-in's with a therapist. Again, someone they trust, someone they can build rapport with.

So I would say -- I'm not -- I think children -- don't really like to do a hierarchy, but I would say children, spouses, parents, siblings, and that's not to compare loss, like everybody's loss is their loss. I'm not saying it's better to have someone -- it's better to have your sibling die than your parent die, I'm not implying that. But I do think because the children all have much more to grapple with, that a bit of the focus -- if I had to say, like, "ripples in a pond," would be the children, the spouses, the parents, the siblings, adult siblings.

THE COURT: We heard testimony about the loss of the individuals involved, but we also heard testimony about property loss and lifestyle loss. Can you talk a bit about how that might affect the victims?

THE WITNESS: Yeah. I mean, it was heartbreaking, really, to hear the hopes that, you know, my children could grow up in the same kind of loving, caring, and fun community, this paradise of a community where we can as kids run out and get on ATVs -- even girls know how to fix them -- you know, we can swim, we can hike, we can help each other. Wanting to have that childhood for your children that you had and to know even if you still are there, that same childhood is shifted for

them.  And, you know, as we heard, not being able to live there because of the memories, to have that stolen, really, to have that safety, that childhood that you wanted for your children, it's -- it changes everything.

THE COURT:  Thank you, Doctor.

Anything else, Mr. Eubanks?

MR. EUBANKS:  No.  Thank you, Your Honor, for your questions.

And, Dr. Schuurman, I have no further questions.

THE COURT:  Thank you very much, Doctor.

THE WITNESS:  Thank you.

MR. EUBANKS:  Your Honor, we do have some procedural matters to take care of in terms of seeking to move into evidence certain exhibits of -- or declarations of individuals who were not able to testify during the trial.

THE COURT:  Sure.

MR. EUBANKS:  I'm going to ask to move in to evidence Exhibit 37, which is a declaration of Shalom Tucker, Rhonita's mother; Exhibit 38, the declaration of Matthew LeBaron, Rhonita's youngest brother; the declaration of Corina LeBaron, Exhibit 39; the declaration of Miguel LeBaron, which is Exhibit 40; declaration of William LeBaron, Exhibit 41; the declaration of Ruthila LeBaron, Exhibit 44; the declaration of Melissa Conklin, Exhibit 45; declaration of Lian Johnson, Exhibit 47; declaration of Andre Miller, Exhibit 55; and this

one was oversight from yesterday's testimony but the declaration of Douglas Johnson at Exhibit 56.  And I'll pass these up to Your Honor.  Each of these declarations was signed under penalty of perjury.  And I'll hand these up.

THE COURT:  All right.  All right.  Then Exhibits 37, 38, 39, 40, 41, 44, 45, 47, 55, and 56 are received.

MR. EUBANKS:  I believe there was also Exhibit 42.

THE COURT:  42 --

MR. EUBANKS:  And one other matter that we wanted to bring --

THE COURT:  42 is received.

MR. EUBANKS:  Thank you, Your Honor.

We would also like to move into evidence the affidavit of Stan Smith, who is the Miller plaintiffs' expert on economic loss.  Dr. Smith has provided an affidavit under penalty of perjury submitting his reports.  Dr. Smith is in Chicago.  He's provided an economic loss report for each of the six estates that our plaintiffs represent which includes the Estate of Rhonita LeBaron, the Estate of Christina Langford, the Estate of Howard Miller Junior, the Estate of Krystal Miller, Tiana Miller, and Titus Miller.  And Dr. Smith has been accepted in hundreds of cases as an economist and forensic economist throughout the country.  And we would submit it's a fairly large exhibit but I can hand it up with the affidavit plus the economic loss reports.  These were submitted with the

pretrial brief but we wanted to submit them into evidence today.

THE COURT:  All right.  And what was that exhibit number again, Mr. Eubanks?

MR. EUBANKS:  It's Exhibit 27.

THE COURT:  27 is received.

MR. EUBANKS:  Would you like to see it?  Thank you, Your Honor.  I believe there are some procedural issues that the Langford plaintiffs would like to present.

MR. PURDON:  We're going to undertake the same process here before the final witness.  Mark will.

THE COURT:  All right, Mr. Purdon.

MR. KOKANOVICH:  Your Honor, Mark Kokanovich for the record.  We have exhibits as well, declarations, one of which was submitted yesterday for demonstrative purposes.  We'd ask to move Exhibit 72 into evidence, and then I'll just give the exhibit numbers, Your Honor, for brevity, Exhibit 28 and Exhibits 57 through 66.

THE COURT:  All right.  72, 28, 57 through 66 all received.

MR. KOKANOVICH:  Thank you, Your Honor.

THE COURT:  You're welcome, Mr. Kokanovich.

Mr. Elsner, any other testimony?

MR. ELSNER:  Yes.  We have one additional witness, Your Honor.  Mr. Mitchell is going to present the witness.

MR. MITCHELL:  Plaintiffs call Adriana Jones to the stand.

ADRIANA JONES,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. MITCHELL:

Q.    Good morning, Ms. Jones.

A.    Good morning.

Q.    Could you please state your name for the record?

A.    Adriana Jones.

Q.    And, Ms. Jones, what's your maiden name?

A.    LeBaron.

Q.    And, Ms. Jones, could you please introduce yourself to the Court and tell us where you live and how old you are.

A.    So I'm Adriana.  I'm one of Rhonita's many siblings.  I live in Utah.  I have six children.  And I'm a homemaker, a mom, just like Rhonita was.  That's part of what makes our relationship so close is every single one of our -- her seven children and my six kids, they're not more than a year apart.  Like, every pregnancy was together.  Every moment was together.  I mean, down to the last detail.  I always would tease her she was just a tiny, slim girl and of course I wasn't quite as -- you know, my bellies were always a lot bigger.  I'm, like, "You better tell them that you're, like, four months' pregnant.  You

can't tell them we're the same far along.  You look tiny."  And then she had her baby before me.

But, yes, we are very much alike.  And I've been given the honor by even all the Langford and La Mora family, "Oh, you just look so much like her.  You just make me miss Rhonita so much, you talk so much like her."  And I've been given that honor.  I get to represent her in this life with some of my attributes, I guess.

Q.    And part of representing her and honoring and fighting for justice for her is you're a plaintiff in this case; is that correct?

A.    Absolutely, yes.

Q.    And as a plaintiff -- handing you what's been marked as Exhibit 46.  Do you recognize this document?

A.    Yes, I do.

Q.    Is this a declaration that you prepared for this case?

A.    Yes.  Yes, it is.

Q.    And is it true and accurate to your knowledge?

A.    Yes, it is.

Q.    And on page 12 --

MR. MITCHELL:  If we could, Jon?

Q.    (MR. MITCHELL CONTINUING)  Is this a copy of your U.S. passport?

A.    Yes, it is.

MR. MITCHELL:  Your Honor, at this time we'd move for

Exhibit 46 to be entered into evidence.

THE COURT:  46 received.

MR. MITCHELL:  And, Jon, if we could, please show Demo 68.

Q.    (MR. MITCHELL CONTINUING) Who is this?

A.    This is our little Nita.  So Nita was the oldest of the little girls.  So there's four girls and then William and then the two little girls, right.  So they were just -- but so I was more of a mama to Nita than a contemporary best friend.  It was Ruthila that were the best buds, but Nita was -- and I know that everybody thinks that you just say they're sweet because they died, but she really was the angel of our family.  Always. Even as a little girl she wore her heart on her sleeve.  She was so sensitive.  Like, she would cry over a sad commercial. I mean, some movie, like, sob her eyes out like her mom had just passed away.  Like, just the most sensitive little child from day one.

Just -- so this is our family tradition, you have to sing to open the first gift, and this was taken on Christmas morning before she was able to open her first Christmas gift.

Q.    Was she a good singer?

A.    No, we are terrible singers.

THE COURT:  Ms. Jones, I'm just going to ask you to just slow down a bit.

THE WITNESS:  Oh, yeah.  Sorry.  That is one of my

problems.

MR. MITCHELL:  And, Your Honor, can we seal the part about her not being a good singer?

THE WITNESS:  Yes.  We just really are not gifted in that area, but it doesn't stop us from trying.  Maybe it should.  But, I mean, for a family that has no talent to make singing traditions, but it's who we are.  And, yeah, we just tease about it all the time.  Like even Howard, I mean -- cause he can carry a tune -- would always just kind of roll his eyes at us, "Like really, girls?"

Q.    (MR. MITCHELL CONTINUING)  And what did you and Nita like to do together as kids?

A.    Nita -- so we would just play house -- as kids or as adults?  Both?

Q.    Both.

A.    So as kids -- and in Spanish it's "casita."  So our lives were a lot of play, play acting, playing house, pretending to be little mamas when we weren't because that's just -- as they've described so many times growing up in Mexico is a paradise.  I mean, running out in the rain, chasing frogs.  As long as you got your chores done, you could run down the street to your best friend's little neighbor house; you didn't need a ride from mom, it's down the street.  It's dirt roads.  But so that's how our lives were just so -- I mean, just so natural and with nature and, you know, and just a lot of --

Q.    And was that in LeBaron?

A.    We lived back and forth, you know, like they've described. So we had years in the U.S. and we had years in LeBaron.

Q.    And was she this fun with all of her brothers and sisters or?

A.    Oh, for sure.  Like, I actually feel so much pressure that I have to somehow express the relationships because they were so deep, and we just are a really united family that saw each other often.  That made the effort to be with each other all the time.  That talked to each other every day.  How can I possibly express Nita's relationship with all of these people because it just -- I mean, we were -- like Corina was saying, "I didn't paint a wall without Nita coming to help pick the color.  I didn't take kids for ice cream."  Nita wouldn't have left the house without inviting the cousins.

After her funeral I walked in -- I took all the kids for ice cream, and when I walked in to the little town ice cream shop the lady started sobbing because she recognized that I was taking them to do what Nita would take them to do because she knew cause Nita would walk in with 20 kids on a regular basis.  And she just -- I walked in and she just instantly started sobbing because that's how we were.  We just -- we shared each other's lives so completely.

Q.    And I'd like to show you what's been marked as Demo 69. It's part of sharing -- well, first, do you recognize these

pictures?

A.    Yes, I do.  This is Nita's wedding.  Young love at its finest.

Q.    And you helped plan that wedding; is that right?

A.    I did.  I did help her.  She came up to Utah, did invitations.  And I'm just a little bit more that sister -- I play that role in the family, so I helped her.  And Nita just wasn't into the whole organizing and detail, she was more of a romantic at heart; and so I helped her, helped her get everything figured out.  My husband told me after I wasn't allowed to do that any more that he felt like he was so low at the wedding because I was busy with the details; but, yes, I helped her.

Q.    And she wasn't very good at giving gifts either, was she?

A.    No.  She would tell me one time -- so she had me in the gift exchange.  Cause she just -- Nita did not have a materialistic bone in her body.  She gave time and love, she didn't care about material things.  So she had me in the gift exchange and she said, "I'm just so -- I don't know what to do for you."  And I'm, like, "What do you mean?  I don't buy myself anything.  A bracelet.  You can't go wrong, it's me."  She's, like, "You have never not given me a meaningful gift.  How can I possibly live up to giving you what you've given to me."  And she ended up giving me -- because I love books and to read.  Actually I wish we could show the picture of her

inscription because it was so beautiful. *Les Mis*, copy -- a vintage book of *Les Mis*, and she wrote the most beautiful thing about how the first time she had watched that movie that the honor of the character -- and how it just reminded her of me and how much she just felt touched by that story and knew I would love it, and that's what she gave me. Which, hello, she really killed it.

Q. And you said, during your introduction to the Court, that you and Nita had children together?

A. Yes. Every single one of them. So I -- my oldest and then Howard's next and then -- I mean, just like little ladders. Every single -- some of them right the same age. I think Zack and Eleanor are three weeks apart, you know, like very, very much so.

Q. And were you present for the births of any of Nita's children?

A. I was. So I was given the honor of being at Howard Junior's and Krystal's births along with some of my other sisters. But Howard's birth was actually one of my most awe-inspiring moments because here you have this young mother, right. She's just -- and she's having a home birth. I had my first in the hospital, but she wanted her home birth. She was always very organic that way, and I was kind of nervous about it. This is the first baby but, you know, I'm going to respect her choices. And then I show up, you know, because she's --

and Rhonita's having contractions and instead of panicking like this first-time mommy expecting, to her she would, like, have a contraction, and then she would just be, like, "It's okay. It's okay. We're going to go through this together, baby. And I just can't wait to see your face." And then she would have another contraction and, "I know it's hard but when you're in my arms, it's going to be worth it." And who has that much poise? Young, young, young mom, first birth and I was, like, "You are amazing." I was just -- I've told the story a million times. Nita was born to have a lot of kids. Yeah, she was made for this.

Q.    And then you were there for Krystal's as well?

A.    I was as well, yes. I actually got in the water with Nita on Krystal's and helped pressure point her back, she was having a water birth, and just hold -- really actually held her hands, actually, as she brought little Krystal into the world.

Q.    And you cut her umbilical cord?

A.    I did, I got to cut Krystal's umbilical cord.

Q.    And what was it like to be mothers together?

A.    It's magical. It's why we all have so many kids and why we keep talking about our community because it's just magic to raise children with your siblings. It's just a force. You know, you trade off with each other. "Oh, he has a earache, what do you do for this?" It's every moment, "Let's take them to the park; let's do arts and crafts." You share everything,

and it just really makes this big family job so much easier and more enjoyable when you do it together.

Q.   And has some of that joy, as a consequence of what happened on November 4th, been taken from you and your sisters and families?

A.   It is.  It's -- it's -- how can I put it?  Like, so Rhonita, out of all of us, or Nita, she was the sweet sister, she just was.  So we all have this -- like, she was the kind of mom every conversation we'd have -- I've been asked probably a hundred times what Nita and I would talk about or my last conversation with her and it was about, "Oh, my gosh, they're peeing the bed.  How do you get organized, Adriana?  How do you he keep your house organized with all these kids."  But then the very next conversation would be, like -- I mean, in the same conversation she'd be like, "I just read the coolest blog post about how you have to teach your kids to love poetry.  So I've been doing story time tea with my kids and they're just loving every minute of it."

So she was the kind that just left everything to be present.  It was her way, right.  It was like she was so present with her children.  Like, I think Tristan read, like, when he was four years ago old.  She followed this, like, "How to teach your child to read in four easy lessons."  But to all of us, you get lost in your own, "Oh, I got dishes to do and laundry to do."  And Nita was that kind just pushed the laundry

over, "Sit down.  It's time to do your reading."  Like what mattered most for Nita, she always had time for that.

So now there's all this, "How do we be more like Nita," you know.  How do we -- how do we rise above our grief and that just paralyzing grief to be present in these moments because they matter so much.  And we know we could be gone tomorrow, like, we really, really know, but it's so hard to rise above what you're feeling in that moment to be present for them.

Q.    And I'd like to show you Demo 33.  What was it like to be present with them?

A.    What was that?  Sorry.

Q.    What was it like to be present with them?

A.    Oh, my goodness.  So Nita -- we have a lot -- you can imagine, start doing the math, that there's a lot of cousins and grandkids and, you know, chaos.  But Nita's children were for sure the sweet ones out of the whole 39 grandkids.  So Howard is actually a really easygoing guy.  He's very chill and Nita's the sweetheart; so her children were like them.  The most easygoing chill kids you'd ever met.  Like I can still hear their singsong, like, "Hi, Adriana," like, even their voices were sweet.  They just -- everything about them was just -- like, if there was drama with the cousins, Chris would be, like, "Well, I'm just going to go write a book over here, you know; I'm not getting into that."  Like it wasn't in their

nature, you know.  They just were so -- just caring and loving but sweet by nature, they really, really were.  And not just cause they're dead, I promise we've told these stories a million times.  They were -- they were just adorable.

Q.    I'd like to now transition to November 4th, and where were you and why were you there?

A.    So I was in Canada, in Victoria, on the island for my 20th wedding anniversary trip, and we had -- we were actually going home that morning, but we had taken a C-Plane and their fog warnings were too high.  So we just -- we were kind of waiting to see if the fog would clear up and they were going to let us fly back over to Vancouver.  So Dusty and I were kind of just wasting time a little bit, just kind of walking the streets, the shops, just for an hour to see if, you know, the fog would clear up enough for us to come home.

Q.    And was it during this time that you first learned that something might be wrong?

A.    So I was in the shop and of course he's just standing back, like men do, while I'm browsing and he just -- he was on his phone.  He had a weird look and he all of a sudden said, "I'm going to go out for a minute," but he had a look on his face.  So I kind of just was, like, what's going on and so I walked out.  And he said, "I don't -- I don't know quite yet what, I don't know, just something about Nita and the kids." That's the first thing he said to me.  But then the message

came through that's been played of -- you know, where you didn't know but it just said that Nita's Suburban had been shot up and was on fire.

Q.    And what are you thinking?

A.    So you have this instant sinking feeling but you, they're kidnapped, but that's still horrible to think about so you're still devastated but you're devastated because they're kidnapped.  It never even occurs to you that they would do that to them.  So you're thinking how Krystal must be feeling and are they going to take this little girl and -- you know, all your horror stories.  And so you're -- my mind was going more there.  It was, they're taking the kids and they're going to kidnap them.  Are they going to rape Nita and Krystal.  That's where my mind was going.  Like, that they kidnapped them somehow or for ransom, you know.  They have to be -- actually, I didn't really imagine what had actually happened.

Q.    And how long was it that you -- until you learned?

A.    So I feel like it was about 30 minutes and we were -- he just said, "Let's walk back and see if, you know, we can get out of -- if the C-Planes are open.  Let's just start walking back."  And I think he must have had a sensation or knew because we'd been walking together and he just walked 5 feet in front of me to hear the message.  And he turned around and he told me, "They're all gone.  They're all burned."  And I just fell to the ground.  Like, just an unbelievable -- just the

shock and the horror of what had happened.

And I don't know how long I sat there for but he finally said, "Let's see if we can get you home.  Let's see if we can go get out of here."  And I was sitting on the chairs while he went in and asked and was talking, and he came out and he told me that I needed to call my parents.  That he had heard that my parents were driving up into the mountains and that I needed to call and tell them that it was too dangerous and that we didn't know what was going on up there, that they needed to stay behind.

So I called my dad, and I said, "Dad, I don't want you to go.  I don't want you to go up there."  And he told me that if I wanted to pray for him, to pray for him but that he was going to get his baby girl.  And he handed the phone to my mom and I'm, like, "Mom, I'm, just so worried."  And she's, like, "We have to do it.  We have to go in there.  Nobody else is going to go get them.  Nobody else is going to, we have to go."  And I said, "Okay," and that's when I hung up.

Q.   And you kind of had, from growing up, the sensation that you guys had to be the first responders, you had to --

A.   So in our community -- so it might come as a surprise to you the way people reacted.  The stoicism, right, but in our community it's -- like, we have grown up being first responders to emergencies.  Like, like that house that Dayer had burned down when he was four on accident?  Like, the fire trucks

509

showed up and there was no water and they watched the house burn.  We've had way too many incidences of our lives where we couldn't depend -- there's no 911.  There's no infrastructure.

So this WhatsApp, "Send out the SOS; we need help; everybody hands onboard."  Even though you're falling apart is actual -- a normal reaction for our community.  And so this convoy and "everybody get together" and "we're in this together" is who we are.  That's how we do things.

My dad was 17 when he drove his brother that had tried -- that had committed suicide all the way from LeBaron to El Paso, and he died but that's a 3 1/2 hour drive with your brother.  So this, you are bred into this (indicating) "it's time to be strong," you know, kind of family.

And so I knew I was going to face tragedy in my life.  I knew I was going to have to be strong.  I knew that somebody was going to die in a car accident or a drowning.  But I never, ever could have prepared myself for what they did to Nita and her babies.  Ever.  Nobody could prepare themselves for what happened that day, and it's worse than anything you've ever read in a book or a movie or it's just the absolute worst thing that can happen.

Q.   And were you able to leave Canada that day?

A.   We ended up having to actually go to the airport that's further away, and so a lot of the fear and the worry for the other women and the children, I'm -- honestly, I was so

shocked, and then we only got the once -- that's when we weren't flying because we had to fly to Seattle and then from Seattle to Utah to pick up my children and then drive to Mexico.  So all those flights, like, I didn't know about them until I got off the planes.

Q.    What was it like when you first saw your children?

A.    Oh, our kids.  So part of you feels like you should -- you know, how do you -- how do you tell kids about something like this, right.  So part of you wants to hide them from the reality of what happened.  Like, do I really want my 12-year-old knowing what happened to her best -- her cousin, these friends that they grew up with.  My children had to know that they were burned alive, that they had to know that.  But at the same time it's their story too, so try to hide them from the truth is only going to make it worse.  It's -- they have to go through the process of what happened to their best friends too.  They have to be given the respect and the opportunity to grieve them too.

My in-laws actually picked up my children but my sister Ruth was watching them at her house so she had my children as well as her own.  And, I mean, Howard Junior and Lisette are the same age, you know.  Like I said, every kid is -- you know, they're just all best friends.

It was the saddest thing, little Troy, this is Corina's son who's the same age as Zack, tells his mom, "I'm so

glad Aunt Nita didn't take my friend with her that day."  But it's just so innocent.  I mean, they're three.  Like, that's the most innocent thing a three-year-old could say, right.  Like, Oh, my buddy didn't die."  You know what I mean?

Oh, we were just -- like, the heartbreaking honesty of these children.  I mean, I overheard Maclan -- so, like, and Maclan's my five-year-old son.  So he's -- him and Ama are a month apart:  "But if their bodies are burned, are they going to be naked when they get to heaven?"

And the 7-year-old, "They don't have bodies."

"But then -- but then did their brain burn?  Their soul burn too?"

"Your soul is not your body."

"Well, what is it then?"

But can you imagine five-year-olds having to process -- process what happened to them.  And that that's true for Ama and Tristan -- like, they have to somehow in their innocent, young minds come to terms with the reality, you know.  It's just -- oh, and it's true for all of the children.

Q.   You grabbed your children and drove from Utah down to Mexico; is that right?

A.   Correct.  Right.

Q.   I'd like to show you what's been marked as Demo 78.  When you got to the border, who did you see there?

A.   So my brother William had actually been in Rome, Italy on

a "once in a lifetime takes forever to get there" trip, right. And because I had had such a hard time getting off the island, we actually arrived to the border and I looked up -- because you have to get your passes on your vehicles, you know -- and there he was.  And as a sibling, as -- you're afraid -- you prepare yourself for each person.  You know you have to watch their pain, right, because you actually wish you could take it all but you know you have to observe.  So when I saw William, I was, like, this happened -- you know, just instantly ran into his arms and I held him and -- heartbreaking.  We actually ended up driving, you know, together after that point.

Q.    Your family was around the country and world when the news broke?

A.    We were.

Q.    And from the border did you drive straight to La Mora?

A.    Yes.  So this whole feeling of fear and what was happening up in the mountains cause -- I mean, this most horrible thing in the world happened and you don't know why, right.  So the level of fear of travel, of everything was -- I mean, so there was going to be a two o'clock convoy to go through and -- but they were meeting at the Pancho Villa, I believe is the name of the town, and so at a little point; and everybody was supposed to gather there and then we were all going to drive in together.  That's when I saw Lian and most of my other siblings had arrived.

Q.   And what was that like?

A.   Like I said, it's just you actually wish that you could guard them from that pain, like, but you know you can't.  So the second you see them you know you have a shared -- that how you feel is how they feel, you know; so there's that instant pull (indicating).

Q.   And did you drive past Rhonita's vehicle?

A.   Yes, I was -- I was so -- so we had arrived first to the scene where, obviously along the road, Christina and Dawna -- and you know you're kind of still kind of in shock a lot, you know, at that time.  But when I arrived to Rhonita's location --

Q.   And this on the screen --

A.   That's the moment, yes.  I actually for a few moments -- like, cause you're so numb.  But the anger, because it was so much closer to her home than I could have imagined.  So before I was imagining her far away up in the mountain, but I felt like they murdered and burned her in her backyard when I got to the site.  That they knew exactly who they were and what they were doing and they did this to her in her home.  Nita walked that exact spot.  It was so close to her home.  It made me feel like they had absolutely no fear or remorse or I was just so -- 10:30 in the morning, blatantly right there next to her home, it was like the most callous, calculated -- it changed my feelings a little bit about life.  Not just remote out there.

It was:  "They saw them, they knew they were -- this is right in her backyard and they did it any ways."  I was mad when I got to that spot.  Really, really mad.

Q.    Where did you go next?

A.    I wanted to see my mom.  My mom had shown up -- she was the only woman who showed up in that caravan.  She received baby Faith.  She said that baby Faith wasn't even crying but not cause she wouldn't have cried because she had a horse like a uhhh (phonetic), like if she already sobbed all she could sob.  Right.  She'd already done all of that and she was so dehydrated and there's not even a bottle.  And my mom said that one of the -- somebody had some, like, electrolytes and she was giving her little capfuls to see if she could but she was just so -- like, she was too exhausted to even cry.

And but my mom, when they arrived to where Nita was, there was so much happening and there was so much need for everybody, right.  Poor David Langford is rushing to his children.  I mean, from the bodies that -- my mom was actually left alone with Nita and the kids for hours because everybody had something to do, and she would tell -- she told me that she -- that she would talk to them and walk around and even observe Howie and she just really -- and she would pray for them.  And then she said she'd have moments where she got so overwhelmed she'd go sit on a rock and sob for 30 minutes, and then kind of gained some composure and go back and walk around,

and tell them that she was sorry, and tell them that it was going to be okay.  But she had lived such an unimaginable event that all I wanted was to see my mom, to hold her, to be -- to help her, to be strength for her.  I wanted to help alleviate her burden.

Q.    And did you participate in what Doug Johnson described?

A.    So Doug -- so my mom was in there with Doug the whole time when they were doing the DNA.  They needed her for the DNA sample.  She actually was part of the grafting and all of -- but when we all went inside there, their bodies were covered with sheets.  So even though we were in their presence and with them, they had them in bins but covered up.  All the things were covered (indicating).  And Doug, like he had said, asked that all the siblings come and if everybody who wasn't family could give us some time in there alone.

And he said to us that this was going to be the most horrific thing that we would ever experience in our lives and that he did not recommend it, but that she was our sister and it was our right to be there; so if we wanted to stay, we had that right or we could leave before they did it.  And not one of us left that room, not a single one of us.  When -- so, like they said, we blessed the room first and then they took Nita's body out.  It was the first time I had seen her.

Q.    And I'd like to show you Exhibit 4, page 264.

A.    That's Nita.  That's my Nita.  So for me -- it might sound

516

morbid but it was actually so solemn.  It felt very, very --
"Nita," that's what I did, "my Nita."

But I remember that her lungs and this part (indicating) -- and I felt that there was something I could touch and I remember just touching her and saying, "I'm so sorry, Nita.  I'm so sorry you had to die this way and watch your children die.  I'm so, so sorry this happened to you."  It's just all I could do.  My prayer was one of just utter grief for her mother as a mother myself that she -- that she -- cause she can handle it for her but that she had to know -- die knowing that her children were dying, being murdered.  That she -- I wished so with my heart that she had taken a first bullet to the brain and the second it happened.  But then -- but then that meant that Howie had to be the one in line, or Krystal had to be the last one.

I swear that's what traumatizes you the most and you wish that you didn't.  You wish that you didn't play it in your mind, that it didn't matter, but you can't help.  But "who died first and who had to watch the other one die" and "who's this" and you just can't help it.  You just can't help it because it's actually the hardest part of all of it.  You just -- had the van just exploded it would have been just such a blessing, but you know that's not what happened.  And as a mother, I just hurt for her mother's soul that she died knowing that.

But we all -- so they let the girls -- all the boys

stepped back and really -- us sisters all came in, and my mom actually stood back a little bit.  She felt that she had really been with them so much that she wanted to give us the chance, you know, to say goodbye, and we all actually lifted -- us girls, me and my sisters -- Nita's body (indicating), set it in her casket, and we said a prayer for Nita.  And everybody just took their moments.  We gave everybody time, like -- you know, I can't remember -- time just, you know, to say their goodbyes.

And then next we did the twins, and the twins -- I was so shocked that you could still see their little -- their little skulls and everything.  They really just were perfect little skull babies even though they were burned.  And I remember my sister-in-law Amy, she just -- we wrapped -- we swaddled them like if they were -- like left their little faces out.  You know, we swaddled them in their blankets.  And I remember her just picking up (indicating) -- little Titus up and, like, rocking him like a little baby when she walked over to go set him down in Nita's arms or what would have been the side that Nita would have held him.  Sorry.

Q.    And I'd like to show you page 16 of your declaration.

A.    Yes, that's their little swaddled body.  Just -- you just -- we're trying.  We wanted them to stay next to each other just like they did in life and be buried with their mama.

Q.    You did the same with Howie and Krystal; is that right?

A.    We did, yes.

Q.    And with Krystal, was it your husband Dustin that found something?

A.    Yes.  So when we were -- cause we were -- we were giving space in between each one of them, to say goodbye individual, even though it was all together, right.  One at a time, okay; your goodbyes.  And then we said a prayer and then we moved to the next one.

But when it -- Krystal, you know, you could tell that that's how she died.  Even in her body you could still -- but all of a sudden Dustin's just looking down and he's, like, "What's that?"  It's just such a bright fuchsia pink, you know, leather, and it was tucked so good under her arm and her fear that a chunk of her little pink leather purse survived.  And if you knew Krystal, there's always -- not a picture that she doesn't have a purse.  It was kind of her thing, right, these purses.  She always had a purse.  And Ruth, my sister, just instantly goes, "It's her purse," and we all just burst out sobbing; like, it's her and her little purse.  Just -- I know it seems -- but those are just the moments that -- like, Dustin had said at the time, he said, even his own baby's birth he never felt so solemn and real with a spirit of a moment in his entire life like it felt in that room in that moment.

Q.    And then after this you were responsible for preparing the eulogy --

A.    Yes.

Q.    -- for Nita and the kids?

A.    Right, I was.  Like I said, I'm kind of that one, right. Everybody plays their roles as siblings and I get the logistical ones a little more.  Trust me.  All the other ones have amazing bossy, take-charge roles, but I get the paperwork roles often.  And I kind of already know that I was going to be helping to write those, you know.

Q.    And where did you go to write that eulogy?

A.    So I knew I needed -- I mean, there's so many of us and people are arriving by the second, they want to give their condolences but I needed to somehow write Nita and all four of her children's stories; so I went into Nita's backyard and sat there alone to try to find a moment to collect my thoughts and write some stuff and it was so heartbreaking for me.

One of my last conversations with Nita had been about her yard.  She said that we needed to come visit her to help her.  She wanted to do a herb rock garden.  She wanted help. She had a beautiful yard with pomegranate bushes all along the edge.  All these beautiful trees that she worried about over the years getting water when she was in North Dakota, but we just needed to help her finalize it and design it.  So now I'm sitting back there, one of the last conversations I had was about this yard, and I was, like, but now I don't get to help her design it and I don't get to be here and we don't get to do those things that we planned on doing, you know.  It just -- it

was really, really hard.

Q.   And did you send her -- or make a recording?

A.   I did.  I sent myself a recording because I know it sounds -- so part of you wants to run away from your pain and part of you wants to hang on to it with all you've got because it's the last thing you got of them and you can't quite decide; so I sent myself a message so I could listen to it.

MR. MITCHELL:  I'd like to play that message, if we could, Jon.

(Exhibit 69, an audio recording, played in open court.)

Q.   (MR. MITCHELL CONTINUING)  That message has been marked as Exhibit 69.  Ms. Jones, is that the message you sent yourself that evening?

A.   Yes.

MR. MITCHELL:  Your Honor, we'd move Exhibit 69 into evidence.

THE COURT:  69's received.

Q.   (MR. MITCHELL CONTINUING)  Now, after delivering your eulogy in the weeks and months after -- and you've been present for Dr. Schuurman's testimony; is that right?  Have your siblings and your family gone through the grief that she has described?

A.   Every detail and all at different times.  So we all talk to each other a lot, we are that kind of a family where we

521

just, you know, visit, and it's just been so interesting to see the different ones try to cope.

I mean, as you've been told, my dad has become a zealous advocate to the detriment of his relationships. We used to talk about books around the dinner table and, you know, the newest Kenneth Follet (ph.), and now we talk about the case and we talk about how we're going to change and what we're going to do to help other victims in Mexico. We talk about the nonprofit we're opening up, and we talk about what we -- we wish we could go back to talking about the origins of Earth instead because the Langfords -- my sisters and I, there's moments of such grief. I mean, all of a sudden we just talk about how angry we are and just even -- just we've had moments. And I called Corina and she's like, "I know, like, someone -- the kids spilled chips in my car. It just felt like my anger wasn't normal for me for that experience." Ama describes Dayer -- her waking up and he's sobbing at 4:00 in the morning. The absolute just (indicating) -- just that the whole life and joy -- you can find purpose and love and gratitude because you have this amazing family and community. But joy, like bubbly joy, like light-hearted joy, it's just -- it's really hard to come by.

Q.   And have you spent time with Tristan, Ama, and Zack?

A.   Yes, I have.

Q.   And how are they doing?

A.   Gosh.  Well, even Howard -- I know they say he holds it all in -- but Howard has anxiety.  Like, just -- he's so -- he just plays with his keys and he's just -- that's how I see Howard.  I offered him a cup of coffee and he said no and then two hours later he said, "I can't drink coffee or anything, my anxiety."  I think I was told -- I asked his sister how he was doing and she said he wakes up at five to go to the gym and often hits the gym at night.  I remember thinking at least he's doing something productive with it instead of like drowning it in drink or something, like, but still that's just a sign of that level of anxiety that he can't get away from because he's holding so much hurt and pain inside.  So he just --

Tristan is -- oh, gosh, Tristan -- Tristan was already the sweet, introverted kid before all of this.  So he just has had such a -- just holding it inside but just, like, such a hallow sad look in his eyes.  And he really -- whenever I've been in Mexico, three weeks at a time, he comes to sleep in our bed.  He has a little -- he had to sleep with somebody so he would find and come snuggle, and you thought that he wanted to -- "Oh, did you -- you need a hug?"  He would take the hug, but he actually just wanted to lay there.  He didn't want to be -- but he would listen in his little earphones every night to a song.  It's -- you know, it's Tristan's song forever for me now.  It used to be someone I love -- it's "And the night comes and I'm all alone, and you're not here to get me

through it all," and he, I think, has probably heard that song a thousand times because he would just -- when he needed to, like, zone out from things, he would put his little headphones in and falls asleep next to you listening to that song.

Q.    And Ama and Zack?

A.    Ama?

Q.    Yeah.

A.    Oh, Ama is -- Ama does show a little more but she's just such a vivacious little girl.  But obviously just sad, and "My mommy's an angel," but it's just like -- it's how -- like my mom said, how do you -- what do you say to a child when they ask you, "Well, if you're supposed to be good and bad things don't happen to you, then why did this happen to my mom and my siblings?"  You know, they're working to comprehend what happened and just her, you know, "Could angels come to earth," and there's been so many moments with Ama.  I mean, here's this little girl that had a mom and two sisters -- she lost the women in her life.  You know, we can try to step in but Nita was the kind of mother that didn't have boundaries with their children.  Like, they were welcome in her bed, in her room, in her heart.  She wore everything -- her love on her sleeve. They had a mom that was like that.  How can anything ever for Ama replace that mom that it was "no matter what," so even though she seems to be working through it all, she's just for sure just -- has many, many questions and sad, sad moments.

And then little Zack -- oh, my goodness -- so Zack acted out more.  You know, you didn't want to discipline him. He's this cute, adorable little three-year-old but then he did smack the other little kid.  You can't let him, you know, not -- so you're watching him and you're, like, I don't -- but I recall one day, it's probably two weeks after the funerals, he told my mom, "Grandma, can we go and check and see if my mom's in her room now?"  Like in his mind it was still kind of go back to better, you know, at that time.

Q.    And, Ms. Jones, following these attacks, when you would leave your family members or you would go on trips or -- would you have to stop and say goodbye or was it hard to leave them and go places alone?

A.    It's almost impossible, obviously.  It just -- but then at the same time leaving them means seeing all my siblings that -- so when I -- leaving my children is just so difficult, but taking the trips to be with my siblings where we all have this shared loss and pain but know so there's always the mixed emotions, I guess I would say, about every moment.

Q.    And my last question is how are you doing?

A.    I'm doing better.  There's -- like I said, there's healing and finding purpose.  I have personally helped out a lot with a lot of my dad's work.  I helped write the petition to have the U.S. declare them as terrorists.  I have gone to the meetings. I have started a nonprofit with my sister Melissa and the rest

of the family members to try to help victims.  Like, we really try to put the pain into something because you just have to do something with all that pain.

But, like I said, it's just -- we're too connected with God and our families to not find joy and gratitude and love.  Sorry.  But just lightness and happiness and just that, that just seems impossible to ever get back.

MR. MITCHELL:  I have no further questions.

Thank you, Ms. Jones.

THE COURT:  Thank you, Ms. Jones, very much.

THE WITNESS:  Thank you.

THE COURT:  Any other testimony this afternoon, Mr. Mitchell?  Mr. Elsner?

MR. MITCHELL:  No, Your Honor.

MR. ELSNER:  No, Your Honor.

THE COURT:  Mr. Purdon?

MR. PURDON:  No, Your Honor.

THE COURT:  1:30 work?

MR. ELSNER:  That's fine, Your Honor.

THE COURT:  And we'll be ready for closing statements at that time?

MR. ELSNER:  Yes.

THE COURT:  Any idea of the amount of time that we need to budget for it?  I say that only because we've got, as you can imagine, things filling in on both sides of us.

MR. ELSNER:  I think that collectively we'll probably be finished in 45 to 50 minutes, certainly no more than an hour.

THE COURT:  Let's shoot for 1:30.  I've got something at 1:15, 1:00, and 4:00 we'll work around, and I've got something now in fact.  But let's shoot for 1:30 this afternoon then for closing statements, then, Counsel.  Check the exhibits in case there are additional offerings or we want to reoffer or whatever.

Mr. Purdon, you had something else?

MR. PURDON:  All good.  Thank you.

THE COURT:  All right.  We are in recess until 1:30.

(Recess taken from 12:03 p.m. to 1:30 p.m.)

THE COURT:  Mr. Elsner.

MR. ELSNER:  Your Honor, plaintiffs have submitted all their evidence and so we've rested and we'd like to now start closing statements.

May it please the Court, I want to start by thanking you for your undivided attention this week.  I've been involved in a lot of cases over my time, and I have to tell you that I don't recall a jurist who's paid as close attention to the evidence and the witnesses as you have this week; so thank you.

I also want to recognize one of my colleagues that I failed to recognize during openings and that's Antonio Martinez, if you could please stand.  Antonio is a former State

Attorney General in Mexico and he's been very helpful to us and to the families.

THE COURT:  Welcome, Mr. Martinez.

MR. MARTINEZ:  Thank you.

MR. ELSNER:  So what do we do now?  We're all going to leave.  You're going to have these stacks of paper, photographs, videos, audio messages, and I'm going to tell you I felt a little bit like that on December 5, 2019, a month and a day after these attacks when I first sat down with Adrian LeBaron and his wife Shalom and their children in Utah.

What I did when I came back to my office -- and it didn't happen as cleanly or as easily as I'm going to describe it to you -- but I tried to put it in the framework of what our legal system provides and is there a remedy here.  And I found -- when I looked at the evidence as much as I knew of it then, and I certainly know a lot more of it now, I found that it fit within the Antiterrorism Act.  That the acts here were acts that are covered by those definitions and that the remedies that people should be entitled to here fit within those remedies.

And we're going to provide you a brief, Your Honor, with Findings of Fact and Conclusions of Law and we're going to cite cases to you.  And there's going to be some other types of cases where this is a little similar and that's a little similar, and one of those is going to be from the 9/11 attacks.

I represented thousands of clients in the 9/11 attacks.  We've pursued claims for those.  So when you read some of those things, that's some of the work that we were personally involved in.

And so our recommendations and the things we cite to you come with some level of experience, but I'm going be honest and I'm going to steal a line from Elizabeth Langford's declaration which is Exhibit 33, she was Christina's sister, she writes:  "There's no playbook for this."  And she's right.  We're not going to be able to give you a perfect image of what this is for you to be able to slide these facts into something that's happened before.  I'm not sure it has.

There's a certain level of what happened here that is so different from so many of the things I've seen.  I mean, the September 11th attacks were horrid and attacks of suicide bombers are horrid, but I don't recall a case where someone shot someone point-blank range -- women, children, babies -- and then intentionally set them on fire.  I don't think I'm going to be able to provide you a framework for that.

What I can give you is some benchmarks and those benchmarks will make recommendations as to how you might scale those up or scale those down depending on the circumstances, but it's not going to be a perfect playbook.  I wish it would.  But in some sense I'm glad that this hasn't happened before, and I hope it won't happen again.

What am I going to do now?  So I thought about what I'd do in closing would be I'm going to give you some snapshots of the evidence.  I'm not going to go through everything that we've already done.  It's only been a couple of days but we've received a lot of information.  I'm going to try to hit some touch points that I think the Court could use as a mechanism to kind of evaluate certain pieces of evidence, and to evaluate certain types of damage claims that are going to be put before you for your consideration.  And I'm going to try to also focus on some evidence that's in the record that you didn't hear from the stand today so that I can kind of give voice to some of the written word that we just didn't simply have the time to provide to you.  You may find that some of those stories are better than the ones I chose to present because each of them are unique in their own special way and they all touch us in a different way.

Three spirited, vivacious, young, beautiful women in the heart of their lives.  You know, mothers capable of balancing newborns with toddlers with a household full of other kids, planning and preparing meals, homeschooling kids, making sure they each had a little special attention.  They were the center of their families' lives, and not just their immediate, nucleus family but their extended family.  Christina was 31 years old with six kids.  Rhonita 30 years old with seven kids.  Dawna 43 years old with 13 kids.  And I think about that

morning.  You know, road trips are exciting, and I'm sure they were excited as they planned for the week ahead.  Some time in Phoenix with my husband who I haven't seen in some time.  A wedding.  Packing up the car and driving all the way to North Dakota to start a new life here.  There was a lot of excitement and anticipation as they drove down that road.  But all that joy and all that excitement, it ended in a split-second.  Just that one second and all of it changed with those first shots from the Juárez Cartel into those vehicles.  It set off a chain of events that started that day and continues today into this courtroom and will likely go beyond.

Devin and Kenny Miller testified that the attackers were dressed in black camo.  They had masks, helmets, automatic rifles.  Those facts were confirmed by a video that we presented into evidence which showed that that's what the attackers were wearing, that video taken by a confessed member of the Juárez Cartel.

We entered into evidence in this case over 1,400 pages of documents contained in 23 different reports.  These were all from the investigation files of the Mexican government, they're contained in Exhibits 3, 4, 5, and 70.  And those reports contain hundreds and hundreds of photographs.  They contain evidence such as confessions and indictments and other forensic reports, and that body of reports that you have here and the testimony of the district attorney, the chief

investigator of the case, confirm the following facts:  Members of La Línea and the Juárez Cartel confessed to participating in this attack.  The order given by the leaders of La Línea was to attack anyone that came down that road.  It didn't matter who they were -- civilian, woman, child -- that was the order.

We presented evidence that the shooters knew that they were shooting at women and children.  That fact was confirmed by the district attorney; it was confirmed by Tyler Johnson who went up to that hill and measured it himself; it was confirmed by Adrian LeBaron who went up to that mesa and measured it for himself, not only what he could see but what he could hear; it was confirmed by Dr. Schubl.  They shot those vehicles, the ballistic reports show -- shot at those vehicles with over 1,300 bullets.  This was not a simple effort to kill someone, this was an effort to send a message.  And to make sure that message was clear, they then went the extra step and engaged in their signature move which was to go down that mesa, surround that vehicle, pour accelerant on it and intentionally set it on fire.

These acts, we submit, as confirmed by the district attorney who knows the Juárez Cartel, it's the intent of the cartel to create a feeling of terror, to intimidate anyone thinking about coming into their territory no matter who they are, civilian, government, police, and we know it worked.

We heard the testimony of Adrian LeBaron that the

authorities didn't want to go in.  That they were pushing the authorities to get in to get to the children.  The authorities were holding back because they were worried and scared.  Why?  They were worried and scared because of the nature of the attacks they carry out.  It's not just an act of murder.  It's an act of murder with a purpose.

These facts establish violations of the Antiterrorism Act and fit the definition of international terrorism.  In doing so, they provide this Court with subject-matter jurisdiction and they entitle these victims to damages under the Antiterrorism Act.

Those first shots fired into those vehicles on November 4th, that, I will submit, is the exact moment when you should start to consider the calculation of damage.  We know that the gunfire did not instantly kill Christina Langford.  Even though the forensic evidence showed that her Suburban was hit by over 40 bullets, we know she wasn't instantly killed because Tyler didn't see any blood inside the car.  We know she wasn't instantly killed because she exited the vehicle.  She raised her hands above her head and then she was shot.  A spot from which the shooters could see that they were shooting at a woman, a blonde-haired [sic] woman.

Dr. Schubl provided his expert testimony that even after being shot, she likely survived for somewhere in the range of 20 to 30 minutes, perhaps up to an hour.  He taught us

that in almost every circumstance, but not every circumstance, but in most circumstances a person is not immediately killed by a bullet. He also taught us that there is this mental state that exists in those that have suffered a traumatic injury. He described it as a concept of doom. This immediate and instinctive panic, bleeding internally and externally. He said your heart rate spikes. You become emotionally overloaded, and all of this is compounded when you know that no one is going to come and help you. I submit it's compounded even more when you know that your infant child is in the back seat of the vehicle and you can't do anything to help her. He said it was more likely than not that her -- that between the time when the gunshot started and when she died was somewhere in the range of 40 minutes to an hour and ten minutes.

A member of the hit team responsible for the shooting at Rhonita's vehicle said the initial gunfire lasted ten minutes; it's in one of the confessions. We offered that her vehicle was hit by .321 bullets, mostly .223s, the same caliber as the bullets shot mostly at Christina's vehicle and at Dawna's vehicle, a caliber which Christina was able to exit the vehicle and that seven of Dawna's children were able to survive those gunshots, although they were seriously wounded. We submitted evidence to prove that Rhonita managed to recline her seat, that Krystal hid under the second seat clutching that pink purse, and that Devin likely opened the passenger's side

door.  All actions of which indicate that they did not immediately die from the gunshots fired into the vehicle.  In fact, Dr. Schubl pointed out that it also indicated they were not so badly wounded they couldn't get into those positions to hide.

Dr. Schubl's opinion was that it's more likely than not that they were conscious and aware and survived the initial shooting, but we all know unfortunately that assault didn't end with ten minutes of gunfire.  Still images of the videotape shot by the La Línea confessor showed that the men descended the mesa.  They surrounded the vehicle.  They added an accelerant to the vehicle.  All of those actions of which Dr. Schubl opines were actions that Rhonita and the children would have been aware of and then they intentionally set that vehicle on fire.  Those elements of damages have to be that awareness.  That fear of the men coming down the mesa toward them.  Them being in the vehicle unable to do anything about it.

We have to -- and we don't want to but we have to think about that accelerant being poured on top of the vehicle. The fear they must have felt.  The fire.  The fear of the fire. The actual burning of the fire, inside and out.  Asphyxiation.

He opined that from the beginning of that attack until their death from fire that period was likely about an hour in time.

Baby Faith:  She also suffered during the attack that morning.  Her car was hit by at least three bullets.  She suffered severe dehydration.  She was traveling with her mother because, like Tiana and Titus, they were still being breastfed, and she was stuck in that car seat for eight to ten hours before she was rescued.  That's probably a period of time longer than she's ever been alone in her life.

These are among the pain and suffering that the estates would be entitled to damages under the Antiterrorism Act.

They're also, though, entitled to damages for the loss of enjoyment of life.  All the joys that make life worth living.  And these were not insignificant periods of time.  The life expectancy tables in Stan Smith's report and online show that Christina had a life expectancy of another 50 years, Rhonita 52 years, Howie 64 years, Krystal 71 years, Titus 76 years, Tiana 80 years.  80 years taken.  And think of all the joys of life that happen in that period of time.  Playing peek-a-boo, making a three-pointer, sewing a perfect dress for a doll, taking a perfect picture with that camera, eating a whole box of Ramen with your buddies playing Fortnite, a first kiss, getting married, raising children, making sure they eat their vegetables, getting away with your husband in an ATV after a rain storm in a desert, a fishing trip to Alaska or catching sun in Cabo.  Making good memories.

Spouses, children, parents, siblings of Christina, Rhonita, Dawna, they're all entitled to solatium damages under the Act. I want to start with Howard and Tyler. You know, we haven't mentioned this but I'm pretty sure Howard went to bed that night, on November 3rd, thinking about the trip to Phoenix he was going to take. He had been working for the last three weeks and he was finally getting a chance to see his wife, hang out with Howie a little bit, and to spend some time with daddy's little girl Krystal and the twins.

Tyler, likewise, was excited. He's rushing in the fields, in the pecan fields, to get all of the harvest done so that they could pack up that car and start that life that he's already planned for them. He's already rented the house. He's already got the trucks lined up and the jobs lined up, and he's finally going to have his whole family with him. Recall it wasn't too long before that he had worked for three months straight without seeing his family to raise some money to start this new life together with them. He too that day was excited of the trip they were about to take.

And their terror started with a phone call or a WhatsApp message. Imagine everyone calling them, asking them, "Have you spoken with your wife," and them trying not to seem worried on the outside and yet secretly going and trying to call their phones to send messages. Calls which are not received. Their anxiety growing. And then finding out about

the wife -- your wife's death via a WhatsApp message. Overhearing some message from somebody else or seeing a video of it and being so far away and unable to be there. Unable to rush there. We know that Howard rushed as fast as he possibly could all the way from New Town, North Dakota to Mexico. He had to fly to Denver. He had to fly to Phoenix. He had to drive to his sister's house. He had to convince someone to take him and then drive all night to be with his kids, to keep safe what he could keep safe.

Tyler, he gathered his five kids together, found a closet, a place to be away, locked the door and then had to have that conversation with his children.

You know, walking into a crime scene is not easy for anybody. It's one of the reasons that authorities typically don't let any family member near a crime scene, but doing so when it's your wife's crime scene looking at your vehicle with all the bullet holes in it, with your wife and children's remains in it. You know, I think as men we want to fix everything even when we can't. Even when nobody wants us to, we try to fix it. We try to protect. And I think for them we've heard and the evidence showed that there's a -- there's a guilt that goes with that, questions that are asked: "Why didn't I go? Why did I let them go?" And it's something that they have to live with, and it's something the Court can consider when it determines the right amount of damage.

You know, they are very fortunate they have the support of large families that love their children and want to help, but the burden of that, it still rests on their shoulders.  It's still their responsibility to care for those kids.  I can imagine, and they've testified to -- and Dr. Schuurman's testified to -- this feeling of, "How do I do this?  How do I raise these kids?  How do I do all the things that my wife was doing?  I don't even know all the things she was doing.  Am I going to make the right decisions?"  And then to try to do all of that in your own grief and in your children's grief, and then compounding that with, you know, I just had this dream that we would raise these kids together.  You know, raise them with someone that I love and that I know loves me, and all of that was robbed from them.

Children:  You know, Dr. Schuurman testified that we often under-estimate children and their capacity to comprehend what's going on around them, which is interesting because I've heard so many parents say, oh, my child is like a sponge, they soak up every single thing.  And I think we think they only soak up the good things.  You know, somehow we tell ourselves, well, they're not quite old enough to understand this and we have expert testimony that tells us that that assumption's wrong.

And we can go through all of each of their particular issues, you know, from Tristan's nightmares, Ama growing up

without a mother, and Chanel being disinterested in piano and other activities that she did with her mother, Hunter's separation anxiety.  We can go through all these different examples, but, you know, beyond all that diagnostics, they just miss their mom.  You know, they miss her playing piano, they miss hikes in the cave, swimming with mom in the river, cheesy potatoes, birthday cakes, and ATV rides, and they miss things they don't even know they're going to miss yet.  They too are entitled to damages for solatium.

Parents:  You know there's something unnatural about losing a child.  It's against the natural order of life to bury a child, and for parents there's that extra element of grief of being unable to protect your own children.  Rhonita's mother Shalom, she cherished the time she was able to spend with Rhonita in the last year of Rhonita's life when she had the twins in LeBaron; and she too, on November 4, when she heard the news, rushed to find Rhonita with her husband Adrian and her grandchildren.  It took them until late into the evening to reach the scene of Rhonita's attack.  The pain she faced in seeing Rhonita's vehicle, the horror, and have to clean and prepare her daughter and grandchildren to be buried.

Shalom, can you stand?

You will read in Exhibit 37 of her declaration, "I've heard people say that losing a child is the most difficult thing, and it would be rude and inappropriate for me to say

that I had it worse than anyone else but to have to collect and piece together the remains of your daughter and grandchildren is and was so difficult and heartbreaking.  We did the best we could to clean and prepare them to be buried.  We prayed with them.  We spoke with them and then we placed them in their coffins.  Howie and Krystal each in their own coffins, and Nita and Titus and Tiana together in one.  Exactly how Nita would have wanted them."

And then she writes, "And because I struggle with answering myself why this happened, I struggle to comfort my children and grandchildren.  I don't know what to do and how to explain to my grandchildren that they're safe in the car with grandma and grandpa, and that they're safe to sleep alone, and they're safe to be alone in a room."

Thank you, Shalom.

Parents too are entitled to solatium damages under the Antiterrorism Act.

And that leaves us with siblings, brothers and sisters, people you pick on more than anyone else in the world until somebody picks on them that's outside of your family and then you rush to their defense.  When you're a kid in a large family like these, I've learned that everyone has their own unique and special roles, and each one of these siblings has prepared a declaration and each one of them has their own unique story and example of the grief that they suffer.  And I

want to highlight a few of them for the Court this afternoon.

Christina's sisters.

Serina Langford, can you stand?  Are you here?

You will read, Your Honor, in Exhibit 34 that "music developed into our thing together."  She and Christina would play the piano together and we'd write music together. "Christina had an uncanny ability to keep our family together. We had a sister's chat on WhatsApp, and in that group chat with my sisters we would check in daily with each other, keep each other apprised of what was going on, and talk about when and where we would see each other next.  With Christina gone we've lost much of that connection."

Isaac Langford.  Are you here, Isaac?

Exhibit 35, Christina's brother.  He writes:  "I miss my sister.  Shortly before Christina's murder I purchased her and Tyler's home in La Mora, Mexico.  I live there when I'm in Mexico.  It's hard to be in Christina's house sometimes.  Her piano's still there.  Everyone wants it but I won't give it up. It reminds me so much of her and her love of music and I cannot part with it."

Thank you, Isaac.

Kerah Ray.  Are you here, Kerah?

Exhibit 50.  She's Dawna's sister.  They were roommates growing up.  She writes:  "Dawna's devotion to God and her family was inspiring.  It inspired me to be a better

542

mother, wife, sister, daughter, and friend."

Thank you.

Jaremy Ray, Exhibit 49: "I miss my sister every day. I think about her every day. Especially on the fourth of each month when my mom will say to me and my siblings in a text message, get up, we're having coffee with Dawna."

Thank you.

Amber Ray. Amber's declaration is Exhibit 54. "Dawna was like my mom in many ways and she was the person I turned to for advice and support. There have been numerous times over the last two years when I've said to myself, Dawna, I really wish I could talk to you right now. I could really use some help."

James Ray, Exhibit 52: "Life is short. No one knows when your last day is. Sometimes it hits me hard. I try not to ponder on it or it gets harder."

Thank you, James.

Justin Ray, Exhibit 57: "Things are different now that my sister's gone. I think that things seem like they should be getting better but the more that time goes by, the more I miss Dawna and the harder the loss seems to get. Memories will kick in and I'll get very emotional or lonely. Even though I know it's part of life and I have to deal with it, it's still very difficult at times to focus on my family and work."

Thank you, Justin.

Lian Johnson. You know, her declaration speaks to her special relationship with Rhonita but I wanted to focus on this part that she wrote: "Howie Junior's the same age as my fourth son Xavier. They were best friends and enjoy playing Fortnite on their Xboxes together. I told my kids that they needed to stay off their computers and get to bed early on Sunday, November 3rd, and I went to check on my son Xavier and found him playing Fortnite on the computer with Howie and I yelled at him. And Howie chimed in, 'Please, Aunt Lian, let us finish our game. I never get to play.' I told them that they could continue their game but only if Howie told me he loved me. And he responded, 'Aunt Lian, I love you. You're the best aunt in the whole world.'"

She writes: "I believe Tristan will always carry the trauma of the November 4th attacks with him. His need for a sense of security is deep and I worry that it will never go away."

And for Zack she writes, "Zack was so young when his mom died but he remembers certain things about her. He'll often say things like, 'My mom said to do it like this but she's in heaven now.' It's cute but heartbreaking too."

Thank you, Lian.

Corina LeBaron, Exhibit 39: "I helped prepare Rhonita and the children for the funeral. Even though only

their bones were left to bury, my father insisted that we still dress them as we would have in any other circumstance.  And so he and I went through Nita's closet and my father and I decided we should dress her in Rhonita's favorite dress.  We did the same for the children.  I remember putting Howie's favorite T-shirt, motorcycle helmet, and basketball into the casket while my father diligently placed pillows into each casket to make sure that the bones would not shift during the burial."

Thank you.

Melissa, Exhibit 45:  "Every Christmas to open a present you have to sing and we always would go in age order.  In 2019, the first Christmas without her, her absence was profoundly felt.  As we passed around the mic that morning my younger brother did not have his little Rhonita to sing after him.  Every Christmas it's a reminder of her murder and the peace that is missing in my family."

She also writes:  "Since Rhonita and her children's deaths I feel like I've not been there for my three children as I should be because my own emotions are in such a tangle, I've not been able to give them the emotional support they need."

Thank you.

And lastly for today, Miguel LeBaron.  He writes:  "To this day I still feel profound sadness and grief over her death.  I find it hard to think about memories with her as it makes me feel sad to know I'll never make another memory with

her.  Every time I try to talk about her I choke up and I want to cry, but I try to stay strong for my family."

Thank you.

You know, technically, WhatsApp and this ability to send instant messages connect us instantaneously with one another.  In this case, as you've seen, they also provided instant information to the whole family spread all over the place, and so it was as if they were all receiving that news at the same time.  And it was also sort of like a boomerang effect as well, so they get the message and they have to think about what they're going to face when they get there and try to, you know, prepare themselves for that.  And then -- and then there's the actual grief of witnessing what you're going to witness.  And I think as wonderful as those devices can be, that aggravated everyone's emotions that day.  It also probably gave them comfort to know what they knew when they did as difficult as it was.

Your Honor, I've been thinking a lot about ice for the last two weeks.  A lot about how not to slip on it, but I've also been thinking about what happens to ice when there's a deep crater in it or a deep crack in it.  What happens to it?  What happens is is that crack creeps across the body of water and it creeps fast and it creeps in ways we don't expect, and it lands in places we're not sure of, and it's deceptive because on the surface of the body of the water it could appear

so stable but underneath it's not.

You know, we've learned from Dr. Schuurman today that there are these factors that increase negative outcomes to family members from the death of a loved one and all ten of these factors are met in this case.  And these factors weren't created for this litigation, these factors are factors that people have been writing and studying about for 20 or 30 years.  And we have this case where any one of these can create an aggregating factor but here we have all ten, and some of them are even worse than they describe.  It's these factors in this event which makes clear to us how deep that crater in the ice really is, and how fast and how wide that crack in the ice has spread across this entire family.

You know, I represent these people that you've had a chance to know this week and they're people who work really hard for a living.  People who have worked for everything they've ever earned.  People who built a special place completely on their own for their families and their extended families in two like communities in Mexico.  A place where children could swim, they could climb in caves, hike in the mountains, fish in the river, a place where you can grow pecans and pomegranates and raise livestock; a peaceful paradise.  A place to escape after weeks and months of hard work in the United States.  They kept to themselves.  Followed the rules.  They didn't pose any risk to anyone.  They're the kind of

folks, though, that would rather fix it themselves than ask you for any help at all.  They don't want handouts and the last thing they want in the world is sympathy, sympathy from anybody including this Court.

They travelled here to this city, to this courtroom because they're U.S. citizens, and U.S. citizens have rights.  A right which entitles them to have their story told.  A right which entitles them to create a permanent record.  They have done that.  We thank you for giving them that opportunity, but they also have a right which entitles them to justice.  So they have only one request left for the Court, render justice for all that's been taken from them.  Pick up the pieces of all the things this cartel tried to destroy.  Value those pieces and render a judgment.

Thank you, Your Honor.

THE COURT:  Mr. Purdon.

MR. PURDON:  Thank you, Your Honor.

Your Honor, before I start I want to -- I want to say thank you to David and Kylie and Devin for allowing me to stand up here for the next 15 minutes and talk for you.  Okay.  Thank you.

I want to thank the team at Ballard Spahr that as you may have picked up here, done all the work here; so they've been great.  They've been true champions for this family as well.

In some sense I'm at a loss today because it's time for closing arguments. And as a lawyer, there's the things you worry about: Which Finder of Fact, which juror is it that wasn't paying attention that I have to reach. Okay. I'm not worried about that today. Okay.

What's opposing counsel going to say when I start talking? I don't have to worry about that today.

Did my clients have an impact when they took the stand? I don't have to worry about that today, and I don't really have to worry about the burden we have when we represent plaintiffs or victims of telling someone a story because David and Kylie and Devin told their story to the Finder of Fact, to the Court.

So given the unique nature of these proceedings, I'm not worried about any of that but I am worried about one thing and it's something I want to talk to you about. Before I get there, I have a little wind up to get us centered.

Can I have the chart? Thank you.

We're here because of an act of terrorism that was committed. Violent, horrible acts committed against innocent women and children. I can't say it any more succinctly than that. We've met the elements of the Antiterrorism Act, that's why we're here. These acts were devastating to David Langford's family. They're devastating to the other families and they're devastating to the communities of La Mora and

Colonia LeBaron.

The statute, though, recognizes that these acts of terrorism are going to send out ripples of trauma.  The statute provides us a roadmap forward.  This is an attempt to summarize the claims under the ATA that you're going be asked to decide, and I just want to take a look at number 3, the solatium damages, right.  So we got 11, 12 claims there.

Look at Kylie Langford who lost her mother and two of her siblings who testified to you about her relationship with her mother Dawna, testified about her brother Rogan who she had a special bond with, and those relationships are over; and she has yet a third solatium claim.

There are 35 solatium claims there and that's just our part, our vehicle, the one vehicle.  The other vehicles, the other -- the size of the families and the relationships.  The raw numbers of claims here are in the dozens and dozens and dozens that you're going to have to assign value to.  I just talked about the solatium.  Obviously, Dawna, Trevor, and Rogan have estate pain and suffering as Mr. Elsner talked about, those moments before they were killed, they're entitled to that pain and suffering.

And in our vehicle, you know, fortunately, we've got these survivors but their story is different and -- again, I'm blessed in that I don't have to explain to you, Devin and Kylie and the experience of that car, they did it far better than I

would ever be able to.  What is that -- what are those claims?  How do you assign value to those claims?

And then, as you know, under the ATA we take those claims, we assign value and then we treble them.  So unlike most of the folks, right, I'm a North Dakotan.  We've got Tyler and Howie have been North Dakotans for a bit, but I know this about North Dakotans, sometimes we get nervous when we start talking about numbers of this size.  It can happen.  I've seen it happen in courtrooms.  And so that's what I want to -- that's what I'm worried about.  That's what I want to talk to you about because this is unique for the Court, for us, and we should talk about that.  That's the one thing I'm worried about.  The reason that the number is going to be big here isn't because of me, isn't because of you, it's because of the size of the suffering coupled with the statute that empowers us here today.

I looked at my cocounsel Mark a couple times because I had previewed for him how I was going to talk about the damages and how they ripple out.  Dr. Schuurman beat me to it: ripples.  You drop a pebble into a pond, you have this horrible incident and out the ripples go; and the ripples, because of the size of these families and the closeness of these families, go -- I can't imagine another scenario in which you might see the ripples go as far and as deep as they are, and every level to the death of a mother, children -- oh my God, the

suffering -- spouses, parents, siblings.  It's the Antiterrorism Act that is going to drive the numbers in this case.  It's the Antiterrorism Act that recognizes that acts of terrorism uniquely create these ripples of trauma, these cracks in the ice.  The statute Congress recognized and created a system that is designed to produce a big number, by creating these categories of damages and including the solatium damage which is damage for people that were not present.  The statute -- it's the statute -- it's Congress's intention that judges like you hear cases like this and have the tools and are pushed to put that number up because it recognizes the dangers and the -- the extensive trauma that flows from a terrorist event.

So I wanted to talk to you about that.  I wanted to give you some ease with that because I know it's hard.  I know it's hard.  These are -- these are -- courtroom -- I've been in a lot of courtrooms in North Dakota as has Your Honor, and I know the feeling towards big numbers and we are uncomfortable with it as a society here in North Dakota.  It's something we don't talk about.

But we're not in -- the second point I want to make is this we're not a state courtroom today.  We've got the seal of the United States District Court behind us.  This is the courtroom, this is the court that people come to to address international -- to address incidents that have an

international impact.  It's the same courtroom whether we were in Manhattan or Los Angeles, Phoenix, Arizona.  In Bismarck, North Dakota, in the federal courtroom we deal with internationally impactful events and there's nothing unique about, Your Honor, this courtroom, lawyers in this courtroom addressing these sorts of issues.

Lawyers and judges in these courtrooms have dealt with international drug trafficking cartels before.  The Arellano-Félix Cartel in Tijuana has been brought to justice in courtrooms in North Dakota.

Organized crime from other countries have been brought, significant syndicates of fraudsters from Jamaica. Large numbers of people were arraigned, indicted, arraigned, plead guilty, tried, were sentenced; the organization was dismantled.  Not from a courtroom in Washington D.C. where there may have been a special unit set up, but here in a courtroom in Bismarck, North Dakota.  We handled that internationally significant case and matter.

This is the spot.  That's the seal.  This is the court that can render some measure of justice.  The statute intends by creating the various levels of damage and by extending it, not just to spouses or children but onto siblings.

I hope -- I hope -- I hope -- I thought long and hard about -- as you can imagine, I thought long and hard about what

to say today.  Again, I'm blessed that I don't have to retell the story because I can't do it as well as David and Kylie and Devin did.  I wanted to be able to say to the Court that -- where we're going to end up here is where Congress and the statute, frankly, the Constitution that establishes federal courts, where they want us to go, where we're supposed to go in this case.

So I'm going to go back to and, again, tie the presentations together because I think it's right.  We have to -- this Court's job under the statute, under its role in government, is to pick up these shreds, right.  Pick up the shreds of these families, these communities, and put them into something that resembles justice.  That's what these people have travelled to Bismarck, North Dakota, for and I'm confident -- I know that we can deliver it for them.  Thank you, Your Honor.

THE COURT:  Thank you.  Thank you, Counsel.

Thank all of you.  Thank those of you who are here in support whether friends or family members.  I have learned a lot from you and from the presentation of evidence and those who are plaintiffs should know that in my 34-odd years of dealing with justice in various forms, I have never seen a better presentation of evidence or a more horrific set of facts; so I promise you I will do my best to do justice to all of this.

Unfortunately that's a complicated process and so as much as I wish I could announce from the bench today the ultimate decision here, I can't because it is so complicated and so voluminous and so unique that it's going to require more work to do that level of justice and I'm going to need your lawyers' help in this.  They already know that, but I want you all to know that it's an arduous task and it may take some time.

But, again, I promise you I will do justice and I promise you I will read this statute in the way that it was meant to be read, and I am not afraid of big numbers at all. There is no way that any big number is going to keep us from finding justice in this case.  Okay.  So thank you all very much.

Counsel, I am thinking as we have talked about briefing this and proposed findings and conclusions, that process, I suspect, is -- knowing what I know now -- going to take longer than what I had initially thought, but I'm willing to get after it sooner rather than later.  I'm thinking in terms of 30 days only because you may need the transcripts -- I know I will -- and I don't know what kind of timeline we have there.  But just know that whatever initial deadlines we may set, we have the flexibility to do what's necessary to make sure that we do justice to this case and that we do it right. Okay.  So let's -- go ahead Mr. Elsner, Mr. Purdon.

555

MR. PURDON:  Thank you.

THE COURT:  30 days can we look at initially?

MR. ELSNER:  Yes, Your Honor.

THE COURT:  I'm happy to have conference calls, status conferences, I suspect that it will be helpful to all of us.  I know it will be helpful to me.

MR. ELSNER:  Your Honor, no matter what we submit in our initial brief, which I think we can do in 30 days, we are always available to discuss that with you, supplement that, explain things further if need be; so please don't hesitate to reach out to us.

THE COURT:  Thank you for that and you may hear from me, we may have a call in a couple of weeks or so.

All right.  Mr. Purdon, anything else?

MR. PURDON:  30 days sounds fine, echo all of that again.  Thank you, Your Honor.

THE COURT:  Thank you all very much.  Travel safely.

(Proceedings commenced at 2:30 p.m., that same day.)

## CERTIFICATE OF COURT REPORTER

I, Ronda L. Colby, a Certified Realtime Reporter and Registered Merit Reporter,

DO HEREBY CERTIFY that I recorded in shorthand the foregoing proceedings had and made of record at the time and place hereinbefore indicated.

I DO HEREBY FURTHER CERTIFY that the foregoing typewritten pages contain an accurate transcript of my shorthand notes then and there taken.

Dated at Bismarck, North Dakota, this 18th day of February, 2022.

/s/ *Ronda L. Colby*
_____
RONDA L. COLBY, RPR, CRR, RMR
United States District Court Reporter
District of North Dakota
Western Division