## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Howard J. Miller, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | **FINDINGS OF FACT, CONCLUSIONS** |
| | ) | **OF LAW AND ORDER FOR** |
| vs. | ) | **JUDGMENT** |
| | ) | |
| Juarez Cartel, a/k/a Vincente Carillo | ) | |
| Fuente Organization (a/k/a "CFO" ), | ) | Case No. 1:20-cv-00132 |
| a/k/a La Linea, | ) | |
| | ) | |
| Defendant. | ) | |

### Background

On November 4, 2019, members of the Juárez Cartel ("Defendant" or "Cartel") and its violent armed wing, La Línea ("The Line"), ambushed three women and fourteen children, murdering six of the children and their mothers in the Sierra Alta in Sonora, Mexico.  All of the people ambushed were United States citizens.

These calculated assaults occurred "approximately 90 miles"[1] south of the United States-Mexico border between the Mexican states of Sonora and Chihuahua.[2]  "Cartel assassins killed Maria Rhonita LeBaron ("Rhonita" and/or "Nita") and her four children, twelve-year-old [H.M. Jr.], ten-year-old [K.B.M.], and eight-month-old twins [T.A.M.] and [T.G.M.]"[3]  Rhonita and her four children were "*alive and conscious*"[4] when their vehicle was "most definitely *intentionally* set on fire."[5]

---

[1] Testimony of Kenneth Miller, Trial Transcript ("Tr.") 37:3.
[2] Testimony of Dayer LeBaron, Tr. 80:4-5.
[3] Testimony of Enrique Baeza, Tr. 113:13-24.
[4] Testimony of Dr. Sebastian Schubl, Tr. 158:17 (emphasis added).
[5] *Id.* at Tr. 156:9 (emphasis added).

"The Cartel also killed Christina Langford ("Christina") and Dawna Ray ("Dawna") and her two children – eleven-year-old [T.L.] and two-year-old [R.L.]"[6]  Those injured in the attack include F.M.J., K.L., D.L., M.L., C.L., J.L., X.L., and B.L.[7]

The Antiterrorism Act of 1990, 18 U.S.C. § 2331, et seq. (2022) and its amendments provide criminal penalties for whoever unlawfully kills or engages in physical violence resulting in serious bodily injury to a United States national.  18 U.S.C. § 2332 (2022).  The Act provides for criminal penalties and broad civil remedies for injured nationals, their estates, survivors and heirs, in addition to criminal penalties. 18 U.S.C. § 2333(a).  Here, family members, legal guardians of injured minors, legal guardians of surviving minor children and siblings of victims, and legal representatives of the estates of the nine victims killed brought claims under the civil remedies provision of the Act, 18 U.S.C. § 2333(a).

## Procedural History

The first case (the "*Miller*" case) arising out of the November 4, 2019, attack was filed on July 23, 2020, including claims by Howard Miller (on his own behalf, on behalf of his wife Rhonita's estate, on behalf of the estates of his four children who were murdered, and on behalf of his three surviving minor children), additional members of the Miller/LeBaron family, Tyler Johnson (on his own behalf, on behalf of his wife Christina's estate, and on behalf of his six surviving minor children), additional members of the Johnson/Langford family, and members of Dawna Ray's family.[8]

The second case (the "*Langford*" case) arising out of the attack was filed on August 25, 2020, including claims by David Langford (on his own behalf, on behalf of the estates of his two

---

[6] Testimony of Enrique Baeza, Tr. 113:13-24.
[7] Testimony of K.L., Tr. 293:19-25; Testimony of Tyler Johnson, Tr. 372:1-7.
[8] *See* ECF No. 1 (Complaint in the *Miller* action).

children who were murdered, and on behalf of his seven surviving minor children who were also present during the attack – five of whom sustained gunshot wounds in the attack), the estate of Dawna Ray and four adult children of Dawna Ray who assert solatium claims arising from the attack in which their mother and nine of their siblings were involved.[9]  The Court consolidated the *Miller* and *Langford* cases on October 16, 2020.[10]

Plaintiffs served the complaint by publication as provided by the Federal Rules of Civil Procedure.  The Cartel failed to timely respond.  Entry of Default was entered in the *Miller* case on December 7, 2020 (ECF No. 22) and in the *Langford* case on December 31, 2020 (ECF No. 25).

The Court presided over a four-day bench trial starting February 7, 2022.  *Miller* and *Langford* Plaintiffs presented evidence the Defendant was responsible for inflicting injury and killing occupants of the three vehicles.  The attacks were conducted to intimidate and coerce civilians and the government, and took place outside the territorial boundaries of the United States.  Evidence was presented as to the pain, suffering, and damages suffered by each Plaintiff as a result of the Defendant's acts.

Evidence was admitted from 1) Plaintiffs, including survivors of the attacks and family members of the victims; 2) expert witness written reports and live expert testimony concerning causes of death, pain and suffering damages, psychological injuries, economic and pecuniary losses; 3) third-party witnesses including eyewitnesses to the attacks and behaviors of the Plaintiffs; and 4) the prosecutor overseeing the Mexican Government's criminal investigation into the November 4, 2019 attacks.  In addition, the Court accepted into evidence sworn affidavits from Plaintiffs and fact witnesses.

---

[9] *See* Complaint in the *Langford* action, Case No. 20-cv-00159.
[10] *See* ECF No. 17.

The court makes the following findings of fact and conclusions of law:

## I.   FINDINGS OF FACT

### A.  Defendant

1. The *Miller* Complaint includes facts of the history and violent activities of the Defendant from its origins in the 1980s (*Miller* Compl. at ¶40) to the attack on November 4, 2019. The Complaint also includes factual quotes and citations to indictments including confessions of known members of the Defendant Cartel.

2. The U.S. government in 2000 designated Vicente Carrillo Fuentes as a significant foreign narcotics trafficker under the Foreign Narcotics Kingpin Act.[11]

3. On June 1, 2004, the Carrillo Fuentes Organization (a/k/a CFO; a/k/a Juárez Cartel) was listed as a significant foreign narcotics trafficker under the Foreign Narcotics Kingpin Designation Act.[12]

4. On December 15, 2021, the U.S. Department of the Treasury further clarified the scope of designations against the Cartel to expressly incorporate an additional alias of the Juárez Cartel, "La Línea".[13]

5. "Throughout history … [the Mexican Government] had several events where La Línea has attacked civilians like [in] this case. Public servants, former police, prosecutors, former politicians. And … it is their signature or their habit[] to burn vehicles".[14]

---

[11] *See* U.S. Dep't of the Treasury, Sanctions Pursuant to the Foreign Narcotics Kingpin Designation Act (Last Updated February 14, 2022), available at: https://home.treasury.gov/system/files/126/narco_sanctions_kingpin.pdf.

[12] Recent OFAC Actions, Department of Treasury, June 1, 2004, Ex. 2.

[13] Dep't of the Treasury, Office of Foreign Assets Control; Notice of OFAC Sanctions Actions, 86 Fed. Reg. 72,307 (Dec. 21, 2021).

[14] Testimony of Enrique Baeza, Tr. 114:8-12.

6. The Cartel's actions are intended "to intimidate civilians so that they don't testify against them. And also they intimidate public servants so that they don't investigate" the Cartel for its criminal activities.[15]

7. The Defendant's objective "is to cause terror in people."[16]

**B.  The November 4, 2019 Attack**

8. The evidence shows that "100 heavily armed individuals had a meeting on November 3, 2019, at the ranch belonging to the leader of the criminal organization known as La Línea or the Juárez Cartel."[17]

9. "The main objective of this criminal organization was to take back the territory of Agua Prieta which at that time belonged to the Sinaloa Cartel."[18]

10. "[A]ll 100 men were divided up into two groups – one group of approximately 60 was led by GIL and a second group of approximately 40 was led by Tolteca."[19] "And this group of about 40 individuals placed themselves in two strategic points: The first strategic point was where the attack against Rhonita and her four minor children occurred, that was the vehicle that was later set on fire and burnt; and the other strategic point was whe[re] the attack to the other two vehicles occurred."[20]  During th[e] planning process, "[t]he order was [given] to shoot ... at anyone, be it a civilian, police officer, just anyone."[21]

11. The next day, November 4, Rhonita, Christina, Dawna, and their children created a three-car caravan to travel the road from La Mora to their separate destinations.[22]

---

[15] *Id.* at Tr. 114:18-21.
[16] *Id.* at Tr. 115:11-12.
[17] *Id.* at, Tr. 106:21-24.
[18] *Id.* at Tr. 107:22-24.
[19] Mexican Government Apostille 2, Ex. 4, at 000702.
[20] Testimony of Enrique Baeza, Tr. 107:8-18.
[21] *Id.* at Tr. 108:1-4.
[22] Testimony of Kenneth Miller, Tr. 41:19-42:2.

12. Rhonita and four of her children were traveling to Phoenix, Arizona to pick up her husband, Howard Miller, at the airport.[23]  Howard had finished a month of work in the oil fields of North Dakota and was traveling to Arizona to meet his wife and their four children to go shopping and spend time together before returning to work in North Dakota.[24]

13. Christina Langford, with her seven-month-old daughter F.M.J., traveled from Colonia LeBaron to La Mora on November 2, 2019 to collect their passports to travel to the United States.[25]  On November 4, 2019, Christina and F.M.J. were returning to Colonia LeBaron. She planned to accompany Rhonita LeBaron to the main highway and then head to Colonia LeBaron in Chihuahua, Mexico to meet her husband Tyler Johnson and their five other children.[26]  Christina and Tyler planned to leave Colonia LeBaron with their six children the following day and begin their family's permanent move back to North Dakota.[27]

14. Dawna Ray also planned to accompany Rhonita to the main highway and then split off to attend a family wedding in Colonia LeBaron.[28]

15. The caravan of vehicles began traveling from La Mora at approximately 9:30 a.m. on November 4, 2019.[29]

16. In the first vehicle, a white 2014 Chevrolet Suburban LT[30], was Christina Langford and her seven-month-old infant F.M.J.[31]

---

[23] *Id.* at Tr. 41:19-20; Testimony of Howard Miller, Tr. 180:21.
[24] Testimony of Howard Miller, Tr. 181:2-9.
[25] Testimony of Tyler Johnson, Tr. 363:5-11.
[26] Testimony of Kenneth Miller, Tr. 41:25 – 42:2.
[27] Testimony of Tyler Johnson, Tr. 365:12-15.
[28] Testimony of Kenneth Miller, Tr. 41:24; Testimony of K.L., Tr. 293:11-12.
[29] Testimony of K.L. Tr. 294:4-6.
[30] Mexican Government Apostille 2, Ex. 4 T_000154.
[31] Testimony of Tyler Johnosn, Tr. 363:21.

17. In the second vehicle, also a white Chevrolet Suburban[32], was Dawna Ray and nine of her children – D.L., T.L., R.L., K.L., M.L., C.L., X.L., B.L., and J.L.[33]

18. In the third car, a black Chevrolet Suburban, was Maria Rhonita LeBaron and four of her children – H.M. Jr., K.B.M, T.A.M, and T.G.M.[34]

19. Soon after departing, Rhonita's vehicle broke down.[35]  Dawna helped get Rhonita and her children back to La Mora, but Christina continued driving.[36]

20. After dropping Rhonita and the children back at La Mora, Dawna and her children got back on the road to continue their journey to Colonia LeBaron.[37]

21. Rhonita spoke with Loretta Miller, her mother-in-law, who loaned  Rhonita her Suburban to continue her journey.[38]  She also asked her brother-in-law, Andre Miller, to assist her in transferring the broken down vehicle back to La Mora.

22. Rhonita then returned to the broken-down vehicle to collect her belongings.  Andre went to pick up a trailer and find someone who could help him tow the broken-down vehicle back to town.[39]

23. Rhonita was driving the vehicle, H.M., Jr. was seated in the front passenger seat, the twins T.A.M. and T.G.M. were in the second row of seats, and it appears that K.B.M. was seated in the third row of seats in the back of the vehicle.[40]

---

[32] Mexican Government Apostille 2, Ex. 4 T_000154.
[33] Testimony of K.L., Tr. 293:23-24
[34] *Id.*
[35] Declaration of Andre Miller, Ex. 55, at ¶ 7.
[36] *Id.* at ¶ 5; Testimony of K.L., Tr. 294:9-12.
[37] Testimony of K.L., Tr. 294:14-16.
[38] Declaration of Andre Miller, Ex. 55, ¶ 8.
[39] *Id.* at ¶ 11.
[40] Testimony of Kenneth Miller, Tr. 47:24-48:6.

### C.  Attack on Rhonita LeBaron and her Children

24. A few minutes up the road, Rhonita's vehicle came under heavy gunfire from the first hit team.  For at least five to ten (5-10) minutes,[41] assailants fired automatic and belt-fed machine gun rounds into Rhonita and her children's vehicle.[42]

25. Specifically, the Mexican Government catalogued 923 spent shell casings[43]—including .223 caliber, 7.62x39 mm, .308 caliber and 50 mm shell casings[44]—in the vicinity of where Rhonita and her children were ambushed.

26. Casings were found "200 meters from the rear part [of Rhonita's] vehicle and at the top of the hill region"[45] with the nearest point being "114.89 meters away."[46] These casings, relative to the vehicle, were located "behind and to the left and right."[47]

27. These casings were shot by at least 23 different assault rifles[48] and nine (9) of these weapons have been linked by the Mexican Government to prior homicides and complex assaults in Mexico.[49]

28. According to the Mexican Government's forensic analysis, Rhonita's vehicle was impacted by 321 bullets.[50]

29. Dr. Sebastian Schubl, a trauma surgeon, burn expert, and the Director of Medical Operations for the University of California-Irvine Health Administration, testified that he

---

[41] Mexican Government Apostille 2, Ex. 4 T_000186.
[42] *See* Mexican Government Apostilles 1 and 2, Exhibits 3B, 3C, 3D, 3E, 4B and 4C.
[43] Mexican Government Apostille 2, Ex. 4 T_000153.
[44] *Id.*
[45] Mexican Government Apostille 1, Ex. 3 T_000133.
[46] Mexican Government Apostille 1, Ex. 3 T_000135.
[47] Mexican Government Apostille 1, Ex. 3 T_000221; *see* Ex. 3 T_000224 for illustrative purposes; Christina Langford 1006 Summary Chart, Ex. 12; Rhonita LeBaron 1006 Summary Chart, Ex. 13; Dawna Langford 1006 Summary Chart, Ex. 14.
[48] Mexican Government Apostille 2, Ex. 4 T_000039-40, 49-63.
[49] Mexican Government Apostille 2, Ex. 4 T_000063.
[50] Mexican Government Apostille 1, Ex. 3 T_000226-233; Rhonita LeBaron 1006 Summary Chart, Ex. 13_000001-2.

was "convinced … all four of the children and Rhonita probably survived the initial assault."[51] When asked whether this was more probable than not, Dr. Schubl responded, "Absolutely", and he testified that he held this opinion to a reasonable degree of medical certainty.[52]

30. At some point during the attack, H.M., Jr. tried to escape the vehicle.  His car door was found open, and his legs hung half-inside and half-outside of the passenger door.[53]

31. The evidence further bolsters Dr. Schubl's opinion as it shows that H.M. Jr.'s sister, K.B.M.'s remains were found in the rear of the vehicle laying on the floor in the fetal position; a position she would not have been able to achieve had she been immediately incapacitated by the fusillade of bullets.[54]

32. Cartel members approached the vehicle after the assault started and shot at it from closer proximity as evidenced by the bullet casings located near and around the vehicle.[55]

33. Mexican authorities created still images of a video taken by the Cartel during the attack and transcribed the video[56] wherein members of the Cartel could be heard saying:

"(…)
Ah no
They already messed it/him up, for real, man
They're gonna finish it/him off, dude
No, man, they stayed
Look at him.
No, he's not gonna see anything
(unintelligible)

---

[51] Testimony of Dr. Schubl, Tr. 154:14-17; *see also* Expert Report of Dr. Sebastian Schubl, Ex. 25_000023.

[52] Testimony of Dr. Schubl, Tr. 154:18-23.

[53] Testimony of Adrian LeBaron-Soto, Tr. 221:4-6; Ex. 25_000012; Declaration of Bathsheba Shalom  Tucker, Ex. 37_000007, ¶ 43; Family Photos of Miller Family Remains, Ex. 17_000004,000012-14; Declaration of Andre Miller, Ex. 55_000003, ¶ 14;  Photos of Miller Family Remains taken by Douglas Johnson, Ex. 73_000005-8.

[54] Testimony of Adrian LeBaron-Soto, Tr. 222:11-12; Testimony of Dr. Schubl, Tr. 154:11-12; Declaration of Adriana Jones, Ex. 46_000005, ¶ 27; Family Photos of Miller Remains, Ex. 17_000003, 6, 7, 15; Family Photos of Miller Family Remains, taken by Douglas Johnson, Ex. 73_000010-11.

[55] Mexican Government Apostille 2, Ex. 4G; Declaration of Andre Miller, Ex. 55_000003, ¶ 14.

[56] Testimony of Enrique Baeza, Tr. 109:3-8, 110:12-18; Mexican Government Apostille 2, Ex. 4_000535; Ex. 4_000594; Mexican Government Apostille 3, Ex. 5_000035.

Shoot him, don't assume
Burn it/her
(unintelligible)
Hey, don't surround it/him, stop
OK, OK
(unintelligible)
This is really fucked up
(unintelligible)
Oh, shit
END OF AUDIO…"[57]

34. Dr. Schubl offered his analysis of the still images and transcript of the video: "[T]here's a lot of information here that's really relevant to the case at hand… [Y]ou can see that downward angle. You can see the distance to the vehicle. You can see there's a lot of cactus and shrubbery in the way. So while there's several attackers around the car, it would have taken them quite some time to work their way down this steep incline and around this greenery to get to where they're standing. You can also, most importantly see that the vehicle is intact. … [D]amaged severely, but it's not on fire for sure. Several of the attackers are standing right next to it. Many of them are carrying weapons; they're surrounding the vehicle, if you will. So this gives [an] understanding of both the time of what happened when and also how long this entire attack took."[58]

35. The Cartel proceeded to "most definitely intentionally set [Rhonita's vehicle] on fire."[59]

36. "[T]here's three potential ways the car could have been set on fire… [T]here's the fuel tank in the back; there's the engine in the front. Both of those have combustible elements to

---

[57] Mexican Government Apostille, Ex. 5 T_000035; *see also* Mexican Government Apostille 2, Ex. 4-G (still photographs from video).
[58] Testimony of Dr. Schubl, Tr. 155:9-23.
[59] Testimony of Dr. Schubl, Tr. 156:9; Testimony of Enrique Baeza, Tr. 110:4-5 ("it was concluded [by the Mexican Government] that the vehicle was [] burnt by the assassins.").

them and then there's obviously the third way which is someone intentionally douses the vehicle in gasoline or kerosene and lights it on fire."[60]

37. Plaintiffs also provided the expert testimony of Dayer LeBaron, Rhonita's brother and also a certified automotive technician with qualifications to render an opinion regarding the source of the fire to Rhonita's vehicle.  His opinion was based on his years of experience in diagnosing and determining the cause of fires in vehicles.  He performed a visual inspection of the vehicle and the area surrounding the vehicle at the site of the attack on November 5, 2019, while the vehicle remained where it had been ambushed the day before.[61]

38. Visual inspection of the engine compartment by Mr. LeBaron revealed "unburnt cardboard on the air filter", the "serpentine belt" wasn't "completely burnt" and the "AC compressor, the alternator, various components of the – that are aluminum similar to the rim[]s of vehicle were still intact."[62]

39. Mr. LeBaron concluded that "the fire did not originate from the engine compartment", to a "reasonable degree of technical certainty."[63]

40. Based on his examination under the vehicle where the fuel tank was located, Mr. LeBaron testified that while "[t]he fuel tank itself had melted away. … [T]he straps [to hold the fuel tank in place] were still intact as if it was holding it [the fuel tank] and the tank just melted away. … [T]he body above the fuel tank [also] didn't receive any damage."[64]

---

[60] *Id.* at 156:11-18.
[61] Testimony of Dayer LeBaron, Tr. 83:23-84:4; Declaration of Dayer LeBaron, Ex. 29_000002, ¶¶10, 11.
[62] *Id.* at Tr. 84:14-15-19.
[63] *Id.* at Tr. 85:2-6.
[64] *Id.* at 86:21-24, *see also* Declaration of Dayer LeBaron, Ex. 29_000003, ¶15.

41. The video taken by Cartel members also demonstrates that as they approached the vehicle following the hail of bullets, the vehicle was not on fire.[65]

42. Additionally, "you're able to hear some voices saying 'burn it' and from the evidence obtained, it was concluded that the vehicle was later burnt by the assassins."[66] This was "not the first time that they [the Defendant] burn[ed] a vehicle because that is a signature move from that criminal organization … La Línea."[67]

43. Rhonita, H.M. Jr., K.B.M., T.A.M., and T.G.M., "to a reasonable degree of medical certainty", "were all alive and conscious" when their vehicle was intentionally set on fire.[68]

44. Dr. Schubl testified that this is "arguably [] the worst way you can die."[69]  He testified that being *just* burned alive does not provide a:

> real summary of what the terror these inhabitants of this car had to deal with on that day. You have to look at it from the start to the finish of the entire assault. So these assailants discharged 900-and-some rounds at the car. Even if there were 20 or 30 of them, they were reloading multiple times and emptying their weapons and reloading again. This stretched on for minutes, many minutes. That … covers the car in bullet holes. The car can't move any more, the inhabitants are inside. They have total panic. They can't get out of the car because the attackers are right outside.
>
> Then this group decides to wander down this hill, training their weapons at the vehicle, shooting a video, surrounding the car, possibly shooting more. That takes time just to get the 200 meters from the top of this steep incline all the way down to the car. The family's sitting there. They see these people coming; they're all carrying weapons. *They know what's going to happen.*
>
> After they surround the car …[t]hey get on the car. They douse the car…. [T]hey actually opened the door and threw the gasoline into the car. But, again, you can't escape because they're surrounding your car and they have guns, so stretching on for even longer. *Think about as a parent what th[at] feels like when your kids are in the back of this car. They're hurt; they're scared. You're hurt; you're terrified, and there's nothing you can do.*

---

[65] *Id.* at Tr. 86:23-87:-2.
[66] Testimony of Enrique Baeza, Tr. 110:3-5.
[67] *Id.* at Tr. 110:5-10.
[68] Testimony of Dr. Schubl, Tr. 158:13-17; *see also* Expert Report of Dr. Schubl, Ex. 25_000023.
[69] *Id.* at. Tr. 158:22.

And then they set the car on fire. You're talking about extreme heat. The human body, unfortunately, is actually fairly resistant to burns. … [P]atients sometimes [] have 90 or nearly 100 percent of their bodies burnt and they still manage to make it to the hospital and some of them still manage to make it through months in the burn ICU and survive. But that doesn't mean its painless. Certainly not. And in an enclosed space, if you can't get the person out, it's even worse because the air becomes super heated and now you're breathing in fire. So not only are you burning from the outside, you're burning from the inside. The oxygen gets completely consumed. So not only are you burning to death after being shot, but you're also suffocating. You're asphyxiating because there's no oxygen left in the air. It's just fire. *So your sensation is intact. There's nothing you can do. You just hear and feel what's going on around you.*"[70]

45. Dr. Schubl testified that, "if you start when the first bullet was shot until the last person in that car took their last breath, that must have been close to an hour, maybe, 45 minutes of just total terror. And as they're sitting in that car burning to death, watching their siblings, their family members burn to death, it's – it must be the most frightening thing that anyone has ever experienced."[71]

### D.  Attack on Christina Langford and her Daughter

46. "14 kilometers and 700 meters north" of the attack on Rhonita's vehicle,[72] Christina's vehicle was attacked by a separate group of members of the Cartel.

47. Mexican authorities located 327 spent shell casings[73]—including .223 caliber and 7.62x39 mm caliber shell casings[74]—136-139 meters[75] "ahead and to the right"[76] of Christina's vehicle.

---

[70] *Id.* at Tr. 158:23 -160:16 (emphasis added).
[71] *Id.* at Tr. 160:22-161:3; *see also* Expert Report of Dr. Schubl Ex. 25_000024.
[72] Mexican Government Apostille 1, Ex. 3 T_000133.
[73] Mexican Government Apostille 2, Ex. 4 T_000155; Christina Langford 1006 Summary Chart, Ex. 12_000001-2.
[74] Mexican Government Apostille 2, Ex. 4 T_000155; Christina Langford 1006 Summary Chart, Ex. 12_000001-2.
[75] Mexican Government Apostille 1, Ex. 3 T_000136; Christina Langford 1006 Summary Chart, Ex. 12_000001-2.
[76] Mexican Government Apostille 1, Ex. 3 T_000220; Christina Langford 1006 Summary Chart, Ex. 12_000001-2.

48. However, the number of casings shot, as reported by Mexican authorities, does not encapsulate the true and total number as family members have reported that they continue, to this day, to find spent shell casings on the mountainside.[77]

49. Christina's vehicle was impacted by 41 bullets[78] shot from a "leftward, downward, and backward"[79] angle.

50. In spite of the heavy gunfire, Dr. Schubl testified there is "no doubt whatsoever that Christina survived th[is] initial hail of bullets, the hundreds of rounds that were discharged at her vehicle."[80]

51. At this point, according to Mr. Baeza—the lead Mexican prosecutor—the Defendant could tell it was attacking innocent women and children because Christina "stepped out of her vehicle with her hands up in the air saying that there [sic] were women and children and asking for them not to shoot, but still the assassins shot and killed her."[81]

52. Additionally, Plaintiff Adrian LeBaron-Soto testified that he had walked up to the place where the shots were fired, and one could "unmistakabl[y]" tell from the Cartel's firing positions that it was 1) firing upon women and children and 2) could even see Christina's hair color.[82]

---

[77] Testimony of Tyler Johnson, Tr. 374:5-7; Christina Langford 1006 Summary Chart, Exhibit 12_000001-2; Dawna Ray 1006 Summary Chart, Ex. 13_000001-2; Rhonita LeBaron 1006 Summary Chart, Ex. 14_000001-2.
[78] Mexican Government Apostille 1, Ex. 3 T_000227-28.
[79] *Id.* at 000215.
[80] Testimony of Dr. Schubl, Tr. 148:8-10; *see also* Expert Report of Dr. Schubl, Ex. 25_000007.
[81] Testimony of Enrique Baeza, Tr. 112:11-21.
[82] Testimony of Adrian LeBaron-Soto, Tr. 228:16 – 229:3.

53. Christina sustained four gunshot wounds.[83] One of those shots was "in the right pectoral of 2x2cm with exit in posterior face of the back of .5x1cm"[84], which ultimately caused her death, but the shot was not "immediately lethal."[85]

54. Dr. Schubl testified that Christina "probably laid down or crawled for some minutes after that and then was probably conscious for at least 10 or 15 minutes more, if not longer."[86]

55. Dr. Schubl further testified that one must:

> put the timeline together again. It takes a long time to fire that many rounds even from a large group; so the terror must have set in instantaneously. Compounding that, of course, is the fact that her 7-month-old child is right behind her, subject to the same assault. People when they're shot, obviously it's incredibly painful.
>
> There's this concept of the "thousand-yard stare," sort of this concept of doom[.] … It's almost instinctive panic that sets in because you know that you've been lethally or nearly lethally injured. You're bleeding internally. Your heart's racing. You're emotionally overloaded. You're terrified and then, of course, that then compounds itself over time as it becomes more and more clear that no one's coming to help.[87]

56. Christina was traveling with her 7-month old baby, F.M.J., at the time.[88] Photographic evidence demonstrated that the base of her car seat sustained three gunshots.[89]

57. F.M.J. survived "but barely… [S]he was [found] strapped into a car seat alone with her mother dead outside the car[,] … severely dehydrated"[90] with "a tiny drop of blood on the top of her head … as if one of the bullets or a piece of plastic from the car seat or something where the bullet had whizzed past had nicked the very top of her head."[91]

---

[83] Testimony of Dr. Schubl, Tr. 146:20-25; Mexican Government Apostille 1, Ex. 3 T_000009-10.
[84] Mexican Government Apostille 4, Ex. 70 T_000010. *See also* Expert Report of Dr. Schubl, Ex. 25_000007 (photograph of Christina's body at scene).
[85] Testimony of Dr. Schubl, Tr. 148:14; *see also* Family Photos of Christina Langford Attack Scene, Ex. 20.
[86] *Id.* at Tr. 148:14-17.
[87] *Id.* at Tr. 149:1-18.
[88] Testimony of Tyler Johnson, Tr. 363:21.
[89] Testimony of Tyler Johnson, Tr. 371:11-22, Photo of F.M.J. Car Seat, Taken by Tyler Johnson, Ex. 11; Testimony of Dr. Schubl, Tr. 149:19-25, 150:1-5;.
[90] Testimony of Dr. Schubl, Tr. 150:7-10.
[91] Testimony of Amelia Sedgwick, Tr. 253:9-13.

### E.  Attack on Dawna Ray and her Children

58. Shortly after the attack on Christina concluded, Dawna and her children reached the location of Christina's bullet-ridden vehicle. They saw Christina lying prone on the ground.[92] Dawna sped up to assist Christina, but before she could reach Christina, the Cartel began firing at Dawna's vehicle.[93] Dawna panicked, yelling to her children to "duck down" and to "get low."[94] K.L., who was holding her two-year old baby brother R.L., attempted to protect him by pushing him underneath the seat.[95] D.L. acted to protect his siblings, but he could not save T.L.[96]

59. Dawna witnessed her son T.L. die from a gunshot wound to his skull.[97] Shortly after, Dawna was shot and killed by the Cartel.[98]

60. After the shooting stopped, men wearing black camouflage suits and carrying guns walked down the mountain towards the surviving children—K.L., D.L., M.L., C.L., J.L., X.L., and B.L.[99] The men opened the vehicle door and pointed a gun at K.L.[100] While staring down the barrel of a gun, K.L. thought, "this is it."[101] The men ordered the children to exit the vehicle despite the fact that many of the children had suffered grievous bullet wounds.[102] A bullet had ripped through K.L.'s foot.[103] M.L. suffered a bullet wound to the forearm, causing her to lose control of her fingers.[104] C.L. suffered a gaping gunshot wound to his

---

[92] Testimony of K.L., Tr. 294:22-24.
[93] Testimony of K.L., Tr. 295:11.
[94] *Id.* at 295:11-12.
[95] *Id.* at Tr. 294:19-20; Expert Report of Dr. Schubl, Ex. 25_000009.
[96] Testimony of D.L., Tr. 307:12-15.
[97] Testimony of K.L., Tr. 295:21-22; Expert Report of Dr. Schubl, Ex. 25_000009, 000794-95
[98] *Id.*
[99] Testimony of K.L., Tr. 296:6-12.
[100] Testimony of K.L., Tr. 296:14-15; Testimony of D.L., Tr. 308:15-17
[101] Testimony of K.L., Tr. 296:17-18.
[102] *Id.* at Tr. 296-97:20-7.
[103] *Id.* at Tr. 297: 3-4.
[104] *Id.* at Tr. 297:3-4.

jaw, exposing the bone, and multiple gunshot wounds in his legs.[105] X.L. suffered a large

exit wound on his shoulder, fracturing his shoulder and exposing muscle.[106] B.L. suffered

a deep laceration across his chest, exposing his muscle, and a wrist fracture.[107]

61. When K.L. began gathering her siblings to exit the vehicle, she realized that R.L. had

succumbed to his gunshot wounds.[108] After the cartel members departed, the seven

surviving children attempted to walk down the mountainous and rugged road to La

Mora.[109]

62. None of the children were wearing jackets, and many of the children were barefoot. It was

"really cold".[110] The children did not have any food or medical supplies to tend to their

bleeding wounds.[111] The children found only a pillow to help stanch the bleeding from the

gunshot wound to C.L.'s jaw.[112]

63. Despite the gunshot wound to her foot, K.L. carried B.L down the mountain, while D.L.

carried C.L.[113] When X.L. could not walk any farther, K.L. carried both X.L. and B.L.[114]

After carrying two siblings down the mountain for 20 minutes, K.L. could not continue.[115]

D.L. volunteered to trek the remaining eight miles to La Mora to get help from his family

members.[116]  D.L. ran down the road, dodging shooters who were firing at him, slowing

his progress.[117] D.L. heard the gunshots and saw the dust spray in the dirt around him as

---

[105] *Id.* at Tr. 297:3-4; Supplemental Declaration of David Langford, Ex. 72, p. 1-6.
[106] *Id.*
[107] *Id.* at Tr. 297:3-4; Supplemental Declaration of David Langford, Ex. 72, p. 7-8, 43.
[108] *Id.* at Tr. 296:23-25.
[109] *Id.* at Tr. 297:13-15; Testimony of Kenneth Miller, Tr. 44:25-45:2.
[110] Testimony of K.L., Tr. 298:7-10.
[111] *Id.* at 298-99:24-3, 299:10-13.
[112] Testimony of D.L., Tr. 310:16-18.
[113] Testimony of K.L., Tr. 297:13-15.
[114] *Id.* at 297-98:25-4.
[115] *Id.* at 298:1-4.
[116] Testimony of D.L., Tr. 310:24-311:2; Testimony of Kenneth Miller, Tr. 59:6-9.
[117] Testimony of D.L., Tr. 312:23-313:8.

he ran.  D.L. followed a wash down the mountain and eventually reached a highway near La Mora where a family member spotted him.[118]

64. As the sun set and the temperatures dropped, help had not arrived.[119] Fearing D.L. dead, K.L. allowed M.L. to walk the remaining distance to La Mora for help.[120] M.L. lost her way in the dark and was later found walking alone in the desert along an old road to Bavispe.[121]

65.  The children waited for help, terrified the cartel would return to kill them.[122] All the children were thirsty and hungry, and B.L. cried for his bottle.[123]

66. Family members and David Langford finally convinced a local military unit to escort them to the location of the attacks, to try to rescue the children.[124] More than ten hours after the attack, the military convoy located the children, and ambulances transported the children to a local hospital in Bavispe.[125] Realizing the children required medical treatment in the United States, the military arranged for helicopter transport to the border.[126] Three hours later, most of the children had arrived at a hospital in Tucson, Arizona, except K.L. who had been separated from her family near the border and transported to a different hospital.[127] K.L. was eventually reunited with her family at the hospital in Tucson.[128]

67. At the hospital, C.L.'s injuries required seven surgeries to address the reconstruction of his jaw, the  puncture wound on his left leg, the puncture wound on his right chest, the puncture

---

[118] *Id.* at 313:11-23.
[119] *Id.* at 298:7-20.
[120] *Id.* at 298:18-23.
[121] Testimony of Kenneth Miller, Tr. 62:10-24.
[122] Testimony of K.L., Tr., 299:16-17.
[123] *Id.* at Tr. 299:1-2.
[124] Testimony of David Langford, Tr. 332-33:16-5.
[125] *Id.* at Tr. 334:9-23; 338:25-339:14.
[126] *Id.* at Tr. 339:14-22.
[127] *Id.* at Tr. 341:15-342:21.
[128] *Id.* at Tr. 342: 11-12.

wound on his right forearm, and the 6 x 8 centimeter wound on his right leg.[129] C.L. remained at the hospital for approximately two months to allow his wounds to heal.[130] If C.L.'s missing jawbone regrows, C.L. may undergo a future surgery to replace the teeth he lost from the gunshot wound.[131] Even after his release, C.L. used a wheelchair and attended physical therapy to regain his ability to walk, albeit with a limp.[132]

68. X.L. underwent surgery to close the two-inch diameter wound on his left shoulder.[133]

69. B.L. arrived at the hospital and was diagnosed with anemia due to acute blood loss.[134] To address his bleeding, B.L. received sutures to close the six-centimeter laceration across his chest and treatment for his fractured wrist.[135]

70. Doctors cleaned and bandaged K.L.'s and M.L.'s gunshot wounds, which have improved over time.[136]

## II.   CONCLUSIONS OF LAW

### A.  The Court Has Jurisdiction Over Defendants and Claims

71. The entry of a default judgment is "committed to a district court's discretion."[137]  While the Eighth Circuit has determined that "there is a 'judicial preference for adjudication on the merits,'" here the grounds for default are *not* in doubt.[138]

---

[129] *Id.* at Tr. 343-44:22-25; Declaration of C.L., Ex. 64; Supplemental Declaration of David Langford, Ex. 72 at ¶70.
[130] *Id.* at Tr. 347:6-9.
[131] *Id.* at Tr. 347:10-15.
[132] *Id.* at Tr. 349:23-25; Declaration of C.L., Ex. 64.
[133] *Id.* at Tr. 346:4-18; Supplemental Declaration of David Langford, Ex. 72, p. 211.
[134] Supplemental Declaration of David Langford, Ex. 72, at 29.
[135] Testimony of David Langford, Tr. 346:21-24; Supplemental Declaration of David Langford, Ex. 72, at 26.
[136] *Id.* at Tr. 345:1-23; Supplemental Declaration of David Langford, Ex. 72, at 147, 158.
[137] *Nuevos Destinos, LLC v. Peck*, Case No. 3:19-cv-00045, 2020 U.S. Dist. LEXIS 207509, at *2 (D.N.D. Mar. 10, 2020), *citing United States ex rel. Time Equip. Rental & Sales, Inc. v. Harre*, 983 F.2d 128, 130 (8th Cir. 1993).
[138] *See Belcourt Pub. Sch. Dist. v. Herman*, 786 F.3d 653, 661 (8th Cir. 2015), *quoting Johnson v. Dayton Electric Mfg. Co.*, 140 F.3d 781, 784 (8th Cir. 1998); *see also Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc.*, 513 F. Supp. 2d 1, 3 (S.D.N.Y. 2007) (quoted in *Belcourt* for the principle that one of the factors to be considered in entering a default judgment includes "whether the grounds for default are clearly established or are in doubt").

72. As part of the analysis, "a district court has an affirmative duty to assure itself of jurisdiction over the case and the defendants" prior to entering a default judgment.[139] Nevertheless, "upon default, the factual allegations of a complaint (except those relating to the amount of damages) are taken as true."[140]

73. "In evaluating plaintiffs' proofs, a court may accept as true plaintiffs' uncontroverted evidence, which may take the form of sworn affidavits or prior transcripts. Such evidence may also include judicial notice of the evidence."[141]

### 1. Personal Jurisdiction and Venue

74. The procedural requirement of service of a summons must be satisfied before a federal court may exercise personal jurisdiction over a defendant.[142]

75. The ATA provides that service of process may be effected "in any district where the defendant resides, is found, or has an agent."[143] Given the Defendant does not reside in any district within the United States, the *Miller* Plaintiffs sought leave to serve Defendant by publication under Fed. R. Civ. P. 4(f)(3).[144] The *Langford* Plaintiffs also moved for leave to serve by publication.[145]

76. "[T]he personal jurisdiction issue in this case is not novel; several courts have faced similar facts.   These courts have held that the Due Process Clause's 'minimum contacts'

---

[139] *Nuevos Destinos*, 2020 U.S. Dist. LEXIS 207509, at *2.
[140] *Murray v. Lene*, 595 F.3d 868, 871 (8th Cir. 2010).
[141] *Flanagan v. Islamic Republic of Iran*, 87 F.Supp.3d 93, 115 (D.D.C. 2015) (internal citation and quotations omitted).
[142] *Omni Capital Int'l Ltd. V. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987).
[143] 18 U.S.C. § 2334(a).
[144] *See* ECF No. 11.
[145] *See* ECF No. 18.

requirement for personal jurisdiction is met when terrorists 'engage[] in unabashedly malignant actions directed at [and] felt in' the forum."[146]

77. The court in *Morris v. Khadr* held that Fed. R. Civ. P. 4(k)(2) "establishes the court's jurisdiction."[147] Rule 4(k)(2) states:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.[148]

78. The D.C. Circuit in *Mwani* interpreted Rule 4(k)(2) to "permit[] a federal court to exercise personal jurisdiction over a defendant (1) for a claim arising under federal law, (2) where a summons has been served, (3) if the defendant is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal jurisdiction is consistent with the Constitution (and laws) of the United States."[149]

79. As in this case, the court in *Morris* determined that in a case arising under the ATA where service by publication was authorized and completed under Fed. R. Civ. P. 4(f), then the first two prongs in the *Mwani* analysis of Rule 4(k)(2) have been satisfied.[150]  Like the defendant in *Morris*, the Defendant here is not subject to the jurisdiction of any single state court.[151]  The Rule allows a court to exercise personal jurisdiction over a defendant with sufficient contacts with the United States generally but lacks contacts with any one state.[152] For the Rule to apply, there must be a federal claim, personal jurisdiction must not exist

---

[146] *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1334 (D. Utah 2006); *see also Mwani v. Bin Laden*, 417 F.3d 1, 12-13 (D.C. Cir. 2005).
[147] *Morris,* 415 F. Supp. 2d at 1334.
[148] Fed. R. Civ. P. 4(k)(2).
[149] *Mwani,* 417 F.3d at 10.
[150] *See Morris,* 415 F. Supp. 2d at 1335.
[151] *See* ECF No. 11 at 2 ("The Juárez Cartel has no known address and operates as a clandestine criminal organization in and around Chihuahua, Mexico").
[152] F.R.C.P. 4(k)(2) (advisory committee's note).

over the defendant in any state, and the defendant must have sufficient contacts with the United States as a whole so that the exercise of jurisdiction does not violate Fifth Amendment due process.[153]

80. The question of personal jurisdiction then turns upon whether the exercise of personal jurisdiction in these circumstances meets the requirement that the Defendant has sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment.[154]

81. Here, this Court has "a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors."[155]

82. "Because injury in the United States undeniably is a foreseeable effect of a terrorist attack purposefully directed at this country's citizens, terrorism inherently is the sort of 'conduct and connection with' the United States that should cause a foreign terrorist to 'reasonably anticipate being haled into court' here."[156]

83. Here, numerous Plaintiffs reside in North Dakota, or were residing in North Dakota at the time of the massacre, causing the impact of the terrorist attack to be felt in the United States as a whole, and in North Dakota specifically.[157]  For example:

    a. Howard Miller, the husband of Rhonita, currently resides in Williston, North Dakota with his children T.M., A.M., and Z.M.[158] He also was working in North Dakota at the time of the attack.[159]

---

[153] *Nuevo Destinos, LLC*, 2019 U.S. Dist. LEXIS 207313 at *25.
[154] *See Id.*
[155] *Burger King v. Rudzewicz*, 471 U.S. 462, 473 (1985).
[156] *Morris*, 415 F. Supp. 2d at 1336, *quoting World-Wide Volkswagen Corp v. Woodson*, 444 U.S. 286, 297 (1980).
[157] *See* ECF No. 1 at ¶¶ 1, 2, 4-6, 10, 19, 22-27, 29-32.
[158] Testimony of Howard Miller, Tr. 161:25-162:1
[159] *Id.* at Tr. 180:19-181:4

b. Estates have been opened in North Dakota for the Estates of Rhonita LeBaron, H.M. Jr., K.B.M., T.G.M., and T.A.M.[160]   Howard was appointed Personal Representative of all of the estates.[161]

c. Tyler Johnson, the husband of Christina, was preparing to move his entire family to North Dakota at the time of the attack.[162]   At the time of filing, Tyler and his children F.M.J., C.C.J., J.T.J., T.E.J., H.J.J, and E.D.J. all resided in North Dakota.[163]

d. An estate has also been opened in North Dakota for the Estate of Christina Langford.[164]   Tyler Johnson was appointed Personal Representative of her estate.[165]

e. Additionally, at the time of filing the complaint, Isaac Langford, E.L., Serina Langford and Elizabeth Langford resided in North Dakota.[166]

f. Ruthila LeBaron, a sibling of Rhonita, is a resident of North Dakota.[167]

g. Estates have been opened for Dawna, T.L., and R.L. in North Dakota.[168] Crystal Langford is the Personal Representative of Dawna's estate, and David Langford is the Personal Representative of T.L.'s and R.L.'s estates.[169]

h. Amber Ray, Dawna's sister, splits her time between Mexico and North Dakota because her husband has worked in Fargo, Williston, Grand Forks, and Dickinson.[170]

---

[160] Declaration of Howard Miller, Ex. 30_000023-27.
[161] *Id*.
[162] Testimony of Tyler Johnson, Tr. 362:3-14.
[163] *Miller* Compl. ¶¶ 19, 22-27.
[164] Declaration of Tyler Johnson, Ex. 31_000016.
[165] *Id*.
[166] *Miller* Compl. ¶¶ 29-32; Declaration of Isaac Langford, Ex. 35, ¶ 2.
[167] Declaration of Ruthila LeBaron, Ex. 44_000001, ¶ 2.
[168] Supplemental Declaration of David Langford, Ex. 72, at 18-21; ECF No. 40, Ex. 9.
[169] *Id.*
[170] Declaration of Amber Ray, Ex. 54_000001, ¶ 2.

84. These claims arise under federal law and the Juárez Cartel is not subject to general jurisdiction of any one state.  As such, Rule 4(k)(2) allows the aggregation of nationwide contacts to allow for service of process because the Plaintiffs' claims arise under federal law and the assertion of personal jurisdiction by this Court over the Defendant comports with the Due Process Clause of the Fifth Amendment.

85. Based on Plaintiffs' representations, this Court granted Plaintiffs' motion for leave to serve by publication finding "there is good cause to authorize service by publication given the particular circumstances in this case."[171]

86. Plaintiffs served the Defendant by publication in Mexico, serving the Defendant in the country where it operates.[172]

87. Proof of service by publication was provided.[173]

88. On motion, the Clerk of the Court entered default judgments.[174]

89. Numerous Plaintiffs reside and work in North Dakota.  The venue provision of the ATA provides:

> Any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent.[175]

Therefore, the United States District Court for the District of North Dakota is a proper venue.

---

[171] *See* ECF No. 14 at 2-3 (*Miller* case); ECF No. 19 (*Langford* case).
[172] *See* ECF No. 20 (*Miller* case); ECF No. 24 (*Langford* case).
[173] *See Id.*
[174] *See* ECF No. 22 (*Miller* case); ECF No. 25 (*Langford* case).
[175] 18 U.S.C. § 2334(a).

### 2. Subject Matter Jurisdiction

90. Plaintiffs' claims arise under both federal law and state law, so subject matter jurisdiction is asserted under 28 U.S.C. §§ 1331 (federal-question jurisdiction) and 1367 (supplemental jurisdiction). Pursuant to 18 U.S.C. § 2338, the district courts of the United States have exclusive jurisdiction over actions arising under 18 U.S.C. § 2333(a), the civil-damages provision of the Antiterrorism Act.

91. The ATA grants United States nationals a private right of action for injury caused by an act of international terrorism.[176]

92. Section 2333(a) states:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sure therefor any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.[177]

#### a. Standing

93. To assert standing under 18 U.S.C. § 2333(a), Plaintiffs must demonstrate they were United States nationals at the time of the injury or that they are the "estate, survivor[], or heir[]" of a United States national who was injured by reason of an act of international terrorism.

94. All victims murdered or injured during the November 4, 2019, massacre and their estates, survivors, and/or heirs in this case, aside from Plaintiff Adrian LeBaron-Soto, are or were United States citizens on November 4, 2019.[178]

---

[176] *See* 18 U.S.C. § 2333(a); *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 846 (2d Cir. 2021); *see also Morris*, 415 F. Supp. 2d at 1327 ("In 18 U.S.C. § 2333, Congress created a cause of action for United States nationals who were injured by 'terrorism that occurred in a foreign country'").

[177] 18 U.S.C. § 2333(a).

[178] Passports of Amelia Sedgwick's Children, Ex. 15: Isaac Langford (15_000001), Serina Langford (15_000002), E.L. (15_000003), Elizabeth Langford (15_000004); Passports of Karen Woolley's Children, Ex. 16: Kerah Ray (16_000001), James Ray (16_000002),  Jaremy Ray (16_000003), Jonathan Ray (16_000004), Amber Ray (16_000005), Justin Ray (16_000006); Declaration of Howard Miller, Ex. 30: Howard Miller (30_000013), H.M. Jr. (30_000015), K.B.M. (30_000016), T.M. (30_000017), A.M. (30_000018), Z.M. (30_000019), T.A.M. (30_000020),

95. Although Plaintiff Adrian LeBaron-Soto is not a United States citizen, he also has standing under the ATA because "18 U.S.C. § 2333(a) contains no requirement that the survivors or heirs of a United States national killed by an act of international terrorism must themselves be citizens of the United States" to hold otherwise "would undermine the ATA's broad remedial purpose to grant a remedy to U.S. nationals and their families who suffered from injury to an individual or property as a result of international terrorism."[179]

**b.   These Attacks Constituted Acts of International Terrorism**

96. For an act to be considered international terrorism, the event must meet the definition provided in 18 U.S.C. § 2331(1).  The term "international terrorism" is defined as:

> …activities that--
>
> > (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
> >
> > (B) appear to be intended--
> >
> > > (i) to intimidate or coerce a civilian population;
> > >
> > > (ii) to influence the policy of a government by intimidation or coercion; or
> > >
> > > (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

---

T.G.M. (30_000021); Declaration of Tyler Johnson, Ex. 31: Tyler Johnson (31_000011), C.J. (31_000018), J.J. (31_000019), T.J. (31_000020), H.J. (31_000021), E.J. (Ex. 31_000022), F.M.J. (31_000023); Declaration of Amelia Sedgwick (Ex. 32_000012); Declaration of Adrian LeBaron-Soto (Ex. 36: Maria Rhonita LeBaron (36_000011)); Declaration of Bathsheba Shalom Tucker (Ex. 37_000011); Declaration of Matthew LeBaron (Ex. 38_000006); Declaration of Laura Corina LeBaron (Ex. 39_000006); Declaration of Miguel LeBaron (Ex. 40_000007); Declaration of William LeBaron  (Ex. 41_000006); Declaration of Javier LeBaron (Ex. 36_000022); Declaration of Dayer LeBaron (Ex. 43_000007); Declaration of Ruthila LeBaron (Ex. 44_000006); Declaration of Melissa Conklin (Ex.45_000006); Declaration of Adriana Jones (Ex. 46_000012); Declaration of Rholena Lian Johnson (Ex. 47_000010); Declaration of Karen Woolley (Ex. 48_000008).  *See also* Testimony of Karen Woolley, Tr. 265:15 (all of Karen Woolley's children, Dawna Ray included, are United states citizens); Testimony of Amelia Sedgwick, Tr. 235:16 (all of Amelia Sedgwick's children, Christina Langford included, are United States citizens.
[179] *Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, l53 (E.D.N.Y. 2020) (internal citations and quotations omitted).

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

97. Plaintiffs "must prove that the defendant's act not only violated United States law or a State law…, but that the act '*also* involve[d] violence of endanger[ed] human life,' and "[f]urther … *appear[ed] to be intended* to intimidate or coerce a civilian population or to influence or affect a government."[180]

98. When considering whether the Defendant "appeared to have intended its activities to intimidate or coerce [it] is not a question of the defendant's subjective intent but rather a question of what its intent *objectively* appeared to be."[181]

### (1) Violation of the Criminal Laws of the U.S. or of any State

99. The murders of Christina, Rhonita, Dawna, T.L., R.L., H.M. Jr., K.B.M., T.A.M., and T.G.M violate the laws of the United States and of North Dakota.[182]

100.    The cause of death for Rhonita, H.M. Jr., K.B.M., T.A.M., and T.G.M. was "calcination by direct exposure to fire,"[183] or, as explained by Dr. Schubl—they "burn[ed] to death, watching their sibling, their family members burn to death" in what "must be the most frightening thing that anyone has ever experienced."[184]

101.    Christina's cause of death was "death caused by wounds from projectiles fired by firearms,"[185] or, in layman terms, bullet wounds.

---

[180] *See Weiss v. Nat'l Westminster Bank*, 993 F.3d 144, 160-61 (2d Cir. 2021), *quoting Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018).
[181] *See Id.* at 161 (internal citation and quotation omitted) (emphasis added)
[182] *See* 18 U.S.C. § 1111; N.D.C.C. 12.1-16-01.
[183] Mexican Government Apostille 4, Ex. 70 T_000002, 4, 6, 8, 16.
[184] Testimony of Dr. Schubl, Tr. 160:25 – 161:3.
[185] Mexican Government Apostille 4, Ex. 70 T_000010.

102.      F.M.J. was also injured in the attack.[186]  She was present, witnessed the attack, was within the zone of danger of the attack, and has suffered emotional injury as a result of the attack.[187]

103.      The Cartel engaged in conduct which, in fact, constitutes a substantial step toward the murder of F.M.J., K.L. D.L., M.L., C.L., J.L., X.L., and B.L. in violation of the laws of the United States and North Dakota.[188]

104.      The three attacks violate the laws of the United States and of North Dakota, as well as endangered human life.

**(2) Appears to be Intended to Intimidate, Coerce, Influence, or Affect**

105.      "Whether a defendant 'appear[ed]' to have intended its activities to intimidate or coerce is not a question of the defendant's subjective intent but rather a question of what its intent objectively appeared to be."[189]

106.      The history of Defendant set forth in the *Miller* Complaint demonstrates the objective intentions of the Defendant.[190]  The Defendant has engaged in decades-long attacks to intimidate civilians and government personnel.  The violent attacks have included mass killings.[191]  Often, Defendant couples its murders with grotesque acts of violence such as decapitation and mutilation.[192] The Cartel has "bombed police and military targets, kidnapped and assassinated political figures, journalists, criminal justice advocates, religious figures, doctors."[193]  "In many instances, they have placed corpses in

---

[186] *See* Testimoy of Dr. Schubl, Tr. 150:7-10; Testimony of Amelia Sedgwick, Tr. 253:9-13.
[187] *Id.*; *see also* Testimony of Dr. Donna Schuurman, Tr. 479:12-480:11.
[188] *See* 18 U.S.C. § 1113; N.D.C.C. 12.1-06-01.
[189] *Weiss*, 993 F.3d at 161.
[190] *See* ECF No. 1 at ¶¶51-78.
[191] *Miller* Compl. ¶60, citing, H Campbell and T Hansen, "Is Narco-Violence in Mexico Terrorism?" 33, No. 2 Bulletin of Latin Am Research, 158, 159 (2014).
[192] *Id.*
[193] *Id.*

public places, hanging them from bridges and buildings and displaying them in theatrical poses."[194]   The Cartel also burns vehicles after assassinations.[195]

107.     The *Miller* Complaint also sets forth examples of particular attacks carried out by Defendant against U.S. and Mexican citizens which fit these descriptions and patterns.[196]

108.     These acts have:

> Political ends rather than simply an individual expression of psychopathology: it is planned and organized, not simply spontaneous and random; it is revenge and retribution-oriented act of violence that responds to perceived social inequality, trauma, abuse, marginalisation, frustration and humiliation; it is dramatic and spectacular and designed to seek publicity, renown, celebrity, recognition, and reaction; and it is violence committed primarily by young males, many of whom are poor and socially deprived (although those ordering narco-terrorism do not necessarily share those characteristics); it is violence that transforms society and instills fear, chaos, alarmism and governmental response.[197]

109.     And throughout Mexican history there have been "several events where La Línea has attacked civilians like this case. Public servants, former police, prosecutors, former politicians."[198]

110.     These attacks against innocent civilians and public officials and prosecutors and former police officers are objectively intended to coerce or intimidate civilians and government officials from acting.[199]

---

[194] *Id.*
[195] *Id.*
[196] *See*, *Miller* Compl. ¶63-78.
[197] *Miller* Compl. ¶61, citing H Campbell and T Hansen, "Is Narco-Violence in Mexico Terrorism?" 33, No. 2 Bulletin of Latin Am Research, 158, 159 (2014) at pg. 162.
[198] Testimony of Enrique Baeza, Tr. 114:8-10.
[199] *Id.* at Tr. 114:14-18.

111.      "La Línea's intention is to intimidate civilians so that they don't testify against them. And also they intimidate public servants so that they don't investigate them…."[200]

112.      In addition, "[b]urning vehicles [such as Rhonita's] and burning houses down is a signature of La Línea's. The objective is to cause terror in people."[201]

113.      Based on facts adduced from evidence at trial and significant documentation of Defendant's tactics found in the public record, and as set forth in the *Miller* Complaint, the attacks carried out by Defendant were objectively intended to intimidate and coerce a civilian population and to influence policy of a government by intimidation and coercion.

### (3) Occurred Primarily Outside the Territorial Jurisdiction of the U.S.

114.      The November 4, 2019 murder of United States citizens Christina Langford, Rhonita LeBaron and her four children, and Dawna Ray and her two children, and attempted murders of United States citizens F.M.J. and seven of Dawna's children occurred in the Mexican state of Sonora.[202]  As documented by the Mexican prosecutorial file, the attacks occurred on a road bordering the Mexican states of Sonora and Chihuahua.[203]

115.      It is undisputed that the attacks took place outside the territorial jurisdiction of the United States.

---

[200] *Id.* at Tr. 114:18-20; *see also U.S. v. Vicente Carrillo-Fuentes*, Case No. 3:97-cr-00665-PRM (W.D. Tex.), Document 11 (Superseding Indictment), Aug. 16, 2010, at Counts 37-45 (Defendant indicted for "intentionally killed and counseled, commanded, induced, procured and caused the international killing" of nine separate individuals "with the intent to prevent the communication" by these individuals "to a law enforcement officer of the United States of information relating to the commission or possible commission of a federal offense.; *U.S. v. Vicente Carrillo Fuentes*, Case No. 1:09-cr-00522-SJ (E.D.N.Y.), Document 6 (Superseding Indictment), Oct. 2, 2019 (the Juaréz Cartel "maintained its power in part through the payment of bribes to law enforcement and public officials, and through numerous acts of violence. [Mr. Carrillo-Fuentes], as a member and leader of the [Juaréz Cartel], employed 'sicarios,' or hitmen, who carried out hundreds of acts of violence, including murders, assaults, kidnappings, assassinations and acts of torture" at Carrillo-Fuentes' direction.  One of the reasons provided by the Grand Jury for these directions was to protect "members of the [Juaréz Cartel] from arrest and prosecution by silencing potential witnesses and retaliating against anyone who provided information or assistance to law enforcement authorities.").

[201] *Id.* at Tr. 115:10-12.

[202] Mexican Government Apostille 2, Ex. 4 T_000152-155; *see also* Mexican Government Apostille 1, Ex. 3 T_000133-37.

[203] *Id.*

### c.   By Reason of Act of International Terrorism

116.    As discussed in detail *supra*, the November 4, 2019, attack by the Cartel on Christina Langford and her daughter, F.M.J.; Rhonita and her four children, H.M. Jr., K.B.M., T.G.M., and T.A.M.; and Dawna and her nine children was an attack on innocent women and children that resulted in the death of three women and six children.[204]

117.    "The evidence collected shows that it was members of La Línea criminal organization … who carried out these attacks killing these individuals."[205]

118.    Defendant used gasoline and other explosive, incendiay and toxic components of a motor vehicle as a device similar to a bomb.   Defendant also used firearms ––.223 caliber, 7.62x39 mm, .308 caliber and 50 mm rifle ammunition[206]— during the attacks.   These are destructive devices and firearms as defined by section 921, thus weapons of mass destruction under the ATA.[207] Their use here involved violent acts and acts dangerous to human life in violation of criminal laws of the United States and the states, including North Dakota.

119.    The Defendant's "objective was to shoot at anyone who came across th[e] road [traveled by Rhonita, Christina, Dawna and their children] be it civilians, assassins from an opposing group or police. For example, at Bavispe they shot at the victims then in Agua Prieta they killed civilians and several police from that city. Th[is] shows what their objective was."[208]

---

[204] Mexican Government Apostille 4, Ex. 70 T.
[205] Testimony of Enrique Baeza, Tr. 113:19-21.
[206] Mexican Government Apostille 2, Ex. 4 T_000153.
[207] 18 U.S.C. § 2332a(c)(2).
[208] Testimony of Enrique Baeza, Tr. 115:2-6.

120.     The objective of the Cartel, by burning Rhonita, H.M. Jr., K.B.M. and the twins was "to cause terror in people."[209]

121.     The Court finds the affidavits and reports offered by Plaintiffs—Exhibits 25, 26, 27, 28, and 29—as expert testimony to be admissible pursuant to Fed. R. Evid. 702 and 703. Each of the proffered witnesses are experts qualified by their knowledge, skill, experience, training and/or education on the subject matters of automobile mechanics, traumatic and life-threatening injuries, and grief.

### d.  Injured In Person

122.     The murder of Rhonita, Christina, Dawna and their children, H.M. Jr., K.B.M., T.A.M., T.G.M., T.L. and R.L. and the attempted murder of F.M.J., K.L., D.L., M.L., C.L., J.L., X.L., and B.L. are all the types of injuries to "his or her person" as set forth in 18 U.S.C. § 2333(a).

123.     In addition to those who were present during the ambush, courts addressing claims under the ATA have almost uniformly allowed "solatium damages in suits brought under the ATA regardless of the availability of such damages under the general tort law of the state in which the district court sits" as such damages evince the deterrent intent of the ATA as a mechanism in the fight against terrorism.[210]

124.     The following paragraphs will outline the relationships of the Plaintiffs to the victims of this action:

---

[209] *Id.* at Tr. 115:11-12.
[210] *See Rosenberg v. Lashkar-e-Taiba*, 2016 U.S. Dist. LEXIS 87724, at *75-*76 (E.D.N.Y. July 5, 2016); *see also Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 41 (E.D.N.Y. 2019).

### (1) Rhonita LeBaron

125.    Howard Miller is the surviving husband of Rhonita LeBaron, and the surviving father of H.M. Jr., K.B.M, T.G.M., and T.A.M.[211]

126.    T.M., A.M., and Z.M. are the surviving children of Rhonita and surviving siblings of H.M. Jr., K.B.M., T.G.M. and T.A.M.[212]

127.    Adrian LeBaron-Soto and Bathsheba Shalom Tucker (hereinafter "Shalom Tucker") are Rhonita's surviving father and mother.[213]

128.    Rholena Lian Johnson, Adriana Jones, Melissa Conklin, William LeBaron, Ruthila LeBaron, Daver LeBaron, Miguel LeBaron, Javier LeBaron, Laura Corina LeBaron, and Matthew LeBaron are Rhonita's surving siblings.[214]

### (2) Christina Langford

129.    Tyler Johnson is the surviving husband of Christina Langford, and the surviving father of F.M.J.[215]

130.    Christina and Tyler have six surviving children together, each of whom have a solatium claim arising from the death of Christina—C.J., J.J., T.J., H.J., E.J., F.M.J.[216]

131.    Amelia Sedgwick is the surviving mother of Christina Langford.[217]

---

[211] Declaration of Howard Miller, Ex. 30 ¶ 3; Civil Registration of Marriage., Ex. 6.

[212] Declaration of Howard Miller, Ex. 30, ¶ 3; Testimony of Howard Miller, Tr. 174:11-18, 174:2-5, 175:4-22.

[213] Declaration of Adrian LeBaron-Soto, Ex. 36, ¶ 2; Testimony of Adrian LeBaron, Tr.194:15-24; Declaration of Bathsheba Shalom Tucker, Ex. 37, ¶ 3.

[214] Declaration of Rholena Lian Johnson, Ex. 47, ¶ 3; Declaration of Adriana Jones, Ex. 46, ¶ 2; Testimony of Adriana Jones, Tr. 496:14-17; Declaration of Melissa Conklin, Ex. 45, ¶ 3; Declaration of William LeBaron, Ex. 41, ¶ 3; Declaration of Ruthila LeBaron, Ex. 44, ¶ 3;Declaration of Dayer LeBaron, Ex. 43, ¶ 3; Testimony of Dayer LeBaron, Tr. 71:17-22; Declaration of Miguel LeBaron, Ex. 40, ¶ 3; Declaration of Javier LeBaron, Ex. 42, ¶ 3; Declaration of Laura Corina LeBaron, Ex. 39, ¶ 3; Declaration of Matthew LeBaron, Ex. 38, ¶ 1.

[215] Declaration of Tyler Johnson, Ex. 31, ¶¶ 3, 10; Testimony of Tyler Johnson, Tr. 354:6-11.

[216] *Id.* at ¶ 10; Testimony of Tyler Johnson, Tr. 358:15-20.

[217] Declaration of Amelia Sedgwick, Ex. 32, ¶ 4; Testimony of Amelia Sedgwick, Tr. 233:25.

132.      Isaac Langford, Serina Langford, Elizabeth Langford, and E.L., a minor under the

guardianship of Amelia, are Christina's surviving siblings.[218]

### (3) Dawna Ray

133.      David Langford and Dawna Ray shared 13 children—Crystal Langford, Brandy

Spenst, Bryce Langford, Joseph Cole Langford, K.L., D.L., T.L., M.L., C.L., J.L., X.L..

R.L., and B.L.[219]

134.      David Langford is the surviving father of T.L. and R.L. who were killed on

November 4, 2019 with their mother.

135.      K.L., D.L., M.L., C.L., J.L., X.L., and B.L. are the surviving children of Dawna

Ray and the surviving siblings of T.L. and R.L. who were present in the vehicle at the time

of the attack on November 4, 2019.

136.      K.L., M.L., C.L., X.L., and B.L. sustained non-fatal gunshot wounds in various

degrees of severity in the attack on November 4, 2019.

137.      Karen Woolley is the surviving mother of Dawna Ray.[220] Ms. Woolley is also

Jonathan Ray's legal guardian.[221]

138.      Jaremy Ray, James Ray, Justin Ray, Jonathan Ray, Kerah Ray, and Amber Ray are

Dawna's surviving siblings.[222]

---

[218] Declaration of Isaac Langford, Ex. 35, ¶ 3; Declaration of Serina Langford, Ex. 34, ¶ 1; Declaration of Elizabeth Langford, Ex. 33, ¶1; Declaration of Amelia Sedgwick, Ex. 32, ¶¶ 3-4.
[219] Testimony of David Langford, Tr. 322:15-16; Declarations of Joseph Cole Langford, Bryce Langford, Crystal Langford, Brandy Spenst, K.L., M.L., D.L., C.L. J.L., and David Langford, Exs. 57-66.
[220] Declaration of Karen Woolley, Ex. 48, ¶ 5; Testimony of Karen Woolley, Tr. 263:16.
[221] Guardianship Documents of Jonathan Ray, Ex. 23.
[222] Declaration of Jaremy Ray, Ex. 49, ¶ 3; Declaration of James Ray, Ex. 52, ¶ 3; Declaration of Justin Ray, Ex. 51, ¶ 3; Declaration of Jonathan Ray, By and Through Legal Guardian Karen Woolley, Ex. 53, ¶4; Declaration of Kerah Ray, Ex. 50, ¶ 3; Declaration of Amber Ray, Ex. 54, ¶ 3.

### B. Damages

#### 1. Damages under the Antiterrorism Act

139.     While Plaintiffs' claims are proceeding under both federal law and state statutory and common law, it is important to note that "the ATA incorporates 'general principles of tort law.' … The basic presumption is that Congress creates federal torts against the background of general tort law…."[223]

140.     The ATA provides "private parties the right to pursue common tort claims against terrorist organizations and those that provide material support or financing to terrorist organizations."[224]

141.     In fact, when the ATA was initially enacted in 1991, Senator Grassley stated that the ATA "removes the jurisdictional hurdles in the courts confronting *victims* and it empowers *victims* with all the weapons available in civil litigation …. The [ATA] accords *victims* of terrorism the remedies of American tort law."[225] This language "suggests that Congress intended that the full range of damages should be available to persons entitled to bring actions pursuant to §2333(a)."[226]

142.     In short, because Plaintiffs have satisfied their burden under the ATA, the state-law claims are superfluous as Plaintiffs are not seeking to "double dip" regarding damages in this case, as the ATA incorporates (and likely exceeds) the damages mechanisms available under state common-law remedies.

143.     The legislative history underpinning 18 U.S.C. § 2333(a) "in combination with the language of the statute itself, evidences an intent by Congress to codify general common

---

[223] *See Linde v. Arab Bank, PLC*, 97 F. Supp.3d 287, 336 (E.D.N.Y. 2015).
[224] *Weiss v. Nat'l Westminster Bank, PLC*, 242 F.R.D. 33, 50 (E.D.N.Y. 2007).
[225] *Litle v. Arab Bank, PLC*, 611 F. Supp.2d 233, 245 (E.D.N.Y. 2009), *quoting* 137 Cong. Rec. S4511 (Apr. 16, 1991).
[226] *Estates of Ungar v. Palestinian Authority*, 304 F. Supp.2d 232, 265 (D.R.I. 2004).

law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law."[227]

144.     This legislative history also "evinces a clear congressional intent to deter and punish acts of international terrorism" and to "hold[] terrorists accountable 'where it hurts them most: at their lifeline, their funds.'"[228]

145.     In *Ungar*, the Magistrate Judge held that "[t]he deterrent effect of [18 U.S.C. § 2333] will be maximized if it is interpreted to subject terrorists to the broadest possible range of damages" including "pecuniary damages … and also for non-economic damages, including loss of companionship, society, and mental anguish experienced by the victim's surviving family members, including his siblings."[229]

146.     Based on this precedent, damages in the ATA context apply not only to those who were injured and/or killed, but also to their immediate family members who sustained loss of their loved ones as a result of the attack.

147.     In ATA death cases that have reached a judgment, such as this case, courts have measured pecuniary economic loss (including loss of income, loss of parental services, etc.) and also non-economic loss including conscious pain and suffering (for the decedent's and survivor's) and mental pain and anguish (solatium) for the family members of the decedent(s) falling within the categories of parents, spouses, children, and siblings.  In many cases, courts have taken guidance from cases arising under an analogous statute, the "terrorism exception" to foreign sovereign immunity codified at 28 U.S.C. § 1605A.

---

[227] *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1010 (7th Cir. 2002) (citing various provisions of the legislative history leading to the enactment of the civil damages provision of the Antiterrorism Act).
[228] *Estates of Ungar*, 304 F. Supp.2d at 238 (citing additional provisions of the legislative history of 18 U.S.C. § 2333).
[229] *Ungar*, 304 F. Supp.2d at 267 (fully adopted by the District Judge in *Ungar*); *see also Morris*, 415 F. Supp. 2d at 1337; *Knox v. Palestine Liberation Organization*, 442 F. Supp. 2d 62 (S.D.N.Y. 2006).

### a. Estate Damages for Pain and Suffering

148.     Estate Plaintiffs under the ATA are eligible for damages based on the amount of pain and suffering endured before death and the amount of time between injury and death.[230]  The Court may also consider any mental anguish caused by observing injured relatives present at the scene.[231]

149.     In *Ungar*, decided in 2004, the court determined that the length of the attack was between ten seconds and 30 seconds with the court accepting 30 seconds for purposes of establishing damages for conscious pain and suffering where the decedent had lost consciousness at least by the end of the attack.[232]  There, the court looked to values for conscious pain and suffering generally in cases arising under the "terrorism exception" to determine an appropriate quantum of damages for the decedent's conscious pain and suffering:

> The physical injuries suffered by [the decedent] prior to his losing consciousness were severe and caused great pain. In addition, he experienced the mental pain resulting from observing that his wife had been horribly wounded and probably killed while seated next to him and knowing that his young son, lying in the back seat, was in danger of being killed. While this physical and mental agony was of mercifully brief duration, a substantial award for pain and suffering is justified. Accordingly, I recommend an award of $500,000 for pain and suffering to the estate. *Cf. Smith v. Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217, No. 01 CIV. 10132(HB), 2003 WL 21027170, at *15 (S.D.N.Y. May 16, 2003) (awarding $2.5 million for pain and suffering to estate of plaintiff who realized he was trapped and doomed in the North Tower of World Trade Center and likely experienced a very painful death); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 18, 23 (D.D.C. 2002) (awarding $10 million for pain and suffering to estate of bombing victim who survived with severe burns for forty-nine days and who suffered a higher level of pain throughout his stay at the hospital than a patient with his injuries otherwise would have endured because usual doses of pain

---

[230] *See Mastrantuono v. United States*, 163 F. Supp. 2d 244 (S.D.N.Y.2001); *see generally Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 51 (D.D.C. 2007).
[231] *Ungar*, 304 F. Supp. 2d at 270.
[232] *Id.*

medication could have lowered his blood pressure and killed him); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 113 (D.D.C. 2000) (finding $1 million appropriate compensation for pain and suffering of decedent who apparently struggled with his assassin for thirty seconds before being shot eight times); *Higgins v. Islamic Republic of Iran*, 2000 U.S. Dist. LEXIS 22173, No. 1:99CV00377, 2000 WL 33674311, at *8 (D.D.C. Sept. 21, 2000) (awarding $30 million for pain and suffering where decedent was held captive for 529 days in primitive conditions and whose body indicated grievous injuries and barbaric mutilations); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5, 8 (D.D.C. 2000) (concluding that $1 million was appropriate to compensate for "several minutes" of pain and suffering of bombing victim who expired on the scene); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998) (finding $1 million appropriate to compensate for three to five hours of pain and suffering of bombing victim).[233]

150.     More recent precedent validates this approach to damages for conscious pain and suffering.[234]  In *Gates*, two U.S. civilian contractors were beheaded by al-Qaeda in Iraq and "suffered unimaginable mental and physical agony" as "[e]ach man was alive throughout a significant portion of the beheading and knew his death was upon him, with pain and blood and indescribable suffering."[235] The court proceeded to award, to each estate, "compensatory damages for pain and suffering in the amount of $50,000,000.00."[236]

---

[233] *Id.*

[234] *See Hirshfeld v. Islamic Rep. of Iran*, 330 F. Supp. 3d 107, 145 (D.D.C. 2018) (awarding $1 million in "survival damages" where the decedent was shot, "was conscious, fearful and suffering for at least a few minutes after he was shot because he was able to run away from the shooter and into a building and then make it to the stairwell, where he was later found deceased"); *Braun v. Islamic Rep. of Iran*, 228 F. Supp. 3d 64, 83 (D.D.C. 2017) (awarding $1 million where evidence showed decedent "suffered being thrown into the air and an impact that caused her head to become smashed and her to begin vomiting and that she survived for two hours after the Attack, during which time she was attended to by medical personnel").

[235] *Gates v. Syrian Arab Republic,* 580 F.Supp.2d 53, 72-74 (D.D.C. 2008)

[236] *Id.* at 74.

### (1) Rhonita LeBaron

151.     Rhonita LeBaron was "born" and "made" to be a mother.[237] "[F]amily was the single most important thing in the world to her".[238] "[S]he was like an angel and her life was her family, her husband, and her friends."[239]

152.     On November 4, 2019, she was "so excited to be traveling to Phoenix. She was looking forward to seeing Howard …. She was also excited to be able to go shopping for the kids", and, according to her older sister Lian Johnson, "[i]t was kind of cute to see her so excited about the trip and reuniting with Howard."[240]

153.     Unfortunately, that excitement turned to "just total terror"[241] about forty-five minutes to an hour after Rhonita and her children left La Mora.

154.     As stated *supra*, Rhonita's vehicle was impacted by 321[242] bullets from the approximately 923 shots[243] fired by the Defendant from .223 caliber, 7.62x39mm, .308 caliber and 50mm long-gun rifles[244] from approximately 114 – 200 meters away "from the rear part of the vehicle."[245]

155.     Dr. Schubl is "convinced" and therefore, it was his "expert opinion that … Rhonita probably survived th[is] initial assault."[246]

156.     The evidence substantiates Dr. Schubl's opinion as Rhonita's seat was reclined towards the back seat.[247] The reclining of her seat was a conscious and deliberate attempt

[237] Testimony of Adriana Jones, Tr. 503:10-11.
[238] Declaration of Bathsheba Shalom Tucker, Ex. 37, ¶ 16
[239] Testimony of Kenneth Miller, Tr. 41:4-5.
[240] Declaration of Rholena Lian Johnson, Ex. 47, ¶ 16.
[241] Testimony of Dr. Schubl, Tr. 160:22-25.
[242] Rhonita LeBaron 1006 Summary Chart, Ex. 14; Mexican Government Apostille 1 Ex. 3 T_000226-000233.
[243] Rhonita LeBaron 1006 Summary Chart, Ex. 14; Mexican Government Apostille 2 Ex. 4 T_000153.
[244] Rhonita LeBaron 1006 Summary Chart, Ex. 14; Mexican Government Apostille 2, Ex. 4 T_000153.
[245] Rhonita LeBaron 1006 Summary Chart, Ex. 14; Mexican Government Apostille 2, Ex. 4 T_000160.
[246] Testimony of Dr. Schubl, Tr. 154:14-17.
[247] *See* Declaration of Adrian LeBaron-Soto, Ex. 36_000050, 53; Testimony of Adrian LeBaron-Soto, Tr. 220:12-16.

by Rhonita to shield herself from the onslaught of bullets and *not* the result of the fire as evidenced by the fact that on pages 48, 50, and 57 of Exhibit 36, the other seats in Rhonita's vehicle are shown in their standard upright-position.

157.     Dr. Schubl testified, to a reasonable degree of medical certainty, that "if you start when the first bullet was shot until the last person in [Rhonita's] car took their last breath, that must have been close to an hour, maybe 45 minutes of just total terror."[248]

158.     "Think about as a parent what that feels like when your kids are in the back of this car. They're hurt; they're scared. You're hurt; you're terrified, and there's nothing you can do."[249]

159.     "Just the emotional impact of both physical pain and knowing your life is likely to end; and for the mothers, of course, not being able to protect their children. It's … unimaginable."[250]

160.     "*And then* they set the car on fire."[251]

161.     The air became "superheated" and Rhonita, H.M. Jr., K.B.M., T.G.M., and T.A.M. were then "breathing in fire."[252] So not only were they "burning from the outside, [they were] burning from the inside."[253]  Then all the oxygen within the vehicle was completely consumed by the fire, so not only were Rhonita, H.M. Jr., K.B.M., T.G.M., and T.A.M. "burning to death after being shot, but [they were] also suffocating. [They were] asphyxiating because there's no oxygen left in the air."[254]

---

[248] Testimony of Dr. Schubl, Tr. 160:22-25.
[249] *Id.* at Tr. 159:23-25.
[250] Testimony of Dr. Schuurman, Tr. 481:6-19.
[251] Testimony of Dr. Schubl, Tr. 160:1.
[252] *Id.* at Tr. 160:9-10.
[253] *Id.* at Tr. 160:10-11
[254] *Id.* at Tr. 160:11-14.

162.      Even worse, Dr. Schubl testified, to a reasonable degree of medical certainty, that Rhonita, H.M. Jr., K.B.M., T.G.M., and T.A.M..'s sensation—their ability to hear, see, smell, feel, perceive and fear—remained intact as they sat in their car "burning to death, watching their siblings, their family members burn to death."[255]

163.      The abhorrent amount of pain and suffering Rhonita, H.M. Jr., K.B.M., T.G.M., and T.A.M. experienced—and established to a reasonable degree of medical certainty by Dr. Schubl—must have been "the most frightening thing that anyone has ever experienced."[256]

164.      Human bodies are resilient.  Rhonita would have had full sensation intact during the fire. She was able to "hear and feel"[257] and "watch[]"[258] her family, "the single most important thing in the world to her,"[259] "burn to death."[260]

165.      "It was, quite obviously and scientifically, a very cruel and inhumane … death."[261]

166.      The evidence in this case "is fully satisfactory to prove the pain and suffering experienced by" Rhonita LeBaron while she "remained conscious before [she] died."[262]

167.      Given the testimony provided by Dr. Schubl along with eyewitness testimony and video evidence recorded by the Defendant Juárez Cartel, the attack in which Rhonita LeBaron and four of her children were killed was horrific, heinous, and inhuman.  The Court is tasked with applying a figure to the pain and suffering that was sustained assuming—as Dr. Schubl testified—that it was more likely than not that Rhonita and her

---

[255] *Id.* at Tr. 160:15-161:2.
[256] *Id.* at Tr. 161:2-3.
[257] *Id.* at Tr. 160:16.
[258] *Id.* at Tr. 161:1.
[259] Declaration of Bathsheba Shalom Tucker, Ex. 37, ¶ 16
[260] Testimony of Dr. Schubl, Tr. 161:1-2.
[261] *Gates*, 580 F.Supp.2d at 73 (internal quotations omitted).
[262] *Id.* at 74.

children survived the hail of bullets that were directed at their vehicle and only perished as a result of the intentionally set fire on and in the vehicle.  The case whose facts most closely match the mental anguish and pain suffered by Rhonita is the *Gates* case in which two U.S. civilian contractors were beheaded by al-Qaeda in Iraq and "suffered unimaginable mental and physical agony" as "[e]ach man was alive throughout a significant portion of the beheading and knew his death was upon him, with pain and blood and indescribable suffering."[263]  In that case, the court proceeded to award, to each estate, "compensatory damages for pain and suffering in the amount of $50,000,000.00."[264]

168.       While the circumstances surrounding the deaths of Rhonita and her four children who were killed appears to rival that of the *Gates* scenario in terms of the actual horror, there are two mitigating factors from the *Gates* case—the individuals had been held hostage for multiple days before their executions, and their executions were broadcast for the whole world to see[265]—that support a downward departure from the *Gates* pain-and-suffering figures here.  The Court applies a 30% downward departure here that places the base value of pain-and-suffering damages for Rhonita LeBaron and each of her four children at $35,000,000.00.  The Court has chosen to apply inflationary calculations to these base values from the time that *Gates* was decided on September 26, 2008 and February 2022.[266]  Therefore, this Court awards compensatory damages for pain and suffering in the amount of $45,390,000.00 (rounding to the nearest ten thousand) to the Estate of Rhonita LeBaron.

---

[263] *Gates v. Syrian Arab Republic,* 580 F.Supp.2d 53, 72-74 (D.D.C. 2008)
[264] *Id.* at 74.
[265] *Id.* at 57-58 (setting out the facts regarding the hostage-taking, the announcement of the murders, and the broadcast on the Internet of the beheadings).
[266] Inflation from September 2008, when *Gates* was decided, to February 2022, has risen approximately 29.7%. *See* https://www.bls.gov/data/inflation_calculator.htm

**(2) H.M. Jr., K.B.M., T.A.M., and T.G.M.**

169.     H.M. Jr. was born on July 12, 2007 (twelve (12) years old on November 4, 2019); K.B.M. was born on September 25, 2009 (ten (10) years old on November 4, 2019); and the twins T.A.M. and T.G.M. were born on March 13, 2019 (seven (7) months old on November 4, 2019).[267]

170.     H.M. Jr. "loved to play basketball; he played all day, every day, with [his father] and with his cousins. He was a huge Kobe Bryant fan. He also enjoyed playing Fortnite with his cousins"[268] and he loved "Ramen noodles".[269]

171.     Rhonita was "so proud of the man [H.M. Jr.] had become; he would milk the cows before school and always be ready to go before it was time to go."[270] And she was excited to be going to Phoenix on November 4, 2019, on "a trip to spoil [H.M. Jr.] and [K.B.M.]."[271]

172.     K.B.M. was "a great big sister and liked to help Rhonita with her younger siblings. The family nicknamed her 'Momma [K.B.M.]' because she was such a natural with kids, just like her mom."[272]

173.     K.B.M. was also a "fashionista" and took her "pink purse" with her everywhere.[273]

174.     The twins—T.A.M. and T.G.M.—were happy, healthy, non-fussy seven-month-old twins.[274] "T.G.M. never even cried!"[275] "They were both just starting to sit up on their own and T.A.M. was beginning to crawl" in November 2019.[276]

---

[267] Declaration of Howard Miller, Ex. 30, ¶ 10.
[268] *Id.* at ¶ 45.
[269] Testimony of Howard Miller, Tr. 187:15-18.
[270] Declaration of Adriana Jones, Ex. 46, ¶ 15.
[271] Testimony of Howard Miller, Tr. 180:23:24.
[272] Declaration of Howard Miller, Ex. 30, ¶ 46.
[273] Declertion of Adriana Jones, Ex. 46, ¶ 27.
[274] Declaration of Howard Miller, Ex. 30, ¶ 47.
[275] *Id.*
[276] *Id.*

175.     As stated *supra*, Rhonita's vehicle was impacted by 321[277] bullets from the approximately 923 shots[278] fired by the Defendant from approximately 114 – 200 meters away "from the rear part of the vehicle."[279]

176.     Dr. Schubl is "convinced" and therefore, it is his "expert opinion that … all four of the children and Rhonita probably survived th[is] initial assault."[280]

177.     The evidence substantiates Dr. Schubl's opinion as H.M. Jr.'s remains were "found half-in/half-out of the vehicle. He knew they were in trouble and he was trying to flee."[281]

178.     It appears that K.B.M. "knew of and appreciated the danger she and her family w[ere] in" as her remains were "found in the back row, curled up in the fetal position trying to hide beneath the seat."[282] She was "so tightly curled up [into the fetal position] that … a little pink piece of her leather purse under her arm[]" was found by her aunts and uncles while they prepared her remains for burial.[283]

179.     This would *not* have been possible had H.M. Jr. or K.B.M. "been incapacitated by the bullets themselves."[284]

180.     Furthermore, because F.M.J.—who was near the same age as the twins when her vehicle was assaulted and and survived the shooting attack, it is Dr. Schubl's expert opinion that "it is more likely [than not] that Rhonita Miller's infant twins who were also in car seats survived the gun shot attacks on their vehicle before the fire was set [, and therefore,]

---

[277] Rhonita LeBaron 1006 Summary Chart, Ex. 14; Ex. 3 T_000226-000233.
[278] Rhonita LeBaron 1006 Summary Chart, Ex. 14; Ex. 4 T_000153.
[279] Rhonita LeBaron 1006 Summary Chart, Ex. 14; Ex. 4 T_000160.
[280] Testimony of Dr. Schubl, Tr. 154:14-17.
[281] Declaration of Bathsheba Shalom Tucker, Ex. 37, ¶ 43; *see also* Declaration of Adrian LeBaron-Soto, Ex. 36_000049, 57-59, 77-79.
[282] Declaration of Bathsheba Shalom Tucker, Ex. 37, ¶ 44; *see also* Ex. 37_000053-55.
[283] Declaration of Adriana Jones, Ex. 46, ¶ 27; *see also* Testimony of Adriana Jones, Tr. 518:11-18.
[284] Testimony of Dr. Schubl, Tr. 154:12-13.

it is extremely likely that Rhonita, [H.M. Jr., K.B.M., T.A.M. and T.G.M] were conscious, receptive, aware and alive when their vehicle was intentionally set on fire."[285]

181.    Death by fire in a confined space, like an automobile, "arguably is the worst way you can die", but according to Dr. Schubl that is not "a real summary" of the "terror" H.M. Jr., K.B.M., T.A.M. and T.G.M. "had to deal with on that day."[286]

182.    One has "to look at it from the start to the finish of the entire assault"[287]:

   a.   The Cartel unleashed a hail of gunfire – approximately 923 bullets.[288]

   b.   This required "reloading multiple times, and emptying their weapons and reloading again. This stretched on for minutes, many minutes."[289]

   c.   Now the "car can't move anymore," H.M. Jr., K.B.M., T.A.M. and T.G.M. are in "total panic" but "can't get out of the car because the attackers are right outside."[290] We know that H.M. Jr. did not try and flee during this point as there is no mention of anyone trying to flee the scene in the transcription from the video taken by the Cartel.[291]

   d.   H.M. Jr., K.B.M., T.A.M. and T.G.M. could see the Cartel coming down the hill, all the assassins were "carrying weapons", and they "kn[e]w what's about to happen"—their family was about to be murdered by the Defendant.[292]

   e.   The Cartel then surrounded the vehicle, and in Dayer LeBaron's expert opinion, they "douse[d] the car" with gasoline, "actually opened [H.M. Jr.'s] door and threw

---

[285] Expert Report of Dr. Schubl, Ex. 25_000025.
[286] Testimony of Dr. Schubl, Tr. 158:19-24.
[287] *Id*. at Tr. 158:25-159:1.
[288] Rhonita LeBaron 1006 Summary Chart, Ex. 14; Mexican Government Apostille 2 Ex. 4 T_000153.
[289] Testimony of Dr. Schubl, Tr. 159:3-4.
[290] *Id*. at Tr. 159:6-8.
[291] Mexican Government Apostille 3 Ex. 5 T_000035.
[292] Testimony of Dr. Schubl, Tr. 159:14-15.

the gasoline into the car."[293] The amount of fear and anxiety H.M. Jr. and the other children must have endured when the Defendant opened his door and poured gasoline on him is unconscionable.

183.     Applying the same application of *Gates* as set forth above for their mother, this Court awards compensatory damages for pain and suffering in the amount of $45,390,000.00 each to the Estates of H.M. Jr., K.B.M., T.A.M. and T.G.M.

### (3) Christina Langford

184.     Christina Marie Langford was born November 23, 1987.[294]

185.     She was a "fierce, protective" mother and "wanted her children to learn to be obedient and to be responsible and love one another and to know God. [She] [w]anted them to be good people. She wanted to teach them that. She homeschooled them and didn't like them watching TV."[295]

186.     Christina loved Tyler, her husband, and "no matter what" she was going to be with her husband, "always be where he [was]" and always "be there for him."[296] And in November 2019, that meant moving to North Dakota "to go start a new life".[297]

187.     Serina Langford, Christina's sister, "had never in [her] life seen Christina so happy. She was so excited to be meeting up with Tyler, the kids and to be moving to North Dakota. She was so excited to have their entire family together."[298]  The entire family would not, and never will be, together again.

---

[293] Testimony of Dayer LeBaron, Tr. 75:21-22; Testimony of Dr. Schubl, Tr. 159:16-20.
[294] Declaration of Amelia Sedgwick, Ex. 32 ¶ 5.
[295] Testimony of Amelia Sedgwick, Tr. 242:10-14.
[296] Testimony of Douglas Johnson, Tr. 409:1-3.
[297] Testimony of Tyler Johnson, Tr. 361:24.
[298] Declaration of Serina Langford, Ex. 34, ¶ 12.

188.     The Cartel ambushed and murdered Christina "14 kilometers and 700 meters north"[299] of where the Cartel murdered Rhonita and her children.

189.     Christina's vehicle was struck by 41 bullets[300] from approximately 327 shots[301] fired by the Defendant from .223 caliber and 7.62x39 mm long-gun rifles[302] from approximately 136-139 meters[303] "ahead and to the right"[304] of Christina's vehicle.

190.     According to Mr. Baeza—the prosecutor in-charge of the Mexican criminal investigation/prosecution—Christina "stepped out of her vehicle with her hands up in the air saying that there were women and children and asking for [the Cartel] not to shoot, but still the assassins shot and killed her."[305]

191.     Christina was shot, outside the vehicle, "just below her left shoulder" exiting "underneath her right arm" this "was most definitely the fatal shot that killed her."[306] While this was ultimately the fatal shot, it was not the only gunshot wounds Christina sustained that morning; she sustained three (3) additional gunshot wounds to her right arm, right and left thighs.[307]

192.     Dr. Schubl has "no doubt whatsoever that Christina survived the initial hail of bullets, the hundreds of rounds that were discharged at her vehicle, the 41 that impacted her vehicle."[308]

---

[299] Mexican Government Apostille 1, Ex. 3 T_000133.
[300] Mexican Government Apostille 1, Ex. 3 T_000227-28.
[301] Mexican Government Apostille 2, Ex. 4 T_000155.
[302] *Id*.
[303] Mexican Government Apostille 1, Ex. 3 T_000136.
[304] Mexican Government Apostille 1, Ex. 3 T_000220.
[305] Testimony of Enrique Baeza, Tr. 112:18-23.
[306] Testimony of Dr. Schubl, Tr. 146:1-5; *see also* Ex. 20.
[307] Testimony of Dr. Schubl, Tr. 147:2-5; *see also* Mexican Government Apostille 4, Ex. 70 T_000009-10.
[308] Testimony of Dr. Schubl, Tr. 148:8-10.

193.       During this time, it is Dr. Schubl's expert opinion that, Christina would have had and experienced the "thousand yard stare" or "this concept of doom" which is an "instinctive panic that sets in because you know that you've been lethally or nearly lethally injured. You're bleeding internally. Your heart's racing. You're emotionally overloaded. You're terrified."[309]

194.       The terror and panic Christina endured during this period of time was "compound[ed]" by the fact that 1) "her 7-month-old child is right behind her, subject to the same assault" and because 2) over time it became "more and more clear that no one's coming to help" her and her daughter.[310]

195.       It is Dr. Schubl's expert opinion that the gunshot wound to the chest was not "immediately lethal" and that Christina as a result "probably laid down or crawled for some minutes after that and then was probably conscious for at least 10 or 15 more minutes, if not longer."[311]

196.       As in *Smith*, where there was direct evidence of the decedent's surviving the initial crash of the plane into the North Tower on 9/11[312], here too there is direct evidence from *both* the Mexican authorities[313] and Dr. Schubl to substantiate the fact that with "no doubt whatsoever [] Christina survived the initial hail of bullets, the hundreds of rounds that were discharged at her vehicle, the 41 that impacted her vehicle."[314]

197.       Given that there is clear evidence that Christina survived the initial hail of bullets, that the ensuing time must have been emotionally and physically terrorizing, and that her

---

[309] *Id*. at Tr. 149:10-16.
[310] *Id*. at Tr. 149:4-5, 17-18.
[311] *Id.* at Tr. 148:14-17.
[312] *Smith ex rel Smith v. Islamic Emirate of Afghanistan,* 262 F.Supp.2d 217, 238-39 (S.D.N.Y. 2003).
[313] Testimony of Enrique Baeza, Tr. 112:18-23.
[314] Testimony of Dr. Schubl, Tr. 148:8-10.

death was very painful, the Court awards the Estate of Christina Langford, after accounting for inflation and in line with *Smith*, $11,550,000.00.[315]

### (4) Dawna Ray

198.     Dawna Ray was a woman with many friends and no enemies.[316] Dawna loved caring for her garden and enjoyed drinking coffee each morning.[317] She loved visiting with friends, but, above all else, she loved her family.[318] As a mother, she instilled in her children the principles of virtue and love.[319] She also ensured that each of her children felt individualized attention and love by preparing beautifully decorated cakes and planning special celebrations on their birthdays.[320]

199.     On November 4, 2019, Dawna was traveling to a family wedding where her nine children, including T.L. and R.L., could play and celebrate with their cousins.[321] Near the location of Christina's vehicle, the Cartel disabled Dawna's vehicle by firing at least 72 rounds.[322]

200.     As eyewitness testimony from two of her children attested, Dawna survived the initial gunshots, yelling for her children to "[g]et down" and praying to God for the safety of her family.[323] Not only did she survive to experience the panic and fear of a lethal attack

---

[315] Inflation has risen approximately 54% since May 2003 when *Smith* was decided to February 2022. https://www.bls.gov/data/inflation_calculator.htm; The court in *Smith* awarded the estate $7.5 million dollars for pain and suffering ($2.5 million "for which all the defendant [were] jointly and severally liable. In addition, pursuant to § 2333, the al Qaeda defendants" were liable "for an additional $5 million"). *Smith,* 262 F.Supp.2d at 239.
[316] Testimony of David Langford, Tr. 322:5-9.
[317] *Id.* at Tr. 322:9-10.
[318] *Id.* at Tr. 322:10-12.
[319] *Id.* at Tr. 322:17-19.
[320] *Id.* at Tr. 324:10-20.
[321] Testimony of K.L., Tr. 293:11-16, Testimony of D.L., Tr. 305:12-13.
[322] Expert Report of Dr. Schubl, Ex. 25_000009.
[323] Testimony of K.L., Tr. 295:11-12, Testimony of D.L., Tr. 307:6-9.

on her children, she also witnessed the top of her son's (T.L.'s) skull blown off by a gunshot.[324]

201.     Because evidence establishes that Dawna survived the initial attack, experienced emotional and physical terror, and witnessed the brutal murder of her son, T.L., the Court awards an upward adjustment from damages in *Smith* based on Dawna witnessing one of her minor children being brutally killed.   Whereas the judgment in *Smith* was $7,500,000.00, the Court awards a 33% upward baseline adjustment, after accounting for inflation[325], to the Estate of Dawna Ray of $15,440,000.00 for pain and suffering damages.

### (5) T.L. and R.L.

202.     T.L. had an active imagination and loved to make his siblings laugh.[326] R.L. was K.L.'s "mini me"; he looked like her and he refused to be separated from K.L. even sleeping in her bed at night.[327]

203.     As to R.L., he experienced the emotional terror of the initial attack while his sister K.L. attempted to push him to safety underneath the seat.[328] Although his conscious suffering was short, "there is no set formula for quantifying the pain and suffering" R.L. experienced.[329]

---

[324] Expert Report of Dr. Schubl, Ex. 25_000009.
[325] Inflation has risen approximately 53% since May 2003 when *Smith* was decided to January 2022. https://www.bls.gov/data/inflation_calculator.htm The court in *Smith* awarded the estate $7.5 million dollars for pain and suffering ($2.5 million "for which all the defendant [were] jointly and severally liable. In addition, pursuant to § 2333, the al Qaeda defendants" were liable "for an additional $5 million"). *Smith,* 262 F.Supp.2d at 239.
[326] Testimony of K.L., Tr. 302:22-23
[327] *Id.* at Tr. 294:21, 302:9-20, Testimony of David Langford, Tr. 325:1-4.
[328] Testimony of K.L., Tr. 295:18-19.
[329] *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 263 (D.D.C. 2008) (awarding the plaintiffs' estates $18,000,000.00 for 89 to 179 seconds of suffering including aircraft decompression, the breakup of the airplane at 35,000 feet, being hit by shards of shrapnel from the exploded aircraft, and plummeting to their death while likely on fire from the explosion).

204.     As to T.L., he experienced the emotional terror of the initial attack, hearing his

mother yell, "Get down."[330] But before he could find safety, he died from a fatal gunshot

wound to his head.[331]

205.     Given that there is clear evidence that T.L. and R.L. survived the initial hail of

bullets, that the ensuing time must have been emotionally and physically terrorizing, and

that their death was very painful, this Court awards, after accounting for inflation and in

line with *Smith*, $11,550,000.00 each to the Estates of T.L. and R.L. for pain and suffering

damages.[332]

### b.  Survivor Damages Pain and Suffering

206.     Pain and suffering damages for individuals who were injured in an attack but who

did not succumb to their injuries are also available.  Again, looking to precedent arising

from FSIA cases demonstrates a range of values for pain and suffering damages in these

circumstances.  Many courts addressing damages in a "directly injured" situation followed

what has been referred to as the *Heiser* framework.

207.     A more recent decision set forth the criteria for applying the *Heiser* framework:

> a court begins with baseline amounts and may adjust upward or downward
> to account for individual circumstances. For a directly-injured claimant,
> "[c]ourts generally 'begin[] with the baseline assumption that persons
> suffering substantial injuries in terrorist attacks are entitled to $5 million in
> compensatory damages.'" *Barry I*, 410 F. Supp. 3d at 180 (quoting *Wultz*,
> 864 F. Supp. 2d at 37-38). An upward adjustment to the $7 to $12 million
> range may be appropriate "in more severe instances of physical and
> psychological pain, such as where victims suffered relatively more
> numerous and severe injuries, were rendered quadriplegic, partially lost
> vision and hearing, or were mistaken for dead." *Valore*, 700 F. Supp. 2d at

---

[330] Testimony of D.L., Tr. 307:6-9.
[331] Expert Report of Dr. Schubl, Ex. 25_000795.
[332] Inflation has risen approximately 54% since May 2003 when *Smith* was decided to February 2022.
https://www.bls.gov/data/inflation_calculator.htm; The court in *Smith* awarded the estate $7.5 million dollars for
pain and suffering ($2.5 million "for which all the defendant [were] jointly and severally liable. In addition, pursuant
to § 2333, the al Qaeda defendants" were liable "for an additional $5 million"). *Smith,* 262 F.Supp.2d at 239.

84. Conversely, a downward departure to the $1.5 million to $3 million range may be appropriate "where victims suffered relatively more minor injuries, such as 'minor shrapnel injuries,' or 'severe emotional injury accompanied by relatively minor physical injuries.'" *Barry I*, 410 F. Supp. 3d at 180 (first quoting *Valore*, 700 F. Supp. 2d at 84, then quoting *Estate of Doe v. Islamic Republic of Iran* (*Estate of Doe II*), 943 F. Supp. 2d 180, 186 (D.D.C. 2013)). Such awards for physical injuries "assume severe psychological injuries." *Schertzman Cohen*, 2019 U.S. Dist. LEXIS 115278, 2019 WL 3037868, at *6 (citing *Wamai*, 60 F. Supp. 3d at 92-93).[333]

208.    In litigation arising out of the terrorist attacks on September 11, 2001, injury judgments asserted against Iran have yielded an upward adjustment from the *Heiser* framework.  In a more recent application of pain and suffering damages that arose as part of the September 11 Litigation, the Court "establishe[d] a baseline award of $7 million, an upward deviation of $10 million, and a downward deviation of $5 million.  The Court, however, reserves its discretion to award further upward departures in exceptional cases."[334]

### (1) F.M.J.

209.    In *Miller*, this analysis would apply to the claims related to minor F.M.J. as the only Plaintiff who was present during the attack who was not killed as a result of the attack on the vehicle where she was a passenger.

210.    Seven-month-old F.M.J. was traveling with her mother on November 4, 2019, and during the attacks, her car seat was shot three times.[335] It was reported for "a good three hours" that F.M.J. was dead.[336]

---

[333] *Barry v. Islamic Rep. of Iran*, 437 F. Supp. 3d 15, 53 (D.D.C. 2020).
[334] *Burnett v. Islamic Rep. of Iran*, 2020 U.S. Dist. LEXIS 22849, at *606 (S.D.N.Y. Feb. 7, 2020) (Magistrate Judge's Report and Recommendation adopted by the District Judge).
[335] Photo of F.M.J.'s car seat, taken by Tyler Johnson, Ex. 11.
[336] Testimony of Tyler Johnson, Tr. 375:24-25.

211.     Fortunately, F.M.J. survived, "but barely."[337] "[S]he was [found] strapped into a car seat alone with her mother dead outside the car[,] … severely dehydrated"[338] with "a tiny drop of blood on the top of her head … as if one of the bullets or a piece of plastic from the car seat or something where the bullet had whizzed past had nicked the very top of her head."[339]

212.     F.M.J. was strapped into that car seat alone and terrified "for a good eight, nine hours."[340]

213.     When she was found, and given to Shalom Tucker,[341] F.M.J. "was limp, quiet and soaked in bodily fluids."[342]  F.M.J. "was in total, complete shock and fear."[343]

214.     The fact that F.M.J. was seven months old at the time of the attack does not, according to Dr. Schuurman,[344] mean that she did not—nor will she not in the future—have to deal with the physical and mental pain and suffering associated with being present for, and a survivor of, this unconscionable attack on her and her mother. It is Dr. Schuurman's expert opinion that F.M.J. "will likely grapple with the horrifying circumstances of her mother's death, and more likely than not will need professional help to do so."[345]

---

[337] Testimony of Dr. Schubl, Tr. 150:7.
[338] *Id.* at Tr. 150:7-10.
[339] Testimony of Amelia Sedgwick, Tr. 253:9-13.
[340] Testimony of Tyler Johnson, Tr. 372:3.
[341] Family Photo of Shalom Tucker and F.M.J., Ex. 22.
[342] Declaration of Bathsheba Shalom Tucker, Ex. 37_000005, ¶ 33.
[343] *Id.*
[344] Testimony of Dr. Schuurman, Tr. 430:10-25.
[345] Expert Report of Dr. Schuurman, Ex. 26_000016.

215.      It is also Dr. Schuurman's expert opinion that F.M.J. is a high risk for "continuing and persistent symptoms of trauma and grief, including depression, anger, sadness, anxiety, helplessness, and hopelessness."[346]

216.      In addition, some "have described F.M.J. living as a miracle"[347] which may, in Dr. Schuurman's expert opinion confer additional "pressure" on F.M.J. "to perform in ways that aren't always consistent" with her personality.[348]

217.      "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case."[349] "An upward adjustment [for survivor pain and suffering damages] … may be appropriate in more severe instances of physical and psychological pain, such as where victims … were mistaken for dead."[350]

218.      F.M.J. was mistaken for dead, severely dehydrated, terrified and alone strapped into her car seat for what must have felt like an enternity. Accordingly, and in no uncertain terms does F.M.J.'s inability to (currently) verbalize and express the sheer scope of the severe physical and psychological pain and suffering she endured on November 4, 2019, undermine her claim for, and upward departure to, survivor pain and suffering damages.

219.      Nonetheless, the limited physical injuries sustained by F.M.J. may require the Court to temper an upward adjustment and instead, rely on the baseline value applied in the *Burnett* action arising out of the terrorist attacks on September 11, 2001.

---

[346] Expert Report of Dr. Schuurman, Ex. 26_000010.
[347] Testimony of Dr. Schuurman, Tr. 479:24-25.
[348] *Id.* at Tr. 480:3-6.
[349] *Barry*, 437 F. Supp. 3d at 53 (quoting *Oveissi*, 768 F.Supp.2d at 26).
[350] *Id.* (internal citation and quotations omitted).

220.     Accordingly, the Court awards, after accounting for inflation, of $7,680,000.00 in compensatory non-economic, survivor pain and suffering damages to F.M.J.[351]

**(2) C.L.**

221.     Eight-year-old C.L. was traveling with his mother and siblings on November 4, 2019. During the attack, C.L. suffered grievous gunshot wounds, including a 4 x 6 centimeter wound to his jaw, a puncture wound on his left leg, a puncture wound on his right chest, a puncture wound on his right forearm, and a 6 x 8 centimeter wound on his right leg.[352] Additionally, he witnessed the gruesome murders of his mother, his brother T.L., and his brother R.L.[353]

222.     With their mother dead and no means to contact their relatives, the children were on their own to tend to their wounds and to find help.[354] C.L.'s suffering continued in the aftermath of the attack. His siblings held a pillow to his missing jaw to stanch his bleeding while carrying him down the mountain.[355] He could not walk given the gaping gunshot wound on his right leg, exposing tendon and muscle.[356]

223.     While waiting more than ten hours for his eventual rescue, he was unable to drink any water because it would leak through his jaw wound.[357] Even after his rescue, he did not receive proper hydration and medical care until more than 14 hours after the attack.[358]

---

[351] Inflation has risen approximately 9.6% since *Burnett* was decided in February 2020 to February 2022. *See* https://www.bls.gov/data/inflation_calculator.htm
[352] Testimony of David Langford, Tr. 343-44:22-25; Declaration of C.L., Ex. 64; Supplemental Declaration of David Langford, Ex. 72 at 70.
[353] Declaration of C.L., Ex. 64.
[354] Testimony of D.L., Tr. 309:7-9, 24-25.
[355] *Id.* at Tr. 310:16-18.
[356] Declaration of C.L., Ex. 64, Supplemental Declaration of David Langford, Ex. 72, at 5-6.
[357] Testimony of K.L., Tr. 300:21-23.
[358] Testimony of David Langford, Tr. 343:15-24.

224.     C.L. underwent seven surgeries to address his wounds, had his jaw wired shut, and remained in the hospital for two months after the attack.[359] Even so, C.L. will require a future surgery to replace missing teeth—that is, if his jaw sufficiently regrows to hold new teeth.[360]

225.     When C.L. was released from the hospital, he used a wheelchair.[361] Through physical therapy he learned to walk again, albeit with a limp.[362] To this day, he experiences pain in his hip from his injuries and permanent facial disfigurement.[363]

226.     Not only does C.L. suffer from his permanent physical injuries, but he also suffers from witnessing the murders of his mother and siblings. C.L. continues to have nightmares about the day of the attack.[364] Treating physicians acknowledged that C.L. and the other Langford children present for the attack will require "significant social support" due to the traumatic nature of their injuries as well as the injuries and deaths their mother and siblings.[365]

227.     As all the case law demonstrates, "there is no exact comparison, and indeed, strict application of precedent could lead to conflicting conclusions about an appropriate award."[366] Evaluating each victim's unique suffering is undeniably difficult and an inexact science.[367] Considering all the circumstances, the court awards $12,000,000.00 to C.L. in

---

[359] Declaration of C.L., Ex. 64; Supplemental Declaration of David Langford, Ex. 72 at 68; Testimony of David Langford, Tr. 347:1-9.
[360] Testimony of David Langford, Tr. 347:10-15.
[361] Declaration of C.L., Ex. 64 at 10.
[362] Declaration of C.L., Ex. 64, at 10; Declaration of David Langford, Ex. 66 at 41.
[363] Declaration of C.L., Ex. 64, at 10.
[364] Declaration of David Langford, Ex. 66, at 39-41.
[365] Supplemental Declaration of David Langford, Ex. 72, at 136.
[366] *Brewer v. Islamic Rep. of Iran*, 664 F. Supp. 2d 43, 57 (D.D.C. 2009).
[367] *Id.*

accordance with the *Burnett* decision which, adjusted for inflation, totals $13,160,000.00 in compensatory non-economic, survivor pain and suffering damages.

### (3) K.L., M.L., X.L., and B.L.

228.     Fourteen-year-old K.L., nine-year-old M.L., four-year-old X.L., and eight-month-old B.L. were also traveling with their mother and siblings on November 4, 2019.[368] During the attack, K.L. suffered a gunshot wound to her foot[369]; M.L. suffered a gunshot wound to her back and forearm, causing nerve damage[370]; X.L. suffered a shoulder facture and a gunshot wound two inches in diameter to his shoulder[371]; and B.L. suffered a six-centimeter laceration across his chest, exposing his muscle, and a fractured wrist.[372] Additionally, they witnessed the gruesome murders of their mother, their brother T.L., and their brother R.L.[373]

229.     When the firing began, K.L. described fear resonating inside the vehicle, hearing her siblings screaming for the entire attack, and her mother praying.[374] Similar to C.L. their suffering continued in the aftermath of the attack, K.L. carried her injured brothers, X.L. and B.L., down a rugged and mountainous road even though she was barefoot and had suffered a gunshot wound to her foot.[375]

230.     They waited more than ten hours in freezing temperatures without food, water, or warmth for their rescue while fearing that the cartel would return to kill them.[376]

---

[368] Testimony of D.L., Tr. 305-06:24-5.
[369] Testimony of David Langford, Tr. 345:1-4.
[370] *Id.* at Tr. 345:6-8.
[371] Supplemental Declaration of David Langford, Ex. 72, at 197.
[372] Testimony of David Langford, Tr. 346:21-24; Supplemental Declaration of David Langford, Ex. 72, p. 26.
[373] Declaration of K.L., Ex. 61; Declaration of M.L., Ex. 62; Declaration of David Langford, Ex. 66.
[374] Declaration of K.L., Ex. 61, at 9, 13.
[375] Testimony of K.L., Tr. 297:14-18; 297:25-298:4.
[376] Declaration of K.L., Ex. 61, at 3.

231.     M.L. attempted to reach La Mora alone to save her siblings even though she was barefoot and injured.[377] However, she became disoriented and made a wrong turn down an unused road to Bavispe.[378] Undoubtedly, she experienced sheer terror wandering through the pitch-black desert lost for hours.

232.     Each child was hospitalized to treat their injuries.[379] Although their physical injuries healed, treating physicians acknowledged that all the Langford children present for the attack will require "significant social support" due to the traumatic nature of their injuries as well as the injuries and deaths of family members.[380] Each of them acted to save each other and they all carry guilt that they could not save their brother T.L. and their baby brother R.L., who was sitting on K.L.'s lap at the moment of attack.[381]

233.     Accordingly, the Court awards, accounting for inflation and in accord with the standard upward deviation in the *Burnett* decision, $10,970,000.00 each in compensatory non-economic, survivor pain and suffering to K.L., M.L., X.L., and B.L.

### (4) D.L. and J.L.

234.     Thirteen-year-old D.L. and six-year-old J.L. were also traveling with their mother and siblings on November 4, 2019. Miraculously, D.L. and J.L. avoided any gunshot wounds, but still suffered the physical and emotional trauma in the aftermath of the attack.

235.     D.L. witnessed his mother, Dawna, slump over her steering wheel as she died from multiple gunshot wounds.[382] During the attack, D.L. looked over to his brother T.L., who

---

[377] Declaration of K.L., Ex. 61.
[378] Testimony of Kenneth Miller, Tr. 62:10-24.
[379] Supplemental Declaration of David Langford, Ex. 72, at 25-228
[380] *Id.* at 136.
[381] Declaration of K.L., Ex. 61, at 12.
[382] Declaration of D.L., Ex. 63 at 10; Expert Report of Dr. Schubl, Ex. 25_00009, 000788

was missing the top of his skull from a gunshot wound and over to his brother R.L. who died on the floorboard from multiple gunshot wounds.[383]

236.     After the attack, D.L. carried his brother C.L. and assisted with carrying X.L. for 20 minutes towards La Mora.[384] When D.L. could not carry C.L. any farther, he volunteered to continue the eight-mile journey to La Mora while his siblings waited near the road for help to arrive.[385] Slowing his progress, the cartel actively shot at D.L., forcing him to hide in bushes and veer from the main road.[386] During his entire run down the mountain, D.L. thought his siblings' survival depended on him finding family to rescue them.[387]

237.     J.L. waited on the mountain in the near-freezing temperatures with K.L., M.L., X.L., and B.L. for D.L.'s return.[388]

238.     As with their siblings, D.L. and J.L. will require "significant social support" due to witnessing the traumatic injuries and deaths of his close family members.[389] To this day, D.L. finds it difficult to talk about the events of the attack, often referring to the attack as "the tragedy that happened."[390] They suffer from the emotional toll of losing their loved ones in a horrific attack, from nightmares, and from anxiety upon hearing loud noises.[391]

239.     Accordingly, the Court awards $10,000,000.00 each in compensatory non-economic, survivor pain and suffering to D.L. and J.L.

---

[383] Declaration of D.L., Ex. 63 at 9-10.
[384] Testimony of D.L., Tr. 310-11:16-2.
[385] Id. at Tr. 310-11:24-2.
[386] Id. at Tr. 312-13:23-8.
[387] Id. at Tr. 314:4-5; Declaration of D.L., Ex. 63 at 14.
[388] Declaration of D.L., Ex. 63 at 13.
[389] Supplemental Declaration of David Langford, Ex. 72, p. 136.
[390] Testimony of D.L., Tr. 313:22.
[391] Declaration of D.L., Ex. 63 at 22.

### c. Pain and Suffering Damages for Survivors of Victims/Solatium Damages

240.     In the terrorism context under the Antiterrorism Act, "non-economic damages are
… available, including loss of companionship and society, and mental anguish experienced
by the victim's surviving family members."[392]   Put more plainly, "[c]ourts permit
'[p]laintiffs to pursue claims for solatium [emotional] damages' under the ATA."[393]

241.     "Courts addressing the availability and amount of solatium damages in terrorism
cases … have considered damages awards in other terrorism cases, including those decided
under the related terrorism exception to the Foreign Sovereign Immunities Act ('FSIA'),
28 U.S.C. § 1605A…."[394]

242.     Under the FSIA, solatium damages are awarded to compensate "the mental anguish,
bereavement, and grief that those with a close relationship to a decedent experience as the
result of the decedent's death, as well as the harm caused by the loss of the decedent's
society and comfort."[395]

243.     For the pain and suffering of relatives who were not present at the site of the attack,
damages "must be determined by the nature of the relationship and the severity and
duration of the pain suffered by the family member."[396] The factors that may be considered
in assessing solatium damages are: "(1) whether the decedent's death was sudden and
unexpected; (2) whether the death is attributable to negligence or malice; (3) whether the
claimants have sought medical treatment for depression or related disorders resulting from

---

[392] *Lelchook v. Islamic Rep. of Iran*, 2020 U.S. Dist. LEXIS 221606, at *20 (E.D.N.Y. Nov. 23, 2020).
[393] *Estate of Henkin*, 495 F. Supp. 3d at 152; *see also Weinstock v. Islamic Rep. of Iran*, 2019 U.S. Dist. LEXIS 75532, at *11-*12 (S.D. Fla. May 6, 2019) (addressing availability of solatium damages in default judgment against the foreign terrorist organization Hamas).
[394] *Weinstock*, 2019 U.S. Dist. LEXIS 56937, at *12; *see also Goldstein*, 383 F. Supp. 3d at 19 ("courts strive to maintain consistency for awards as between the specific plaintiffs and among plaintiffs in comparable situations.").
[395] *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D. D.C. 2010).
[396] *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 55 (citing *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56).

the decedent's death; (4) the nature (i.e., closeness) of the relationship between the claimant

and the decedent; and (5) the duration of the claimant's mental anguish in excess of that

which would have been experienced following the decedent's natural death."[397]

244.     The *Heiser* decision created a framework also for solatium damages for the family

members of individuals who were killed in terrorist attacks:

> In determining the amount of compensatory damages awards to family
> members of a surviving victim, this Court has held that these awards are
> determined by the "nature of the relationship" between the family member
> and victim, and "the severity of the pain suffered by the family
> member." *Haim*, 425 F. Supp. 2d at 75. Spouses typically receive greater
> damage awards than parents, who, in turn, receive greater awards than
> siblings. *Compare, e.g., Anderson v. Islamic Republic of Iran*, 90 F. Supp.
> 2d 107, 113 (D.D.C. 2000) (Jackson, J.) (awarding $10 million to the wife
> of a hostage and torture victim); *Sebago*, 18 F. Supp. 2d at
> 70 (same), *with Eisenfeld*, 172 F. Supp. 2d at 8 (awarding $5 million each
> to the parents and $2.5 million each to the siblings of victims of a suicide
> bombing on a passenger bus); *see also Flatow*, 999 F. Supp. at 31 (awarding
> parents each $5 million and siblings each $2.5 million of victim who was
> killed in the same passenger bus bombing in which Seth was
> injured). Moreover, "families of victims who have died are typically
> awarded greater damages than families of victims who remain alive." *Id.*
> While the loss suffered by the plaintiffs in these cases is undeniably difficult
> to quantify, courts typically award between $8 million and $12 million for
> pain and suffering resulting from the death of a spouse, approximately $5
> million to a parent whose child was killed, and approximately $2.5 million
> to a plaintiff whose sibling was killed.[398]

245.     The September 11 Litigation altered the determination of solatium damages.  In

that litigation, the court adopted solatium values of $12.5 million for spouses, $8.5 million

for parents, $8.5 million for children, and $4.25 million for siblings.[399]  In making its

determination, the court stated that "[c]onsidering the extraordinarily tragic circumstances

surrounding the September 11th attacks, and their indelible impact on the lives of the

---

[397] *Rosenberg*, 2016 U.S. Dist. LEXIS 87724, at *104-*105, *quoting Knox*, 442 F. Supp. 2d at 78.
[398] *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269.
[399] *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 110673, at *105-*106 (S.D.N.Y. July 30, 2012). These awards were upward departures of 56% for spouses and 70% for parents and siblings from *Heiser*.

victims' families" it was "appropriate to grant the upward departures from the *Heiser* framework."[400]

246.     The above precedent are solely guidelines, as adjustments from baseline awards are available. "*These numbers, however, are not set in stone.*"[401] Courts have discretion to "grant solatium damages based on the particular facts of each case, subject to abuse-of-discretion review for errors of law, clearly erroneous factual findings and faulty reasoning."[402]

247.     Adjustments upward may be warranted when the evidence establishes: "an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing."[403]

248.     Furthermore, "families of torture and hostage-tak[en] victims are typically awarded greater damages than are the families of victims of a single attack because in the former cases, the afflicted party not only had to cope with the grief that follows the loss of a loved one, but—at the time of the event was also forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive family member."[404]

249.     As stated by Adriana Jones, and family members *infra*, initial thoughts in this case were that their family members were kidnapped which was "still horrible to think about so

---

[400] *Id.*
[401] *Greenbaum v. Islamic Republic of Iran,* 451 F.Supp.2d 90, 108 (D.D.C. 2006) (emphasis added).
[402] *Warmbier v. Democratic People's Rep. of Korea,* 356 F. Supp. 3d 30, 58 (D.D.C. 2018) (internal citations omitted).
[403] *Oveissi,* 768 F. Supp. 2d at 26-27; *see also Flanagan,* 87 F. Supp. 3d at 118.
[404] *Warmbier,* 356 F.Supp.3d at59  (internal citation and quotations omitted).

[the families were] still devastated but [they were] devastated because they're kidnapped. … [they were] thinking how [K.B.M.] must be feeling and are [the Cartel] going to take this little girl and … [a]re they going to rape Nita and [K.B.M.]"[405]

250.     Such anguish and "first-hand observations and acute memories of their child's death" led the court in *Warmbier* to award a 300% upward adjustment from *Heiser* to the decedent's parents. [406]

251.     Additionally, as the court noted in *Greenbaum*, "larger awards are typically reserved for cases with aggravating circumstances that appreciably worsen the surviving spouse's pain and suffering".[407] This may be indicated by things such as "[t]estimony which describes a general feeling of permanent loss or change caused by decedent's absence" or "[m]edical treatment for depression and related affective disorders."[408]

252.     Through report and testimony evidence, Dr. Donna Schuurman from The Dougy Center in Portland, Oregon proffered her expert opinions as to the grief, loss and bereavement of "two of the families who were impacted by the death of Rhonita and the death of Christina."[409]

253.     Dr. Schuurman discussed the four risk factors (all of which are present in this case) that affect children when a parent dies, as well as ten complicating factors that arise when a parent is murdered.[410]

254.     The four risk factors include:

---

[405] Testimony of Adriana Jones, Tr. 507:5-13.
[406] *Warmbier*, 356 F.Supp.3d at 59 (internal citations and quotations omitted); *see also Pugh*, 530 F.Supp.2d at 266 (325% upward departure from *Heiser* for spouse; 320% upward departure from *Heiser* for siblings).
[407] *Greenbaum*, 451 F.Supp.2d at 108.
[408] *Flatow*, 999 F.Supp at 31; *Greenbaum*, 451 F.Supp.2d at 108.
[409] Testimony of Dr. Schuurman, Tr. 438:13-15; Expert Report of Donna Schuurman, Ex. 26.
[410] Expert Report of Dr. Schuurman, Ex. 26_000005; *see also* Testimony of Dr. Schuurman, Tr. 450:5-451:6.

- Higher risk for mental health problems, lower academic success, lower self-esteem, and greater external locus of control (e.g. sensing oneself as a victim);

- Higher risk for anxiety, depression, behavioral issues, and substance abuse;

- Higher risk for depression among girls/aggression and acting out among boys; and

- Higher risk for depressive symptoms and future relationship challenges.[411]

255.    There are ten "additional risk factors" (all of which are present in this case) that apply to children who lose a parent, parent who lose a child, and siblings who lose a sibling due to a "violent death".[412]

256.    The ten complicating factors include:

- The closeness of the relationship;

- Whether the death was sudden and occurred without warning;

- Whether the loss was untimely;

- Whether the manner of death was violent;

- Whether the manner of death caused trauma to the loved one's body;

- Whether the surviving family members believe that the loved one may have suffered;

- Whether the death was caused by someone else's negligence;

- Whether the death is regarded as unjust;

- Whether the person or persons whose actions brought about the death are held accountable for what happened; and

---

[411] Expert Report of Dr. Schuurman, Ex. 26_000005; *see also* Testimony of Dr. Schuurman, Tr. 450:5 – 451:6.
[412] *Id.* at Tr. 452:5-8.

- Whether the responsible party or parties show remorse for what happened[413].

257.     First, Dr. Schuurman discussed how the closeness of the family related to the families in this case.  She stated: "And I have to say in this situation these three mothers, wives, sisters, daughters, everyone loved. Were beautiful, caring women. And their children with so much hope in front of them whose lives were just tragically ended that -- and I think numerous people have said, you know, no one had a bad word about Rhonita. No one had a bad word about Christina, you know. And so the closeness of family, immediate family as well as extended family -- and I do -- I will add that I think a protective factor in this is the number of loving, caring family members and community members who have surrounded the families because not everyone has that; so that is a helpful and protective factor. And it doesn't bring them back."[414]

258.     Risk factors "4 through 6, deal with a violent nature or the suffering of the individual or the trauma caused to their body" and "the callousness and the ruthlessness and the horror of how [these innocent women and children] were killed, [] just adds another dimension" of risk and pain "that isn't there when someone dies of a heart attack."[415]

259.     The impact to the Howard Miller and the entire LeBaron family, in particular, knowing that Rhonita and the kids were conscious and alive when their vehicle was incinerated beyond recognition "just adds more horror to the reality of what happened."[416] As Rhonita's mother, and H.M. Jr., K.B.M., T.A.M. and T.G.M.'s grandmother, Bathsheba

---

[413] Expert Report of Dr. Schuurman, Ex. 26_000005-09; *see also* Testimony of Dr. Schuurman, Tr. 452:15-456:11.
[414] Testimony of Dr. Schuurman, Tr. 457:22-458:-8.
[415] *Id.* at Tr. 458:10-18.
[416] *Id.* at Tr. 459:2-3.

Shalom Tucker, said the worst part of this all is that "it appears as if Nita and the kids knew they were going to die."[417]

260.     As Rhonita's father said, "[i]t was horrible, it was sickening; I cannot imagine a more gruesome scene for a father and a family to have to encounter and … me, my wife and family were forced to do the unconscionable, collect our families bones and ashes."[418]

261.     As it relates to Christina Langford, a complicating risk factor for her husband (Tyler Johnson), children, mother and brother and sisters will be knowing that she exited her vehicle to attempt to show that she was an innocent woman and yet her she was still callously murdered.[419]

262.     What happened to these families "is unjust. It is unfair. … [I]t is unlikely that every perpetrator will be found and will be brought to justice let alone express remorse for their behavior, and that is a reality that doesn't end."[420] As Dr. Schuurman testified:

> I think every parent, every father, every mother has it innately in them that one of their roles is to protect their children. Every husband wants to protect his wife and children, and the inability to do that in this horrific situation adds to the complicating factors. It is unjust. It is unfair. … [I]t is unlikely that every perpetrator will be found and will be brought to justice let alone express remorse for their behavior, and that is a reality that doesn't end. You don't some magical day say, "I think I'm okay with that." You know, it's always there. And it's kind of like it's unresolvable. It fosters what we call "rumination," which is a negative outcome actually. And rumination comes from the word -- from animals that are ruminates that -- like cows that chew their cud, chew their food but they never digest it. And so one of the challenges here is there's not going to be some nice way to neatly wrap this all in a package and tie a bow on it and say, "Okay. I think I'm done now. It's all over." This has shaped and it will continue to shape every family member who loved each of these children and each of these mothers.[421]

---

[417] Declaration of Bathsheba Shalom Tucker, Ex. 37. ¶ 43.
[418] Declaration of Adrian LeBaron-Soto, Ex. 36, ¶ 37.
[419] Testimony of Dr. Schuurman, Tr. 459:11-25.
[420] *Id.* at Tr. 460:10-14.
[421] *Id.* at Tr. 460:6-461:14.

263.     Many of the family members in this case check *all* ten of these boxes, or have all ten complicating factors present, and as such, they are at greater risk to experience, going forward:

   a. "[D]epression, major depressive disorder, certainly Posttraumatic Stress Disorder[,] … sense of helplessness";[422]

   b. "[C]ertainly, … higher levels of anxiety".[423]

   c. "[A] higher potential propensity for panic attacks,"[424] which have already manifested themselves in Plaintiff's Karen Woolley[425] and Kerah Ray.[426]

   d. "[S]eparation anxiety" which "has been evidence by some of the children": "'I don't want to sleep alone; I'm afraid to be alone; I don't want to sleep alone; I want to be around people.'"[427]

   e. "[S]urvivor's guilt. Why did I live and my sibling dies? … Why our family?" Why didn't I do X, Y or Z?"[428]

264.     As each family member expressed,  through  testimony and/or through sworn declarations accepted into evidence during the trial, the deaths of Christina, Dawna, Rhonita, and the children have had a profound effect on each of the family-member Plaintiffs since the attack causing each of them injury.

265.     Plaintiffs in this action also had to, among other things, "load[] up" their deceased family members "into the back of a flatbed truck" and take them home and pack their bodies with ice[429]; and "collect and piece together the remains of [their] daughter and grandchildren".[430]

---

[422] *Id.* at Tr. 461:19 – 462:8.
[423] *Id.* at Tr. 462:9-10.
[424] *Id.* at Tr. 462:18-19.
[425] Declaration of Karen Woolley, Ex. 48, ¶ 26.
[426] Declaration of Kerah Ray, Ex. 50, ¶ 28.
[427] Testimony of Dr. Schuurman, Tr. 463:1-4.
[428] *Id.* at Tr. 463:11-13.
[429] Declaration of Justin Ray, Ex. 51, ¶¶ 15, 16.
[430] Declaration of Bathsheba Shalom Tucker, Ex. 37, ¶ 46.

266.     Dr. Schubl's report and testimony describe in-detail the agonizing horror, mental and physical pain and suffering Rhonita, H.M. Jr., K.B.M., T.A.M., T.G.M., and Christina Langford[431] went through and as Dr. Schuurman testified, this only "adds more horror to the reality of what happened"[432] for these families and will "complicate[] how [they] … find peace."[433]

267.     Plaintiffs have suffered great personal loss due to the suffering and death of their dearly loved family members.  While some may have, and continue to suffer more than others, *all* have suffered the particularly devastating and uniquely acute pain and suffering arising from these particular events warranting upward enhancement departures.[434]

268.     The fundamental aim of terrorism is to instill fear and trepidation – and that was *precisely* what the Defendant's objective was on November 4, 2019.[435]

269.     Plaintiffs are those who paid the immediate price for this terrorist effect, and it is the Plaintiffs who are, and forevermore will be, reminded constantly of the cruel and terrible deaths their loved ones.

270.     This case involves the murder of innocent women and children; not military personnel, members of a peace-keeping force or independent contractors on hostile foreign soil – these were innocent United States citizens in the prime of their lives traveling to be with friends and family.

271.     Plaintiffs have also requested that this Court apply upward departures from the *Havlish* numbers for certain of the solatium awards sought to compensate for the litany of

---

[431] *See generally* Expert Report of Dr. Schubl, Ex. 25; Testimony of Dr. Schubl, Tr. 141:13 – 149:18, 153:20 – 161:3.
[432] Testimony of Dr. Schuurman, Tr. 459:2-3.
[433] *Id.* at Tr. 459: 24-25.
[434] *Valore*, 700 F.Supp.2d at 86
[435] Testimony of Enrique Baeza, Tr. 115:10-12.

aggravating circumstances present in this case and to reinforce the objectives of the ATA that 1) United States citizens are off-limits and 2) that this Court, as will the courts following the wake of this Court, will "hold terrorists accountable where it hurts them most: at their lifeline, their funds."[436] Plaintiffs' requests are discussed below.

272.    The Court may also consider the rate of inflation that has occurred since these framework cases were decided.  According to the Bureau of Labor Statistics, from when *Havlish* was decided in July 2012 to February 2022, inflation has risen 23%[437]; meaning that the present value of those claims evaluated ten years ago should be adjusted as follows:

|  | *Havlish* solatium values | Present Day solatium values, accounting for inflation[438] |
|---|---|---|
| **Spouses** | $12,500,000.00 | $15,300,000.00 |
| **Parents** | $8,500,000.00 | $10,400,000.00 |
| **Children** | $8,500,000.00 | $10,400,000.00 |
| **Siblings** | $4,250,000.00 | $5,200,000.00 |

### (1) Family of Rhonita LeBaron

### (a) Howard Miller

273.    United States citizen[439] and North Dakota resident,[440] Howard Miller is Rhonita LeBaron's husband, and H.M., Jr., K.B.M, T.A.M., T.G.M, T.M., Z.M., and A.M.'s father.[441] And on November 4, 2019, the Defendant with conscious indifference to human life, and an evil-depraved heart callously murdered his wife, the best person he had ever

---

[436] *Estates of Ungar*, 304 F. Supp.2d at 238 (internal citation and quotations omitted).
[437] https://www.bls.gov/data/inflation_calculator.htm
[438] https://www.bls.gov/data/inflation_calculator.htm
[439] Declaration of Howard Miller, Ex. 30, ¶ 2.
[440] *Id.*
[441] *Id.* at ¶ 3.

known,[442] and his four children—H.M., Jr. (12), K.B.M. (10), T.A.M. (almost eight months), T.G.M (almost eight months)— and inflicted substantial, forever emotional and physical pain and suffering damages.

274.    Rhonita and Howard met as teenagers[443] and they knew immediately that they had found their soul mates.[444] And just a few short months later, they were married on August 2, 2006.[445] It was "[y]oung love at its finest."[446]

275.    Their family, and the LeBaron family, grew by one on July 17, 2007, with the birth of their first child H.M. Jr.[447] H.M. Jr. "loved his cousins and his friends. He loved to play basketball and stay up late playing video games."[448]

276.    K.B.M. was born next on September 25, 2009.[449] K.B.M. was the light of Howard's life and his "favorite child by far."[450] "She was always a daddy's girl. Every time [Howard] came home without fail she'd run up to [him] and g[i]ve [him] a big hug and big kiss and always had [Howard's] back no matter what."[451]

277.    K.B.M. "loved her American Girl dolls and would make clothes for them. She wanted to be a fashion designer when she grew up."[452] But most impressive was "how much of a mother she was to her baby brothers and sisters and how much she loved to hep

[442] Testimony of Howard Miller, Tr. 166:7-8.
[443] Declaration of Howard Miller, Ex. 30. at ¶ 4
[444] *See* Declaration of Howard Miller, Ex. 30 at ¶ 7; Declaration of Bathsheba Shalom Tucker, Ex. 37, ¶ 9.
[445] Declaration of Howard Miller, Ex. 30, ¶ 8; Civil Registration of Marriage, Ex. 6.
[446] Testimony of Adriana Jones, Tr. 501:2-3.
[447] Declaration of Howard Miller, Ex. 30, ¶ 10.
[448] Testimony of Howard Miller, Tr. 171:7-9.
[449] Declaration of Howard Miller, Ex. 30, ¶ 10.
[450] Testimony of Howard Miller, Tr. 172:13-14.
[451] *Id.* at Tr. 172:17-19.
[452] Declaration of Adriana Jones, Ex. 46, ¶ 27.

take care of them. … She was very good, helped out a lot with the twins. Helped A.M. every day get ready and get dressed. Just the sweetest thing."[453]

278.    Rhonita "was an amazing mother."[454] She like to "do arts and crafts" with the kids, "she like to teach them to serve the Lord", "[s]he love taking them on all kinds of adventures", "loved taking them swimming", "to the park, to the lake."

279.    On November 3, 2019, Howard was "very much"[455] looking forward to reuniting with his wife and children the next day in Phoenix, AZ after working in the oil fields in New Town, North Dakota.[456]

280.    Via WhatsApp messages and phone calls, over a thousand miles away from his family in Mexico, Howard learned that the "unimaginable"[457] happened—his four children and wife "burned to death" in what must have been "the most frightening thing that anyone has ever experienced."[458]

281.    He already had a flight booked to Phoenix to spend a few days there with Rhonita, H.M. Jr., K.B.M., T.G.M., and T.A.M.[459]  He frantically tried to get to Mexico sooner, but could not get a flight.[460]  After he reached Phoenix on his original flight, he drove through the night to reach La Mora with Doug Johnson, his brother-in-law.[461]

282.    But even after seeing the videos[462] and speaking with family members who confirmed that Rhonita and the kids were in the vehicle and had died—Howard held "out

---

[453] Testimony of Howard Miller, Tr. 173:3-10.
[454] *Id.* at Tr. 176:19.
[455] Testimony of Howard Miller, Tr. 181:11.
[456] *Id.* at Tr. 181:4.
[457] Testimony of Dr. Schuurman, Tr. 481:12.
[458] Testimony of Howard Miller, Tr. 160:21, Tr. 161:2-3.
[459] Declaration of Howard Miller, Ex. 30 ¶ 17, 20; Testimony of Howard Miller, Tr. 181:2-9.
[460] Testimony of Howard Miller, Tr. 181:6-9.
[461] *Id.* at Tr. 183:11-17; Testimony of Douglas Johnson, Tr. 400:9-20.
[462] Video taken by Kenny Miller, "Nita is Shot Up", Ex. 8.

hope kind of in nonbelief … maybe hoping they [his family] could have got out or something."[463]

283.     That hope was shattered when Howard saw Rhonita, H.M. Jr., K.B.M., T.A.M. and T.G.M.'s remains in the vehicle.[464]

284.     And even though Howard could not bear the sight of the scene he, along with his surviving children—T.M., A.M., and Z.M.—in keeping with their religious tradition, spent the night and slept with Rhonita and H.M. Jr., K.B.M., T.A.M. and T.G.M.'s remains[465] because he wanted to "spend one last night" together with his family.[466]

285.     A piece of Howard feels as though it is missing after Rhonita's death, as he testified: "I loved Rhonita with all of my heart; she was my everything. I've lost the person I was supposed to spend the rest of my life with and the mother to my children. I'm lost without her."[467]

286.     Howard continues to miss H.M. Jr.'s "company, kind heart and just the things [they] used to do together."[468]  As for K.B.M, he misses "Everything. Her sweet smile. She's the most beautiful girl I've ever seen in my life."[469]  Howard "will never get to see T.A.M. and T.G.M. take their first steps, or to hear them call [him] 'Daddy.' Th[is] pain is unbearable."[470]

---

[463] Testimony of Howard Miller, Tr. 185:10-13.
[464] *Id.* at Tr. 185:14-15; *see* Family Photos of Miller Attack Scene (Day), Ex. 18.
[465] Photos of Miller Family Remains, Taken by Douglas Johnson, Ex. 73.
[466] Testimony of Howard Miller, Tr. 186:5-14.
[467] Declaration of Howard Miller, Ex. 30 ¶ 53.
[468] Testimony of Howard Miller, Tr. 188:19-22.
[469] *Id.* at Tr. 188:23-25.
[470] Declaration of Howard Miller, Ex. 30 ¶ 56.

287.     This pain, and hurt is ever-present in Howard's eyes since the attacks.[471] He is "numb", "in shock," and struggling "[b]e strong; be a man; be tough; keep [his] feelings inside."[472]

288.     Rhonita's family also has noticed how this all has affected Howard.  Adriana specifically told the Court how Howard goes to the gym constantly and will not drink coffee because of how bad his anxiety is, and she sees how much he is holding so much hurt and pain inside.[473]

289.     Howard also reflected on the affect that this massacre has had, is having, and will continue to have on his surviving children.[474]  He knows they will hurt when they do not have their mother by their sides for big events like graduations, weddings, births of their own children.[475]  He also sees their hurt the small moments they are missing: "the kids are missing out on the routine moments, too."[476]

290.     According to Howard's father, Kenneth Miller, since the attacks Howard has "closed" "into himself" and whenever Mr. Miller has tried to speak with his son and see how he is doing, Howard "definitely [does not] want to talk about it."[477]   As a result, to this day, Mr. Miller and his son have had only "surface" level discussions about what happened and have had "absolutely" zero "in-detail" conversations.[478]

---

[471] Testimony of Douglas Johnson, Tr. 419:12-13.
[472] Testimony of Dr. Schuurman, Tr. 464:20 – 465:5.
[473] Testimony of Adriana Jones, Tr. 522: 1-12.
[474] Declaration of Howard Miller, Ex. 30, ¶¶ 54, 55.
[475] Declaration of Howard Miller, Ex. 30 ¶ 55
[476] *Id.*
[477] Testimony of Kenneth Miller, Tr. 68:7-13.
[478] *Id.* at Tr. 68:20-21.

291.     Mr. Miller's observation of his son being "closed into himself" was confirmed by the testimony of Douglas Johnson, who stated that after the attacks, Howard has "closed up" due to the pain and hurt that is ever-present and visible "in his eyes."[479]

292.     Dr. Schuurman also reflected on how Howard was doing.  She stated that from her interviews with Howard and other family members, as well as the testimony she observed at trial, Howard's coping mechanism is to internalize his feelings rather than to confide in someone. Such avoidance of his feelings may lead, in Dr. Schuurman's expert opinion, to physical symptoms.[480]

293.     Dr. Schuurman testified that Howard's internalization of his feelings likely has something to do with how masculinity is portrayed in mainstream society as well as his smaller community.  Dr. Schuurman believes that Howard feels the need to be strong for his children and not show his feelings.[481]  Dr. Schuurman opined that Howard's behaviors and symptoms are consistent with trauma reactions and PTSD, including dissociative reactions.[482]

294.     Unfortunately, this places Howard at higher risk for longstanding emotional and physical difficulties.[483]

---

[479] Testimony of Douglas Johnson, Tr. 419:12-13.
[480] Testimony of Dr. Schuurman, Tr. 465:12-25, 466:1.
[481] *Id.* at Tr. 465:1-9.
[482] Expert Report of Dr. Schuurman, Ex. 26_000011.
[483] Testimony of Dr. Schuurman, Tr. 465:21-24.

295.     Mr. Miller has five solatium claims—one for his wife, and one for each of his four

children murdered on November 4, 2019:

|  | *Havlish* solatium values | Present Day solatium values, accounting for inflation (rounded to the closest $100,000)[484] | Present Day solatium values, accounting for inflation |
|---|---|---|---|
| **Spouse** | $12,500,000.00 | $15,300,000.00 | $15,300,000.00 |
| **Parent** | $8,500,000.00 | $10,400,000.00 | $41,600,000.00[485] |
| **Total** | | | **$56,900,000.00** |

296.     The Court addresses, *infra.*, Plaintiffs' request for an upward departure from these

figures for Plaintiff Howard Miller for the loss of his wife Maria Rhonita LeBaron and the

loss of his children—K.B.M., H.M. Jr., T.A.M., and T.G.M.

**(b) T.M.**

297.     United States citizen[486] and North Dakota Resident[487] T.M. was born on March 22,

2011. He was the third oldest of Howard and Rhonita's seven children on November 3,

2019.

298.     But on November 4, 2019, everything shifted "in the family dynamics."[488]

299.     "T.M. is now the oldest boy"[489] because his mother, older brother (H.M. Jr.), older

sister (K.B.M.) and youngest brother and sister (T.A.M. and T.G.M.) were, with wanton

indifference to human life, murdered by the Defendant.

---

[484] https://www.bls.gov/data/inflation_calculator.htm

[485] $10,400,000.00 x 4 as Howard Miller lost four children on November 4, 2019.
[486] Declaration of Howard Miller, Ex. 30_000017
[487] Testimony of Howard Miller, Tr. 188:15-16.
[488] Testimony of Dr. Schuurman, Tr. 467:6-7.
[489] *Id.* at Tr. 467:5-6.

300.     "T.M. [has] suffered the most", "[a]nd he [has] suffered bad."[490] He was initially "crying himself to sleep for hours. He didn't want to sleep alone. Even if he fell asleep alone, he would wake up and go"[491] "pounding, … screaming, yelling"[492] on the door of an adult's bedroom door just to "crawl into the bed"[493] next to them.

301.     These "nightmares" are in addition to his being "afraid all the time," being "scared to death at every noise" and his difficulty "coping" "when it gets dark."[494]

302.     In short, "[h]is sense of security is deep" and it is Dr. Schuurman's expert opinion that "ultimately, that type of anxiety is not going to serve him well."[495]

303.     It is Dr. Schuurman's expert opinion that T.M. "is suffering from symptoms consistent with [Post Traumatic Stress Disorder] PTSD … including recurrent distressing dreams related to the traumatic series of events that killed his mother and siblings, intense and persistent anxiety, and dissociative reactions. T.M. (like his father) appears to be 'stuffing' his feelings, and displaying anxiety, separation anxiety, and post-traumatic stress symptoms. While these responses are understandable given what he has experienced, the short-term as well as long-term impact will take a toll on his physical, emotional, and mental health."[496]

---

[490] Testimony of Douglas Johnson, Tr. 420:14, 17.
[491] Testimony of Dr. Schuurman, Tr. 468:1-3.
[492] Id. at Tr. 420:21.
[493] Id. at Tr. 420:24-25.
[494] Id. at Tr. 468:4; 468:12-15.
[495] Id. at Tr. 468:16:17.
[496] Expert Report of Dr. Schuurman, Ex. 26_000012.

304. T.M. has five distinct solatium claims—for the loss of his mother along with the loss of four of his siblings murdered on November 4, 2019.

| | *Havlish* solatium values | Present Day solatium values, accounting for inflation (rounded to the closest $100,000)[497] | Present Day solatium values, accounting for inflation |
|---|---|---|---|
| **Child** | $8,500,000.00 | $10,400,000.00 | $10,400,000.00 |
| **Sibling** | $4,250,000.00 | $5,200,000.00 | $20,800,000.00[498] |
| **Total** | | | **$31,200,000.00** |

305. The Court addresses, *infra.*, Plaintiffs' request for an upward departure from these figures for Plaintiff T.M. for the loss of his mother Maria Rhonita LeBaron and four of his siblings. A similar request wil be discussed for each of the surviving children.

### (c) A.M.

306. United States citizen[499] and North Dakota resident[500] A.M. was born on April 22, 2014.[501] She was the fourth oldest of Howard and Rhonita's seven children.

307. Rhonita "played an important role in [A.M's] life in terms of" "fostering … [her] interests, but also for her physical challenges to make sure that she was doing everything possible to help [A.M] be able to use her arm, her side of her body that has some paralysis."[502]

308. A.M. has "cerebral palsy"[503] which is affecting "the whole left side of her body."[504]

---

[497] https://www.bls.gov/data/inflation_calculator.htm.

[498] $5,200,000.00 x 4, as T.M. lost four siblings on November 4, 2019.
[499] Declaration of Howard Miller, Ex. 30_000018.
[500] Testimony of Howard Miller, Tr. 188:15-16.
[501] Declaration of Howard Miller, Ex. 30, ¶ 10.
[502] Testimony of Dr. Schuurman, Tr. 469:2-6.
[503] Testimony of Howard Miller, Tr. 174:19.
[504] *Id.* at Tr. 174:21.

309.     And on November 4, 2019, A.M. "lost her mother, her caretaker, her protector",[505] her oldest and youngest brothers and both of her sisters as a result of the depraved-evil hearts of the Defendant.

310.     Rhonita was supposed to be there for A.M. as she "gr[e]w developmentally, everything from … all [her] successes, [her] recitals, [her] graduating from high school, [her] first dates, [her] getting attracted to a boy"; she was supposed to be there at "her wedding" and be a "grandmother" to A.M.'s children.[506]

311.     A.M. will feel the pain and sorrow of her mother's absence at all these events as she grows up.[507] And while she is surrounded by a loving community, "[t]here's a mother/daughter bond that no one else can completely fill."[508]

312.     Her loss will also, unfortunately, be compounded as she "struggle[s] with her physical disabilities and being different" because "sometimes kids can bully," "be cruel to one another" or they may "just tease" her "as she goes through these different developmental ages."[509]

313.     It is Dr. Schuurman's expert opinion that A.M. "is going to need specialized medical and psychological care as she grows up. Her mother was the driving force behind getting the physical therapy she needs, and although other family members have worked to help her, there is no substitute for her mother and her mother's love. We know from studies of 'motherless daughters' that she will experience, and does already experience, estrangement from 'feeling different' from other girls who have their mothers. That,

---

[505] Declaration of Adriana Jones, Ex. 46, ¶ 38.
[506] Testimony of Dr. Schuurman, Tr. 469:19-25.
[507] *Id.* at Tr. 470:1; *see also* Declaration of Howard Miller, Ex. 30, ¶ 55 (A.M. will miss her mother making "cheesy potatoes for her birthday").
[508] Testimony of Dr. Schuurman, Tr. 470:3-4.
[509] *Id.* at Tr. 470:5-12.

combined with her physical challenges, has been extremely difficulty and will continue to be an ongoing challenge as she grows through puberty and into adulthood."[510]

314.     A.M. has five distinct solatium claims—for the loss of her mother and four of her siblings who were murdered on November 4, 2019.

|  | *Havlish* solatium values | Present Day solatium values, accounting for inflation (rounded to the closest $100,000)[511] | Present Day solatium values, accounting for inflation |
|---|---|---|---|
| **Child** | $8,500,000.00 | $10,400,000.00 | $10,400,000.00 |
| **Sibling** | $4,250,000.00 | $5,200,000.00 | $20,800,000.00[512] |
| **Total** |  |  | **$31,200,000.00** |

### (d) Z.M.

315.     United States citizen[513] and North Dakota resident[514] Z.M. was born on September 22, 2016.[515] He was fifth oldest of Howard and Rhonita's children.

316.     Z.M. was three years old when the Cartel brutally murdered his mother and four brothers and sisters.

317.     Following his mother's and siblings' funerals, Z.M. asked his grandmother, Plaintiff Shalom Tucker, "Grandma, can we go and check and see if my mom's in her room now?"[516] And due to his age, there is a common misconception that he did not or could not

---

[510] Expert Report of Dr. Schuurman, Ex. 26_000013.
[511] https://www.bls.gov/data/inflation_calculator.htm.

[512] $5,200,000.00 x 4, as A.M. lost four siblings on November 4, 2019.
[513] Declaration of Howard Miller, Ex. 30_000019.
[514] Testimony of Howard Miller, Tr. 188:15-16.
[515] Declaration of Howard Miller, Ex. 30, ¶ 10.
[516] Testimony of Adriana Jones, Tr. 524:7-8.

understand and recognize the gravity of what happened and what was going on, thus the reason for the question.[517]

318.     But as Dr. Schuurman testified, "if we as adults learned as many new words a day as your average three-year-old, we'd all be geniuses. So while [Z.M. couldn't] verbalize as well" at three, he was certainty "observing" and "taking in what's going" on.[518]

319.     Irrespective of what Z.M. understood at "three, as he grows older, he will learn more and more and understand better what happened to his mother and siblings."[519] This will lead, in Dr. Schuurman's expert opinion, to a feeling of being "cheated" for Z.M. "as opposed to [his] older siblings" because he will not "necessarily have memories of" his other and siblings.[520] "People can show photos and they can talk about [Z.M.'s] mother and siblings," but unlike T.M and A.M, Z.M. will not "have the same memories."[521]

320.     It is Dr. Schuurman's expert opinion that Z.M. "is incorporating the masculine stereotype that 'men don't cry' as well as the 'revenge attitude' of getting 'the bad guys.' Z.M. will need assistance to channel his anger and frustration in positive ways, as well as getting nurturing that he would have received from his mother. Z.M. appears to have internalized the 'be strong' and 'keep it inside' coping of his father and older brother T.M., and the research suggests that children who do so are at risk for greater adverse outcomes."[522]

321.     It is also the expert opinion of Dr. Schuurman that the death of his brothers and sisters "carries high risk factors for [Z.M.] to have psychological, emotional, and relational

---

[517] Testimony of Dr. Schuurman, Tr. 470:15-21; Expert Report of Dr. Schuurman, Ex. 26_000013.
[518] Testimony of Dr. Schuurman, Tr. 470:22-471:2.
[519] *Id.* at Tr. 471:3-5.
[520] *Id.* at Tr. 471:8-10.
[521] *Id.* at Tr. 471:10-12
[522] Expert Report of Dr. Schuurman,Ex. 26_000013.

challenges throughout [his] lifetime[]. … Under these circumstances (horrific, mutilation [,] destruction [of his family]), the risk for the development of traumatic memories, images, and post-traumatic stress is elevated[ and] … is something [Z.M.] will struggle with as [he] grow[s] into adolescence and adulthood."[523]

322.    Z.M. has five distinct claims for solatium—for the loss of his mother and four of his siblings who were all killed on November 4, 2019:

|  | *Havlish* solatium values | Present Day solatium values, accounting for inflation (rounded to the closest $100,000)[524] | Present Day solatium values, accounting for inflation |
|---|---|---|---|
| **Child** | $8,500,000.00 | $10,400,000.00 | $10,400,000.00 |
| **Sibling** | $4,250,000.00 | $5,200,000.00 | $20,800,000.00[525] |
| **Total** |  |  | **$31,200,000.00** |

**(e) Adrian LeBaron-Soto and Bathsheba Shalom Tucker**

323.    Adrian LeBaron-Soto and Batheseba Shalom Tucker are Maria Rhonita LeBaron's father and mother and H.M. Jr., K.B.M., T.M., A.M., Z.M., T.A.M and T.G.M.'s maternal grandfather and grandmother.[526]

324.    To Mr. LeBaron-Soto, his daughter "was perfect in every sense of the word. She was intelligent, passionate, beautiful, honest and caring. [He] trusted Nita and her judgment."[527] She was inquisitive, asked a lot of questions and that helped "buil[d] a very strong relationship between [Mr. LeBaron-Soto] and [Rhonita]."[528]

---

[523] Expert Report of Dr. Schuurman, Ex. 26_000014 (internal citation omitted).
[524] https://www.bls.gov/data/inflation_calculator.htm.

[525] $5,200,000.00 x 4, as Z.M. lost four siblings on November 4, 2019.
[526] Declaration of Adrian LeBaron-Soto, Ex. 36, ¶ 2; Declaration of Bathsheba Shalom Tucker, Ex. 37, ¶ 3.
[527] Declaration of Adrian LeBaron-Soto, Ex. 36, ¶ 8.
[528] Testimony of Adrian LeBaron-Soto, Tr. 198:19-22.

325.       Rhonita and her mother also had "a very special relationship."[529] Rhonita and Ms. Tucker "would share secrets with one another."[530]

326.       "While Nita's family was growing, she always reminded [her mother], her father and her brothers and sisters how much she loved and cared about [them]. She would surprise [them] with visits, call and leave voice mails just to tell [them] that she loved [them] and was thinking about [them]."[531]

327.       "Watching Nita grow as a mother was a blessing" to her mother who also stated that to her daughter, "family was the single most important thing in the world."[532]

328.       The last time Mr. LeBaron-Soto saw his daughter was on her birthday, which also happens to be Mexican Independence Day.[533] Rhonita wanted to celebrate the day with her father; so, they went to the local plaza where there was a ceremony and the band started playing one of Mr. LeBaron-Soto's favorite songs to which he and Rhonita danced and laughed.[534]

329.       On November 4, 2019, approximately three and a half hours away from La Mora just outside of Colonia LeBaron,[535] Mr. LeBaron-Soto and Ms. Tucker were together at a gas station when they first learned that something may have gone wrong with Rhonita and the kids.[536]

---

[529] Declaration of Bathsheba Shalom Tucker, Ex. 37, ¶ 8
[530] *Id.*
[531] *Id.* at ¶ 13.
[532] *Id.* at ¶¶ 14, 16.
[533] Declaration of Adrian LeBaron-Soto, Ex. 36, ¶ 20.
[534] Testimony of Adrian LeBaron-Soto, Tr. 199:11 – 200:2; Declaration of Adrian LeBaron-Soto, Ex. 36, Exhibit D.
[535] Testimony of Kenneth Miller, Tr. 44:2.
[536] Testimony of Adrian LeBaron-Soto, Tr. 200:10-23.

330.     "Immediate disbelief and shock set in."[537] "It was like hitting a brick wall."[538] Mr.
LeBaron-Soto and Ms. Tucker "immediately began driving to where" their daughter and
grandchildren had last been seen and known to be traveling.[539] However, due to the security
concerns they were twice stopped and the drive which should "have taken three hours …
ended up taking an agonizing 8+ hours."[540]

331.     During this time, Mr. LeBaron-Soto and Ms. Tucker had seen the videos and heard
the audio WhatsApp messages[541] of what had happened to their daughter and grandchildren
in the mountains and had received phone calls from their children pleading with them not
to go[542]; Mr. LeBaron-Soto's response to it all – "if [you] wanted to pray for [me], [] pray
for [me] but [] [I] [am] going to get [my] baby girl."[543] Ms. Tucker's response – "We have
to do it. We have to go in there. Nobody else is going to go get them. Nobody else is going
to, we have to go."[544]  They "were going in regardless the cost to save [their] family."[545]

332.     Because of the direction they were traveling, the first scene they arrived at was
where Christina, Dawna, T.L. and R.L. had been murdered and it was like "a scene from
the worst horror movie [one] could imagine. Christina's door was open, and she was lying
in a pool of blood, dead in the middle of the road."[546]

---

[537] Declaration of Adrian LeBaron-Soto, Ex. 36, ¶ 21.
[538] Declaration of Bathsheba Shalom Tucker, Ex. 37, ¶ 21.
[539] *Id.*
[540] Declaration of Adrian LeBaron-Soto, Ex. 36, ¶ 22.
[541] Video taken by Kenny Miller "Nita is Shot Up", Ex. 8; Testimony of Adrian LeBaron-Soto, Tr. 202:6-22; WhatsApp from Kenny Miller, "Julian call Nitas Parents", Ex. 74.
[542] Testimony of Adriana Jones, Tr. 508:11-12.
[543] *Id.* at 508:12-14.
[544] *Id.* at 508:16-18.
[545] Declaration of Bathsheba Shalom Tucker, Ex. 37, ¶ 24.
[546] Declaration of Adrian LeBaron-Soto, Ex. 36, ¶ 26; Family Photos of Christina Langford Attack Scene, Ex. 20.

333.     After a short time at the scene of Christina and Dawna's attack on the "[p]itch black, no moon"[547] evening around approximately 11:00p.m., Mr. LeBaron-Soto and Ms. Tucker arrived "at Nita's car and what [they] couldn't see, [they] could feel. [They] could feel, and smell the horrible crime scene. [They] could feel the death and destruction that had bestowed [their] family. From that moment [Mr. LeBaron-Soto's] life was shattered."[548]

334.     Ms. Tucker continues to this day to smell "the fire and smoke" emanating from her family's remains and vehicle that evening.[549]

335.     Mr. LeBaron-Soto and Ms. Tucker were soon thereafter asked by authorities to leave the scene that evening[550] and believed that they were prepared to see the scene in the day light— they were not.[551]

336.     Mr. LeBaron-Soto described that what he saw "was horrible, it was sickening; [he] cannot imagine a more gruesome scene for a father and family to have to encounter and because of [his, and his family's] religious beliefs and the authorities inaction – [he], [his] wife and family were forced to do the unconscionable, collect [their] families bones and ashes."[552]

337.     Mr. LeBaron-Soto and Ms. Tucker had to try to "piece-by-piece, bone-by-bone, collect [their] daughter and grandchildren."[553]

---

[547] Testimony of David Langford, Tr. 340:10.
[548] Declaration of Adrian LeBaron-Soto, Ex. 36, ¶31; *see* Family Photos of Miller Attack Scene (Evening), Ex. 19; Declaration of Bathsheba Shalom Tucker, Ex. 37_000027-32.
[549] Declaration of Bathsheba Shalom Tucker, Ex. 37, ¶ 36.
[550] Declaration of Adrian LeBaron-Soto, Ex. 36, ¶ 34; Declaration of Bathsheba Shalom Tucker, Ex. 37, ¶ 39.
[551] *Id.* at ¶¶ 35, 36.
[552] Declaration of Adrian LeBaron-Soto, Ex. 36, ¶ 37; Testimony of Adrian LeBaron-Soto, Tr. 223:7-10; *see also* Declaration of Adrian LeBaron-Soto, Ex. 36_000046-63; Family Photos of Miller Attack Scene (Day), Ex. 18.
[553] Declaration of Bathsheba Shalom Tucker, Ex. 37, ¶ 41, Ex. 37_000034-51.

338.     "Worse yet, it appears as if Nita and the kids knew they were going to die. H.M. Jr. was found half-in/half-out of the vehicle. … K.B.M. knew of and appreciated the danger she and her family were in."[554]

339.     Ms. Tucker could not process then, nor can she today, "the fear [her family] felt and the pain that they endured. It breaks [Ms. Tucker's] heart thinking about this. At the same time, [Ms. Tucker] can't not think about what happened and how it happened."[555]

340.     This horrible nightmare got even darker for Mr. LeBaron-Soto and his family because once they collected Rhonita and the children's bones and ashes, they cleaned and prepared their bodies for burial.[556]

341.     And just when it could not get any worse, Howard's father said "the saddest thing"[557] at the funeral – there were no bodies left "to touch, dress and kiss one last time; the sicarios [the Defendant] and their calloused evil stole" that from him and his family.[558]

342.     Mr. LeBaron-Soto feels as though he "died on th[e] mountain"[559] with Rhonita and his grandchildren and in order to deal with that, he feels "compelled to act on behalf of [his] daughter and all who were killed."[560]

343.     His compulsion, however, according to Dr. Schuurman does not, and will not, shield him from "more depressive symptoms, poorer wellbeing, more health problems and

---

[554] *Id.* at ¶¶ 43, 44.
[555] *Id.* at ¶ 45.
[556] Testimony of Adrian LeBaron-Soto, Tr. 224:20-24; *see* Photos of Miller Family Remains Taken by Douglas Johnson, Ex. 73; Declaration of Bathsheba Shalom Tucker, Ex. 37_000057.
[557] Testimony of Adrian LeBaron-Soto, Tr. 225:24.
[558] Declaration of Adrian LeBaron-Soto, Ex. 36, ¶ 42; Ex. 76.
[559] *Id.* at ¶ 40.
[560] Testimony of Dr. Schuurman, Tr. 482:19-21.

more marital conflict."[561] It is Dr. Schuurman's expert opinion, that Mr. LeBaron-Soto is at risk for "enduring stress" and "anxiety".[562]

344.  Dr. Schuurman further stated that, in her opinion, she does not "think there's really anything worse for a mother or a father than having a child die in such a horrific way."[563] Ms. Tucker has "suffered from nightmares and trouble sleeping and trouble regulating emotion and anger, and all of those things … can be really challenging."[564]

345.  The sights and smells Mr. LeBaron-Soto and Ms. Tucker endured as two of the first individuals to see both attack scenes, given that it was *their* family must have been of unconscionable weight and disturbance.

346.  There is no question, based on the moving testimony, affidavits, expert reports, and evidence submitted in this case, that Mr. LeBaron-Soto and Ms. Tucker were close with their daughter and grandchildren and that they miss them greatly. Plaintiffs submit that it was agonizingly painful for Mr. LeBaron-Soto and Ms. Tucker to 1) see, smell and feel the scene of where their family was massacred; 2) have to collect their family's remains and ashes from the scene and 3) have to clean and prepare their families remains for burial.

347.  Furthermore, compounding their pain, Mr. LeBaron-Soto and Ms. Tucker initially believed their family was kidnapped, thus they were forced not only "to cope with the grief that follows the loss of a loved one, but—at the time of the event—w[ere] also forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive family member[s]."[565]

---

[561] *Id.* at 483:22-24.
[562] *Id.* at 484:7-16.
[563] *Id.* at 482:7-9.
[564] *Id.* at 482:10-13.
[565] *Warmbier*, 356 F.Supp.3d at 59 (internal citation and quotations omitted).

348.     Since Rhonita and her children's death, Mr. LeBaron-Soto has followed a path of advocacy for victims of cartel violence to cope with his grief—what Dr. Schuurman called "instrumental" coping.[566]   This advocacy places him in (bodily) danger and causes his family to worry about him constantly.[567]  Mr. LeBaron-Soto has also acknowledged that the attacks have affected his relationship with his wife, Shalom, and his other children.[568] He thinks about Rhonita and his grandchildren a lot, especially knowing H.M. Jr. tried to escape the car—the whole thing is very powerful over him.[569]

349.     Having examined closely the facts of this particular case, Mr. LeBaron-Soto and Ms. Tucker should be awarded solatium damages in line with those issued in *Warmbier v. Democratic People's Rep. of Korea*, 356 F. Supp. 3d 20, 59 (D.D.C. 2018), adjusted for inflation.[570] The values in *Warmbier* for parent solatium claims was $15,000,000.00, and adjusted for the 12% inflation since the *Warmbier* case was decided, the Court awards solatium damages in the amount of $16,800,000.00 each to Adrian LeBaron-Soto and Bathseba Shalom Tucker for the loss of their daughter Maria Rhonita LeBaron on November 4, 2019. No request for an upward departure has been requested for these awards.

> **(f)  Rhonita's Siblings— Rholena "Lian" Johnson, Melissa Conklin, Adriana Jones, Laura LeBaron, William LeBaron, Ruthila LeBaron, Dayer LeBaron, Miguel LeBaron, Javier LeBaron, and Matthew LeBaron**

350.     As stated *supra*, Rhonita Maria LeBaron's ten siblings are Plaintiffs in this case— Rholena Lian Johnson, Melissa Conklin, Adriana Jones, Laura Corina LeBaron, William

---

[566] Testimony of Dr. Schuurman, Tr. 482:14-22.
[567] Testimony of Adrian LeBaron-Soto, Tr. 231:5-25, 232:1-9.
[568] *Id*.
[569] *Id*. at Tr. 232:10-14.
[570] Inflation has risen approximately 12% since *Warmbier* was decided in December 2018 to February 2022. https://www.bls.gov/data/inflation_calculator.htm

LeBaron, Ruthila LeBaron, Dayer LeBaron, Miguel LeBaron, Javier LeBaron, and Matthew LeBaron.

351.     There is not enough ink "to somehow express the relationships" between Rhonita and each of her siblings "because they were so deep, and [the LeBaron's] just are a really united family that saw each other often. That made the effort to be with each other all the time. That talked to each other every day."[571]

352.     Rhonita and her siblings shared many experiences.  Rhonita and her sisters shared many memories such as, shared pregnancies.[572] They "told each other everything, and always discussed" their hopes and dreams.[573] Lian, Melissa, Adriana, Corina, Ruthila, and Rhonita were each other's "best friends."[574]

353.     Rhonita and her brothers had "an unspoken bond and connection".[575] Rhonita also helped her mother raise her younger brothers.[576] She and her brothers "did almost everything together—school, chores, work and play."[577]

354.     Rhonita's siblings were scattered all over the globe on November 4, 2019, when they learned Rhonita and the children "had been brutally murdered."[578] Lian and Matthew were in Colonia LeBaron[579]; Melissa and Ruthila were in Utah[580]; Adriana was in Canada for her 20th wedding anniversary[581]; Corina was in Minnesota[582]; William was in Italy

---

[571] Testimony of Adriana Jones, Tr. 500:7-10.
[572] Declaration of Rholena Lian Johnson, Ex. 47, ¶ 9; Testimony of Adriana Jones, Tr. 496:18-22.
[573] Declaration of Laura Corina LeBaron, Ex. 39, ¶ 5.
[574] Id. at ¶ 3; Declaration of Ruthila LeBaron, Ex. 44 ¶ 7.
[575] Declaration of William LeBaron, Ex. 41 ¶ 5.
[576] Testimony of Dayer LeBaron, Tr. 89:22 – 90:22; Declaration of Miguel LeBaron, Ex. 40, ¶¶ 4-5; Declaration of Javier LeBaron, Ex. 42, ¶ 4; Declaration of Matthew LeBaron, Ex. 38, ¶ 7.
[577] Declaration of William LeBaron, Ex. 41 ¶ 4.
[578] Declaration of Rholena Lian Johnson, Ex. 47, ¶ 21.
[579] Id ; Declaration of Matthew LeBaron, Ex. 38, ¶ 6.
[580] Declaration of Melissa Conklin, Ex. 45, ¶ 12; Declaration of Ruthila LeBaron, Ex. 44 ¶ 11.
[581] Testimony of Adriana Jones, Tr. 506:7-8, Declaration of Adriana Jones, Ex. 46, ¶ 16.
[582] Declaration of Laura Corina LeBaron, Ex. 39, ¶ 10.

celebrating his mother-in-law's 60th birthday[583]; Dayer was in Texas[584]; and Miguel and Javier were in Colorado[585].  They all rushed to La Mora, Mexico to be together as a family and to be the "first responders" they had grown up to be.[586]

355.    There was a lot of confusion in the beginning, no one really knowing what had happened.  At first, they were unsure if "Nita and the kids had been taken hostage".[587] As time passed, the gravity of the situation became clear.[588]

356.    As they pieced together the information from WhatsApp messages[589] and began to arrive at the scene, they all learned the gruesome and "horrific"[590] nature of the murders of their sister, nieces, and nephews—they were shot at by countless Cartel members and intentionally burned alive.[591]

357.    After the bodies of Rhonita and the children were collected from the scene by the LeBarons, each sibling assisted in the preparation of the bodies for the funeral—cleaning the bones and/or assisting in constructing caskets, and placing Rhonita, H.M. Jr., K.B.M., T.A.M. and T.G.M.'s remains into their caskets.[592]

---

[583] Declaration of William LeBaron, Ex. 41, ¶ 9.

[584] Declaration of Dayer LeBaron, Ex. 43, ¶ 11.

[585] Declaration of Miguel LeBaron, Ex. 40, ¶¶ 16-17; Declaration of Javier LeBaron, Ex. 42, ¶ 12.

[586] Testimony of Adriana Jones, Tr. 508:19-24.

[587] Declaration of Adriana Jones, Ex. 36, ¶ 17; Testimony of Dayer LeBaron, Tr. 77:10-15; Declaration of Matthew LeBaron, Ex. 38, ¶ 10.

[588] Declaration of Ruthila LeBaron, Ex. 44 ¶ 11.

[589] *Id.* at ¶ 14; Declaration of William LeBaron, Ex. 41, ¶ 11; Declaration of Melissa Conklin, Ex. 45, ¶ 13; Declaration of Rholena Lian Johnson, Ex. 47, ¶ 21.

[590] Declaration of Miguel LeBaron, Ex. 40, ¶ 14.

[591] Testimony of Dr. Schubl, Tr. 156:9; 160:1; Declaration of Matthew LeBaron, Ex. 38, ¶ 10; Rhonita LeBaron 1006 Summary Chart, Ex. 14; Mexican Government Apostille 2 Ex. 4 T_000153.

[592] Testimony of Douglas Johnson, Tr. 417:23-418:5; Declaration of Melissa Conklin, Ex. 45, ¶ 14; Testimony of Adriana Jones, Tr. 515: 3-7, 16-21;  Declaration of Laura Corina LeBaron, Ex. 39, ¶ 12; Declaration of William LeBaron, Ex. 41, ¶ 12; Declaration of Ruthila LeBaron, Ex. 44 ¶ 15; Testimony of Dayer LeBaron, Tr. 117:10; Declaration of Miguel LeBaron, Ex. 40, ¶ 19; Declaration of Matthew LeBaron, Ex. 38, ¶ 14.

358.     Every day since, Lian's husband sees the pain in her eyes[593] as the November 4, 2019, massacre has "changed everything" forever.[594] Lian now only travels "during daylight hours" and lives in constant fear of "being kidnapped and held for ransom."[595]

359.     Melissa recalled a Christmas family tradition, and how it changed after the murders: "Every Christmas, to open a present, you have to sing. We always would go in age order. In 2019, the first Christmas without her, her absence was profoundly felt. As we passed around the mic that morning, my younger brother did not have his little sister, Rhonita, to sing after him. Every Christmas it is a reminder of her murder and the piece that is missing in our family."[596]

360.     In describing her grief after losing Rhonita and the children, Adriana testified: "So now there's all this, 'How do we be more like Nita,' you know. How do we -- how do we rise above our grief and that just paralyzing grief to be present in these moments because they matter so much. And we know we could be gone tomorrow, like, we really, really know, but it's so hard to rise above what you're feeling in that moment to be present for them."[597]

361.     Corina now lives "in constant fear" which has resulted in her inability to be "the mother or wife" she needs to be for her family, and her to "wonder what the point of dreaming is when it all can end so suddenly."[598]

362.     The deaths have affected William's own relationships—he treasures them more but is afraid to burden his wife "with his emotions."[599] As William stated: "I am able to still be

---

[593] *Id.* at Tr. 422:4.
[594] Declaration of Rholena Lian Johnson, Ex. 47, ¶ 26
[595] *Id.* at ¶¶ 27, 28.
[596] Declaration of Melissa Conklin, Ex. 45, ¶ 10.
[597] Testimony of Adriana Jones, Tr. 504:3-9.
[598] Declaration of Corina LeBaron, Ex. 39, ¶¶ 19, 20.
[599] Declaration of William LeBaron, Ex. 41, ¶¶ 18-19.

present with my children, but their relationship with other family members have changed. Not only did they lose an aunt and cousins, but they also lost their relationship with their grandparents. It is something that upsets me whenever I think about it."[600]

363.     Ruthila describes losing her "better half"[601] and believes that she has yet to "fully grieve" what happened because "[i]t is a daily pain" she lives with but the guilt is profound, and wallowing in sadness is inescapable.[602]

364.     Since November 4, 2019, Dayer has felt "unimaginable pain and just sadness from deep inside [his] soul"[603] leaving him unable to "get a good night's sleep. [He] would have to watch TV until [he] fell asleep. If [he] turned the TV off" he would "just start thinking about [the attack] and sometimes be up until four in the morning just contemplating what had occurred."[604]

365.     As Miguel put it, "[t]o this day, I still feel profound sadness and grief over her death.  I find it hard to think about memories I had with her, as it makes me feel sad to know I will never make another memory with her.  Every time I try to talk about her, I choke up and want to cry…"[605]

366.     Javier and Rhonita were "extremely close" and in constant communication.[606] After her death, and to this day, he continues to face "psychological, emotional, and relational challenges,"[607] as discussed by Dr. Schuurman.

---

[600] *Id.* ¶ 20.
[601] Declaration of Ruthila LeBaron, Ex. 44 ¶ 7.
[602] *Id.* at ¶ 17.
[603] Testimony of Dayer LeBaron, Tr. 77:18-21.
[604] *Id.* at Tr. 122:2-6.
[605] Declaration of Miguel LeBaron, Ex. 40, ¶ 25.
[606] Declaration of Javier LeBaron, Ex. 42, ¶¶ 4, 7.
[607] Expert Report of Dr. Schuurman, Ex. 26_000014.

367.     And Matthew, the youngest of Rhonita's siblings, no longer has his "second mother"[608] who "frequently checked" on him to make sure he was pursuing his dreams.[609]

368.     The Defendant's depraved murder of Rhonita, H.M. Jr., K.B.M., T.G.M., and T.A.M. has "broke[n] the root of [their] support system" and caused "profound sadness"[610] that each one of them feel each and every day.

369.     Dr. Schuurman, in her expert report, states that "[l]osing a sibling means the loss of a companion, confidante, role model, and friend. Siblings' identities are intricately connected because they share similar histories so that when of them dies, the survivors essentially lose part of themselves."[611]

370.     The *Havlish* value for solatium damages for a sibling is $4,250,000.00, and adjusted for inflation,[612] this amount rises to $5,200,000.00.

371.     Difficult as it may be, "[b]efore plaintiffs can be awarded any relief" it is the obligation of the Court to ensure that Plaintiffs have "establish[ed] their claims by evidence satisfactory to the [C]ourt."[613]

372.     As shown *infra*, all ten of Rhonita LeBaron siblings have established their claims and each shall be awarded the relief they seek.

373.     The Court addresses, *infra.*, Plaintiffs' request for an upward adjustment from these figures for Plaintiffs Rholena "Lian" Johnson, Melissa Conklin, Adriana Jones, Laura Corina LeBaron, William LeBaron, Ruthila LeBaron, Dayer LeBaron, Miguel LeBaron, Javier LeBaron, and Matthew LeBaron for the loss of their sister Maria Rhonita LeBaron.

---

[608] Declaration of Matthew LeBaron, Ex. 38, ¶ 3.
[609] *Id.* at ¶ 9.
[610] Declaration of Melissa Conklin, Ex. 45, ¶ 16-18.
[611] Expert Report of Dr. Schuurman, Ex. 26_000018 (internal citation and quotations omitted).
[612] Inflation has risen approximately 23% since *Havlish* was decided in July 2012 to February 2022. https://www.bls.gov/data/inflation_calculator.htm.
[613] *Flanagan* , 87 F.Supp.3d at 114.

### (2) Family of Christina Langford

### (a) Tyler Johnson

374.    When Plaintiff Tyler Edward Johnson first met Christina Langford, she "captured" him with her beauty and presence, Mr. Johnson would later say that it was "love at first sight."[614] Their love for one another grew exponentially quickly, and after just a few short months of dating, they were engaged and married.[615]

375.    On February 14, 2007,[616] before "[b]etween one and two hundred" people at Mr. Johnson's mother's house in Mexico, Tyler and Christina were married.[617] This year, 2022, would have been Tyler and Christina's fifteenth (15) wedding anniversary.

376.    The District Court for the County of Cass, North Dakota recognized this marriage and "declared" on October 11, 2021, that Mr. Johnson is "the common law spouse of the decedent Christina Marie Langford."[618] Tyler was subsequently "appointed Personal Representative of the Estate of Christina Marie Langford."[619]

377.    Shortly after their wedding Tyler and Christina moved to Missouri where he worked "doing dry wall finishing on an Air Force base."[620] It was not all work and no fun though, as Tyler and Christina enjoyed camping, hiking, and fishing together. Christina may have been a better fisherman than Tyler, but as long as they were together and outdoors, they were happy.[621]

---

[614] Testimony of Tyler Johnson, Tr. 354:2-5.
[615] *Id.* at Tr. 354:6-9.
[616] *Id.* at Tr. 354:9.
[617] Testimony of Amelia Sedgwick, Tr. 240:20-25.
[618] Declaration of Tyler Johnson, Ex. 31_000013 (Judgment of Cass County District Court).
[619] *Id.* at Ex. 31_000016 (Letters of Administration).
[620] Testimony of Tyler Johnson, Tr. 355:7.
[621] *Id.* at Tr. 355:15 – 356:14.

378.     Their happiness went to new levels one week shy of their first wedding anniversary—February 7, 2008—when their first child, their baby girl, C.J., was born.[622] Tyler and Christina would proceed to have a total of six (6) children together—J.J., a boy born on January 18, 2010; T.J. Jr., a boy born on July 24, 2012; H.J. a boy born on February 4, 2015; E.J. a boy born on March 1, 2017; F.M.J. a girl born on April 9, 2019.[623] Because they were both from big families, it was important to Tyler and Christina to have a large family of their own; Christina "wanted to have as many kids as God would send her."[624]

379.     Tyler worked in North Dakota and various other states, on the oil fields or doing construction, in order to provide for his family and allow Christina to be a stay-at-home, "very loving mother" to their children.[625] Christina's love for their children was "fierce."[626] She was protective of their children, she "wanted [their] children to learn to be obedient and to be responsible and to love one another and to know God. Wanted them to be good people. She wanted to teach them that. She homeschooled them and didn't like them watching TV. She didn't want them playing video games. She didn't want them eating junk food."[627] Christina was "[v]ery, very attentive" to the needs of her children.[628]

380.     In the weeks before the November 4, 2019 massacre, Tyler was making arrangements so that he and his family could start their new lives together in North Dakota.[629] This included, among other things: renting a house, furnishing it and, organizing

---

[622] Declaration of Tyler Johnson, Ex. 31, ¶ 9.
[623] *Id.* at ¶ 10.
[624] Testimony of Tyler Johnson, Tr. 358:17-20.
[625] *Id.* at Tr. 352:1-7, Tr. 355:6-14; Declaration of Tyler Johnson, Ex. 31, ¶¶ 11, 16-17.
[626] Testimony of Amelia Sedgwick, Tr. 242:9-10.
[627] *Id.* at Tr. 242:10-15.
[628] *Id.* at Tr. 242:19-20.
[629] *Id.* at Tr. 361:20-24.

a business to make sure that he had a job and that his family would be provided for when they made the move.[630]

381.     Tyler returned to Colonia LeBaron in the latter part of October 2019 to harvest the pecans in their orchard before he and his family moved to North Dakota.[631] It was in this orchard on November 4, 2019, where the terror for Tyler first began[632] with the bombardment of questions such as: "have you heard from your wife?", "where is Christina?", "did Christina get there to LeBaron?"  "Where's Christina, have you texted her, has she called you, it's been a while."[633]

382.     Trying on the exterior to remain calm, the alarm bells and panic inside Tyler were going off as his WhatsApp messages and calls to Christina "weren't going through." This terror would metastasize into a five-alarm fire as minutes felt like hours[634] for Tyler as he soon learned that "Rhonita and her kids had been killed."[635]

383.     Tyler did everything he could imagine to try and locate his wife and daughter, F.M.J. (who was traveling with Christina because she was still nursing at the time). He sent additional messages, he tried to track the vehicle using its built-in OnStar system and he even tried calling the government for answers and help.[636] But while sitting on the balcony at his mother's house, Tyler learned where they were and what had happened as he overheard an audio message to his mother which said, "Christina and her baby are dead."[637]

---

[630] *Id.* at Tr. 362:6-15.
[631] *Id.* at Tr. 362:21-363:1; Declaration of Tyler Johnson, Ex. 31, ¶ 24.
[632] Testimony of Tyler Johnson, Tr. 365:21-24.
[633] *Id.* at Tr. 366:3-15; Declaration of Tyler Johnson, Ex. 31, ¶ 25.
[634] Declaration of Tyler Johnson, Ex. 31, ¶ 27.
[635] Testimony of Tyler Johnson, Tr. 366:12-24.
[636] *Id.* at Tr. 367:7-126.
[637] *Id.* at Tr. 367:20-368:6.

384.     Tyler immediately stood up, "exited off the balcony," "went and gathered all [his] children" and "locked [himself and his children] in the closet in one of the bedrooms and just fell apart."[638] But his children did not know why their father was deteriorating before their eyes, so he had to tell them that the unimaginable had occurred and that their mother and sister were dead as a result.[639]

385.     Through the darkness, there was light as Tyler learned, "a good three hours"[640] later, that his daughter, F.M.J. was not dead but in-fact, she was alive.[641] Due to the pain and chaos of the day, however, Tyler was skeptical and "didn't want to get [his] hopes up" so he asked for proof, which he received via a "selfie" of Shalom Tucker holding F.M.J.[642]

386.     F.M.J. was left alone, strapped in her bullet-riddled car seat for "a good eight, nine hours" without food and water, *but* she was alive, and when Mr. Johnson finally saw her a few days later, "[i]t was probably one of the happiest moments" of his life. When held her in his arms he "felt more joy that [he] probably [has] ever felt".[643]

387.     Before being reunited with his youngest daughter, Tyler stopped at the scene[644] where his wife had been murdered, and after the gravity of the situation passed and his clarity was regained, Tyler needed to answer two overarching questions.

388.     First, he wanted to determine where the Cartel unleashed their hail of bullets and based upon "the way it looked on [Christina's] vehicle it definitely showed that the bullets came from high above on the right. All of the bullets came in from an angle on the right

[638] *Id.* at 368:21-25.
[639] Declaration of Tyler Johnson, Ex. 31, ¶ 31.
[640] Testimony of Tyler Johnson, Tr. 375:24.
[641] Declaration of Tyler Johnson, Ex. 31, ¶ 32.
[642] *Id.*; Testimony of Tyler Johnson, Tr. 369:12-16; Family Photo of Shalom Tucker and F.M.J., Ex. 22.
[643] Testimony of Tyler Johnson, Tr. 375:21-376:1.
[644] Mexican Government Apostille 2, Ex. 4_000319, 320, 324, 328.

passenger's side."[645] So, he hiked up the mountainside—this is after Mexican authorities had processed the scene—and found where the Cartel fired their bullets upon his wife and daughter. Tyler testified that he continued to find bullet casings and rounds for months after the attack on this hillside.[646]

389.    Second, Mr. Johnson wanted to determine if this was an accident i.e., could the Defendant determine from where they shot whether it was a woman and child in Christina's vehicle. Tyler measured the distance from where the shots were fired to Christina's vehicle to be approximately 140 – 175 yards[647], a distance consistent with the Mexican authorities' findings,[648] and from this distance one could "very clearly" "see who was in the vehicles and if it was women and children."[649]

390.    Back in La Mora, "Christina needed to be embalmed because her body began to decompose quickly, and her funeral was not set to be held for another few days."[650] Mr. Johnson "didn't think that the first time [he and his wife] went in a helicopter ride would be" so that Christina could be embalmed.[651]

391.    Following Christina's funeral, Mr. Johnson has "lost interest in a lot of things;" he doesn't "want to go to [his] farms" or "to golf" because "[i]t's hard to find joy in things following the attack. These days, [he is] just trying to keep it together for [his] kids and to help them move forward."[652]

---

[645] Testimony of Tyler Johnson, Tr. 373:17-20.
[646] Id. at Tr. 373:21-374:7.
[647] Id. at Tr. 375:5-10.
[648] Christina Langford 1006 Summary Chart, Ex. 12_000001.
[649] Testimony of Tyler Johnson, Tr. 375:10-11.
[650] Declaration of Tyler Johnson, Ex. 31, ¶ 38.
[651] Testimony of Tyler Johnson, Tr. 376:24-25, 377:1
[652] Id. at ¶¶ 46, 47.

392.     Mr. Johnson's "pain is palpable."[653] "He has regret and guilt about why he let Christina go back to get the passports rather than doing it himself," he plays the "woulda/coulda/shoulda stuff all the time", and it is Dr. Schuurman's expert opinion that Mr. Johnson "is experiencing symptoms of PTSD" as well as "Major Depressive Disorder, including loss of energy, diminished interest in activities (known as *anhedonia*), depressed mood, feelings of detachment from others, persistent inability to experience positive emotions, and self-blame."[654]

393.     At trial, Tyler testified:

> I miss just having someone, a companion, someone around to talk to, confide in. Someone to help me raise my kids and I miss her, her smile. Just being able to -- I really miss listening to her play the piano. It's one of my favorite things is just to lay on the couch and fall asleep while she plays the piano; she played the most beautiful music. I miss seeing her with my kids and how she treated them, how she loved them so much. The attention she would give them and the patience she had with them.[655]

394.     After Christina's death, Tyler has tried to make special events more important, knowing his children are missing their mom.[656]

395.     "Considering the extraordinarily tragic circumstances"[657] surrounding the murder of Mr. Johnson's wife on November 4, 2019, and following a thorough review of his declaration, his testimony, testimony of his mother-in-law and Dr. Schuurman's expert report; Plaintiffs submit that Mr. Johnson has suffered, and will continue to suffer, "the exact sort of acute feeling of permanent loss or change caused by [Christina's] absence that warrants an upward departure" from the standard *Havlish* valuation.[658]

---

[653] Expert Report of Dr. Schuurman, Ex. 26_000014.
[654] *Id.* at 000014-15
[655] Testimony of Tyler Johnson, Tr. 381:12-23.
[656] *Id.* at Tr. 359:21 - 360:1.
[657] *Havlish*, 2012 U.S. Dist. LEXIS 110673, at *105-*106.
[658] *Oveissi*, 768 F. Supp. 2d at 29-30.

396.      The *Havlish* value for solatium damages for a spouse is $12,500,000.00, and adjusted for inflation,[659] this amount rises to $15,300,000.00.

397.      The Court addresses, *infra.*, Plaintiffs' request for an upward adjustment from these figures for Plaintiff Tyler Johnson for the loss of his wife Christina Langford and the belief that he had lost his daughter F.M.J. in the attack.

### (b) Solatium Damages for Tyler and Christina's Six Children

398.      On November 4, 2019, the Defendant not only brutally murdered Christina Langford but it also stole approximately "50.2 years"[660] of precious, beautiful moments and memories that Christina and her children C.J., J.J., T.J. Jr., H.J., E.J., and F.M.J. would have undoubtably shared and left these children motherless and "with continuing and persistent symptoms of trauma and grief, including depression, anger, sadness, anxiety, helplessness, and hopelessness."[661]

399.      While C.J., J.J., T.J. Jr., H.J., E.J., and F.M.J. may be experiencing/displaying similar types of grief, every child has a "different personality," is a different age, and therefore, necessarily will, and does, have different amounts and types of grief.[662]

### i.   C.J.

400.      Tyler and Christina's children are "trying to hide their feelings and they're trying to act like they're okay."[663] For example, C.J. "goes into the closet in her bedroom and cries. She doesn't want people to see her crying. She doesn't want to show how she's feeling."[664] Dr. Schuurman testified that "there is a commonality in children that they want

---

[659] Inflation has risen approximately 23% since *Havlish* was decided in July 2012 to February 2022. https://www.bls.gov/data/inflation_calculator.htm.
[660] Expert Report of Dr. Stan Smith, Ex. 27_000008.
[661] Expert Report of Dr. Schuurman, Ex. 26_000010.
[662] Testimony of Dr. Schuurman, Tr. 475:17.
[663] *Id.* at Tr. 474:3-5.
[664] *Id.* at Tr. 474:6-9.

their parent to feel better. They don't want to add to their pain. … So it's not unusual for them to want to hide their feelings, to want to look like they're okay because in their minds often it's, like, that's a way I can be helpful."[665]

401.     In Dr. Schuurman's expert opinion, C.J. is exhibiting symptoms "consistent with PTSD including diminished interest in activities, feeling of detachment or estrangement from others, avoidance, and dissociative reactions" which will "take a physical and emotional toll on [C.J] over time."[666]

402.     C.J., who just turned 14 years old in February was once an upbeat girl, now frequently breaks down and cries because she does not understand why this happened.[667] She has been described as becoming very quiet and kind of numb since the attack.[668]  Ms. Sedgwick, C.J.'s grandmother, described C.J. as becoming more introverted and shy, not wanting to speak to anyone except her friends.[669] Dr. Schuurman believes that C.J. does not want to add to the burden that her father is feeling, and her way of doing that is hiding her emotions.[670]  C.J. has also lost joy she used to find in playing piano, likely because of the association it has to her mother.[671]  Dr. Schuurman stated that C.J. seems to also be suffering from the detachment and diminished interest Tyler is feeling.[672]

---

[665] *Id.* at Tr. 474:15-23.
[666] Expert Report of Dr. Schuurman, Ex. 26_000015, 17.
[667] Declaration of Elizabeth Langford, Ex. 33 ¶ 16.
[668] Expert Report of Dr. Schuurman, Ex. 26_000015; Testimony of Dr. Schuurman, Tr. 474:5-11.
[669] Declaration of Amelia Sedgwick, Ex. 32 ¶ 35; Testimony of Amelia Sedgwick, Tr. 258:11-23.
[670] Testimony of Dr. Schuurman, Tr. 474:3-25.
[671] Expert Report of Dr. Schuurman, Ex. 26_000015; Testimony of Dr. Schuurman, Tr. 538:24-25, 539:1-2.
[672] *Id.* at Tr. 475:1-12.

### ii.  J.J.

403.      J.J. was nine (9) years old when Christina was murdered,[673] and he "was very angry" following her death.[674] He would "lose[] his temper [and], throw fits" frequently, which in Dr. Schuurman's expert opinion, is consistent with "PTSD, including irritable behavior and angry outbursts, verbal and physical aggression toward others, problems with concentration, reckless behavior, and depressed mood."[675] Unfortunately, the difficulties J.J. has faced, and the symptoms he is experiencing, have been made worse by "bullying from other kids."[676] While J.J. appears to be doing better now,[677] finding constructive channels to express his emotions will be a lifelong challenge for J.J.[678]

### iii.  T.J. Jr.

404.      Like his older brother, T.J. Jr.—seven (7) years old when Christina was murdered— has also been, following the death of his mother, teased by the other children and defiant when given instruction;[679] contrary to what his mother tried to teach him.[680] In short, T.J. Jr. has been a bit of "Dennis the Menace" in that he does things he knows that he should not do but does them anyways irrespective the cost.[681] As T.J. Jr. grows older, he will experience "a recurring loss" "as literally a piece of [him] is missing that can't be filled." Dr. Schuurman concluded that T.J. Jr. is at high risk for "PTSD, including diminished

---

[673] Declaration of Amelia Sedgwick, Ex. 32, ¶ 36.
[674] Testimony of Amelia Sedgwick, Tr. 258:25.
[675] Expert Report of Dr. Schuurman, Ex. 26_000015.
[676] Testimony of Dr. Schuurman, Tr. 475:23-24.
[677] Testimony of Amelia Sedgwick, Tr. 259:3-12.
[678] Testimony of Dr. Schuurman, Tr. 476:9-16.
[679] Expert Report of Dr. Schuurman, Ex. 26_000015
[680] Testimony of Amelia Sedgwick, Tr. 242:10-11 (Christina "wanted her children to learn to be obedient and to be responsible").
[681] Testimony of Dr. Schuurman, Tr. 476:21-24.

interest or participation in events, feelings of detachment or estrangement from others, and reckless behavior."[682]

### iv.  H.J.

405.      "From everything that H.J. does and says, he shows [everyone] that he is very sad, heartbroken. He was really attached to his mom … [and] [d]ifferent family members have caught him in Tyler and Christina's bedroom kissing a picture of his mom on various occasions."[683] H.J., for the first several months following the attack, would not let his father out of his sight because of the significant fear that he would not come back.[684] Dr. Schuurman opined that H.J. "is displaying symptoms of PTSD as outlined in the APA's guidelines for children 6 years and younger, including recurrent, involuntary, and intrusive distressing memories of the traumatic death of his mother" "and dissociative reactions."[685] Such high levels of anxiety and need for security, as such an early age, if not properly addressed may become chronic issues for H.J.[686]

### v.  E.J.

406.      E.J. was two-years-old and "was very close to Christina" when she was murdered.[687] He "[a]lways had to be right next to Christina on her lap or tight next to her. Wherever she was, she took him because he would not be left behind. And just having her gone from one minute to the next" "after the funeral" was "heart wrenching just because [E.J.] was so traumatized and he was so distraught. He just cried trying to let [his grand-mother, Amelia Sedgwick] know that he wanted his mom."[688]

---

[682] Expert Report of Dr. Schuurman, Ex. 26_000016.
[683] Declaration of Amelia Sedgwick, Ex. 32, ¶ 38.
[684] Testimony of Dr. Schuurman, Tr. 477:18-20.
[685] Expert Report of Dr. Schuurman, Ex. 26_000016.
[686] Testimony of Dr. Schuurman, Tr. 477:21-23.
[687] Testimony of Amelia Sedgwick, Tr. 260:16-17.
[688] *Id.* at Tr. 260:18-25.

407.     E.J. grew angry with his grandmother because she "wouldn't go get [his mother],
wouldn't take him to her" and so, "the first night was an hour or two of him just crying and
crying and screaming and crying and [Ms. Sedgwick] just held him, wouldn't let him go.
[Even though] [h]e wanted to just fight [Ms. Sedgwick] and run away. [She] wouldn't let
him go. [She] just held him and cried with him until he finally tried to settle down a little
bit and went to sleep."[689]

408.     The issues and fears E.J. experience in the days and months immediately following
his mothers murder, persist to this day. "On a recent road trip, [E.J. and his family] stopped
at a store in Chihuahua where some National Guard vehicles and members had parked. E.J.
enter the store panicked that they were going to shoot him. Another time when [he] saw
the Federales (federal police) he asked, 'are they going to shoot us?'"[690] It is Dr.
Schuurman's expert opinion that "[a]lthough E.J. is young, he is acutely aware of what
happened to his mother and … is exhibiting anxiety and PTSD-related symptoms. While
his anxiety is in some ways well-founded, carrying that king of anxiety has potential long-
term physical and emotional harm."[691]

### vi.  F.M.J.

409.     F.M.J., who survived the attack in her carseat, similar to the other young children
affected, will have no memories of her mother, which will affect her throughout her
lifetime.[692] F.M.J. does not remember her mother and sometimes refers to her grandmother,
Ms. Sedgwick, as mom.[693]  Dr. Schuurman also discussed that F.M.J.'s grief and suffering

---

[689] *Id.* at Tr. 261:1-9.
[690] Expert Report of Dr. Schuurman, Ex. 26_000016.
[691] *Id.*
[692] Testimony of Dr. Schuurman, Tr. 479: 12-14.
[693] Declaration of Amelia Sedgwick, Ex. 32 ¶ 40; Testimony of Amelia Sedgwick, Tr. 261:17-25, 262:1-7.

will be compounded by her coming to terms with the fact that she was involved in, and survived, the attack.[694] Dr. Schuurman explained that society can put pressure on "miracle children," such as F.M.J., to perform in ways that are not consistent with their personality.[695] It is something that will present itself as she gets older.[696]

410.    Again, it bears mentioning that C.J., J.J., T.J. Jr., H.J., E.J., and F.M.J. were between the ages of twelve and seven months when their mother was violently taken from them.  They no longer have the opportunity to build new memories with their mother or have her present at their weddings, graduations, births of their children, or other key life events. They will also no longer be able to experience the love, support, and guidance their mother would provide for them.

411.    As Dr. Schuurman stated in her report, "[t]here is no measure valid or reliable enough to fully calculate the depth of the loss" these children "have experienced through the traumatic murder[] of their mother. For the rest of their lives, they will grieve and miss their mother's presence and [her] affection, support, protection, comfort, care, advice, assistance, solace, companionship. No one can fully 'replace' [Christina's] role[] as mother[] and caretaker[] for [her] children, no matter how much love and support surrounds them."[697]

412.    C.J., J.J., T.J. Jr., H.J., E.J., and F.M.J. each have distinct solatium claims arising from the murder of their mother on November 4, 2019.

---

[694] Testimony of Dr. Schuurman, Tr. 479:20-23.
[695] *Id.* at Tr. 480:3-6.
[696] *Id.* at Tr. 480: 3-11.
[697] Expert Report of Dr. Schuurman, Ex. 26_000017.

|  | *Havlish* solatium values | Present Day solatium values, accounting for inflation (rounded to the closest $100,000)[698] |
|---|---|---|
| **Child** | $8,500,000.00 | $10,400,000.00 |

413.     The Court addresses, *infra.*, Plaintiffs' request for an upward departure from these figures for Plaintiffs C.J., J.J., T.J. Jr., H.J., E.J., and F.M.J. for the loss of their mother Christina Langford.

### (c) Amelia Sedgwick

414.     Plaintiff Amelia Sedgwick is Christina Langford's mother.[699] Ms. Sedgwick and all her children—five of whom are Plaintiffs in this case (Estate of Christina Langford, Elizabeth Langford, Serina Langford, Isaac Langford and E.L.)—are United States Citizens.[700]

415.     Christina was a "super happy," "[f]un and mischievous" child growing up.[701] As a child, Christina liked to cut her own hair, help her mother with her brothers and sisters by covering them, their "crib, the walls, everything, her[self]" with "diaper ointment."[702] But she would help "sweep[] and mop[] the floors" afterwards because even at a young age "[s]he was responsible."[703]

---

[698] Inflation has risen approximately 23% since *Havlish* was decided in July 2012 to February 2022. https://www.bls.gov/data/inflation_calculator.htm.
[699] Declaration of Amelia Sedgwick, Ex. 32, ¶ 4.
[700] Testimony of Amelia Sedgwick, Tr. 234:20-21, 235:15-25; Amelia Sedgwick's Children's Passports, Ex. 15.
[701] *Id.* at Tr. 237:4-6.
[702] *Id.* at Tr. 237:7-11
[703] *Id.* at Tr. 239:21-25.

416.    Christina fell "head-over-heels in love with [Tyler]."[704] Shortly thereafter, on February 14, 2007, Christina married "her first boyfriend"[705] at Mr. Johnson's parents' house in Colonia LeBaron in a beautiful ceremony before 100-200 people.[706]

417.    Fifty-one (51) weeks later, on February 7, 2008, Christina would give birth to her first child C.J. and she and her mother would share an impactful, cathartic moment. Her mother was present for the births of all of Christina's children.[707]

418.    Ms. Sedgwick loved her grandchildren but her relationship with them "was different then than it is now."[708] To say 2019 was a difficult year for Ms. Sedgwick and her family would be an understatement but for the first ten (10) months of the year there was one constant, Christina's love and support.

419.    In January 2019, Ms. Sedgwick's son-in-law died in an unexpected plane crash and "the pain of seeing [her] daughter suffer and [her] sons who were very, very close to Alvin and Wesley who died that day was probably the hardest thing [Ms. Sedgwick] ever experienced at that point in [her] life as a mother."[709] But Christina was there and "was so supportive."[710]

420.    A few months later, Ms. Sedgwick's husband and Christina's father, contracted an "intestinal flu" and died within moments of reaching the hospital.[711] But again, Christina was there. Every day "[s]he'd bounce through the door, 'I'm here, Mom. What do you want to do today? [W]hatever she did it was to cheer people up, to bring some sunshine, to bring

---

[704] Declaration of Amelia Sedgwick, Ex. 32, ¶ 9.
[705] *Id.*
[706] *Id.* at ¶ 10; Testimony of Amelia Sedgwick, Tr. 240:19-25.
[707] *Id.* at Tr. 242:7-8.
[708] *Id.* at Tr. 242:24-25.
[709] *Id.* at Tr. 243:16-244:1.
[710] *Id.* at Tr. 244:5.
[711] *Id.* at Tr. 244:9-18.

something positive. To lend support and if [Ms. Sedgwick] wasn't feeling good or was down, she would put her arm around [Ms. Sedgwick] and say, 'I'm so sorry, Mom.'"[712]

421.      Ms. Sedgwick was the town schoolteacher in La Mora and on November 4, 2019, at 10:00 a.m. school started.[713] Shortly after it began, Ms. Sedgwick's days of being a teacher ended.  Approximately twenty minutes into her lesson plan, someone ran into the classroom and told Amelia "that there was a car, that it was burning and that it was Rhonita's vehicle."[714]  Ms. Sedgwick "tried to call [Christina] over WhatsApp, but she didn't answer."[715] She then reached out to Tyler and asked that he contact her if he heard from Christina.[716]

422.      The terror of anticipation lasted all day for Ms. Sedgwick until "around sundown" when D.L. returned to La Mora and told everyone that his mother and Christina were dead.[717]  When she learned her daughter had been murdered, and assumed F.M.J. was also dead, Ms. Sedgwick was "devastated"[718] because "when you lose one of your children, it's a whole different story."[719]

423.      A glimmer of hope arrived when the earlier reports of F.M.J's death were inaccurate.  F.M.J. was alive—there was "joy" and "relief" on this most disastrous day.[720]

424.      Christina was "loaded [] into the back of [a] pickup and carried" into Ms. Sedgwick's house, "into [her] room and laid" "on a table." Ms. Sedgwick and her daughters

[712] *Id.* at Tr. 244:25-245:7.
[713] Declaration of Amelia Sedgwick, Ex. 32, ¶ 16.
[714] *Id.*; Testimony of Amelia Sedgwick, Tr. 247:21-24.
[715] *Id.* at Tr. 249:20-250:1.
[716] *Id.*
[717] Declaration of Amelia Sedgwick, Ex. 32, ¶ 24.
[718] Testimony of Amelia Sedgwick, Tr. 251:10-11; 250:21.
[719] *Id.* at Tr. 254:3-4.
[720] *Id.* at Tr. 252:9-10.

"cleaned [Christina] up and dressed her and combed her hair and washed her up…."[721] Ms. Sedgwick slept by Christina's body that evening.[722]

425.     Ms. Sedgwick has now assumed the role of "mother" to C.J., J.J., T.J. Jr., H.J., E.J. and F.M.J.—a "difficult" process that has been "physically and mentally draining."[723]

426.     Ms. Sedgwick has "suffered from nightmares and trouble sleeping and trouble regulating emotion and anger" since her daughter's murder.[724] Dr. Schuurman testified that she could not imagine "anything worse for a mother … than having their child die in such a horrific way."[725] As a result, it is Dr. Schuurman's expert opinion that Ms. Sedgwick is at risk for "more depressive symptoms, poorer wellbeing, more health problems" and "enduring distress" which may manifest in heightened "anxiety" and "fear."[726]

427.     Based upon Ms. Sedgwick's gripping testimony and declaration, declarations from her children and Dr. Schuurman's expert report and testimony, Plaintiffs submit that Ms. Sedgwick was close with and misses her daughter immensely. Ms. Sedgwick endured the agonizing pain of receiving her daughter's body, cleaning her, preparing her, packing her with ice and sleeping next to her on November 4, 2019.

428.     As such, and having examined closely the facts of this particular case, Ms. Sedgwick should be awarded solatium damages in line with those issued in *Warmbier v. Democratic People's Rep. of Korea*, 356 F. Supp. 3d 20, 59 (D.D.C. 2018), adjusted for inflation.[727] The values in *Warmbier* for parent solatium claims was $15,000,000.00, and

---

[721] *Id.* at Tr. 254:11-16.
[722] Declaration of Amelia Sedgwick, Ex. 32, ¶¶ 30, 31.
[723] Testimony of Amelia Sedgwick, Tr. 256:12-15; *see also* Tr. 258:11 – 262:7 (testimony of how the children are doing and their relationship with Ms. Sedgwick); Declaration of Amelia Sedgwick, Ex. 32 ¶¶ 33-40 (same).
[724] Testimony of Dr. Schuurman, Tr. 482:10-11.
[725] *Id.* at Tr. 482:7-9.
[726] *Id.* at Tr. 483:23-484:16.
[727] Inflation has risen approximately 12% since *Warmbier* was decided in December 2018 to January 2022. https://www.bls.gov/data/inflation_calculator.htm

adjusted for the 12% inflation since the *Warmbier* case was decided, the Court awards solatium damages in the amount of $16,800,000.00 to Plaintiff Amelia Sedgwick for the tragic loss of her daughter Christina Langford on November 4, 2019. Plaintiffs do not seek a request for an upward departure for Ms. Sedgwick's judgment.

### (d) Christina's Siblings—Elizabeth Langford, Serina Langford, Isaac Langford, and E.L.

429.    As stated *supra*, four of Christina's younger siblings—Elizabeth Langford, Serina Langford, Isaac Langford and E.L.—are Plaintiffs in this case. This section addresses their claims for solatium damages arising from the murder of their sister.

430.    E.L., a minor under the guardianship of Amelia, Elizabeth Langford, and Serina Langford are Christina's sisters[728] and Isaac Langford is Christina's brother.[729]

431.    Christina, Isaac, Elizabeth, Serina and E.L., on paper were separated; but in reality, they were "very close," "best friends," each other's confidants, connected and always interested in what each other were doing.[730] This included among other things, Christina's participation in Elizabeth's wedding, daily check-ins on the "sisters chat" or getting together and spending time together over the holidays.[731]

432.    Serina and Christina's "thing" together was writing music and playing the piano together while Christina's children danced in the living room.[732] Because of this, Serina began to teach approximately "thirty (30) kids, ages three to fifteen, to dance" "three times a week" at the local dance studio.[733] "Now, instead of preparing lesson plans" for her

---

[728] Declaration of Amelia Sedgwick, Ex. 32, ¶¶ 3-4; Declaration of Elizabeth Langford, Ex. 33, ¶1; Declaration of Serina Langford, Ex. 34, ¶ 1.
[729] Declaration of Isaac Langford, Ex. 35, ¶ 3.
[730] *Id*. at ¶ 3; Declaration of Serina Langford, Ex. 34, ¶ 7; Declaration of Elizabeth Langford, Ex. 33, ¶¶ 3,7.
[731] Declaration of Isaac Langford, Ex. 35, ¶ 3; Declaration of Serina Langford, Ex. 34, ¶ 7; Declaration of Elizabeth Langford, Ex. 33, ¶7.
[732] Declaration of Serina Langford, Ex. 34, ¶¶ 4, 5.
[733] *Id.* at ¶ 6.

students, Serina spends her time helping her mom and her family with raising Christina's children and "trying to restore some balance" to their lives.[734]

433.     Elizabeth and Christina bonded, and had "a running joke," over the birth of F.M.J. Elizabeth was present for the birth of F.M.J., the first person F.M.J. saw when she came into this world, and as a result, Elizabeth came to be known as F.M.J.'s "pseudo-mom."[735] As a result of the Defendant's brutal murder of Christina, the "joke" has become a reality as Elizabeth has been forced to "assum[e] the daunting task of trying to fill [Christina's] shoes" and try and be F.M.J.'s mother.[736]

434.     Isaac and Christina spoke weekly about their lives and what was going on.[737] While E.L.'s relationship with Christina was different. Because of their age difference, E.L. was "raised pretty much as an only child" that didn't like it when Christina's kids came over and got "into her bedroom and into her things."[738] But Christina "was always such a sweetheart and a gem", and E.L. and Isaac miss her terribly.[739]

435.     E.L. was in class in La Mora with her mother, Serina was in La Mora, Elizabeth was in Wisconsin, and Isaac was in North Dakota, when the earth-shattering news first came in that "Nita's truck had been blown up."[740] This caused Serina to become "violently ill and spike[] a fever," and the rest of the day became a blur for Elizabeth.[741]

---

[734] *Id.*
[735] Declaration of Elizabeth Langford, Ex. 33, ¶ 8.
[736] *Id.* at ¶ 14.
[737] Declaration of Isaac Langford, Ex. 35, ¶ 3; Testimony of Amelia Sedgwick, Tr. 239:14-16.
[738] Testimony of Amelia Sedgwick, Tr. 257:4-10.
[739] Declaration of Isaac Langford, Ex. 35, ¶ 3.
[740] Testimony of Amelia Sedgwick, Tr. 249:9-10; Declaration of Serina Langford, Ex. 34, ¶ 12; Declaration of Elizabeth Langford, Ex. 33, ¶ 9; Declaration of Isaac Langford, Ex. 35, ¶ 5.
[741] Declaration of Serina Langford, Ex. 34, ¶ 14; Declaration of Elizabeth Langford, Ex. 33, ¶ 10.

436.     Several hours later, their fears, anxieties, and "now illness," were "all magnified upon learning of Christina's death."[742] Ms. Sedgwick, E.L,. and Serina "almost all three collapsed" upon hearing the news, and Serina's illness, grief, and sadness, had grown so significant that she was "bed-ridden" for the rest of the evening.[743] Their family will forever have "this 'black cloud' surrounding" them.[744]

437.     The loss has impacted the siblings in additional ways: E.L. sold her horse (which she had saved up for),[745] moved from La Mora, and went from being the equivalent of an only child to having Christina's six children in the home with her.[746]  But E.L. has said to Ms. Sedgwick, "those are Christina's kids, and they need us, Mom."[747] Isaac purchased Christina and Tyler's home in La Mora, and he refuses to part with Christina's piano.[748] Elizabeth struggles with trying to figure out how to care for all the children, her mom, and Tyler without it feeling like she is trying to replace Christina.[749]   Serina feels like her "home is forever shattered" by the attack and Christina's death.[750]

438.     It is Dr. Schuurman's expert opinion that "the death of a sibling can have profound implications for surviving brothers and sisters" because "[l]osing a sibling means the loss of a companion, confidante, role model, and friend. Siblings' identities are intricately connected because they share similar stores, histories so that when one of them dies, the survivors essentially lose a part of themselves."[751]  As a result, it is Dr. Schuurman's expert

---

[742] Declaration of Serina Langford, Ex. 34, ¶ 16.
[743] Testimony of Amelia Sedgwick, Tr. 243:22; Declaration of Serina Langford, Ex. 34, ¶ 16.
[744] Declaration of Serina Langford, Ex. 34, ¶ 20.
[745] Testimony of Amelia Sedgwick, Tr. 257:14-15.
[746] Declaration of Amelia Sedgwick, Ex. 32, ¶¶ 33, 43.
[747] *Id.* at ¶ 43.
[748] Declaration of Isaac Langford, Ex. 35, ¶ 8.
[749] Declaration of Elizabeth Langford, Ex. 33, ¶ 21.
[750] Declaration of Serina Langford. Ex. 34, ¶ 20.
[751] Expert Report of Dr. Schuurman, Ex. 26_000018.

opinion that Elizabeth Langford, Serina Langford, Isaac Langford and E.L. are at risk for "serious physical and mental health problems" including "somatic symptoms, depression," "sense of isolation and alienation from others," and "elevated mortality risk."[752]

439.     Dr. Schuurman's expert opinion that—as result of the Defendant's violent murder of their sister Christina—Elizabeth Langford, Serina Langford, Isaac Langford and E.L. are at "high risk" of "hav[ing] psychological, emotional, and relational challenges throughout their lifetimes" which may include, but is not limited to, "the development of traumatic memories, images, and post-traumatic stress symptoms."[753]

440.     The *Havlish* value for solatium damages for a sibling is $4,250,000.00, and adjusted for inflation,[754] this amount rises to $5,200,000.00.

441.     The Court addresses, *infra.*, Plaintiffs' request for an upward departure from these figures for Plaintiffs Elizabeth Langford, Serina Langford, Isaac Langford, and E.L. for the loss of their sister Christina Langford on November 4, 2019.

### (3) Family of Dawna Ray

442.     Solatium damages, like damages for pain and suffering, are "by their very nature unquantifiable."[755] As outlined above, courts have developed a commonly accepted standardized framework for awarding solatium damages to family members of deceased victims. Courts award half these amounts to family members of persons who are injured rather than killed.[756] Accordingly, "where the victim does not die, but instead suffers only injury, spouses receive $6.25 million, parents and children receive $4.25 million, and

---

[752] *Id.* at 26_000018-19.
[753] *Id.* at 26_000014.
[754] Inflation has risen approximately 23% since *Havlish* was decided in July 2012 to February 2022. https://www.bls.gov/data/inflation_calculator.htm.
[755] *Moradi v. Islamic Rep. of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015).
[756] *Moradi*, 77 F. Supp. 3d at 72.

siblings receive $2.125 million."[757] These amounts are merely the baseline and may be subject to upward or downward adjustments as appropriate under the circumstances.[758]

443.     The Langford family members claiming solatium damages arising from the murder of Dawna Ray are David Langford, Crystal Langford, Brandy Spenst, Joseph Cole Langford, Bryce Langford, K.L., D.L., M.L.,  C.L. X.L., J.L., B.L., Karen Woolley, Jaremy Ray, James Ray, Justin Ray, Jonathan Ray, Kerah Ray, and Amber Ray.

444.     The Langford family members claiming solatium damages arising from the murder of T.L. and R.L. are David Langford, Crystal Langford, Brandy Spenst, Joseph Cole Langford, Bryce Langford, K.L., D.L., M.L.,  C.L. X.L., J.L., and B.L.

445.     The Langford family members claiming solatium damages arising from injuries of the children present at the massacre are David Langford, Crystal Langford, Brandy Spenst, Joseph Cole Langford, Bryce Langford, K.L., D.L., M.L., C.L., X.L., J.L., and B.L.

### (a) David Langford

446.     On the day of the attack, David Langford was in Phoenix assisting a family member.[759] While running errands, David received a Whatsapp message of a burning vehicle, but without any context, the burning vehicle alone did not concern him.[760] Shortly after, David received a message from Kenny Miller that Rhonita's vehicle had been intentionally set ablaze.[761] David immediately jumped into his vehicle and began the eight-hour drive to La Mora, Mexico.[762]

---

[757] *Id.*
[758] *Id.*
[759] Testimony of David Langford, Tr. 328:16-18.
[760] *Id.* at Tr. 328:20-24.
[761] *Id.* at Tr. 328:24-329:1.
[762] *Id.* at Tr. 329:1-5

447.     During the drive, David prayed that Dawna and his children had somehow avoided the attack, but Dawna failed to respond to any of David's messages.[763] Assuming the worst, David feared that he had lost Dawna and his nine children to an attack.[764] Even after David arrived in Mexico, he "was preparing [himself] mentally for most likely what happened to [his] family."[765] As David traveled with the military to find the location of the attack, he received a call that the Cartel had murdered Dawna, an older child, and a younger child.[766] David had three hours to consider which of his children he would have to live without for the rest of his life.[767]

448.     When David reached the site of the attack three hours later, he opened the front door of Dawna's vehicle to find her dead, slumped over the steering wheel.[768] Dawna's lifeless body had been in that position for hours.[769] David then opened the back door to find his "precious" T.L. "in a fetal position" and "blown to bits."[770] He also knew that inside the vehicle lay his baby, R.L., "full of holes and shot up."[771] But David's nightmare did not end here. David next learned that M.L. was missing and his other children had sustained life-threatening injuries.[772]

449.     Entering the hospital in Mexico where his children lay injured and crying was like walking into a military hospital; "it was horrific."[773] Because the hospital could not provide the required critical care, David and his injured children traveled by helicopter to the United

---

[763] *Id.* at Tr. 329:20-330:18.
[764] *Id.* at Tr. 332:7-9.
[765] *Id.* at Tr. 333:19-22.
[766] *Id.* at Tr. 334:23-335-3.
[767] *Id.* at Tr. 335:1-8.
[768] *Id.* at Tr. 336:3-10.
[769] *Id.* at Tr. 336:9.
[770] *Id.* at Tr. 336:10-15.
[771] *Id.* at Tr. 336:12-15.
[772] *Id.* at Tr. 336:16-19; 337:1-4.
[773] *Id.* at Tr. 339:1-12.

States.[774] During the 40-minute flight, B.L. laid on David bleeding from his chest wound, X.L. leaned on David bleeding from his shoulder, while C.L. received urgent medical attention in effort to keep him alive.[775] Even after they arrived at the hospital and his injured children were stabilized, David endured anguish over his separation from D.L. and J.L. who remained in Mexico. [776] They had witnessed the murders of their mother and siblings, yet David could not console them while he attended to his other children's injuries.[777]

450.     Since the attack, David has moved his surviving children from their family home to the United States.[778] C.L. continues to recover from his physical injuries, requiring ongoing treatment.[779] All the surviving children exhibit signs of psychological trauma, such as refusing to sleep alone in their rooms, experiencing nightmares, and showing a trigger response to loud noises.[780] David focuses on healing his children's suffering instead of addressing his own grief and pain.[781]

451.     The loss of T.L. and R.L. has caused David immense personal suffering and stripped his daily life of joy.[782] He misses T.L.'s and R.L.'s companionship and mourns the fact that he never had the opportunity to watch T.L. and R.L. grow into young men.[783]

452.     Accordingly, the court awards David Langford for solatium damages for the deaths of T.L. and R.L. and the injuries to his other children in the values set forth in *Havlish* and adjusted for inflation in the total amount of $57,200,000.00.

---

[774] *Id.* at Tr. 339:12-16.
[775] *Id.* at Tr. 340:7-18.
[776] *Id.* at Tr. 342:24-343:4.
[777] *Id.*
[778] Declaration of David Langford, Ex. 66, at 35.
[779] *Id.* at 39.
[780] *Id.* at 41-42.
[781] Testimony of David Langford, at Tr. 349-50:17-11.
[782] Declaration of David Langford, Ex. 66, at 48.
[783] *Id.* at 47.

| David Langford Solatium Claims | *Havlish* solatium values | Present Day solatium values, accounting for inflation (rounded to closest $100,000) |
|---|---|---|
| T.L (deceased) | $8,500,000.00 | $10,400,000.00 |
| R.L. (deceased) | $8,500,000.00 | $10,400,000.00 |
| K.L. (physical and emotional injury) | $4,250,000.00 | $5,200,000.00 |
| M.L. (physical and emotional injury) | $4,250,000.00 | $5,200,000.00 |
| C.L. (physical and emotional injury) | $4,250,000.00 | $5,200,000.00 |
| X.L. (physical and emotional injury) | $4,250,000.00 | $5,200,000.00 |
| B.L. (physical and emotional injury) | $4,250,000.00 | $5,200,000.00 |
| D.L. (emotional injury) | $4,250,000.00 | $5,200,000.00 |
| J.L. (emotional injury) | $4,250,000.00 | $5,200,000.00 |
| **Total** | **$46,750,000** | **$57,200,000.00** |

**(b) K.L., D.L., M.L., C.L., J.L., X.L., and B.L.**

453.     As described in detail herein, K.L., D.L., M.L., C.L., J.L., X.L., and B.L., witnessed the murders of their mother, T.L., and R.L. They deeply miss their mother's comfort and love, and they miss T.L.'s and R.L.'s companionship.[784]

454.     Furthermore, in the immediate aftermath of the attack, the burden fell on them to find help and tend to each other's injuries. Even now, they experience nightmares, flashbacks, sensitivity to loud noises, and physical reactions when discussing the terrorist attack.[785]

455.     Because of the terrorist attack, the children no longer want to live in the family home in Mexico.[786] Although the idea of living in La Mora terrifies them, they miss their family and friends; they miss the river running beside La Mora; and they miss taking hikes together.[787]

---

[784] Declaration of K.L., Ex. 61; Declaration of M.L., Ex. 62; Declaration of D.L., Ex. 63; Declaration of C.L., Ex. 64; Declaration of J.L., Ex. 65; Declaration of David Langford, Ex. 66.
[785] Declaration of David Langford, Ex. 66.
[786] *Id.*; Testimony of David Langford, Tr. 349:17-18.
[787] Testimony of K.L., Tr. 292:16-21, 293:3-4; Declaration of D.L., Ex. 63, at 3.

456.     During their transition to a new home in the United States, they missed school and had difficulty finding new friends.

457.     Accordingly, the Court awards K.L., D.L., M.L., C.L., J.L., X.L., and B.L. for solatium damages for the deaths of Dawna Ray, T.L., and R.L., and the injuries to their siblings in the values set forth in *Havlish* and adjusted for inflation in the total amount of $36,400,000.00 each. In lieu of a chart demonstrating solatium claims for each child who was present for the attack, the below chart serves as an example of the present children's claims. Each child receives solatium for Dawna, T.L, R.L., and the other six surviving children, but does not receive solatium for him or herself.

| K.L. Solatium Claims | *Havlish* baseline solatium values | Present day value, accounting for inflation |
|---|---|---|
| Dawna (deceased) | $8,500,000.00 | $10,400,000.00 |
| T.L (deceased) | $4,250,000.00 | $5,200,000.00 |
| R.L. (deceased) | $4,250,000.00 | $5,200,000.00 |
| M.L. (physical and emotional | $2,125,000.00 | $2,600,000.00 |
| C.L. (physical and emotional injury) | $2,125,000.00 | $2,600,000.00 |
| X.L. (physical and emotional injury) | $2,125,000.00 | $2,600,000.00 |
| B.L. (physical and emotional injury) | $2,125,000.00 | $2,600,000.00 |
| D.L. (emotional injury) | $2,125,000.00 | $2,600,000.00 |
| J.L. (emotional injury) | $2,125,000.00 | $2,600,000.00 |
| **Total** | **$29,750,000.00** | **$36,400,000.00** |

### (c) Joseph Cole Langford, Bryce Langford, Crystal Langford, Brandy Spenst

458.     Each of the older children who were not present for the attack have suffered severe emotional distress since the date of the attack.[788] Each member of the Langford family developed and maintained strong relationships with their mother and siblings. The evidence presented establishes that the violent circumstances of the attack, the deaths of the their mother and siblings, and the trauma of their siblings hospitalizations for their injuries continues to cause Joseph Cole, Bryce, Crystal, and Brandy grief and pain effecting their daily lives, their health, and their relationships.[789] Accordingly, the Court awards Joseph Cole, Bryce, Crystal, and Brandy solatium damages adjusted for inflation in the amount of $39,000,000 each.

| Solatium Claims | *Havlish* baseline solatium Values | Present day value, accounting for inflation |
| --- | --- | --- |
| Dawna (deceased) | $8,500,000.00 | $10,400,000.00 |
| T.L (deceased) | $4,250,000.00 | $5,200,000.00 |
| R.L. (deceased) | $4,250,000.00 | $5,200,000.00 |
| K.L. (physical and emotional injury) | $2,125,000.00 | $2,600,000.00 |
| M.L. (physical and emotional injury) | $2,125,000.00 | $2,600,000.00 |
| C.L. (physical and emotional injury) | $2,125,000.00 | $2,600,000.00 |
| X.L. (physical and emotional injury) | $2,125,000.00 | $2,600,000.00 |
| B.L. (physical and emotional injury) | $2,125,000.00 | $2,600,000.00 |
| D.L. (emotional injury) | $2,125,000.00 | $2,600,000.00 |
| J.L. (emotional injury) | $2,125,000.00 | $2,600,000.00 |
| **Total** | **$31,875,000.00** | **$39,000,000.00** |

---

[788] Declaration of Joseph Cole Langford, Ex. 57; Declaration of Bryce Langford, Ex. 58; Declaration of Crystal Langford, Ex. 59; Declaration of Brandy Spenst, Ex. 60.
[789] *Id.*

### (d) Karen Woolley

459.　　Karen Woolley is Dawna Ray's mother.[790] Dawna was the oldest of Ms. Woolley's "seven children and she was a constant over-achiever. She learned to talk at ten months old and was up and walking by the time she was one."[791]

460.　　Ms. Woolley is also the mother to, and legal guardian of, Jonathan Ray, a Plaintiff in this action.[792]  When Jonathan was born, Ms. Woolley deputized Dawna (nine (9) years old at the time) to be "little mama" of the house because Ms. Wooley would need to travel far and wide to ensure that Jonathan could (and would) receive the best medical care possible for his autism.[793] Dawna "never hesitated" and "never questioned" Ms. Woolley about why she was being asked to be "little mama" of the house.[794] Rather, Dawna made sure that she and her brothers and sisters did their "schoolwork, … that they ate, showered, and brushed their teeth."[795] "Because of this, Dawna and [Ms. Woolley] had a deep connection that is difficult to explain. She was more than [Ms. Woolley's] daughter, she was also [her] best friend, [her] confidant, and the person whom [Ms. Woolley] trusted the most."[796]

461.　　On November 4, 2019, Ms. Woolley was in Colonia LeBaron, Mexico for her grandchild's wedding, and both she and Dawna were excited for the time they would get to spend together.[797]

---

[790] Testimony of Karen Woolley, Tr. 263:16.
[791] Declaration of Karen Woolley, Ex. 48, ¶ 6; Testimony of Karen Woolley, Tr.  266:15-18.
[792] Declaration of Karen Woolley, Ex. 48 ¶ 6, 9; Jonathan Ray Guardianship Documents, Ex. 23.
[793] Testimony of Karen Woolley, Tr. 269:19-21; Declaration of Karen Woolley, Ex. 48, ¶ 9.
[794] Declaration of Karen Woolley, Ex. 48, ¶ 10.
[795] *Id.*
[796] *Id.* at ¶ 11.
[797] *Id.* at ¶¶ 17-18.

462.     That morning, however, Ms. Woolley had a mother's intuition, a sort of feeling that something was not right.[798]  Ms. Woolley's bad feeling proceeded to get progressively worse, particularly, when around "noonish," Dawna should have but did not arrive in Colonia LeBaron.[799]

463.     Soon thereafter, Ms. Woolley's "daughter Amber, who was white as a sheet, told [Ms. Woolley] that Dawna, T.L., and R.L. were dead."[800] Ms. Woolley "suffer[s] from high blood pressure and upon hearing the news, it spiked, [Ms. Woolley] could not breath, and [she] collapsed. And once [Ms. Woolley] stabilized [her] blood pressure, [she] proceeded to suffer a debilitating panic attack."[801]

464.     Ms. Woolley has suffered two additional, three total, panic attacks as result of the November 4, 2019, massacre.[802] Ms. Woolley has also experienced night terrors since November 4, 2019, and "[t]hese night terrors persist to this day."[803]

465.     And in April of 2021, Ms. Woolley suffered from a stroke that doctors believe was brought on by, among other things, the stress of her daughter and grandchildren's murder.[804]

466.     Ms. Woolley has seen a therapist which has helped "[t]o some degree."[805] Ms. Woolley's therapist has diagnosed Ms. Woolley with PTSD "as she me[ets] all of the criteria, including intrusive thought, nightmares, increased arousal, unpleasant reminders, etc."[806] Dr. Schuurman concurs with this diagnosis, and it is Dr. Schuurman's expert

---

[798] Testimony of Karen Woolley, Tr. 275:17-276:13.
[799] Testimony of Karen Woolley, Tr.  276:2-5.
[800] Declaration of Karen Woolley, Ex. 48, ¶ 19.
[801] *Id.* at ¶ 20.
[802] Testimony of Karen Woolley, Tr. 282:4-9.
[803] Declaration of Karen Woolley, Ex. 48, ¶ 26.
[804] *Id.* at Tr. 282:22-283:6.
[805] *Id.* at Tr. 282:14-17.
[806] Expert Report of Dr. Schuurman, Ex. 26_000018.

opinion that Ms. Woolley is a greater risk for long-term "depressive symptoms, poorer well-being," "more health problems" and "enduring stress."[807]

467.     Ms. Woolley said her family dynamics have changed since the attack, and that she and her whole family feel the profound loss of Dawna – "While the miles remain the same, without Dawna's constant efforts to keep us together, our geographically dispersed family feels more apart than ever.  We do what we can, but we are all kind of drifting asea.  And knowing that we will never again receive that emoji string from Dawna has only exacerbated our distance."[808]

468.     Having examined closely the facts of this particular case, Ms. Woolley should be awarded solatium damages in line with those issued in *Warmbier v. Democratic People's Rep. of Korea*, 356 F. Supp. 3d 20, 59 (D.D.C. 2018), adjusted for inflation.[809] The values in *Warmbier* for parent solatium claims was $15,000,000.00, and adjusted for the 12% inflation since the *Warmbier* case was decided, the Court awards solatium damages in the amount of $16,800,000.00.

### (e)     Dawna's Siblings—Jaremy Ray, Justin Ray, James Ray, Jonathan Ray, Kerah Ray, and Amber Ray

469.     As stated *supra*, Dawna Ray was one of Karen Woolley's seven children,[810] Dawna's six (6) brothers and sisters—Jaremy Ray, Justin Ray, Jonathan Ray, James Ray, Kerah Ray, and Amber Ray (collectively, the "Ray's")—are Plaintiffs in this case.[811]

---

[807] *Id.*
[808] Testimony of Karen Woolley, Tr. 283:10-17; Declaration of Karen Woolley, Ex. 48 ¶ 30.
[809] Inflation has risen approximately 12% since *Warmbier* was decided in December 2018 to January 2022. https://www.bls.gov/data/inflation_calculator.htm
[810] Declaration of Karen Woolley, Ex. 48, ¶ 6.
[811] Declaration of Jaremy Ray, Ex. 49, ¶ 3; Declaration of Justin Ray, Ex. 51, ¶ 3; Declaration of Jonathan Ray, by and through, Legal Guardian Karen Woolley, Ex. 53, ¶ 3; Declaration of James Ray, Ex. 52, ¶ 3; Declaration of Kerah Ray, Ex. 50, ¶ 3; Declaration of Amber Ray, Ex. 54, ¶ 3.

470.     Jonathan "was born with autism and required [their] mother to focus much of her attention on his care."[812] So, not only was she Jeremy, Justin, Jonathan, James, Kerah and Amber's sister, Dawna was also their pseudo-mother.[813] Dawna would also, whenever called upon, "do whatever was needed to take care" of Jonathan because she was his "second mother" too.[814] Dawna *never* did anything but show unconditional love for Jonathan."[815]

471.     Dawna and Kerah shared another special relationship growing up: they were roommates.[816] Naturally, they fought, "but it was during this time that [Kerah] developed a special, unique relationship with [her] sister. [Dawna] would tell [Kerah] about her hopes and dreams of one day meeting a Godly man, starting a family with him and having as many children as possible because to Dawna, children were life's blessing. Children were constant reminders of God's ever presence and love."[817]

472.     Dawna was the first of the Ray sisters to have a child so, she was able to (and did) spend hours talking on the phone with Amber and Kerah telling them what to expect, feel, and do during pregnancy and motherhood.[818]

473.     Ms. Woolley and her children have one new family tradition – on the fourth (4th) of every month since November 4, 2019, they get together to "reminisce and remember [Dawna] and [to] honor her."[819]

---

[812] Declaration of Amber Ray, Ex. 54, ¶ 4.

[813] Declaration of Kerah Ray, Ex. 50, ¶ 4; Declaration of Amber Ray, Ex. 54, ¶ 4; Declaration of Justin Ray, Ex. 51, ¶ 4.

[814] Declaration of Karen Woolley, Ex. 48, ¶ 10.

[815] Declaration of Jonathan Ray, by and through, Legal Guardian Karen Woolley, Ex. 53, ¶ 8; Declaration of Karen Woolley, Ex. 48, ¶ 10.

[816] Declaration of Kerah Ray, Ex. 50, ¶ 5.

[817] *Id.* at ¶ 6

[818] Declaration of Kerah Ray, Ex. 50, ¶¶ 10, 11; Declaration of Amber Ray, Ex. 54, ¶ 17.

[819] Declaration of Amber Ray, Ex. 54, ¶ 18.

474.       Kerah's son was "getting married in Chihuahua, Mexico on November 8, 2019."[820] So on November 4, 2019, Dawna and her children set out from La Mora for the wedding.[821]

475.       But before she hit the road, Dawna called Kerah and they talked about how it had been too long and about how excited they were "to see each other, to have the family back together and to having the long overdue family cook out."[822] Dawna also messaged Amber and asked if she could make "an appointment for her to have a massage when she arrived."[823] And she called her brother Justin to discuss her and the kids staying with him for the week.[824]

476.       "[A]round 11:00 a.m." when Dawna and the children should have been arriving in Colonia LeBaron, the Rays learned "that Rhonita LeBaron's truck was found on fire and that Dawna and Christina Langford were missing."[825] Amber called Justin "to see if he had additional information" because, in addition to the shocking news about Rhonita, it was Amber's belief "that a cartel had kidnapped Dawna and her children and Christina."[826]

477.       Rather than sit and wait for answers and endure the ensuing chaos and confusion, Justin left to search for his sister, nieces, and nephews.[827] Kerah, Amber and their "family and friends went to the Church to pray."[828]

478.       "Things soon took a turn for the worst and began snowballing. [The Rays] learned that Nita and her children [were] killed and burned. And then, around 5 p.m., [D.L.] (who was traveling with Dawna) made it back to La Mora and confirmed that Dawna, Christina,

---

[820] Declaration of Kerah Ray, Ex. 50, ¶ 16.
[821] Testimony of Kenneth Miller, Tr. 41:24-25.
[822] Declaration of Kerah Ray, Ex. 50, ¶ 17.
[823] Declaration of Amber Ray, Ex. 54, ¶ 8.
[824] Declaration of Justin Ray, Ex. 51, ¶ 5.
[825] Id. at ¶ 6; Declaration of Amber Ray, Ex. 54, ¶ 9.
[826] Declaration of Amber Ray, Ex. 54, ¶ 10.
[827] Declaration of Justin Ray, Ex. 51, ¶ 8.
[828] Declaration of Kerah Ray, Ex. 50, ¶ 20.

[T.L.] and [R.L.] were all dead and that his brothers and sisters were still out there-alone, shot and afraid. Everything, in that moment, forever changed. Everything was turned-upside-down, wringed-out and hung-out-to-dry."[829]

479.     Justin was informed that his rescue mission had turned into one of recovery. He was now "going to retrieve [his] sister's and nephews' bodies, which was the worst experience[s]" of his life.[830] Justin saw his sister "slouched over her steering wheel" with "two gunshots in her head and eleven others throughout her body."[831] He saw his nephew T.L. "dead in the second row with his head blown out."[832] And he saw his nephew R.L. "on the front floorboard" with "two or three bullets in him."[833]

480.     Justin "loaded up Dawna and her kids into the back of a flatbed truck," drove to Dawna's house in La Mora, "turned the air conditioning in the master bedroom down as low as it would go, placed the bodies of Dawna, [T.L.] and [R.L.] on the master bed and packed them with ice."[834]

481.     Back in Colonia LeBaron, Dawna's sisters were "inconsolable" and trying to help their mother who was suffering from a panic attack[835] while Dawna's brothers in Utah and North Dakota[836] rushed as quickly as possible to La Mora.

---

[829] *Id.* at ¶¶ 21, 22.
[830] Declaration of Justin Ray, Ex. 51, ¶ 8; *see also* Declaration of Adrian LeBaron, Ex. 36_000041-44 (photographs from Dawna's vehicle on evening of November 4, 2019).
[831] Declaration of Justin Ray, Ex. 51, ¶ 11; *see also* Declaration of Adrian LeBaron, Ex. 36_000041-44 (photographs of Dawna Ray).
[832] Declaration of Justin Ray, Ex. 51, ¶ 12; *see also* Declaration of Adrian LeBaron, Ex. 36_000043 (photograph of T.L.).
[833] Declaration of Justin Ray, Ex. 51, ¶ 13; *see also* Declaration of Adrian LeBaron, Ex. 36_000044 (photograph of R.L.).
[834] Declaration of Justin Ray, Ex. 51, ¶¶ 15-16.
[835] Declaration of Kerah Ray, Ex. 50, ¶ 23; Testimony of Karen Woolley, Tr. 280:13-21.
[836] Declaration of James Ray, Ex. 52, ¶ 4 (Utah); Declaration of Jaremy Ray, Ex. 49, ¶ 5 (North Dakota).

482.     Dawna's murder has "created a hole" in the Rays' lives.[837] It has caused, among other things, Kerah to suffer from anxiety so bad that she was hospitalized for six weeks; Amber to suffer insomnia; and Justin and James to suffer deep depression and loneliness.[838] "Dawna was the glue that held all the family" together, and now that she is gone, the "hurt" and pain can be seen in all the Rays' "eyes" and it can be felt in their presence.[839]

483.     Based upon a thorough review of the record and Dr. Schuurman's expert opinion, that Dawna's death has had, and will continue to have, "profound implications" on the Rays,[840] including but not limited to, "somatic symptoms, depression, and painful feelings of grief," "an elevated mortality risk," and "sense of isolation and alienation from others."

484.     The *Havlish* value for solatium damages for a sibling is $4,250,000.00, and adjusted for inflation,[841] this amount rises to $5,200,000.00.

485.     The Court addresses, *infra.*, Plaintiffs' request for an upward departure from these figures for Plaintiffs Jaremy Ray, Justin Ray, Jonathan Ray, Kerah Ray, and Amber Ray for the loss of their sister Dawna Ray.

### (4) Requests for Upward Adjustments for Solatium Judgments

486.     The *Havlish* numbers are "not set in stone" rather, they "act as a center of gravity for solatium awards, around which a court may vary the final amount based on the facts

---

[837] Declaration of Amber Ray, Ex. 54, ¶ 13.
[838] Declaration of Jaremy Ray, Ex. 49, ¶ 10; Declaration of Justin Ray, Ex. 51, ¶ 18; Declaration of James Ray, Ex. 52, ¶¶ 12, 13; Declaration of Kerah Ray, Ex. 50, ¶ 28; Declaration of Amber Ray, Ex. 54, ¶ 19.
[839] Testimony of Douglas Johnson, Tr. 422:2-8.
[840] *See e.g.* Declaration of Amber Ray, Ex. 54, ¶ 7 (Amber lost her role model); Declaration of Kerah Ray, Ex. 50, ¶ 28 (Kerah hospitalized for six-weeks).
[841] Inflation has risen approximately 23% since *Havlish* was decided in July 2012 to February 2022. https://www.bls.gov/data/inflation_calculator.htm.

and circumstances of a particular case."[842] Adjustments upward or downward from the *Havlish* baseline are "committed to the discretion of the particular court in each case."[843]

487.     "Factors pertinent to the determination of damage enhancements are largely derived from common sense" and adjustments "are generally small relative to the award specified by the developed framework, absent circumstances that appreciably worsen a claimant's pain and suffering, such as cases involving torture or kidnapping."[844]

488.     "In such cases, greater awards are justified because the afflicted party not only had to cope with the grief that follows the loss of a loved one, but—at the time of the event— was also forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive member."[845]

489.     Furthermore, "[c]ourts have previously recognized that whether the victim's death was 'sudden and unexpected' is an issue to consider in the calculation of solatium damages."[846] Because "where the death of a loved one is unforeseen, it can render the shock and grief suffered by family members all the more intense."[847]

490.     Plaintiffs here were "simply living" their lives when their siblings, children, wives and/or children were brutally murdered and "[t]hese circumstances warrant an enhancement" to the standard *Havlish* numbers.[848]

491.     A comparison with other terrorist cases suggests that the Court temper its total enhancement in this case. In *Valore*, the court found that the one family member suffered

---

[842] *Oveissi*, 768 F.Supp.2d at 26; *see also Valore,* 700 F.Supp.2d at 85-86; *Murphy v. Islamic Republic of Iran*, 70 F.Supp.2d 51, 79 (D.D.C. 2010).
[843] *Id.*
[844] *Id.* at 26- 27 (internal citation and quotations omitted); *see also Greenbaum*, 451 F.Supp.2d at 108.
[845] *Id.* at 27.
[846] *Oveissi,* 768 F.Supp.2d at 28 (citing *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 90 (D.D.C. 2002)).
[847] *Id.*
[848] *Id.* at 29.

"several nervous breakdowns", while another lost both her husband and brother in the attack yet it found a 25% upward departure to be more reasonable than the plaintiffs' requested 100% departure.[849] Similarly, courts have found "that 40% upward departures were warranted in (1) a case where one family member testified that her life was irrevocably changed by the attack, and (2) a cases where the family member was forced to quit her job and become a full-time caretaker of her now quadriplegic child"; and that where the decedent's death was the result of "the heinous murder that defendants planned and ordered", a 50% upward adjustment was warranted.[850]

### (a) Miller/LeBaron Family Plaintiffs

492.    In the case of Rhonita and her children, it was initially believed that the decedents were kidnapped[851] which caused Plaintiffs to worry whether the Defendant Juárez Cartel was "going to rape Nita and K.B.M."[852] As stated previously, while no upward adjustment is being sought for Rhonita's parents, upward adjustments are being sought for Rhonita's husband, her surviving children, and her siblings.

### i.   Howard Miller

493.    Howard Miller learned that the "unimaginable"[853] happened via WhatsApp message and phone calls from over a thousand miles away from his wife and children in Mexico. He learned that his wife and four of his children were "burned to death" in what must have been "the most frightening thing that anyone has ever experienced."[854]

---

[849] *Valore,* 700 F.Supp.2d at 86.
[850] *Oveissi*, 768 F.Supp.2d at 30 (internal citations and quotations omitted).
[851] Declaration of Laura Corina LeBaron, Ex. 39, ¶ 11; Declaration of Adriana Jones, Ex. 46, ¶ 17;Testimony of Adrian LeBaron-Soto, Tr. 202:6-13.
[852] Testimony of Adriana Jones, Tr. 507:5-13.
[853] Testimony of Dr. Schuurman, Tr. 481:12.
[854] Testimony of Dr. Schubl, Tr. 160:21-161:3.

494.     Even after seeing the videos[855] and speaking with family members who confirmed that Rhonita and the kids were in the vehicle and had died—Mr. Miller held "out hope kind of in nonbelief … maybe hoping they [his family] could have got out or something."[856]

495.     His hope was shattered when he saw Rhonita, H.M. Jr., K.B.M., T.A.M. and T.G.M.'s remains in the vehicle.[857] The tragic loss of his wife, first son, eldest daughter and youngest twins, in such a barbaric and sadistic manner, warrants an enhancement to the standard *Havlish* numbers.

496.     The intensity of this pain, and hurt is ever-present in Mr. Miller's eyes since the attacks.[858] He is "numb", "in shock," and struggling "[b]e strong; be a man; be tough; keep [his] feelings inside."[859] He is struggling with the fact that the Defendant murdered his soul mate[860] and stole from him the opportunity to teach H.M. Jr. how to golf,[861] walk his daughter (and favorite child) down the aisle at her wedding[862] and opportunity to hear T.A.M. and T.G.M. call him "Daddy."[863]

497.     According to his family, before the attack Howard was "a happy, goofy giant, always laughing, smiling, just full of life.[864] "After the attacks he changed."[865] "He's closed up"[866] and "[closed] into himself."[867] According to Dr. Schuurman, this places Mr. Miller at higher risk of longstanding emotional and physical difficulties.[868]

---

[855] Video taken by Kenny Miller, "Nita is Shot Up" Ex. 8.
[856] Testimony of Howard Miller, Tr. 185:10-13.
[857] *Id.* Tr. 185:14-15; *see* Family Photos of Miller Attack Scene (Day), Ex. 18.
[858] Testimony of Douglas Johnson, Tr. 419:12-13.
[859] Testimony of Dr. Schuurman, Tr. 464:20 – 465:5.
[860] *See* Declaration of Howard Miller, Ex. 30 at ¶¶ 7, 53.
[861] Declaration of Howard Miller, Ex. 30, ¶ 56.
[862] *Id.*
[863] *Id.*
[864] Testimony of Douglas Johnson, Tr. 419:10-12; *see also* Testimony of Adriana Jones, Tr. 505:18.
[865] Testimony of Douglas Johnson, Tr. 419:12.
[866] *Id.* at Tr. 419:13.
[867] Testimony of Kenneth Miller, Tr. 68:7.
[868] Testimony of Dr. Schuurman, Tr.  465:21-24.

498.     It is Dr. Schuurman's expert opinion that Mr. Miller "behaviors and 'symptoms' are consistent with trauma reactions and PTSD, including dissociative reactions, and persistent avoidance of reminders that arouse memories or thoughts associated with the traumatic events" of November 4, 2019.[869]

499.     As detailed above, Mr. Miller's "lifetime of suffering constitutes the exact sort of acute feeling of permanent loss or change caused by decedent's absence that warrants an upward departure" from the standard *Havlish* valuation.[870]

500.     This is not a situation where the connexity between the murder and the family member is attenuated. Howard Miller arrived on the scene to see the charred remains of his wife and four of his children as they had not yet been removed—by other family members in conjunction with the Mexican authorities—from the scene.  He slept with his three surviving children in the room with his murdered family's remains that night.[871]

501.     As set forth, *supra.*, the *Havlish* numbers—taking into consideration an adjustment for inflation, places Howard Miller's pain and suffering for the loss of his wife at $15,300,000.00 and for the loss of each of his four children at $10,400,000.00 for a total pain-and-suffering judgment of $56,900,000.00.   Plaintiffs herein have requested an upward departure in the range of 10-20% given the egregious circumstances surrounding this event and Mr. Miller's suffering.  Such an upward departure would render his solatium damages for the loss of his wife between $16,830,000.00 and $18,360,000.00 and his solatium damages for the loss of his four children between $45,760,000.00 and

---

[869] Expert Report of Dr. Schuurman, Ex. 26_000011.
[870] *Oveissi*, 768 F.Supp.2d at 29 (citing *Valore,* 700 F.Supp.2d at 86) (internal quotations omitted).
[871] Testimony of Howard Miller, Tr. 186:5-14.

$49,920,000.00 for a total solatium damages of between $62,590,000.00 and $68,280,000.00.

502.     In the exercise of the Court's discretion, the Court here determines that it will award an upward adjustment of 20% for the solatium damages judgments for Plaintiff Howard Miller rendering his total solatium-damages judgment amount $68,280,000.00 for the loss of his wife, K.B.M., H.M. Jr., T.A.M., and T.G.M..

### ii.  T.M., A.M., and Z.M.

503.     Rhonita's surviving children have also significantly suffered followed the death of their mother and four siblings.   T.M. "[has] suffered bad."[872] He was initially "crying himself to sleep for hours. He didn't want to sleep alone. Even if he fell asleep alone, he would wake up and go"[873] "pounding, … screaming, yelling"[874] on the door of an adult's bedroom door just to "crawl into the bed"[875] next to them. These "nightmares" are in addition to his being "afraid all the time," being "scared to death at every noise" and his difficulty "coping" "when it gets dark."[876] In short, "[h]is sense of security is deep" and it is Dr. Schuurman's expert opinion that "ultimately, that type of anxiety is not going to serve him well."[877]

504.     It is also Dr. Schuurman's expert opinion that T.M. "is suffering from symptoms consistent with PTSD … including recurrent distressing dreams related to the traumatic series of events that killed his mother and siblings, intense and persistent anxiety, and dissociative reactions. T.M. (like his father) appears to be 'stuffing' his feelings, and

---

[872] Testimony of Douglas Johnson, Tr. 420:14, 17.
[873] Testimony of Dr. Schuurman, Tr. 468:1-3.
[874] *Id.* Tr. 420:21.
[875] *Id.* Tr. 420:24-25.
[876] Testimony of Dr. Schuurman, Tr. 468:4; 468:12-15.
[877] *Id.* at Tr. 468:16:17.

displaying anxiety, separation anxiety, and post-traumatic stress symptoms. While these responses are understandable given what he has experienced, the short-term as well as long-term impact will take a toll on his physical, emotional, and mental health."[878]

505.     A.M. has "cerebral palsy"[879] which is affecting "the whole left side of her body"[880], and on November 4, 2019, A.M. "lost her mother, her caretaker, her protector",[881] her oldest and youngest brothers and both of her sisters as a result of the depraved acts of the Defendant. Her mother was supposed to be there for A.M. as she "gr[e]w developmentally, everything from … all [her] successes, [her] recitals, [her] graduating from high school, [her] first dates, [her] getting attracted to a boy"; she was supposed to be there at "her wedding" and be a "grandmother" to A.M.'s children.[882] A.M. will feel the pain and sorrow of her mother's absence at all these events as she grows up.[883]

506.     "A.M. is going to need specialized medical and psychological care as she grows up. Her mother was the driving force behind getting the physical therapy she needs, and although other family members have worked to help her, there is no substitute for her mother and her mother's love.[884] As such, "she will experience, and does already experience, estrangement and 'feeling different' from other girls who have their mothers. That, combined with her physical challenges, has been extremely difficult and will continue to be an ongoing challenge as she grows through puberty and into adulthood."[885]

---

[878] Expert Report of Dr. Schuurman, Ex. 26_000012.
[879] Testimony of Howard Miller, Tr. 174:19.
[880] *Id.* Tr. 174:21.
[881] Declaration of Adriana Jones, Ex. 46, ¶ 38.
[882] Testimony of Dr. Schuurman, Tr. 469:19-25.
[883] *Id.* Tr. 470:1; *see also* Howard Miller Declaration, Ex. 30, ¶ 55 (A.M. will miss her mother making "cheesy potatoes for her birthday").
[884] Expert Report of Dr. Donna Schuurman, Ex. 26_000013.
[885] *Id.*

507.     While Z.M. was "only" three years old when his mother and siblings were murdered, Dr. Schuurman testified, "if we as adults learned as many new words a day as your average three-year-old, we'd all be geniuses. So while [Z.M. couldn't] verbalize as well" at three, he was certainty "observing" and "taking in what's going" on.[886] In addition, irrespective of what Z.M. understood at "three, as he grows older, he will learn more and more and understand better what happened to his mother and siblings."[887] This will lead, in Dr. Schuurman's expert opinion, to a feeling of being "cheated" for Z.M. "as opposed to [his] older siblings" because he will not "necessarily have memories of" his mother and siblings.[888] "People can show photos and they can talk about [Z.M.'s] mother and siblings," but unlike T.M and A.M, Z.M will not "have the same memories."[889]

508.     "Z.M. will need assistance to channel his anger and frustration in positive ways, as well as getting nurturing that he would have received from his mother. Z.M. appears to have internalized the 'be strong' and 'keep it inside' coping of his father and older brother T.M., and the research suggests that children who do so are at risk for greater adverse outcomes."[890] Dr. Schuurman further opines that Z.M. is at elevated risk for "development of traumatic memories, images, and post-traumatic stress symptoms" as well as "psychological, emotional, and relational challenges."[891]

509.     As set forth *supra* the *Havlish* numbers—taking into consideration an adjustment for inflation, places T.M.'s, A.M.'s, and Z.M.'s solatium damages for the loss of their mother at $10,400,000.00 and for the loss of each of their four siblings at $5,200,000.00

---

[886] Testimony of Dr. Schuurman, Tr. 470:22 – 471:2.
[887] *Id.* at Tr. 471:3-5.
[888] *Id.* at Tr. 471:8-10.
[889] *Id.* at Tr. 471:10-12
[890] Expert Report of Dr. Donna Schuurman, Ex. 26_000013.
[891] *Id. at* Ex. 26_000014.

for a total solatium-damages judgment of $31,200,000.00 each.  Plaintiffs herein have requested an upward departure in the range of 10-20% given the egregious circumstances surrounding this event and the suffering of these three minor children.  Such an upward departure would render their solatium damages for the loss of their mother between $11,440,000.00 and $12,480,000.00 and their solatium damages for the loss of their four siblings between $22,880,000.00 and $24,960,000.00 for a total solatium damages judgment of between $34,320,000.00 and $37,440,000.00 each.

510.　　In the exercise of the Court's discretion, the Court here determines that it will apply a 20% upward adjustment for the solatium-damages judgments for Plaintiffs T.M., A.M., and Z.M. rendering their total solatium-damages judgment amounts $37,440,000.00  each for the loss of their mother and their siblings K.B.M., H.M. Jr., T.A.M., and T.G.M.

### iii. Rhonita's Siblings

511.　　Taken together, the circumstances detailed *supra*, along with the heinous murder of Rhonita, H.M. Jr., K.B.M., T.A.M. and T.G.M. has had a profound impact on *all* of Rhonita's siblings.[892] It is Dr. Schuurman's expert opinion, which the Court shares, that "[l]osing a sibling means the loss of a companion, confidante, role model, and friend. Siblings' identities are intricately connected because they share similar histories so that when of them dies, the survivors essentially lose part of themselves."[893] Rhonita's death "also carries high risk factors for  … psychological, emotional, and relational challenges" for Rhonita's siblings and because of the brutality of her murder, they are also at an

---

[892] *See* Declaration of Rholena Lian Johnson, Ex. 47, ¶¶ 26 - 28; Declaration of Melissa Conklin, Ex. 45, ¶¶ 15-19; Testimony of Adriana Jones, Tr. 504: 3-9; Declaration of Laura Corina LeBaron, Ex. 39, ¶¶ 19, 20; Declaration of William LeBaron, Ex. 41, ¶¶ 18-20; Declaration of Ruthila LeBaron, Ex. 44, ¶¶ 17, 18; Dayer LeBaron Transcript, Tr. 123:10-15; Miguel LeBaron Declaration, Ex. 40, ¶¶ 24, 25. Declaration of Javier LeBaron, Ex. 42, ¶¶ 16, 17; Declaration of Matthew LeBaron, Ex. 38, ¶ 19.
[893] Expert Report of Dr. Schuurman, Ex. 26_000018 (internal citation and quotations omitted).

elevated risk for "the development of traumatic memories, images, and post-traumatic stress symptoms."[894]

512.     The LeBaron siblings were forced as a result of the Defendant's abhorrent massacre on November 4, 2019, to *literally* attempt to piece-by-piece, collect, remove debris from, clean and prepare for burial, the remains of their sister Rhonita and nieces and nephews H.M. Jr., K.B.M., T.A.M. and T.G.M. The smells and sights of this cannot and will not ever be forgotten.[895]

513.     A number of these siblings also assisted in the construction of the caskets used to bury their sister, nieces, and nephews.[896]

514.     The testimony and evidence demonstrates the close nature of the relationship between Rhonita and her siblings and the continuing impact of her loss to her siblings. "This lifetime of suffering constitutes the exact sort of acute feeling of permanent loss or change caused by decedent's absence that warrants an upward departure" from the standard *Havlish* valuation.[897]

515.     As set forth, *supra.*, the *Havlish* numbers—taking into consideration an adjustment for inflation, places Rhonita's siblings' solatium damages for the loss of their sister at $5,200,000.00.  Plaintiffs herein have requested an upward departure in the range of 10-20% given the egregious circumstances surrounding this event and the suffering endured by Rhonita's family including the hands-on nature of helping to prepare her remains for

---

[894] *Id.* at 000014.
[895] *See* Testimony of Douglas Johnson, Tr. 414:7-8; Declaration of Adrian LeBaron, Ex. 36_000046-63; Photos of Miller Family Remains Taken by Douglas Johnson, Ex. 73.
[896] Declaration of Dayer LeBaron, Ex. 43, ¶ 17; Declaration of Miguel LeBaron, Ex. 40, ¶ 19; Testimony of Dayer LeBaron, Tr. 118:2-10.
[897] *Oveissi*, 768 F.Supp.2d at 29 (citing *Valore,* 700 F.Supp.2d at 86) (internal quotations omitted).

burial.  Such an upward departure would render each sibling's solatium damages for the loss of their sister between $5,720,000.00 and $6,240,000.00.

516.     In the exercise of the Court's discretion, the Court here determines that it will apply a 20% upward departure for the solatium-damages judgments for each of Rhonita's siblings rendering their solatium-damages judgment amount $6,240,000.00 each for the loss of their sister Maria Rhonita LeBaron.

### (b) Johnson/Langford Family Members

517.     In the case of Christina and her daughter F.M.J., little was known at first because the only information that anyone was providing was with regard to Rhonita's family and what happened to them.  It was only later that information began to trickle down about what happened to Christina, but at that time, it was believed that Christina and Tyler's baby, F.M.J., had also perished in the attack. While no upward departures are being sought for Christina's mother Amelia Sedgwick,Christina's husband, her surviving children, and her siblings are seeking such an upward departure.

### i.   Tyler Johnson

518.     On November 4, 2019, Mr. Johnson was bombarded with questions such as: "have you heard from your wife?", "where is Christina?", "did Christina get there to LeBaron?" "Where's Christina, have you texted her, has she called you, it's been a while."[898] Trying on the exterior to remain calm, the alarm bells and panic inside Mr. Johnson were going off as his WhatsApp messages and calls to Christina "weren't going through." This terror would metastasize into a five-alarm fire as minutes felt like hours.[899]

---

[898] *Id.* at Tr. 366:3-15; Declaration of Tyler Johnson, Ex. 31, ¶ 25.
[899] Declaration of Tyler Johnson, Ex. 31, ¶ 27.

519.     It would be hours "until that evening before"[900] Mr. Johnson would hear "the message say[ing] that Christina and her baby [were] dead."[901] Mr. Johnson "at the time of the event" was "forced to endure unending anxiety and an extended period of extreme distress over the health and safety" of his (presumed) captive wife and daughter.[902]

520.     Upon hearing the initial news that his wife and daughter had been murdered, Mr. Johnson "exited off the balcony," "went and gathered all [his] children" and "locked [himself and his children] in the closet in one of the bedrooms and just fell apart."[903] But his children did not know why their father was deteriorating before their eyes, so he had to tell them that the unimaginable had occurred and that their mother and sister were dead.[904]

521.     Christina and F.M.J.'s (presumed) murder was *unequivocally* "unforeseen" and as a result "the shock and grief" Mr. Johnson and his children experienced that evening and in that closet, and to this day renders Mr. Johnson's pain and suffering "all the more intense."[905]

522.     Mr. Johnson's "pain is palpable."[906] Mr. Johnson battles the "regret and guilt" he feels about allowing Christina to make the drive by herself.[907] And all of Mr. Johnson's "dreams are gone; everything [he] valued doesn't mean anything. [He] feel[s] like [he is] limbo, just trying to raise [his] kids well. But [he] feels like [he] ha[s] no real purpose on a personal level."[908]

---

[900] Testimony of Amelia Sedgwick, Tr. 250:18.
[901] Testimony of Tyler Johnson, Tr. 368:5-6.
[902] *Oveissi*, 768 F.Supp.2d at 27.
[903] Testimony of Tyler Johnson, Tr. 368:21-25.
[904] Declaration of Tyler Johnson, Ex. 31, ¶ 31.
[905] *Oveissi*, 768 F.Supp.2d at 28.
[906] Expert Report of Dr. Schuurman, Ex. 26_000014.
[907] *Id.*; Testimony of Tyler Johnson, Tr. 372:8-12.
[908] Expert Report of Dr. Schuurman, Ex. 26_000014.

523.     It is Dr. Schuurman's expert opinion that Mr. Johnson "is experiencing symptoms of PTSD a[s] well as Major Depressive Disorder, including loss of energy, diminished interests in activities (known as *anhedonia*), depressed mood, feelings of detachment from others, persistent inability to experience positive emotions, and self-blame."[909]

524.     As set forth *supra* the *Havlish* numbers—taking into consideration an adjustment for inflation—places Tyler Johnson's solatium damages for the loss of his wife at $15,300,000.00.  Plaintiffs herein have requested an upward departure in the range of 10-20% given the egregious circumstances surrounding this event and Mr. Johnson's belief on the day of the attack that his baby daughter, F.M.J., had also perished with his wife Christina.  Such an upward departure would render his solatium damages for the loss of his wife between $16,830,000.00 and $18,360,000.00.

525.     In the exercise of the Court's discretion, the Court here determines that it will apply a 20% upward departure for the solatium-damages judgments for Plaintiff Tyler Johnson rendering his solatium-damages judgment amount $18,360,000.00 for the loss of his wife Christina Langford.

### ii.  C.J., J.J., T.J. Jr., H.J., E.J., and F.M.J.

526.     C.J., J.J., T.J. Jr., H.J., E.J., and F.M.J. were between the ages of twelve and seven months when their mother was violently taken from them.  They no longer will have the opportunity to build new memories with their mother or have her present at their weddings, graduations, births of their children, or other key life events. They will also no longer be able to experience the love, support, and guidance their mother would provide for them.

---

[909] *Id.* at 000015.

527.     They will also know that their mother did everything she could to protect one of her children by emerging from her vehicle during the attack to identify herself as a woman in hopes of mercy. Her children will know that the Defendant Juárez Cartel disregarded this fact and murdered their mother after she emerged from the vehicle.

528.     Taken together, the circumstances detailed *supra*, along with the heinous murder of their mother Christina Langford has had a profound impact on *all* her children.[910] It is Dr. Schuurman's expert opinion, which this Court shares, that "[t]here is no measure valid or reliable enough to fully calculate the depth of the loss" these children "have experienced through the traumatic murder[] of their mother. For the rest of their lives, they will grieve and miss their mother's presence and [her] affection, support, protection, comfort, care, advice, assistance, solace, companionship. No one can fully 'replace' [Christina's] role[] as mother[] and caretaker[] for [her] children, no matter how much love and support surrounds them. "[911]

529.     As set forth *supra* the *Havlish* numbers—taking into consideration an adjustment for inflation, places C.J.'s, J.J.'s, T.J. Jr.'s, H.J.'s, E.J.'s, and F.M.J.'s solatium damages for the loss of their mother at $10,400,000.00.  Plaintiffs herein have requested an upward departure in the range of 10-20% given the egregious circumstances surrounding this event and the suffering of these six minor children.  Such an upward departure would render their

---

[910] Testimony of Dr. Schuurman, Tr. 474:6-9 (C.J. "goes into the closet in her bedroom and cries."); Testimony of Amelia Sedgwick, Tr. 258:25 (J.J. "was very angry; very, very angry" following the death of his mother); Expert Report of Dr. Schuurman, Ex. 26_000015 (T.J. Jr. has been defiant when given instruction, contrary to what his mother tried to teach him); Declaration of Amelia Sedgwick, Ex. 32, ¶ 38 (H.J. is "very sad, heartbroken" since the death of his mother); Testimony of Amelia Sedgwick, Tr. 260:18-25 (E.J. has been "traumatized" and "distraught" since his mother's murder)

[911] Expert Report of Dr. Schuurman, Ex. 26_000017; Testimony of Dr. Schuurman, Tr. 479: 12-14 (F.M.J. will have no personal memories of her mother to remember, which will affect her throughout her lifetime).

solatium damages for the loss of their mother between $11,440,000.00 and $12,480,000.00 each.

530.    In the exercise of the Court's discretion, the Court here determines that it will apply a 20% upward departure for the solatium-damages judgments for Plaintiffs C.J., J.J., T.J. Jr., H.J., E.J., and F.M.J. rendering their solatium-damages judgment amounts $12,480,000.00 each for the loss of their mother Christina Langford.

### iii. Christina's Siblings—Elizabeth Langford, Serina Langford, Isaac Langford, and E.L.

531.    In this case, it was believed for seven hours, "that Christina had been kidnapped and was being held for ransom by the cartel."[912]

532.    The circumstances detailed *supra*, along with the heinous murder of Christina Langford has had a profound impact on *all* of Christina's siblings.[913] It is Dr. Schuurman's expert opinion, which this Court shares, that ""[l]osing a sibling means the loss of a companion, confidante, role model, and friend. Siblings' identities are intricately connected because they share similar histories so that when of them dies, the survivors essentially lose part of themselves."[914] As a result, it is Dr. Schuurman's expert opinion that Elizabeth Langford, Serina Langford, Isaac Langford and E.L. are at risk for "serious physical and mental health problems" including "somatic symptoms, depression," "sense of isolation and alienation from others," and "elevated mortality risk."[915]

533.    Christina's siblings all play a role in assisting Tyler and their mother, Plaintiff Amelia Sedgwick, with raising Christina and Tyler's six surviving children.[916]

---

[912] Declaration of Isaac Langford, Ex. 35, ¶ 6.
[913] *See* Declaration of Isaac Langford, Ex. 35, ¶¶ 8-10; Declaration of Serina Langford, Ex. 34, ¶¶ 20-21; Declaration of Elizabeth Langford, Ex. 33, ¶¶ 15-22.
[914] Expert Report of Dr. Schuurman, Ex. 26_000018 (internal citation and quotations omitted).
[915] *Id.* at 26_000018-19.
[916] Testimony of Amelia Sedgwick, Tr. 256:12-23; Declaration of Elizabeth Langford, Ex. 33, ¶¶ 14-19.

534.     E.L.—who is still a minor herself—has been uprooted from her home to move with her mother to assist in caring for her nieces and nephews and has been deprived of the normalcy of a traditional upbringing.[917]

535.     Elizabeth Langford, Serina Langford, Isaac Langford and E.L. are at "high risk" of "hav[ing] psychological, emotional, and relational challenges throughout their lifetimes" which may include, but is not limited to, "the development of traumatic memories, images, and post-traumatic stress symptoms."[918]

536.     As set forth *supra* the *Havlish* numbers—taking into consideration an adjustment for inflation, places Christina's siblings' solatium damages for the loss of their sister at $5,200,000.00.  Plaintiffs herein have requested an upward departure in the range of 10-20% given the egregious circumstances surrounding this event and the suffering endured by Christina's family.  Such an upward departure would render each sibling's solatium damages for the loss of their sister between $5,720,000.00 and $6,240,000.00.

537.      In the exercise of the Court's discretion, the Court here determines that it will apply a 20% upward departure for the solatium-damages judgments for Elizabeth Langford, Serina Langford, Isaac Langford, and E.L. rendering their solatium-damages judgment amount $6,240,000.00 each for the loss of their sister Christina Langford.

### (c) Langford/Ray Family Members

#### i. Dawna's Surviving Children—Crystal Langford, Brandy Spenst, Joseph Cole Langford, Bryce Langford, K.L., D.L., M.L., C.L.X.L., J.L., and B.L.

538.     K.L., D.L., M.L., C.L., X.L., J.L., and B.L. were between the ages of eight months and 14 years old when the Cartel murdered their mother and their siblings T.L. and R.L. as

---

[917] Testimony of Amelia Sedgwick, Tr. 256:24-25, 257:1-22.
[918] Expert Report of Dr. Schuurman, Ex. 26_000014.

they helplessly watched.[919] They experienced and continue to experience mental anguish and grief as result of their own experiences during the massacre and also the heinous murders of their mother and brothers.[920]

539.     They witnessed their mother riddled with bullets, T.L.'s head blown off, and R.L. suffer multiple gunshot wounds.[921] They then tended each other's wounds before painfully trekking their way down the mountain to find help for each other.[922]

540.     Crystal, Brandy, Joseph Cole, Bryce, K.L., D.L, M.L., C.L., X.L., J.L., and B.L. miss the comfort of their mother and the special attention she bestowed upon them.[923] They miss their brothers' company and the opportunity to watch them grow up.[924] They have been uprooted from their family home in Mexico, resulting in a physical rift from family and friends who used to live beside them.[925]

541.     As set forth *supra* the *Havlish* numbers—taking into consideration an adjustment for inflation, places Crystal, Brandy, Joseph Cole, Bryce, K.L., D.L, M.L., C.L., X.L., J.L., and B.L.'s solatium damages for the loss of their mother at $10,400,000.00.  Plaintiffs herein have requested an upward departure in the range of 10-20% given the egregious circumstances surrounding this event and the suffering of these children.  Such an upward departure would render their solatium damages for the loss of their mother between $11,440,000.00 and $12,480,000.00 each. Additionally, the *Havlish* numbers—taking into consideration an adjustment for inflation, places Crystal, Brandy, Joseph Cole, Bryce, K.L.,

---

[919] Declaration of K.L., Ex. 61; Declaration of M.L., Ex. 62; Declaration of D.L., Ex. 63; Declaration of C.L., Ex. 64; Declaration of J.L., Ex. 65; Declaration of David Langford, Ex. 66.
[920] *Id.*
[921] Testimony of K.L., Tr. 295:21-22, 296:23-25; Declaration of Justin Ray, Ex. 51, ¶¶ 11-13; *see also* Declaration of Adrian LeBaron, Ex. 36_000041-44.
[922] Testimony of K.L., Tr. 299:10-13, 297-98:25-14.
[923] Exs. 57-66.
[924] *Id.*
[925] Testimony of K.L, Tr. 292-93:25-7.

D.L., M.L., C.L., X.L., J.L., and B.L.'s solatium damages for the loss of their brothers T.L. and R.L. at $5,200,000.00 each. Plaintiffs herein have requested an upward departure in the range of 10-20% given the egregious circumstances surrounding this event and the suffering of these children. Such an upward departure would render their solatium damages for the loss of their brothers between $5,720,000.00 and $6,240,000.00 each.

542.     In the exercise of the Court's discretion, the Court here determines that it will apply a 20% upward departure for the solatium-damages judgments for Plaintiffs Crystal, Brandy, Joseph Cole, Bryce, K.L., D.L, M.L., C.L., X.L., J.L., and B.L. rendering their solatium-damages judgment amounts $12,480,000.00 each for the loss of their mother Dawna Langford, $6,240,000.00 each for the loss of their brother T.L., and $6,240,000.00 each for the loss of their brother R.L.

### ii.     David Langford

543.     Similar to his children, David Langford experienced severe mental anguish and grief as the result of the murders of his sons and the corresponding loss of society.[926] He must provide guidance and comfort to his children that not only lost their brothers but also their mother.[927]

544.     David also suffered immense mental anguish as he traveled to the scene of the massacre, knowing that an older child and a younger child had died.[928] He had three hours to think about which children the Cartel had forced him to live without for the remainder

---

[926] Declaration of David Langford, Ex. 66.
[927] Testimony of David Langford, Tr. 322:5-19.
[928] *Id.* at Tr. 335:1-8.

of his life. [929] Given that he was a first responder, his last memory of T.L. and R.L. are them "blown to bits." [930]

545.     The massacre has uprooted his family.[931] David left behind his orchards which he had considered a family legacy that his children would continue to foster for generations.[932] But he cannot live near the area that has devastated their lives.[933]

546.     As set forth *supra* the *Havlish* numbers—taking into consideration an adjustment for inflation, places David's solatium damages for the loss of his children T.L. and R.L. at $10,400,000.00 each.  Plaintiffs herein have requested an upward departure in the range of 10-20% given the egregious circumstances surrounding this event and the suffering of these children.  Such an upward departure would render his solatium damages for the loss of his children T.L. and R.L. between $11,440,000.00 and $12,480,000.00.

547.     In the exercise of the Court's discretion, the Court here determines that it will apply a 20% upward departure for the solatium-damages judgments for Plaintiff David rendering his solatium-damages judgment amounts $12,480,000.00  for the loss of his son T.L. and $12,480,000.00 for the loss of his son R.L.

### iii. Dawna's Siblings—Jeremy Ray, James Ray, Jonathan Ray, Justin Ray, Kerah Ray, and Amber Ray

548.     It was initially believed that the Cartel had "kidnapped Dawna and her children."[934] But these reports were wrong as Justin Ray (one of the first on the scene) would, later in the evening of November 4, 2019, recover his sister "slouched over her steering wheel"

---

[929] *Id.* at 335:1-8.
[930] *Id.* at 336:10-15.
[931] *Id.* at Tr. 349-50:17-11.
[932] *Id.* at Tr. 321-22:19-3.
[933] *Id.* at Tr. 349:17-20.
[934] Declaration of Amber Ray, Ex. 54, ¶ 10; Declaration of Justin Ray, Ex. 51, ¶ 6.

with "two gunshots in her head and eleven others throughout her body."[935] He recovered his nephew T.L. who was "dead in the second row with his head blown out."[936] And he recovered his nephew R.L. who was "on the front floorboard" with "two or three bullets in him."[937]

549.     Justin and his brothers and sisters here were "simply living"[938] their lives, excited to see Dawna at  the upcoming wedding and excited to be getting together again for a family cook-out when their sister was brutally murdered.

550.     As Dr. Schuurman testified, "[t]hese deaths cannot be viewed as anything less than unjust"[939] and the "the lack of trust in 'justice' in this case is pervasive."[940]

551.     The closeness of the family and their reliance upon Dawna as a source of wisdom and guidance has been forever lost and replaced with a new family tradition – on the fourth (4th) of every month since November 4, 2019, they get together (using the technology Dawna taught them) to "reminisce and remember [Dawna] and [to] honor her."[941]

552.     As set forth *supra* the *Havlish* numbers—taking into consideration an adjustment for inflation, places Dawna's siblings' solatium damages for the loss of their sister at $5,200,000.00.  Plaintiffs herein have requested an upward departure in the range of 10-20% given the egregious circumstances surrounding this event and the suffering endured

---

[935] Declaration of Justin Ray, Ex. 51, ¶ 11; *see also* Declaration of Adrian LeBaron, Ex. 36_000041-44 (photographs of Dawna Ray).
[936] Declaration of Justin Ray, Ex. 51, ¶ 12; *see also* Declaration of Adrian LeBaron-Soto, Ex. 36_000043 (photograph of T.L.).
[937] Declaration of Justin Ray, Ex. 51, ¶ 13; *see also* Declaration of Adrian LeBaron-Soto, Ex. 36_000044 (photograph of R.L.).
[938] *Oveissi*, 768 F.Supp.2d at 29
[939] Expert Report of Dr. Schuurman, Ex. 26_000008.
[940] *Id.*
[941] Declaration of Amber Ray, Ex. 54, ¶ 18.

by Dawna's family.  Such an upward departure would render each sibling's solatium damages for the loss of their sister between $5,720,000.00 and $6,240,000.00.

553.　　　In the exercise of the Court's discretion, the Court here determines that it will apply a 20% upward departure for the solatium-damages judgments for Jaremy Ray, James Ray, Jonathan Ray, Justin Ray, Kerah Ray, and Amber Ray rendering their solatium-damages judgment amount $6,240,000.00 each for the loss of their sister Dawna Ray.

### d.  Pecuniary Loss

554.　　　In addition to their emotional suffering, certain Plaintiffs also sustained economic or pecuniary damages.  This includes lost wages, funeral expenses, lost benefits, loss of household services, and loss of enjoyment of life.

### (1) *Miller* Plaintiffs

555.　　　The *Miller* Plaintiffs' economic expert, Dr. Stan V. Smith, offered evidence by affidavit that calculated the economic loss for each deceased victim—Maria Rhonita LeBaron, Christina Langford, H.M., Jr., K.B.M., T.G.M. and T.A.M.[942]

556.　　　In calculating pecuniary damages resulting from the deaths of Rhonita and Christina, Dr. Smith considered several factors: loss of household/family services; loss of value of life; and loss of society or relationship. [943] Dr. Smith considered estimated life expectancy if they had not been killed by the Defendant on November 4, 2019, among other factors, to calculate the damages that resulted from their murders.[944]

557.　　　For the loss of household/family services, Dr. Smith analyzed contributions to the household through housekeeping and household management services; advice and

---

[942] Expert Report of Dr. Stan Smith, Ex. 27.
[943] *See Id.* Ex. 27_000009-18 (Christina); 000188-000199 (Rhonita).
[944] *See Id.* Ex. 27_000008 (Christina); 000187 (Rhonita).

guidance the adult decedents would have given their surviving families; accompaniment services they would have participated in with their surviving families.[945]

558.    For Rhonita, Dr. Smith also analyzed the contribution she made to A.M's therapy for cerebral palsy.[946]

559.    For H.M. Jr., K.B.M., T.A.M., and T.G.M., the pecuniary damages include loss of household/family services, loss of value of life, and loss of society or relationship discussed above.[947]  In addition, loss of wages and employee benefits are part of the calculation for the deceased children.  Dr. Smith's methodology for calculating each child's lost wages and benefits included looking at the parents' education level and career.[948]  He set up two scenarios based on Rhonita's and Howard Miller's education levels and estimated the average earnings based on information from the U.S. Department of Labor.[949]  Dr. Smith then accounted for personal consumption to offset the income total.[950]  He applied the personal consumption offset to both wage scenarios and created a chart to reference depending on the age the child stopped working.[951]

560.    Due to the uncertainty of how much schooling the children would have pursued, Dr. Smith provided two scenarios in his calculations.[952]

561.    In the report provided for Rhonita LeBaron, Dr. Smith provides the monetary damages that would be award to the estates of the deceased victims as well as the damages for their surviving family members.

---

[945] *Id.* at Ex. 27_000009-15 (Christina); 000188-000194 (Rhonita).
[946] *Id.* at 000194-195.
[947] *Id.* at 000447-454 (H.M. Jr.); 000555-562 (K.B.M.); 000647-654 (T.A.M.); 000741-74A8 (T.G.M.).
[948] *Id.* at 000445-447 (H.M. Jr.); 000553-555 (K.B.M.); 000645-647 (T.A.M.); 000739-741 (T.G.M.).
[949] *Id.*
[950] *Id.*
[951] *Id.*
[952] *Id.*

562.     In the analysis of pecuniary damages for each of the *Miller* Plaintiffs, Dr. Smith used well-accepted methodologies in economics to calculate the losses using multiple categories and scenarios to account for differences in age, educations, and lifestyle.

563.     The analysis conducted by Dr. Smith in this case is similar to that which Dr. Smith performed in *Havlish*, and as the court in *Havlish* found, this Court finds Dr. Smith's calculations to be "reasonable, and yield economic damages comparable to those in other cases." [953] Dr. Smith calculated the *Miller* economic damages to the victims as follows.

564.     The economic damages related to the death of Rhonita LeBaron:

| Rhonita LeBaron | | |
|---|---|---|
| **Plaintiff** | **Total Economic Loss to Plaintiff** | **Citation** |
| Estate | $7,970,160.00[954] | Ex 27_000209-10 |
| Adrian LeBaron-Soto | $726,149.00[955] | Ex 27_000209-10 |
| Bathsheba Tucker | $950,819.00 | Ex 27_000209-10 |
| Rholena Johnson | $1,240,675.00 | Ex 27_000209-10 |
| Melissa Conklin | $1,308,506.00 | Ex 27_000209-10 |
| Adriana Jones | $1,299,899.00 | Ex 27_000209-10 |
| Laura LeBaron | $1,330,552.00 | Ex 27_000209-10 |
| William LeBaron | $1,325,583.00 | Ex 27_000209-10 |
| Ruthila LeBaron | $1,437,822.00 | Ex 27_000209-10 |
| Dayer LeBaron | $1,424,945.00 | Ex 27_000209-10 |
| Javier LeBaron | $1,462,555.00 | Ex 27_000209-10 |
| Miguel LeBaron | $1,497,138.00 | Ex 27_000209-10 |
| Matthew LeBaron | $1,545,638.00 | Ex 27_000209-10 |

---

[953] *Havlish*, 2012 U.S. Dist. LEXIS 110673, at *98-*99*, adopted in its entirety by Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 143525 (S.D.N.Y. Oct. 3, 2012).

[954] The value of pecuniary loss attributed to the estate claimants reflects the totals of Loss of Wages & Benefits, Net of Personal Consumption, Loss of Household/Family Housekeeping and Home Management Services, and Loss of Value of Life.

[955] The value of pecuniary loss attributed to family members of decedents includes Loss of Household/Family Guidance Services, Loss of Household/Family Accompainment Services, and Loss of Society and Relationship.

565.      The economic damages to the Estate related to the death of H.M. Jr.:

| H.M. Jr. | | |
|---|---|---|
| Plaintiff | Total Economic Loss to Plaintiff | Citation |
| Estate - Scenario 2[956] | $8,153,448.00 | Ex 27_000465 |

566.      The economic damages to the Estate related to the death of K.B.M.:

| K.B.M. | | |
|---|---|---|
| Plaintiff | Total Economic Loss to Plaintiff | Citation |
| Estate – Scenario 2 | $7,784,430.00 | Ex 27_000573 |

567.      The economic damages to the Estate related to the death of T.A.M.:

| T.A.M. | | |
|---|---|---|
| Plaintiff | Total Economic Loss to Plaintiff | Citation |
| Estate - Scenario 2 | $8,861,742.00 | Ex 27_000665 |

568.      The economic damages to the Estate related to the death of T.G.M.:

| T.G.M. | | |
|---|---|---|
| Plaintiff | Total Economic Loss to Plaintiff | Citation |
| Estate - Scenario 2 | $8,337,358.00 | Ex 27_000759 |

[956] The Court hereby endorses "Scenario 2" for each of the children who were killed as it maximizes the damages for these horrific events and accounts for some level of post-secondary education for each child.

569.     Plaintiff Howard Miller's economic damages related to the death of his wife, Rhonita LeBaron, and his four deceased children—H.M. Jr., K.B.M., T.A.M., and T.G.M.:

| Howard Miller | Total Figure | Citation |
|---|---|---|
| Rhonita | $2,744,453.00 | Ex 27_000209-10 |
| H.M. Jr. | $1,352,118.00 | Ex 27_000465 |
| K.B.M. | $1,325,168.00 | Ex 27_000573 |
| T.A.M. | $1,194,348.00 | Ex 27_000665 |
| T.G.M. | $1,194,348.00 | Ex 27_000759 |
| **Total Loss to Howard Miller Sr.** | **$7,810,435.00** | |

570.     Plaintiff T.M.'s economic damages related to the death of his mother, Rhonita LeBaron, and four brothers and sisters—H.M. Jr., K.B.M., T.A.M., and T.G.M.:

| T.M. | Total Figure | Citation |
|---|---|---|
| Rhonita LeBaron | $3,194,656.00 | Ex 27_000209-10 |
| H.M. Jr. | $1,783,485.00 | Ex 27_000465 |
| K.B.M. | $1,798,632.00 | Ex 27_000573 |
| T.A.M. | $1,626,644.00 | Ex 27_000665 |
| T.G.M. | $1,626,644.00 | Ex 27_000759 |
| **Total Economic Loss to T.M.** | **$10,030,061.00** | |

571.     Plaintiff A.M.'s economic damages related to the death of her mother, Rhonita LeBaron, and four brothers and sisters—H.M. Jr., K.B.M., T.A.M., and T.G.M.:

| A.M. | Total Figure | Citation |
|---|---|---|
| Rhonita LeBaron | $3,734,033.00 | Ex 27_000209-10 |
| H.M. Jr. | $1,858,107.00 | Ex 27_000465 |
| K.B.M. | $1,909,405.00 | Ex 27_000573 |
| T.A.M. | $1,794,686.00 | Ex 27_000665 |
| T.G.M. | $1,794,686.00 | Ex 27_000759 |
| **Total Economic Loss to A.M.** | **$11,090,917.00** | |

572.     Plaintiff Z.M.'s economic damages related to the death of his mother, Rhonita

LeBaron, and four brothers and sisters—H.M. Jr., K.B.M., T.A.M., and T.G.M.:

| Z.M. | Total Figure | Citation |
|---|---|---|
| Rhonita | $3,538,881.00 | Ex 27  000209-10 |
| H.M. Jr. | $1,836,347.00 | Ex 27  000465 |
| K.B.M. | $1,887,645.00 | Ex 27  000573 |
| T.A.M. | $1,769,450.00 | Ex 27  000665 |
| T.G.M. | $1,769,450.00 | Ex 27  000759 |
| **Total Economic Loss to Z.M.** | **$10,801,773.00** | |

573.     The economic damages related to the death of Christina Langford:

| Christina Langford | | |
|---|---|---|
| **Plaintiff** | **Total Economic Loss to Plaintiff** | **Citation** |
| Estate | $7,710,017.00 | Ex 27_000028 |
| Tyler Johnson Sr. | $4,132,610.00 | Ex 27_000028-29 |
| C.J. | $3,020,645.00 | Ex 27_000028-29 |
| J.J. | $3,081,303.00 | Ex 27_000028-29 |
| T.J. Jr. | $3,229,694.00 | Ex 27_000028-29 |
| H.J. | $3,423,974.00 | Ex 27_000028-29 |
| E.J. | $3,551,362.00 | Ex 27_000028-29 |
| F.M.J. | $3,747,500.00 | Ex 27_000028-29 |
| Amelia Sedgwick | $914,662.00 | Ex 27_000028-29 |
| E.L. | $1,630,834.00 | Ex 27_000028-29 |
| Elizabeth Langford | $1,524,309.00 | Ex 27_000028-29 |
| Serina Langford | $1,544,444.00 | Ex 27_000028-29 |
| Isaac Langford | $1,432,556.00 | Ex 27_000028-29 |

574.     While Dr. Smith was not asked to opine on the economic impact of Dawna's death

on her surviving family members, it is possible to use the numbers established with

Rhonita, K.B.M., H.M. Jr., T.A.M., T.G.M., and Christina's estates to extrapolate the

following general guidelines for the Ray family members who are Plaintiffs in the *Miller*

case (Karen Woolley, Jaremy Ray, James Ray, Justin Ray, Jonathan Ray, Kerah Ray, and Amber Ray) and the economic awards to the various members of the family:

| Dawna Ray | |
| --- | --- |
| Plaintiff | Total Economic Loss to Plaintiff |
| Karen Woolley | $517,644.00[957] |
| Jaremy Ray | $982,722.00[958] |
| Justin Ray | $1,079,486.00[959] |
| James Ray | $1,126,347.00[960] |
| Jonathan Ray | $1,172,228.00[961] |
| Kerah Ray | $1,172,228.00[962] |
| Amber Ray | $1,304,210.00[963] |

575.     In addition to Dr. Smith's evaluation of the losses to Plaintiffs, Plaintiff Dayer LeBaron also submitted evidence by affidavit and live testimony to the lost wages—totaling $308,648.00—he experienced after the November 4, 2019 attack.[964]  Based on the evidence submitted, the Court shall award economic-loss damages to Plaintiff Dayer LeBaron in the amount of $150,000.

[957] Loss of Household/Family Guidance Services: $43,014.00; Loss of Household/Family Accompaniment Service: $40,494.00; Loss of Relationship: $434,136.00.
[958] Loss of Household/Family Guidance Services: $77,282.00; Loss of Household/Family Accompaniment Service: $72,739.00; Loss of Relationship: $832,701.00.
[959] Loss of Household/Family Guidance Services: $86,208.00; Loss of Household/Family Accompaniment Service: $81,140.00; Loss of Relationship: $912,138.00.
[960] Loss of Household/Family Guidance Services: $90,637.00; Loss of Household/Family Accompaniment Service: $85,309.00; Loss of Relationship: $950,401.00.
[961] Loss of Household/Family Guidance Services: $95,045.00; Loss of Household/Family Accompaniment Service: $89,458.00; Loss of Relationship: $987,725.00.
[962] Loss of Household/Family Guidance Services: $95,045.00; Loss of Household/Family Accompaniment Service: $89,458.00; Loss of Relationship: $987,725.00.
[963] Loss of Household/Family Guidance Services: $108,138.00; Loss of Household/Family Accompaniment Service: $101,782.00; Loss of Relationship: $1,094,290.00.
[964] Declaration of Dayer LeBaron, Ex. 43_000003, ¶ 18.

**(2)** *Langford* **Plaintiffs**

576.     Langford Plaintiffs' economic expert, J. Matthew Sims, offered evidence by affidavit that calculated the economic loss for each deceased victim—Dawna Langford, T.L., and R.L.[965] Mr. Sims also evaluated the vocational and rehabilitation losses for K.L., D.L., M.L., C.L., J.L., X.L., and B.L. who witnessed the traumatic murders of Dawna, T.L., and R.L.

577.     For the loss of Dawna Langford's household services, Mr. Sims considered the time Dawna Langford devoted to her family and her contributions to caring for the household, such as cooking, cleaning, gardening, making household purchases, and caring for other household members.[966]  Mr. Sims used Dawna Langford's life expectancy if she had not been murdered on November 4, 2019, to reach a final value for those contributions.[967]  For the minor surviving plaintiffs, Mr. Sims calculated the cost of vocational rehabilitation to compensate for the lingering psychological symptoms that effect schooling and lifelong earning capacity.[968] For the deceased minor plaintiffs, T.L. and R.L., Mr. Sims calculated the loss of earning capacity minus personal consumption.[969]

578.     The tables below capture the vocational economic damages calculated by Mr. Sims for the *Langford* Plaintiffs.

579.     As with Dawna's mother and adult siblings *supra*, the expert did not opine on (1) loss of family guidance services, (2) loss of accompaniment, or (3) loss of family society and relationship as economic damages for the deaths of Dawna, T.L., and R.L. However,

---

[965] Expert Report of J. Matthew Sims, Ex. 28.
[966] *Id.* at 14.
[967] *Id.*
[968] *Id.* at 28-29.
[969] *Id.* at 125-26.

case law recognizes that the court should "strive to maintain consistency of awards among plaintiffs in comparable situations." *Goldstein v. Islamic Rep. of Iran*, 383 F. Supp. 3d 15, 19 (D.D.C. 2019). Equity compels that the *Langford* Plaintiffs receive economic damages for loss of guidance, accompaniment, and society for the deaths of Dawna, T.L., and R.L. as established by Dr. Smith. *Id.* Accordingly, the below tables demonstrate the loss of guidance, accompaniment, and relationship as extrapolated from Dr. Smith's calculations and rounded down.

| David | Guidance, Accompaniment, and Relationship |
|---|---|
| T.L. | $1,110,000.00 |
| R.L. | $750,150.00 |
| **Total Economic Loss** | **$1,860,150.00** |

| Crystal, Brandy, Joseph Cole, and Bryce | Guidance, Accompaniment, and Relationship |
|---|---|
| Dawna | $1,200,000.00 |
| T.L. | $1,320,000.00 |
| R.L. | $1,180,000.00 |
| **Total Economic Loss** | **$3,700,000.00** |

| K.L. | Guidance, Accompaniment, and Relationship | Vocational | Combined Total |
|---|---|---|---|
| Dawna | $2,248,000.00 | $32,354.00[970] | |
| T.L. | $1,680,000.00 | | |
| R.L. | $1,520,000.00 | | |
| **Totals** | **$5,448,000.00** | **$32,354.00** | **$5,480,354.00** |

| D.L. | Guidance, Accompaniment, and Relationship | Vocational | Combined Total |
|---|---|---|---|
| Dawna | $2,990,00.00 | $33,562.00[971] | |
| T.L. | $1,680,000.00 | | |
| R.L. | $1,520,000.00 | | |
| **Totals** | **$6,190,000.00** | **$32,562.00** | **$6,222,562.00** |

| M.L. | Guidance, Accompaniment, and Relationship | Vocational | Combined Total |
|---|---|---|---|
| Dawna | $3,046,000.00 | $35,667.00[972] | |
| T.L. | $1,680,000.00 | | |
| R.L. | $1,520,000.00 | | |
| **Totals** | **$6,246,000.00** | **$35,667.00** | **$6,281,667.00** |

| C.L. | Guidance, Accompaniment, and Relationship | Vocational | Combined Total |
|---|---|---|---|
| Dawna | $3,170,611.00 | $37,220.00[973] | |
| T.L. | $1,680,000.00 | | |
| R.L. | $1,520,000.00 | | |
| **Totals** | **$6,370,611.00** | **$37,220.00** | **$6,407,831.00** |

---

[970] Expert Report of J. Matthew Sims, Ex. 28, at 29-33.
[971] *Id.* at 43-48.
[972] *Id.* at 58-63.
[973] *Id.* at 73-78.

| J.L. | Guidance, Accompaniment, and Relationship | Vocational | Combined Total |
|---|---|---|---|
| Dawna | $3,377,000.00 | $38,026.00[974] | |
| T.L. | $1,781,000.00 | | |
| R.L. | $1,600,000.00 | | |
| **Totals** | **$6,577,000.00** | **$38,026.00** | **$6,796,026.00** |

| X.L. | Guidance, Accompaniment, and Relationship | Vocational | Combined Total |
|---|---|---|---|
| Dawna | $3,468,000.00 | $35,685.00[975] | |
| T.L. | $1,781,000.00 | | |
| R.L. | $1,600,000.00 | | |
| **Totals** | **$6,849,000.00** | **$35,685.00** | **$6,884,685.00** |

| B.L. | Guidance, Accompaniment, and Relationship | Vocational | Combined Total |
|---|---|---|---|
| Dawna | $3,746,500.00 | $37,752.00[976] | |
| T.L. | $1,781,000.00 | | |
| R.L. | $1,600,000.00 | | |
| **Totals** | **$7,127,500.00** | **$37,752.00** | **$7,165,252.00** |

| Estates | Household Services and Vocational | Total |
|---|---|---|
| Dawna | $740,030.00[977] | **$740,030.00** |
| T.L. | $497,188.00[978] | **$497,188.00** |
| R.L. | $485,712.00[979] | **$485,712.00** |

---

[974] *Id.* at 118-23.
[975] *Id.* at 88-93.
[976] *Id.* at 103-08.
[977] *Id.* at 14-16.
[978] *Id.* at 125-32.
[979] *Id.* at 141-48.

### e.  Treble Damages

580.     Finally, 18 U.S.C. § 2333(a) specifically provides that Plaintiffs "shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." The trebling applies not only to economic, but also to non-economic damages (solatium/pain and suffering). [980]

### f.  Pre-Judgment Interest

581.     This Court has discretion to award Plaintiffs' pre-judgment interest from November 4, 2019, until the date of final judgment, "and how to compute—prejudgment interest rests within the sound 'discretion of the court subject to equitable considerations.'"[981]

582.     Courts dealing with other terrorism-related claims arising from the terrorist attacks on September 11, 2001 and the bombings of EgyptAir Flight 648 and UTA Flight 772 have awarded prejudgment interest to "compensate the victims for *any* delay due to litigation" and to prevent terrorists "from profiting from [their] terrorist attacks."[982] "[E]ven where statutory treble damages are available, any erosion of the *trebling* on account of a *denial* of interest undermines the deterrent force of the [ATA].... The denial of prejudgment interest systematically undercompensates victims and undeters putative offenders. We should allow, *indeed require*, such awards."[983]

---

[980] *See, e.g., Caballero v. FARC*, 2020 U.S. Dist. LEXIS 89839, at *14 (S.D. Fla. May 20, 2020).

[981] *Pugh*, 530 F.Supp.2d at 263 (D.D.C. 2008) (internal citation omitted); *see also Turn Key Gaming v. Oglala Sioux Tribe*, 313 F.3d 1087, 1093 (8th Cir. 2002), *quoting Cargill, Inc. v. Taylor Towing Serv., Inc.*, 642 F.2d 239, 241-43 (8th Cir. 1981) (holding "the award of prejudgment interest, in the absence of statutory directives, rests in the discretion of the district court.... Prejudgment interest is to be awarded whenever damages lawfully due are withheld, unless there are exceptional circumstances to justify the refusal").

[982] *Baker v. Socialist People's Libyan Arab Jamahiriya*, 775 F.Supp.2d 48, 86 (D.D.C. 2011) (emphasis added); *see also Pugh*, 530 F.Supp.2d at 264; *Havlish v. bin Laden*, 2012 U.S. Dist. LEXIS 143525, at *82-*83 (S.D.N.Y. Oct. 3, 2012).

[983] *Pugh*, 530 F.Supp.2d at 264 (internal citation and quotations omitted) (emphasis added).

583.      Prejudgment interest is one of the general principals against which Congress created the ATA; as such, this Court chooses to follow its fellow North Dakota district court in *LexMac Energy, L.P.,*[984] and looks to North Dakota law which allows for the recovery of pre-judgment interest, in the discretion of the Court, "in *every* case of oppression, fraud, *or malice*."[985]

584.      The facts as stated *supra* will not be restated; however, the outrageous conduct of Defendant here exceeds the standard for awarding prejudgment interest.

585.      Therefore, the Court awards Plaintiffs' prejudgment interest, on Plaintiffs "economic and non-economic damages,"[986] at a rate of 6.5 percent[987] from November 4, 2019, until the date of this judgment. Under North Dakota law, such prejudgment interest amounts are subject to simple, and not compound, interest.[988]

### g.   Post-Judgment Interest

586.      Section 1961(a) of Title 28 of the United States Code provides that post-judgment "[i]nterest **shall** be allowed on **any** money judgment in a civil case recovered in a district court."[989] "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgement."[990]

---

[984] *LexMac Energy, L.P. v. Macquarie Bank Ltd.,* Case No. 4:08-cv-048 (D.N.D.), 2014 U.S. Dist. LEXIS 188438, at *127 (D.N.D. Feb. 19, 2014).
[985] N.D.C.C. § 32-03-05 (emphasis added).
[986] *Gonzalez v. Tounjian*, 665 N.W.2d 705, 717 (N.D. 2003) (internal citation omitted).
[987] N.D.C.C. § 28-20-34; "Interest Rate on Judgments," State of North Dakota Courts, located at https://www.ndcourts.gov/state-court-administration/interest-rate-on-judgments (last visited Mar. 17, 2022).
[988] N.D.C.C. § 28-20-34.
[989] 28 U.S.C. § 1961(a) (emphasis added).
[990] *Id.*

587.    Post-judgment interest "*shall* be compounded annually."[991]

588.    Accordingly, and as the court in *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,[992] this Court finds that Plaintiffs are entitled to post-judgment interest, compounded annually, at a rate equal to the weekly average 1-year constant maturity Treasury yield for the calendar week preceding the date of this final judgment.[993]

### h. Attorney's Fees and Costs

589.    Under 18 U.S.C. § 2333(a), prevailing plaintiffs "shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."

590.    Under a similar statutory scheme utilizing this same language for recovery of "threefold the damages … and the cost of the suit, including attorney's fees", the Eighth Circuit has stated that "an award of reasonable attorney's fees and costs under [this verbiage] is mandatory…."[994]

591.    The *Miller* and *Langford* Plaintiffs have stated their intention to move this Court for an award of attorney's fees and costs and shall submit such motion along with an Affidavit of Attorney's Fees and Costs pursuant to 18 U.S.C. § 2333(a) within twenty (20) days of the Court entering this Order unless such motion and affidavit has already been filed in advance of the entry of this judgment.

## CONCLUSION

For the foregoing reasons, this Court enters these Findings of Fact and Conclusions of Law and awards damages in the following amounts to each Plaintiff in the *Miller* action.

---

[991] 28 U.S.C. § 1961(b) (emphasis added).

[992] *Caballero,* 2020 U.S. Dist. LEXIS 89839, at *7.

[993] Market Yield on U.S. Treasury Securities at 1-year Constant Maturity may be found on the Board of Governors of the Federal Reserve System's website: https://www.federalreserve.gov/releases/h15/default.htm.

[994] *United HealthCare Corp. v. American Trade Ins. Co.*, 88 F.3d 563, 575 (8th Cir. 1996) (interpreting identical language contained in 18 U.S.C. § 1964(c) relating to claims under RICO).

| Plaintiff | Economic Damages | Non-Economic Damages Value (Decedent/ Survivor) | Solatium Damages (Relatives Only) | 20% Departure Value(s) Solatium Award (Relatives Only) | Total Damages Prior to Trebling Under 18 U.S.C. 2333(a) |
|---|---|---|---|---|---|
| Miller Family | | | | | |
| Estate of Maria Rhonita LeBaron | $7,970,160.00 | $45,390,000.00 | | | $53,360,160.00 |
| Estate of H.M. Jr. | $8,153,448.00 | $45,390,000.00 | | | $53,543,448.00 |
| Estate of K.B.M. | $7,784,430.00 | $45,390,000.00 | | | $53,174,430.00 |
| Estate of T.A.M. | $8,861,742.00 | $45,390,000.00 | | | $54,251,742.00 |
| Estate of T.G.M. | $8,337,358.00 | $45,390,000.00 | | | $53,727,358.00 |
| Howard Miller | $7,810,435.00 | | $56,900,000.00 | $68,280,000.00 | $76,090,435.00 |
| T.M. | $10,030,061.00 | | $31,200,000.00 | $37,440,000.00 | $47,470,061.00 |
| A.M. | $11,090,917.00 | | $31,200,000.00 | $37,440,000.00 | $48,530,917.00 |
| Z.M. | $10,801,773.00 | | $31,200,000.00 | $37,440,000.00 | $48,241,773.00 |
| Adrian LeBaron-Soto | $726,149.00 | | $16,800,000.00 | $16,800,000.00 | $17,526,149.00 |
| Bathsheba Shalom Tucker | $950,819.00 | | $16,800,000.00 | $16,800,000.00 | $17,750,819.00 |
| Rholena Lian Johnson | $1,240,675.00 | | $5,200,000.00 | $6,240,000.00 | $7,480,675.00 |

| Plaintiff | Economic Damages | Non-Economic Damages Value (Decedent/ Survivor) | Solatium Damages (Relatives Only) | 20% Departure Value(s) Solatium Award (Relatives Only) | Total Damages Prior to Trebling Under 18 U.S.C. 2333(a) |
|---|---|---|---|---|---|
| Melissa Conklin | $1,308,506.00 | | $5,200,000.00 | $6,240,000.00 | $7,548,506.00 |
| Adriana Jones | $1,299,899.00 | | $5,200,000.00 | $6,240,000.00 | $7,539,899.00 |

| Plaintiff | Economic Damages | Non-Economic Damages Value (Decedent/ Survivor) | Solatium Damages (Relatives Only) | 20% Departure Value(s) Solatium Award (Relatives Only) | Total Damages Prior to Trebling Under 18 U.S.C. 2333(a) |
|---|---|---|---|---|---|
| Laura Corina LeBaron | $1,330,552.00 | | $5,200,000.00 | $6,240,000.00 | $7,570,552.00 |
| William LeBaron | $1,325,583.00 | | $5,200,000.00 | $6,240,000.00 | $7,565,583.00 |
| Ruthila LeBaron | $1,437,822.00 | | $5,200,000.00 | $6,240,000.00 | $7,677,822.00 |
| Dayer LeBaron | $1,424,945.00 | | $5,200,000.00 | $6,240,000.00 | $7,664,945.00 |
| Javier LeBaron | $1,462,555.00 | | $5,200,000.00 | $6,240,000.00 | $7,702,555.00 |
| Miguel LeBaron | $1,497,138.00 | | $5,200,000.00 | $6,240,000.00 | $7,737,138.00 |
| Matthew LeBaron | $1,545,638.00 | | $5,200,000.00 | $6,240,000.00 | $7,785,638.00 |
| **Johnson Family** | | | | | |
| Estate of Christina Langford | $7,710,017.00 | $11,550,000.00 | | | $19,260,017.00 |
| Tyler Johnson | $4,132,610.00 | | $15,300,000.00 | $18,360,000.00 | $22,492,610.00 |
| C.J. | $3,020,645.00 | | $10,400,000.00 | $12,480,000.00 | $15,500,645.00 |
| J.J. | $3,081,303.00 | | $10,400,000.00 | $12,480,000.00 | $15,561,303.00 |
| T.J. Jr. | $3,229,694.00 | | $10,400,000.00 | $12,480,000.00 | $15,709,694.00 |
| H.J. | $3,423,974.00 | | $10,400,000.00 | $12,480,000.00 | $15,903,974.00 |
| E.J. | $3,551,362.00 | | $10,400,000.00 | $12,480,000.00 | $16,031,362.00 |
| F.M.J. | $3,747,500.00 | $7,680,000.00 | $10,400,000.00 | $12,480,000.00 | $23,907,500.00 |
| Amelia Sedgwick | $914,662.00 | | $16,800,000.00 | $16,800,000.00 | $17,714,662.00 |
| Isaac Langford | $1,432,556.00 | | $5,200,000.00 | $6,240,000.00 | $7,672,556.00 |
| Elizabeth Langford | $1,524,309.00 | | $5,200,000.00 | $6,240,000.00 | $7,764,309.00 |
| **Plaintiff** | **Economic Damages** | **Non-Economic Damages Value (Decedent/ Survivor)** | **Solatium Damages** (Relatives Only) | **20% Departure Value(s) Solatium Award** (Relatives Only) | **Total Damages Prior to Trebling Under 18 U.S.C. 2333(a)** |
| Serina Langford | $1,544,444.00 | | $5,200,000.00 | $6,240,000.00 | $7,784,444.00 |
| E.L | $1,630,834.00 | | $5,200,000.00 | $6,240,000.00 | $7,870,834.00 |
| **Ray Family** | | | | | |
| Karen Woolley | $517,644.00 | | $16,800,000.00 | $16,800,000.00 | $17,317,644.00 |

| Jaremy Ray | $982,722.00 | | $5,200,000.00 | $6,240,000.00 | $7,222,722.000 |
| Kerah Ray | $1,079,486.00 | | $5,200,000.00 | $6,240,000.00 | $7,319,486.00 |
| Justin Ray | $1,126,347.00 | | $5,200,000.00 | $6,240,000.00 | $7,366,347.00 |
| James Ray | $1,172,228.00 | | $5,200,000.00 | $6,240,000.00 | $7,412,228.00 |
| Jonathan Ray | $1,172,228.00 | | $5,200,000.00 | $6,240,000.00 | $7,412,228.00 |
| Amber Ray | $1,304,210.00 | | $5,200,000.00 | $6,240,000.00 | $7,544,210.00 |

The Court further awards damages in the following amounts to each Plaintiff in the

*Langford* action:

| Plaintiff | Economic Damages | Non-Economic Damages | Total Solatium Damages | 20% Departure Value(s) Solatium Award (Relatives Only) | Total Damages Prior to Trebling Under 18 U.S.C. 2333(a) |
|---|---|---|---|---|---|
| **Langford Family** | | | | | |
| K.L. | $5,480,354.00 | $10,970,000.00 | $36,400,000.00 | $40,560,000.00 | $57,010,354.00 |
| M.L. | $6,281,667.00 | $10,970,000.00 | $36,400,000.00 | $40,560,000.00 | $57,811,667.00 |
| X.L. | $6,884,685.00 | $10,970,000.00 | $36,400,000.00 | $40,560,000.00 | $58,414,685.00 |
| **Plaintiff** | **Economic Damages** | **Non-Economic Damages** | **Total Solatium Damages** | **20% Departure Value(s) Solatium Award (Relatives Only)** | **Total Damages Prior to Trebling Under 18 U.S.C. 2333(a)** |
| B.L. | $7,165,252.00 | $10,970,000.00 | $36,400,000.00 | $40,560,000.00 | $58,695,252.00 |
| C.L. | $6,407,831.00 | $13,160,000.00 | $36,400,000.00 | $40,560,000.00 | $60,127,831.00 |
| D.L. | $6,222,562.00 | $7,680,000.00 | $36,400,000.00 | $40,560,000.00 | $54,462,562.00 |
| J.L. | $6,796,026.00 | $7,680,000.00 | $36,400,000.00 | $40,560,000.00 | $55,036,026.00 |
| Crystal Langford | $3,700,000.00 | N/A | $39,000,000.00 | $43,160,000.00 | $46,860,000.00 |
| Brandy Spenst | $3,700,000.00 | N/A | $39,000,000.00 | $43,160,000.00 | $46,860,000.00 |
| Joseph Cole Langford | $3,700,000.00 | N/A | $39,000,000.00 | $43,160,000.00 | $46,860,000.00 |

| Bryce Langford | $3,700,000.00 | N/A | $39,000,000.00 | $43,160,000.00 | $46,860,000.00 |
| Estate of Dawna Ray | $740,030.00 | $15,361,500.00 | N/A | N/A | $16,101,530.00 |
| Estate of T.L. | $497,188.00 | $11,550,000.00 | N/A | N/A | $12,047,188.00 |
| Estate of R.L. | $485,712.00 | $11,550,000.00 | N/A | N/A | $12,035,712.00 |
| David Langford | $1,860,150.00 | | $57,200,000.00 | $61,360,000.00 | $63,220,150.00 |

Both economic and non-economic damages are subject to trebling of damages under the

18 U.S.C. § 2333(a).  Accordingly, the final award of damages each Plaintiff in the *Miller* and

*Langford* actions are as follows:

| Miller Family | |
|---|---|
| Plaintiff | Treble Damages |
| Estate of Maria Rhonita LeBaron | $160,080,480.00 |
| Estate of H.M. Jr. | $160,630,344.00 |
| Estate of K.B.M. | $159,523,290.00 |
| Estate of T.A.M. | $162,755,226.00 |
| Estate of T.G.M. | $161,182,074.00 |
| Howard Miller | $228,271,305.00 |
| T.M. | $142,410,183.00 |
| A.M. | $145,592,751.00 |
| Z.M. | $144,725,319.00 |
| Adrian LeBaron-Soto | $52,578,447.00 |
| Bathsheba Shalom Tucker | $53,252,457.00 |
| Rholena Lian Johnson | $22,442,025.00 |
| Melissa Conklin | $22,645,518.00 |
| Adriana Jones | $22,619,697.00 |
| Laura Corina LeBaron | $22,711,656.00 |
| William LeBaron | $22,696,749.00 |

| Ruthila LeBaron | $23,033,466.00 |
|---|---|
| Dayer LeBaron | $22,994,835.00 |
| Javier LeBaron | $23,107,665.00 |
| Miguel LeBaron | $23,211,414.00 |
| Matthew LeBaron | $23,356,914.00 |
| **TOTAL** | $1,799,821,815.00 |

| Johnson Family | |
|---|---|
| Plaintiff | Treble Damages |
| Estate of Christina Langford | $57,780,051.00 |
| Tyler Johnson | $67,477,830.00 |
| C.J. | $46,501,935.00 |
| J.J. | $46,683,909.00 |
| T.J. Jr. | $47,129,082.00 |
| H.J. | $47,711,922.00 |
| E.J. | $48,094,086.00 |
| F.M.J. | $71,722,500.00 |
| Amelia Sedgwick | $53,143,986.00 |
| Isaac Langford | $23,017,668.00 |
| Elizabeth Langford | $23,292,927.00 |
| Serina Langford | $23,353,332.00 |
| E.L | $23,612,502.00 |
| **Total** | **$579,521,730.00** |

| Ray Family | |
|---|---|
| Plaintiff | Treble Damages |
| Karen Woolley | $51,952,932.00 |

| Jaremy Ray | $21,668,166.00 |
| Kerah Ray | $21,958,458.00 |
| Justin Ray | $22,099,041.00 |
| James Ray | $22,236,684.00 |
| Jonathan Ray | $22,236,684.00 |
| Amber Ray | $22,632,630.00 |
| **Total** | **$184,784,595.00** |

| Langford Family | |
|---|---|
| Plaintiff | Treble Damages |
| K.L. | $171,031,062.00 |
| M.L | $173,435,001.00 |
| X.L. | $175,244,055.00 |
| B.L. | $176,085,756.00 |
| C.L. | $180,383,493.00 |
| D.L. | $163,387,686.00 |
| J.L. | $165,108,078.00 |
| Crystal Langford | $140,580,000.00 |
| Brandy Spenst | $140,580,000.00 |
| Joseph Cole Langford | $140,580,000.00 |
| Bryce Langford | $140,580,000.00 |
| Estate of Dawna Ray | $48,304,590.00 |
| Estate of T.L. | $36,141,564.00 |
| Estate of R.L. | $36,107,136.00 |
| David Langford | $189,660,450.00 |
| **Total** | **$2,077,208,871.00** |

The cumulative trebled damages for all of the Plaintiffs is $4,641,337,011.

The Court further awards prejudgment interest to all economic and non-economic damages (including solatium damages) from November 4, 2019 through the date of this final judgment at a rate of 6.5% applied annually, non-compounding.

The Court further awards postjudgment interest to the final judgment amounts in the percentage permitted pursuant to 28 U.S.C. § 1961(a).

**JUDGMENT SHALL BE ENTERED ACCORDINGLY.**

Dated this 24th day of June, 2022.

*/s/ Clare R. Hochhalter*
Clare R. Hochhalter, Magistrate judge
United States District Court